# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

KENNETH COLE,                           )
BRIGITTE BROWN,                         )
                                        )
              Plaintiffs,               )
                                        )
       v.                               )        C.A. No.  05-270 (KAJ)
                                        )
DELAWARE TECHNICAL AND                  )
COMMUNITY COLLEGE,                      )
                                        )
              Defendant.                )

## COMPENDIUM OF UNREPORTED OPINIONS CITED IN DEFENDANT'S  OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

David H. Williams (#616)
Dwilliams@morrisjames.com
James H. McMackin, III ) (#4284)
jmcmackin@morrisjames.com
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900/5849
Attorneys for Defendant

Dated:  April 17, 2006

# TABLE OF CONTENTS

**TAB**

*Baselice v. Philadelphia Federation of Teachers Health,*
2002 WL 827128 (E.D.PA.) .........................................................................A

*Bishop v. Inacom, Inc.,*
1999 WL 1416919 (D.N.J. Dec. 1, 1999)......................................................B

*Clary v. Marley Cooling Tower Company,*
1997 WL 150048 (D. Kan. March 12, 1997)...................................................C

*Daniel v. Skudder Kemper Investments, Inc.,*
2002 WL 1160934 (N.D. Ill. May 23, 2002)...................................................D

*Floyd v. Mellon Bank,*
1991 WL 30755 (E.D.PA.1991) ....................................................................E

*Hamlett v. Gonzales,*
2005 WL 1500819 (N.D. Tex, June 15, 2005) ............................................. F

*Hampton v. Tokai Fin. Servs.,*
2001 WL 881443 (E.D. PA. May 7, 2001).....................................................G

*Hay v. GMAC Mortg. Corp.,*
2003 WL 22133801 (E.D.PA. Sept. 15, 2003) .............................................H

*Kidd. v. Pennsylvania,*
2002 WL 1343624 (3rd Cir. June 19, 2002)................................................... I

*McBride v. Hospital of the University of Pennsylvania,*
2001 WL 1132404 (E.D.PA. September 21, 2001) ........................................J

*Mobley v. City of Atlantic City Police Dept.,*
2000 WL 363692 (D.N.J. March 30, 2000)....................................................K

*Nielsen v. Acorn Corrugated Box Co.,*
2002 WL 1941365 (N.D. Ill. Aug. 21, 2002) ................................................L

*Olabode v. William Hecht Inc.,*
1997 WL 805187 (E.D. PA Dec. 30, 1997)...................................................M

*Robinson v. BT Financial Corporation,*
2003 WL 288402 (W.D. PA Feb. 11, 2003)...................................................N

*Thomas v. Secretary of Health and Human Services,*
    1999 WL 637214 (D. OR. Aug. 20, 1999) ...................................................................O

*Wooley v. Colonial School Dist.,*
    1993 WL 431208 (D. Del. 1993) .................................................................................. P

TAB A

Not Reported in F.Supp.2d
(Cite as: 2002 WL 827128 (E.D.Pa.))

Page 242

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

**Robert BASELICE,**
v.
**PHILADELPHIA FEDERATION OF
TEACHERS HEALTH & WELFARE FUND.**

**No. CIV.A. 01-477.**

May 1, 2002.

MEMORANDUM

DALZELL, J.

**\*1** Robert Baselice brings this age discrimination case against the Philadelphia Federation of Teachers Health & Welfare Fund ("Fund"), his former employer, alleging that he was laid off as retirement coordinator, and given a newly created position of part-time retirement coordinator, because of his age. The alleged adverse job action occurred in the context of the reorganization of the Fund's staff.

Before the Court is defendant's motion for summary judgment.

Background [FN1]

> FN1. These facts are derived by construing the record in the light most favorable to the plaintiff.

The Fund is the employee benefits association which administers the employee health and welfare benefits guaranteed in the collective bargaining agreement between the Philadelphia Federation of Teachers ("Union") and the Philadelphia School District ("School District"). The Fund is a separate entity from the Union. Its employees are Union members, on leave from their positions in the School District, and who pursuant to the collective bargaining agreement between the Union and the School District may return to their original positions in the District at any time. While at the Fund, however, they are not covered by any collective bargaining agreement. They are at-will employees.

Robert Baselice has a Bachelor of Arts Degree in history, a Masters Degree in education, and certifications in elementary school education and as a principal. He worked as an elementary school teacher in the School District for thirteen years and as a staff representative of the Union for two years. In 1983, the Fund hired Baselice as a retirement coordinator. As retirement coordinator, Baselice counseled employees who are planning their retirements; he also took phone calls from retirees who had questions about benefits or claims. [FN2] There is no reason to believe Baselice did not handle these responsibilities effectively.

> FN2. The in-person counseling is known as "retirement counseling." The counseling retirees by phone is known as "benefits counseling."

In the spring of 1999, just prior to the events giving rise to this lawsuit, the Fund had on its staff two retirement coordinators, two benefits coordinators, and one Reading Recovery Specialist. Robert Baselice (age 53) and Dorothea Bell (age 54) were retirement coordinators. Ernest Merriweather (age 55) and Philip Petrone (age 55) were benefits coordinators. Rosalind Johnson (52) was Reading Recovery Specialist. The Fund was governed by the Board of Trustees, and its Chairman, Jack Steinberg. Arthur Steinberg, Jack Steinberg's son, was the Fund's lead coordinator.

In May of 1999, Jack Steinberg summoned Baselice into his office. Arthur Steinberg also was present. Jack Steinberg asked Baselice whether he would be interested in returning to school so that he could then take on additional responsibilities at the Fund. Steinberg said that he had in mind college courses at night in such areas as statistics and educational research. Baselice told Steinberg he was hesitant to return to school because of the impact the stress of school could have on his health. [FN3] Baselice nevertheless said, in effect, if that is what the Steinbergs wanted, he would send for course catalogs. [FN4] Steinberg asked Baselice how long he planned to work at the Fund and remain a School District employee, and Baselice replied, "I told him I would like to work, definitely, three more years, and, hopefully, if my medical condition allowed it, to work three more." Id. at 55.

> FN3. I was a little bit tense because I had not been back to school for, approximately, seven years. And since that time I developed a medical condition, diabetes and high blood pressure, and I told Jack, with Art in attendance, that I was fearful

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



of the stress of, you know, going back to class, taking exams, doing paperwork, how that might impact on my medical condition. Baselice Dep. at 51.

FN4. But if that's what they wanted me to do, I would call the local university and ask for catalogs to be sent to me and see what was being offered in those areas. Id. at 51-52.

On June 1, 1999, about ten days after the May meeting, Jack Steinberg again called Baselice into his office. Arthur Steinberg was again present. Jack Steinberg told Baselice he was to be laid off as retirement coordinator effective the end of the month. He offered Baselice interim work in a full-time capacity during the summer (July and August). He also offered Baselice a position as part-time retirement coordinator effective September. Baselice acquiesced to both positions. Steinberg explained the reason for the layoff was the economic distress of the Fund. Baselice Dep. at 56-59.

*2 At this time, it is undisputed that the Fund was undergoing reorganization. That is, in June, the Fund eliminated two retirement coordinator positions--laying off Robert Baselice as retirement coordinator and Ernest Merriweather as benefits coordinator. The Fund established a new part-time retirement coordinator position, the one Baselice filled. In August, it hired two new employees, James Madgey (age 50) and Crystal Barnett (age 42), to fill a newly created position that consisted of part-time (50%) benefits counseling and part-time (50%) teacher training and development. Thus, the employee roster was: Dorothea Bell was full-time retirement coordinator and Robert Baselice was part-time coordinator; Philip Petrone was benefits coordinator; James Madgey and Crystal Barnett were benefits coordinators/teacher training and development staff; and Rosalind Johnson was Reading Recovery Specialist.

Robert Baselice remained at the Fund until December 1999, when he left voluntarily. Baselice was replaced as part-time coordinator by Janice Bushman (age 65).

Baselice asserts claims of termination based on age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and in violation of the Pennsylvania Human

Relations Act (PHRA), 43 Pa.C.S. § 955, as well as intentional infliction of emotional distress.

