**PART 2**

TAB C

Not Reported in F.Supp.
(Cite as: 1997 WL 150048 (D.Kan.))

Only the Westlaw citation is currently available.

United States District Court,
D. Kansas.

**Agnes J. CLARY, Plaintiff,**
v.
**The MARLEY COOLING TOWER COMPANY,
Defendant.**

**Civil Action No. 96-2277-KHV.**

March 12, 1997.

Elizabeth A. Kaplan, Ruth M. Benien, Benien & Kaplan, Chtd., Kansas City, KS, for plaintiff.

Daniel D. Crabtree, Stinson, Mag & Fizzell, P.C., Overland Park, KS, Patricia A. Konopka, Stinson, Mag & Fizzell, P.C., Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

*1 Plaintiff Agnes J. Clary claims that her employer, The Marley Cooling Tower Company, discriminated against her on the basis of age and retaliated against her for complaining of age discrimination and filing an administrative complaint of discrimination, in violation of the Age Discrimination in Employment Act [ADEA], 29 U.S.C. § 621 et seq., and the Kansas Age Discrimination in Employment Act [KADEA], K.S.A. § 44-1111 et seq., and breached an implied contract of employment in violation of the common law of the State of Kansas. The matter comes before the Court on Defendant's Motion For Summary Judgment (Doc. # 32) filed January 17, 1997. For reasons stated more fully below, the Court finds that said motion should be and hereby is sustained in part and overruled in part.

## Summary Judgmnent Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c);

accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson. 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. Celtex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Hicks v. City of Watonga, Okla. 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." See Applied Genetics Int'l. Inc. v. First Affiliated Securities, Inc., 912 F.2d 1238, 1241 (10th Cir.1990); see also Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc. 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Investments, Ltd., v. Jackson Hole Ski Corp. 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. See Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 793 (10th Cir.1988). Where the nonmoving party fails to properly respond to the motion for summary judgment, the facts as set forth by the moving party are deemed admitted for purposes of the summary judgment motion. D. Kan. Rule 56.1. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson at 251-52. Ever mindful of these summary judgment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



standards, we now turn to the merits of defendant's motion.

### Uncontroverted Facts

*2 Agnes J. Clary was born May 11, 1934, and has worked for The Marley Cooling Tower Company [Marley]. [FN1] According to payroll records, Marley hired plaintiff in a Cost Clerk II position in 1986 and promoted her to a Cost Clerk II position on July 1, 1989. Effective September 1, 1993, Marley again promoted plaintiff, this time to the position of Field Payroll Accountant, and increased her salary from $1,605 to $1,735 per month. [FN2] Ronald D. Endecott, who was born April 11, 1946, and is Marley's Controller Manufacturing and Construction Divisions, made the decision to promote plaintiff. Endecott reported to James R. Wylly, who was born April 13, 1932, and has been Marley's Senior Vice President & Controller since August 1988. Wylly supervised the cost accounting department, and he approved plaintiff's promotion.

> FN1. Marley manufactures industrial and commercial cooling towers which customers use to dissipate heat loads for a variety of applications. Some of Marley's cooling towers are manufactured in its plants and shipped to the customer. Other towers are erected on the customer's site by Marley's construction division.

> FN2. Plaintiff's predecessor in the Field Payroll Accountant position was Teresa Burns, age 33. At the time Burns transferred out of position, she was earning $2,055.00 per month ($320.00 more than plaintiff earned when she transferred into position). Plaintiff was 59 years old at the time of the promotion.

As Field Payroll Accountant, plaintiffs duties included gathering payroll information and preparing monthly journal entries; gathering all information related to the cost of field labor; and processing the revenue received from each job to calculate the completion percentage of each job. [FN3] All of the Field Payroll Accountant duties were new and challenging to plaintiff, and she admittedly had difficulty with some of them. She moved to the Field Payroll Accountant position just as United Dominion Industries (UDI) was purchasing Marley, and that period was very hectic.

The purchase required two closings within twelve days and each closing involved much detail and many problems. Teresa Burns (who had held the Field Payroll Accountant position for more than one year and had preceded plaintiff in the position) did the first closing while Clary observed. Clary did the second while Burns observed. Burns told Clary that it would take eight months to really get to know the closing procedure.

> FN3. Clary admits that these were her duties but denies that Marley "timely or appropriately apprised [her] what her job duties were and how to do them." Marley had no formal written job description for the position.

Burns worked side by side with Clary for only a short period of time because Burns was pressed to learn her own new duties in the Pricing and Estimating (P & E) department. When Burns took the P & E position, she promised that she would give full support to the old position and come back and help with it. Burns only stayed a week or two, however, and she only assisted "a little" because she had things to do in her own position. To Clary, the training was not at all satisfactory. Also, at the time Clary became Field Payroll Accountant, Endecott (her supervisor, Marley's Controller Manufacturing and Construction Divisions) had just come into the department and did not know his position or all of the ins and outs of it; he therefore was very busy and buried in work. The department was understaffed and needed more help. Endecott came in terribly early and stayed until late at night. Clary also worked a good deal of overtime.

Marley's accounting records are closed every month and as part of her job, Clary had to meet a closing deadline on a monthly basis. On two separate occasions, Clary could not timely provide the information necessary to close the books, and Endecott had to use estimated information, then reverse the estimates at a later time when he learned the actual figures. On one occasion, Clary's failure to timely provide the necessary information delayed the entire company's monthly closing. Clary claims that this occurred because Endecott's estimate was so far out that it got him into trouble and she did not know that it was off. [FN4] Clary was not always the one who was holding things up. [FN5]

> FN4. According to Clary, Endecott had work



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *2 (D.Kan.))

Page 94

performance problems while she was Field Payroll Accountant. He had problems with inventory and made a one million dollar error that was announced departmentally. From the record, however, it is unclear whether these problems relate to the problem estimate. Marley did not demote Endecott or remove him from position on account of his problems, whatever they might have been.

FN5. During the time that Burns held the job of Field Payroll Accountant, there was no occasion when her failure to provide timely information delayed the entire company's monthly closing. She was able to keep the schedule because she always had help from her predecessor and co-employee, Gary Barnes, who was there before office hours to help Burns and work with her. Also, Burns received more training in the position than Clary. Since Clary left the position, Marley's books have been opened up for other things (for example in 1995, because of errors in service approvals), although there apparently have been no occasions when the Field Payroll Accountant's failure to provide timely information has delayed the entire company's monthly closing. Frank Minshall, Clary's successor in the Field Payroll Accountant position, got more training than Clary to do the same job. Endecott also had more time to devote to Minshall than he had with Clary.

*3 Clary complained to Endecott about her frustrations in the position. Endecott was also frustrated. Still, between September, 1993 and August, 1994, Endecott never suggested to Clary that her work was unsatisfactory. [FN6] Moreover Wylly, Endecott's supervisor, never told Clary anything negative about her job performance. Marley has no written documentation of any counseling, formal discipline, or review of Clary or her job performance between September 1, 1993 when she moved to Field Payroll Accountant and August 10, 1994, when it decided to demote her. Also, while plaintiff worked as Field Payroll Accountant, neither Endecott nor anyone else at Marley did anything that plaintiff viewed as demeaning or mean-spirited.

FN6. Clary's annual performance appraisal in September, 1992 was completely positive and reflected Clary's ability to learn new skills. It also reflected her service on internal committees at Marley. Clary's 1993 Review (conducted at the end of July, 1993, just before her promotion) praised Clary for being "dependable and accurate" and a "good organizer," and noted that she "seeks improvement in processes" and was "not afraid to try something new or different." On a scale of one to five, Clary generally received high marks (fours and fives) in the categories which Marley evaluated.

On August 22, 1994, Endecott and Wylly met with plaintiff and informed her that she was being removed from Field Payroll Accountant position and returned to Cost Clerk II, and that her salary would revert to $1,605 per month. [FN7] At the meeting, Endecott and Wylly gave the following reasons for their decision orally and in a written performance evaluation: that plaintiff had had a year to learn and still could not complete the work of the position; that she was not providing the necessary information for closings on time; and that they felt someone else could do a better job. [FN8] Clary disagreed with their assessment, but she had no reason to doubt that Wylly and Endecott believed the reasons they stated for the demotion. Clary nonetheless claims that their statements were a pretext for discrimination because (1) although work in the Field Payroll Accountant position could have been done better, the problem "had nothing to do" with her; (2) since Clary left the position, the position has been changed; [FN9] (3) in August, 1994, no one could have done a better job; [FN10] (4) Clary did not receive proper instruction; [FN11] (5) had Clary received proper support, she could have done just as well as her predecessor (Teresa Burns) and her successor (Frank Minshall); and (6) Frank Minshall, Clary's replacement, was younger than 60--plaintiff's age at the time of the demotion.

FN7. In fact, Marley placed Clary in a Cost Clerk II position in terms of salary but relegated her to the job duties of a Cost Clerk III position (the job she originally had held with Marley).

FN8. Marley's Employee Status Form stated that the reason Clary was being moved from Field Payroll Account to Cost Clerk II was "to replace Carol Eichman" (who had moved to the tax department). The form did not comment on Clary's job performance, although the form provided space for that information. Endecott initiated the Status Form on August 8, 1994; Wylly approved it on August 9, 1994; and James P. Way, Marley's Vice President Human Resources

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *3 (D.Kan.))

Page 95

Administration, approved it on August 10, 1994. Before it demoted Clary, Marley told Eichman that she was moving to the tax department but that she should keep it a secret. Clary learned that Eichman was moving, however, and asked Endecott about it. He initially would not comment. He later confirmed Clary's information but would not say who was taking Eichman's position. In Clary's opinion, this was "odd" because Marley normally posted positions and announced moves.

FN9. Certain job duties have been eliminated because payroll and tax payments have been transferred to outside contractors, and a very difficult Lotus computer program has also been eliminated.

FN10. According to plaintiff, it was a struggle to get the monthly closing done on time and UDI cut a day and a day off the closing schedule (making matters worse).

FN11. Clary states that younger employees at Marley--Nadine Wisdom (who is five years younger than plaintiff), Elaine Johnson (who is in her late forties), Wayne Wall (who at age 60 is two years younger than plaintiff), and Sharon McIntosh (who is in her late thirties)--received new position training that she did not get. By "training," plaintiff means that "someone should have been going over each thing and making sure it was done correctly ... because when you learn something new, someone should check."

At the meeting with Endecott and Wylly on August 22, 1994, Clary received her performance review dated August 10, 1994. In general, the review indicated Endecott's view that while Clary had learned a lot about the field labor process over the preceding eleven months, "we are still not getting the complete job done"--due to a lack of "accounting basics" which hindered Clary's ability to balance the labor and tax accounts. Endecott and Wylly told Clary to sign the review in the meeting, before she had finished reading and making comments on it. [FN12] In the comment section Clary complained that she lacked the support provided Burns and that she had not been advised of job functions for four months, had not received proper training, and had received incorrect figures and a lack of cooperation from other departments. [FN13]

FN12. After Clary signed the review, Wylly congratulated Endecott--apparently for his ability to get Clary to sign the review. Clary responded by crossing her name off one copy of the review. Endecott and Wylly told Clary that she could make her comments later but Endecott kept putting her off.

FN13. Clary also advised that she wished to take computer classes and felt that Marley was limiting her ability to advance.

Plaintiff first complained to Marley of age discrimination sometime after she learned that Marley was demoting her. She later appealed the demotion through Marley's internal appeal resolution procedure. James P. Way, Marley's EEO Officer and Vice President Human Resources Administration, investigated plaintiffs appeal. [FN14] On or about April 7, 1995, Way met with plaintiff to discuss the resolution of her appeal. In that meeting, Way was professional and courteous and other than her disagreement with Way's conclusion, plaintiff had no complaints with Marley's appeal resolution process. She did not feel the complaint "would do any good," however, and she specifically takes issue with the facts that (1) the EEOC sent Marley notice of Clary's charge of discrimination, along with the charge of discrimination on March 8, 1995, but Way did not prepare a final report on its internal review of her complaint until April 7, 1995; (2) the report gave no reasons why "age was not a factor in the decision" or how the demotion was "in the best interest of department and [her];" (3) Marley had previously denied her an opportunity to move up through the ranks. [FN15]

FN14. Marley denies that Way's investigation was impartial and claims that he did nothing to verify her version of the events.

FN15. Clary cites evidence that Marley refused various transfers and promotions which she requested over the course of her employment. Marley never gave Clary a reason why it did not transfer or promote her to these positions, and she does not seek damages in that regard. She felt at the time, however, and still feels that age was the motivating reason why she did not receive such promotions and/or transfers. Specifically: (a) Plaintiff applied for a position at the Olathe plant in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *3 (D.Kan.))

