**PART 4**

TAB H

Not Reported in F.Supp.2d
(Cite as: 2003 WL 22133801 (E.D.Pa.))

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.

**Laverne M. HAY, David Copling and Dustin
Queenan,**
v.
**GMAC MORTGAGE CORPORATION**

**No. Civ.A.2001-CV-1030.**

Sept. 15, 2003.

Marc H. Pachtman, on behalf of Plaintiffs.

Michael L. Banks, Sarah E. Bouchard, Paul C.
Evans, on behalf of Defendant.

OPINION

GARDNER, J.

*1 This matter is before the court on Defendant's
Motion for Summary Judgment of Claims of
Plaintiff Laverne M. Hay filed June 19, 2002,
which motion is unopposed. [FN1] For the reasons
set forth below, we grant defendant's motion for
summary judgment regarding plaintiff Laverne M.
Hay and dismiss Counts I and II of the Amended
and Restated Complaint filed June 11, 2001.

FN1. This matter was originally assigned to our
former colleague District Judge Jay C. Waldman.
By Order dated September 9, 2002, Judge Waldman
granted plaintiffs a final extension of time until
October 18, 2002 to respond to defendant's motion
for summary judgment. As of the date of this
Memorandum and accompanying Order, plaintiff
Laverne M. Hay has not filed a response to
defendant's motion for summary judgment.
Accordingly, we consider defendant's motion for
summary judgment in conjunction with Federal Rule
of Civil Procedure 56 which permits the grant of
summary judgment only where there are no genuine
issues for trial and judgment as a matter of law is
appropriate.

Complaint

Plaintiff Laverne M. Hay has asserted claims for
racial discrimination under Title VII of the Civil

Rights Act of 1964 and 1991 [FN2] and the
Pennsylvania Human Relations Act ("PHRA")
[FN3] against defendant (Counts I and II). [FN4]
The claims asserted by plaintiff [FN5] include
disparate treatment, retaliation for complaining
about racial discrimination, and constructive
discharge. [FN6]

FN2. 42 U.S.C. §§ 2000(e) to 2000(e)-17; 42
U.S.C. § 1981.

FN3. Act of October 27, 1955, P.L. 744, No. 222,
§§ 1-13, as amended, 43 P.S. §§ 951-963.

FN4. The Complaint contains five counts. Plaintiff
Laverne M. Hay ("Hay") brings two charges
against defendant (Counts I and II), plaintiff David
Copling ("Copling") brings one count against
defendant (Count III), and plaintiff Dustin Queenan
("Queenan") brings two counts against defendant
(Counts IV and V).

FN5. Throughout this Opinion, all references to
"plaintiff" in the singular refer to plaintiff Laverne
M. Hay.

FN6. On June 20, 2000 plaintiff cross-filed an
administrative complaint alleging race
discrimination, a hostile work environment and
constructive discharge with the Equal Employment
Opportunity Commission (docketed at 170A01426)
and the Pennsylvania Human Relations Commission
(docketed at L07416). Each agency denied
plaintiff's claims and she received a right to sue
letter on December 5, 2000.

Facts

Based upon the pleadings, record papers,
depositions, affidavits, defendant's motion and brief
and the exhibits submitted by defendant, as
uncontroverted, or otherwise taken in the light most
favorable to the plaintiff, the pertinent facts are as
follow.

Plaintiff Laverne M. Hay began working at
defendant GMAC Mortgage Corporation
("GMACMC") on January 28, 1998 in the
company's consumer loan department. One of her
functions was to evaluate productivity in the
Collection Department by creating statistical reports
showing the productivity of individual collectors.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

On May 11, 1998 plaintiff became an administrative assistant.

On July 30, 1999 plaintiff was transferred into another department and became a Document Customer Service Specialist. She held that position until defendant promoted her to the position of Training Specialist in February 1999.

As a Training Specialist, plaintiff designed and presented training courses about defendant's customer service products and computer system applications to employees in defendant's Client Branded Solutions Group ("CBSG"). She worked closely with managers and the Human Resources Department to ensure that the training aligned with defendant's needs. Plaintiff attended several training seminars funded by the defendant. Plaintiff received positive performance evaluations from defendant. She was never given any written warnings, nor were any formal disciplinary actions ever taken against her.

In Spring 1999 GMACMC considered creating a Training Manager position within CBSG. Plaintiff became concerned when she learned that a candidate for the position had been interviewed, although an opening for the new position was never advertised within the company. This position was never created, but plaintiff was concerned because defendant never formally advised her that defendant contemplated creating such a position.

Plaintiff met with Anthony Renzi, Senior Vice President of CBSG, to discuss her concerns. Mr. Renzi told her he would look into the situation and that if the position were to be created, she "would definitely be the choice." [FN7] Because of cost concerns, defendant never created the position. Despite Mr. Renzi's assurances, plaintiff became suspicious because she believed he lied about his knowledge of this new position.

> FN7. Plaintiff ended up writing a college paper about her interactions with Mr. Renzi in which she lauded her positive experience. She shared the paper with Susan Fratoni, Vice President of Voice of the Associate and Voice of Customer Service, defendant's internal grievance programs.

**\*2** In Fall 1999 Mr. Renzi decided to revise the CBSG training program for which plaintiff was responsible. He wanted to create a complete, integrated training curriculum that would be required of all CBSG associates. It required training throughout employment and testing employees afterward to guage their understanding.

To implement his proposed curriculum, Mr. Renzi assigned plaintiff to work with Julie Frank, the CBSG Human Resources Coordinator. Mr. Renzi remained involved in the project and frequently complimented the pair on their work product. Both employees were instructed to report directly to him, but primarily by electronic mail ("e-mail"). Plaintiff was directed to focus on the technical aspects of the training, while Miss Frank worked on the human resource aspects.

On October 19, 1999 plaintiff asked Mr. Renzi in an e-mail whether she should move forward with New Hiring Training Classes. He responded by telling her to cancel the classes and to focus on the new training curriculum project.

On October 25, 1999 plaintiff told one of her managers, Joan Duxbury, Vice President of Customer Care Projects, that plaintiff lacked direction and was confused about her job responsibilities. Plaintiff also stated that she was frustrated because Mr. Renzi did not respond to her e-mails or her request to attend a training seminar in Toronto. Miss Duxbury scheduled a meeting for October 28, 1999, between Mr. Renzi and the plaintiff to address the issue.

A day after approaching Miss Duxbury and before her meeting, plaintiff went to the Voice of the Associate ("VOA") program, an internal grievance program through which employees can lodge formal grievances. Plaintiff spoke with Lidia Downie, a VOA representative, about her unhappiness with the restructuring of the training program and her concerns about working with Miss Franks.

Plaintiff complained that Mr. Renzi sent Miss Frank copies of the e-mail which he sent to the plaintiff. She also complained that Mr. Renzi had suggested that plaintiff use Miss Frank as a sounding board for plaintiff's ideas about the project. She also complained that Mr. Renzi had approved the request of Miss Frank to attend an outside conference but had not yet approved plaintiff's request to attend the same conference.

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.2d
(Cite as: 2003 WL 22133801, *2 (E.D.Pa.))

Plaintiff admits that she did not complain about racial discrimination at this meeting but contends that she did refer to "unfair" and "unequal" treatment.

On October 28, 1999 plaintiff met with Mr. Renzi and Miss Duxbury. Mr. Renzi applauded plaintiff's work and told her that he appreciated her work. He also approved her request to attend a training session, in Pittsburgh, Pennsylvania, rather than Toronto, Ontario, Canada.

On October 28, 1999, after the meeting, Miss Downie from VOA called plaintiff regarding the meeting. Plaintiff returned Miss Downie's call and left a message stating that the meeting had been "positive". The following day plaintiff spoke with Miss Downie, and plaintiff reported that the meeting had gone well. On November 12, 1999 Miss Downie sent plaintiff an e-mail asking if everything was going well. Plaintiff responded three days later stating that "things are going well" and thanked her for asking. In her deposition, plaintiff testified that she was not being truthful in her response to Miss Downie's inquiry. [FN8]

FN8. Deposition of plaintiff Laverne M. Hay, March 29, 2002, page 95.

*3 On January 28, 2000 plaintiff received her 1999 performance review. Defendant rated her "solid" overall, which meant that her "[p]erformance meets and sometimes may exceed" the job requirements. Plaintiff received "outstanding" ratings in three areas and a "solid" rating in all seven categories on the review related to leadership abilities. Additionally, she received a "solid" rating for eight of the ten categories reflecting her job performance. As a result, defendant increased plaintiff's compensation for the year 2000.

