**PART 5**

TAB K

Not Reported in F.Supp.2d                                                                        Page 136
(Cite as: 2000 WL 363692 (D.N.J.))

Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.

Jennifer MOBLEY, Plaintiff,
v.
CITY OF ATLANTIC CITY POLICE DEPT.,
Walter Spears, and James Dinoto,
Defendants.

No. Civ.A.97-2086JBS.

March 30, 2000.

Clifford L. Van Syoc, Van Syoc Law Offices, Chartered, Woodland Falls Corporate Park, Cherry Hill, New Jersey, for Plaintiff Jennifer Mobley.

Karen M. Williams, Jasinski & Paranac, P.C., Newark, New Jersey, for Defendant City of Atlantic City.

Louis M. Barbone, Jacobs & Barbone, Atlantic City, New Jersey, for Defendant Walter Spears.

Joseph J. Rodgers, North Wildwood, New Jersey, for Defendant James Dinoto.

OPINION

SIMANDLE, J.

*1 This matter is before the court on the motions for summary judgment of defendants Atlantic City Police Department (ACPD), Walter Spears, and James Dinoto pursuant to Federal Rule of Civil Procedure 56. In the underlying case, plaintiff, Jennifer Mobley, an employee of the ACPD, alleges that the ACPD is liable under 42 U.S.C. § 1983 for hostile work environment sexual harassment as a result of an allegedly inadequate investigation by the ACPD of Mobley's internal complaint of direct sexual harassment by defendant Spears. Mobley also alleges that defendant Spears is liable under § 1983 for his individual sexual harassment of plaintiff, and that defendant Dinoto is liable under the New Jersey Conscientious Employees Act (CEPA), N.J.S.A. 34:19-3(a) for retaliating against plaintiff after she reported Spears' harassment. Because Mobley has not come forward with any evidence from which a reasonable jury could find that there existed a hostile work environment, or that the ACPD deprived her of her right to Equal Protection, the Court will grant the ACPD's motion for summary judgment. Next, because plaintiff has not adduced evidence showing that defendant Spears engaged in state action as required for actions brought under § 1983, the Court grants Spears' motion for summary judgment. Finally, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims in this case, and these claims, including all claims against defendant Dinoto, will be dismissed without prejudice for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Thus, Dinoto's summary judgment motion will be dismissed as moot.

BACKGROUND

This action arises out of a single incident of alleged sexual harassment and the ACPD's allegedly inadequate internal investigation thereof. This Opinion incorporates the factual and procedural history of this case set forth in this Court's June 24, 1999 Opinion in this case. See Mobley v. Atlantic City Police Dept., 76 Empl. Prac. Dec. P 46,172, 1999 WL 1567735 (Civ. No. 97-2086(JBS)) (D.N.J., June 24, 1999).

In brief, plaintiff Mobley, who is employed by the ACPD as a civilian communications operator, alleges that she was harassed in the early morning hours of January 28, 1997 when defendant Walter Spears exposed himself to her and made several sexually explicit comments. Plaintiff complained of Spears' conduct, and was displeased with the ACPD's investigation into her claims in the several weeks following the incident.

This Court's 6/24/99 Opinion entered summary judgment against plaintiff's claims against then-defendants Nicholas Rifice, Joseph Fair, Daniel Loen and Dave Snyder, on the grounds that plaintiff failed to come forward with any evidence from which a reasonable jury could find that these defendants had discriminated against plaintiff because of her gender, and because she likewise had not adduced evidence showing that these defendants had aided and abetted such discrimination.

*2 Among plaintiff's remaining claims in this case are that Spears, a supervisor, sexually harassed her in violation of Title VII and § 1983, and that the ACPD is liable under § 1983 for failing to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw

Not Reported in F.Supp.2d  
(Cite as: 2000 WL 363692, *2 (D.N.J.))

Page 137

adequately investigate her allegations against Spears and for permitting sexual harassment such as Spears' to occur within the department.

## DISCUSSION

### A. Summary Judgment Standard

A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). An issue is "genuine" if it is supported by evidence upon which a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if a dispute about it might affect the outcome of the suit under the governing substantive law. Id. In deciding whether a genuine issue of material fact exists, the court must view the facts in the light most favorable to the non-moving party and extend all reasonable inferences to that party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact, regardless of which party ultimately would have the burden of persuasion at trial. Celotex, 477 U.S. at 323. Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. at 324. The non-moving party may not rest upon the mere allegations or denials of its pleadings. Id. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. "When the record is such that it would not support a rational finding that an essential element of the non-moving party's claim or defense exists, summary judgment must be entered for the moving party." Turner v. Schering-Plough Corp., 901 F.2d 335, 341 (3d Cir.1990).

### B. Mobley's Claims Against the ACPD

#### 1. Section 1983 Custom or Policy Claim

Among plaintiff's surviving claims is that the ACPD deprived her of her Fourteenth Amendment right to equal protection of the laws, in violation of 42 U.S.C. § 1983, by failing to conduct an adequate investigation of her internal complaint of sexual harassment by Spears.

The statute invoked, 42 U.S.C. § 1983, is a powerful legislative "sword" providing injunctive relief and damages for the benefit of citizens whose Federal Constitutional rights have been violated by persons acting on behalf or under the authority of state others. Since its enactment, § 1983 has become Congress's primary means of protecting United States citizens from illegal state action. Sheldon H. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983 § 1.1 (4th ed.1997).

*3 Section 1983 provides, in relevant part:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Thus, to properly assert a claim for alleged violations of his constitutional rights pursuant to 42 U.S.C. § 1983, a plaintiff must allege (1) a violation of a right secured by the Constitution and laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

Here, the ACPD clearly is a state actor. In order to establish liability of a municipal agency such as the ACPD for sexually discriminatory conduct under § 1983, a plaintiff must show (1) that a decision maker possessing final authority to establish official municipal policy created a policy in support of sexual discrimination; or (2) City officials engaged in a "policy or custom" of sexual harassment "so permanent and well settled as to virtually constitute law." Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir.1990.)

