**PART 6**

TAB M

Not Reported in F.Supp.
75 Fair Empl.Prac.Cas. (BNA) 1555
**(Cite as: 1997 WL 805187 (E.D.Pa.))**

Page 267

United States District Court,
E.D. Pennsylvania.

**Babatunde Olatunji OLABODE**
v.
**WILLIAM HECHT INC., et al.**

No. CIV. A. 95-6221.

Dec. 30, 1997.

MEMORANDUM

O'NEILL

*1 Babatunde Olatunji Olabode, an African-American immigrant from Nigeria, brought this Title VII and 42 U.S.C. § 1981 action alleging that his employer, defendant William Hecht, Inc., ("WHI") discriminated against him because of his race and national origin. Plaintiff's complaint alleged that he was hired to and did perform architectural drafting for WHI, but was paid substantially less than another full-time architectural draftsman then employed by WHI. Plaintiff also contended that he performed tasks similar to those performed by union members employed by WHI, but that WHI refused to sponsor him for the union. Plaintiff claimed that the wage disparity and the refusal to sponsor him for the union resulted from race and national origin discrimination.

A jury trial resulted in a verdict for plaintiff on both the Title VII and the § 1981 claims. Pursuant to the verdict, I entered judgment for plaintiff in the amount of $410,644. Subsequent to entry of judgment, WHI moved for a new trial and timely renewed its motion for judgment as a matter of law. In the alternative, WHI seeks a substantial remittitur.

I. The Parties

Plaintiff is forty-one years old and immigrated to the United States in 1979. He worked at WHI from 1980 until 1994 when he was injured on the job. Since that time he has been receiving workers' compensation benefits.

WHI is a small business located in Philadelphia, Pennsylvania that designs, manufactures and installs cabinets and other wooden fixtures. Stuart Hecht is the founder's son and president of the company; Neil Hecht, Stuart's brother, is the vice-president of WHI; and Celia Hecht, Stuart's and Neil's mother, is the bookkeeper for WHI.

II. Plaintiff's Claims and the Jury's Verdict

Plaintiff's complaint contained two counts. The first alleged that WHI discriminated against him because of his race in violation of 42 U.S.C. § 1981, and the second alleged race and/or national origin discrimination in violation of Title VII. Plaintiff originally sought damages beginning in 1980 through the date of trial and into the future. Title VII, however, while allowing recovery for race or national origin discrimination, limits recovery of back pay damages to two years before plaintiff filed his complaint with the Equal Employment Opportunity Commission. See 42 U.S.C.2000e-5(g)(1). Plaintiff filed his complaint with the EEOC on January 31, 1995, and recovery was therefore limited to the period after January 31, 1993. Section 1981, on the other hand, permits recovery for race discrimination only [FN1] and limits recovery for back pay damages to the date of enactment, November 21, 1991. [FN2] Title VII and § 1981 are similar in virtually all respects, but these two differences required a fairly complex jury questionnaire. [FN3] Also adding to the complexity of the jury questionnaire was my decision to separate the amount of back pay damages from the back benefits damages, [FN4] and to charge the jury on front pay damages.

FN1. 42 U.S.C. § 1981 reads as follows: (a) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

FN2. Section 101 of the Civil Rights Act of 1991 broadened § 1981's definition of "make and enforce contracts." Employees could bring claims under § 1981 for acts occurring prior to enactment of the Civil Rights Act of 1991 only if they alleged discrimination in the formation of the employment contract, as opposed to claims based on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *1 (E.D.Pa.))

Page 268

discrimination while working. Strother v. Southern California Permanente Med. Group, 79 F.3d 859, 875-76 (9th Cir.1996). Because § 101's more expansive definition of "make and enforce contracts" was not made retroactive, Rodriguez v. General Motors Corp., 27 F.3d 396, 398 (9th Cir.1994), and because plaintiff did not allege discrimination in the formation of the employment contract, his § 1981 claim is limited to acts occurring after November 21, 1991.

FN3. See Appendix A.

FN4. See infra note 20.

**\*2** The jury awarded $50,830 in back pay damages and $74,520 in back benefits damages for the period between November 21, 1991 and the date of the verdict, and attributed $40,511 and $59,392, respectively, of those amounts to the period between January 31, 1993 and the date of the verdict. The jury awarded $250,000 in front pay damages, but made no award of front benefits. The jury also awarded $100,000 in punitive damages, attributing $35,294 of that amount to the period between November 21, 1991 and the date of the verdict. Therefore, the jury awarded $449,902 under the Title VII claim and $410,644 under the § 1981 claim. [FN5] The Title VII claim, unlike the § 1981 claim, has a combined $50,000 limit on front pay and punitive damages for a company the size of WHI which would limit the total amount plaintiff could recover under Title VII to $149,903. [FN6] The total recoverable damages were therefore greater under the § 1981 claim and judgment was entered for plaintiff in the amount of $410,644.

FN5. See Appendix B.

FN6. See 42 U.S.C. § 1981a(b)(3)(A) which limits recovery for front pay, emotional pain and suffering and the amount of punitive damages against an employer "who has more than 14 and fewer than 101 employees" to $50,000. The parties do not dispute that this limitation applies to plaintiff's Title VII claim. The limitation provision does not apply to the § 1981 claim: "In an action brought [pursuant to Title VII] against a respondent who engaged in unlawful intentional discrimination .... and provided that the complaining party cannot recover under section 1981 on this title, the complaining party may recover compensatory and

punitive damages as allowed in subsection (b) of this section...." Plaintiff recovered under § 1981 and therefore the limitation provision of subsection (b) does not apply. Defendant did not contend in its post-trial motions or otherwise that subsection (b)'s limitation provision applied to plaintiff's § 1981 claim.

I will first examine defendant's contention that the weight of the evidence does not support the jury's verdict of intentional race discrimination, and that therefore it is entitled to a new trial. I will next consider defendant's motion for judgment as a matter of law. Resolution of these motions necessarily require an understanding of the facts presented to the jury. Lastly, I will review plaintiff's claim for a new trial or a substantial remittitur based on the contention that the jury's award of damages is not supported by the evidence.

**III. Motion for New Trial--Race Discrimination [FN7]**

FN7. I will examine only the weight of the evidence supporting the § 1981 claim (race discrimination) and not the Title VII claims (race discrimination and/or national origin discrimination) because I entered judgment based on the jury's verdict on the § 1981 claim, and, as discussed below, this verdict is supported by the evidence.

WHI contends that the jury's finding of intentional race discrimination is against the clear weight of the evidence. While the evidence need not be viewed in the light most favorable to the verdict winner when deciding a motion for a new trial. Smith v. General Elec. Corp., 1996 WL 24762 (E.D.Pa.1996). I must not substitute my judgment of the facts and the credibility of the witnesses for that of the jury. Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1076 (3d Cir.1996) (en banc), cert. denied, 117 S.Ct. 2532 (1997). I should grant a motion for a new trial on the basis that the verdict was against the weight of the evidence "only where a miscarriage of justice would result if the verdict were to stand." Id; see also Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1353 (3d Cir.1991).