While the Complaint alleges age discrimination both with respect to Baselice's downgrade from full-time retirement coordinator to part-time coordinator and his eventual separation from the Fund, since the record discloses no evidence that Baselice's departure from the Fund was anything but voluntary, and Baselice has effectively waived any claim that he was constructively discharged [FN5] from the Fund because of his age by making no argument to that effect, we will analyze alleged age discrimination only with respect to Baselice's downgrade from full-time coordinator to part-time coordinator, not with respect to his departure from the Fund in December of 1999.

FN5. A resignation is not actionable under the ADEA unless it is a constructive discharge, which is measured by the high standard that "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir.1992).

Legal Standard

The Age Discrimination in Employment Act (ADEA) makes it "unlawful for an employer [ ] to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1). Our Court of Appeals has adapted the McDonnell Douglas burden-shifting framework to determine the sufficiency of evidence on summary judgment. Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir.1997); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141-42, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The plaintiff must first produce enough evidence to convince a reasonable finder of fact of the prima facie case. The prima facie case of age discrimination consists of four elements: (1) the plaintiff was a member of the protected class of those forty or older, (2) the plaintiff suffered an adverse employment action, (3) the plaintiff was qualified for the position, and (4) the plaintiff was



Not Reported in F.Supp.2d
(Cite as: 2002 WL 827128, *2 (E.D.Pa.))

replaced by a sufficiently younger person, or there was other sufficient age disparity, to create an inference of age discrimination. [FN6] Keller, 130 F.3d at 1108; Sempier v. Higgins, 45 F.3d 724, 728 (3d Cir.1995).

> FN6. The customary formulation of this prong is that the plaintiff must be "replaced by a sufficiently younger person to create an inference of age discrimination." See, e.g., Keller, 130 F.3d at 1008; Sempier, 45 F.3d at 728. Several appellate decisions hold, however, that the plaintiff need not in all cases be replaced by a younger person. Rather, any age disparity between plaintiff and other employees which creates an inference of age discrimination will suffice. Especially in the reduction in force context, where the plaintiff is not replaced at all, and so cannot be replaced by a younger employee, our Court of Appeals urges a relaxed interpretation of the fourth prong. See Showalter v. Univ. of Pitt. Med. Ctr., 190 F.3d 231, 234-36 (3d Cir.1999); Torre v. Cassio, Inc., 42 F.3d 825, 830-31 (3d Cir.1994); Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 353-354 (3d Cir.1999); Martin v. Healthcare Bus. Res., No. 02-5117, 2002 U.S. Dist. LEXIS 5117, at *16 (E.D.Pa. March 26, 2002).

*3 Second, if the plaintiff can establish a prima facie case, the burden shifts to the defendant. The burden on the defendant is "relatively light." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994). The defendant must "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Id. While the burden of production shifts to the defendant, the burden of persuasion does not, for "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reeves, 530 U.S. at 143. If the defendant cannot meet its burden of production, judgment should be entered for the plaintiff. Keller, 130 F.3d at 1108. If the defendant can articulate a legitimate nondiscriminatory reason for the employment action, the burden returns to the plaintiff. Id.; Fuentes, 32 F.3d at 763.

Third, the plaintiff may overcome summary judgment in one of two ways. "[T]he plaintiff generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons

proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 762.

Under Fuentes, if the plaintiff attempts to use the first method and present evidence from which a reasonable jury could conclude the employer's proffered reason was a pretext or fabrication, the plaintiff generally must do more than show that the employer's purported reason for the employment decision is ill-advised. For "federal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." Keller, 130 F.3d at 1109 (internal punctuation omitted) (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir.1996)). Importantly, the Court in Fuentes stated:

> To discredit the employer's proffered reason, ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for the asserted non-discriminatory reasons.' "

*4 Fuentes, 32 F.3d at 765 (internal citations and internal punctuation omitted).

If the plaintiff attempts to show that discrimination is more likely than not the motivating factor for the adverse job action, he may do so with direct or circumstantial evidence of discrimination. Id. at 764, 767; Keller, 130 F.3d at 1111-13.

Analysis [FN7]

> FN7. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment we view the facts, and any inferences from them, in the light most favorable to the party opposing the motion. Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir.1995). The moving party bears the initial burden of proving that no genuine issue of material fact is in dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party satisfies this initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.' " Id. at 587. The nonmoving party must present "more than a mere scintilla of evidence." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989). At bottom, he must come forward with sufficient evidence to enable a reasonable jury to find in his favor at trial. Id.; Groman, 47 F.3d at 633.

Baselice has not made out a prima facie case that he was laid off as retirement coordinator because of age discrimination. The Fund having decided to eliminate one retirement coordinator position, it had to lay off either Baselice or Bell. Baselice was the younger employee. Since there was no age disparity between Baselice and Bell (or any other employee for that matter) that is consistent with the inference of age discrimination, Baselice cannot make out element four of the prima facie case with respect to his layoff. See Showalter, 190 F.3d at 234-36; Torre, 42 F.3d at 830-31; Sempier, 957 F.2d at 1087.

Since there was, however, an age disparity between Baselice and Barnett and Madgey sufficient to support the inference that age discrimination accounts for the decision of the Fund not to offer Baselice the newly created position of benefits coordinator/teacher trainer and developer after it laid him off as retirement coordinator, we will proceed to examine the Fund's legitimate nondiscriminatory explanation for that decision. [FN8] [FN9] The Fund points to the need to expand its focus on teacher training, and tight budget constraints, as the reasons for the elimination of Baselice's position as retirement coordinator and its hiring of Madgey and Barnett (who were already skilled in teacher training) to undertake teacher training and development. These reasons also

account, in the Fund's view, for its elimination of Merriweather's position as benefits coordinator. The Fund thus meets its burden of production.

> FN8. The difference in age between Baselice and Madgey is four years, and between Baselice and Barnett, twelve years. Construed liberally, this difference is sufficient to support an inference of age discrimination. See Sempier, 45 F.3d at 729-30 (holding that four years and eight years, respectively, was sufficient age difference between plaintiff and other relevant employees to sustain element four of plaintiff's prima facie case).

> FN9. The Fund makes a substantial argument that plaintiff does not meet prong three--that the plaintiff was qualified for the position--with respect to the benefits counselor and teacher trainer and developer position. While Baselice was qualified to perform benefits counseling, he did not have all of the requisite skills to perform teacher training and development programming. Ordinarily, this would disqualify plaintiff as it would preclude him from satisfying prong three of the prima facie case. However, here, the record unequivocally reflects that Jack and Arthur Steinberg considered Baselice for the new position, proposing to send him to school to make up for the shortcomings in his skills. Since the defendants, by their own admission, considered cultivating plaintiff for the newly established job despite the fact that he did not have all the qualifications, the inference remains possible that the real reason it did not give him the job was not because he was not qualified but because of age discrimination. See Torre, 42 F.2d at 830 (" '[T]he nature of the required showing' to establish a prima facie case of disparate treatment by indirect evidence 'depends on the circumstances of the case.' " (quoting Massarsky v. General Motors Corp., 706 F.2d 111, 118 n. 13 (3d Cir.1983)).

According to the affidavit of Jack Steinberg, beginning in 1997, the Fund revised its mission. "Due to the influx of new teachers into the School District, and the constant criticism that teachers were not being trained properly, the Fund decided to become more involved in the professional training and development of teachers." J. Steinberg Aff. at ¶ 4. Rosalind Johnson was hired as "Reading Recovery Specialist." Philip Petrone, benefits coordinator, was given an added responsibility of tracking the scores in the School District on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2002 WL 827128, *4 (E.D.Pa.))

statewide tests. Id. at ¶¶ 4, 19.

In the spring of 1999, the Fund decided to expand its teacher training program. Id. at ¶ 19. Specifically, the Fund set out to improve training of teachers in reading and math; expand teacher training to cover areas of classroom management and classroom support; and intensify tracking of test scores. Id. To implement and sustain these programs, the Fund needed to employ qualified professionals. Id. at ¶ 20. No current employee of the Fund had the necessary skills. Id. at ¶ 21; A. Steinberg at ¶ 9; see also Baselice Dep. at 52-53, 77-78. Furthermore, while teacher training was a new imperative, the Fund had to provide the desired programming within its limited budget, and without adversely impacting the provision of other health and welfare benefits to Union members. J. Steinberg Dep. at ¶ 20.