1989. The record is unclear whether Marley offered Clary the position (Marley claims that it did but plaintiff does not recall any job offer). The evidence is undisputed, however, that plaintiff wanted more money than the supervisor could pay, and Clary either did not accept or would not have accepted the transfer. (b) Over a period of time, plaintiff applied for various P & E positions. In 1990 or 1991, Clary interviewed for a position which opened when Marley promoted Curtis Strucktemeyer. Stan Liberty, who was in his forties and supervised P & E, interviewed Clary. He left the door open during the interview and a co-employee, Dave Bethka, could hear what they were discussing. Bethka sat outside laughing. The interview lasted only 15 minutes. Liberty asked Clary her qualifications. When she finished, Liberty made no comment but told her that he "had to go see his old parents, he hadn't seen them in a long time." Liberty went on to ask Clary about her children and how old they were. Liberty filled the position with Brad Meadows, age 34-35. Plaintiff applied for the P & E position that Susan McMillan received in 1992 or earlier. Plaintiff did not receive the position but McMillan was admittedly as well qualified as plaintiff was. Plaintiff applied for the P & E position that Gary Hughes received in 1992, but Marley did not award it to her. Plaintiff applied for the P & E position that Teresa Burns received in 1993. Clary interviewed for that position with supervisor Jim Beets, who told her that she was "only empowered so far as your manager would let you," and "if he said no, you lost all of your empowerment." Beets then told Clary that "if I would hire you, Aggie, you would have to stay out of [Dean Oehlert's] office" and instructed her that she could not "take anything to Dean." Clary feels that Marley denied her these positions because of her age. The basis for her feeling is that (1) Dean Oehlert, who managed the P & E department between 1986 and 1995 or 1996, hired younger people and had no employee as old as plaintiff (over 59 years) whom he had hired into the department (only one employee over age 40 was hired or moved into the department and that employee recently turned 50); (2) Oehlert considered P & E a training ground for young people; (3) an older female employee named Enid made a claim of discrimination involving Oehlert and Endecott some time before 1986 (Endecott had allegedly been promoted over Enid, but Clary has nothing but hearsay information about

these events since they occurred before she joined Marley); (4) Liberty made reference to his "old parents"; and (5) Liberty filled his opening with Brad Meadows, age 34-35. Clary also believed that Oehlert did not want older employees in P & E even if they were qualified and could do the work. (c) Plaintiff applied for a position in the billing department that Jon Adams received between 1992 and 1993.

*4 At the meeting with Way, Clary said that she was unhappy; that she did not believe she had been treated fairly; and that she wanted her position and salary back. Way prepared a file memo which summarized their meeting, stating that he had explained to Clary that "[h]er skills did not allow her, in the sufficient amount of time permitted, to achieve the satisfactory level of performance expected by management." He added that "[s]ufficient training and supervision were available" and that "[a]ge was not a factor as demonstrated by the promotion."

Plaintiff filed a charge of discrimination with the EEOC on March 8, 1995. After March 13, 1996, Clary received an EEOC notice of right to sue. Plaintiff filed no other charges of discrimination with any governmental agency responsible for the enforcement of age discrimination statutes, and she neither requested nor received any other notices of a right to sue.

After her demotion, in June or July 1996, plaintiff applied for the position of Pricing Analyst in the cost accounting department. A general requirement of that position was two years of college course work in accounting or business. At most, however, plaintiff had only 14 credit hours of college course work. [FN16] Scott Tripp interviewed plaintiff for the position, and he went into an extensive explanation of how it took two years to train a person for the position. Clary therefore believes that Tripp was considering her age. [FN17] Tripp has never used any other language or conducted himself in any other fashion that made plaintiff think he was harassing, discriminating, or retaliating against her. Tripp ultimately selected Sean O'Grady, an individual under age 40, because Tripp believed him to be the most qualified applicant. Plaintiff admits that she was not more qualified than O'Grady. [FN18]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *4 (D.Kan.))

FN16. Marley also had a "utilization commitment" to "advance from within." Therefore, in promoting employees, it considered the following factors (not in priority order): experience in the employee's present and previous jobs at Marley, performance, related education, ability, character, skill and willing participation in on-the-job training programs.

FN17. Since Clary filed suit, Tripp has been very cool towards her.

FN18. O'Grady's qualifications included a bachelor's degree in business administration, with a major in economics and a minor in accounting.

**\*5** Plaintiff also applied for the position of Order Administrator in approximately October, 1996, and she interviewed with Elizabeth McWilliams and Sandy Meinke. Neither McWilliams nor Meinke did anything that led plaintiff to believe they were discriminating against her on the basis of her age or because she had complained about discrimination. McWilliams selected Tom McKay, an outside applicant, because she believed he was the most qualified applicant. Plaintiff had no experience in the area of order administration, and she was not more qualified for the position than McKay. [FN19] According to McWilliams' affidavit, her decision not to select plaintiff was not based on or in any way influenced by plaintiffs age, nor was it motivated by a desire to retaliate against her for complaining of age discrimination.

FN19. McKay's qualifications include an associate's degree in technical arts and work experience selling and marketing parts. His work experience included prior employment at both Marley and a competitor. His most recent work experience involved duties quite similar to those of the Order Administrator position for which he was selected.

Until Clary filed suit, the Marley finance department celebrated birthdays and employment anniversaries on a monthly basis. Wylly's secretary prepared a memorandum showing that month's birthdays and anniversaries. Before May 2, 1994, the age of a birthday honoree was not included. After May 2, 1994, on a sporadic basis, Wylly's secretary indicated the ages of employees who were celebrating "milestone" birthdays, i.e., birthdays in five-year or ten-year increments such as 35, 40, 50,

etc. Employees whose ages were indicated included employees under and over age 40. Plaintiffs birthday appeared on a memorandum dated May 2, 1994. Next to her birthday, the memorandum stated in boldface type "60 YEARS YOUNG!" [FN20] No prior memorandum had shown plaintiffs age and she had not given permission for her age to be listed. Clary does not complain about the celebration of birthdays but attacks the posting of milestone birthdays. [FN21] Wylly and Endecott received the birthday memo of May 2, 1994, and knew its contents.

FN20. The memo also referred to another employee, "Ole Wayne Wall," as also being "60 years young."

FN21. Under Marley's practice, the ages of other birthday honorees were not listed. Thus the age of Pat Killerman, an employee celebrating his 41st birthday, was not included.

In March of 1996, Marley moved its offices to a newly constructed building in Overland Park, Kansas. Before the move, in late December, 1995 and January, 1996, Marley employees received diagrams which identified where their cubicles would be located in the new building. Marley also allowed employees to view and tour the cubicle areas. Before the move, however, Marley changed plaintiff's cubicle assignment. When the move occurred, Clary received a cubicle eight feet from the one originally assigned to her, and a younger employee (Elaine Johnson) received the cubicle Clary had thought was hers. The new cubicle was "dark, dimly lit, [and] isolated," and plaintiff complained to her supervisor Dale Unglesbee that it was too dark for her to work effectively. She told Unglesbee that the cubicle was bothering her so much so that her "eyes [were] bloodshot." It also aggravated her allergies. Moreover, the cubicle assignment was undesirable to plaintiff because she had to physically get up to communicate with her co-workers. The work area was supposedly designed so that employees would be able to share, talk, and learn from each other--and Clary could not do this. No other employee had a cubicle that was misplaced or improperly organized in such a manner. Marley did not g explain the reason for the assignment and Clary never asked.

**\*6** Clary complained to Unglesbee about the

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *6 (D.Kan.))

Page 98

cubicle three to four times during the three to four months that she occupied it. In response to a complaint in July, 1996, that the cubicle made her eyes bloodshot, Unglesbee responded that if plaintiff did not drink so much, her eyes would not be bloodshot. When Clary told him that she did not have a drinking problem, Unglesbee laughed and walked off. Clary did not find the remark humorous, and construed it as another attempt to make her feel negative about herself. [FN22]

> FN22. In June, 1996, Unglesbee also told plaintiff's co-employee Pam Thelan that if Clary "wouldn't drink so much, [her] eyes wouldn't be so bloodshot." Unglesbee later prepared a memo which claimed that Clary had "serious mental or emotional problems" because she had complained about her work station location and insisted that it was discriminatory against her. Unglesbee gave plaintiff her performance review in August 1995. Nothing in that evaluation was discriminatory, although Unglesbee was aware of Clary's pending litigation with Marley.

When another cubicle opened up, Unglesbee did not take responsibility for moving Clary to it. Instead, he told Clary and Johnson (who had plaintiff's "original" cubicle) to "draw straws" or "flip a coin" for it. Johnson declined interest when Clary said she wanted it. As a result, three to four months after the move to the new building, plaintiff received a cubicle that she finds appropriate and desirable.

Prior to plaintiff's 1995 review, Marley had encouraged Clary to attend college classes and paid for her to do so. During the 1995 review, Unglesbee stated that it would not be necessary for plaintiff to take any more college classes. Plaintiff took his comment to mean that she had no room for advancement. Plaintiff last took a college class in 1994 or 1995, and regardless of Unglesbee's statement, plaintiff would take additional college classes if she believed it to be a good idea.

In a meeting in June of 1996, Unglesbee discussed reassignment of certain tasks due to the imminent departure of one employee. One such task involved the processing of Canadian invoices. Unglesbee stated that plaintiffs coworker Wayne Wall would code the invoices, and that plaintiff would enter the invoices into the computer system. At the time of

the meeting, Wall was approximately 59 years of age. He was a very knowledgeable person and he had more extensive education in accounting than plaintiff. After the meeting, plaintiff informed Unglesbee that this division of work was ridiculous. She went to Unglesbee on July 9, 1996, to complain that she felt she was being discriminated against on the basis of age because of the method and manner in which Unglesbee was assigning the Canadian invoice work. Her complaint was that Unglesbee had made the announcement in a department meeting; she believed his announcement implied that she could not do the invoices, when the employee who had previously done them had told her there was no reason she could not do them. [FN23] Also, splitting the task meant that Clary had to initial invoices without checking them for errors and risk having errors blamed on her. [FN24] At Marley it was not common practice for two people to code invoices.

> FN23. Pam Thelan worked on the Canadian invoices with both Clary and Wall, and told Clary that there was no reason she could not do the Canadian invoices by herself. Clary has been doing all the Canadian invoices (alone) since October, 1996.

> FN24. Clary had found as many as 16 errors a day.

In the meeting, plaintiff accused Unglesbee of being discriminatory. In the ensuing exchange, both plaintiff and Unglesbee "were very verbal with one another." Unglesbee became very angry and yelled. [FN25] Clary told Unglesbee that he had humiliated her in front of the entire department when he assigned the work, that everyone knew it was not difficult, and he was intentionally degrading her abilities. Unglesbee's response was to shut the door, and to tell Clary in "clear, unequivocal terms, and in an elevated tone, that [he] practiced neither age, sex nor racial discrimination of any kind, that [he] was offended by her comments" and "to never accuse [him] of discrimination again." At one point during the conversation, Clary cried. In response to Clary's complaints, Unglesbee promised to look into reassigning the Canadian invoice work and in fact he assigned plaintiff all of the Canadian invoices in October, 1996. This assignment was satisfactory to plaintiff. Unglesbee wrote a file memo, however, which stated, "I believe Aggie has some serious mental or emotional problems although I certainly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *6 (D.Kan.))

Page 99

am not qualified to diagnose them.    I say this because of remarks she has made to me in the past year, including her not being allowed to have a set of Microsoft Office on her home computer ... and because of her work station location in the new office.    These actions she felt were 'discrimination' against her.        This she believes in spite of explanation by me to the contrary."

> FN25.    After the confrontation, Unglesbee apologized for raising his voice and plaintiff accepted his apology.

**\*7** Sometime after she filed suit in July or August of 1996, Marley received service of process in this case.    Wylly later came up the aisle and stopped at Clary's cubicle.    In front of Clary and a co-worker, and with another employee across the aisle, Wylly announced that he had just found out that Clary was suing the company for one million dollars.    Since that date he has only called her "Mrs. Clary" and for a period of time, Wylly did not speak to her at all. Wylly does not treat other employees in that manner.    Since Wylly made those comments, five of Clary's co-employees treat her differently.    They keep their distance or are cool towards her.    Way told Clary not to discuss her litigation and Clary assumed that management would follow the same rule.    Except for plaintiffs feeling that certain nonsupervisory co-workers are treating her in a "cool" manner, plaintiff has suffered no ill effects from Wylly's reference to her lawsuit.    Plaintiffs income did not decrease after this exchange, nor did the nature of her work change.

Since returning to the position of Cost Clerk II, plaintiff has performed adequately and effectively, and she functions as part of a team.    Nothing has prevented her from doing so.

On more than one occasion, plaintiff requested copies of Microsoft software for use on her home computer.    Marley told plaintiff that pursuant to its licensing agreement with Microsoft, only those employees who used a personal computer at their work station were entitled to copy software for home use.    Plaintiff was informed that she could copy the software after she had a computer installed at her work station--which occurred when Marley moved into its new building in March of 1996.    At that point plaintiff again asked for the software. Unglesbee refused, however, without explanation.

Clary assumed that when he said "no" he meant "no" so she did not seek an explanation.    Plaintiff purchased software on February 20, 1994, and April 1, 1996, and she seeks reimbursement in this lawsuit.    Prior to filing suit, however, plaintiff never requested reimbursement.