Despite the largely positive performance review, plaintiff was unhappy because of two "less than desirable" ratings. In response, she submitted a six-page letter to Diane Bowser, Vice President-Managing Director of Customer Care Operations, indicating that she believed the two lower rating were undeserved because she was allegedly being held accountable for work that was the responsibility of Miss Frank. Moreover, plaintiff did not feel that she should have been "surprised" by a negative

rating in her performance evaluation. Rather, plaintiff contends her shortcomings should have been discussed with her prior to the performance review.

After receiving plaintiff's letter, Miss Bowser met with plaintiff who once again indicated that she believed that defendant held her accountable for Miss Frank's mistakes. Miss Bowser then scheduled a meeting between plaintiff and Miss Duxbury, who had written the performance review.

At that meeting, Miss Duxbury informed plaintiff that she and others believed that plaintiff required too much oversight from management. Plaintiff contends that Miss Duxbury pointed out that those were minor concerns and that every employee has some room for improvement. Plaintiff then prepared a document stating that she did not "dispute the fact that there are areas that I need to improve in", but still disputed the unfavorable performance review in these two areas.

On March 13, 2000 plaintiff called Susan Fratoni, Vice President of Voice of the Associate and Voice of the Customer, to state, for the first time, that she felt that defendant discriminated against her on the basis of her race. She expressed concerns similar to those previously expressed, but now stated that she believed that she was treated poorly because of her race.

Plaintiff complained about defendant not making her aware of the possibility of creating a Training Manager position, Mr. Renzi's better treatment of Miss Frank, and plaintiff's 1999 performance review. In addition, she claimed that several of defendant's other minority employees also believed defendant discriminated against them.

Miss Fratoni was receptive to plaintiff's comments, and plaintiff hoped that the culture of CBSG would change. Miss Fratoni told plaintiff that "she [could not] cure the sins of the past, but let's look to the future."

Miss Fratoni relayed plaintiff's complaints to Anne Janiczek, defendant's Employee Relations Manager. Miss Janiczek spoke with plaintiff on March 20, 2000. Plaintiff told her that Mr. Renzi treated her unfairly, and plaintiff threatened to resign at the end of March 2000. Miss Janiczek

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



advised Miss Bowser of plaintiff's concerns. She also spoke with Mr. Renzi. Mr. Renzi told her that he considered plaintiff to be a valuable asset and wanted her to remain employed by defendant.

**\*4** On March 22, 2000 plaintiff met with Miss Janiczek and Miss Bowser. They advised her that the Human Resources Department would investigate her allegations of race discrimination. Despite attempts to encourage plaintiff to stay, plaintiff verbally announced that she was resigning, effective that day. She did not return to work again.

Miss Bowser completed a company form indicating that plaintiff had resigned. She indicated on the form that she would rehire plaintiff if given the opportunity. Defendant also investigated plaintiff's allegations of discrimination and found no evidence to substantiate her claims.

Plaintiff filed a complaint with the federal Equal Employment Opportunity Commission ("EEOC") on June 20, 2000. In her complaint, plaintiff alleged that defendant had discriminated against her because of her race.

### Standard of Review

In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Federal Home Loan Mortgage Corporation v. Scottsdale Insurance Company, 316 F.3d 431, 433 (3d Cir.2003). Only facts that may affect the outcome of a case are "material". Moreover, all reasonable inferences from the record are drawn in favor of the non-movant. Anderson, supra.

Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof. See Watson v. Eastman Kodak Company, 235 F.3d 851, 858 (3d Cir.2000). A plaintiff cannot avert summary judgment with speculation or by resting on the allegations in her

pleadings, but rather must present competent evidence from which a jury could reasonably find in her favor. Ridgewood Board of Education v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir.1999); Woods v. Bentsen, 889 F.Supp. 179, 184 (E.D.Pa.1995).

### Discussion
### Race Discrimination Claim

The same general standards and analyses are applicable to plaintiff's Title VII and PHRA claims. See Jones v. School District of Philadelphia, 198 F.3d 403, 410-411 (3d Cir.1999); Gomez v. Allegheny Health Services, Inc., 71 F.3d 1079, 1083-1084 (3d Cir.1995).

A plaintiff has the initial burden of establishing a prima facie case of employment discrimination by showing she was a member of a protected class, she was qualified for the job she held, she suffered an adverse employment action, and the surrounding circumstances give rise to an inference of discrimination. See Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 353-354 (3d Cir.1999); Fuentes v. Perksie, 32 F.3d 759, 763 (3d Cir.1994).

**\*5** Once a plaintiff does so, the burden then shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. See St. Mary's Honor Center v.. Hicks, 509 U.S. 502, 506-507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407, 416 (1993); McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 319 (3d Cir.2000). If the defendant articulates such a reason, the plaintiff could still prevail by demonstrating that the employer's proffered reasons were not its true reasons but rather a pretext for unlawful discrimination. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105, 117 (2000); Goosby, 228 F.3d at 319.

The plaintiff must present evidence from which a factfinder could reasonably disbelieve the employer's proffered reasons, from which it may then be inferred that the real reason for the adverse action was discriminatory, or otherwise present evidence from which one could reasonably find that unlawful discrimination was more likely than not a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



determinative cause of the employer's action. Hicks, supra; Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir.1997).

To discredit a legitimate reason proffered by the employer, a plaintiff must present evidence demonstrating "such weakness, implausibilities, inconsistencies, incoherencies, or contradictions" for the proffered explanation that one could reasonably conclude it is incredible and unworthy of credence, and ultimately infer that the employer did not act for the asserted non-discriminatory reasons. Fuentes, 32 F.3d at 765. The ultimate burden of proving that a defendant engaged in intentional discrimination remains at all times on the plaintiff. Hicks, supra.

As an African-American, plaintiff is a member of a protected class. She contends that she was discriminated against on the basis of her race. There appears to be little dispute that she was qualified to perform her job. [FN9]

> FN9. When completing post-separation paperwork, defendant wrote that it would consider rehiring the plaintiff if she wanted to return. In addition, plaintiff's performance evaluations were largely positive throughout her tenure with the company.

However, plaintiff cannot make out a prima facie case of employment discrimination or retaliation because she cannot demonstrate that defendant took any adverse employment action against her. Only conduct which "alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affects his or her status as an employee" ' is proscribed by Title VII. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir.1997).

Plaintiff asserts that the following three incidents constitute adverse employment actions: 1) defendant considered creating a Training Manager position that would have overseen plaintiff's Training Specialist position, but the new position was never actually created; 2) Mr. Renzi, her boss, acted differently toward her than he acted toward Miss Franks, although no specific examples are provided by plaintiff; and 3) defendant rated plaintiff's performance in two categories as "less than desirable". However, her overall performance was rated as "solid" in her 1999 performance evaluation, and she received an increase in salary as a result.

*6 Defendant's consideration of establishing a Training Manager position did not alter the terms and conditions of plaintiff's employment. While plaintiff believed that she should have been interviewed for such a position, defendant did not actually hire a training manager or create such a position. Accordingly, even if defendant considered creating such a position, it could not have affected defendant's terms and conditions of employment.

Plaintiff failed to present any evidence indicating that Mr. Renzi's conduct had an impact on plaintiff's terms and conditions of employment. She contends that he delayed approving her attendance at a training meeting in Toronto and also blamed her for shortcomings in work that was the responsibility of a co-worker, Miss Franks. However, Mr. Renzi merely delayed approval of plaintiff's request to attend a training meeting, ultimately authorizing her to attend a conference in Pittsburgh rather than Toronto.

Plaintiff acknowledged that there was no difference between the two conferences and that she was satisfied by the conference which she did attend in Pittsburgh. Moreover, plaintiff cannot point to any other evidence indicating that Mr. Renzi treated plaintiff differently in a way that affected the terms and conditions of her employment.

Plaintiff's performance review also fails to rise to the level of an adverse employment action. Even a poor performance rating does not give rise to an adverse employment action unless it has a tangible effect on recipient's employment. See Williams v. Pennsylvania State Police-Bureau of Liquor Control Enforcement, 108 F.Supp.2d 460, 467, n. 5 (E.D.Pa.2000) citing Spears v. Missouri Department of Corrections & Human Resources, 210 F.3d 850, 854 (8th Cir.2000). A poor performance evaluation alone does not give rise to a case of discrimination, but must be accompanied by a clear inference or connection to discriminatory animus. See Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir.2000).