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in F.Supp.2d                                                                                       Page 138
(Cite as: 2000 WL 363692, *3 (D.N.J.))

Plaintiff's complaint alleges that defendants have deprived her of her right to equal protection. To succeed on a claim for denial of equal protection under § 1983, a plaintiff must prove purposeful discrimination. Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir.1990); Foster v. Township of Hillside, 780 F.Supp. 1026, 1045 (D.N.J.), aff'd, 977 F.2d 567 (3d Cir.1992). "[I]n order to establish individual liability for sexual discrimination under § 1983, 'there must be some affirmative conduct by the [individual] that played a role in the discrimination." ' Foster, 780 F.Supp. at 1026 (quoting Andrews, 895 F.2d at 1045 (citations omitted)). The necessary involvement may be demonstrated by proof of personal direction of or actual knowledge and acquiescence in a subordinate officers's unlawful discrimination, or through proof of direct discrimination by the individual. Id. However, a supervisor's mere failure to train, supervise or discipline subordinate officers, absent proof of direct participation by the superior in some unlawful conduct, does not form the basis for a § 1983 claim against the supervisor. Brown v. Grabowski, 922 F.2d 1097, 1119-20 (3d Cir.1990), cert. denied, 591 U.S. 1218 (1991).

Here, plaintiff has not adduced sufficient evidence that a reasonable jury could find that there was direct individual discrimination against her that constituted a policy, custom or practice of discrimination against her on the basis of gender. In order to show municipal liability under a custom or practice, the Court must determine which agency official had final decision making power. See St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988). The Court already has dismissed all claims against the final decision maker at the ACPD: Chief Rifice. See Mobley v. Atlantic City Police Dept., supra, 1999 WL 1567735 at *7, Slip Op. at 15.

*4 Once a party has been dismissed from the case, that dismissal become the law of the case. The doctrine of "the law of the case" applies to the effect of previous orders on the later action of the Court in the same case, and empowers courts to refuse to reopen issues that already have been decided. Messenger v. Anderson, 225 U.S. 435, 444 (1912). Under this doctrine, once a court has decided an issue pursuant to a summary judgment motion, that decision becomes the law of the case. Hayman Cash Register Co. v. Sarokin, 669 F.2d 162, 165 (3d Cir.1982).

Because the Court already has granted summary judgment against all of plaintiff's § 1983 claims against Rifice, it follows that municipal liability cannot exist on the basis of purposeful discrimination by Rifice, nor for a policy or practice promulgated by Rifice. See Foster, 780 F.Supp. at 1047 (dismissing claims against municipality after dismissing claims against police chief). Accordingly, plaintiff has failed to meet her burden of showing the fault of the final decision maker in this case, and her claims against the ACPD will be dismissed.

Plaintiff also has argued that, despite Rifice's dismissal from the case, her burden of establishing a policy or custom of gender discrimination is satisfied by the Third Circuit's holding in Hurley v. Atlantic City Police Department, 174 F.3d 95 (3d Cir.1999), in which that court upheld a jury finding that there existed at the ACPD a hostile work environment in violation of Title VII. (Pl. Br. at 34.)

In essence, what plaintiff seeks to do by invoking Hurley is to satisfy her burden of adducing evidence of a custom or policy by relying on the findings in that case. This argument seems to be an attempt to invoke the doctrines of res judicata and collateral estoppel to relieve plaintiff of her burden of proof. For reasons discussed below, this argument is untenable.

Under federal law, collateral estoppel prohibits a party from reopening and re-litigating issues that were or could have been decided in a previous case involving the same parties arising out of the same transaction. There are three elements to claim preclusion: "(1) a final judgment on the merits in a prior suit involving (2) the same claim and (3) the same parties or their privies." EEOC v. United States Steel Corp., 921 F.2d 489, 493 (3d Cir.1990). See also Federated Dep't Stores v. Moitie, 452 U.S. 394 (1981). The doctrine of res judicata is similar, and precludes claims that were determined in the earlier action as well as ones that could have been determined. Angel v. Bullington, 330 U.S. 183, 192-93 (1947).

This case involves neither the same parties nor the exact same issues as Hurley. As defendants accurately have pointed out, plaintiff was not a party to Hurley, and that case did not involve a § 1983

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d  
(Cite as: 2000 WL 363692, *4 (D.N.J.))

Page 139

custom or practice claim, but rather was prosecuted under Title VII. Thus, Hurley did not hold that ACPD had a policy or practice of gender discrimination in violation of § 1983. Because there is no nexus between Mobley's claims and the claims in Hurley, then, that case does not collaterally estop the ACPD from challenging the issue of whether there was in place a custom or policy of gender discrimination.

*5 Without any evidence to the contrary, plaintiff has not refuted the ACPD's showing that the city had no reason to know of sexually harassing work environment that would deprive female workers of their right to equal protection of the laws. The fact that a plaintiff successfully litigated a previous federal lawsuit against the same defendant on similar issues does not mitigate Mobley's duty to prove her case. See Sutton v. Sutton, 71 F.Supp.2d 383, 389-90 (D.N.J.1999). Accordingly, judgment will be granted against plaintiff's custom or policy claim, plaintiff having failed to create a genuine issue as to whether an offending custom or policy existed.

2. Hostile Work Environment Claim

Plaintiff also asserts in her complaint that there existed a hostile work environment due to her gender at the ACPD. This claim is pursued both under Title VII itself and § 1983. Although these are distinct statutory schemes, in practice the plaintiff's burdens are the same. [FN1] See Schanzer v. Rutgers, 934 F.Supp. 669 (D.N.J.1996). In order to survive summary judgment, plaintiff must come forward with evidence showing that the state actor-- here the ACPD--subjected her to a hostile work environment under the standards of Title VII.