**A. Factual Background [FN8]**

FN8. Because I am required to give deference to

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



the jury's finding of race discrimination, I will present primarily plaintiff's version of events to the extent evidence in the record supports it. Guess v. Pfizer, Inc., 971 F.Supp. 164, 167 n. 3 (E.D.Pa.1996); see also Hurley v. Atlantic City Police Dept., 933 F.Supp. 396, 404 n. 4 (D.N.J.1996).

Prior to coming to the United States, plaintiff attended and graduated from a technical college in his native Nigeria. His courses at the technical college included physics, carpentry and joinery, architectural drawing and surveying and leveling. He also took a construction course for which he received a certificate. After he completed his course work, he worked for a group of architects as a professional draftsman, and also worked part-time for his father's construction business where he worked as a draftsman, a carpenter and a cabinetmaker. While working in Nigeria plaintiff prepared intricate technical drawings for various buildings including an apartment, a library for the Nigerian Army Academy, a Nigerian courtroom, and a chemical laboratory.

*3 After his arrival in the United States, plaintiff worked as a dishwasher and took classes at the Pennsylvania Institute of Technology. He began studies in pursuit of an advanced degree in architectural engineering but did not complete the program.

Plaintiff interviewed for a position at WHI in 1980. During the interview he presented to Stuart, Neil and Celia Hecht numerous examples of the drafting work which he did while in Nigeria. They immediately hired him as a draftsman and furnished him with a drawing table. Initially WHI did not provide any benefits to plaintiff contending he would have to become an American citizen before WHI would pay him benefits. Plaintiff immediately began the process of becoming a citizen, and he became a citizen on December 2, 1992. He again requested benefits, but Stuart Hecht refused and plaintiff never received any type of benefits from WHI.

Plaintiff testified about various projects on which he performed drafting work and introduced into evidence in numerous examples of his work while at WHI. One of these projects was the Douglas & Walters project which was a $125,000 job

performed in early 1993 that required numerous technical drawings. [FN9] The other draftsman employed by WHI was either laid off or on vacation during this period and plaintiff did all the drawings for this project. In total plaintiff estimated that he drew over 3,000 drawings during his employment at WHI.

FN9. Stuart Hecht testified as follows: Q Now, can you give the jury an idea, what would you say the average order you get on the drafting or manufacturing job really is? What is the average price on it? A Of the jobs? Q Yes. A They can run anywhere from $1,000 to $100,000. Q So when it gets to $100,000, that's a very big job; is that right? A Yes. To us it is, yes.

Although plaintiff was initially hired as a draftsman, he began to perform numerous other tasks for the company when there was not enough drafting work or when one of the Hechts requested that he perform other duties. His various odd jobs included shoveling snow, cleaning the bathrooms, sweeping the floors, delivering materials to the various job sites, purchasing materials, and running various errands. He also performed semi-skilled labor including plumbing, electrical and carpentry work in WHI's factory, and occasionally drove a truck. He also went to job sites to unload trucks, install fixtures and clean. Plaintiff testified in detail about how he used various pieces of equipment in the factory including a table saw, sanders, radial saw, etc. from the mid-1980s until his disabling injury in November 1994. Plaintiff also performed minor electrical, carpentry and maintenance work on the Hechts' private properties. In his testimony, plaintiff estimated that he spent 60-80% of time doing drafting work and the other 40-20% performing these various tasks.

The employees who worked in the factory as cabinetmakers, carpenters, and general laborers were members of a union and WHI paid for their health and pension benefits through the union. A general laborer at WHI loads and unloads trucks, assists in the installation of fixtures, cleans job sites, and receives and distributes materials. The only qualification necessary is that the employee must be physically fit and strong.

When plaintiff was not drafting he was often performing jobs that according to the collective



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *3 (E.D.Pa.))

Page 270

bargaining agreement were to be performed only by union employees. These jobs included carpentry, cabinetmaking, installation, and janitorial work. Because he was performing these union jobs, plaintiff requested of Stuart Hecht that WHI sponsor him for union membership. Stuart Hecht said that would not sponsor him for the union because he was not an American citizen. After plaintiff became a citizen in 1992 he again asked Stuart Hecht to sponsor him for union membership. Stuart Hecht refused and threatened to fire plaintiff if he continued to bother him about joining the union. Plaintiff spoke to the union representative and was told that he must get sponsored by WHI before he would be admitted into the union. [FN10]

> FN10. Uncontroverted evidence presented at trial established that there were two ways of joining the union. The first was through an employer who would sponsor the employee for union membership after satisfactorily working for the employer for a period of time. The second was through the union's apprenticeship program, which was much more lengthy process. Plaintiff never applied for the apprenticeship program. This omission is not fatal to plaintiff's claim because, as discussed below, he demonstrated that he was qualified for sponsorship and his claim is not based on a failure to admit him into the apprenticeship program.

*4 Plaintiff continued to work at WHI for $350 per week without any benefits until November 1994, when he injured his lower back while performing some electrical work in the factory. Since this disabling injury, plaintiff has been unable to return to work and has received workers' compensation benefits; he has not been terminated by WHI. Plaintiff failed to present any evidence of what the worker's compensation benefits would have been had he been earning a higher salary prior to his injury.

Plaintiff testified that a white employee at WHI, Richard Nickels, started working as a driver for WHI around 1992 and shortly thereafter became a member of the union. WHI provided him benefits after he had worked there for thirty days and paid him $13 to $14 per hour (approximately $520-560 per week). Plaintiff also testified that another white employee, William Hughs, who worked as a general laborer, was sponsored by WHI for the union, received union benefits and was paid more than

plaintiff during the same time period. Plaintiff was making $8.75 per hour (approximately $350 per week).

WHI employed another draftsman, Amado Acuno, who is Filipino. Mr. Acuno did not perform any duties other than drafting. While Mr. Acuno, unlike plaintiff, was an architect and had a undergraduate degree, they both performed the same duties at WHI. Plaintiff testified that WHI provided Mr. Acuno with benefits, and other testimony established that WHI paid him approximately $520 per week or $170 more per week the plaintiff as of November 1994.

Plaintiff claims that the wage disparity between Mr. Acuno and himself, the refusal to provide him benefits as WHI did for Mr. Acuno, and the failure to sponsor him for the union, all resulted from intentional racial discrimination.

B. Prima Facie Case

To recover under a claim of disparate treatment in the terms and conditions of employment because of race discrimination, plaintiff must prove a prima facie case of discrimination under the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and as recently explained in Sheridan. Under this framework plaintiff must establish that: (1) he was a member of a protected class; (2) he was qualified to receive the terms and conditions of employment to which he claims he was entitled; and (3) other employees of a different race with similar qualifications as plaintiff received those terms and conditions and he did not.