*5 Although no Fund employee was qualified to perform training and development of teachers, the Fund initially considered sending a coordinator to school at night. Id. at ¶¶ 21-22. Indeed, Jack and Arthur Steinberg met with Baselice in May of 1999 and broached with him the possibility of returning to night school to acquire supplementary education. Based upon Baselice's unenthusiastic reception, see supra notes 1 and 2 and accompanying text, Jack Steinberg and Arthur Steinberg concluded that Baselice was not interested. J. Steinberg Aff. at ¶ 23; A. Steinberg Aff. at ¶ 11.

The Fund thus in the end concluded that it would be best to hire an employee from outside the Fund. It decided not to groom a coordinator from within for several reasons. First, "the Fund did not want to put off instituting the training and development programs for two to three years while someone went to school." Second, "depending on the number of courses the coordinator needed to take to become proficient and the university s/he attended, the cost of sending someone to school could be expensive." Third, the existing collective bargaining agreement was slated to expire in August of 2001. Experience proved that contributions for health and welfare benefits were slack during the first year of any collective bargaining agreement; the Fund therefore thought it prudent to devote resources to teacher training and development before expiration of the contract. J. Steinberg Aff. at ¶ 24.

Accordingly, the Fund sought individuals skilled from outside the Fund, and reorganized its staff to absorb the new hires without unduly impacting its budget. Thus, the Fund eliminated two coordinator positions--one retirement coordinator and one benefits coordinator--and created a part-time retirement coordinator position. It hired two employees, Madgey and Barnett, to perform benefits counseling half the day and teacher training and development programming the other half.

As to the Fund's reason for eliminating Baselice, rather than Bell, as retirement coordinator, that decision was rooted in money. Baselice, who earned $88,510.14 per year, was much more highly paid than Bell, who earned $58,210.80. Id. at ¶ 37. The Fund laid off Merriweather, rather than Petrone, as benefits coordinator because Petrone had developed more versatile skills. Id. a ¶ 27.

Since the Fund has proffered a legitimate nondiscriminatory explanation for Baselice's change in status from full-time to part-time retirement coordinator, the burden returns to Baselice.

*6 Of course, when there is reduction in force or other reorganization of the workplace, such a fact does not necessarily preclude employment discrimination. "If the reduction in force is a sham, or if the employer in a legitimate business cutback uses age to decide which employees to lay off, [the reduction in force] may be a pretext for discrimination." 8 Lex K. Larson, Employment Discrimination (MB) § 132.03 (Oct.1999) (footnotes omitted); see Showalter v. Univ. of Pitt., 190 F.3d 231 (3d Cir.1999) (finding pretext in the context of reorganization); Armbruster v. Unisys Corp., 32 F.3d 768 (3d Cir.1994) (same).

Baselice argues that the Fund has not convincingly demonstrated the need to hire Barnett and Madgey rather than train him to perform the job of teacher trainer and developer/benefits counselor. The very implausibility of its position, he argues, reveals that it is a pretext.

The Fund maintains that neither Baselice nor any other coordinator at the Fund was qualified to do teacher training and development programming. Baselice's own deposition testimony supports the Fund's position. Baselice recalls that Jack Steinberg asked him in the May meeting to consider taking

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



courses in educational research and statistics. Baselice admits that he has little or no education or background in both of those areas. Baselice Dep. at 51-53. Baselice also denies having training and experience in peer intervention, and concedes having no background in behavior modification, apart from using it in the classroom sixteen years ago when he was a teacher. Id. at 77. Baselice also acknowledges having no background in reading recovery and Web page fabrication. Id. at 78. Finally, Baselice's lack of qualifications to perform teacher training and development programming is confirmed by the undisputed fact that Steinberg proposed to send Baselice to school so that he could assume that responsibility.

Baselice reasons that the Fund could have inexpensively trained him to take on the responsibilities that Madgey and Barnett assumed. True, Baselice was qualified to perform benefits counseling, which Madgey and Barnett performed half of the time. However, the undisputed fact remains that Baselice would have had to have gone to school to undertake teacher training and development, and Madgey and Barnett did not. Baselice provides no suggestion of how much such additional school would have cost to support his conclusory assertion that "Plaintiff would not have required a substantial time and monetary investment" in school. Pl.'s Mem. L. in Opp. to Summ. J. at 13. Nor does he venture what classes would have been necessary, and how long such school would have taken to complete.

Baselice also attempts to negate the asserted difference in qualifications between Barnett and Madgey and him. He maintains that there is no discernible difference, and that the proffered difference is merely a pretext for age discrimination. Barnett and Madgey are, as noted, younger than he.

*7 Baselice points out that he has a Masters Degree in education, elementary-education and principal certifications, and taught elementary school for fourteen years. Baselice also was a Union staff representative, as was Barnett. These credentials, impressive as they are, absent other evidence are not weighty enough by themselves to permit a reasonable jury to conclude that Baselice had comparable credentials for teacher training and development to Barnett and Madgey. Barnett was experienced in behavior shaping modification and

elementary reading research and analysis. J. Steinberg Dep. at ¶ 35. Madgey was a peer intervener. He also could help maintain the Fund's Web site. Id. at ¶ 36. Baselice has not presented any evidence that Madgey and Barnett did not have these qualifications, or that Baselice did.

Furthermore, Baselice has not produced evidence discrediting the Fund's assertion about the skills needed for the job--such as statistics, peer intervention, and educational research. Baselice has not deposed Barnett or Madgey about what they do from day to day and what experiences they have, nor has he peeled away with any evidence of his own the Fund's representations about the qualifications necessary to perform teacher training and development. Consequently, Baselice has not demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.' " Fuentes, 32 F.3d at 765.

> Baselice similarly asserts:
> Notably, Mr. Madgey and Ms. Barnett did not possess similar experience to each other, within a particular skill set from which Plaintiff was excluded. Their particular 'qualifications' for the training and development aspect of their positions were as disparate from each other as they were from Plaintiff's.

Pl.'s Mem. L. in Opp. Mot. Summ. J. at 13-14. This observation may be suggestive that the qualifications for the job of benefits coordinator/ teacher training and development programmer were not as rigorous nor as specialized as the defendant has said. The fact alone that Barnett, Madgey and Baselice may, somehow, have different work histories does not convert the Fund's reasons for hiring Barnett and Madgey over Baselice into a pretext. The plaintiff has demonstrated no "weaknesses, implausibilities ... or contradictions", but merely proffers unsupported conclusions.

Baselice next attempts the alternate route of citing evidence from which a reasonable fact finder could conclude that discrimination based on age was more likely than not a motivating or determinative cause of the adverse job action. Fuentes, 32 F.3d at 764. Under this method, he "must point to evidence that proves age discrimination in the same way that



Not Reported in F.Supp.2d
(Cite as: 2002 WL 827128, *7 (E.D.Pa.))

critical facts are generally proved--based solely on the natural probative force of the evidence." Keller, 130 F.3d at 1111. Here, he stresses that he was laid off as retirement coordinator and passed over for the new position of benefits counselor/teacher trainer and developer ten days after he told Jack Steinberg that he only planned to work three to six more years.

The time one will continue to occupy a job is not an automatic surrogate for age. [FN10] It is legitimate for an employer to consider how long an employee states he wishes to remain in a job before investing in supplementary education or other substantial outlays that only yield a marginal return later. [FN11] Of course, a manager's reference to an employee's eventual retirement can constitute evidence of age discrimination. Here, however, the surrounding facts make Baselice's and Steinberg's discussion of Baselice's retirement date insufficiently suggestive of age discrimination to present a genuine issue of fact of discrimination under Fuentes.

> FN10. Cf. Gray, 957 F.2d at 1087 (holding seniority--or the length of time one has held a job-- as a distinct factor from age).