No express contract of employment controlled the terms of plaintiffs employment with Marley. Plaintiff claims that she and Marley had an implied employment contract, however, and she alleges that the following documents evidence the terms of that contract of employment:    Marley's handbook called Salaried Guidelines for Cooperation (Ex. 24); Clary's performance reviews and awards;    Marley's EEO or affirmative action plans;    memos and documents in Clary's personnel file;    and job descriptions for the positions at issue.    Clary also claims that contractual expectations arose through her tenure and service on Marley's performance review committee and the understanding of its members.

Defendant insists that the foregoing documents do not manifest any contractual intent by Marley. Clary's opinion is otherwise:    she believes that if a company is going to expect certain things of its employees, the employee should be able to expect the same from the company;    that when an employee--regardless of age--is functioning well, that employee should be entitled to expect advancements and receive opportunities;    and that payment of a paycheck implies a contract.    In part, Clary based her contractual expectations on what she saw Marley doing with other employees who moved up and received promotions.    She claims that Marley's EEO policy required every manager required to "treat each employee with respect," "be consistent," "use good judgment," "dialog with those involved, fact find and ask peers for opinions," "document," "use your common sense," "apply the 'golden rule' " and "document with bona fide business qualifications your decision."    She claims that Marley's "Performance Evaluation System" memo, which is included as part of each employee's annual performance review, promised written reviews at least annually and required the review to be "job-related and non-discriminatory." [FN26]    She claims that the employee handbook created a contract because it explained what the company would do and the whole employer-employee relationship. [FN27]    She adds that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Case 1:05-cv-00270-GMS    Document 52-2    Filed 04/17/2006    Page 11 of 36

Not Reported in F.Supp.                                    Page  100
(Cite as: 1997 WL 150048, *7 (D.Kan.))

specific portions of the handbook obligated Marley to support "individual freedom and economic opportunities safeguarded and guaranteed by ... [the] Constitution and applicable federal, state and local legislation and comply with relevant executive orders and regulations ... [and] with the enforcement of equal employment opportunity," respect the dignity of each member in the organization and provide freedom of opportunity for every individual to work at a job for which such individual qualifies on merit, "transfer, promote, train, demote and compensate ... without regard to ... age ... unless a bona fide job requirement," administer all personnel practices and programs with concern for equal employment opportunity, make sure that "all personnel share in this responsibility" and that "such efforts will be reflected in performance reviews," and "derive positive benefits through fill utilization and development of human resources."   Clary did not understand or believe Marley could change its policies at any time, if they impacted her, without notice to her.

> FN26. It also states that the review is designed to (1) assist the manager and the employee to formally evaluate overall results and discuss progress against the standards/goals established during daily coaching and counseling dialogue and the last performance plan;  (2) help the employee set job goals/responsibilities and develop action plans to meet those expected;  (3) enable managers to correlate salary increases with each employee's performance;  (4) mutually identify specific performance factors for improvement and measurement; (5) establish when necessary future job related training and/or development activities;  (6) create better understanding of judgment factors used by supervisor and Company;  (7) allow employee comments in writing on any part of the evaluation.   These same guidelines are given to employees in the "Performance Evaluation System" handbook.   The policy goes on to state that the review and performance evaluation system exists because the "continued success of ... Marley ... and our employees depends on the achievement of the Company's business objectives, plan and mission."  Nothing on the "Performance Evaluation System" sheet suggests to employees that they are not entitled to rely upon it, that Marley does not intend to be bound by it or follow it, or that it is not a contract.

> FN27. On its front cover the handbook states that Marley's mission, in part, is to "provide a rewarding environment for our employees."   The "Purpose" section of the Handbook contains no disclaimer or "at will" language whatsoever.   Instead, it states that the information is given to employees to provide them with an explanation of the "philosophy used to guide the Company."   It states that the "ultimate goal of any employment relationship is the establishment of an ongoing mutual effort which fulfills the needs of both the employer and the employee" (emphasis added).  Marley goes on to state that "we believe in that goal and try to accomplish by this simple Code of Business Conduct which: "affirms the dignity of all persons," "provides an environment where all employees are given the opportunity to fulfill their potential, regardless of ... age," and "expects honest, fair and ethical behavior at all times." "

**\*8** The Marley Guidelines booklet contains no "disclaimer" clause, nor any section for the employee to acknowledge in writing that the booklet does not create a contract.   It does contain "A Note About Changes," which states that "[b]ecause the business world is constantly changing, the Company reserves the right to change the guideline policies and practices described in this handbook at any time, with or without advance notice.   We hope you understand."

Plaintiff claims that Marley intended the handbook to be a contract, despite the lack of direct oral statements to Clary, because the "Communication" section at the bottom of page one of the Handbook states:  "Appropriate statements such as this, at a minimum, are to be posted at all Cooling Tower Company locations, distributed to each employee annually and placed in the company newspaper....  Should employees feel that 'fair and reasonable management decisions in the above stated areas are not being accomplished,' discussion with ... EEO, EEO officer or President should take place."  Marley promises (according to plaintiff) that an evaluation and report of findings will be made within 30 days.

The centerfold of the employee handbook states as follows:

THE MARLEY COOLING TOWER COMPANY IS A TEAM OF EMPLOYEES ... WHO EXPECT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *8 (D.Kan.))

Page 101

TO:

Deal fairly with coworkers at all levels, and enjoy the same treatment in return

Improve and develop their skills to maximize their opportunities for advancement

Feel confident that the work they do is meaningful, and that they have the training, equipment and support to do it

Function professionally in an environment totally committed to safety, excellence and customer satisfaction

Express opinions regularly and reasonably through suggestions and ideas that are reviewed and responded to

Receive ongoing information concerning company plans, progress and profitability

Experience individual evaluations based on the quality and consistency of their effort, enthusiasm and results

Need and receive regular updates about what duties are required of them, as well as performance and progress

Count on their Marley family for the respect, concern and team support that has typified our organization

Enjoy being part of a company that recognizes each employee as essential to its overall success

In addition, plaintiff claims that the Appeal Resolution for Employee portion promises employees an "open door" policy which it promises will include "our best good faith efforts coupled with a spirit of mutual cooperation from the parties. ...." She also cites the "Employee Utilization" provision which states Marley's "commitment ... to advance from within," considering factors such as experience in the present and previous jobs held while with the Company, performance, and related education.

Clary's service on the Performance Review committee also lead her to believe that she had an implied contract or agreement with Marley, in that performance evaluations were to be used when necessary or when anyone felt a need. Clary never received an evaluation more frequently than once a year. If there was a problem, Clary feels that she should have been told.

**\*9** Plaintiff cannot identify any time that Marley expressed a view that its relationship with plaintiff was a contractual one. Clary nonetheless claims that Marley obligated itself to treat her fairly, to

promote her, to properly review her performance and allow her to correct it, to follow its EEO and anti-discrimination statutes among others. As a result of Marley's breach, plaintiff claims that she was demoted, that she has been denied promotion and opportunity for advancement, and that she has been humiliated in front of her co-workers and is being driven from her job.

### Analysis

Plaintiffs allegations of discriminatino and retaliation span seven years and raise distinct legal issues. Defendant attacks each in turn, arguing that (1) certain ADEA claims are barred because plaintiff failed to exhaust administrative remedies; (2) plaintiff's claim under KADEA is barred because she failed to exhaust administrative remedies before the Kansas Human Rights Commission; (3) as a matter of law, ADEA affords plaintiff no remedy on account of the demotion, Marley's investigation and refusal to rescind the demotion, plaintiff's salary reduction in connection with the demotion, or Marley's alleged failure to properly train plaintiff for the Field Payroll Accountant position; (4) because plaintiff was not qualified for promotions and transfers which she sought, plaintiff cannot prevail on her claim that Marley discriminated or retaliated against her when it awarded the positions to other applicants; (5) as a matter of law, plaintiff cannot prevail on her claim that Marley discriminated or retaliated against her in miscellaneous respects from 1994 to the present; (6) as a matter of law, plaintiff cannot recover compensatory or punitive damages under ADEA; and (7) plaintiff has no actionable claim that Marley breached an implied contract of employment.

### A. FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES UNDER THE ADEA

Filing a charge with the EEOC is a prerequisite to suit under ADEA. 29 U.S.C. § 626(d) ("No civil action may be commenced by an individual under this section until 60 days after a charge" has been filed with EEOC.); see also 1 Barbara Lindemann & Paul Grossman, Employment Discrimination Law at 559 (3d ed.1996). Exhaustion is not mere etiquette; rather, it is a jurisdictional prerequisite. See Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir.1996) (discussing Title VII's similar

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *9 (D.Kan.))

Page 102

provisions).

Not only must plaintiff have filed an administrative charge with the EEOC in order to prosecute a lawsuit, she must have done so in compliance with ADEA's explicit time limits. To comply, a plaintiff must have filed an EEOC charge within 300 days of the employer's allegedly unlawful action. 29 U.S.C. § 626(d)(2); see also West v. Boeing Co. 843 F.Supp. 670, 674 (D.Kan.1994) (applying 300-day limit under Title VII), vacated in part on other grounds, 851 F.Supp. 395 (D.Kan.1994). [FN28]

> FN28. ADEA actually establishes alternative limitation periods of 180 and 300 days. The longer limitation period applies in Kansas because it is a so-called "deferral state," i.e., one having adopted a law against age discrimination and authorized a state agency to grant relief from age discrimination. See Employment Discrimination Law at 562 n. 124, citing 29 U.S.C. § 633(b) and 29 C.F.R. § 1626.9(a).

In part, plaintiff claims that Marley discriminated against her by awarding six positions to younger, less qualified people, and during an interview with Stan Liberty for one of those jobs. The latest of these seven allegedly unlawful acts occurred in 1993. To preserve her right to seek relief under ADEA, plaintiff was bound to file a charge within 300 days of the offending act. 29 U.S.C. § 626(d). Plaintiff failed to do so. Even if one assumes that the latest of these seven unlawful acts occurred on the very last day of 1993, plaintiff would have had to file her EEOC charge no later than the 300th day of 1994, namely October 27, 1994. Plaintiff has filed only one charge of discrimination with the EEOC, that being on March 8, 1995. She thus filed her EEOC charge more than four months after the deadline. Under the federal discrimination laws, plaintiff's untimeliness requires summary judgment as to events which occurred more than 300 days before March 8, 1995. See West, 843 F.Supp. at 674-75 (granting motion to dismiss under Title VII). Thus, if these seven incidents alone constituted the basis of plaintiff's claim, the action would be time barred.

*10 Plaintiff concedes, at least tacitly, that her various promotion claims in and before 1994 are not actionable. In Plaintiff's Response To Defendant's Motion For Summary Judgment (Doc. # 40) filed February 10, 1997 [Plaintiffs Response ] at 44, Clary seeks to avert summary judgment "only for the 1993-1994 pay differential, verification and actual knowledge of which she was only provided on January 2, 1997." [FN29] Contrary to defendant's argument, plaintiff articulates a claim for such relief in the pretrial order. See Pretrial Order at 8 (Doc. # 31) filed January 14, 1997. Plaintiff claims that the pay differential was part of a continuing pattern of discrimination which is actionable even if it occurred outside the 300-day time limit. Under the continuing violation doctrine, a plaintiff may rely on discriminatory conduct occurring before the limitations period if at least one of the discriminatory practices occurred within the filing period and the earlier acts are "part of a continuing policy or practice" that includes acts within the statutory time period. Mascheroni v. Board of Regents of University of California, 28 F.3d 1554, 1561 (10th Cir.1994); Martin v. Nannie and Newborns, Inc. 3 F.3d 1410, 1415 (10th Cir.1993). Plaintiff alleges that both within and beyond the appropriate time period, Marley underpaid her in comparison to younger, similarly situated workers.

> FN29. The record reveals no evidence that defendant was dilatory in providing evidence of the alleged salary differential. Moreover, plaintiff at least suspected the differential--even if she did not have actual knowledge of the precise amount--at the time she completed the EEOC Intake Questionnaire in March, 1995.

To determine whether multiple allegedly discriminatory acts are in fact connected (and therefore constitute a continuing pattern of discrimination) or are instead, discrete from one another, the Tenth Circuit has adopted a three-part test. This test requires the Court to consider: (I) "subject matter--whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence--whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequence of the act would continue even in the absence of a continuing intent to discriminate." Mascheroni, 28 F.3d at 1561, quoting Martin, 3 F.3d at 1415. Under this standard, the third factor perhaps deserves the most consideration. Berry v. Board of Supervisors of L.S.U., 715 F.2d 971, 981

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *10 (D.Kan.))

Page 103

(5th Cir.1983) (source of three-part standard adopted by Tenth Circuit in Martin ). Examining these factors, the Court finds that for purposes of the pending motion, as it relates only to the alleged salary differential, plaintiff has demonstrated a triable issue of fact as to a continuing course of discriminatory conduct under ADEA. Part of the alleged differential occurred within 300 days of the time plaintiff filed her charge of discrimination. The alleged salary discrimination is identical to that which occurred immediately outside the 300-day period. It allegedly occurred every two weeks, with each recurring paycheck. While plaintiff might have filed a timely charge of discrimination at an earlier time, the record is unclear when (and how) she first received notice that Marley had committed age discrimination with respect to salary. Clary has therefore introduced evidence sufficient to avert summary judgment on her salary differential claim under the ADEA.