In this case, defendant gave plaintiff an overall "solid" rating on her 1999 performance evaluation, and even awarded her its highest rating in several categories. In fact, as a result of the review

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2003 WL 22133801, *6 (E.D.Pa.))

Page 190

defendant gave plaintiff a raise. Accordingly, plaintiff's performance review does not give rise to an adverse employment action.

We find this situation analogous to the case of Elwell v. PP & L, 2001 WL 1529063, at *9-10 (E.D.Pa. Nov. 28, 2001) wherein United States Magistrate Judge Thomas J. Reuter rejected plaintiff's claim that a performance review rating of "good" was an adverse employment action absent evidence that the review had an actual impact on promotional opportunities or a reduction in salary. Accordingly, we conclude that in this case plaintiff's performance review does not give rise to an adverse employment action.

Finally, plaintiff asserts that she was constructively discharged and that this constitutes an adverse employment action by defendant. In order to establish a constructive discharge claim, a plaintiff must show that her employer knowingly engaged in conduct so intolerable that a reasonable person in the employee's shoes subject to them would resign. See Durham Life Insurance Company v. Evans, 166 F.3d 139, 155 (3d Cir.1999); Konstantopoulos v. Westvaco Corporation, 112 F.3d 710, 718 (3d Cir.1997); Connors v. Chrysler Financial Corporation, 160 F.3d 971, 975 (3d Cir.1988).

*7 A reasonable employee would usually explore alternatives such as requesting a transfer to another position, advising her employer that she would feel compelled to leave if improvements in working conditions were not made, or filing a grievance before leaving work, unless she is able to show that the conditions were so intolerable that a reasonable employee would be forced to resign without remaining on the job for a period necessary to take those steps. See Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1161 (3d Cir.1993). For the following reasons, we conclude that the evidence, viewed in the light most favorable to plaintiff, does not support a claim for constructive discharge.

Based on the available evidence, plaintiff cannot support a claim for constructive discharge because a reasonable jury could not conclude that plaintiff faced a situation so intolerable as to be constructively discharged. Plaintiff contends that defendant did not adequately address her workplace concerns. However, at the various times plaintiff

expressed concerns with an aspect of her employment, she expressed satisfaction with how defendant resolved each situation.

Specifically, after plaintiff discussed her concerns about the possible creation of a Training Manager position with Mr. Renzi in Spring 1999, plaintiff wrote a paper for college lauding her satisfaction with Mr. Renzi's response to her concerns. Moreover, during Fall 1999, when plaintiff expressed dissatisfaction to Voice of the Associate regarding the conduct of Mr. Renzi, VOA members contacted her several times to ensure that the situation had been addressed satisfactorily and plaintiff responded that "things [were] going well."

Finally, because plaintiff fails to show that any of the allegedly discriminatory conduct had any adverse effect on her employment, we conclude that plaintiff was not constructively discharged.

### Retaliation Claim

Plaintiff also alleges that defendant retaliated against her for complaining of discrimination. Title VII prohibits an employer from discriminating against an employee because she opposed any unlawful employment practice. 42 U.S.C. § 2000e-3(a); Durham, 166 F.3d at 157.

To establish a prima facie case for retaliation, plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) she suffered an adverse employment action after, or contemporaneous with, the protected activity; and (3) a causal link existed between the protected activity and the adverse action. See Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir.2001).

The burden then shifts to the defendant to offer a legitimate non-retaliatory reason for the adverse action. Woodson v. Scott Paper Company, 109 F.3d 913, 920 (3d Cir.1997). Informal protests of discrimination, such as complaints to management, rise to the level of protected activity. Abramson v. William Patterson College, 260 F.3d 265, 288 (3d Cir.1997). However, only grievances actionable under Title VII are considered a protected activity. See Walden v. Georgia Pacific Corporation, 126 F.3d 506, 513 n. 4 (3d Cir.1997).

*8 In this case, plaintiff engaged in a protected

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2003 WL 22133801, *8 (E.D.Pa.))

activity when she complained to Voice of the Associate on March 13, 2000, that she had been treated differently by defendant because of her race. Although she had complained about unfair treatment on at least one other occasion, plaintiff never mentioned race or discrimination in any of these other discussions, and those complaints did not constitute a protected activity for Title VII purposes. See McBride v. Hospital of the University of Pennnsylvania, 2001 WL 1132404, at *7 (E.D.Pa. September 21, 2001).

Plaintiff fails to prove a sufficient causal connection to establish retaliation because she resigned from her employment with defendant on the day she first engaged in a protected activity. The conduct which plaintiff characterizes as discriminatory occurred before she first complained to management and cannot be actionable retaliation. See Robinson, 120 F.3d at 1301. In addition, while constructive discharge may constitute an adverse employment action, this claim must fail because plaintiff cannot establish that she was constructively discharged.

### Hostile Work Environment

Plaintiff asserts that defendant created a hostile work environment in violation of Title VII and the PHRA. A hostile work environment exists when a workplace is permeated with discriminatory intimidation, ridicule, and insult so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Incidents of harassment are pervasive if they occur in concert or with regularity. Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir.1990).

To state a hostile work environment claim premised on racial animus, an employee must establish that: (1) she suffered intentional discrimination because of her race; (2) the discrimination was "pervasive and regular"; (3) she was adversely affected by the discrimination; (4) the discrimination would adversely affect a reasonable person of the same race; and (5) respondeat superior liability applies. Cardenas v. Massey, 269 F .3d 251, 260 (3d Cir.2001); Weston, 251 F.3d at 426; Kunin v. Sears, Roebuck & Co., 175 F.3d 289, 293

(3d Cir.1999). Although overt racial harassment is not necessary, the plaintiff must be able to show that race is a substantial factor in the harassment. Aman v. Cort Furniture Rental Corporation, 85 F.3d 1074, 1083 (3d Cir.1996); Andrews, 895 F.2d at 1482.

Plaintiff has failed to adduce evidence showing that what she characterized as poor treatment was at all motivated by her race. Moreover, we conclude that plaintiff has not presented sufficient evidence to show that the alleged discrimination she faced was severe and pervasive. In Williams v. Pennsylvania State Police-Bureau of Liquor Control Enforcement, 108 F.Supp.2d 460, 468 (E.D.Pa.2000), evidence that over the course of five years an employee received poor performance evaluations, was the subject of three disciplinary complaints, and had interpersonal conflicts with her supervisors and co-workers was insufficient to support employee's claim of a hostile work environment. Accordingly, we conclude that because plaintiff's claims do not even rise to the level of those in Williams, plaintiff fails to set forth a claim for hostile work environment as a matter of law.

### Conclusion

**\*9** If there is evidence to support plaintiff's claims, she has not produced it. Speculation and subjective opinions are not competent evidence. Plaintiff speculated that she was unfairly blamed for a co-worker's shortcomings. However, one cannot reasonably conclude from the competent evidence of record that defendant discriminated against plaintiff on the basis of her race or retaliated against her. Nor can one reasonably conclude from the competent evidence that plaintiff was a victim of a hostile work environment.

Accordingly, for all the foregoing reasons, defendant is entitled to summary judgment as a matter of law. Therefore, we grant its motion and dismiss plaintiff Laverne M. Hay's claims contained in Counts I and II of her Amended and Restated Complaint.

2003 WL 22133801 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



TAB I

37 Fed.Appx. 588                                           **Page 223**
**(Cite as: 37 Fed.Appx. 588, 2002 WL 1343624 (3rd Cir.(Pa.)))**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.

**Kathy D. KIDD, Appellant**
**v.**
**Commonwealth of PENNSYLVANIA;**
**Pennsylvania State Police; Bureau**
**Liquor Control Enforcement; William H.**
**Hairston; Walter N. Peterson; Jan F.**
**Llewellyn; Thomas J. Sweetz; Michael R.**
**Moyer; Nathan R. Savage; Robert**
**Murry; [FN*] Keith Knock; 3 Jane/John Doe.,**
**All but Commonwealth of**
**Pennsylvania, PSP/BLC Defendants sued**
**individually and in official capacity.**
**All Defendants held jointly and severely liable**

FN* Amended per the Clerk order dated 12/07/01

**No. 01-3447.**

Submitted Pursuant to Third Circuit LAR 34.1 June 11, 2002.
Filed June 19, 2002.