> FN1. The Court notes that there is authority suggesting that plaintiffs must exhaust available administrative remedies even where a Title VII claim is cast as a § 1983 "laws" violation. See Nahmod, supra, § 9.65 at 9-172 (if remedies required under the relevant statute, "then a § 1983 'laws' action based on that federal statute will similarly be conditioned on exhaustion of administrative remedies"). However, defendants have not raised an exhaustion argument here.

In order to establish a claim of hostile work environment, plaintiff must demonstrate that:  
(1) she suffered intentional discrimination on the basis of her membership in a protected class;  
(2) the discrimination was pervasive and regular;  
(3) the discrimination detrimentally affected her;  
(4) the discrimination would have detrimentally affected a reasonable person of the same protected class in that position; and  
(5) there exists a basis for respondeat superior liability.  

Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990). The Supreme Court has enumerated some of the factors that courts should consider in determining whether alleged conduct is sufficiently serious to support a hostile work environment claim, including: "... the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). Furthermore, courts must not view individual incidents in a vacuum, but must instead consider the totality of the circumstances. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir.1996); Vance v. Southern Bell Tel and Tel. Co., 863 F.2d 1503, 1510 (11th Cir.1989).

In the present case, it is clear that plaintiff not met her burden of showing a hostile work environment. In support of her hostile work environment claim, plaintiff argues that the deposition testimony of Mobley, former defendant Dave Snyder, and ACPD employee Diane Deborah Jones establishes that ACPD customarily engaged in sexual banter in Mobley's presence, and that this banter subjected plaintiff to a hostile work environment. Defendants argue that this theory has no merit because the record before the Court shows that plaintiff herself engaged in the allegedly offending sexual banter, and never once complained about it.

*6 As discussed above, it is a fundamental element of any hostile work environment claim that a claim based on hostile work environment must identify behavior that is unwelcome. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986); Andrews, 895 F.2d at 1482. The Supreme Court also has instructed that courts judging hostility should "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of gender-related jokes, and occasional teasing." ' Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citing Oncale v. Sundowner

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Offshore Services, Inc. 523 U.S. 75, 80 (1998)). This screening is in place to ensure that Title VII does not become trivialized as a "general civility code." Id. In particular, courts should filter out simple teasing, offhand comments, and isolated incidents (unless extremely serious). Id. (citing Oncale, 523 U.S. at 82.)

In this case, plaintiff herself has testified that, to the extent that there was sexual banter in the ACPD, she actively participated in it:
> Q: Did you participate in these topics [relationships, sex generally, who was sleeping with whom] during the course of your job as a communications operator?
> A: Yes.

(Mobley 11/25/1997 Dep. at 137:14-17, Pl.Ex. A.) Moreover, plaintiff testified that she never reported these allegedly hostile conversations because "it was never serious talk. You know, it was just like jokingly or, you know, it was never like serious." (Id. at 141:1-4.)

Based on the record presently before the Court, it is manifest that plaintiff participated in the allegedly sexually charged conversations which she now claims constituted a hostile work environment. It is also undisputed that she did not ever report them as harassment. Accordingly, the Court finds that plaintiff has not adduced evidence from which a jury could find that the sexual banter at the ACPD was unwelcome, nor that it constituted a hostile work environment under Meritor.

Alternatively, plaintiff again urges this Court to adopt the Third Circuit's holding in Hurley that "the ACPD constitutes a hostile work environment." (Pl. Br. at 36.) For reasons explained above, the holding in Hurley does not preclude litigation of material issues in this case, and does not constitute evidence allowing plaintiff to survive summary judgment. Accordingly, judgment will be entered against plaintiff's § 1983 claims against the ACPD. [FN2]

> FN2. Notwithstanding the Court's previous dismissal of all claims against Rifice, plaintiff's brief in opposition to ACPD's present motion for the first time alleges that the ACPD is liable under a § 1983 "failure to train" theory because Spears did not attend a mandatory sexual harassment training implemented by Rifice. (Pl. Br. at 17-18.) This argument is unavailing, because a supervisor's mere failure to train, supervise or discipline subordinate officers, absent proof of direct participation by the superior in some unlawful conduct, does not form the basis for a § 1983 claim against the supervisor. Brown v. Grabowski, 922 F.2d 1097, 1119-20 (3d Cir.1990), cert. denied, 591 U.S. 1218 (1991). As explained above, absent supervisory liability, there is no municipal liability.

C. Mobley's § 1983 Claims Against Spears

The Court next turns to a discussion defendant Spears' motion for summary judgment against plaintiff's § 1983 claims against him. The Court construes Mobley's complaint as stating a claim that Spears' conduct (1) deprived her of her right to equal protection and (2) deprived her of her workplace rights under Title VII. Because plaintiff has elected to pursue both theories of relief under the rubric of § 1983, however, plaintiff's claims must fit the requirements of that statute.

*7 As stated above, in order to be actionable under § 1983, plaintiff must allege (1) a violation of a right secured by the Constitution and laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. West, 487 U.S. at 48. Thus, before the Court addresses the merits of Mobley's claims arising under the equal protection clause or Title VII, it must be determined whether Spears' actions towards Mobley were done "under color of state law" as required for claims brought under § 1983.

It is undisputed that Spears was Mobley's supervisor at the ACPD. However, Spears' higher ranking within the department does not necessarily mean that he was exercising his supervisory power over Mobley when he exposed himself, nor when he made lewd comments to her. Plaintiff's version of the facts of the alleged incident involving Spears is as follows: at 3:00 or 4:00 a.m. on January 28, 1997, Mobley asked Spears for assistance with putting in a request for a vacation day. When Spears asked her to come closer to explain, Mobley walked around the console toward Spears, and then saw Spears holding his erect penis. Spears asked Mobley "you think you can handle this?", to which she replied "No. You should keep that to yourself". Spears then asked Mobley "What, you scared?", to which she again replied "No. You should keep that to yourself." (Mobley Dep. at 218:4-22, Pl.Ex. B.)