WHI first argues that the weight of the evidence shows that plaintiff was not qualified for the position of architectural draftsman because he did not possess an undergraduate degree. I disagree. Plaintiff testified that his educational background included completion of technical college in Nigeria where he took courses in carpentry, architectural drawing and surveying. After graduation he also took a course in construction, and began technical school in the United States and he worked as a professional draftsman for a group of architects in Nigeria. He also worked part time for his father's construction firm as a draftsman and as a carpenter. Plaintiff presented the jury with extensive examples

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *4 (E.D.Pa.))

Page 271

of his work both in this country and in Nigeria. The drawings from Nigeria included a drawing of an apartment, a library for the Nigerian Army Academy, a courthouse, and a chemical laboratory. Plaintiff testified that he presented these drawings to the Hechts and that they hired him as a draftsman immediately after the interview.

*5 Moreover, plaintiff testified that he worked at WHI as a draftsman for approximately fourteen years. He presented to the jury numerous drawings of projects that he did while at WHI, and testified about other projects. Plaintiff estimated that he produced a total of approximately 3,000 drawings in his time at WHI, including all of the drawings for the significant Douglas & Walters project. Plaintiff therefore presented evidence not only that he was qualified to perform the job of draftsman, but that he actually performed the job to the satisfaction of WHI. [FN11]

> FN11. WHI also contends that plaintiff failed to prove that Amado Acuno was not a member of the protected class and that this failure is fatal to plaintiff's claim. WHI argues that because Acuno was not a Caucasian but of Philippine national origin plaintiff failed to establish any legally actionable disparate treatment. This argument is without merit because § 1981 requires that plaintiff prove that defendant intentionally discriminated against him because of his race regardless of the race of the person to whom plaintiff is comparing himself. See Douglas v. Evans, 888 F.Supp. 1536, 1548 (M.D.Ala.1995); Baca v. Butz, 394 F.Supp. 888, 890 (D.N.M.1975). All that is required is that plaintiff prove that he is a member of a protected class. Therefore, plaintiff's claim that he, as an African-American, was treated disparately from a person of another race, in this case a Filipino, is actionable pursuant to § 1981.

Defendant also contends that plaintiff was not qualified to join the union because he was not sufficiently skilled and because he performed union work only part-time while union membership required full-time performance of union-type work. Plaintiff, however, presented sufficient evidence from which the jury could conclude that he was suitably skilled to join the union. By Stuart Hecht's own testimony, the only qualifications for general laborer union members, who load and unload trucks and distribute materials, are general

physical fitness and strength. Plaintiff also presented evidence from which a jury could conclude that he was qualified to perform more skilled carpentry work, testifying that he performed those duties and explaining in detail how many of the machines in the plant operated and their function.

Plaintiff testified that he spent 60-80% of his time doing drafting work and 40-20% performing various other tasks, some of which were union-type jobs. If full-time employment performing union work were a requirement for union membership plaintiff would not quality, but the evidence on this point is capable of multiple interpretations. Defendant points to the following testimony of Mr. Mario Venneri, a union official who is the liaison between the union and the workers at the WHI shop, as establishing full-time union work as a prerequisite to union membership:

Q Now, you saw Olabode in the shop a number of times. I take it that if you saw him doing work which would have qualified as union work, you would not have stood still for that, would you?
A. That's right.
Q. Did you make any inquiries when you saw him in the shop as to exactly what he was doing?
A. Yes, I did.
Q. And as a result of your finding out as what he was doing, did you feel that he was doing what you would consider to be union work?
A. I believe that once or twice he was sweeping up, and I inquired about it, and the shop steward said to me, "He only comes here once in a blue moon." He wasn't full-time. He led me to believe, my shop steward, that, you know, if they needed something, you know, they would bring him in.
Q. And that was sufficient for you not to bother about Mr. Olabode; isn't that correct?
A. That's correct. He wasn't a full-time employee doing that constantly as a laborer or a janitor.

Contrary to defendant's assertion, this testimony does not unequivocally establish that an employee must perform union work full-time before he can become a member of the union. Moreover, the bargaining agreement between the union and WHI does not include a requirement of full-time union work and does include a table of hourly wage rates for each type of union member and thus a reasonable juror could interpret this agreement as allowing part-

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *5 (E.D.Pa.))

time performance of union functions. [FN12] Therefore a jury could reasonably conclude that plaintiff was qualified for union membership and that plaintiff established a prima facie case. [FN13]

> FN12. For instance, the minimum hourly rate of wages for a laborer was $11.85 on May 1, 1992, $12.15 on November 1, 1993, and $12.45 on November 1, 1994.

> FN13. Defendants also argue that plaintiff failed to demonstrate that he was rejected for a union position while other non-members of the protected class were treated more favorably. This argument is without merit because the uncontroverted evidence established that Mr. Hughs and Mr. Nickels were sponsored for union membership soon after becoming employed by WHI. WHI also contends that plaintiff failed to affirmatively take any of the required steps which were prerequisites to becoming a member of the union. This argument is also without merit because plaintiff testifies that he asked Stuart Hecht to sponsor him for the union, but that he refused and threatened to fire plaintiff if he persisted with attempts to have WHI sponsor him for the union.

C. Ultimate Burden of Pretest or Intentional Discrimination

*6 Pursuant to the shifting burden analysis of McDonnell Douglas, once plaintiff establishes a prima facie case of discrimination, defendant must articulate a non-discriminatory reason for the disparate treatment. If defendant articulates a legitimate non-discriminatory reason for the disparate treatment, the burden then shifts to plaintiff to prove that proffered reasons are not credible. If a jury disbelieves defendant's proffered reasons, it is "permitted, but not required, to draw an inference leading it to conclude that there was intentional discrimination." Sheridan, 100 F.3d at 1066.

Defendant did articulate a non-discriminatory reason for the disparate treatment of plaintiff. First, with respect to paying the plaintiff less than Amando Acuno, the defendant claimed that Mr. Acuno was more skilled and more qualified than plaintiff. Acuno had an undergraduate degree in architecture that plaintiff lacked, and Stuart Hecht testified that plaintiff's drawings were not as crisp as

Mr. Acuno's. Defendant also claimed that Mr. Acuno and plaintiff performed different functions with Mr. Acuno actually creating original designs and plaintiff merely tracing or creating shop drawings from others' original work. [FN14] Second, with respect to sponsorship in the union, defendant claimed that plaintiff was not qualified for union work at WHI's shop and did not perform union labor. Stuart Hecht testified that plaintiff performed some minor maintenance work and that he would occasionally sweep the shop when there was no other work for him to do, but that he was not qualified to perform the union jobs in the shop.

> FN14. Defendant did not present examples of Mr. Acuno's work. The jury may have found this omission significant.