> FN11. In this case, Baselice's night school classes were expected to last two to three years. J. Steinberg Aff. at ¶ 23.

**\*8** It will be recalled that Jack Steinberg's question to Baselice about how long Baselice intended to work was prompted by Steinberg's proposition to Baselice about returning to school and Baselice 's response that he was concerned about the impact of his health problems. Jack Steinberg merely followed up on the natural consequences of what Baselice himself put in issue--his health--as it related to the position of benefit counselor/teacher trainer and developer. In that context, Steinberg's conversation with Baselice about his retirement date is insufficient evidence from which a jury could reasonably infer age discrimination. Indeed, it is worth noting that if Steinberg were motivated by age discrimination it is a wonder he would have offered to send Baselice to school to assume the additional responsibilities in the first place. Furthermore, recalling this workplace--in which Baselice was by no means the oldest employee but in the middle, younger than the retirement coordinator retained,

and ultimately replaced as part-time retirement coordinator by an older employee--all the surrounding circumstances neutralize any reasonable inference of age discrimination that could be made from Jack Steinberg's single conversation with Baselice about Baselice's retirement. See Keller, 130 F.3d at 1111-12; Fuentes, 32 F.3d at 767.

Baselice also states that he was the most senior employee at the Fund, and one of the most highly compensated, factors which he posits are suggestive that he was laid off and given the replacement position of part-time retirement coordinator because of his age. It is clear, as noted above, that seniority is a distinct factor from age, and one which, when not used as a proxy for age, is permissible. Our Court of Appeals has stated:

> [Plaintiff] cites no support for his proposition that the ADEA protects an employee from an adverse employment decision based on seniority even if it cannot be demonstrated that chronological age was a factor. Indeed, it has been recognized that "seniority and age discrimination are unrelated. The ADEA targets discrimination against employees who fall within a protected age category, not employees who have attained a given seniority status."

Gray, 957 F.2d at 1087 (citation omitted). The ADEA proscribes employment decisions based on age, but not on seniority vel non.

The ADEA and PHRA impose identical standards of substantive liability for claims of discrimination based on age. See Martin, No. 00-3244, 2002 U.S. Dist. LEXIS, at \*14; Harris v. Smithkline Beechem, 27 F.Supp.2d 569, 576 (E.D.Pa.1998), aff'd, 203 F.3d 816 (3d Cir.1999). Since the Fund is entitled to summary judgment under the ADEA, it follows that it is also entitled to summary judgment under the PHRA. Baselice has waived his claim of intentional infliction of emotional distress, as he has not addressed it in his responsive brief. [FN12]

> FN12. Furthermore, the record does not disclose the existence of "extreme and outrageous conduct" "so extreme in degree[ ] as to go beyond all possible bounds of decency ..." or medically determinable emotional injury necessary to make this legal theory tenable. Kazatsky v. King David Memorial Park, 515 Pa. 183, 527 A.2d 988, 991, 995 (Pa.1987).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
**(Cite as: 2002 WL 827128, \*9 (E.D.Pa.))**

**\*9** We will grant summary judgment to defendant Fund. An appropriate Order follows.

## ORDER

AND NOW, this 1st day of May, 2002, upon consideration of defendant's motion for summary judgment, plaintiff's response thereto, and defendant's reply thereto, and in accordance with the foregoing Memorandum, it is hereby ORDERED that:

1. Defendant's motion for summary judgment is GRANTED;

2. JUDGMENT IS ENTERED in favor of defendant Philadelphia Federation of Teachers Health and Welfare Fund and against plaintiff Robert Baselice; and

3. The Clerk shall CLOSE this case statistically.

2002 WL 827128 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



TAB B

Not Reported in F.Supp.2d
(Cite as: 1999 WL 1416919 (D.N.J.))

Page 211

Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.

**Karen J. BISHOP, Plaintiff,**
v.
**INACOM, INC., Helmut Kalman, Joan
Reinhardt, and Kelly Mckeever, Defendants.**

**No. CIV. A. 99-664.(JBS).**

Dec. 1, 1999.

Sally E. Heckeroth, Esquire, Fox, Rothschild,
O'Brien & Frankel LLP, Atlantic City, for Plaintiff.

Joseph P. Paranac, Jr. Esquire, Jasinski &
Paranac, P.C., Newark, for Defendant.

OPINION

SIMANDLE, District J.

### I. INTRODUCTION

*\*1* In this diversity-based employment
discrimination case, plaintiff Karen J. Bishop
("Bishop") has brought suit against her former
employer, Inacom, Inc. ("Inacom") and several of
its management-level employees, alleging, inter alia,
breach of implied employment contract, hostile
work environment and sexual harassment in
violation of the New Jersey Law Against
Discrimination ("NJLAD"), as well as common law
claims of defamation and infliction of emotional
distress. Specifically, the Complaint alleges that,
two days after Bishop filed an in-house EEO charge
alleging sexual harassment by her supervisor Helmut
Kalman, Inacom retaliated by firing her on
pretextual grounds.

Presently before the Court are: (1) defendants'
motion to dismiss plaintiff's claims against
defendants Joan Reinhardt and Kelly McKeever for
lack of personal jurisdiction pursuant to Rule
12(b)(2), Fed.R.Civ.P.; and (2) defendants' Rule
12(b)(6), Fed.R.Civ.P., motion to dismiss
plaintiff's Counts Three through Eight, Twelve, and
Thirteen through Seventeen for failure to state a
claim upon which relief can be granted. Defendants
also move to strike plaintiff's demand for punitive
damages in the breach of contract claims in Counts

One and Two, and plaintiff's claim for attorneys'
fees as requested in Counts One, Two, and Ten
through Seventeen. For reasons stated herein, the
Court determines that it may exercise jurisdiction
over all defendants.

The primary issue to be decided is whether an
allegation that a supervisor's crude warning to an
employee not to share confidential workplace
information with her boyfriend/co-worker is
actionable under the NJLAD. For reasons stated
herein, the Court will resolve this issue in favor of
defendants, and holds that plaintiff's allegations fail
to state a valid claim of sexual harassment or hostile
work environment in violation of the NJLAD. Other
aspects of the plaintiff's Complaint survive,
however, and therefore defendants' motion will be
granted in part and denied in part.

### II. BACKGROUND

According to plaintiff's Complaint, [FN1] this
matter arises from Bishop's past employment with
Inacom, a Nebraska Corporation doing business in
Swedesboro, New Jersey. (Compl.¶ 5.) Bishop, an
experienced human resources professional, was
hired as Inacom's Swedesboro Human Resources
Manager in August 1997, but held that position for
less than seven months before she was fired. (Id.)
Her boyfriend, Joe Hatton, was also a co-worker,
and was employed as Inacom's Configuration
Supervisor for the Swedesboro facility. (Id . at ¶
13.)

> FN1. The important consideration in deciding a
> 12(b)(6) motion is whether the plaintiff has alleged
> facts which would constitute a legal claim, and not
> whether the alleged facts are true. The Court must
> accept as true all of the matters pleaded in the
> complaint, as well as reasonable inferences from
> those matters. Markowitz v. Northeast Land Co.,
> 906 F.2d 100, 103 (3d Cir.1990). The facts here
> are therefore taken from plaintiff's complaint.

The events giving rise to this case began on March
13, 1998. On that date, plaintiff attended a meeting
with Helmut Kalman, Inacom's Director of
Operations, Loss Prevention Specialist Thomas
Schlichtig, and Inventory Manager Howard
Stranahan. During this meeting, which concerned
another employee's suspected theft of an expensive
camera, Bishop was told of the investigation into the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1416919, *1 (D.N.J.))

theft and Kalman's plans to terminate the employee from employment. (Id. at ¶ 12.) At the conclusion of this meeting, Kalman turned to Bishop and specifically warned her not to share the information discussed at the meeting with her boyfriend/co-worker Joe Hatton, Inacom's Configuration Supervisor for the Swedesboro facility. (Id. at ¶ 13.) Although there is no company policy against employee dating, Bishop apparently was the only one at the meeting who was involved with a co-worker and the only one to receive such a warning.