**B. PLAINTIFF'S KADEA CLAIM IS BARRED BECAUSE SHE FAILED TO EXHAUST ADMINISTRATIVE REMEDIES BEFORE THE KANSAS HUMAN RIGHTS COMMISSION.**

*11 Like its federal counterpart, KADEA requires a plaintiff to exhaust administrative remedies as a prerequisite to suit. Codified at K. S.A. § 44-1111 through § 44-1121, KADEA adopts by reference the administrative procedures and requirements in the Kansas Acts Against Discrimination [KAAD]. See § 44-1115 (Supp.1995)(judicial review of decision by Kansas Human Rights Commission conducted in manner required by KAAD's § 44-1010). Plaintiff bears the burden of proving that she has exhausted her administrative remedies. Morris v. Kansas Dep't of Revenue 849 F.Supp. 1421, 1427 (D.Kan.1994).

Under § 44-1010, as made applicable to court actions brought under KADEA, "[n]o cause of action ... shall accrue in any court" unless the party dissatisfied with the decision by the Kansas Human Rights Commission has petitioned that agency for reconsideration. Id. Thus a plaintiff who has failed to exhaust administrative remedies may not prosecute a civil action under KAAD. Davidson v. MAC Equipment, Inc. 878 F.Supp. 186, 189 (D.Kan.1995); Davis v. Roadway Express Co. 1994 WL 583125, at *4 (D.Kan.).

Plaintiff admits that she has never filed anything with the Kansas agency responsible for administering KADEA. She now appears to argue that she exhausted her administrative remedies under KADEA by filing a charge of discrimination with the EEOC. Plaintiffs Response at 46-47. She cites no authority, however, for this proposition. Instead, she cites Morris v. Kansas Dep't of Revenue for the principle that she was entitled to "rely on the EEOC to refer her discrimination charge" to the Kansas agency. Morris does not stand for such a proposition.

Plaintiff cannot meet her burden to plead and establish exhaustion of administrative remedies because she never filed a charge or complaint of discrimination with the Kansas agency. This mandates summary judgment against all claims brought under KADEA.

**C. AS A MATTER OF LAW, ADEA AFFORDS PLAINTIFF NO REMEDY ON ACCOUNT OF HER DEMOTION, MARLEY'S INVESTIGATION AND REFUSAL TO RESCIND HER DEMOTION, THE SALARY REDUCTION IN CONNECTION WITH THE DEMOTION, OR MARLEY'S FAILURE TO PROVIDE ADEQUATE TRAINING.**

Plaintiff claims that effective September 1, 1994, without notice or warning, while she was satisfactorily and ably performing her duties as a Field Payroll Accountant, Marley demoted her to the Cost Clerk II position which she had previously occupied and filled her position with a younger, less qualified individual (Frank Minshall); that from September 1, 1993 through September 1, 1994, Marley also "denied training, required [her] to work long and excessive hours, had her job duties increased and changed and denied sufficient support, staff, help and assistance, in an effort to prevent her from being able to adequately perform her job and/ or to drive her from her employment at Marley due to her age." Pretrial Order at 4.

An age discrimination plaintiff may prove her case in two ways: by direct evidence or circumstantial evidence. MacDonald v. Delta Air Lines, Inc. 94 F.3d 1437, 1441 (10th Cir.1996). Direct evidence, though rare, consists of "proof of an existing policy which itself constitutes discrimination." Mosley v. Pena, 100 F.3d 1515, 1519 (10th Cir.1996). When

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *11 (D.Kan.))

Page 104

an age discrimination plaintiff instead relies on circumstantial evidence, federal courts apply the three-part analysis adopted in McDonnell Douglas Corp. v. Green 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See MacDonald, 94 F.3d at 1441 (applying to ADEA claim). Under this approach, plaintiff must first establish a prima facie case. If that occurs, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for its action. If defendant identifies such a reason, plaintiff must prove that defendant's stated reason is actually a pretext concocted to conceal an illegal discriminatory motive. Trujillo v. Grand Junction Regional Center, 928 F.2d 973, 977 (10th Cir.1991).

*12 To demonstrate pretext sufficient to require a trial, plaintiff must produce specific facts showing that defendant's "explanation is unworthy of credence" or demonstrate directly that a discriminatory reason more likely motivated defendant's action. Rea v. Martin Marietta Corp. 29 F.3d 1450, 1455 (10th Cir.1994). Where plaintiff fails to come forward with facts meeting one of these two alternatives, defendant is entitled to summary judgment. Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 529 (10th Cir.1994).

1. Demotion and Failure to Train

The precise elements of a prima facie case "must be tailored, on a case-by-case basis, to differing factual circumstances." Employment Discrimination Law at 587. With appropriate modifications for the circumstances alleged by plaintiff in this case, the Tenth Circuit has held that plaintiffs prima facie case must show:
(1) the employee belongs to the protected age group; (2) the employee's job performance was satisfactory, (3) the employee was [demoted]; and (4) the employee was replaced by a younger person.
MacDonald, 94 F.3d at 1441. In determining whether plaintiff has made a prima facie case that she was performing the work in a satisfactory manner, the Court must disregard the employer's proffered reasons for the demotion. Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1470 (10th Cir.1992), citing MacDonald v. Eastern Wyoming Mental Health Center, 941 F.2d 1115, 1119-20 (10th Cir.1991). To the contrary, a plaintiff may make out a prima facie case of

discrimination in a discharge case by credible evidence that she continued to possess the objective qualifications she held when she was fired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she held her position for a significant period of time.
MacDonald, 941 F.2d at 1121.

The uncontroverted facts preclude the second element of this formulation. [FN30] Plaintiff concedes that she was unable to perform some of the work required of the Field Payroll Accountant. She was unable to close the company's books on time, which forced her supervisor to use estimated numbers and later correct those numbers with actual data. Moreover, plaintiff admits that on one occasion her inability to close delayed the closing for the entire company. She concedes that her predecessor as Field Payroll Accountant never caused such problems. Given these concessions--all of which come from plaintiffs own testimony--she cannot establish a prima facie case that she was performing satisfactorily as Field Payroll Accountant. See MacDonald, 94 F.3d at 1443 (affirming summary judgment for defendant where plaintiff failed to establish element of prima facie case).

> FN30. In this case, the Court is principally concerned with plaintiff's testimony that her work was satisfactory. At the time of the demotion, plaintiff continued to possess the objective qualifications she held when she was promoted. By all accounts, however, the promotion involved new duties and job requirements. Plaintiff's ability to do the job was untested, and the fact that she continued to possess the same objective qualifications at the time of demotion has no particular relevance. Similarly, given the fact that the job was all new to plaintiff and that at best it had an eight-month learning curve, the Court cannot find that plaintiff occupied the position for any significant period of time.

Plaintiff does not quarrel with the general legal principles set forth above, but she strongly disagrees that they preclude her age discrimination claim based on the demotion. She admits that she had no reason to doubt that Wylly and Endecott believed the reasons they stated for her demotion, but apparently insists that whatever Endecott and Wylly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *12 (D.Kan.))

Page 105

may have believed, she is entitled to proceed to trial under Ingels v. Thiokol Corp., 42 F.3d 616, 621 (10th Cir.1994), and Jones v. Unisys Corp. 54 F.3d 624, 630 (10th Cir.1995). Clary reasons that (1) although work in the Field Payroll Accountant position could have been done better, the problem "had nothing to do" with her; (2) since Clary left the position, the position has been changed; [FN31] (3) in August, 1994, no one could have done a better job; [FN32] (4) Clary did not receive proper instruction, [FN33] and (5) had Clary received proper support, she could have done just as well as her predecessor and her successor. Plaintiff also argues that younger employees in the Field Payroll Accountant position (that is, Clary's predecessor and her successor) received assistance and training which allowed them to do and keep their jobs; and that statistical evidence of Marley reflects systematic elimination of older employees. Plaintiffs Response at 14-16. [FN34]

> FN31. Certain job duties have been eliminated because Marley transferred payroll and tax payments to outside contractors, and eliminated a very difficult Lotus computer program.

> FN32. According to plaintiff, it was a struggle to get the monthly closing done on time and UDI cut a day and a day off the closing schedule (making matters worse).

> FN33. Clary states that younger employees at Marley--Nadine Wisdom (who is five years younger than plaintiff), Elaine Johnson (who is in her late forties), Wayne Wall (who at age 60 is two years younger than plaintiff), and Sharon McIntosh (who is in her late thirties)--received new position training that she did not get. By "training," plaintiff means that "someone should have been going over each thing and making sure it was done correctly ... because when you learn something new, someone should check."

> FN34. Plaintiff also notes that Wylly and Unglesbee used the phrase "young guns" in an award ceremony and in meetings, and that such statements provide proof of intentional discrimination. Plaintiffs Response at 15, 50. Plaintiff was not specific about the use of this language, saying only that she thinks it happened more than once. Even assuming that Marley employees used this phrase, this is not sufficient to require a trial. "Isolated

comments, unrelated to the challenged action, are insufficient to show discriminatory animus in [the challenged] decisions." Cone v. Longmont United Hospital Ass'n, 14 F.3d 526, 531 (10th Cir.1994). Isolated comments, such as the phrase at issue, are best characterized as "stray remarks" that are "insufficient to create a jury issue in an ADEA case." Id. Moreover, plaintiff must show a nexus between the alleged remark and her demotion. Rea v. Martin Marietta Corp., 29 F.3d 1450, 1457 (10th Cir.1994); Cone, 14 F.3d at 531-32. She has not done so. The record yields no evidence that use of the phrase "young guns" related to the decision to demote plaintiff or any other allegedly adverse action. Consequently, pretext cannot be inferred from it.

*13 In arguing that the Field Payroll Accountant problems "had nothing to do" with her, that "no one could have done a better job" and that Marley changed the duties of the position after it demoted her, Clary essentially concedes that she failed to perform her job to defendant's satisfaction but rationalizes that Marley's expectations and requirements were not realistic or attainable--for her or for anyone else. Even construing the record in the light most favorable to plaintiff, the Court must reject these contentions. The record is undisputed that plaintiff's predecessor met the requirements of the position, and a jury could not reasonably find that Marley's expectations and requirements were so unrealistic and unattainable that no employee could fulfill them. Whether the job requirements were reasonable and attainable for plaintiff is another question. Viewing the record in the light most favorable to plaintiff, we accept her argument-- speculative as it may be--that had she received proper oversight and training, Clary could have done her job as well as anyone. On this record, however, that argument is insufficient to avert summary judgment. The record is undisputed that plaintiff accepted the promotion at a time which imposed unprecedented demands on the Field Payroll Accountant position because UDI had just acquired Marley. Plaintiffs supervisor was overworked, as were her co-workers and her predecessor (on whom Clary was counting for help), and plaintiff did not receive the one-on-one assistance she needed or desired. Even if we assume that Marley provided better training to plaintiff's predecessor and successor, and that such evidence might give rise to a prima facie case of age



Not Reported in F.Supp.                                                    **Page 106**
(Cite as: 1997 WL 150048, *13 (D.Kan.))

discrimination in relation to training, plaintiff's claim would nonetheless fail. Marley does not concede that it provided inadequate training but contends that if it did not, the lack of training was due to the UDI acquisition and the general level of unprecedented activity within plaintiff's department. This statement constitutes a legitimate non-discriminatory reason for any failure to train. Plaintiff, in response, has identified no facts which suggest that Marley intentionally understaffed plaintiffs department or overworked other employees to prevent them from training plaintiff or checking on her work, or that it might have done so on account of plaintiff's age.

With reference to the so-called "statistical evidence" of discrimination, plaintiff argues that Marley discriminated against her because few employees in her department are older than she. Plaintiff is 63 years old and, not surprisingly, she is one of the oldest employees in her department. That fact alone is not probative of intentional discrimination. Contrary to plaintiffs assertion that these data prove an age-based animus, plaintiffs statistics show that in each of the three years covered by her information, the majority of employees in plaintiff's department were in the class of persons protected by ADEA. Even giving plaintiff the benefit of every favorable inference, the statistical evidence she presents is incomplete, ill-defined, and piecemeal and it therefore is not probative. See McCarter v. West, 910 F.Supp. 519, 524 (D.Kan.1995), affd, 105 F.3d 1335 (10th Cir.1997). It does not create an inference of pretext which requires a trial.