Former employee brought various federal and state civil rights and employment discrimination claims in connection with her employment as state liquor enforcement officer. The United States District Court for the Eastern District of Pennsylvania, Petrese B. Tucker, J., entered orders dismissing claims, 1999 WL 391496, and denying employee's motion for new trial, 2001 WL 1159770, and employee appealed. The Court of Appeals, McKee, Circuit Judge, held that: (1) employee's uncorroborated allegations of harassment did not create fact question; (2) supervisor's alleged unauthorized recording of conversation with employee did not violate wiretapping laws; and (3) exclusion of evidence that state police had system-wide practice of conducting psychological examinations of officers who filed sexual harassment complaints was not abuse of discretion.

Affirmed.

**West Headnotes**

**[1] Federal Civil Procedure      2491.5**
170Ak2491.5
Liquor enforcement officer's allegation that co-worker pointed loaded gun at her at work was insufficient to raise fact issue as to whether she was "seized" by co-worker, in violation of Fourth Amendment, and thus did not preclude summary judgment in officer's § 1983 suit, where co-worker denied that incident took place, and no other witnesses could corroborate officer's story. U.S.C.A. Const.Amend. 4.

**[2] Civil Rights      1246**
78k1246
(Formerly 255k30(6.10) Master and Servant)
Co-worker's derogatory comments towards employee after she filed sexual harassment complaint against him did not constitute adverse employment decision sufficient to support employee's claim against co-worker for retaliation under Title VII. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e-3(a).

**[3] Telecommunications      1436**
372k1436
(Formerly 372k494.1)
Supervisor's alleged unauthorized recording of conversation with employee did not violate federal or Pennsylvania wiretapping statutes, absent allegation that employee spoke while recorder was on. 18 U.S.C.A. § 2520; 18 Pa.C.S.A. § 5725(a).

**[4] Civil Rights      1542**
78k1542
(Formerly 78k381)
Exclusion of evidence that state police had system-wide practice of conducting psychological examinations of officers who filed sexual harassment complaints was not abuse of discretion in liquor enforcement officer's employment discrimination action, where proposed witnesses did not work at same office as officer, and officer was forced to undergo psychological examination before she filed sexual harassment complaint.

**[5] Civil Rights      1185**
78k1185
(Formerly 78k167)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



37 Fed.Appx. 588

**Page 224**

**(Cite as: 37 Fed.Appx. 588,  2002 WL 1343624 (3rd Cir.(Pa.)))**

Fact that supervisor called female employee "bitch" on one occasion in midst of argument with her did not constitute actionable sexual harassment.

**[6] Federal Courts ☞ 910**
170Bk910

Fact that judge, on two occasions, started to instruct jury in sex discrimination case that applicable burden of proof was "beyond a reasonable doubt" was not reversible error, where court immediately corrected itself both times and stated that burden was "preponderance of the evidence," and judge also correctly and adequately explained preponderance of evidence standard to jury.

**\*590** On Appeal from the Orders of the United States District Court for the Eastern District of Pennsylvania, dated May 20, 1999, November 29, 2000, and August 20, 2001, and from Judgment Entered July 11, 2001 Civ. No. 97-cv-5577. District Judge: Hon. Petrese B. Tucker.

Before SLOVITER, ROTH, and McKEE, Circuit Judges.

OPINION OF THE COURT

McKEE, Circuit Judge.

**\*\*1** Kathy Kidd brought various federal and state civil rights and employment discrimination claims against the defendants in connection with her employment as a Liquor Enforcement Officer at the Pennsylvania State Police Bureau of Liquor Enforcement ("the Bureau"). The district court disposed of a number of issues in pretrial rulings leaving only the Title VII sex harassment claim against the Bureau to proceed to trial. A jury subsequently found the Bureau not guilty on that claim. Kidd's motion for a new trial was denied, and this appeal followed. For the reasons that follow, we will affirm.

I.

Inasmuch as we write only for the parties, we need not set forth the factual background of this dispute except insofar as may be helpful to our brief discussion. We exercise plenary review over a district court's order granting summary judgment, see Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir.2001), as well as its order granting

a motion to dismiss, see Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir.1997). A district court's rulings regarding the admission of evidence are reviewed for an abuse of discretion. See Glass v. Philadelphia Electric Co., 34 F.3d 188, 191 (3d Cir.1994). The order denying a motion for a new trial is also reviewed for an abuse of discretion. See Pryer v. Slavic, 251 F.3d 448, 453 (3d Cir.2001).

II.

Kidd appeals the district court's grant of summary judgment, and the district court's pre-trial evidentiary rulings. She also challenges the jury instructions and interrogatories. We will address each issue in turn.

A. The Dispositive Motions

The district court granted summary judgment to defendant Moyer on Kidd's civil rights claim under 42 U.S.C.1983. Kidd argues that Moyer, a co-worker, deprived her of her rights under the Fourth and Fourteenth Amendments by unlawfully "seizing" her when he allegedly pointed a loaded gun at her at work.

To prevail on a claim under Section 1983, a plaintiff must show that: 1) the conduct was committed by a person acting under color of state law; and 2) the conduct deprived the plaintiff of his or her constitutional rights. See 42 U.S.C.1983; Anderson v. Davila, 125 F.3d 148, 159 (3d Cir.1997).

[1] Moyer denies that the gun incident took place. The State Police conducted an extensive investigation into the incident. They concluded that the six witnesses who were in the squad room when Moyer allegedly pointed his gun at Kidd did not see the alleged incident and could not corroborate Kidd's story. The State Police concluded that "[t]here exist[s] insufficient evidence to sustain the allegation that Officer Moyer pointed a pistol at Officer Kidd." App. 2386. As Kidd has offered no additional evidence beyond her unsupported allegations to corroborate her version of events, there was no genuine issue of material fact that Moyer "seized" Kidd. Therefore, the district court properly granted summary judgment in favor of **\*591** Moyer on the Section 1983 claim. [FN1]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



37 Fed.Appx. 588                                                                                          **Page 225**
(Cite as: 37 Fed.Appx. 588, *591, 2002 WL 1343624 (3rd Cir, **1.(Pa.)))

FN1. Even assuming the gun incident is true, it is not clear that the act of one officer pointing a gun briefly at another under these circumstances would constitute a "seizure" within the meaning of the Fourth Amendment. Moreover, inasmuch as we dispose of the Section 1983 claim on the grounds that there is no evidence Kidd was "seized," we need not address the question whether Moyer was acting "under the color of law."

**2 Kidd also argues that defendants are liable for conspiracy to deprive her of equal protection of the laws under 42 U.S.C.1985. That section provides a cause of action to a party where two or more people have conspired to deprive the plaintiff of the equal protection of the laws. See 42 U.S.C.1985(3) (2002). As Kidd can not show that Moyer deprived her of any constitutional rights, Kidd's Section 1985 conspiracy claim must necessarily fail also.

Next, Kidd argues that the district court erred in granting summary judgment in favor of the defendants on her Title VII retaliation claim. The district court found that Kidd had not made out a prima facie case for retaliation in that she had not demonstrated that the Bureau took any "adverse employment decision" against her. [FN2]

FN2. Kidd also argues in her brief that Moyer retaliated against her for exercising her First Amendment rights. However, to the extent that Kidd's Title VII retaliation argument rests on First Amendment analysis, it is waived, as she didi not raise this First Amendment claim in the district court.

[2] Under Title VII, an employer may not retaliate against an employee for opposing a practice that is unlawful under Title VII. See 42 U.S.C. § 2000e-3(a) (2002). However, in order to prevail on this claim, a plaintiff must first establish a prima facie case, which consists of demonstrating: 1) protected employee activity; 2) an adverse employment decision; and 3) a causal connection between the protected activity and the adverse employment decision. See Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 201 (3d Cir.1994). Moreover, under Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir.1997), the adverse employment decision must rise to the level of "alter[ing] the employee's compensation, terms, conditions, or

privileges of employment, deprive[ ] him or her of employment opportunities, or adversely affect[ ] his [or her] status as an employee." Robinson, 120 F.3d at 1300 (internal quotation marks omitted). Derogatory comments and unsubstantiated oral reprimands without more are not enough. See id. Here, Kidd alleges that Moyer's retaliation for her filing a sexual harassment complaint was calling her a "Judas," a "rat," and pointing a loaded gun at her. As noted above, the alleged retaliation must constitute an "adverse employment decision" within the meaning of Title VII. Under Robinson, however, Moyer's name-calling, even if true, does not suffice. Further, as discussed earlier, we find that there is no genuine issue of material fact that Moyer pointed a loaded gun at Kidd. Kidd's claim of retaliation rests only upon the alleged name calling. Therefore, the district court properly granted summary judgment in favor of the defendants on the Title VII retaliation claim.