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d                                                                              Page 141
(Cite as: 2000 WL 363692, *7 (D.N.J.))

No further offensive interaction with Spears is alleged, and, after Mobley reported the incident to ACPD authorities, Spears was transferred to a different shift. (Mobley Dep. at 95:12-13, Pl.Ex. A.)

Even assuming that Spears' actions deprived Mobley of her rights under Title VII or the equal protection clause of the Fourteenth Amendment, because she has framed her claims as arising under § 1983, her claims against Spears must allege conduct done under color of state law. The Court finds that although Mobley describes conduct that is vile and of appallingly low character, such conduct was not done under color of state law, and thus is not actionable under § 1983.

In what is perhaps the leading case on the subject of what supervisor-related acts are actionable under § 1983, the Third Circuit in Bonenberger noted that not all offensive acts committed by state or municipal employees constitute state action, even if committed while on duty. Bonenberger v. Plymouth Tp., 132 F.3d 20, 24 (3d Cir.1997). If the behavior complained of is unconnected with the execution of an official duty, § 1983's under color of state law is not satisfied. Id. "The essence of § 1983's color of state law requirement is that the alleged offender, in committing the act complained of, abused a power or position granted by the state." Id. The defendant-supervisor in Bonenberger had substantial authority over the plaintiff, and (1) made statements that could be interpreted as a veiled threat to have plaintiff fired for rejecting his sexual advances, and (2) effectively conditioned plaintiff's continued employment on her willingness to endure a sexually charged hostile work environment. Id. at 27.

*8 In this case, there is no indication in the complaint or the record that Spears' actions towards Mobley were connected with the execution of an official duty. Rather, Spears responded to a request from Mobley by asking her to come closer, and, when she did, exposed himself to her. To the extent that Spears' acts can be interpreted as an invitation to engage in sex, plaintiff does not assert that she felt compelled to obey the invitation. Instead, she twice rejected Spears, and no further inappropriate interaction occurred. Mobley states that Spears exposed himself, asked "do you think you can handle this?" and made vulgar remarks, but did not attempt to coerce plaintiff into further observation or action. Plaintiff walked away and told Spears to "keep it to himself". There is nothing in the record to show that Spears attempted to use his supervisory powers to compel Mobley to continue to look once she realized his intentions, or that he somehow abused his official position to force her to look in the first place. Significantly, there is no allegation that Spears threatened any employment-related retaliation (or any consequence, for that matter) against Ms Mobley for rebuffing his misconduct. Instead, what transpired is best described as Spears misleading Mobley, rather than forcing or coercing her. This deception, although committed while on-duty, was not an abuse of Spears' position granted by the state, but was instead an individual act unattached to any sort of official influence. Finally, there is no indication that Spears used his superior position to coerce Mobley to keep secret his actions.

The Court finds that, despite Spears' engagement in unquestionably inappropriate workplace behavior, there is no indication that he used the power of his office to somehow further his misconduct. This was an incident of indecent exposure unconnected with the execution of Spears' official duties, and devoid of any threat of reprisals against Mobley. Indeed, soon after the incident, Mobley reported Spears and he consequently was transferred. Her immediate rejection of Spears and the speed with which she reported him betokens her lack of fear of any sort of official reprisal from Spears. Without some indication that Spears exerted his supervisory authority over Ms. Mobley, this single incident of indecent exposure does not rise to the level of action done under color of state law. Accordingly, the Court will enter summary judgment against plaintiff's § 1983 claims against Spears. [FN3]

> FN3. The Court does presently decide whether plaintiff's claims might be actionable under Title VII. Had plaintiff elected to proceed under Title VII, the state action requirement would not apply. Thus, it is possible that her individual claims against Spears might have survived even absent state action by Spears. Because her complaint was styled as an action under § 1983, however, Mobley preliminarily was required to show that Spears' conduct constituted state action, which she has failed to do.

D. Supplemental Jurisdiction

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d  
(Cite as: 2000 WL 363692, *8 (D.N.J.))

Page 142

Having dismissed the § 1983 claims over which this Court has original jurisdiction, this Court will decline to exercise supplemental jurisdiction over plaintiff's state law claims. 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over claims for which it does not have original jurisdiction [such as state law claims where there is no diversity between the parties] once the district court "has dismissed all claims over which it has original jurisdiction"). Accordingly, plaintiff's claims against all defendants arising under state law will be dismissed.

CONCLUSION

*9 For reasons discussed above, the Court now enters summary judgment against plaintiff's claims based on federal law and will not exercise supplemental jurisdiction over the remaining state law claims. The accompanying Order is entered.

2000 WL 363692 (D.N.J.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

TAB L

Not Reported in F.Supp.2d  
(Cite as: 2002 WL 1941365 (N.D.Ill.))

Page 58

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

Sandra NIELSEN, Plaintiff,  
v.  
ACORN CORRUGATED BOX CO., Defendant.

No. 01 C 1988.

Aug. 21, 2002.

Employee brought action against employer alleging retaliation under Title VII for employee's sexual harassment complaints. On employer's motion for summary judgment, the District Court, Hibbler, J., held that: (1) employee's complaints of sexual harassment to company's president were statutorily protected expressions; (2) one half hour switch of employee's work hours did not constitute adverse employment action; (3) moving employee to broken-down, smaller, and less stable workstation, which made it more difficult for her to do her job, was not adverse employment action; (4) employer's instruction to other employees to avoid employee was not adverse employment action; and (5) employee failed to rebut employer's legitimate nondiscriminatory reason for terminating employee.

Motion granted.