Plaintiff, however, presented sufficient evidence from which a reasonable juror could conclude that these proffered reasons were not credible. As discussed above, plaintiff presented evidence that he was as qualified as Mr. Acuno to perform as a draftsman for WHI and that he was qualified to join the union.

Plaintiff also proffered affirmative evidence of intentional discrimination. Plaintiff and Clyde Charles testified that both Stuart and Neil Hecht both directed racial slurs at African-American employees. [FN15] Plaintiff also presented evidence of a pattern of disparate treatment directed at African-American employees. Plaintiff testified that in his fourteen years with WHI, with the exception of a single African-American employee, Floyd Cheeks, none of the employees that WHI sponsored for union membership or paid benefits was African-American. Plaintiff also testified that all African-American employees other than himself and Mr. Cheeks were paid "under the table" and not kept on the official payroll records, and that, with the exception of the three other African-American employees and Mr. Acuno, all of the other employees at WHI were white. [FN16] While defendants did dispute the testimony concerning racial slurs, plaintiff's testimony concerning the treatment of African-Americans was not controverted by payroll records or any contradictory testimony. [FN17]

> FN15. Mr. Charles, and African-American former employee, worked as a truck driver for WHI for



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *6 (E.D.Pa.))

Page 273

approximately five years. WHI did not sponsor him for the union or provide him benefits.

FN16. Plaintiff also presented uncontroverted evidence that he was required to do menial labor like cleaning bathrooms and running errands for the Hechts that white employees or Mr. Acuno were not asked to do. This testimony of disparate treatment also buttresses the jury's finding of intentional discrimination.

FN17. Both Stuart and Neil Hecht denied using racial slurs, and WHI presented the testimony of several employees of various ethnic backgrounds who stated that they never heard either of the Hechts utter a racial slur and that WHI was an enjoyable place to work where everyone got along.

*7 Based on the evidence introduced at trial as outlined above, allowing the jury's verdict to stand would not be a "miscarriage of justice." Dunn v. HOVIC, 1 F.3d 1362, 1364 (3d Cir.) (en banc), modified on other grounds, 13 F.3d 58 (3d Cir.1993) (citations omitted). Nor is there any basis for me to "substitute [my] 'judgment of the facts and the credibility of the witnesses for that of the jury.' " Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 211 (3d Cir.1992) (quoting Lind v. Schenley Indus., Inc., 278 F.2d 79, 90 (3d Cir.1960) (en banc)). Accordingly, I conclude that the jury's conclusion that WHI intentionally discriminated against plaintiff is supported by the evidence.

IV. Judgment as a Matter of Law

In deciding a motion for judgment as a matter of law, I must look at the evidence in the light most favorable to plaintiff, the verdict winner, and draw all reasonable inferences in his favor. Sheridan, 100 F.3d at 1072. I must determine whether "the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.' " Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 691 (3d Cir.1993) (quoting Keith v. Truck Stops Corp., 909 F.2d 743, 745 (3d Cir.1990) (citation omitted)). Further, I am not to weigh the credibility of witnesses, determine the credibility of witnesses, or substitute my judgment for that of the jury. Id. The evidence discussed above provided the jury with ample evidence to afford relief under § 1981, and, accordingly, defendant's motion for judgment as a matter of law is denied.

V. Damages

Defendant seeks a new trial or a substantial remittitur because of the jury's award of damages. While I have "a responsibility to review a damage award to determine if it is rationally based," Williams v. Martin Marietta Alumina, Inc., 817 F.2d 1030, 1038 (3d Cir.1987), I may not disturb a jury's award "merely because [I] would have granted a lesser amount of damages." Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir.1989); Hurley v. Atlantic City Police Dep't. 933 F.Supp. 396, 423 (D.N.J.1996). Where, however, the verdict is so excessive that it finds no rational support in the record, I may order the plaintiff "to remit the portion of the verdict in excess of the maximum amount supportable by the evidence or, if the remittitur [is] refused, to submit to a new trial." Dunn v. HOVIC, 1 F.3d 1371, 1383 (3d Cir.) (en banc), modified on other grounds, 13 F.3d 58 (3d Cir.1993); Kazen v. Wolinski, 721 F.2d 911, 914 (3d Cir.1983). I must decide whether the award of $410,644 is, as defendant contends, clearly unsupported by the evidence. Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1101 (3d Cir.1995). [FN18]

FN18. Plaintiff "must prove entitlement to back pay by providing information from which [his] damages can be determined." EEOC v. Wilson Metal Casket Co., 24 F.3d 836, 841 (6th Cir.1994). On post-trial motions, however, "any ambiguity in what the claimant would have received but for discrimination should be resolved against the discriminating employer." Mason v. Association for Independent Growth, 817 F.Supp. 550, 555 (E.D.Pa.1993) (citation omitted).

A review of the special interrogatories and the evidence makes clear how the jury arrived at its back pay and back benefits damages amounts. The back pay award of $50,830 is equal to $170 per week for a period of 299 weeks. The $170 represents the difference between plaintiff's salary, $350 per week, and Mr. Acuno's salary, $520 per week, and the 299 weeks represents the number of weeks between November 21, 1991 and the date of the verdict. It is therefore clear that the jury calculated back pay as the difference between plaintiff's and Mr. Acuno's salary over the relevant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



time period.

**\*8** The jury awarded back benefits of $74,520, which amounts to $249.23 per week over the same 299 week period. Plaintiff presented evidence that WHI paid the union $1080 per month for benefits for an employee named Richard Nickels. $1080 times twelve divided by 52 weeks equals $249.23 per week, and this is the amount the jury used to calculate back benefits damages. It is unclear, however, how the jury arrived at the front pay damages award.

A. Back Pay

Defendant contends that the jury's award of back pay damages of $50,820, representing the difference between Mr. Acuno's salary over the applicable time period, is without adequate support in the record. Defendant argues that the evidence lacks the specificity to support this award because plaintiff performed drafting work only 60-80% of the time and the remaining 40-20% was spent performing various tasks, and because plaintiff failed to present evidence of Mr. Acuno's salary in 1991.

The jury, however, could have reasonably concluded that a non-discriminatory wage for the 40-20% of the time that plaintiff was not performing drafting work was at least $520 per week because of the union wages presented into evidence. [FN19] The jury, therefore, could have reasonably found that plaintiff would have been paid at least $520 per week if not for the discrimination while performing non-drafting work.

> FN19. The collective bargaining agreement in effect between May 1, 1992, and April 30, 1995 included hourly wages of between $15.52 and $16.12 for a Journeyman Millman & Cabinetmaker and $11.85 to $12.45 for a laborer. Using a forty hour week, these hourly wages equate to weekly salaries of between $620.80 and $644.80 for a Journeyman Millman & Cabinetmaker and between $474.00 and $498.00 for a laborer.