*2 After Kalman expressed his concern that Bishop would discuss sensitive matters with Hatton, plaintiff assured Kalman that she never leaked confidential information, even to Hatton. To this Kalman retorted, "whatever, but you know that pillow talk." Following Kalman's "pillow talk" comment, Stranahan stated "I don't want to hear this", to which Kalman again allegedly asserted that there was "pillow talk" between Bishop and Hatton. Bishop again allegedly told Kalman that at no time had she discussed confidential Inacom matters with Hatton. This second reassurance allegedly went unacknowledged by Kalman (Id. at ¶ 17.) While the statements about "pillow talk" were being made, the door to the meeting room was left open and at least five (5) other Inacom employees allegedly could hear Kalman's comments. (Id. at ¶ 16 .)

Despite Kalman's vocal concerns about Bishop's ability to keep secrets, it is not alleged that Bishop was ever excluded from any meetings or confidential discussions. Apparently, Kalman nevertheless continued to cast doubt on Bishop's ability to keep silent. Bishop learned from several other Inacom employees that Kalman allegedly had on other occasions remarked to management-level employees that Bishop and Hatton were "bed buddies" and that they engaged in "pillow talk." (Id. at ¶ 18.)

On March 19, 1998, Bishop complained of Kalman's comments to Reinhardt, Inacom's Regional Human Resource Manager and McKeever, Inacom's Corporate Human Resource Manager. In a meeting held in Bishop's office, plaintiff requested that the sexually harassing statements cease and desist. Without investigating Bishop's complaint or preparing an incident report, Reinhardt and McKeever told plaintiff that Kalman's statements were not sexual harassment. (Id. at ¶ 20.) Significantly, on the same day Bishop complained

about Kalman's inappropriate comments, Reinhardt and McKeever informed Ms. Bishop that she was under investigation for certain company "concerns". (Id. at 22.) It is unclear from the Complaint whether these suspicions were voiced at the same meeting during which Bishop complained of Kalman's comments, or whether Reinhardt and McKeever informed plaintiff of their concerns at a second, separate meeting.

Dissatisfied with McKeever and Reinhardt's treatment of her complaints, plaintiff sent a March 21, 1998 e-mail to Inacom's Vice-President of Corporate Resources, Larry Fazzini, and Director of Technical Integration, John Galan, again complaining about Kalman's "pillow-talk" statements and requesting that such comments cease. (Id. at ¶ 23.) On March 23, Fazzini responded to Bishop's e-mail, stating that he was referring Bishop's complaints to McKeever.    Later that afternoon, McKeever chided plaintiff for advancing such picayune complaints, stating that Bishop was not "being part of the team." McKeever did not indicate that she had investigated Bishop's complaints, but did advise that she told Kalman to apologize, which he later did. (Id. at ¶¶ 23-24.)

*3 Still unhappy with the lack of official action on Kalman's comments, on March 24, 1998, Bishop filed an in-house EEO charge. Two days later, on March 26, 1998, Reinhardt and McKeever entered Bishop's office and informed her that she was fired, effective immediately. This firing came without warning or disciplinary action, an alleged violation of the contract of employment implied in Inacom's employee handbook, which provides that Inacom employees will not be fired except for just cause and after receiving progressive discipline. (Id. at ¶ 7.) The two informed Bishop that the reasons for her termination were due to breaches of confidence, authorization of illegal background searches for all employees of the facility, and performance issues involving the customer service department and payroll. (Compl. ¶ 26.)

Plaintiff filed the present Complaint on December 15, 1998 in the Superior Court of New Jersey. On January 4, 1999, defendants timely removed to this Court, which has jurisdiction based on diversity of citizenship and amount in controversy. 28 U.S.C. § 1332(a)(1). Defendants filed the present motion in lieu of an answer on May 9, 1999.

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1416919, *3 (D.N.J.))

Page 213

### III. DISCUSSION
#### A. Personal Jurisdiction

Defendants first raise the threshold issue of whether this Court has personal jurisdiction over McKeever and Reinhardt. They argue that, because McKeever and Reinhardt's contacts with New Jersey were solely in their corporate capacity, plaintiff cannot demonstrate contacts with New Jersey sufficient to give this Court in personam jurisdiction. Plaintiff responds that this Court may exercise specific jurisdiction over McKeever and Reinhardt because this controversy relates to and arises out of the incidents which occurred in New Jersey in mid to late-March 1998.

In cases such as this one, where a defendant has raised a jurisdictional defense, the plaintiff bears the burden of demonstrating contacts with the forum state sufficient to give the Court in personam jurisdiction. Wright v. Xerox Corp., 882 F.Supp. 399, 403 (D.N.J.1995). "However, upon a Rule 12(b)(2) attack on personal jurisdiction, the Court must accept as true the allegations in the Complaint, and resolve the disputed issues of fact in favor of the plaintiff." Id.

A district court's deliberation on a motion to dismiss for lack of personal jurisdiction is governed by Rule 4(e), Fed.R.Civ.P., which provides that a district court sitting in diversity may assert personal jurisdiction over non-resident defendants to the extent allowed by the applicable statute or rule of the state in which the district court sits. See Bane v. Netlink, Inc., 925 F.2d 637, 639 (3d Cir.1991). In New Jersey, the New Jersey Long-Arm Statute, Rule 4:4-4, has been construed to extend personal jurisdiction "to the uttermost limits permitted by the United States Constitution." Charles Gendler & Co. v. Telecom Equipment Corp., 102 N.J. 460, 469 (1986). Thus, this Court may exercise personal jurisdiction over defendants McKeever and Reinhardt if it is clear that they have certain "minimum contacts" with New Jersey such that the exercise of jurisdiction would not offend the "traditional notions of fair play and substantial justice" contemplated by the Due Process Clause of the Fourteenth Amendment. International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

*4 Minimum contacts exist when a defendant performs certain acts by which she purposefully avails herself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. Hanson v. Denckla, 357 U.S. 235, 253 (1958). The contacts with the forum state must be of a nature such that the non-resident defendant "should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985).

According to the Complaint, McKeever and Reinhardt heard plaintiff's complaints of Kalman's harassment while in New Jersey, aided and abetted Kalman's harassment by failing to act on it while in New Jersey, and retaliated against plaintiff for her filing of a EEO complaint against Kalman by coming to Bishop's New Jersey office and firing her. Thus, the Complaint alleges that, while in New Jersey, these defendants' actions directly harmed the plaintiff. Defendants' argument that McKeever and Reinhardt are somehow insulated by their status as employees of Inacom in unavailing. Conduct which took place in this state confers in personam jurisdiction, notwithstanding the status of these defendants' as employees of an out of state business. Moreover, even if the above conduct had not taken place in New Jersey, it is clear that these allegedly tortious acts were directed at a plaintiff who was in New Jersey. This alone would be sufficient to give rise to specific jurisdiction under "effects test" of Calder v. Jones, 465 U.S. 783 (1984). See also, Bryan v. ACT, 837 F.Supp. 633 (D.N.J.1993) (jurisdiction proper over New Zealand defendant based on allegation that negligently packed cargo harmed New Jersey plaintiff). In sum, as plaintiff has pleaded causes of action against McKeever and Reinhardt that arise out of their contacts with New Jersey, the Court finds that sufficient minimum contacts are present to give rise to specific, in personam jurisdiction over these defendants.

Therefore, jurisdiction is proper over McKeever and Reinhardt on the grounds that they directed acts affecting a New Jersey plaintiff and that they were in New Jersey while engaging in this conduct. The Court finds that, under these circumstances, McKeever and Reinhardt should reasonably have anticipated being haled into Court in New Jersey and that the exercise of specific personal jurisdiction over them would not offend any traditional notions of fair play or substantial justice. Accordingly, the Court denies defendants' motion to dismiss plaintiff's claims against McKeever and Reinhardt

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1416919, *4 (D.N.J.))

for lack of in personam jurisdiction.