**\*14** Finally, even if plaintiff could make a prima facie case, Marley has articulated a legitimate, non-discriminatory reason for the decision to demote her. Plaintiff does not dispute the fact that her immediate supervisor and his supervisor believed she was not performing the job and that someone could do the job better. Given Marley's articulation of a legitimate reason for the demotion, plaintiff must show that this reason is pretextual-- that is, it is "unworthy of credence" or that the decision was more likely motivated by discriminatory animus--or accept summary judgment. Plaintiff's admissions preclude such proof. Plaintiff admits that she repeatedly failed to discharge at least one of the job's central functions, i.e. close the books in a timely manner, and she

admittedly had no reason to doubt that Endecott and Wylly believed that the stated reasons for the demotion were true. Wylly, who is older than plaintiff, had approved her promotion--and no reasonable fact-finder would infer that eleven months later, the 62-year old executive would discriminate against his 60-year old Field Payroll Accountant on account of her age. Endecott, the other person who demoted plaintiff also selected plaintiff for the promotion eleven months earlier. Plaintiffs concession that the people who demoted her are the very people who had promoted less than one year earlier creates a "powerful inference" against any discrimination. Proud v. Stone, 945 F.2d 796, 798 (4th Cir.1991)(when the hirer and firer are same individual, powerful inference that discrimination was not motivating factor). This Court has recognized the value of this inference in circumstances like this case, McKinsey v. Sentry Ins., 1992 WL 101686, at * 4 (D.Kan.), aff'd 986 F.2d 401 (10th Cir.1993), as have other courts. See, e.g., Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1336 (8th Cir.1996) (affirming summary judgment against plaintiff); LeBlanc v. Great American Ins. Co., Inc. 963 F.2d 173, 175 (8th Cir.1992).

2. Related events

Plaintiff asserts that two events directly related to her demotion also represent age discrimination: (1) Marley's refusal to "rescind, revoke or consider plaintiffs [internal] appeal" of the demotion; and (2) Marley's decision to reduce plaintiffs salary as a result of her demotion. See Pretrial Order at 5. Neither claim withstands legal analysis.

As for the internal appeal of the demotion decision, it is undisputed that Marley's EEO officer investigated plaintiffs assertion that discrimination had caused the demotion. He discussed the situation with plaintiff and the relevant decision-makers. Given the Court's finding that the demotion itself is not actionable, plaintiff has not established an independently actionable claim based on Marley's failure to reverse its decision through the internal grievance procedure.

Moreover, on the record, the one permissible conclusion is that the reduction in plaintiffs salary after the demotion reflected the change in plaintiffs job duties. Marley had increased plaintiff's

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *14 (D.Kan.))

Page 107

monthly salary by $130 when it promoted her to Field Payroll Accountant; when it demoted her, it reduced her salary to its earlier level. Plaintiff may not agree with either decision, but she has not established a prima facie case that it was discriminatory.

## D. POST-DEMOTION CLAIMS OF DISCRIMINATION AND RETALIATION, BASED ON MARLEY'S REFUSAL TO PROMOTE PLAINTIFF AFTER HER DEMOTION ON SEPTEMBER 1, 1994.

**\*15** Plaintiff contends that virtually all employment actions which occurred after her demotion in 1994 were discriminatory and retaliatory, and she specifically claims that Marley failed to promote her in violation of the ADEA. To the extent plaintiff relies on discrimination theories, this order has already identified the appropriate legal analysis. To the extent retaliation provides plaintiffs theory, the ADEA also prohibits an employer from discriminating against an employee because that employee "has opposed any practice made unlawful" by the ADEA. 29 U.S.C. § 623(d); see also Verstraete v. Farmers Ins. Co., Inc. 1994 WL 373890, at *3 (D.Kan.). The approach adopted in McDonnell Douglas also applies to retaliation claims. Meredith v. Beech Aircraft Corp., 18 F.3d 890, 896 (10th Cir.1994); Boyd v. Telecable of Overland Park, Inc. 752 F.Supp. 388 (D.Kan.1990). Under this approach, a plaintiff claiming retaliation must first establish a prima facie case by showing:

(1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer contemporaneously or subsequent to the employee's protected activity; and (3) a causal connection between such activity and the employees actions.

Anderson v. Phillips Petroleum Co., 861 F.2d 631, 634 (10th Cir.1988); see also Meredith v. Beech Aircraft Corp., 18 F.3d 890, 896 (10th Cir.1994) (applied in case alleging retaliation under Title VI); Verstraete 1994 WL 373890, at *2. If plaintiff establishes each of these elements, the burden shifts to defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. Anderson, 861 F.2d at 634. Once defendant states a legitimate reason for its action, plaintiff can prevail only by demonstrating

that the defendant's articulated reason was merely pretext. Id.

### 1. Position In Pricing & Estimating

Plaintiff cannot establish a prima facie case on her claim that Marley did not select her for pricing and estimating position which became available in 1996, on account of age discrimination. To do so, she must prove that she was qualified. See Kenworthy v. Conoco, Inc., 979 F.2d 1462, 1469 (10th Cir.1992) (to establish prima facie case in Title VII failure to promote claim, plaintiff must establish she was qualified for the position). The posting for this job stated that the general requirements for the position were two years of college course work in accounting or business. At most, plaintiff had only fourteen hours of college courses. Thus plaintiff did not meet the minimum requirements for the job, as stated by Marley's neutral job description. Moreover, while plaintiff argues that Marley had a "utilization commitment" to "advance from within," she has not introduced facts from which a jury might reasonably infer that her present and previous experience at Marley, and her performance, related education, ability, character, skill and willing participation in on-the-job training programs, might supply the reasonable equivalent of two years of college course work in accounting in business. Moreover, plaintiff has not purported to demonstrate--even superficially--how her qualifications might meet the requirements of this particular job.

**\*16** Even if plaintiff could move beyond the prima facie phase of the analysis, however, she can identify no facts showing that Marley's explanation for selecting another applicant is pretextual. Tripp stated that he chose O'Grady because, in his judgment, he had the best qualifications. O'Grady's qualifications included a bachelor's degree in business administration, with a major in economics and a minor in accounting.

Assuming without deciding that Tripp knew of plaintiff's protected activity and that the timing of his actions gave rise to a prima facie case of retaliation, defendant is nonetheless entitled to summary judgment because it has articulated a legitimate nondiscriminatory reason for its refusal to hire plaintiff in the P & E position. Plaintiff's inability to establish pretext for purposes of her age

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *16 (D.Kan.))

discrimination claim means she cannot show it for purposes of her retaliation claim. See Anderson, 861 F.2d at 634 (requiring retaliation plaintiffs, like those claiming under ADEA, to demonstrate facts indicating pretext). Her failure mandates summary judgment for Marley on that theory. See Rea, 29 F.3d at 1460.

Plaintiff cites case law to the general effect that close temporal proximity between a protected act and adverse employment action is sufficient to defeat summary judgment on a retaliation claim, Marx v. Schnuck Markets, Inc., 76 F.2d 324, 329 (10th Cir.) cert. denied, 116 S.Ct. 2552 (1996), and that an employer's differential treatment of other employees who have not pursued protected claims may establish retaliatory motive. See Moore v. McDermott, Inc., 494 So.2d 1159 (La.1986) on remand to 504 So.2d 982 (La.App.1987). Plaintiff does not otherwise respond to defendant's argument that summary judgment is necessary because plaintiff can identify no facts which establish that Marley's explanation for selecting O'Grady is pretextual. Indeed, plaintiff admits that she was not better qualified than O'Grady. See Plaintiffs Response at 22 (admitting plaintiff not more qualified for position). By this admission, plaintiff has conceded that Marley had legitimate non-discriminatory reasons for selecting O'Grady and precluded the possibility of proof that its reasons were pretextual. See Rea, 29 F.3d at 1457 (to raise inference of pretext, plaintiff must show she was more qualified than successful applicant).

### B. Position as Order Administrator

The analysis which governs plaintiffs age discrimination claim on the P & E position applies to the claim based on the Order Administrator's position. The posting for this job stated that qualified candidates should have some college experience or equivalent work experience, with degreed candidates preferred. In fact, the person ultimately selected for this position had a two-year degree. Plaintiff did not have a college degree of any kind and moreover, she has not shown that she possessed equivalent non-educational qualifications. Thus she has not shown that she was qualified, as she must to establish a prima facie case. Kenworthy, 979 F.2d at 1462.

*17 Moreover, Marley has articulated a non-

discriminatory reason for selecting another candidate, Tom McKay, for the job. McKay had not only had a college degree but previous experience in similar work. Plaintiff admits that she had no experience in the kind of work required by the Order Administrator's job and that, even in her opinion, she was not better qualified than McKay. These admissions render plaintiff unable to show pretext and require summary judgment. See Rea, 29 F.3d at 1460. This conclusion also disposes of plaintiff's retaliation claim arising from failure to promote.

### E.  POST-DEMOTION  CLAIMS  OF DISCRIMINATION  AND  RETALIATION, BASED ON MISCELLANEOUS EVENTS.

Plaintiff claims that Marley discriminated and retaliated against her in various respects between 1994 and the present:

#### 1. Birthday memoranda

Plaintiff claims that Marley engaged in age discrimination or retaliation when it included her age on the finance department's monthly birthday memo. With respect to plaintiffs claim of retaliation, the timing of the memo defeats plaintiffs claim. Marley distributed the memo in May of 1994, well before plaintiff engaged in protected activity under the ADEA. Anderson, 861 F.2d at 634.

As for plaintiffs assertion that the memorandum discriminated against her based on age, plaintiff also cannot make a prima facie case. In order to show disparate treatment, plaintiff must show that she was treated less favorably than others because of her protected status. Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1424 (10th Cir.1993). Plaintiff cannot show that she was treated less favorably than others who were not members of the protected class, i.e. employees under age 40. The birthday memo included the ages of employees under age 40 in addition to those of employees over age 40.

Defendant is entitled to summary judgment on this issue and plaintiffs suggestions in opposition to defendant's motion for summary judgment do not argue otherwise.

#### 2. Location of plaintiffs cubicle

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *17 (D.Kan.))

To make a prima facie case of retaliation, plaintiff must show that she suffered adverse employment action after complaining of age discrimination. Anderson, 861 F.2d at 234. The conduct of which she complains must represent a materially adverse change in the terms and conditions of her employment. Crady v. Liberty Nat'l Bank & Trust Co. 993 F.2d 132, 136 (7th Cir.1993); Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 885 (6th Cir.1996)(nurse's reassignment from supervisor to unit RN not materially adverse change); Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir.1994)(change in job duties and negative evaluations causing no materially significant disadvantage insufficient to establish adverse conduct). To be materially adverse, a change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." Crady, 993 F.2d at 136. Not everything that makes an employee unhappy is an actionable adverse action. Otherwise, every minor and trivial employment action would form the basis of a discrimination suit.

*18 Defendant argues that plaintiffs assignment to an undesirable cubicle (one located eight feet away from her originally assigned cubicle, in a darker area of the office) for a period of three or four months was a trivial inconvenience that as a matter of law did not constitute employment action which was materially adverse to plaintiff Throughout the time, all cubicles were apparently occupied, [FN35] so the question is whether Marley acted unlawfully when it assigned plaintiff (instead of another employee) to that position. Crady, 933 F.2d at 136.

> FN35. Approximately three to four months after plaintiff received this cubicle assignment, a different cubicle became available when an employee resigned.

Plaintiff does not argue that the cubicle assignment occasioned anything that can remotely be described as adverse employment action. Her suggestions in opposition to defendant's motion for summary judgment offer nothing on the subject. [FN36] The Court therefore finds that summary judgment is appropriate. The record does not suggest that Marley's new offices were unfit for habitation, that they violated federal or state standards with respect to occupational health or safety, or that they failed any objective minimal standards with respect to the working environment.

Moreover, the record will not support any reasonable inference that plaintiff's cubicle assignment occasioned a "materially adverse" change in the terms and conditions of her employment. The fact that plaintiff's cubicle for three or four months may have been darker, or located outside the central path of traffic, is a trivial inconvenience which does not warrant a trial. Moreover, even if the assignment caused plaintiff to have bloodshot eyes or exacerbated her allergies for several months, the record is devoid of evidence that such conditions had any effect on plaintiff's ability to perform her work or occasioned any materially adverse change in the terms and conditions of her employment.

> FN36. Her brief states only that it was not coincidental that plaintiff "is told and shown in late December, 1995 that she will have a certain position/cubicle in the new offices, but without warning or notice is stuck in the back in a dark, undesirable location while no younger employees are similarly treated and a younger employee is given her original cubicle."

3. Unglesbee's comment about "drinking"

When plaintiff complained to Mr. Unglesbee about the darkness of her work area, she said that her eyes were bloodshot, leading Unglesbee to respond that "if [plaintiff] wouldn't drink so much, [she] wouldn't have bloodshot eyes." Marley argues that while such a comment might have been inappropriate or even in bad taste, there is no evidence that it affected plaintiffs employment in any way, much less in a material one.

Plaintiff does not respond to this argument, focusing her limited attention on the question of causation ("It is simply not a coincidence that Clary was booted from her position as a Field Payroll Accountant in September, 1994, and then after objecting and seeking review of such action, was then ... accused by Unglesbee, her supervisor, in June, 1996, of having a drinking problem which he then shared with her co-worker.") The Court find that plaintiff makes no claim of materiality and that summary judgment for defendant is appropriate. Moreover, the Court finds that the comments by Unglesbee did not constitute materially adverse employment action, singly or in combination with other events described in this order. [FN37]



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *18 (D.Kan.))