Next, Kidd argues that the district court erred in granting summary judgment in favor of the defendants on her federal and state wiretapping claims. Both Pennsylvania and federal law provide a cause of action where a person's wire, electronic, or oral communication has been intercepted in violation of the applicable statute. See 18 U.S.C. 2520 (2002) (federal wiretapping statute); see also 18 Pa. Cons.Stat. 5725(a) (2002) (state wiretapping statute). Under both federal and state law, the plaintiff must first she that: 1) her oral communications were intercepted; 2) she had an expectation of privacy in the communications; and 3) her expectation of privacy *592 was justified. See Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir.1990) (analyzing federal statute); Agnew v. Dupler, 553 Pa. 33, 717 A.2d 519, 522 (1998) (analyzing state statute).

**3 [3] Kidd alleges that she had a meeting with Murray and Savage where all three agreed to tape record their conversation. Kidd alleges that after a time, Murray asked that all tape recorders be turned off, but that he secretly kept his on. Kidd further alleges that Murray later destroyed the evidence. However, once again, Kidd provides no support beyond mere allegations that Murray's tape player continued to record and that he destroyed the recording. Further, she testified at her deposition that she could not recall if she even said anything in the brief time Murray's tape player was supposedly

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



37 Fed.Appx. 588                                                                                  **Page 226**
(Cite as: 37 Fed.Appx. 588, *592, 2002 WL 1343624 (3rd Cir, **3.(Pa.)))

recording in violation of the agreement not to record. A necessary element to the crime of wiretapping is that an oral communication must have been intercepted, and as Kidd does not know if she was speaking while the recorder was on, the district court properly granted summary judgment in favor of defendants on the wiretapping claims. [FN3]

> FN3. We also summarily dismiss Kidd's Intentional Infliction of Emotional Distress claim. The Commonwealth, it subdivisions, and its employees acting within the scope of employment enjoy Eleventh Amendment immunity in federal court. See 42 Pa.Cons. Stat. § 8521 (1998). The Pennsylvania legislature has not chosen to waive this immunity for intentional torts. See LaFrankie v. Miklich, 618 A2d 1145, 1149 (Pa.Cmmwlth.1992). Therefore, Kidd's Intentional Infliction of Emotional Distress claim is barred under the doctrine of sovereign immunity.

### B. Evidentiary Issues

Kidd argues that the district court improperly prevented her from introducing evidence at trial during rebuttal regarding events predating January 1996. Kidd contends that the district court's November 29, 2000 Order stated that it would not allow her to present this evidence in her case in chief, but that Kidd could present this evidence on rebuttal if the defendants opened the door. Kidd contends that, contrary to the order, the district court did not allow her to introduce necessary pre-1996 rebuttal evidence.

The record indicates that in a sidebar during re-direct, the judge told counsel that he would allow Kidd to provide a brief explanation of her forced leave of absence in 1992, as defense counsel had touched on it during examination, but that Kidd would not be allowed to give full details since it was not relevant to Kidd's remaining post-1996 claims. App. 2630-2640. After the sidebar, Kidd was given the opportunity to testify that she felt that her forced leave of absence was unjustified and that her allegations were not afforded a proper and fair investigation. App. 2640. Moreover, Kidd was allowed to testify that her firearm was eventually returned to her and she was returned to full duty. App. 2640-41. Therefore, Kidd's argument that she was not allowed to present any rebuttal evidence regarding the forced leave of absence is plainly

contradicted by the record.

Next, Kidd argues that the district court erred in granting defendants' motion in limine to exclude the admission of testimony of four State Police employees. Kidd sought to introduce testimony that these four witnesses had each brought complaints of sexual harassment against the State Police, and that their supervisors forced them to undergo psychological examinations in an effort to discredit them rather than investigating the allegations. Kidd wanted to introduce this evidence to establish a system-wide practice of ignoring sexual harassment complaints. The district court ruled that the testimony was irrelevant to Kidd's case, and thus inadmissible.

**\*\*4** Two of the witnesses, Sharon Williams and Edwina Clarkson, were Bureau officers, but did not work at the Allentown office where Kidd worked. Two of the other witnesses, Robert Ward and Crystal Rogers, worked for the State Police, but **\*593** not for the Bureau, and not in Allentown. Therefore, none of the witnesses could testify from firsthand knowledge about the relevant procedures in Allentown, where Kidd worked.

[4] Kidd was ordered to undergo a psychological examination, but that occurred in April 1992. This was well before she made any complaints regarding harassment, and there is therefore no nexus between those events on this record. Moreover, she was not ordered to undergo a new exam after she started making complaints in 1996. Any testimony the four witnesses could provide regarding an order they received to take a psychological exam after complaining of sexual harassment was therefore clearly not relevant to Kidd's situation. Accordingly, we find that the district court did not abuse it discretion in excluding the testimony of the four witnesses. [FN4]

> FN4. Kidd also argues that the witnesses' testimony was relevant to establish malice or reckless indifference for punitive damages. There is no merit to this argument as 42 U.S.C. § 1981a(b)(1) precludes recovery of punitive damages in suits against a governmental agency in Title VII cases. See 42 IU.S.C. § 1981a(b)(1). Moreover, even if it was allowed against the individual defendants in their capacities, it would still have to be relevant to her allegation of retaliation or harassment. It

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



clearly wasn't.

Next, Kidd argues that the district court erred in excluding from evidence several pieces of anonymous mail that were sent to her house. This consisted of sexually explicit pictures as well as Corporal Hairston's office notes.

Kidd argues that her inability to directly link the mailings to anyone at the Bureau is due to sub-par investigative work on the part of the police investigator. Kidd argues that if the investigator had done a better job investigating the source of the mailings would have been discovered as coming from within the Bureau. However, this is pure conjecture that doesn't merit further comment.

Moreover, the district court properly concluded that the notes were not relevant. Therefore, there was not an abuse of discretion. [FN5]

> FN5. Even though the notes were properly excluded on relevancy grounds, the district court allowed Kidd the opportunity to use the notes in rebuttal if the defendants "opened the door." App. 064.

C. The Jury Instructions and Interrogatories

[5] Kidd argues that the district court erroneously refused to allow her to submit a jury charge on supervisor liability. She alleges that Corporal Hairston, her supervisor, engaged in sexually harassing behavior by calling her a "bitch" on one occasion in the midst of an argument with her. The district court correctly ruled as a matter of law that the one-time use of this epithet under these circumstances was not sexual harassment. Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

Kidd also argues that the district court erroneously rejected her proposed jury instruction on supervisor liability. We review a jury charge "as a whole ... to determine if it fairly and adequately submitted the issues to the jury[.]" Pryer, 251 F.3d at 454, quoting Griffiths v. CIGNA Corp., 988 F.2d 457, 462 (3d Cir.1993). A jury charge is inadequate "only if the instruction [is] capable of confusing and thereby misleading the jury." Link v. Mercedes-Benz of North Am., Inc., 788 F.2d 918, 922 (3d Cir.1986), quoting United States v. Fischbach &

Moore, Inc., 750 F.2d 1183, 1195 (3d Cir.1984). Here, the district court instructed the jury that the plaintiff has the burden of proving that "management level employees actually knew, or should have known, of the sexually hostile work environment, and failed to take prompt and appropriate remedial action to stop the sexual harassment." App. 079. The adequacy of Kidd's proposed instruction is not the threshold question. The district court was well within its discretion in rejecting her proposed jury charge, and using its own language instead as it is an accurate statement of the law.

*594 **5 Kidd also argues that the district court's jury instructions were biased towards the defendants. This is based on the fact that the district court largely used the Bureau's proposed instructions. Kidd also contends that the jury became confused because the court incorrectly explained the burden of proof.

[6] As noted above, we find that the charge submitted to the jury adequately stated the law regarding supervisor liability, and, therefore, regardless of whether the charge was crafted by the defendants, there is no merit to the argument that it was biased towards the defendants. It is true that on two occasions the court started to instruct that, "beyond a reasonable doubt" was the standard for burden of proof. However, both times the court immediately corrected itself and stated that the burden was a "preponderance of the evidence." App. 3349, 3369. The judge also correctly and adequately explained the preponderance of the evidence standard to the jury, and therefore no reasonable juror could have been confused or misled. App. 3346-48.

Lastly, Kidd argues that the jury interrogatories were not specific enough. However, a trial court has discretion in formulating jury interrogatories. See Armstrong v. Dwyer, 155 F.3d 211, 216 (3d Cir.1998). So long as the questions are adequate for a "jury to determine the factual issues essential to the judgment[,]" a court is "not obliged to distill these issues with any greater clarity." Id. at 216.