West Headnotes

[1] Civil Rights 1244  
78k1244  
(Formerly 255k30(6.10) Master and Servant)  
Employee's complaints of sexual harassment to company's president, which were followed up by her filing of charge of sexual harassment with Equal Employment Opportunity Commission (EEOC), were statutorily protected expressions under Title VII, even though her reports of sexual harassment to her supervisor, as person who was allegedly harassing her, was not protected activity since her supervisor was not in authorized position to address problem. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[2] Civil Rights 1246  
78k1246  
One half hour switch of employee's work hours did not constitute "adverse employment action," for purpose of employee's Title VII retaliation claim, where employee's pay and job title remained same and employer did not significantly decrease her job responsibilities. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[3] Civil Rights 1246  
78k1246  
(Formerly 255k30(6.10) Master and Servant)  
Moving employee to broken-down, smaller, and less stable workstation, which made it more difficult for her to do her job, was not "adverse employment action," for purpose of employee's Title VII retaliation claim, since other than discomfort resulting from having to work in tighter space, with no privacy, employee could not explain how changed desk caused any material loss to her and her job responsibilities, title and pay remained the same. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[4] Civil Rights 1246  
78k1246  
Employer's alleged instruction to other employees to avoid employee was not "adverse employment action," for purpose of employee's Title VII retaliation claim, since employee did not show that she suffered material harm as result of it, such as reduction in salary, benefits or responsibilities. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[5] Civil Rights 1247  
78k1247  
(Formerly 255k40(4) Master and Servant)  
Employee failed to establish prima facie case of Title VII retaliation, even though she did show that she suffered adverse employment action, since employer proffered legitimate nondiscriminatory reason for terminating employee and employee did not offer any evidence on issue of her job performance. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

[6] Civil Rights 1246  
78k1246  
(Formerly 255k40(4) Master and Servant)  
Employee failed to show that she was treated less favorably than other employee who occasionally filled in for her at switchboard during lunchtime who did not engage in statutorily protected activity,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



in lawsuit employee's Title VII retaliation claim; employees were not similarly situated with respect to their performance, qualifications and conduct since other employee's regular position was not as switchboard operator. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

MEMORANDUM OPINION AND ORDER

HIBBLER, District J.

*1 Plaintiff Sandra Nielsen ("Nielsen") filed this lawsuit against her former employer, Defendant Acorn Corrugated Box Company ("Acorn"), alleging retaliation in violation of 42 U.S.C. § 2000e-3(a)(1), for complaining about sexual harassment. Acorn now moves for summary judgment. The Court has examined the submissions by the parties, and concludes that Nielsen has neither satisfied her threshold burden of establishing a prima facie case, nor rebutted Acorn's legitimate nondiscriminatory reason for its actions. Accordingly, Acorn's motion for summary judgment is granted.

BACKGROUND [FN1]

FN1. The facts below are taken from Acorn's Local Rule 56.1(a) statement of undisputed material facts and Nielsen's Local Rule 56.1(b) counter-statement of material facts. In responding to Nielsen's LR 56.1(b) counter-statement, Acorn raised numerous objections to practically every "fact" asserted, and thus neither admitted nor denied the statements. Many of Acorn's objections are valid, as statements of material facts (1) should contain only factual allegations, not legal conclusions; (2) should be limited to material facts (e.g., this case is not about sexual harassment or gender discrimination); and (3) must be supported by admissible evidence, which hearsay is not. See generally Malec v. Sanford, 191 F.R.D. 581 (N.D.Ill.2000). However, it would have been more appropriate, albeit inconvenient, for Acorn to attempt to respond to the counter-statement in accordance with LR 56.1(b)(3), and then file a separate motion to strike. Regardless, this Court will limit its consideration to only those material factual contentions that are supported by admissible evidence.

Nielsen began working for Acorn in January 1995 as a switchboard operator. Her primary responsibilities included answering the telephone and directing calls. In January 2000, Acorn decided to upgrade its telephone system with voicemail. Because this change reduced Nielsen's workload, Acorn assigned her additional work duties under a new supervisor, Ron Danczyk ("Danczyk"). Nielsen alleges that shortly after she began working for Danczyk, he began to sexually harass her. She complained to Danczyk about his offensive behavior, but when he persisted, she wrote a letter to Phil Goldstein ("Goldstein"), Acorn's President, dated February 22, 2000, informing him of Danczyk's inappropriate conduct. Nielsen says she gave the letter to David Ainsley ("Ainsley"), Goldstein's personal driver who also handled the mail at Acorn. However, Goldstein claims that he did not see Nielsen's letter in February, but some months later. According to Nielsen, the harassment persisted, but she did not attempt to talk to Goldstein or any other member of management about it, as Acorn's February 1994 written sexual harassment policy instructed her to do, because she feared losing her job.

On August 7, 2000, Danczyk and Steve Toffler ("Toffler"), a design manager at Acorn, called Nielsen into a meeting regarding her work assignments. Nielsen was asked if she was willing to be a "team player" to which she responded "definitely." Danczyk then informed Nielsen that she would be getting additional work to do at the switchboard, and that in light of those extra duties, she would no longer be able to do any homework at the switchboard. While working for Acorn, in January 1997, Nielsen had begun attending college part-time in the evenings. Acorn's then Vice-President, Marianne Malaychuck, told Nielsen she could do her homework at her desk when things were slow, so long as she completed her work. After the August meeting with Danczyk and Toffler, though, Nielsen says she only did homework during lunchtime.

In late September 2000, Nielsen's work hours were changed from 7:30 am-4:00 pm to 8:00 am-4:30 pm because Goldstein wanted the switchboard to be covered for calls received after 4:00 pm. Nielsen, however, did not like her new hours because most employees left at 4:00 p.m., and thus she was left alone in the building with Danczyk (and a few other employees) between 4:00 and 4:30 pm.

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d                                                                                                      Page 60
(Cite as: 2002 WL 1941365, *2 (N.D.Ill.))