Defendant's argument that plaintiff failed to establish Mr. Acuno's salary in 1991 is also unavailing. The jury's determination of back pay was not based on Mr. Acuno's salary, but on the differential between Mr. Acuno's and plaintiff's salary. This differential was $170 as of November,

1994 and the evidence supported an inference that this differential existed throughout plaintiff's tenure.

B. Back Benefits

Defendant contends that plaintiff failed to present adequate evidence to support the jury's award of back benefits. As discussed above, the jury calculated the back benefits amount based on the $1,080 monthly payments that WHI made to the union for benefits for a truck driver named Richard Nickels for the month of October, 1994. [FN20] These payments to the union included payments for health and welfare benefits and for pension benefits, and they were based on hourly amounts included in the collective-bargaining agreement. In the collective-bargaining agreement truck drivers and laborers were categorized together for the purposes of paying health and pension benefits. [FN21]

> FN20. During a charge conference held off the record the parties and I discussed the charge related to the valuation of the benefits. Defendant sought a charge that the health insurance benefits would be limited to the amount of out-of-pocket expenses plaintiff incurred either acquiring health insurance or paying for health services. Plaintiff sought a charge that stated the jury was to value the health benefits as the amount defendant would have had to pay for plaintiff's health insurance. I instructed the jury in accordance with plaintiff's requested charge because plaintiff did not plan to present any evidence of out-of-pocket expenses and because if my instruction were improper it could be corrected in the post-trial motions. This decision also mandated use of separate interrogatories on the benefits in the jury questionnaire. I was prepared to decide the propriety of this instruction post-trial, but defendant failed to raise this issue in its post-trial motions thereby waiving any objection it had to the instruction.

> FN21. Plaintiff failed to present evidence from which a reasonable juror could conclude that he was qualified to join the union as a truck driver, but he did present sufficient evidence that he was qualified to join the union as a general laborer.

Defendant first contends that Mr. Acuno did not receive any benefits and therefore the jury could not have awarded back benefits by comparing plaintiff's benefits to Mr. Acuno's benefits. My review of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *8 (E.D.Pa.))

record did not reveal any evidence that Mr. Acuno did not receive benefits. On the contrary, the only evidence concerning Mr. Acuno's benefits was plaintiff's testimony that Mr. Acuno received benefits. [FN22] There was no evidence presented at trial, however, that established the value of Mr. Acuno's benefits leaving the jury to speculate as to that value.

> FN22. Defendant contends that it is noteworthy that Mr. Acuno testified in his deposition that he did not receive any benefits in addition to his salary. This evidence, however, was not presented at trial.

*9 Apparently because the jury was not provided with the value of Mr. Acuno's benefits, the jury awarded plaintiff the full value of union health and pension benefits. Defendant argues that this award is not supported by the evidence because plaintiff only performed union-type work on the part-time basis. It is unclear how much of his time was spent performing union-type labor because he testified that he spent 40-20% of his time performing non-drafting work, but did not provide an estimate of the percentage of that time he spent performing union-type work. Defendant argues that the award of the total amount of the union benefits when plaintiff spent an undetermined amount of time performing work covered by the collective bargaining agreement is unreasonable. I agree. The evidence simply does not support an award of the total union benefits because plaintiff spent the vast majority of his time performing jobs that were not union jobs and because the record is devoid of a valuation of the benefits Mr. Acuno received.

Plaintiff contends that the jury reasonably could have concluded that plaintiff would have worked full-time as a union employee but for the discrimination, and therefore an award of full-time union benefits is supported by the evidence. I do not agree because plaintiff never sought to work as a full-time union employee. On the contrary, plaintiff took great pride in his drafting qualifications and skills and worked for the majority of the time as a draftsman. Although exactly what plaintiff claimed would have occurred absent the discrimination is not entirely clear, all of the evidence indicates that plaintiff sought to be paid equal to Mr. Acuno when performing draftsman work and equal to the union employees when performing his other duties. For the jury to

conclude that plaintiff would have worked as a full-time union employee would therefore contradict plaintiff's theory of liability and damages and his own testimony. I thus conclude that the jury could not have reasonably found that but for the discrimination plaintiff would have worked as a full-time union employee.

Having concluded that the jury's award of back benefits is without adequate support in the record, I must determine the maximum amount of back benefits that is supportable. Gumbs, 823 F.2d at 771-74. As determined above plaintiff testified that he spent 40-20% of his time doing work other than drafting. Plaintiff, however, failed to provide the jury with an estimate of the portion of 40-20% that he spent performing union work. [FN23] Plaintiff did testify extensively about his work using several machines in the factory and a number of job sites where he assisted union members and performed union work. He also testified that a number of the non-union duties that he performed took relatively little time. [FN24] Bearing in mind that the jury retains "broad discretion to calculate damages" and that its award may not be reduced below "the maximum amount ... the jury could reasonably find," id., I conclude that the maximum percentage of time plaintiff spent performing union duties that the jury could rationally find based on the evidence is 30%. It follows from this conclusion that a remittitur of $52,164 is appropriate. [FN25]

> FN23. Plaintiff testified under cross examination as follows: Q Of the remaining 20 percent of the work that you were performing, what portion of that absolute sum was involving carpentry work? A I cannot give you a percentage because its a systematic system, do this, do this, do this, do this, do this. And I carried out automatically. Q Of the remaining 20 percent of the absolute remaining period of time, what percentage of that time did you engage in electrical work? A Electrical work comes with cabinet making and other assignment that was assigned me. I cannot give you a percentage in my hands because I don't have no records.

> FN24. Plaintiff testified under cross-examination as follows: Q Can you estimate the percentage as to the time spent on plumbing? A Plumbing, its about 15, 20 minutes job, its no big deal. Q And what percentage of the time was spent sweeping, running

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *9 (E.D.Pa.))

errands, shoveling snow, fixing toilets? A Shoveling snow if there is snow coming down now.... That takes about ten minutes to just shovel a 16 to 20-foot pathway, about 16 inches wide, just quickly down and put the salt rock, that's no big deal.

FN25. The back benefits award of $74,520 multiplied by 70% equals $52,164.

C. Back Pay and Back Benefits After Disability

*10 Defendant also contends that plaintiff is not entitled to back pay and benefits damages after November 1994 when the plaintiff was injured and began receiving workers' compensation benefits. I instructed the jury on this point as follows:

There are three types of compensatory damages that are potentially recoverable. The first is called back pay. If you find that defendant acted unlawfully, than plaintiff is entitled to all the back pay and benefits plaintiff would have received from defendant if defendant had not discriminated against plaintiff. This amount should then be reduced by the amount plaintiff actually received during the same period. During the period plaintiff was on disability, this amount is measured by any additional money that plaintiff would have received had he been earning a non-discriminatory income prior to the injury that caused him to be disabled.