### B. Standards for Rule 12(b)(6) Motions to Dismiss

Having decided that the exercise of personal jurisdiction over McKeever and Reinhardt is proper, the Court next turns to consider defendants' motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6), Fed.R.Civ.P. The Supreme Court has instructed that a Rule 12(b)(6) motion must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). A district court must accept any and all reasonable inferences derived from those facts. Unger v. National Residents Corp. v. Exxon Co., U.S.A., 761 F.Supp. 1100, 1107 (D.N.J.1991); Gutman v. Howard Sav. Bank, 748 F.Supp. 254, 260 (D.N.J.1990).

*5 However, a Complaint should be dismissed if, accepting all plaintiff's allegations and the reasonable inferences to be drawn therefrom, no relief could be granted under any set of facts to be proved. Watts v. Internal Revenue Service, 925 F.Supp. 271, 275 (D.N.J.1996). Although this Court must for the purposes of a Rule 12(b)(6) motion read the Complaint indulgently, the Court is not required to accept as true unsupported conclusions and unwarranted inferences. Schuykill Energy Resources v. PP & L, 113 F.3d 405, 417 (3d Cir.1997). There must be an actual, actionable claim underlying the Complaint's allegations. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

### C. Motion to Dismiss Counts Three and Five through Eight

In Counts Three and Five through Eight, plaintiff alleges that the comments of defendant Kalman, who referred to plaintiff and her boyfriend/co-worker as "bed buddies" who engaged in "pillow talk", created a sexually hostile work environment at Inacom. Defendants respond that, even assuming such remarks were made, Kalman's comments were benign and cannot reasonably be viewed as having been made because of plaintiff's gender, thus precluding a finding of harassment. Moreover, defendants argue, such comments are certainly not

so pervasive as to create a hostile work environment actionable under the New Jersey Law Against Discrimination ("NJLAD").

As set forth in the margin, [FN2] the plain language of the NJLAD provides formidable protections against discrimination in the workplace. The legislative history of the act is silent, however, on the subject of sexual harassment. Lehman v. Toys 'R' Us, Inc., 132 N.J. 587, 600 (1993). The basic formula for establishing whether certain comments are actionable as harassment is a judicial construct, established by the New Jersey Supreme Court in Lehman, supra. In that case, the court determined that a female plaintiff alleging that conduct in the workplace constitutes invidious discrimination in violation of the NJLAD must show by a preponderance of evidence that the "complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a(3) reasonable woman believe that (4) the conditions of employment and the working environment is hostile or abusive." Id. at 603-04 (emphasis in original). Of course, as this Court now considers defendants' motion to dismiss pursuant to Rule 12(b)(6), all the plaintiff need do is properly allege each of these four elements to survive the present motion.

> FN2. The NJLAD, originally enacted in 1945, provides (as amended) in relevant part: It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, genetic information, [or] sex ... of any individual to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment;
>
> * * *
>
> d. For any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1416919, *5 (D.N.J.))

person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act. e. For any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so. N.J.S.A. 10:5-12.

In addition to setting forth a general framework for determining sexual harassment, the Lehman court elaborated upon what constitutes gender-based harassment, declaring that mere name calling is not considered conduct actionable under the LAD:

Common sense dictates that there is no LAD violation if the same conduct would have occurred regardless of the plaintiff's sex. For example, if a supervisor is equally crude and vulgar to all employees, regardless of their sex, no basis exists for a sex harassment claim. Although the supervisor may not be a nice person, he is not abusing a plaintiff because of her sex.

*6 Id. at 604. Thus, under the sexual harassment framework provided in Lehman, the NJLAD does not create a cause of action for comments that are simply rude or not nice.

In the event that plaintiff cannot show that the form of harassment is obviously sex-based, the victim must make a prima facie case showing that the harassment occurred because of her sex. Id. at 605. For example, a prima facie case might be made by showing that only women suffered the non-facially sex-based harassment. In any event, all that is required to satisfy the first prong of the Lehman test is a showing that it is more likely than not that the harassment would not have occurred but for the plaintiff's sex. Id.

Federal courts, to which the New Jersey courts sometimes look for guidance in sexual harassment matters, Lehman 132 N.J. at 600-01, have generally held that crude or unkind comments are not actionable as sexual harassment. The Supreme Court has instructed that courts judging hostility should "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of gender-related jokes, and occasional teasing.' ' Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citing Oncale v. Sundowner Offshore Services, Inc. 523 U.S. 75, 80 (1998)). This screening is in place to ensure that Title VII does

not become trivialized as a "general civility code." Id. In particular, courts should filter out simple teasing, offhand comments, and isolated incidents (unless extremely serious). Id. (citing Oncale, 523 U.S. at 82.)

An example of such filtering can be seen in a case from this District, Reyes v. McDonald Pontiac-GMC Truck, Inc., 997 F.Supp. 614 (D.N.J.1998). There, a plaintiff sued her employer and a co-worker for violation of the NJLAD, alleging that she was sexually harassed when, on three occasions during a seven day period her co-worker verbally abused her, using obscenities and calling her a "bitch", and "Miss f* * * * * * Queen Bee." The court in that case held that such name-calling did not occur because of the sex of either party. Without establishing that the conduct occurred because of the parties' gender, the court held, plaintiff fell short of alleging an NJLAD violation. Furthermore, the court held, the name calling was insufficiently severe or pervasive to create a hostile working environment. Id. at 617. See also Holtz v. Marcus, 31 F.Supp.2d 1139 (E.D.Wis.1999)(no Title VII hostile work environment claim where supervisor yelled at female employees).

In this case, plaintiff claims that a hostile work environment was created when Kalman twice used the phrase "pillow talk" to refer to her private conversations with Hatton, and commented to other Inacom employees that plaintiff and Hatton were "bed buddies" who engaged in "pillow talk". The Court finds that plaintiff's complaint does not allow a conclusion that Kalman's remarks, while crude, are anything other than gender neutral. There is nothing to suggest that the phrases "pillow talk" or "bed buddies" carry additional meaning for female listeners. Clearly, these phrases would have the same meaning whether directed at male or female listeners. Thus, plaintiff's complaint does not warrant the inference that Kalman's conduct was obviously sex-based. Because the comments were gender neutral, plaintiff must overcome the statements' neutrality by alleging surrounding circumstances showing it to be more likely than not that Kalman directed his comments at Bishop because of her sex.

*7 Upon a review of the Complaint, it is apparent that plaintiff has not alleged sufficient surrounding circumstances to warrant the inference that Kalman's

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1416919, *7 (D.N.J.))

statements were gender-based. While she does allege that she was the only female at the loss-prevention meeting, and that she was the only person admonished not to share the sensitive information being discussed, there is no indication that there were other individuals present who were dating co-workers. From these circumstances, it cannot reasonably be inferred from the circumstances of the meeting that Kalman isolated his comments to Bishop because of her sex. Rather, the only inference to be drawn is that Kalman's comments were a simple, albeit crude, request for discretion directed to the only employee present who was dating a co-worker, and that this discretion involved a sensitive work-place investigation. Indeed, plaintiff admits as much in her brief when she concedes that "the statement might not have been made if she was not dating a fellow employee." (Pl's Br. in Opp'n at 11.) While Kalman's statements might be interpreted as an obnoxious reference to the sex life of a co-worker couple, such references are not prohibited by the NJLAD, especially when germane to the legitimate need for workplace confidentiality and security.

The Court finds that plaintiff has not presented facts from which one could infer that Kalman's comments would not have been made but for plaintiff's gender, nor facts showing that the totality of circumstances shows that Kalman's comments and subsequent actions created a hostile work environment. Besides Kalman's two "pillow talk" comments directed towards plaintiff, the only other hostile acts alleged are Kalman's "bed buddies" remarks made to other employees. The Court finds that the "bed buddies" comments amount to mere gossip, and even assuming that the comments were harmful, there is no indication that the comments-- uttered a few times to a few employees--were pervasive. The NJLAD should not be read so broadly as to create a cause of action for casual workplace chatter.