FN37. Sexually-oriented conduct in the workplace which is severe and pervasive enough to create an objectively hostile work environment is actionable under Title VII. Harris v. Forklift Systems, Inc. 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Meritor Say, Bank v. Vinson 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Hicks v. Gates Rubber Co. 833 F.2d 1406 (10th Cir.1987). The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. Episodic and isolated incidents or verbal comments which are severe neither in duration nor content will not form the basis for a claim of hostile working environment. See Bolden v. PRC Inc., 43 F.3d 545 (10th Cir.1994), cert denied 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995); Honce v. Vigil, 1 F.3d 1085, 1090 (10th Cir.1993); Ziegler v. K-Mart Corp., 1994 WL 476251 (D.Kan.), aff'd 74 F.3d 1250 (10th Cir.1996); Goeffert v. Beech Aircraft Corp., 1994 WL 146355 (D.Kan.), aff'g 51 F.3d 286 (10th Cir.1995). Applying such standards to this case, the Court finds as a matter of law that defendant is entitled to summary judgment on any claim that the alleged events of discrimination, taken together, subjected plaintiff to a hostile work environment in violation of the ADEA.

#### 4. Lack of encouragement to enroll in college courses

**\*19** In August 1995, while discussing plaintiffs performance evaluation, Unglesbee told plaintiff that "[i]t won't be necessary for you to take any more college classes." Plaintiff did not inquire what Unglesbee meant by that statement, nor did he elaborate. Plaintiff concedes that regardless of Unglesbee's statement, she would "absolutely" take college classes if she thought it was a good idea. Marley argues that this ambiguous statement did not materially change the terms or conditions of plaintiffs employment, and that it is not actionable under ADEA.

Plaintiff again does not respond to Marley's arguments; she addresses only the question of causation ("It is simply not a coincidence that Clary was booted from her position as a Field Payroll Accountant in September, 1994, and then after objecting and seeking review of such action, was ... told in August, 1995 that she doesn't need to take any more college classes."). The Court finds that plaintiff makes no claim of materiality and that summary judgment for defendant is appropriate. Moreover, the Court finds that the comments by Unglesbee did not constitute materially adverse employment action, singly or in combination with other events described in this order.

#### 5. Plaintiffs confrontation with Unglesbee

In a department meeting in June of 1996, Unglesbee stated that coding the invoices would be the responsibility of plaintiffs co-worker, Wayne Wall, and that plaintiff would input the information into the system. Plaintiff contends that the way Unglesbee divided the work was age discrimination and she told him so in a "very verbal" exchange of views on the subject. By October of 1996 (three to four months later), Unglesbee had redistributed the work in a manner which satisfied plaintiff.

At the time of this discussion, Clary was 62 years old and Wall (with whom Unglesbee proposed that Clary divide the work) was 59 years old. Marley claims that it is entitled to summary judgment because plaintiff asserts nothing more than a non-actionable disagreement with a supervisor about allocation of work. Plaintiff again does not respond, arguing only that "[i]t is simply not a coincidence that Clary was booted from her position as a Field Payroll Accountant in September, 1994, and then after objecting and seeking review of such action, was ... denied opportunity to do Canadian invoices and subjected to exposure from improper errors in coding without justification from early 1996 until July, 1996." Plaintiff does not purport to make a prima facie case of that Unglesbee discriminated against a 62-year-old, in favor of a 59-year-old, on the basis of age. While she may be capable of establishing a prima facie case of retaliation, the Court find that she has not demonstrated a triable issue whether the work allocation announcement--or the work allocation itselfhad a materially adverse impact on the terms and conditions of plaintiff's employment. While Unglesbee's announcement may have offended plaintiff, the record does not suggest that it had any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *19 (D.Kan.))

stigmatizing or other negative impact on plaintiff's work. The same is true with respect to the division of work which Unglesbee utilized for three or four months.

*20 The Court finds that plaintiff makes no claim of materiality and that summary judgment for defendant is appropriate. Moreover, the Court finds that the comments and work allocation decisions by Unglesbee did not constitute materially adverse employment action, singly or in combination with other events described in this order.

### 6. Comment in workplace concerning plaintiffs lawsuit

Plaintiff alleges that Marley discriminated and retaliated against her when Wylly "announc[ed][her] lawsuit so people that I work with could hear him;" that after he made this statement, Wylly did not speak with plaintiff for "a period of time;" and that he now addresses her only as "Mrs. Clary." Except for plaintiff's feeling that certain coworkers treat her in a "cool" manner, plaintiff can identify no effect of Wylly's statement. Marley therefore argues that plaintiff cannot show that Wylly's statement or behavior had any adverse effect on her employment.

Plaintiff again addresses nothing but causation ("It is simply not a coincidence that Clary was booted from her position as a Field Payroll Accountant in September, 1994, and then after objecting and seeking review of such action ... has the company President accost her in the hallway by her cubicle and announce to her co-workers, after she served Marley with litigation in mid-1996, that she has sued Marley for $1 million dollars; [that] her co-workers then shun her and Wylly; [and that] then James Wylly, the Sr. Vice President, refuses to talk or communicate with her in a normal fashion."). The Court find that plaintiff has therefore abandoned any claim of materiality and that summary judgment for defendant is appropriate. The Court finds that plaintiff makes no claim of materiality and that summary judgment for defendant is appropriate. Moreover, the Court finds that the comments by Wylly did not constitute materially adverse employment action, singly or in combination with other events described in this order.

### 7. Computer software

Plaintiff asked that Marley provide copies of Microsoft software for use on her home computer. Unglesbee initially declined her request, based on Marley's licensing agreement with Microsoft. Therefore, on February 20, 1994--before plaintiff had engaged in protected activity under ADEA--plaintiff purchased the software she had requested. In March of 1996, plaintiff received a computer at her office desk and she again requested software for her home computer. Marley again declined, so on April 1, 1996, plaintiff purchased more software. Plaintiff neither sought nor received an explanation for this decision.

Marley argues that even if its conduct in this regard could be considered adverse employment action, plaintiff cannot show that it was causally connected to her prior complaint of age discrimination and that she therefore fails to make a prima facie case.

A causal connection may be inferred when an adverse employment action follows an employee's charges of discrimination against the employer. Candelaria v. EG & G Energy Measurements, Inc. 33 F.3d 1259, 1262 (10th Cir.1994). But that inference can be drawn only where there is a "close temporal proximity" between the employee's charges and the subsequent adverse employment action. Id. The Tenth Circuit found a sufficient temporal proximity where the plaintiff was fired two hours after engaging in protected activity. Love v. Re/Max of America, Inc., 738 F.2d 383, 386 (10th Cir.1984). Similarly, this Court found a sufficient causal connection where the plaintiffs employment was terminated one month after filing a charge of discrimination. Tourtillott v. Maryland Casualty Co. 1993 WL 339070, at *4 (D.Kan.).

*21 In contrast, the Tenth Circuit held in Candelaria that adverse employment action which occurred three years after the employee had engaged in protected activity was insufficient to raise an inference of a causal connection in the absence of other evidence of retaliatory motive. 33 F.3d at 1262. Similarly, this Court has found that where the employee's complaint and the adverse action were separated by three years and no other evidence connected the events, plaintiff had failed to show a causal connection. Redmond v. Day & Zimmerman, Inc. 897 F.Supp. 1380, 1386 (D.Kan.1995), aff'd, 85 F.3d 641 (10th Cir.1996).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *21 (D.Kan.))

Page 112

Indeed, the Tenth Circuit has held that a temporal proximity as short as two months is insufficient to create an inference of retaliatory motive. Murray v. City of Sapulpa, 45 F.3d 1417, 1421-22 (10th Cir.1995).

In the present case, plaintiff's first internal complaint of discrimination occurred shortly after August 22, 1994. Plaintiff filed an EEOC charge on March 8, 1995. In March or April of 1996--a year later--Marley declined plaintiff's request for software. Plaintiff has produced no evidence of a causal connection between her age or her protected activity, on the one hand, and Marley's refusal to let her copy software for her home computer, on the other. Plaintiff does not directly address the legal or factual argument raised by Marley, other than to state in conclusory fashion that "[I]t is simply not a coincidence that Clary was booted from her position as a Field Payroll Accountant in September, 1994, and then after objecting and seeking review of such action, was ... denied software for her home computer from March, 1996 on without explanation or justification." The temporal proximity in this case is too attenuated, however, to support on inference of causation without further evidence. Such evidence does not exist in this record. Moreover, Clary does not purport to demonstrate that Marley distributed free software to younger employees but not to older employees. Accordingly, the Court finds that plaintiff has not established a prima facie case of discrimination or retaliation in this regard.

Moreover, the record is devoid of evidence that Marley's refusal to provide software for plaintiff's home computer occasioned any materially adverse change in the terms and conditions of plaintiff's employment. Plaintiff does not claim that she used her home computer for work-related purposes or that the lack of free software altered her ability to do the job. Summary judgment for defendant is therefore appropriate. Plaintiff makes no claim of materiality and the Court finds as a matter of law that finds that Marley did not take employment action which was materially adverse to plaintiff(singly or in combination with other events described in this order) when it refused to provide free software for plaintiff's home computer.

### E. AS A MATTER OF LAW, PLAINTIFF MAY NOT RECOVER PUNITIVE DAMAGES OR MORE THAN $2,000 IN COMPENSATORY DAMAGES.

*22 Defendant correctly argues, and plaintiff does not dispute, that Marley is entitled to summary judgment on plaintiff's claim for punitive damages and compensatory damages exceeding $2,000.00. Plaintiff may not recover punitive damages under the ADEA. Bruno v. Western Electric Co., 829 F.2d 957, 967 (10th Cir.1987). Moreover, while the ADEA is silent on the question, the Tenth Circuit has held that the act does not authorize recovery of compensatory damages. Perrell v. Financeamerica Corp. 726 F.2d 654, 655 (10th Cir.1984).

### F. PLAINTIFF CAN PRODUCE NO EVIDENCE SHOWING THAT MARLEY ENTERED INTO A CONTRACT OF EMPLOYMENT WITH PLAINTIFF.

Plaintiff claims that she had an implied contract of employment and that Marley breached it in respects which she does not identify in the Pretrial Order. In her response to defendant's motion for summary judgment, however, plaintiff claims that Marley breached the implied contract by demoting her, docking her pay, paying her less than it paid her predecessor and her successor in the Field Payroll Accountant position, failing to give her an opportunity to correct or improve deficiencies prior to penalizing her with demotion, and repeatedly treating her unequally and unfairly and contrary to specific promises. Plaintiffs Response at 3341.

Plaintiff bears the burden of proving the existence and breach of such a contract. Unless she demonstrates a triable issue of fact in that regard, summary judgment is required under Celotex. See Nash Finch Co. v. Caspa, 813 F.Supp. 1497, 1499 (D.Kan.1993). An implied contract may be "inferred from the facts and circumstances of the case and [they] are not formally or explicitly stated in words." Atchison County Farmers Union Co-op Ass'n v. Turnbull, 241 Kan. 357, 363, 736 P.2d 917, 922 (1987). For a factfinder to find that such a contract exists, however, the evidence must show a mutual intent to have a contractual relationship. 241 Kan. at 364, 736 P.2d at 917. Consequently the issue is whether Marley made statements or conducted itself in such a manner as might lead a jury to reasonably infer that Marley intended to

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 150048, *22 (D.Kan.))

Page 113

form a binding contract with plaintiff. *Berry v. General Motors Corp.,* 838 F.Supp. 1479, 1492 (D.Kan.1993), aff'd 56 F.3d 1233 (10th Cir.1995); *Pegg v. General Motors Corp.* 785 F.Supp. 901, 909 (D.Kan.1992); *Care Display, Inc. v. Didde-Glaser, Inc.,* 225 Kan. 232, 589 P.2d 599 (1979).

When asked at her deposition to identify any time Marley has uttered words manifesting its relationship with plaintiff, plaintiff conceded--albeit in a roundabout way--that none exist:

Q: Did you ever tell anyone, any member of Marley's management; your supervisor, anyone in [the Vice President in charge of employment matters]'s office, that you viewed the employment contract or the reviews or the awards as an implied contract or as a contract?

A: I never used that term, no.

Q: All right. Has anyone at Marley ever indicated to you that from Marley's standpoint they think of the handbook as being a contract of employment with you?

*23 A: I've not heard them reference that as such.

Q: And you answered that you had never used that term with Marley. Whether you have used that particular term, have you ever had any communications with members of Marley of their management indicating that you believe you have an agreement or contract of employment with them?

A: I feel that the fact that I received a paycheck from them twice a month is an implied contract; that they're paying me for my services.

Q: And have you ever told anyone at Marley that that is the way you view your relationship?

A: I don't believe so.

* * *

Q: All right. Did anyone at Marley, kind of coming at it from the other direction, ever tell you that from Marley's perspective, Marley thought it had an agreement with you, whether it was implied or expressed, that they would treat you in the fashion that you think you saw other employees being treated? And I'm talking about verbal communications now.

A: Whey I was hired I assumed that there would be this type of relationship, that if you worked well, that you would be rewarded.

Q: And again, with all respect to your opinions, I'm asking specifically from a factual standpoint,

did you talk with someone at Marley to the effect "I think we have an agreement that I'll be treated in this fashion; do you agree with that?" Did you have that conversation ever?

A: I didn't have a conversation of that nature, no. Deposition of Agnes J. Clary (December 30 and 31, 1996) [Clary Dep.] at 278-279, 281-282.