In conclusory fashion, Kidd states that these interrogatories were not sufficiently detailed, but provides no explanation or rationale for her argument. We find that the interrogatories were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



adequate, and that the district court did not err in denying Kidd's motion for a new trial.

Accordingly, for all the reasons set forth herein, we will affirm the district court's Orders dated May 20, 1999, November 29, 2000, and August 20, 2001, as well as the judgment entered July 11, 2001.

Kathy KIDD, Appellant/Plaintiff, v. COMMONWEALTH OF PENNSYLVANIA, Pennsylvania State Police Bureau of Liquor Control Enforcement; William H. Hairston, Walter N. Peterson, Jan F. Llewellyn, Thomas J. Sweetz, Michael R. Moyer, Nathan R. Savage, Robert Murry, 3 Jane/John Doe. all but Commonwealth of Pennsylvania, Psp/Blce Defendants sued individually and in official capacity.All Defendants held joint and severely liable, Appellees/ Defendants., 2001 WL 34553390 (Appellate Brief) (C.A.3 2001), Brief of Appellant

Kathy D. KIDD, Appellant, v. COMMONWEALTH OF PENNSYLVANIA; Pennsylvania State Police; Bureau Liquor Control Enforcement; William H. Hairston; Walter N. Peterson; Jan F. Llewellyn; Thomas J. Sweetz; Michael R. Moyer; Nathan R. Savage; Robert Murry; Keith Knock; 3 Jane/John Doe., All but Commonwealth of Pennsylvania, Psp/Blc Defendants sued individually and in official capacity. All Defendants held jointly and severely liable Appellees., 2002 WL 32508007 (Appellate Brief) (C.A.3 March 8, 2002), Brief for Appellees Walter N. Peterson, Jan F. Llewellyn, Michael R. Moyer, and Keith Knock

Kathy D. KIDD, Appellant, v. COMMONWEALTH OF PENNSYLVANIA; Pennsylvania State Police; Bureau Liquor Control Enforcement; William H. Hairston; Walter N. Peterson; Jan F. Llewellyn; Thomas J. Sweetz; Michael R. Moyer; Nathan R. Savage; Robert Murry; 3 Jane/John Doe, all but Commonwealth of Pennsylvania, Psp/Blc Defendants sued individually and in official capacity. All Defendants held jointly and severely liable., 2002 WL 32508006 (Appellate Brief) (C.A.3 April 1, 2002), Brief for Appellees Commonwealth of Pennsylvania Pennsylvania State Police, Bureau of Liquor Control Enforcement, and Hairston, Sweetz, Savage, and Murray

37 Fed.Appx. 588, 2002 WL 1343624 (3rd Cir.(Pa.))

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



TAB J

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1132404 (E.D.Pa.))

Page 197

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

**Beverly Campbell MCBRIDE, Paulette Martin, Rose Anderson,**
v.
**HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA, Lisa Malloy and Elaine Thompson.**

No. CIV.A. 99-6501.

Sept. 21, 2001.

MEMORANDUM

WALDMAN, J.

### I. Introduction

*1 Plaintiffs have asserted claims pursuant to 42 U.S.C. §§ 1981 and 1985(3) for discrimination and conspiracy to discriminate in employment decisions because of race, creating a hostile work environment and retaliation. Presently before the court is defendants' motion for summary judgment.

### II. Legal Standard

In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564, 568 (3d Cir.1986). Only facts that may affect the outcome of a case are "material." See Anderson, 477 U.S. at 248. All reasonable inferences from the record must be drawn in favor of the non-movant. See id. at 256.

Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof. See J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir.1990)

(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), cert. denied, 499 U.S. 921 (1991). A plaintiff cannot avert summary judgment with speculation or conclusory allegations, such as those found in the pleadings, but rather must present evidence from which a jury could reasonably find in his favor. See Anderson, 477 U.S. at 248; Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir.1999); Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989); Woods v. Bentsen, 889 F.Supp. 179, 184 (E.D.Pa.1995).

### III. Facts

From the evidence of record, as uncontroverted or otherwise viewed in a light most favorable to plaintiffs, the pertinent facts are as follow.

Plaintiffs are three African American women who worked as assistants in the Occupational and Physical Therapy Department ("OT/PT") at the Hospital of the University of Pennsylvania ("HUP").

Plaintiff McBride worked at HUP from January 1995 until July 1998 when she requested and received a medical leave of absence which continued to November 19, 2000 when she resigned.

Plaintiff Anderson worked at HUP from October 1989 until August 1998 when she requested and received a medical leave of absence which continued to October 28, 1998 when she resigned. [FN1]

FN1. At some point during her employment in the OT/PT Department, Ms. Anderson requested and received a transfer to another department. She was unhappy in the new position and transferred back to the OT/PT Department.

Plaintiff Martin was interviewed and hired by defendant Malloy in June 1994. She worked until August 10, 1998 when she requested and received a medical leave of absence which continued to October 26, 1998 when she resigned.

*2 Defendant Malloy was employed by HUP from 1993 to 1999. She began her career at HUP as a Clinical Specialist. She then became the Outpatient Unit Supervisor for the Physical Therapy Department and in June 1994 became the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1132404, *2 (E.D.Pa.))

Page 198

Ambulatory Care Coordinator. The Physical Therapy Department merged with the Occupational Therapy Department in June 1996, creating the OT/PT Department which was relocated to a facility at 37th and Market Streets. Ms. Malloy was promoted to Director of Ambulatory Services for the OT/PT Department. She left HUP in June 1999.

Defendant Thompson was employed by HUP from 1992 to 2000. She was Director of the Physical Therapy Department from 1992 to 1995. From 1995 to 1997 Ms. Thompson was a hospital director and from 1997 to 2000 she was the chief administrative officer for the trauma network.

Plaintiffs' duties included scheduling patients' physical therapy appointments, maintaining the gym area, including stocking supplies, and sometimes assisting patients on the therapy equipment. After the merger of the Occupational and Physical Therapy Departments and the relocation to the new facility, plaintiffs' responsibilities changed. Plaintiffs were all situated at the front desk of the reception area and were responsible for answering the telephones, scheduling patient appointments and greeting the incoming patients. The OT/PT Department hired an athletic trainer to perform the patient care duties and as a result, the plaintiffs' patient care responsibilities were terminated.

At times never specified, Ms. Anderson applied for other "clerk positions" and some "patient care positions" which she did not receive. No other details are provided. At unspecified times, Ms. McBride applied for a nursing assistant position in a department she could not recall and clerk positions in departments she could not recall except for one which was in the otolaryngology department. She testified that she went to Human Resources "all the time" to see what positions were available. Ms. Martin applied for various patient registrar positions. The only one she could recall was in gynecology.

Ms. Anderson acknowledged that Ms. Malloy did not want her to transfer because Ms. Malloy depended on her in the OT/PT Department. Ms. McBride testified that Ms. Malloy did not want her to transfer out of OT/PT because of the "good job" Ms. McBride did. When plaintiffs complained sometime in 1997 to Ms. Malloy about their classification and salary, she approved their

promotion from Clerk II to Clerk III. Ms. Malloy believed plaintiffs would receive some retroactive pay as a result. When they complained to Ms. Malloy that they had not received such pay, she advised them that she was too busy to deal with the matter.

Plaintiffs assert that defendants Malloy and Thompson acted in concert to discriminate against them in filling these other positions because of race and took actions which created a racially hostile work environment. These actions included not allowing plaintiffs to all have lunch hours at the same time; not providing plaintiffs with voice mail on their office telephones; [FN2] installation of a security camera in the front reception area where plaintiffs' desks were located; locking of the thermostat at a set temperature in the front reception area; [FN3] failure to provide a coat rack for plaintiffs; [FN4] and, a prohibition on leaving personal belongings in the front reception area. [FN5] Plaintiffs assert that they were forced to resign because of the resulting hostile working environment created by these allegedly discriminatory acts.

FN2. There was no voice mail on the front reception desk telephones during hours of operations. Therapists with direct lines did have telephones with voice mail.

FN3. At plaintiffs' request, the thermostat would be unlocked and the temperature adjusted by Bob LaBelle who maintained a key. Mr. LaBelle was not always available.

FN4. Employees in the back sometimes hung their personal coats on racks provided for lab coats.