*2 On October 2, 2000, Danczyk suspended Nielsen for one day without pay for doing homework during work hours and for not completing her work assignments. Nielsen maintains that she was suspended in retaliation for threatening to report Danczyk to Roseann Hopkins ("Hopkins"), a member of company management, if he did not stop sexually harassing her. The very next day, on October 3, 2000, Nielsen in fact met with Hopkins and Norine Gomoll, Acorn's Personnel Director, and filed a formal complaint of sexual harassment against Danczyk. An investigation followed and Danczyk admitted making comments of a sexual nature towards Nielsen. Acorn then suspended Danczyk for three days without pay from October 5th through October 7th. Nielsen, however, was not satisfied with that result, so she retained an attorney and filed a charge of discrimination alleging sexual harassment and retaliation with the EEOC. Although the charge is dated October 5, 2000, the EEOC marked it as received on October 24, 2000.

Nielsen contends that after she formally complained of sexual harassment, Acorn retaliated against her in several ways. First, on October 9, 2000, Acorn changed Nielsen's work area. Acorn says it did so as part of an ongoing remodeling project, while Goldstein testified at his deposition that Nielsen's counter was removed so that they could see what she was doing. Prior to the change, the switchboard area had a half-wall around Nielsen's desk. (See Pl.'s App. to LR56.1(B) Statement in Opp'n to Def.'s Mot. for Summ. J., Exs. 26, 27 (before and after photographs of Nielsen's work station)). Nielsen maintains her desk was changed because she complained to management about Danczyk. Nielsen concedes she was aware that Acorn had been remodeling its office space, but insists she was told her work area would not be changed. Nielsen described the replacement desk as a "broken down tiny little makeshift desk" that had "dangerous wires all over the place." (Pl.'s 56.1(b) Counter-Statement of Material Facts, ¶¶ 148-49). She contends the desk was so small and unstable that it interfered with her ability to do her job. After Nielsen left Acorn, though, her replacement continued to use the same desk until all switchboard operations were relocated from the first floor (where Nielsen had worked) to the second floor.

Next, Nielsen alleges that on or about October 10, 2000, several co-workers told her Goldstein instructed them not to speak with her or eat lunch with her. However, Goldstein maintains that he only told employees not to hang around the switchboard and to remain at their own desks if they did not have any work to do.

Finally, Nielsen claims she was subjected to false accusations of doing homework at her desk. On October 19, 2000, though, Hopkins actually observed Nielsen doing homework at the switchboard. Hopkins then warned Nielsen not do homework at her desk any more, even during lunchtime, although she could read while waiting for additional work. On December 5, 2000, Donna Quinlan, another Acorn employee, attests that saw Nielsen doing homework at her desk and told Hopkins. Consequently, on December 6, 2000, Hopkins met with Nielsen and Toffler and told her, once again, to stop doing homework at her workstation during regular work hours. Nielsen responded by denying that she had been doing homework. On December 7, 2000, Goldstein claims he saw Nielsen doing homework at her desk and thus directed Hopkins and Toffler to terminate Nielsen's employment. Nielsen was discharged on that same day.

*3 Nielsen denies doing homework at her desk and maintains that if those accusing her had confronted her at the time, she would have been able to prove otherwise. She also points out that Lori Zygaldo, an Acorn employee who occasionally relieved her at the switchboard during the lunch hour, would read a magazine or do personal things at the switchboard, but was not reprimanded.

STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving title is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute about a material fact is "genuine" if the

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has met the initial burden, to avert summary judgment, the party opposing the motion must go "beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial." Anderson, 477 U.S. at 248. The nonmoving party cannot rest on its pleadings, Weicherding v. Riegel, 160 F.3d 1139, 1142 (7th Cir.1998); Waldridge v. American Hoechst Corp., 24 F.3d 918, 920-21 (7th Cir.1994), nor may that party rely upon conclusory allegations in affidavits, Smith v. Shawnee Library Sys., 60 F.3d 317, 320 (7th Cir.1995). However, in determining if a genuine issue of material fact exists, the Court will draw all reasonable inferences in a light most favorable to the non-movant. Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir.1991).

ANALYSIS

In Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640 (7th Cir.2002), the Seventh Circuit recently clarified the proper standard for analyzing retaliation claims on summary judgment. Previously, a plaintiff had to show that he opposed an unlawful employment practice, and, as a result, was subjected to an adverse employment action. Cullom v. Brown, 209 F.3d 1035, 1040 (7th Cir.2000). Proving causation required a plaintiff to demonstrate that his employer would not have taken the adverse action but for the plaintiff engaging in protected activity. Id. (quotation omitted).

Stone now sets forth two routes to summary judgment for retaliation claims. Id. at 644. Under the first method, a plaintiff may present direct evidence that he engaged in protected activity and as a result suffered some adverse employment action. Id. If the evidence is uncontradicted, plaintiff is entitled to summary judgment; but if defendant presents unrebutted evidence that it would have take the adverse employment action against plaintiff regardless of any retaliatory motive, defendant would be entitled to summary judgment. Id.

*4 Under the second method or the indirect method, an adaptation of McDonnell Douglas to the retaliation context, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) he was subjected to adverse employment action, (3) he was performing his job in a satisfactory manner, and (4) he was treated less favorably than any other similarly situated employee who did not engage in such protected activity. Stone, 281 F.3d at 644; Smith v. Allstate Ins. Corp., No. 99 C 0906, 2002 WL 485374, at *16 (N.D.Ill. Mar.29, 2002). If plaintiff establishes a prima facie case of retaliation, the burden then shifts to defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, [it] is entitled to summary judgment. Otherwise there must be a trial." Stone, 281 F.3d at 644. Establishing a causal link between the protected expression and adverse employment action is not required under the second method. Id.; McKay v. Town & Country Cadillac, Inc., No. 97 C 2102, 2002 WL 664024, at *4 (N.D.Ill. Apr.23, 2002).