Defendant contends that this instruction was erroneous because, as a matter of law, plaintiffs are not entitled to any damages during the period of disability.

Defendant is correct that the general rule is that a plaintiff "will not be allowed back pay during any periods of disability." Mason v. Association for Independent Growth, 817 F.Supp. 550, 554 (E.D.Pa.1993) (citations omitted). The rationale behind this rule is that a plaintiff should not be able to receive back pay for a period when he was unable to work for reasons unrelated to the employment discrimination. Id. Plaintiff, however, did not contend that he was entitled to a full, non-discriminatory salary while receiving workers' compensation benefits. Rather, he contended that he would have been earning significantly more than $350 but for the discrimination and therefore would have received a larger amount of workers' compensation benefits while disabled. [FN26]

Plaintiff thus sought an instruction that would allow for recovery of the additional amount of workers' compensation benefits that he would have earned absent the discrimination. I agreed and gave the above-quoted instruction.

FN26. See 77 P.S. § 511 (setting compensation for total disability at 66.67% of the wages of the injured employee with certain minimums and maximums)

I believe that I gave the proper instruction. The underlying premise in computing an employment discrimination plaintiff's award is to restore the employee to the economic position in which the employee would have been but for the discrimination. Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975); Maxfield v. Sinclair Int'l, 766 F.2d 788, 796 (3d Cir.1985). "The appropriate standard for the measurement of a back pay award is to take the difference between the actual wages earned and the wages the individual would have earned in the position that, but for the discrimination, the individual would have attained." Gunby v. Pennsylvania Elec. Co., 840 F.2d 1108, 1119 (3d Cir.1988).

The instruction is consistent with this underlying premise and this standard for measurement of a back pay award because it provides a formula for restoring plaintiff to the financial position he would have been in but for the discrimination. Had he not been subject to discrimination, plaintiff would have been earning a higher salary prior to his injury, and would have received greater workers' compensation benefit. Therefore, an award of this incremental amount of workers' compensation benefits would restore him to the position he would have been but for the discrimination.

*11 The propriety of the above-quoted jury instruction does not end the inquiry into the award of back pay and benefits for the period after the disabling injury to the date of the verdict. To properly calculate the proper award during this period, the jury should have been instructed on how to calculate the amount of benefits due under Pennsylvania's workers' compensation law. Neither of the parties requested and I did not give such a charge. In addition, plaintiff failed to present any evidence of the amount of workers' compensation benefits he would have received had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



he been earning a higher salary prior to his disabling injury. Without this evidence and without the proper instruction, the jury was forced to speculate as to the amount of workers' compensation benefits plaintiff would have received absent the discrimination. Accordingly, I must conclude that the evidence was insufficient to support the jury's award of back pay after the date of the injury.

The jury's award indicates that it believed that the same differential in salary as existed prior to plaintiff's injury would exist in the workers' compensation benefits. A review of Pennsylvania's workers' compensation law, however, reveals that the jury's award is excessive. Subject to certain limitations and caps inapplicable in this situation, workers' compensation benefits are calculated as 67% as the average weekly salary. See 77 P.S. § 511. Because the jury concluded that plaintiff would have been earning $520 per week absent the discrimination as opposed to his salary of $350 per week, the jury, had it been properly instructed, should have awarded $113.90 [FN27] per week after November, 1994 rather than the $170 per week actually awarded. A remittitur of $7,910 is therefore required. [FN28]

> FN27. $520 per week multiplied by 67% less $350 per week multiplied by 67% equals $113.90.

> FN28. $170 less $113.90 equals $56.10, and there are 141 weeks between the date of the injury, November 3, 1994, and the date of the verdict. $56.10 multiplied by 141 weeks equals $7,910.10

A remittitur for back benefits after the injury date is also appropriate because the award is without adequate support in the record. Plaintiff presented no evidence that he would have maintained union benefits while on disability had he been receiving them prior to his injury, and if so, what the value of those benefits would have been. On the contrary, the only evidence on the point suggests that the union benefits would not have continued during the period of disability. Pursuant to the collective-bargaining agreement, WHI contributed to the union's health and pension benefit fund based on the number of hours an employee works during the applicable pay period and it does not contain a provision that required the employer to continue paying benefits for a disabled employee. Because nothing in the record supports an award of back

benefits after the injury and because the only evidence is contrary to such a finding, I conclude that a remittitur of $10,507 is mandated. [FN29]

> FN29. $22.356 multiplied by 47% equals $10,507.32, $22.356 equals the $74,520 back benefits award less $52,164, the remittitur calculated in section V.B. of this memorandum. The $22,356 figure thus represents the remaining award of back benefits. 47% is the percentage of weeks after the injury (141) as compared to the total number of weeks the jury used in its damages calculation (299).

### D. Front Pay

The jury awarded $250,000 in front pay and nothing for front benefits. Unlike the award for back pay and benefits, it is unclear how the jury arrived at the $250,000 figure. Based on the $170 weekly differential between Mr. Acuno's salary and plaintiff's salary that the jury used to calculate the back pay award, the $250,000 represents over 28 years of income. [FN30] Defendant contends that this award is excessive and unsupported by the evidence. [FN31] Plaintiff argues that the award is a reasonable estimation of the difference between the pay plaintiff would have received absent the discrimination and the pay he would receive until retirement.

> FN30. Plaintiff was 41 years old at the date of the verdict and the 28 years of income would have brought him to the age of 69. But see Floyd v. Mellon Bank, 1991 WL 30755, \*4 (E.D.Pa.1991) ("A front pay award may be made "for a reasonable future period required for the victim to reestablish [his] rightful place in the job market," quoting Goss v. Exxon Office Sys. Co. 747 F.2d 885, 889 (3d Cir.1984); award of front pay for eighteen months fully compensates plaintiff).

> FN31. Defendant also contends that the award of front pay is unwarranted because the plaintiff was not terminated. I disagree. Plaintiff's claims for front pay is unusual because plaintiff has not been terminated and he will receive workers' compensation benefits into the future. By contrast, in the Title VII and § 1981 claims of which I am aware, the front pay issue arises where an employee has been actually or constructively terminated from his position for an illegal discriminatory reason. If

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



the defendant is found liable in that situation the Court then determines whether reinstatement or front pay is the appropriate remedy taking into consideration whether animosity between the parties renders reinstatement infeasible and whether the same or a comparable position is available. Here, there is a great deal of animosity between the parties and the record is devoid of any indication whether plaintiff's former position remains open or whether there is another position available to him. Traditional reinstatement is therefore not a proper remedy because plaintiff has not been terminated and because reinstatement if infeasible. Traditional front pay, however, is also not a proper remedy because plaintiff will be receiving workers' compensation benefits.    I therefore instructed the jury similarly to the instruction on back pay after the disability:  "To calculate [the amount of front pay damages] you should calculate the value of the total wages and benefits [plaintiff] would have received in the future absent the discrimination and reduce that amount by the amount of actual wages and benefits that he will receive."   I conclude that this instruction was proper and conforms to the compensatory purpose of front pay damages for the same reasons discussed in section V.C. of this Memorandum.