Even if these comments were gender-specific, they would at most amount to "second-hand harassment" the impact of which is not as great as comments directed at a plaintiff. See Gleason v. Mesirow Financial, Inc., 118 F.3d 1134 (7th Cir.1997). Moreover, plaintiff has not alleged that she was demoted, transferred, or suffered other harm to the quality of her employment. Because plaintiff has only alleged indirect gossip about her relationship

with a co-worker who was her boyfriend, and has not alleged circumstances showing that the conditions of her employment were altered by such comments, the Court finds that plaintiff could not reasonably have believed that her working environment was hostile. For this reason, even assuming that Kalman's comments were gender-based, plaintiff also fails to satisfy the second, third and fourth prongs of the Lehman test. Accordingly, the Court will grant defendants' motion to dismiss plaintiff's Counts Three and Five, which allege sexual harassment by Kalman.

*8 In addition, because plaintiff has failed to state an actionable claim against Kalman, the Court finds that neither Reinhardt nor McKeever may be held individually liable for aiding and abetting a non-violation of the NJLAD. Accordingly, the Court will also dismiss plaintiff's Count Eight, which alleges that these defendants aided and abetted an NJLAD violation. Finally, with respect to plaintiff's argument that Counts Six and Seven state a valid claim against McKeever and Reinhardt for failure to investigate a violation of the NJLAD, the Court finds no support for such a claim in case law or in the NJLAD itself. Certainly, the Act cannot be read to create a cause of action against employers who do not investigate even frivolous claims. At best, the allegations of failure to investigate should be considered incorporated into the now-dismissed Aiding and Abetting allegations in Count Eight.

C. Plaintiff's Slander Claim

Defendants next argue that plaintiff's Count Ten should be dismissed because her claim of defamation is not reasonably susceptible to a defamatory meaning. This Count alleges that Kalman's public remarks concerning "pillow talk" with her "bed buddy" Hatton tended to "blacken the ... morality and reputation of the plaintiff, ... and exposed her to ridicule and contempt." In her opposition brief, plaintiff urges the Court to find that Kalman's statements are actionable both as slander per se, or in the alternative as traditional slander.

Under New Jersey law, unless Kalman's statements are reasonably susceptible of a defamatory meaning, plaintiff has failed to state a claim of slander. See Kotlikoff v. the Community News, 89 N.J. 62, 67 (1982); cf. Beverly Enterprises v. Trump, 182 F.3d 183, 191 (3d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1416919, *8 (D.N.J.))

Page 217

Cir.1999) (citing similar provisions in Pennsylvania law). Courts must judge both the content and context of the statement in determining whether the statement is capable of a defamatory meaning. Ward v. Zelikovsky, 136 N.J. 516, 532 (1994).

Although in traditional slander the plaintiff must also establish that she was harmed by the defamatory statement, the damages are presumed if the statement is slander per se. Defamatory statements are slanderous per se when they charge a commission of a crime; impute certain loathsome diseases; strike at a person in his business, trade, profession, or office; or impute unchastity to a woman. Hoagburg v. Harrah's Marina Hotel Casino, 585 F.Supp. 1167, 1170 (D.N.J.1984). When alleging defamation under these four categories, the damages element is waived because damage to reputation is presumed to flow from such statements. Ward, 136 N .J. at 541.

Here, it can be inferred that in both content and context Kalman's "pillow talk" and "bed buddies" comments may be construed as slander per se. First, Kalman's warning to Bishop not to speak to others about the theft investigation could reasonably be taken to imply that Bishop could not be trusted with sensitive information an important aspect of any managerial position. These remarks can therefore be construed as tending to sully her professional reputation. Such a denigration of an employee's trustworthiness fits squarely within the third category of slander per se. Likewise, Kalman's remarks about Bishop's intimate relationship with Hatton could be construed as implying that Bishop was unchaste. Such allegations of unchastity directed towards a female plaintiff fits within the fourth category of slander per se. Therefore, plaintiff has stated a claim for slander per se upon which relief may be granted and defendants' motion will be denied with respect to Count Ten.

D. Plaintiff's Self-Defamation Claim

*9 Defendant next moves this Court to dismiss plaintiff's Count Twelve, which alleges that Bishop was harmed when she was compelled to repeat Reinhardt's defamatory statements when explaining the reasons for her termination from Inacom to prospective employers, and her bank. (Compl.¶ 109.) As accurately pointed out by defendants, New Jersey has not recognized the tort of self-

defamation. In response, plaintiff argues that, because New Jersey has not specifically rejected such a cause of action, this Court should find that the New Jersey Supreme Court could decide to follow the jurisdictions that have recognized self-defamation, and that Count Twelve therefore states a viable claim.

Here, plaintiff states a claim for self-defamation that is not actionable under New Jersey law. As no relief may be granted on this claim it is due to be dismissed. Undeterred, plaintiff in her brief asks this Court to predict that the New Jersey Supreme Court will someday recognize such a claim. However, plaintiff has provided no New Jersey authority showing a trend towards recognizing claims of self-defamation. Nor has she provided the Court with any cogent policy reasons why such an adoption would be beneficial. A determination of whether such a claim is viable should be deferred until the Courts of New Jersey have had an opportunity to consider the issue. As there is at present no claim upon which relief can be granted for plaintiff's allegations of self-defamation, plaintiff's Count Twelve will be dismissed.

E. Plaintiff's Claims of Intentional Infliction of Emotional Distress

Next, defendants argue that the Court should dismiss plaintiff's Count Sixteen which alleges that all defendants intended to inflict emotional distress on the plaintiff and/or recklessly inflicted such distress. (Compl.¶ 127.) Because plaintiff has not alleged behavior that is outrageous, defendants argue, plaintiff has not stated a proper claim of intentional infliction of emotional distress ("IIED").

In claims of IIED, New Jersey courts have adopted the definition of the Restatement (Second) of Torts § 46 (1965). Obendorfer v.. Gitano Group, Inc., 838 F.Supp. 950 (D.N.J.1993) (citing Buckley v. Trenton Saving Fund Soc., 111 N.J. 355 (1988)). Under this definition, at this stage a plaintiff must allege conduct " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." ' Buckley, 111 N.J. at 366 (quoting Restatement (Second) of Torts § 46, cmt. d). This standard is exceedingly difficult to meet in the employment context, where courts have been particularly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
**(Cite as: 1999 WL 1416919, \*9 (D.N.J.))**

reluctant to allow claims of IIED by discharged employees against their employers. Pitak v. Bell Atlantic Network Services, Inc., 928 F.Supp. 1354, 1372 (D.N.J.1996).

Defendants argue that the conduct alleged in the Complaint does not rise to the level of outrageousness and thus does not state an actionable claim of IIED. The Court agrees and finds Count Sixteen deficient in that it fails to allege conduct that is sufficiently outrageous, atrocious, or indecent to state a claim of IIED under Buckley. At most, the Complaint alleges that Kalman was rude to Bishop and made degrading comments about her, (Compl.¶ 13); that plaintiff was chagrined when McKeever told her that she was not being part of the team, (Compl.¶ 24); that she was fired in retaliation for her complaints about Kalman, (Compl.¶ 26); and that Inacom breached an implied employment contract, (Compl.¶ 31-35). Even read in the most generous light, this behavior is not sufficiently outrageous to go beyond all possible bounds of decency. The Court therefore finds that plaintiff has failed to state an actionable claim of IIED, and will dismiss Count Sixteen.

F. Plaintiff's Claims of Negligent Infliction of Emotional Distress

**\*10** Defendants next move the Court to dismiss plaintiff's Counts Thirteen and Seventeen, which allege that plaintiff is entitled to recovery for defendants' negligent infliction of emotional distress. Defendants argue that these counts must be dismissed because plaintiff has not pleaded any of the elements necessary to establish such a cause of action. Under New Jersey law, a claim of Negligent Infliction of Emotional Distress involves a "bystander case" in which the necessary elements are "(1) the death or serious injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." Williamson v. Waldman, 150 N.J. 232 (1997). It is clear from the face of plaintiff's Complaint that none of these elements are present. Not surprisingly, plaintiff in her Brief in Opposition agrees that her claim does not satisfy the necessary elements, and has withdrawn Counts Thirteen and Seventeen. (Pl's Br. in Opp'n at 34.) Accordingly, the Court will dismiss these Counts.