In fact, other than expressing her opinion or feelings, plaintiff was equally unable to identify what portion of the contract Marley breached:

Q: What part of this implied employment contract or employment contract with Marley do you think Marley has not kept, has breached, as you say, in your complaint?

A: I think regardless of age of an employee, that when a person is functioning well--not just functioning well, but producing good work, managing to receive awards for their ideas, and is a good employee and has a good spirit and produces what they want, that they should be entitled to expect advancements. I think they should be given opportunities, and I think that I was not given the opportunities that I requested until 1993, and I think actually that I would have been far better suited in a department where I was already doing that type of work, working with A Maps, working with COPS, and working with costs, working with labor standards, working with material standards. I feel that in there I would have been better suited.

Clary Dep. at 279-280.

A unilateral expectation by an employee is insufficient to imply a contract. *Conyers v. Safelite Glass Corp.,* 825 F.Supp. 974, 977 (D.Kan.1993). While plaintiff is entitled to think or feel as she wishes, such beliefs are no substitute for facts and evidence. In sum, plaintiff has not identified any statement or conduct from which a reasonable factfinder could infer that Marley intended to enter into a binding contract with her. Because she bears the burden on this issue at trial and cannot set forth specific facts to support it now, summary judgment is appropriate. *Celotex,* 477 U.S. at 325.

*24 Citing *Dickens v. Snodgrass, Dunlap & Co.,,* 255 Kan. 164, 872 P.2d 252, 260 (1994), and *Allegri v. Providence-St. Margaret Health Center,* 9 Kan.App.2d 659, 684 P.2d 1031 (1984), plaintiff argues that she is entitled to proceed to trial on her implied contract claim. The sum total of her

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                                Page 114
(Cite as: 1997 WL 150048, *24 (D.Kan.))

argument, as expressed in her suggestions in
oppositions to defendant's motion for summary
judgment, is that Marley did not expressly disclaim
any intent to be contractually bound, cf Morriss v.
Coleman Co., Inc., 241 Kan. 501, 738 P.2d 841
(1987); see Brown v. United Methodist Homes for
the Aged 249 Kan. 124, 815 P.2d 72 (1991).  This
fact alone, however, is insufficient to defeat
defendant's summary judgment motion.

  Plaintiff has failed to discharge her fundamental
obligation to identify some statement or conduct
from which a factfinder could reasonably infer that
Marley intended to enter a binding contract with
plaintiff.  See, e.g., Berry, 785 F.Supp. at 1492.
Plaintiff reasons that unless a employer states in
writing that it did not intend to create a contact with
its employees, then it must have so intended.  If
any authority supports this extremist view of Kansas
law, she has not cited it.

                    Conclusion

  The summary judgment process is intended to
separate insubstantial and fanciful claims, on which
no jury could reasonably find in favor of plaintiff,
from claims which require submission to a jury.  In
persuading the Court that her claims fall into the
latter category, however, speculation is no substitute
for evidence and plaintiff's suspicions are
insufficient to carry the day.

  The Court has conducted an exhaustive review of
the record in this case.  Having done so, it finds that
defendant's motion for summary judgment must be
denied as to the alleged pay differential from
September 1, 1993, through September 1, 1994, but
that in all other respects it must be sustained.

  IT IS THEREFORE ORDERED that Defendant's
Motion For Summary Judgment (Doc.  # 32) filed
January 17, 1997, be and hereby is denied as to the
alleged pay differential from September 1, 1993,
through September 1, 1994, but in all other respects
that it be and hereby is sustained.

  1997 WL 150048 (D.Kan.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



TAB D

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1160934 (N.D.Ill.))

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

**Ronicia C. DANIEL, Plaintiff,**
**v.**
**SKUDDER KEMPER INVESTMENTS, INC.,**
**Defendant.**

**No. 00 C 5961.**

May 23, 2002.

MEMORANDUM OPINION AND ORDER

COAR, J.

**\*1** Before this court is the four-count complaint of plaintiff, Ronicia C. Daniel ("Daniel"), alleging employment discrimination on the basis of race in the terms and conditions of her employment and retaliatory discharge. Zurich Scudder Investments, Inc. ("Zurich") (f/k/a Skudder Kemper Investments, Inc.) argues that summary judgment should be granted in its favor because Zurich's actions were caused by Daniel's poor work performance, not because of any racial or retaliatory motive. For the reasons set forth below, Zurich's motion for summary judgment is granted.

### I. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Michael v. St. Joseph County, et. al, 259 F.3d 842, 845 (7 th Cir.2001). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir.1995).

Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-movant must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. See Fed.R.Civ.P. 56(e); Michael, 259 F.3d at 845; Albiero v. City of Kankakee, 246 F .3d 927, 932 (7th Cir.2001). To successfully oppose the motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, see Wolf v. Northwest Ind. Symphony Soc'y, 250 F.3d 1136, 1141 (7th Cir.2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, see Albiero, 246 F.3d at 932. Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial ." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552-53. A scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250, 106 S.Ct. at 2511.

### II. Jurisdiction and Venue

Plaintiff's federal claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, and 42 U.S.C. § 1981. Jurisdiction over these claims is provided by 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5 (f)(3). Venue is proper in this Court under 42 U .S.C. § 1391(b) and 42 U.S.C. § 2000e-5 (f)(3). The plaintiff was employed in defendant's office in Chicago, Illinois and the facts giving rise to the complaint occurred in Chicago, Illinois.

### III. Factual Background

**\*2** The plaintiff, Ronicia Daniel, is an African-American who lives in Chicago, Illinois. The defendant, Zurich, is a company which owns a family of mutual funds. Zurich does business in Chicago, Illinois. Daniel was employed as an Investment Representative at Zurich in Chicago, Illinois.

An Investment Representative receives inbound calls from shareholders of any of the mutual funds owned by Zurich, provides information to customers, processes certain transactions requested

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1160934, *2 (N.D.Ill.))

Page 149

by customers and corrects problems that may arise. When an Investment Representative first begins working at Zurich, she spends six weeks in full-day training classes. The training includes daily classroom instruction (on, e.g., the market, updates, processing guidelines and the types of products Zurich offers), telephone instruction and a mentoring program. Investment Representatives are organized into teams of approximately 10 to 12 (though it could vary considerably) with a manager (also sometimes referred to as a supervisor) at the head of each team. Investment Representatives work in one of two divisions within Sales Support, either Shareholder Services or Broker Dealer Services.

There are five ascending levels of telephone representative positions: entry level (which is called Investment Representative), investment associate, senior investment associate, investment specialist and senior investment specialist. After six months as an Investment Representative, the employee's salary may be increased based on merit. [FN1] After one year's employment, an Investment Representative may be eligible for promotion to investment associate. At subsequent annual reviews, an Investment Representative can be considered for further promotions. During Daniel's tenure; other African-American Investment Representatives did receive merit increases.

> FN1. Zurich maintains that it performs an evaluation after six months and Daniel denies that she received any such evaluation. Further, Daniel did not receive a salary increase after six months of employment.

Kathryn Koury is Vice President at Zurich. She began at Zurich in 1989 in a position that was, during its time, comparable to today's Investment Representative. She was then promoted to a position in which she created Zurich's quality control department. She was subsequently promoted to manager, then director, and then Vice President. During Daniel's tenure at Zurich, Koury had overall responsibility for the shareholder's in-bound call center where Investment Representatives work. All calls from shareholders to Investment Representatives are tape recorded. The taping is done for two reasons: to provide protection against errors in financial transactions, and to evaluate the performance of the Investment Representatives. Kemper maintains a Quality Control Division which

trains Investment Representatives, and then reviews their calls to evaluate their performance. Zurich's quality control system is described in its Quality Evaluation Guidebook. The rating system, effective September 1999, sets forth the call performance expectations raw point score or a percentage score (based on a maximum of 275 points) as follows:

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1160934, *2 (N.D.Ill.))

```
Needs Improvement     Less than 217 points (less than 78.9%)
Meets Expectations    218-228 points (79.3%--82.9%)
Exemplary             229+ points (83.3%+)
```

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d

**(Cite as: 2002 WL 1160934, *3 (N.D.Ill.))**

**\*3** Prior to September 1999, the B.E.S.T. Monitoring Guidebook contained the call performance expectations standard which was based on tenure as follows:

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1160934, *3 (N.D.Ill.))

```
Time on the Job              Quality Performance Measurements

0-6 Months/  Investment Rep   187-202 Points
6-12 Months/ Investment Rep   203-217 Points
12+ Months/  Investment Rep   218-228 Points
```

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1160934, *3 (N.D.Ill.))

Zurich expects that around 80% of an Investment Representative's calls will meet or exceed expectations. Calls from all Investment Representatives are evaluated by Quality Analysts who are separate from the Investment Representatives' managers in that the quality analysts report to their own managers. Each quarter, eleven randomly selected calls from each Investment Representative (and one additional call selected by the Representative if he or she chooses) are assigned randomly to Quality Analysts who evaluate the calls using the point system described in the Quality Guidebook. Investment Representatives are evaluated based on the raw individual scores and the consistency of the particular Representative's scores, including the percentage of calls that met or exceeded expectations. [FN2] Over time, different Quality Analysts review calls from any one Investment Representative. Managers also used the quality scores from phone calls that were monitored by the Quality Control Division to evaluate the performance of Investment Representatives. In addition to the formal evaluations done by Quality Analysts, managers routinely review calls taken by the Investment Representatives in their teams. [FN3]

> FN2. Daniel denies that any method other than average scores are used to evaluate employees. The Guidebook expressly states, however, that "the overall rating of the call is to fall within an acceptable range." Further, Zurich's Quality Management Report sets forth not only the average scores, but the number of scores that met or exceeded expectations.

> FN3. Daniel denies that the call reviews done by Tully were for evaluation purposes. She asserts that the reviews were done solely for coaching purposes. While Tully stated that his review was not part of an Investment Representative's score for the Quality Analyst review, he also testified that "the purpose [for managers reviewing additional calls] is to use it as a tool in coaching, as well as become familiar with how your representatives are progressing and how they're doing." Further, Tully, as well as Daniel's other managers, issued performance reviews and evaluations to Daniel based on calls other than those included in the quarterly scores.

Zurich's attendance policy provides that "[e]xcessive absences, lateness, or sick days are

managed according to their impact on the employee's performance, the employee's colleagues and manager, and the department's business needs. Payroll deductions are not made for absences, latenesses, early departures, extended lunch hours, or sick days for exempt or nonexempt employees. These concerns are managed as disciplinary matters. Absences are disciplined by the same progressive disciplinary process that Zurich uses for other disciplinary problems. The progressive discipline policy states that verbal warnings will normally be used first, followed by written warnings.

Daniel was employed by Zurich as an Investment Representative in the Shareholder Services division from July 13, 1998 until March 16, 2000. When Daniel was hired, the minimum entry level salary for Investment Representatives was $23,700, but Daniel was paid $25,000 because she had prior business experience. During her tenure at Zurich, Daniel served on three teams supervised by Brian Vance, Tina Donnelly, and Kevin Tully. Throughout her employment at Zurich, Daniel was in the entry level for Investment Representatives. Koury testified that she believed that Daniel did not meet expectations from early in her tenure. On November 17, 1998, Daniel's manager, Brian Vance, gave her a "performance action plan" which concerned problems in Daniel's performance. Those problems included: scores of 175 and 185 on calls dated October 16 and 21, 1998; the need to bring down her average talk time; the use of correct resources when handling shareholder calls; the use of effective listening skills, improving her phone manner, improving operations and system knowledge; providing correct information; and handling requests from shareholders without assistance from others. On or about January 28, 1999, Vance gave Daniel a verbal warning which he memorialized in a memo. The warning concerned problems in Daniel's performance, particularly a score of 150 on a call dated January 22, 1999.

*4 On or about July 22, 1999, Tina Donnelly (who had, by then, replaced Vance as Daniel's manager) gave Daniel a written warning. Donnelly's written warning was based, in large part, on Daniel's poor performance in that "[t]he attitude and professional demeanor demonstrated on these calls, as well as your responsiveness and ability to address the callers['] needs were not satisfactory." Donnelly described the calls detailed in Vance's previous

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1160934, *4 (N.D.Ill.))

memoranda on which Daniel's performance was unsatisfactory including the calls on which Daniel scored 175, 185 and 150; she addressed a more recent call (dated June 18, 19998(sic)) on which Daniel's score was 185; and she warned Daniel that her quality averages for the first quarter of 1999 were 215, and that additional monitorings averaged 206.67 for three calls in April 1999 and 216.67 for three calls in May of 1999. Donnelly's written was also based, in part, on attendance problems in that Daniel had had three occurrences of unscheduled absences to that point during calendar year 1999. Not including a short term disability leave, at Zurich, Daniel was out of work on unscheduled absences on the following days: December 7, 1998; April 1, 1999; May 27, 1999; June 21, 1999; June 22, 1999; and June 24, 1999.