FN5. Plaintiffs were provided with lockers but complained to Ms. Malloy that they were not large enough when Ms. McBride's and Ms. Martin's leather coats were torn. Ms. Malloy noted that the plaintiffs all wore black leather coats and said she would try to get larger lockers to accommodate them. Because Ms. McBride's leather coat was brown, she thought "maybe [Ms. Malloy] wasn't talking about the black leather jackets but us black women." Ms. McBride also perceived as racist Ms. Malloy's reference to a black patient as "crazy." This patient "kept calling and calling" to press a complaint about having to wait too long in the lobby

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



before receiving attention.

Plaintiffs assert that Ms. Thompson denied them other positions, and Ms. Malloy denied them retroactive pay for the promotion they received from Clerk II to Clerk III, in retaliation for "complaining to [HUP's] Human Resource Department." At an unspecified time, Ms. McBride complained to Diane Allen at Human Resources about not receiving interviews for positions she had applied for. Ms. McBride did not recall what else she may have said to Ms. Allen but assumes she would "have said something about race" because "I know Diane Allen's husband was black." Ms. Anderson complained to Marilyn Caldwell at Human Resources about being treated unfairly by Ms. Malloy. There is no competent evidence of record that Ms. Anderson was any more specific or ever related that the alleged unfair treatment was because of race. Ms. Anderson could not recall when, even by year, she spoke with Ms. Caldwell.

IV. Discussion

A. § 1981 Claim for Intentional Discrimination

*3 To sustain a § 1981 discrimination claim, a plaintiff must show that the defendant intentionally discriminated against her because of race in the making, performance, enforcement or termination of a contract or for such reason denied her the enjoyment of the benefits, terms or conditions of the contractual relationship. See Saint Francis College v. Al-Khazraji, 481 U.S. 604, 609, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 385 (3d Cir.1999); Green v. State Bar of Texas, 27 F.3d 1083, 1086 (5th Cir.1994); Mian v. Donaldson, Lufkin & Jenrette Securities, 7 F.3d 1085, 1087 (2d Cir.1993); Williams v. Carrier Corp., 889 F.Supp. 1528, 1530 (M.D.Ga.1995); Flagg v. Control Data, 806 F.Supp. 1218, 1223 (E.D.Pa.1992).

The McDonnell Douglas analytic framework for Title VII claims also applies to employment discrimination claims under § 1981. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (applying McDonnell Douglas framework to claims under 42 U.S.C. § 1981); Pamintuan, 192 F.3d at 385

(same); Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir.1997) (same); Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107, 112 (3d Cir.1996) (same).

The plaintiff has the initial burden of establishing a prima facie case of employment discrimination. See McDonnell Douglas, 411 U.S. at 802; Pamintuan, 192 F.3d at 385. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. See McDonnell Douglas, 411 U.S. at 802; Hampton, 98 F.3d at 112. The plaintiff may then discredit the defendant's articulated reason and show that it was pretextual from which a factfinder may infer that the real reason was discriminatory or otherwise present evidence from which one reasonably may find that unlawful discrimination was more likely than not a determinative cause of the adverse employment action. Id. at 112-3.

To discredit a legitimate reason proffered by the employer, a plaintiff must present evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in that reason that one could rationally conclude it is incredible and unworthy of credence, and ultimately infer that the employer did not act for the asserted non-discriminatory reasons. See Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir.1994). The ultimate burden of proving that a defendant engaged in intentional discrimination remains at all times on the plaintiff. See Hicks, 509 U.S. at 508.

*4 To establish a prima facie case of racial discrimination in the circumstances presented, a plaintiff must show that plaintiff belongs to a racial minority; that plaintiff applied and was qualified for a position for which the employer was seeking applicants; that plaintiff was rejected; and, that thereafter, the position was filled by another or remained open while the employer continued to seek applications from persons of plaintiff's qualifications. See McDonnell Douglas, 411 U.S. at 802.

Plaintiffs are members of a racial minority. Plaintiffs, however, have failed to show that they applied for any position which was filled by another with comparable or lesser qualifications, or that they were qualified for any position for which they did

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1132404, *4 (E.D.Pa.))

apply.

Ms. Anderson, an outpatient clerk at level two, claims that she applied for another clerk position which was given to someone else. There is no showing, however, that she was qualified for the level five inpatient position that she applied for. [FN6]

> FN6. Plaintiff Anderson acknowledged that on one occasion she applied for and received a transfer to a desired position.

Ms. McBride testified that she applied for several clerk positions outside of the physical therapy department and never received an interview. She cannot recall which positions she applied for. She provides no evidence that any such position was filled with a person of comparable or lesser qualifications. An employer is not required to interview every applicant for a position. A mere failure to receive an interview is not sufficient to establish a prima facie case of intentional discrimination.

Ms. Martin states she applied for several patient registrar positions and only received one interview. Ms. Martin never asked why she did not get the position. She was simply told it was given to somebody else. Ms. Martin provides no evidence that the position was given to someone with comparable or lesser qualifications than hers. Indeed, she acknowledges that one position was filled by someone with a degree that Ms. Martin did not have.

That plaintiffs may have been qualified for positions within HUP filled by others, even others less qualified, would not satisfy the second requirement of a prima facie case that plaintiffs applied for and were qualified for particular positions. In response to defendants' argument that plaintiffs have provided no evidence they applied for other positions, plaintiffs state only that defendant HUP failed to provide notice of new positions. It appears, however, from Ms. McBride's testimony that she went to Human Resources "all the time" to see what positions were available that HUP did not withhold or obscure such information.

Plaintiffs assert that there is rarely direct evidence of discriminatory motive. This may be true,

however, plaintiffs have failed to produce any evidence, direct or indirect, to demonstrate that defendants intentionally discriminated against them on the basis of race. [FN7] Indeed, there is no competent evidence of record that Ms. Malloy or Ms. Thompson had authority to place any plaintiff in any position for which she did apply or were involved in the pertinent decisionmaking.

> FN7. One cannot reasonably or objectively find in context that Ms. Malloy's observation about black leather coats or characterization of a persistent complaining patient as "crazy" evince racial animus.

*5 Conclusory assertions of discrimination are insufficient to raise an issue of material fact. See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). A prima facie case of discrimination cannot be established by conjecture or speculation. See Bray v. L.D. Caulk Dentsply Int'l, 2000 WL 1800527, *5 (D.Del. July 31, 2000).

B. § 1981 Hostile Work Environment Claim

To sustain a racially hostile work environment claim, a plaintiff must prove that she suffered intentional discrimination because of her race; the discrimination was pervasive and regular; the discrimination detrimentally affected her; the discrimination would detrimentally affect a reasonable person in the same position; and, respondeat superior liability. See Andrews, 895 F.2d at 1482; Lanzot v. Sacred Heart Healthcare Sys., 2001 WL 872685, *4 (E.D.Pa. July 5, 2001).

An employer is subject to liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate, or successively higher, authority over the employee. See Faragher v. City of Boca Raton, 524 U.S. 775, 808, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). When no tangible adverse employment action is taken, a defending employer may raise an affirmative defense that it exercised reasonable care to prevent and correct promptly any harassing behavior and that the plaintiff employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or otherwise to avoid harm. See Id.

A hostile work environment exists when a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1132404, *5 (E.D.Pa.))

workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). See also Kohn v. Lemmon Co., 1998 WL 67540, *4 (E.D.Pa. Feb. 19, 1998). Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment is not actionable. See Harris, 510 U.S. at 21; Kohn, 1998 WL 67540, *4. Incidents of harassment are pervasive if they occur in concert or with regularity. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir.1990).

In determining whether a work environment is hostile or abusive, the pertinent factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; [and] whether it unreasonably interferes with an employee's work performance." Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir.2001) (quoting Harris, 510 U.S. at 23).

*6 Defendants assert that the security camera was installed as a safety measure for the protection of the front desk employees and to record anyone who harmed the employees to aid the police in apprehending the assailant. Plaintiffs have produced no evidence to show that the placement of the security cameras in the front lobby was for any reason other than security.

The only evidence proffered that the thermostat in the front waiting area was pre-set and locked because of plaintiffs' race is Ms. McBride's testimony that "most black people, by nature, are cold most of the time and most Caucasian people that I know are more warm-blooded" and thus she was were more comfortable with a warm temperature. Plaintiffs have presented no competent evidence to refute defendants' assertion that the thermostat was locked to control sharp fluctuations in temperature which had resulted when persons in the waiting area variously complained that it was too warm or too cold. Plaintiffs Anderson and McBride acknowledged that at plaintiffs' request, the thermostat would be unlocked by Bob LaBelle to adjust the temperature. Moreover, there is no evidence that the thermostat was set at an unusually low temperature, and no evidence to support a conclusion that the thermostat was locked as an act of intentional racial discrimination.