The Seventh Circuit decided Stone after Acorn moved for summary judgment, but before Nielsen responded to the motion. In fact, it is clear that Nielsen was aware of Stone because she cited to the case in her response. But Nielsen did not present her rebuttal arguments in the framework adopted by Stone, but instead used the old test. Nevertheless, the Court will assume, because Nielsen has not pointed to any direct evidence of a retaliatory motive by Acorn [FN2], that the indirect McDonnell Douglas method articulated in Stone applies to her case.

> FN2. See Fyfe v. City of Fort Wayne, 241 F.2d 597, 602 (7th Cir.2001) ("When a plaintiff proceeds under the direct proof method, allegedly discriminatory statements are relevant only if they are both made by the decisionmaker and related to the employment decision at issue."); Radue v. Kimberly Clark Corp., 219 F.3d 612, 616 (7th Cir.2000) ("Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus.").

A. Prima Facie Case
1. Statutorily Protected Activity

[1] For purposes of retaliation claims, statutorily protected activity generally consists of either an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



employee filing a charge with the EEOC or opposing any practice made unlawful under 42 U.S.C. § 2000e-3(a). See Rizzo v. Sheahan, 266 F.3d 705, 714-15 (7th Cir.2001); EEOC v. Yellow Freight Sys., Inc., 253 F.3d 943, 952 (7th Cir.2001). It is undisputed that when Nielsen formally complained to Acorn on October 3, 2000, and filed her charge of sexual harassment with the EEOC on October 24, 2000, she was engaging in statutorily protected activity. However, Nielsen contends the complaints about sexual harassment that she made to Danczyk from January to September 2000, and Goldstein in February 2000, also constitute protected activities. The issue that must be decided, then, is whether those complaints were sufficient to put Acorn on notice of Nielsen's sexual harassment claim.

The Court first looks at whether Acorn has designated channels for reporting sexually harassing conduct. Parkins v. Civil Constructors of Ill. Inc., 163 F.3d 1027, 1035 (7th Cir.1998). Where an employer identifies a person to accept these complaints, under normal circumstances, the employee should complain to the designated individual. Id. If no person is identified or that person is not easily accessible, notice can still be imputed upon an employer if the employee reasonably believed that he or she complained to someone who is authorized to receive and forward the complaint to the employer. Id.

*5 According to Acorn's written sexual harassment policy, an employee subjected to such harassment should contact "Marianne Malaychuck or any other member of management she/he feels comfortable speaking with." (Pl.'s App. to LR56.1(B) Statement in Opp'n to Def.'s Mot. for Summ. J., Ex. 13). Plaintiff contends her oral and written complaints to Danczyk, her supervisor, were sufficient to impute notice to Acorn, but the Court disagrees. Complaining to Danczyk would not qualify as notice to Acorn because it would be unreasonable to believe Danczyk would forward a complaint of sexual harassment against himself to company management. See Parkins, 163 F.3d at 1037 (plaintiff's complaint of sexual harassment to foreman against foreman did not impute notice to employer). Other than refraining from the complained of conduct, Danczyk was not in an authorized position to address the problem. Nielsen's complaints to Danczyk, therefore, are not statutorily protected expressions. See McKay, 2002 WL 664024, at *10.

The February 2000 letter Nielsen wrote to Goldstein in which she complains about Danczyk sexually harassing her is a different matter, though, since Goldstein, as Acorn's President, was a member of management authorized to investigate such a complaint. Nevertheless, there is some question as to when Goldstein actually saw the letter. Although Nielsen says she gave the letter to Goldstein's personal driver, who also delivered the mail at Acorn, Goldstein denies receiving the letter in February. However, he does admit to having seen it at a later point in time. Exactly how many months later is not clear from his testimony, though. But in light of the fact that all reasonable inferences must be drawn in favor of the nonmoving party when determining whether a genuine issue of material fact exists, the Court will assume that Goldstein received the letter sometime after February. Bartman v. Allis-Chalmers Corp.., 799 F.2d 311, 312 (7th Cir.1986). Hence, Nielsen engaged in statutorily protected activity in February 2000, and October 2000.

2. Adverse Employment Action

A materially adverse employment action may include termination of employment, demotion evidenced by decrease in wages or salary, material loss of benefits, or significantly diminished responsibilities. Ribando v. United Airlines, Inc., 200 F.3d at 507, 511 (7th Cir.1999). Although adverse employment actions may include more forms of adversity than quantifiable reduction of pay or benefits, minor or trivial actions that make the employee unhappy are not sufficient to qualify. See Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir.1996); McKay, 2002 WL 664024, at *15. It is undisputed that Nielsen's December 2000 termination qualifies as an adverse action. Nielsen also alleges that after she complained of sexual harassment and filed an EEOC charge, Acorn subjected her to four other adverse employment actions as well.

[2] First, Nielsen contends the September 2000 switch in her work hours from 7:30am-4pm to 8am-4:30pm constitutes an adverse action. However, Nielsen's pay and job title remained the same, and Acorn did not significantly decrease her job

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



responsibilities. Such a minor shift in her work schedule, therefore, does not rise to the level of an adverse employment action. [FN3] Grube v. Lau Indus., Inc., 257 F.3d 723, 728 (7th Cir.2001).

> FN3. Additionally, the Court finds nothing suspicious about Acorn's business justification of wanting switchboard coverage for that additional 30 minute period, even though voicemail was available, as many consumers still prefer talking to a live person.

*6 Second, Nielsen points to her one-day suspension without pay on October 2, 2000, arguing that it qualifies as an adverse action. In cases involving disciplinary suspensions with a loss of pay ranging from five to nine days, the Seventh Circuit has found an adverse employment action occurred. See Russell v. Bd. of Trustees of Univ. of Ill. at Chicago, 243 F.3d 336, 341 (7th Cir.2001) (collecting cases). But it has not yet considered if a one day suspension is sufficient. See Tan v. City of Chicago, No. 00 C 1470, 2001 WL 1012586, at *5 (N.D.Ill. Aug.30, 2001). Nevertheless, because "the Seventh Circuit has defined 'broadly' what constitutes an adverse employment action," Id., the Court will simply assume for the sake of argument that a one-day suspension without pay is sufficient for material adversity.