   **\*12** The jury's award of front pay damages is entitled to deference because of the inherent speculation involved in the prospective calculation. In addition, the "risk of lack of certainty with respect to projections of lost income must be borne by the wrongdoer, not the victim." Wulf v. City of Wichita, 883 F.2d 842, 873 (10th Cir.1989);  See also Goss v. Exxon Office Sys. Co., 747 F.2d 885, 889 (3d Cir.1984).  "Accordingly, [I] should not disturb the award of future damages absent a conclusion that the jury engaged in 'unreasonable' or 'wild' speculation." Marchese v. Goldsmith, 1994 WL 263301, \*4 (E.D.Pa.1994);  see also Green v. USX Corp., 843 F.2d 1511, 1532 (3d Cir.1988); Blum v. Witco Chem. Corp., 829 F.2d 367, 375 (3d Cir.1987).

   I conclude that the jury relied on unreasonable speculation in awarding front pay damages because of plaintiff's failure to produce evidence on which the jury could have reasonably based a calculation of front pay damages.  Plaintiff failed to present any medical or other testimony about how long plaintiff was likely to remain on disability, how long

plaintiff intended to work at the company, and when he planned to retire. [FN32]  In fact, the record contains no information as to the extent of plaintiff's injury and the likely prognosis.  Plaintiff also did not present expert testimony concerning his future economic losses. [FN33]  Without this evidence, the record is devoid of any information that the jury could use to determine the length of time over which to award front pay damages. [FN34]  Plaintiff, therefore, failed to meet his initial burden of proof of "providing information from which [his] damages [could] be determined," Wilson Metal Casket Co., 24 F.3d at 841, and is not entitled to an award of front pay damages.   See Eldred v. Consolidated Freightways Corp. Of Delaware, 907 F.Supp. 26, 28 (D.Mass.1995) (lengthy period and speculative inquiry preclude award of front pay).   A remittitur of $250,000 is thus ordered. [FN35]

> FN32. Plaintiff argues that he was foreclosed from presenting this evidence at trial by arguing that: When plaintiff was testifying about the effect of his work-related disability and his inability to return to work, the court sustained defendant's objection. Defendant cannot now argue plaintiff did not introduce evidence that the defendant did not object to.  Plaintiff then references a portion of plaintiff's testimony which reads: Q As a result of that injury, was there any treatment that you received for that? A I had two surgeries.  I spent about--almost three months in the hospital.  THE COURT: Here again, I don't see the relevance of it.  I think you ought to move on.  It is clear from the above quote that the defendant did not object to the testimony and that the plaintiff was not testifying about when he would be able to return to work.   It is also clear that I was limiting plaintiff's testimony about the length of his hospital stay and the number of surgeries.  This testimony was not relevant because the pain and suffering damages from plaintiff's injuries are not recoverable under § 1981 because they were not caused by racial discrimination.

> FN33. See Scarfo v. Cabletron Sys. Inc., 54 F.3d 931, 954-55 (1st Cir.1995) (affirming award of front pay based on expert testimony): Young v. Lukens Steel Co. 881 F.Supp. 962, 976 (E.D.Pa.1994) (upholding award of front pay damages based on jury's acceptance of plaintiff's economic loss expert).

> FN34. See Hansel v. Public Serv. Co. of Colorado,



778 F.Supp. 1126, 1135-36 (D.Colo.1991) (quantification of front pay damages requires "some basis upon which to base an award of future earnings [and] must specify an ending date."); Rosemond v. Cooper Indus. Prods., 612 F.Supp. 1105, 1117 (D.Ind.1985) ("The court simply has before it no evidence from which it could determine an appropriate award of front pay for a reasonable future period.); see also Wilcox v. Stratton Lumber, Inc., 921 F.Supp. 837, 844 (D.Me.1996) (plaintiff not entitled to front pay award where offered no expert testimony or evidence on economy of the region or employment availability, plaintiff who was 37 years old was not too old to seek and begin new employment, employer was a small company with limited income and had not been profitable during the last two years, court was not convinced that employer would exist for another ten years, and plaintiff's generous back pay award of $41,210 sufficed to make her whole).

FN35. Even if plaintiff were entitled to front pay damages award, the award would be subject to substantial remittitur because of my failure to properly instruct the jury on the proper method for calculation of workers' compensation damages as discussed in section V.C. of this Memorandum. An award of front pay while plaintiff is disabled necessarily involves the calculation of the amount the benefits he would have received had he not been discriminated against less the amount of benefits he would actually receive. The plaintiff failed to present any evidence of the amount of benefits he would actually receive. The plaintiff failed to present any evidence of the amount of benefits he would actually receive. The plaintiff failed to present any evidence of the amount of benefits he was likely to receive absent the discrimination, and I failed to instruct the jury on how to calculate workers' compensation benefits. Without this evidence and these instructions the jury was forced to impermissibly speculate as to the amount of workers' compensation benefits plaintiff would have received absent the discrimination.

### E. Punitive Damages

The jury awarded $35,294 [FN36] in punitive damages and defendant contends that plaintiff failed to present evidence of the necessary degree of malice or reckless disregard for plaintiff's right's to warrant an award of punitive damages. [FN37] I disagree.

As discussed above plaintiff presented evidence of various racial slurs directed at African-American employees and a long history of maltreatment of plaintiff and other African-American employees. From this evidence, a jury could have reasonably concluded that defendant acted with the requisite malice or reckless disregard for plaintiff's rights.

FN36. The jury awarded a total of $100,000 in punitive damages, but attributed only $35,294 of the amount to conduct after November 21, 1991. Because § 1981 limits recovery under plaintiff's claim to conduct after November 21, 1991 and because the award under § 1981 was larger than the Title VII award, I entered judgment on the punitive damages claim for $35,294. See section II and Appendix B of this Memorandum.

FN37. Defendant who contends that the award of punitive damages in excessive. This argument is without merit because the award is far less than the back pay and front pay awards, and it in no way shocks the judicial conscience. See Edynak v. Atlantic Shipping, Inc., 562 F.2d 215, 225-26 (3d Cir.1977).

### VII. Conclusion

I will therefore vacate the judgment entered on August 18, 1997 and present plaintiff with a choice. He may either accept a remittitur in the amount of $320,581 for an award of $90,063 or opt for a new trial. [FN38]

FN38. See Appendix C for calculation of remittitur and final award.