G. Plaintiff's "Prima Facie Tort" Claims

Defendants next move the Court to dismiss Counts Fourteen and Fifteen of plaintiff's Complaint. In Count Fourteen, plaintiff generally asserts that she was injured by the defendants' conduct, and that this conduct deprived her of "any opportunity again to become a Human Resources Manager employed by Inacom," (Compl.¶ 119), and caused her "damage to her ... reputation, physical and emotional distress, loss of income ... pain and humiliation (Compl.¶ 125.) In Count Fifteen, plaintiff asserts that defendants "acted with reckless indifference to the consequences that would flow from Kalman's behavior and defendants' failure to respond to that conduct. (Compl.¶ 124.) Although these counts do not on their face state a distinct claim upon which relief may granted, plaintiff urges the Court to find that these Counts state a case of "prima facie tort", and should not be dismissed. (Pl.'s Br. in Opp'n at 29.)

Remarkably, plaintiff here asks the Court to recognize a prima facie tort cause of action despite the fact that the New Jersey Supreme Court has specifically forbidden plaintiffs from appending prima facie tort claims an NJLAD complaint. Taylor v. Metzger, 152 N.J. 490, 522-523 (1998). Indeed, as the court observed, "[e]ven if allegations of harassment [are] insufficient to state an LAD claim ... a prima facie tort cause of action should not be used to overcome those deficiencies." A prima facie cause of action should be allowed, if at all, much as the doctrine of res ipsa loquitur, that is, in situations in which plaintiffs would have no other causes of action. Id.

Even if plaintiff was not barred by New Jersey law from asserting a prima facie tort cause of action, the Court finds that these claims suffer from basic deficiencies that would warrant their dismissal. It is axiomatic that the fundamental element of a tort is the violation of a duty owing the plaintiff. Black's Law Dictionary at 1496 (7th ed.1999). Before a party may be held liable for breach of an obligation to another party, it must first be established that the party in fact owed a duty to act in a certain manner. Riggs v. Schappell, 939 F.Supp. 321, 329 (D.N.J.1996). Under New Jersey law, a showing of tortious conduct "involves a demonstration by the plaintiff that there exists 'some breach of duty, by action or inaction, on the part of the defendant to the

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



individual complaining, the observance of which would have averted or avoided the injury." ' Id. (citing Brody v. Albert Lifson & Sons, 17 N.J. 383 (1955)).

**\*11** Although this Court must for the purposes of a Rule 12(b)(6) motion read the Complaint indulgently, the Court is not required to accept as true unsupported conclusions and unwarranted inferences. Schuykill Energy Resources, 113 F.3d at 417. The Court finds that even a liberal reading of Count Fourteen does not permit an inference that defendants owed plaintiff a duty to allow her to continue her employment with Inacom. Employers are free to terminate an employee at will barring a contractual agreement to the contrary. See Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980). As it lacks an allegation of duty, then, Count Fourteen fails to state a valid tort claim. In addition, there is not a suggestion of a duty of any sort in Count Fifteen. Instead, this Count simply alleges that "conduct of Inacom, Kalman, McKeever, and Reinhardt was in deliberate disregard for the rights of plaintiff." (Compl. ¶ 20.) This vague allegation to a violation of plaintiff's rights does not give adequate notice to the defendants what conduct is referred to, and fails to give notice of what "rights" of plaintiffs were violated. The Court finds that, rather than valid claims, Counts Fourteen and Fifteen merely allege unactionable harm caused by breach of an unspecified duty. Accordingly, these Counts will be dismissed.

### H. Plaintiff's Demand for Punitive Damages

Next, defendants request that plaintiff's request for punitive damages be stricken from the contract claims in Counts One and Two. In these Counts, plaintiff alleges that defendants breached an implied employment contract that was in force at the time of her firing, and also that this firing breached the implied covenant of good faith and fair dealing. Defendants argue that punitive damages are not available in contract cases, plaintiffs claim for such damages must be dismissed.

Under New Jersey law, punitive damages generally are not available in actions for breach of contract. Buckley, 111 N.J. at 369-70. Although exceptions have been carved out of this rule, these exceptions have been premised on the finding of a special connection, such as a fiduciary relationship

between the parties. These relationships impose a duty of trust on the contracting parties, and it is the breach of this duty of trust, rather than the breach of contract, which gives rise to an award of punitive damages. W.A. Wright, Inc. v. KDI Sylvan Pools, Inc., 746 F.2d 215 (3d Cir.1984); Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J.Super. 437, 448-49 (App.Div.1976), cert. den., 71 N.J. 503 (1976).

Plaintiff has not alleged any such special relationship in her Complaint. Plainly, the relationship between Bishop and Inacom was that of employer and employee. Even assuming, as this Court must for this motion, that an employment contract existed between these parties, and that Inacom breached this contract and all implied covenants therein, this breach does not violate a special relationship of trust. Cf. Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980). Bishop's Complaint does not allow a reasonable inference of a fiduciary relationship between these parties, and therefore does not state an exceptional contract claim upon which punitive damages could be awarded. Accordingly, plaintiff's demand for punitive damages in Counts One and Two will be stricken.

### I. Plaintiff's Demands for Attorneys' Fees

**\*12** Finally, defendants move to strike plaintiff's demand for attorneys' in Counts One, Two, and Ten through Seventeen. Because the Court now dismisses Counts Thirteen through Seventeen, we need only consider the fee demand in Counts One, Two, Ten and Eleven. In these Counts, plaintiff includes in the demand paragraph a claim for attorneys' fees. The general rule in American jurisprudence is that each party shall bear the cost of their own attorney's fees, see Aleyska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247 (1975). While attorneys' fees may be awarded to the prevailing plaintiff as part of a statutory scheme such as the NJLAD, see e.g . N.J.S.A. 10:5-27.1, plaintiff's Counts One, Two, Ten and Eleven advance common law claims that contain no provisions for attorney's fees. Plaintiff concedes as much in her Brief in Opposition, and admits that there is no basis for awarding attorneys' fees in these non-LAD claims. Accordingly, the Court will strike plaintiff's demand for attorneys' fees in Counts One, Two, Ten, and Eleven.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 1999 WL 1416919, *12 (D.N.J.))

Page 220

### CONCLUSION

For the reasons discussed above, the Court now denies defendants' Rule 12(b)(2), Fed.R.Civ.P., motion to dismiss for lack of personal jurisdiction over defendants McKeever and Reinhardt, and denies in part and grants in part defendants' motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. [FN3] The accompanying Order is entered.

> FN3. Although the Court now dismisses plaintiff's hostile work environment and sexual harassment claims in their entirety, other of plaintiff's Counts alleging NJLAD violations were not challenged in the present motion to dismiss. Thus, the present Opinion does not affect plaintiff's retaliation claim in Count Four, nor plaintiff's age discrimination claim in Count Nine.

### ORDER

THIS MATTER having come before the Court on defendants' motion to dismiss the Complaint as to defendants McKeever and Reinhardt for lack of in personam jurisdiction pursuant to 12(b)(2), and to dismiss Counts Three, Five through Eight, Twelve, and Thirteen through Seventeen for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6), Fed.R.Civ.P.; and the Court having considered the submissions of the parties; and for the reasons stated in the Opinion of today's date;

IT IS this _____ day of December, 1999, hereby

ORDERED that the motion of defendants' McKeever and Reinhardt to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) be, and hereby is, DENIED; and

IT IS FURTHER ORDERED that defendants' motion to dismiss pursuant to Rule 12(b)(6), be, and hereby is, DENIED as to Count Ten; and

IT IS FURTHER ORDERED that defendants' motion to dismiss pursuant to Rule 12(b)(6), be, and hereby is, GRANTED as to Counts Three, Five through Eight, and Twelve through Seventeen of the Complaint, and that those Counts be, and hereby are, DISMISSED; and

IT IS FURTHER ORDERED that plaintiff's demand for punitive damages in Counts One and Two be, and hereby is, STRICKEN from the Complaint; and

IT IS FURTHER ORDERED that plaintiff's demand for attorneys' fees in Counts One, Two, Ten and Eleven be, and hereby is, STRICKEN from the Complaint.

1999 WL 1416919 (D.N.J.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