On September 13, 1999, Daniel's annual salary was increased approximately 8% to $27,012 when the entry level salary for Investment Representatives generally was raised to a minimum of $27,000. Daniel did not receive a merit increase after six months. Similarly, Daniel did not receive a merit increase after one year at Zurich. In both instances, substandard job performance was the reason for her failure to receive a merit increase. On July 22, 1999, approximately one year after she was hired, she was given a written warning for poor job performance.

Kevin Tully became Daniel's supervisor in approximately September of 1999. On October 6, 1999, Daniel filed charge No.2000CF2662 which the Illinois Department of Human Rights ("IDHR"). On or about February 22, 2000, Tully gave Daniel a Performance--Corrective Review. In the corrective review, Tully said "we have discussed multiple operational errors that we would not expect of a representative of your tenure." The various errors that are described in the corrective review include wiring money to the wrong account; failure to provide a customer with her extension number; incorrect instructions regarding the process of wiring funds and for faxed instructions for changing bank information; failing to listen carefully to customer's calls so as to respond to their requests; failing to discuss information in language that a particular customer could understand; recording incorrect figures for transactions; and inability to respond to relatively easy customer requests without the help of a supervisor. The corrective review also

identified a 205 score for one call. Tully stated that he put Daniel on corrective review because "there was a pattern of performance not meeting expectations." When Tully put Daniel on corrective review, he knew she had filed some sort of complaint about discrimination, but he did not know for sure what the nature of the complaint was; he did not know that she alleged race discrimination; and he did not know that IDHR had conducted a fact finding conference regarding her October 6 th charge. During his tenure as a manager at Zurich, Tully also put another Investment Representative on corrective review and that individual was not African American.

*5 On March 16, 2000, Tully gave Daniel a discharge notice. Tully made the decision to discharge Daniel. Before doing so, he talked to Paul Wisnewski in Zurich's Human Resources department and to Kim Koury. Tully decided to discharge Daniel after the call described in the discharge notice. At that point, he decided that Daniel had exhibited a "pattern of behavior" sch that her continued employment put Zurich and its shareholders at risk.

On March 17, 2000, Daniel filed charge No. 210A02341 with the Equal Employment Opportunity Commission. On August 8, 2000, the EEOC sent Daniel a notice dismissing both charges pursuant to the following finding: "Based upon the Commission's investigation, the Commission is unable to conclude that the information obtained establishes violations of the statutes."

### IV. Analysis

Daniel alleges that Zurich violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Both claims are governed by the same standards. Gonzalez v. Ingersoll Milling Machine Company, 133 F.3d 1025, 1035 (7 th Cir.1998). Title VII makes it "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race or color." 42 U.S.C. § 2000e-2(a)(1). Two methods exist for Daniel to satisfy his burden of proof: by direct evidence that racial discrimination motivated Zurich's decision to terminate her, or by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



indirect, burden-shifting method of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L.Ed.2d 668, 93 S.Ct. 1817 (1973), and Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 256, 67 L.Ed.2d 207, 101 S.Ct. 1089 (1981).

Daniel offers no direct evidence of alleged racial animus. In this circuit, "direct evidence" is defined as evidence which "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." Plair v.. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7 th Cir.1997) (quoting Randle v. LaSalle Telecommunications, 876 F.2d 563, 569 (7th Cir.1989)). Here, direct evidence would be what Zurich and its employees said or did in the specific employment decision in question: terminating Daniel. Daniel does not contend that Tully ever said he discharged Daniel because she is black. Nor is there any claim Tully ever referred to blacks in racially derogatory terms.

Thus, Daniel's allegation centers on her assertion of indirect evidence of racial discrimination. Applying the McDonnell Douglas-Burdine burden shifting test, Daniel first must establish a prima facie case of racial discrimination by a preponderance of the evidence. Sample v. Aldi, Inc., 61 F.3d 544, 547 (7 th Cir.1995). Without a prima facie case, Daniel cannot withstand summary judgment. See Gilty v. Village of Oak Park, 919 F.2d 1247, 1250 (7th Cir.1990). To do so, she must show (1) she is a member of a protected class, (2) her job performance met Zurich's legitimate expectations, (3) she suffered an adverse employment action, and (4) that another, similarly situated but not of the protected class, was treated more favorably. Stockett v. Muncie Indiana Transit System, 221 F.3d 997, 1000-02 (7 th Cir.2000); Geier v. Medtronic, Inc., 99 F.3d 238, 241 (7th Cir.1996).

*6 Once a plaintiff has made this showing, there is a presumption that she was discriminated against, and the employer must come forward with a legitimate, non-discriminatory reason for the employment action. See McDonnell Douglas, 411 U.S. at 802; Lenoir, 13 F.3d at 1133. At this stage, the employer need not prove that it was actually motivated by the proffered reason. Rather, an employer "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Burdine, 450 U.S. at 257. Once the defendant has met this burden of production, the plaintiff must prove by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. Id. at 253; Plair, 105 F.3d at 348. While the McDonnell Douglas approach is often called a "burden shifting" method of proof, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253.

It is undisputed that Daniel is a member of a protected class. Zurich attacks Daniel's prima facie case on two fronts. First, Zurich argues that as to many of her claims, Daniel did not suffer a materially adverse employment action. Second, Zurich argues that Daniel did not meet Zurich's legitimate expectations. Further, according to Zurich, even if Daniel could make out a prima facie case, she cannot show that Zurich's reasons for its conduct are pretextual. Each of these contentions will be addressed in turn.

A. Materially Adverse Employment Action

An adverse employment action is "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir.1993). Adverse employment actions encompass more than simply the termination of employment or a decrease in salary. They also may include actions such as bestowing on an employee "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Crady, 993 F.2d at 136. However, "not everything that makes an employee unhappy is an actionable adverse action." Smart v. Ball State University, 89 F.3d 437, 441 (7 th Cir.1996).

It is undisputed that Daniel's termination constitutes an adverse employment action. Daniel also alleges that she suffered adverse employment actions when she received negative evaluations, her seat was reassigned from a window to closer to her supervisor, she was denied Series 7 study materials,

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



her calls were listened to more frequently than others, and she was not invited to meetings. The Seventh Circuit has held that unfavorable performance evaluations alone do not constitute adverse employment actions. See Oest v. Illinois Dept. of Corrections, 240 F.3d 605, 612-13 (7 th Cir.2001); see also Smart, 89 F.3d at 442. Daniel's seat reassignment may have made her unhappy because she no longer had a window seat, but it certainly did not rise to the level of an adverse employment action. Her responsibilities, job title, and benefits remained the same. The denial of Series 7 study materials similarly is not an adverse employment action. Zurich's policy on series 7 licensing materials expressly provides that "[e]ligibility for the Series 7 will be limited to Investment Associates and above." It is undisputed that during Daniel's tenure she was an Investment Representative, not an Investment Associate. As Daniel was never an Investment Associate, Zurich's failure to provide her with Series 7 materials can not rise to the level of an adverse employment action. Daniel's claim that her calls were frequently monitored is not an adverse employment action. To begin with, monitoring of Investment Representatives calls was a normal practice engaged in for the dual purposes of coaching and evaluation. In addition, Daniel had received several negative reviews so it is only natural that she would be monitored closely to evaluate her improvement. As for Daniel's claim that she was not invited to meetings, there is simply no evidence to support that allegation.

B. Zurich's Legitimate Expectations

*7 Even if all of the claimed actions were adverse, Daniel must establish that she was meeting Zurich's legitimate expectations. She cannot satisfy this requirement by showing that her performance was adequate for some period of time during her employment. Hong v. Children Memorial Hospital, 993 F.2d 1257, 1262 (7 th Cir.1993). "[T]he critical issue is whether she was performing well in her job at the time of her termination." Id.

In Hong, the employer used an evaluation system based on point scores, much like Zurich's system. Although Hong's evaluations had been favorable during her first 17 years at work, her more recent scores were poor. The Seventh Circuit affirmed a summary judgment decision for the employer

holding that "[a]gainst the record in this case, the plaintiff's bare assertion of disparate treatment is not persuasive." 993 F.2d at 1262. Similarly, in Villa v. Chicago, 924 F.2d 629, 631 (7 th Cir.1990), the court affirmed summary judgment for the employer even though the plaintiff had two positive reviews. In this case, Daniel had extremely low scores on some of her calls, did not meet the requirement that at least 80% of her calls meet or exceed expectations and her performance did not improve even as she became more experienced. Zurich's use of its progressive discipline procedure to notify her of the need to improve her performance to remain employed did not prove succesful.. As in Hong, Daniel's assertion "that her disciplinary record is itself the result of discriminatory treatment is also unavailing." 993 F.2d at 1263. Daniel's performance was evaluated by five Analysts, three managers and a Vice President, all of whom found her work unsatisfactory. She offers no evidence that any one of these individuals, let alone more than one, held any racial bias. Moreover, all the Analysts gave her scores on some calls in which she met, or even exceeded expectations.

As a rule, this court will "not sit as a super-personnel department that reexamines an entity's business decisions" in cases where discrimination is alleged. Dale v. Chicago Tribune Company, 797 F.2d 458, 464 (7th Cir.1986), cert. denied, 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). Zurich is in the best position to assess the relative qualifications of its employees and to determine when an employee's performance is so deficient as to potentially compromise the level of care to which its shareholders are entitled. In short, evidence that would permit a jury to infer that Zurich acted unlawfully, rather than because of Daniel's poor performance, is so lacking, that a jury should not be permitted to speculate as to Zurich's motives. See Coco v. Elmwood Care, 128 F.3d 1177, 1179 (7 th Cir.1997).

C. Pretext

As this Court has determined that Daniel was not meeting the legitimate expectations of Zurich, she has failed to make out a prima facie case and a pretext analysis is unnecessary.

D. Retaliation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**\*8** Daniel also alleges that her discharge was retaliation for filing the October 6 th charge with the IDHR. Under Title VII, it is "an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §§ 2000e-3(a). Under the McDonnell Douglas burden shifting method of proving discrimination, Daniel must first establish a prima facie case of retaliation. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to do so, she must show that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action." Dey v. Colt Construction & Development Co., 28 F.3d 1446, 1457 (7th Cir.1994) (internal quotation marks and citations omitted). Once Daniel makes this showing, the burden shifts to the Zurich to state a "legitimate, nondiscriminatory reason" for the adverse action. Id. If Zurich is able to state such a reason, the burden shifts back to Daniel to show that the "proffered reasons are pretextual and that [the] actual reason was discriminatory." Id. Although the burden of production shifts under this method, "the burden of persuasion rests at all times on the plaintiff." Klein v. Trustees of Indiana University, 766 F.2d 275, 280 (7th Cir.1985).

It is undisputed that Daniel engaged in statutorily protected expression in filing the October 6 th charge and that she was eventually discharged. In order to meet the causation requirement for her retaliation claim, Daniel must prove that, but for her filing of the October 6 th charge, Zurich would not have discharged her. Adusumilli v. City of Chicago, 164 F.3d 353, 363 (7 th Cir.1998). Daniel has not come forth with any evidence to support her belief that similarly situated non-black employees who did not file charges were not disciplined for errors or discharged. Instead, Daniel cites the timing of the two events in support of her allegation. The relative timing of a discharge and the filing of a charge is probative of causation only if "the discharge took place on the heels of protected activity." Dey v. Colt Cont. & Dev. Co., 28 F.3d 1446, 1458 (7 th Cir.1994). "As the period of time separating the two lengthens, the hint of causation weakens." Davidson v. Midelfort Clinic Ltd., 133 F.3d 499, 511 (7 th

Cir.1998). Daniel was discharged on March 16, 2000, more than five months after she filed her Oct. 6 th charge. "[W]hen so much time passes, before the adverse action takes place, the order in which the events occurred does not by itself suggest a causal link between them. Id.    (five months); Fillpovic v. K & R Express Systems, Inc., 176 F.3d 390, 398-99 (7 th Cir.1999) (same); Hughes v. Derwinski, 967 F.2d 317, 321 (7 th Cir.1992) (four months). Even a period of only three months between the two events does not create a material issue of fact in the absence of other evidence that connects the two events. Sauzek v. Exxon Coal, USA, Inc., 202 F.3d 913, 918-19 (7 th Cir.2000). Moreover, once an employer offers evidence that an employee was discharged for poor performance (particularly when, as here, the performance problems arose before the plaintiff complained about discrimination), plaintiff creates no triable issue of fact merely because she filed a charge before she was discharged. Adusumilli, 164 F.3d at 363-64; Davidson, 133 F.3d at 512; Juarez v. Ameritech Mobile Comm ., Inc., 957 F.2d 317, 321-22 (7 th Cir.1992). The poor performance, and documentation thereof, continued up to the time when Daniel was fired. Given this history, no jury could rationally conclude that Zurich would not have fired Daniel but for her Oct. 6 th charge with the IDHR.

### Conclusion

**\*9** For the foregoing reasons, Zurich's motion for summary judgment is GRANTED. Daniel, who bears the burden of proof at trial, has failed to make a showing sufficient to establish the existence of an element essential to her disparate treatment claim (that she was meeting the legitimate expectations of Zurich at the time of her discharge) and her retaliation claim (the existence of a causal connection between the filing of her complaint and her discharge). Thus, there is no evidence upon which a rational jury could find in her favor.

2002 WL 1160934 (N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