The only evidence proffered that plaintiffs' lunch hours were staggered in half hour increments for racial reasons is Ms. McBride's statement that she perceived this as a reversion "to slavery days" when "they never wanted African Americans to talk to each other because that means divide us and you can conquer us." It is uncontroverted that plaintiffs were the only employees who covered the reception area. Ms. Malloy avers that plaintiffs were unable to all take lunch together because someone always had to be available to answer the phones and interact with the patients as they entered the facility. Plaintiffs have presented no competent evidence to show that this was not the true reason or otherwise that lunch schedules were racially motivated. That other employees with different responsibilities may have been able to take lunch together is irrelevant.

There is no competent evidence that plaintiffs were not permitted to leave their personal belongings at the front desk or were required to keep their pocketbooks and coats in a locker for reasons of race. That professional staff in the back area may have put purses in their desks or placed coats on hooks in the professional offices for lab coats is simply not probative in connection with rules regarding security and appearances at the front desk and reception area.

Plaintiffs have presented no competent evidence from which one could find they did not receive voice mail on their telephones for reasons of race. They have presented no competent evidence to refute Ms. Malloy's testimony that there was no voice mail during hours of operation on the telephone lines covered by plaintiffs because all calls had to be handled as they came in and that the professional staff in the back offices had voice mail because there was no one to answer their direct lines when they were away from their desks.

*7 Plaintiffs also suggest that racism may be inferred from their having to sit together and being physically separated from the other white employees in the OT/PT Department. This is fatuous. Plaintiffs performed reception functions at the front desk while the physical therapists and others in the department worked with the patients in the back



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1132404, *7 (E.D.Pa.))

area. [FN8]

> FN8. At least one of the physical therapists, Nicole
> Holder, was African American.

A reasonable factfinder could not conclude from the competent evidence of record that plaintiffs were subjected to intentional racial discrimination, let alone on a regular and pervasive basis. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir.1996). Even assuming the acts complained of were racially motivated, they clearly did not Oreate an abusive working environment. See Weston, 215 F.3d at 426. Placing a security camera at the reception area of a busy hospital, presetting a thermostat, staggering lunch hours of those assigned to the reception area and requiring that personal belongings be secured were not remotely threatening, humiliating or disruptive to plaintiffs' work performance and would not detrimentally affect any reasonable person in the same position.

C. § 1981 Retaliation Claim

A retaliation claim is also cognizable under § 1981. See Kohn, 1998 WL 67540, *5. To make out a prima facie case of retaliation, a plaintiff must show that she engaged in protected conduct; the employer took adverse action against her; and, there was a causal link between the protected conduct and the adverse action. See Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir.1997); Twyman v. Dilks, 2000 WL 1277917, *8 (E.D.Pa. Sept. 8, 2000).

Plaintiffs claim that after complaining to HUP's Human Resources Department and Ms. Thompson about poor treatment by Ms. Malloy, they did not receive promotions or transfers from Ms. Thompson and were denied retroactive pay by Ms. Malloy for promotions they did receive from Clerk II to Clerk III.

Protected activity includes formal charges and informal complaints of unlawful discrimination to management. See Abramson v. William Patterson College, 260 F.3d 265, 287-88 (3d Cir.2001) EEOC v. L.B. Foster Co., 123 F.3d 746, 754 (3d Cir.1997); Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir.1990) (same). Expressions of dissatisfaction and grievances about working conditions, however, are not protected

activity. See Walden v. Georgia-Pacific Corp., 125 F.3d 506, 513 n. 4 (3d Cir.1997); Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir.1995). There is no competent evidence of record that any plaintiff related a complaint to anyone at HUP to racial discrimination. The closest thing to such evidence is the testimony of Ms. McBride, who said "I don't recall" if I complained of racial discrimination, that she assumes she must "have said something about race" to Diane Allen because "I know [her] husband was black." This kind of assumption is not evidence.

Further, even if there were competent evidence of protected activity, there has been no showing of a causal link between plaintiffs' complaints and the allegedly retaliatory acts.

*8 Plaintiffs provide no dates and there is otherwise no evidence of when they made complaints to Human Resources. In the absence of a pertinent time line, one cannot reasonably infer that Ms. Thompson declined to promote or transfer plaintiffs because of any complaints to Human Resources. [FN9] There is no competent evidence that Ms. Thompson had authority to promote or transfer plaintiffs at the pertinent time. Ms. Thompson was not connected to the OT/PT Department after 1995.

> FN9. Plaintiffs incorrectly assert that Ms. Thompson was the Director of Human Resources. It is uncontroverted on the evidence that Ms. Thompson never held this position or any other position with Human Resources.

There is no competent evidence of record that Ms. Malloy promised or could have provided the retroactive pay sought by plaintiffs. Moreover, there is no competent evidence of record that Ms. Malloy ever knew plaintiffs had complained about her. When plaintiffs complained to Ms. Malloy about their classification and salary, she approved a reclassification to Clerk III. It was Ms. Malloy's "understanding and belief that [plaintiffs] received retroactive pay increases" as a result of the reclassification. There is no evidence that she could ensure such pay or interfered with any plaintiff receiving it.

Plaintiffs state that when they complained to Ms. Malloy that they had not received retroactive pay,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



she said she was too busy to address the matter. There is no evidence that Ms. Malloy was not in fact busy with more pressing matters at the time and no evidence that plaintiffs were prevented from pursuing the retroactive pay issue directly with Human Resources or the Payroll Office.

D. § 1985(3) Conspiracy Claim

To sustain a claim of conspiracy under § 1985(3), a plaintiff must prove the existence of a conspiracy, motivated by racial discriminatory animus, for the purpose of depriving a person or class of persons of the equal protection of the law or equal privileges and immunities under the laws, and an act in furtherance of the conspiracy whereby a person is injured. See United Brotherhood of Carpenters & Joiners of America, Local 610 v. Scott, 463 U.S. 825, 829, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983). See also Jackson, 2000 WL 562741, *5; Armstrong v. School Dist., 597 F.Supp. 1309, 1313 (E.D.Pa.1984).

Plaintiffs have failed to provide competent evidence from which one could reasonably find that Ms. Malloy or Ms. Thompson engaged in any racially discriminatory acts, let alone that they conspired to do so. There is no competent evidence to show an agreement or that the conduct complained of involved concerted action by these defendants. [FN10]

> FN10. Although not argued by defendants, it appears that this claim may suffer from an even more fundamental deficiency. There is no showing or suggestion that HUP is not a private entity or that Ms. Thompson or Ms. Malloy were state actors. See, e.g., Wells v. Thomas, 569 F.Supp. 426, 428 n. 1 (E.D.Pa.1983). To sustain a § 1985(3) deprivation claim for a private conspiracy, a plaintiff must show that the conspirators intended to deprive her of a right protected by the Constitution against private infringement. See Brown v. Philip Morris, Inc., 250 F.3d 789, 805 (3d Cir.2001); Libertad v. Welch, 53 F.3d 428, 446-47 (1st Cir.1995); Welch v. Board of Dir. of Wildwood Golf Club, 877 F.Supp. 955, 958-59 (W.D.Pa.1995). The Supreme Court has recognized only two such rights, the right against involuntary servitude and the right to interstate travel. See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 278, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993).

V. CONCLUSION

If there is evidence to support plaintiffs' claims, they have failed to adduce or produce it. Subjective perceptions, contrived or strained interpretations, suppositions and sheer speculation are not competent evidence.

One cannot reasonably conclude from the record presented to the court that any plaintiff applied for a position which was given to someone else with comparable or lesser qualifications. One cannot reasonably conclude from the record that the acts which purportedly constitute a hostile work environment were abusive, would detrimentally affect a reasonable person similarly situated or resulted from intentional racial discrimination. One cannot reasonably find that any plaintiff was a victim of retaliation. One cannot reasonably find from the record that Ms. Thompson or Ms. Malloy engaged in any act of intentional race discrimination, or that they entered into a conspiracy to deprive any plaintiff or a secured right.

Defendants are entitled to summary judgment. Their motion will be granted. An appropriate order will be entered.

ORDER

*9 AND NOW, this day of September, 2001, upon consideration of defendants' Motion for Summary Judgment (Doc. # 12) and plaintiffs' response thereto, consistent with the accompanying memorandum, IT IS HEREBY ORDERED that said Motion is GRANTED and accordingly, JUDGMENT is ENTERED in the above action for the defendants.

2001 WL 1132404 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