[3] Next, Nielsen argues that Acorn's change to her workstation on October 9, 2000 was an adverse action. Nielsen claims the new desk was broken-down, smaller and less stable, which made it more difficult for her to do her job. No doubt, the before and after pictures of Nielsen's workstation show a less aesthetically pleasing and cramped work area, but "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience." Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir.1993). Other than the discomfort resulting from having having to work in a tighter space, with no privacy, Nielsen has not explained how the changed desk caused any material loss to her. Indeed, while the change may have made her unhappy, her job responsibilities, title and pay remained the same. Thus, the change to her workstation area does not rise to the level of an adverse employment action. See, e.g., Daniel v. Skudder Kemper Investments, Inc., No. 00 C 5961, 2002 WL 1160934, at *6 (N.D.Ill. May 23, 2002) (seat reassignment from window closer to supervisor does not constitute an adverse employment action).

[4] Finally, Nielsen asserts that Goldstein's alleged October 2000 instruction to other employees to avoid her is an adverse action. However, shunning by other employees is not actionable unless Nielsen also shows that she suffered material harm as a result of it, such as a reduction in salary, benefits or responsibilities. Parkins, 163 F.3d at 1039. Once again, because Nielsen has not demonstrated any resultant material effect, even if Goldstein did tell employees not to speak with her, his conduct does not qualify as an adverse job action. [FN4]

> FN4. Nielsen actually concedes that these each action standing alone may not be actionable, but nonetheless argues that when viewed collectively, they all rise to the level of adverse employment actions. In support of this position, Nielsen cites to Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) and Saxton v. American Tel. & Tel. Co., 10 F.3d 526 (7th Cir.1993). However, those cases are distinguishable since the courts there considered the totality of circumstances in order to determine if a work environment was hostile and abusive, not whether the plaintiff had been subjected to an adverse employment action. See Harris, 510 U.S. at 23; Saxton, 10 F.3d at 533-34.

At most, then, Nielsen has identified two adverse employment actions, her one-day suspension, and her termination.

3. Performing to Employer's Expectations

[5] Nevertheless, Nielsen has not presented any objective evidence whatsoever to suggest that she was performing according to Acorn's expectations. In fact, the focus of her response brief is on Acorn's alleged retaliatory motive. But to meet her burden of establishing a prima facie case of retaliation, Nielsen must also demonstrate that her work performance was satisfactory. See Stone, 281 F.3d at 644. The record reflects that Nielsen was specifically told on August 7, 2000 by Danczyk and Toffler not to do homework at the switchboard during work hours, suspended for one-day without pay on October 2, 2000 by Danczyk for doing homework at her desk and not completing her work assignments, warned

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



again on October 19, 2000 by Hopkins about doing homework at her desk, allegedly seen doing homework at her desk on December 5, 2000 by Donna Quinlan, an Acorn employee who filed an affidavit attesting to that fact, warned once more by Hopkins and Toffler, and allegedly seen again doing homework at her desk on December 7, 2000 by Goldstein, who also submitted an affidavit attesting to that fact.

*7 To create a genuine issue of material fact and thereby defeat summary judgment, Nielsen must "make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] bears the burden of proof at trial." McKenzie v. Illinois Dept. of Transp., 92 F.3d 473, 479 (7th Cir.1996). By not offering any evidence on the issue of her job performance, Nielsen fails to establish a prima facie case of retaliation.

4. Treated Less Favorably than Similarly Situated Employee

[6] Moreover, even if Nielsen had demonstrated a satisfactory job performance, she still has not satisfied her burden of showing that she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. See Stone, 281 F.3d at 644. Nielsen maintains that Lori Zygaldo, an Acorn employee who occasionally filled in for her at the switchboard during lunchtime, was allowed to read a magazine or do other personal things. However, the Court does not believe Nielsen has established that she and Zygaldo were similarly situated with respect to their performance, qualifications and conduct. See Radue, 219 F.3d at 617. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id. Because Zygaldo's regular position was not as a switchboard operator, she and Nielsen were not in comparable situations.

B. Legitimate Non-discriminatory Reason for Action by Employer

Finally, even if Nielsen could make out a prima facie case of retaliation, Acorn is still entitled to summary judgment because, as the Court noted above, Nielsen has not offered any evidence to rebut its legitimate non-discriminatory reason for the one-day suspension and termination of her employment. Stone, 281 F.3d at 644. Both adverse employment actions resulted from Acorn's belief that Nielsen had continued to do homework at her desk during work hours, even though she had been warned on several occasions not to do so.

Nielsen does deny that she was doing homework at her desk, and maintains that she could have proven this if Acorn management had confronted her with the accusations at the time. In support of her contention, she points only to a letter she wrote to her attorney denying Acorn's allegations. However, an employee's self-serving statements cannot be used to defeat a summary judgment motion. See Billups v. Methodist Hosp. of Chicago, 922 F.2d 1300, 1303 (7th Cir.1991) ("[Plaintiff's] own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination.").

Moreover, the Court's concern is with whether Acorn honestly believed Nielsen was doing her homework during work hours. See, e.g., Essex v. United Parcel Serv., 111 F.3d 1304, 1310 (7th Cir.1997) ("The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proferred explanation is pretextual."). Nielsen has not presented any evidence to suggest that Acorn harbored a dishonest motive when the company suspended her, and then subsequently terminated her employment, for continuing to engage in conduct that she had been told was prohibited. As such, she has not shown that genuine issues of material fact exist that warrant a trial. See Stone, 281 F.3d at 644.

CONCLUSION

*8 For all of the foregoing reasons, this Court finds that Acorn is entitled to summary judgment on Nielsen's claims.

IT IS SO ORDERED.

2002 WL 1941365 (N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