I note that the peculiar factual situation presented by this case requires that a new trial encompass all issues in the case, both liability and damages. In Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494 (1931), the Supreme Court held that where errors occurred in the damages portion of the trial and not the liability portion, the court may order a new trial on damages only. Id. at 499. The Court, however, concluded that the record in that case did not contain jury findings necessary for a damages only trial. Id.; see also Williams v. Rene, 72 F.3d 1096 (3rd Cir.1995). The record in this case also lacks the jury findings which would allow for a damages only trial. Plaintiff's claim is not a wrongful termination or a failure to promote or hire

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                    **Page 280**
(Cite as: 1997 WL 805187, *12 (E.D.Pa.))

case where the liability and damages phases of the trial are easily segregated. Plaintiff claimed that the defendant discriminated against him by failing to sponsor him for the union and by failing to pay him an equal amount to the other draftsman employed by WHI. It is not clear from the jury questionnaire whether the jury found that WHI discriminated against plaintiff by failing to sponsor him for the union, or by not paying him like the other draftsman employed, or both. [FN39] Without this information, I cannot order a new trial on damages only because plaintiff is entitled only to the damages attributable to the discrimination that the jury found.

> FN39. Neither of the parties requested separate questions on plaintiff's two theories of liability, and I, not anticipating this problem, neglected to include separate questions.

*13 Moreover, "[i]f the issue of damages ... is so intertwined with liability that one cannot be submitted to the jury independently of the other without confusion and uncertainty, then a new trial must extend to all issues." Rene, 72 F.3d at 1101. [FN40] The damages and liability issues are so interwoven here as to make a damages only trial impracticable because of the confusion and uncertainty that would inevitably follow. In addition, I cannot envision a principled way to segregate the damages and liability issues so as to proceed in a damages only trial that would sufficiently mitigate that confusion and uncertainty. See also Geuss v. Pfizer, Inc., 971 F.Supp. 164, 179 (E.D.Pa.1996) (ordering new trial if remittitur not accepted because the issues of liability and damages too interwoven to allow fair determination of damages apart from liability); Hurley, 933 F.Supp. at 426 (same).

> FN40. See also Simone v. Golden Nugget Hotel & Casino, 844 F.2d 1031, 1040 (3d Cir.1988); Vizzini v. Ford Motor Co., 569 F.2d 754, 759 (3d Cir.1977); Fed.R.Civ.P. 59(a) ("A new trial may be granted to all or any of the parties and on all or part of the issues[.]").

Appendix A: Jury Questionnaire

1. Did defendant intentionally discriminate against plaintiff because of plaintiff's race and/or national origin in violation of Title VII?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.    **Page 281**
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

YES    X    NO
    ----        ----

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

2. Did defendant intentionally discriminate against plaintiff because of plaintiff's race after November 21, 1991 in violation of § 1981?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                         **Page 283**
**(Cite as: 1997 WL 805187, *13 (E.D.Pa.))**

YES    X    NO
       ----        ----

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

   3. Did the intentional discrimination you found in question 1 and/or question 2 legally cause injury or damages to plaintiff?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

```
YES    X    NO
       ----        ----
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                    **Page 286**
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

4. What amount of back pay and benefits do you award plaintiff that would have been earned after November 21, 1991?

a. Amount of back pay without benefits from November 21, 1991 up to the date of the verdict? $50,830

b. Amount of back benefits from November 21, 1991 up to the date of the verdict? $74,520

5. Of the damages awarded in response to question 4, what portion of that amount is attributable to the period between January 31, 1993 and the date of the verdict?

a. Portion of the back pay damages without benefits attributable to the period from January 31, 1993 to the date of the verdict? $40,511

b. Portion of the back benefits damages attributable to the period from January 31, 1993 to the date of the verdict? $59,392

6. What amount of front pay and benefits, if any, do you award plaintiff?

a. Amount of front pay without benefits? $250,000

b. Amount of front benefits? $0

7. What amount of other compensatory damages, if any, do you award plaintiff?

a. Amount of other compensatory damages from date of discrimination? $0

b. Portion of the amount of other compensatory damages awarded in response to question 7(a) attributable to conduct after November 21, 1991? $0

8. Punitive Damages

a. Did defendant act with malice, for the purpose of causing harm, or with reckless disregard for plaintiff's rights?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

YES    X    NO
    - - - -      - - - -

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

b. Amount of punitive damages from the date of discrimination?  $100,000

c. What portion of the amount of punitive damages awarded in response to question 8(b) is attributable to conduct after November 21, 1991? $35,294

**\*14** Appendix B:  Damages

The total amount of damages awarded under the Title VII and the § 1981 were:

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                                    **Page 289**
**(Cite as: 1997 WL 805187, \*14 (E.D.Pa.))**

|                   | Title VII  | s 1981    |
|-------------------|------------|-----------|
| Back Pay          | $ 40,511   | $ 50,830  |
| Back Benefits     | $ 59,392   | $74,520   |
| Front Pay         | $250,000   | $250,000  |
| Punitive damages  | $100,000   | $ 35,294  |
|                   | $449,902   | $410,644  |

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw.

Not Reported in F.Supp.
**(Cite as: 1997 WL 805187, \*14 (E.D.Pa.))**

Appendix C:  Calculation of Remittitur and Final Damages Award

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                                   Page 291
(Cite as: 1997 WL 805187, *14 (E.D.Pa.))

|                 | Award      | Remittitur      | Final Damages Award |
|-----------------|------------|-----------------|---------------------|
| Back Pay        | $ 50,830   | $  7,910 *      | $42,920             |
| Back Benefits   | $ 74,520   | $ 62,671 **     | $11,849             |
| Front Pay       | $250,000   | $250,000 ***    | --                  |
| Punitive damages| $ 35,294   | --              | $35,294             |
|                 | $410,644   | $320,581        | $90,063             |

  *    See section V.C of this Memorandum.
 **    See Sections V.B($52,164) and V.C.($10,507) of this Memorandum.
***    See section V.D of this Memorandum.

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
**(Cite as: 1997 WL 805187, \*14 (E.D.Pa.))**

ORDER

AND NOW this 30 day of December, 1997, upon consideration of defendant's motion for judgment notwithstanding the verdict, defendant's motion for a new trial and plaintiff's motion for attorney fees, and the parties' filings related thereto, it is hereby ORDERED that:

(1) The judgment entered by Order of August 18, 1997 is VACATED;

(2) If plaintiff, within twenty (20) days of the date of this Order, files an acceptance of remittitur in the amount of $320,581, defendant's motion for new trial will be DENIED in all respects and judgment will be entered on plaintiff's claims in favor of plaintiff and against defendant in the amount of $90,063;

(3) If plaintiff declines to accept the remittitur, a new trial will be granted as all issues, both liability and damages;

(4) Defendant's motion for judgment as a matter of law is DENIED;  and

(5) Plaintiff's motion for attorney fees is DENIED without prejudice to its renewal if plaintiff accepts the remittitur.

1997 WL 805187 (E.D.Pa.), 75 Fair Empl.Prac.Cas. (BNA) 1555

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

