**PART 7**

TAB N

Not Reported in F.Supp.2d  
(Cite as: 2003 WL 288402 (W.D.Pa.))

Page 49

Only the Westlaw citation is currently available.

United States District Court,  
W.D. Pennsylvania.

**Loretta L. ROBINSON, Plaintiff,**  
v.  
**BT FINANCIAL CORPORATION, et al., Defendants.**

Civil Action No. 01-574.

Feb. 11, 2003.

Former bank teller supervisor sued employer bank, claiming violation of Age Discrimination in Employment Act (ADEA). Employer moved for summary judgment. The District Court, Standish, J., adopting Report and Recommendation of Francis X. Caiazza, United States Magistrate Judge, held that supervisor was not subject of adverse employment action, when she was required to transfer to another location without sustaining any loss of title, salary or benefits.

Judgment for employer.

West Headnotes

[1] Civil Rights  1203  
78k1203  
Bank teller supervisor was not subject of adverse employment action, as required for suit under the ADEA, when she was transferred to another employer location without loss of title, salary or benefits, and only problem was her aversion to driving longer commute. Age Discrimination in Employment Act of 1967, § 2 et seq, 29 U.S.C.A. § 621 et seq.

Neal A. Sanders, Law Office of Neal Alan Sanders, Butler, PA, for plaintiff.

Hayes C. Stover, Kirkpatrick & Lockhart, Pittsburgh, PA, for defendants.

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

FRANCIS X. CAIAZZA, Magistrate Judge.

I. RECOMMENDATION

*1 For the reasons stated below, it is respectfully recommended that the District Court grant the Defendants' Motion for Summary Judgment (Doc. 13) and dismiss this case with prejudice.

II. REPORT

BACKGROUND

The Plaintiff Loretta L. Robinson ("Ms. Robinson" or "the Plaintiff") has filed this age discrimination lawsuit against her former employer(s), BT Financial Corporation and Laurel Bank ("the Bank"). [FN1] See generally Compl. (Doc. 1). Ms. Robinson asserts parallel claims of discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("the ADEA") and the Pennsylvania Human Relations Act, 43 Pa. Cons.Stat. § 951, et seq. ("the PHRA"), and her pleadings state the following allegations in support thereof.

> FN1. The Defendant-financial institutions indicate that they became the Plaintiff's employer through "[a] series of mergers and acquisitions." See generally Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 14, hereinafter cited as "Defs.' Br.") at 1-2. For the sake of simplicity, Defense counsel's papers refer to the Defendants collectively as "the Bank," see id. at 2, and the court follows counsel's lead.

In 1963, the Plaintiff began working for the Bank at its branch in Kittanning, Pennsylvania ("the Kittanning Branch"). See Compl. at ¶ 9. She worked at the Kittanning Branch until approximately December 2, 1999, when her employment was terminated. See id. at ¶¶ 13, 20. At the time of her termination, Ms. Robinson was fifty-four years old and she held the title of "Supervisor of Tellers" at the Kittanning Branch, a position she acquired through a series of promotions. See generally id. at ¶¶ 8, 10-14.

The Plaintiff describes the circumstances leading to her termination as follows. On approximately November 19, 1999, the Bank informed Ms. Robinson that she "would be required to transfer" to one of three other branches, "any of which would require [her] to engage in substantial additional travel." See id. at ¶ 15. The Bank informed her that, "if she did not transfer to one of the other [three] branch[es] ..., her employment would be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d   Page 50
(Cite as: 2003 WL 288402, *1 (W.D.Pa.))

terminated." See id. at ¶ 16.

At the time this "ultimatum was issued," the Bank "was aware that [Ms. Robinson] was not comfortable driving long distances and would not be able to make the commute." See id. at ¶ 17. On this basis, the Plaintiff "requested on numerous occasions to be assigned to a position at the Kittanning [Branch,] as she did not want to commute to any of the other [three] branch[es]." See id. at ¶ 19. The Bank declined Ms. Robinson's requests, and it terminated her employment when she refused to accept the transfer. See id. at ¶ 20.

In support of her discrimination claims, the Plaintiff alleges that: at the time she was terminated, "employees who were substantially younger than" her "were treated more favorably in that they were hired or retained to work in the Kittanning" Branch, see id. at ¶ 21; the Bank's denial of her requests to remain in Kittanning was "motivated by ... age," see id. at ¶ 22; and the Bank's decision to terminate her was similarly motivated. See id. at ¶ 23.

The Defendants filed their Motion for Summary Judgment on June 27, 2002. See Defs.' Mot. for Summ. J. (Doc. 13). Among other things, their counsel asserts that the Plaintiff has failed to sufficiently refute the Bank's legitimate, non-discriminatory reason for terminating her employment. See generally, e.g., Defs.' Br. at 22. The undersigned agrees, and therefore recommends that the Defendants' Motion for Summary Judgment be granted.

ANALYSIS

*2 The age discrimination claims presented in this case are subject to analysis under the familiar McDonnell Douglas framework. Cf. generally Fakete v. Aetna, Inc., 308 F.3d 335, 337-38 & n. 3 (3d Cir.2002). [FN2] First, the Plaintiff must establish her prima facie case by showing that: "(1) [she] was a member of a protected class, i.e., ... she was over forty, (2) [she wa]s qualified for the position, (3)[she] suffered an adverse employment decision, (4) and [she] was ultimately replaced by[, or treated less favorably than,] a person sufficiently younger to permit an inference of age discrimination." See Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir.2001) (citation omitted). If the Plaintiff makes her prima facie case,

the burden shifts to the Defendants to identify "a legitimate, nondiscriminatory reason" for the adverse employment action. See generally Fakete, 308 F.3d at 338, n. 3. Once the Defendants proffer a legitimate, nondiscriminatory reason, the Plaintiff "must demonstrate that the proffered reason was merely a pretext for unlawful discrimination." See Hubbard v. Ashcroft, 2002 WL 1769003, *1 (3d Cir. Aug.1, 2002) (citation omitted). To show pretext, the Plaintiff "must submit evidence [that] ... casts sufficient doubt upon ... the legitimate reason[ ]" identified by the Defendants or that "allows the factfinder to infer ... discrimination was more likely than not a motivating or determinative cause of the adverse employment action." See id. (citation and internal quotations omitted).

   FN2. "There is no need to differentiate between" Ms. Robinson's ADEA and PHRA claims because "the same analysis is used for both." See generally Connors v. Chrysler Fin. Corp., 160 F.3d 971, 972 (3d Cir.1998) (citations omitted).

In this case, the undersigned has serious doubts regarding Ms. Robinson's ability to satisfy one of her prima facie elements, namely that she "suffered an adverse employment decision." See generally discussion supra. [FN3] Even assuming the Plaintiff has made her prima facie case, however, she has completely failed to meet her burden on pretext.

   FN3. As further addressed below, it was the Bank's decision to transfer Ms. Robinson, not her being terminated for refusing the transfer, that forms the crux of the Plaintiff's discrimination claims. See generally discussion infra. As also seen below, the Bank's decision to transfer her does not qualify as an "adverse employment decision." See id. Thus, if the court focuses on the true employment decision being challenged, the Plaintiff fails even to state a prima facie case. Nevertheless, the fact that Ms. Robinson ultimately was terminated, an archetypical adverse employment decision, causes the undersigned sufficient pause to forego a recommendation of dismissal based on her prima facie case, alone. At a minimum, however, the shortcoming in Ms. Robinson's prima facie case provides additional grounds for entering summary judgment against her.

At the onset, the court notes that the parties have expended the bulk of their energy debating whether

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d                                                                   Page 51
(Cite as: 2003 WL 288402, *2 (W.D.Pa.))

the Bank was justified in requiring Ms. Robinson to transfer. Compare Defs.' Br. at 20-23 (arguing that Bank had legitimate reasons for transferring Plaintiff and for not requiring younger employees to transfer) with Pl.'s Opp'n Br. at 4-5, 8-11 (arguing opposite). Although ultimately misguided, this approach is somewhat understandable in light of the express allegations of the Complaint. See, e.g., Compl. at ¶ 21 (asserting that "substantially younger" employees "were treated more favorably" because they were "retained to work in ... Kittanning"). As seen below, however, the Bank's decision to transfer Ms. Robinson has no bearing on whether it had a legitimate, non-discriminatory reason for terminating her employment.

The flaw in the Plaintiff's reasoning is best exemplified through the Pennsylvania district courts' analyses in Hussein v. Genuardi's Family Mkts., 2002 WL 56248 (E.D.Pa. Jan.15, 2002) and in Grande v. State Farm Mut. Auto. Ins. Co., 83 F.Supp.2d 559 (E.D.Pa.2000). In Hussein, the plaintiff was transferred from one of the defendant-employer's stores to another, while retaining "the same responsibilities and pay as [she had in her former] position...." See id. at *2. Shortly thereafter, she was terminated by her employer when she "abandon[ed]" the new position. See id.

*3 In the lawsuit that followed, the plaintiff sought to establish that her former employer discriminated against her by requiring the transfer. The Hussein court rejected this approach, reasoning:
> [Although the p]laintiff ... establishes the [adverse employment decision] element of [her] prima facie case because[,] as a formal matter, she was terminated[, her transfer to another store] .... do[es] not constitute [an] adverse employment action[ ]....
> [T]he record indicates that [she] was provided essentially the same job with the same responsibilities at the same pay at th[e] new location. ... Even viewing the evidence in the light most favorable to [the p]laintiff, an essentially lateral transfer such as this does not equal an adverse employment action. ... This is true even if ... [the d]efendant forced [the p]laintiff to accept [the] transfer ... against her will.

See id., 2002 WL 56248 at *5-6 (citation omitted, some emphasis added, some in original).

The Hussein Court's holding that an "essentially lateral transfer" does not constitute an adverse employment decision is hardly unique. As seen below, a multitude of federal courts have issued decisions, both before and after Hussein, reaching the very same conclusion. See generally discussion infra. Hussein is particularly instructive here, though, in its recognition that an employer "need not offer legitimate, nondiscriminatory reasons for" a decision to transfer that "ultimately do[es] not constitute [an] adverse employment action[ ] ." See id. at *5 (emphasis added). This conclusion demonstrates why the parties' debate as to whether the Bank's proposed transfer was supported by a legitimate, non-discriminatory reason (as opposed to pretext) misses the mark.

Of course, this conclusion is based on the undersigned's finding that Ms. Robinson's anticipated transfer did not rise to the level of an adverse employment decision. The Pennsylvania district court's analysis in Grande further supports this proposition.

In Grande, the plaintiff "was offered a lateral transfer to another" of the defendant-employer's offices. See id., 83 F.Supp.2d at 561. When the plaintiff "decided not to report" to the new location, his employer "fired [him] ... for his failure to" show. See id.

In his discrimination lawsuit, the plaintiff "argue[d] that the long commute to" the new location "made [the] transfer an adverse employment decision." The court disagreed:
> To be an adverse action, an employment decision must be serious and tangible enough to alter an employee's compensation, terms, conditions or privileges of employment. ... [Although the court declines to hold that] a lateral transfer can never constitute an actionable employment decision, .... [none of the requisite] qualifying circumstances exist[.] ...
> [The] plaintiff has presented no evidence suggesting that the transfer was anything but a full-fledged job. [He] conceded in his deposition ... that he did not believe the transfer was a first-step towards a termination or demotion. ... [The] plaintiff has provided no evidence suggesting that his pay, promotion, or other benefits would have been harmed by [the] transfer .... In fact, in his deposition ..., he conceded that there would have

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d  
(Cite as: 2003 WL 288402, *3 (W.D.Pa.))

Page 52

been no difference in pay or benefits and that he could have performed the job, which would have had the same title ....
*4 He also stated that he could have made the commute to [said location], ... although he stressed that the drive would have been longer....
In these circumstances, ... there has been no adverse employment decision. While the court does not minimize the effect of a lengthened commute ..., without some evidence of actual harm to [the] plaintiff's career or some indication that he could not perform the job, these factors do not create ... a prima facie case. [FN4] ...

> FN4. As a purely technical matter, the plaintiff in Grande suffered an adverse employment action in that he was terminated for his failure to appear at the new location. See generally discussion supra in text. The Grande Court nevertheless held that the plaintiff could not state a prima facie case, implicitly recognizing that his termination was a mere formality resulting from his refusal to appear. Cf. Grande. This court is inclined to agree with Grande, and disagree with Hussein, that Ms. Robinson's ability to state a prima facie case should not turn on whether she was terminated, as opposed to having resigned, based on the anticipated transfer. Indeed, to entertain such a distinction would be to elevate form over substance. For this reason, the undersigned's recommended dismissal of the Plaintiff's discrimination claims would be equally justified at the prima facie stage of the McDonnell Douglas analysis. Cf. Grande, 83 F.Supp.2d at 564.

[Relatedly, t]he simple increase in the commuting distance is not enough to find [a] constructive discharge .... While [the plaintiff] may have found the [additional] distance impossible to tolerate, ... the test looks to the reasonable person. ... [Thus, for example,] ... while an employer cannot transfer an employee to a job the employee cannot do, a desire to live in a certain city is not a job-related factor supporting a claim of constructive discharge. ... Similarly, subjective feelings, on their own, are insufficient to find [a] constructive discharge.
See id. at 563-64 (citations and internal quotations omitted, emphasis added).

As referenced above, the holdings in Hussein and Grande are far from unique. A number of other federal courts, in Pennsylvania and elsewhere, have likewise concluded that a truly "lateral" transfer is not converted to an adverse employment decision, notwithstanding complaints regarding additional commute time. See, e.g., Jenkins v. Philadelphia Housing Auth., 2001 WL 1298988, *5 (E.D.Pa. Oct.24, 2001) (transfer to "division [that] was less geographically convenient" to plaintiff did not constitute adverse employment action because her "assigned shift, days off, pay [and] responsibilities [did not] change[ ] depending on [the] site at which she work[ed]"); Spears v. Missouri Dep't. of Corr. & Human Res., 210 F.3d 850, 853-54 (8th Cir.2000) (transfer resulting in "mere[ ] ... inconvenience" to plaintiff, absent "any impact on her job title, salary, benefits, or any other material aspect of her employment," was not adverse employment decision); Anzaldua v. Chicago Transit Auth., 2002 WL 31557622, *3-4 (N.D.Ill. Nov.15, 2002) (even transfer "add[ing] up to an hour and a half each way to [plaintiff's] daily commute" was insufficient to establish adverse employment decision; such increased commute is "merely an inconvenience," not an actionable employment decision) (emphasis added); Johnson v. Eastchester Union Free Sch. Dist., 211 F.Supp.2d 514, 517-18 (S.D.N.Y.2002) (plaintiff's "mere dissatisfaction" with transfer, based on "inconvenience of the change in location," was not actionable as adverse employment decision). [FN5]

> FN5. In Hussein, the district court stated in dicta that the failure to show the "new location was particularly inconvenient for or placed a[n undue] burden on" the plaintiff further supported the court's conclusion that her lateral transfer was not an adverse employment decision. See id., 2002 WL 56248 at *6. In light of the numerous court decisions holding that mere "inconvenience" fails to establish an adverse employment decision, however, the undersigned cannot agree with the dicta in Hussein. Thus, even assuming Ms. Robinson can satisfy the overly-liberal standards suggested in Hussein, the District Court should decline to adopt them here. Cf. generally cases cited supra in text (repeatedly concluding that mere inconvenience does not constitute adverse employment decision).

Under the aforementioned standards, Ms. Robinson has failed to show that the Bank's ordered transfer rose to the level of an adverse employment decision. Her counsel has neither urged nor shown

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d                                                              Page 53
(Cite as: 2003 WL 288402, *4 (W.D.Pa.))

that the transfer would have "any [adverse] impact on her job title, salary, benefits, or any other material aspect of her employment." See Spears, 210 F.3d at 853-54. In fact, Ms. Robinson has expressly admitted that the proposed transfer to the Bank's branch in Sarver, Pennsylvania would have resulted in a job promotion. Compare Defs.' Am. Statement of Uncontested Material Facts (Doc. 17) at ¶ 33 (stating that Plaintiff "would receive a promotion" upon transfer to Sarver) with Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 21) at ¶ 33 (stating that said "averment [was] admitted ") (emphasis added). Simply put, there is no evidence in the record that the Bank's proposed transfer would have had any negative impact on Ms. Robinson's present or future conditions of employment. [FN6]

>   FN6. This conclusion renders inapposite the holding in Torre v. Casio, Inc., 42 F.3d 825 (3d Cir.1994), the only potentially relevant decision cited in the Ms. Robinson's opposition papers. In Torre, the plaintiff was transferred "to [a] dead-end position, ... from which he could [more easily] ... be fired." See id. at 827 (emphasis added). Indeed, the plaintiff's employment was terminated within five weeks of the transfer, see id., and the Torre Court considered the "transfer [ ] and ... discharge[ ]" collectively when discussing the adverse employment decision presented. See id. at 831. In this case, no evidence exists that the Bank sought to transfer Ms. Robinson into a "dead-end position" or to make easier a later discharge. The Plaintiff's refusal to accept the transfer, moreover, negates any speculative allegations regarding the same.

*5 The only other conceivable basis for distinguishing Ms. Robinson's claims is her counsel's bald assertion that "Sarver was too far for her to drive." See generally, e.g., Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 20, hereinafter cited as "Pl.'s Opp'n Br.") at 10. Unfortunately for the Plaintiff, however, she has failed to show that her purported difficulties in driving are relevant to the adverse employment inquiry.

At the onset, the undersigned finds telling the Plaintiff's express averment in her pleadings that she "was not comfortable driving long distances...." See Compl. at ¶ 17 (emphasis added). And while this averment is followed by the bare assertion Ms. Robinson "would not be able to make the commute," see id . (emphasis added), there is absolutely no evidence supporting this conclusion. To the contrary, the record plainly reveals that Ms. Robinson "has been a licensed driver since the age [of] 18," she has "no restrictions on her driver's license," and she has no medical restrictions regarding her ability to drive. See Defs.' Br. at 11 (citing evidentiary support in record). In addition, the record confirms that the additional commute required by the transfer to Sarver would have been a mere nineteen miles, the difference between a seven-mile drive from her home to the Kittanning Branch and a twenty-six mile drive to Sarver. See id. at 11-12 (citing record support).

As just seen, the Plaintiff has failed to identify any evidence supporting her assertion she was unable to make the additional commute: no restrictions on her driver's license, no findings or testimony of a medical health professional establishing her inability to drive the additional distance, et cetera. Instead, she offers only her subjective statements that the additional commute would be "difficult[ ]" and that she "intensely dislike[s] driving." See Pl.'s Opp'n Br. at 10. This type of evidence is insufficient for the purposes of establishing an adverse employment action. Cf., e.g., Grande, 83 F.Supp.2d at 564 ("subjective feelings, on their own, are insufficient to find" an adverse employment decision); see also, e.g., Pimentel v. City of New York, 2002 WL 977535, *4 (S.D.N.Y. May 14, 2002) ("purely subjective feelings about a transfer which, by objective standards, [do] not negatively alter the terms and conditions of [the plaintiff's] employment in any respect have no bearing on whether an adverse employment action has occurred "; "[i]nterference with sleeping, therapy, eating and medication schedules are purely subjective matters that [unrelated discrimination statutes] do[ ] not address") (citations and internal quotations omitted, emphasis added).

For all of these reasons, the Plaintiff has failed to show that the Bank's proposed transfer constituted an adverse employment decision. [FN7] Even assuming this conclusion is not fatal to her prima facie case, the Bank owed no duty to "offer legitimate, nondiscriminatory reasons for" its decision to transfer the Plaintiff. See Hussein, 2002 WL 56248 at *5.

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



FN7. As referenced above, the undersigned concludes that the Bank's proposed transfer, and not the mere formality of Ms. Robinson's being terminated based on her refusal to accept it, constitutes the purported adverse employment decision placed before the court. See generally discussion supra. The undersigned also has doubts regarding the Plaintiff's ability to show that younger employees were treated more favorably. See generally Compl. at ¶ 21 (alleging that "substantially younger" employees "were treated more favorably in that they were hired or retained to work in ... Kittanning ") (emphasis added). Ms. Robinson's supposition that working in Kittanning would, in fact, be more favorable to younger employees enjoys no evidentiary support. Stated differently, there is no reason for the court to presume that younger workers likewise would have preferred to stay in Kittanning; it seems equally likely that working in one or more other location(s) may have been of greater convenience to any given worker. This analytical disconnect further evidences the infirmity of Ms. Robinson's approach.

*6 The proper inquiry is whether the Defendants have proffered, and whether the Plaintiff has sufficiently refuted, the Bank's non-discriminatory reason for Ms. Robinson's termination. The bank's stated reason is clear, and it seems beyond meaningful dispute: the Plaintiff was terminated for refusing to accept the transfer. And though the Plaintiff's Complaint alleges that the termination was "motivated by ... age," see id. at ¶ 23, her counsel has failed to identify one shred of evidence supporting this assertion and/or refuting the Bank's stated non-discriminatory reason. See generally Pl.'s Opp'n Br. Rather, in arguing that the transfer was not supported by legitimate reasons, Ms. Robinson implicitly concedes that her termination was based on her refusal to agree to the same. See id.

As seen above, the Bank's decision to transfer was not an adverse employment action, and it therefore is not subject to the "legitimate non-discriminatory reason" analysis under McDonnell Douglas. See discussion supra. Having failed to identify evidence that she was terminated for any reason other than her refusal to transfer, the Plaintiff cannot meet her burden on pretext.

In conclusion, Ms. Robinson's grievances boil down to her displeasure with the Bank's reassigning her to a different location. "The realities of the workplace," however, "dictate that employees do not always have the option to work in the location they desire." See Nonnenmann v. City of New York, 174 F.Supp.2d 121, 133 (S.D.N.Y.2001) (citation and internal quotations omitted, emphasis added) (holding that employer's denial of request for transfer to facility "13.5 miles closer to [plaintiff's] home [wa]s insufficient to constitute an adverse employment action"). Nothing in the ADEA bestows upon Ms. Robinson the right to demand employment at the Bank branch of her choosing, and for this reason, as well as the others stated above, the Defendants' Motion for Summary Judgment is well taken.

CONCLUSION

For the reasons stated above, it is recommended that the District Court grant the Defendants' Motion for Summary Judgment (Doc. 13) and dismiss this case with prejudice.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the local Rules for Magistrates, objections to this report and recommendation are due by February 27, 2003. Responses to objections are due by March 10, 2003.

2003 WL 288402 (W.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



TAB O

Only the Westlaw citation is currently available.

United States District Court, D. Oregon.

James THOMAS, Plaintiff,  
v.  
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.

No. CIV. 98-1068-KI.

Aug. 20, 1999.

Thane W. Tienson, Copeland, Landye, Bennett and Wolf, LLP, 3500 Wells Fargo Center, Portland, Oregon 97201, Attorney for Plaintiff

Kristine Olson, United States Attorney, Ronald K. Silver, Assistant United States Attorney, 1000 S.W. Third Avenue, Suite 600, Portland, Oregon 97204-2902, Attorneys for Defendant

OPINION

KING, Judge.

\*1 Plaintiff James Thomas was an employee at the Portland Area Office ("PAO") of the Indian Health Service ("IHS"). In 1995, Thomas filed an EEO ("Equal Employment Opportunity") complaint alleging sex discrimination. In the current action, Thomas alleges that he was harassed in retaliation for filing the 1995 complaint. Before the court is defendant's motion for summary judgment (# 22). For the reasons below, I grant summary judgment.

FACTS

Thomas joined the IHS in 1979. Beginning in the mid-1980s, he was the Chief of Administrative Services at the PAO. Thomas was supervised by Daniel Madrano, the Director of Financial Management and Acting Director of the Office of Administration and Management, until March 1996 when Madrano was reassigned away from the PAO. Due to a reduction in force ("RIF"), Thomas was reassigned to a Supervisory Contract Specialist position in April 1996 at a reduced pay grade.

Thomas' function of supervising warehouse employees was transferred to the Area Pharmacy Consultant effective October 1, 1994. The change was in response to the employees' threat to file a joint grievance against Thomas for his confrontational style. At the time, Thomas thought Madrano changed his duties "to diminish [Thomas] to where [he] was a nobody." Thomas Depo. at 32. By the end of July 1995, Thomas no longer supervised his last two subordinates.

On July 28, 1995, Priscilla Miller, a subordinate of Thomas, reported that she was concerned regarding Thomas' relationship with a company doing business with the IHS. Kathy Block, the Contracting Officer, began to investigate the allegations. On July 31, 1995, Thomas initiated EEO counseling, maintaining that Block's investigation was harassment because of his sex. This is the EEO complaint Thomas now alleges caused the retaliation by Madrano. The EEO investigation resulted in a finding of no discrimination. Although Block conducted the investigation, Thomas is convinced that Madrano was "right in the thick of it." Thomas Depo. at 45. Thomas thinks that Madrano and Block have a professional, but very close, relationship.

On August 29, 1995, the EEO counselor notified Madrano that Thomas had filed a complaint. Also on that day, Thomas met with the EEO counselor to complain that Madrano was harassing him because of the EEO complaint against Block.

Thomas states that after he filed the EEO complaint against Block, Madrano treated him differently by: (1) reducing Thomas' workload to the lowest point possible; (2) no longer inviting Thomas to monthly meetings of the program directors; and (3) not talking to Thomas or discussing his assignments.

Thomas also gives examples of harassing remarks, such as Madrano calling him a "Sioux dog eater," but says that he has endured that environment since the early 1990s, well before Thomas filed the EEO complaint against Block. In particular, Madrano allegedly made a remark naming Thomas as the father of a baby who was miscarried by a coworker, but the incident was in 1991.

\*2 Wesley Bell, the Area Facilities Manager for the PAO, states that the entire fourth floor of the federal building, including the PAO, had to be reconfigured to allow another group to relocate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d                                                                                                  Page 117
(Cite as: 1999 WL 637214, *2 (D.Or.))

there. Bell was part of a group that applied criteria in place since 1987 which allocated private offices to people who supervise several people or who have a significant need for a confidential work space, such as employees who confidentially counsel others or who work with confidential financial data. Bell and the group knew that Thomas only had two remaining subordinates who were about to be transferred to another supervisor, so the group collectively decided that Thomas, as well as some other employees, no longer required a private office. Once the joint decision was made to move Thomas from his private office, Madrano alone decided the specific location where Thomas would sit.

On September 26, 1995, Madrano told Thomas that he would no longer have a private office and would be moved to a cubicle along a wall. According to Thomas, Madrano told him that it was his decision alone to remove Thomas from his private office. When Thomas asked why, Madrano swore at him and told him it was because he was no longer a supervisor and that nobody wanted Thomas in their group. Thomas believes that Madrano was trying to belittle him because of his EEO complaint against Block. Thomas sent an E-mail to James Floyd, Area Director of the PAO, on November 9, 1995, complaining about being moved from his office. Thomas complained to Floyd about favoritism, because other nonsupervisors retained offices, but he did not mention retaliation.

On January 19, 1996, Thomas received a performance evaluation rating of "excellent" for the 1995 calendar year. He was rated at the higher level of "outstanding" for the 1994 calendar year. People receiving excellent ratings are entitled to twelve extra hours of paid leave; people receiving outstanding ratings are entitled to twenty extra hours of paid leave.

Darlene Marcellay, Director of the Personnel Division for the PAO, states that employees with an outstanding rating are eligible for a Quality Step Increase ("QSI") but that the award is quite rare. A QSI award entitled the person to a cash award of $2,500 to $3,000 and could affect retirement benefits. The PAO is limited to awarding three QSI awards in a calendar year to its 500 employees. None were awarded for 1995 or 1996. Between 30 to 40% of those employees receive an outstanding rating in any year. According to Marcellay, the vast majority of employees who receive outstanding ratings do so year after year without ever receiving a QSI award. Madrano had never nominated any employee under his supervision for a QSI.

Thomas believes that he was entitled to an outstanding rating because he received an award from the Northwest Portland Indian Health Board for saving $12,000. Thomas believes that Madrano reduced his rating because the allegations investigated by Block were not substantiated and because Thomas filed the EEO claim against Block. [FN1] Thomas states that he "was in line" for a QSI if he had received an outstanding rating in 1996 because that would have been his third outstanding rating in a row.

> FN1. Thomas' belief on the connection between his performance review and Madrano's retaliation is in the record in several places. I am ignoring Thomas' deposition testimony from page 55, line 16 through page 60, line 16 after his attorney ignored LR 30.5 and began coaching Thomas while a question was pending.

*3 On February 1, 1996, Madrano and Thomas argued in Madrano's office about the procurement of office copiers. Madrano was waving his fists in the air, screaming, and cursing Thomas. Ronda Sandvik was in Madrano's office at the time and witnessed the argument. Madrano slammed the door, nearly hitting Thomas and causing Sandvik to jump out of the way. Sandvik witnessed Madrano kick his desk and slam his fist onto it. Madrano told Sandvik that he was "going to get [Thomas] once and for all." Plaintiff's Response to Defendant's Concise Statement, Ex. A at 62.

Madrano states that he and Thomas have had several discussions with both of them raising their voices since he became the acting executive officer in November 1993. Michael Smith, a supervisory Operating Accountant, works near Madrano's office. Between 1992 and 1995, he has overheard several loud arguments between Madrano and Thomas. Thomas states that he and Madrano had eight or nine heated discussions beginning when Madrano transferred from South Dakota.

Sandvik has also heard Madrano demean Thomas at staff meetings, including a comment about how Thomas was moving from an office to the floor, as

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



if he was being put into a lower status. Sandvik states that after she filed an EEO complaint against Madrano but before Madrano had been formally notified about the complaint, he described to her a long scenario about how he had deduced that the complainant must be Thomas. According to Sandvik, Madrano would talk in staff meetings about people who had filed complaints against him and would become very irate, yell, point fingers, and call the women who had filed complaints "bitches."

On February 9, 1996, Thomas learned that he would be displaced from his position in a RIF but that he could be reassigned to another position at one pay grade lower.

On February 29, 1996, Block, who was Thomas' new supervisor, gave Thomas an informal job description which described that he could occupy one of two workstations, neither of which is a private office. It was unusual for a job description to give that type of detail. Thomas thinks that Madrano approved of the job description and used it to demean him. Block states that she drafted the informal description so that Thomas would have a good understanding of the position before he accepted the job. She provided the description because she and Thomas had each filed EEO complaints against each other. The official position description given to Thomas on April 26, 1996, mentions the work location in two respects: (1) the cover letter stated that he would remain in his current office for the time being; and (2) the description described the work environment as being performed in an office setting.

On March 4, 1996, Thomas filed a Stage I grievance pursuant to the departmental grievance procedure alleging retaliation by Madrano for Thomas' EEO complaint against Block. On March 7, 1996, Thomas asked that the grievance be converted to an EEO complaint.

*4 On March 13, 1996, Thomas initiated EEO counseling for retaliation.

In April 1996, Thomas went to the EEO counselor to complain that Madrano's evaluation was unfair.

On April 19, 1996, Thomas filed a formal EEO complaint alleging retaliation for filing the complaint against Block.

On November 7, 1996, after Madrano was reassigned from the PAO, he gave memorandums to over twenty PAO employees to explain his thinking about the reassignment. Madrano commented "both complainants had self-serving reasons to try to get rid of me." Plaintiff's response to defendant's concise statement, Ex. F at 18. The two complainants were Thomas and Sandvik.

On December 7, 1996, Thomas sent a letter requesting that his EEO complaint be amended to include his lowered performance evaluation and Madrano's letters to the office as forms of retaliation.

LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Robi v. Reed, 173 F.3d 736, 739 (9th Cir.1999).

DISCUSSION

I. Timeliness of the Claim

The agency contends that many of the incidents stated above are untimely and cannot be considered as part of Thomas' retaliation claim.

Thomas must exhaust his administrative remedies on his claims before filing suit. Vinieratos v. U.S. Depart. of Air Force, 939 F.2d 762, 768 (9th Cir.1991). To begin the process, a federal employee must initiate contact with an EEO counselor within 45 days of the alleged discriminatory action. 29 C.F.R. 1614.105(1)(a). The 45-day deadline is not jurisdictional and is subject to equitable tolling like a statute of limitations. Cosgrove v. Bolger, 775

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



<5>Thomas states that he met with the EEO counselor on August 29, 1995, and complained of retaliation. The EEO counselor closed the informal counseling period for Thomas' complaint against Block on that day or the next and does not appear to have started a new investigation for the retaliation charge. But Thomas has at least raised a factual issue that he initiated counseling within 45 days of the first event. Under this scenario, the remaining events took place within the next six months: loss of his office, the lower performance rating, the argument about copiers with Madrano, the RIF notice and associated informal job description. Although Thomas initiated counseling concerning retaliation a second time in March 1996, I will not dismiss his claim on summary judgment because the EEO process did not begin when he first reported the retaliation in August 1995.</5>

F.2d 1078, 1080 (9th Cir.1985); 29 C.F.R. § 1614.105(a)(2).

Thomas contends that his claim is timely for the following reasons: (1) he complained to Floyd within 45 days of being informed that he would lose his office; (2) the conduct formed a continuing violation; (3) his April 1996 complaint only formalized his March 4, 1996, letter; (4) the effective date of the January 19, 1996, performance evaluation did not take place until August 2, 1996; (5) he did not know that a performance evaluation could be the subject of an EEO complaint; and (6) the agency waived the time limit by never previously raising the issue during the administrative process. Although the agency provides legal reasons why these arguments are insufficient, I do not need to reach the issues for purposes of summary judgment.

\*5 Thomas states that he met with the EEO counselor on August 29, 1995, and complained of retaliation. The EEO counselor closed the informal counseling period for Thomas' complaint against Block on that day or the next and does not appear to have started a new investigation for the retaliation charge. But Thomas has at least raised a factual issue that he initiated counseling within 45 days of the first event. Under this scenario, the remaining events took place within the next six months: loss of his office, the lower performance rating, the argument about copiers with Madrano, the RIF notice and associated informal job description. Although Thomas initiated counseling concerning retaliation a second time in March 1996, I will not dismiss his claim on summary judgment because the EEO process did not begin when he first reported the retaliation in August 1995.

II. Merits of the Retaliation Claim

I will consider the following events as possible retaliatory conduct: (1) loss of the private office; (2) lowered performance evaluation; (3) RIF notice; (4) informal job description; (5) arguments with Madrano; and (6) Madrano memo on his departure from the PAO.

To establish a retaliation claim, a plaintiff can establish a prima facie case by establishing the following factors:
(1) that he was engaging in a protected activity, (2) that he suffered an adverse employment decision, and (3) that there was a causal link between his activity and the employment decision. Trent v. Valley Elec. Ass'n Inc., 41 F.3d 524, 526 (9th Cir.1994). The causal link can be inferred from circumstantial evidence, such as the proximity in time between the protected activity and the retaliatory employment decision. Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.1987) (holding that a two-to-three-month delay was not too long to establish a causal link sufficient to withstand summary judgment and citing with approval Hochstadt v. Worcester Found. for Experimental Biology, Inc., 425 F.Supp. 318, 324-25 (D.Mass.), aff'd, 545 F.2d 222 (1st Cir.1976), which held that a six-month delay could satisfy the causation requirement).

I note that Sandvik's testimony of Madrano's statements about Thomas and other EEO complainants provides evidence of the causal link between Thomas' EEO complaint and Madrano's conduct, but it is not relevant to the second prong of the prima facie case, discussed in detail below.

A. Causal Link

The agency contends that there is no evidence of a causal link between Thomas's protected EEO activity and the loss of his private office.

The record contains a detailed declaration from Bell explaining that a committee applied preexisting criteria and came to a joint decision that Thomas' new work duties did not require a private office. Once that decision was made, Madrano determined where Thomas' new work space would be located. Thomas controverts this in his declaration by stating that Madrano told him that it was Madrano's decision to take away his office and that the tone of the conversation conveyed that Madrano was punishing Thomas by doing so. I am not allowed to weigh the evidence. This is sufficient to create a factual issue that a causal link exists.

\*6 I also note that the record contains evidence that Madrano not only argued with Thomas both before and after Thomas's EEO complaint against Block, but that Madrano was abusive to many of the employees of the PAO, regardless of whether they had engaged in protected activities. I conclude that Thomas has failed to establish a causal link as part

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d                                                                            Page 120
(Cite as: 1999 WL 637214, *6 (D.Or.))

of the prima facie case concerning the arguments and will not consider it further.

   B. Adverse Employment Decisions

The agency also contends that the conduct allegedly suffered by Thomas while supervised by Madrano is not sufficiently onerous to constitute adverse employment decisions. The conduct to be considered is: (1) loss of the private office; (2) lowered performance evaluation; (3) RIF notice; (4) informal job description; and (5) Madrano memo on his departure from the PAO.

The Eighth Circuit has held that an employment action is adverse if it causes "a material change in the terms or conditions of employment." Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir.1997); see also Munday v. Waste Management of North America, Inc., 126 F.3d 239, 243 (4th Cir.1997) ("In no case in this circuit have we found an adverse employment action ... without evidence that the terms, conditions, or benefits of her employment were adversely affected."), cert. denied, 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998).

Although the Ninth Circuit has not explicitly defined what is meant by "adverse employment action," its opinion in Steiner v. Showboat Operating Co., 25 F.3d 1459 (9th Cir.1994), cert. denied, 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995), indicates that it would likely follow the decisions noted above and hold that an employment action is adverse only if it causes a material change in the terms or conditions of employment. In Steiner, the court held that an employee's transfer to a less desirable shift was "just barely--if at all--characterizable as 'adverse' employment action." Id. at 1465 n. 6. The court then mentioned examples more properly characterized as adverse, noting that the plaintiff "was not demoted, or put in a worse job, or given any additional responsibilities." Id. This litany suggests that an employment action is not "adverse" unless it affects, in a tangible way, the terms or conditions of a plaintiff's employment. See also Strother v. S. Cal. Permanente Medical Group, 79 F.3d 859, 869 n. 12 (9th Cir.1996) (citing Steiner in support of the statement that "[n]ot every employment decision amounts to an adverse employment action.").

Consistent with its comments in Steiner, the Ninth Circuit stated in Hashimoto v. Dalton, 118 F.3d 671, 675 (9th Cir.1997), cert. denied, 523 U.S. 1122, 118 S.Ct. 1803, 140 L.Ed.2d 943 (1998), that "[t]raditionally, in cases alleging retaliation, the retaliatory conduct takes the form of discharge, demotion, failure to promote, or similar actions that clearly inflict tangible, employment-related harm upon the employee." The court went on to hold that a retaliatory negative job reference was an adverse "personnel action." Cf. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998) (explaining the term "tangible employment action" as constituting "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Recognizing the Ninth Circuit's rejection of the defendant's "no harm, no foul" argument in Hashimoto, the applicable standard is perhaps best phrased as follows: an employment action is not significant enough to serve as a basis for a retaliation claim unless it has the potential to affect or has affected, in a tangible way, the terms or conditions of a plaintiff's employment.

*7 The loss of a private office is not a significant enough change in the conditions of employment to be considered an adverse employment action. There is evidence that Thomas was moved back to a private office within one year after he transferred during the RIF. Moreover, his cubicle was larger than typical.

The lowered performance evaluation resulted in a loss of eight hours of leave time. This also is not a significant enough change in benefits to be considered an adverse employment action. Similarly, the lowered evaluation's effect on Thomas' ability to win the QSI award is extremely tenuous and insufficient to be an adverse employment action. Without going through the complicated analysis concerning bumping and retreating, Thomas contends that the lowered performance evaluation affected his status in the RIF. The agency provided an analysis and evidence that it did not. In a RIF, an employee's service computation date ("SCD") is adjusted by the results of the last three performance evaluations. Thomas' bump and retreat rights would not have differed if he had received an outstanding rating for 1995 and

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw

Not Reported in F.Supp.2d  
(Cite as: 1999 WL 637214, *7 (D.Or.))

Page 121

his SCD was changed accordingly.

The informal job description Block gave Thomas which stated where he would be physically located has less effect on the terms and conditions of his employment than the actual loss of his private office. Likewise, the memo Madrano circulated on his departure from the PAO which made negative comments about the complainants, one of which was Thomas, may have been embarrassing, but did not affect the terms and conditions of his employment enough to be considered an adverse employment action.

Even if all of these events are considered together, along with the evidence of Madrano cutting Thomas out of staff meetings and not being willing to talk to him, it is not harassment that is severe and pervasive enough to change the terms and conditions of employment as discussed in Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The events are spread over a fourteen-month period.

I want to clearly state that Madrano's conduct in many instances was repugnant and should not have been tolerated for as long as it apparently was at the PAO. Unfortunately for Thomas and the other plaintiffs from that agency, Title VII does not protect employees from this type of conduct.

Accordingly, Thomas has failed to establish the second prong of his prima facie case, that he suffered an adverse employment decision. I grant summary judgment against his retaliation claim.

CONCLUSION

Defendant's motion for summary judgment (# 22) is granted. The action is dismissed with prejudice.

1999 WL 637214 (D.Or.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



TAB P

Not Reported in F.Supp.  Page 306
(Cite as: 1993 WL 431208 (D.Del.))

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

**Herman J. WOOLEY, Plaintiff,**
v.
**COLONIAL SCHOOL DISTRICT and Board of Education of Colonial School District, Defendants.**

Civ. A. No. 91-407 MMS.

May 11, 1993.

Joseph M. Bernstein, Wilmington, DE, for plaintiff.

David H. Williams, and Peter C. Campbell, Morris, James, Hitchens & Williams, Wilmington, DE, for defendants.

MEMORANDUM OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

*1 Currently before the Court is a pretrial request from the defendants, the Colonial School District and Board of Education of the Colonial School District, to include in the jury charge an instruction on failure to mitigate damages. Plaintiff alleges defendants unlawfully discriminated against him because of his race under 42 U.S.C. § 2000e-2 (1988) (Title VII) and under 42 U.S.C. § 1981. D.I. 1 at ¶¶ 1-10. Plaintiff also alleges unlawful discrimination based on age under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623. As part of their defense, defendants assert plaintiff failed to mitigate his damages as required by law and now seek a jury instruction on failure to mitigate. Such an instruction would allow the jury to consider plaintiff's attempts, or lack of attempts, to mitigate damages by seeking higher-paying employment. Unlike cases in which plaintiff made efforts to mitigate and the issue of the mitigation's extent arises, defendants here assert plaintiff failed to mitigate. If the jury were to find plaintiff failed to mitigate, plaintiff will have forfeited any putative back pay award. For the reasons which follow this Court will grant the defendants' request and will instruct the jury on mitigation of damages.

I. Facts

Plaintiff, Herman J. Wooley, alleges defendants discriminated against him by denying him the position of "Supervisor of Maintenance and Operations" on June 27, 1990. D.I. 1 at ¶ 7(e). The position carried with it a yearly salary between $58,851.00 and $64,205.00. D.I. 37 at 4. Before, during and after the alleged discrimination, plaintiff, employed by the Wilmington Housing Authority (WHA), has earned between $32,250.38 and $32,896.50 per year. D.I. 37 at 4. [FN1] After being denied the position with the defendants, plaintiff made a single attempt at promotion within WHA, but withdrew his application because the position was not securely funded. D.I. 49 at A-3, A-4. Besides this one attempt, plaintiff has not applied for any other employment. D.I. 49 at A-4.

II. Discussion

Of the three statutory grounds of plaintiff's complaint, only Title VII contains an express provision which requires mitigation of damages. 42 U.S.C. § 2000e-5(g). That provision requires "interim earnings or amounts earnable with reasonable diligence by the person ... discriminated against shall operate to reduce the back pay otherwise available...." 42 U.S.C. § 2000e-5(g) (1988). To fulfill this statutory duty, a plaintiff must use "reasonable diligence to find other employment." Ford Motor Co. v. EEOC., 458 U.S. 219, 231 (1982).

Neither the ADEA nor § 1981 contain an express mitigation-of-damages provision. However, the United States Court of Appeals for the Third Circuit has applied mitigation of damages in ADEA cases. See, e.g., Carden v. Westinghouse Elec. Corp., 850 F.2d 996, 1005 (3d Cir.1988) (stating defendant in ADEA case must show plaintiff failed to exercise reasonable diligence to seek substantially equivalent employment); Rodriguez v. Taylor, 569 F.2d 1231, 1243 (3d Cir.1977) (finding "the absence of express set-off language in the ADEA enforcement provisions does not compel the inference that Congress intended to preclude set-offs"), cert. denied, 436 U.S. 913 (1978). While § 1981 also does not contain an express provision requiring plaintiff to mitigate damages, the Third Circuit had held the legal standards governing Title VII and § 1981 are interchangeable. Gunby v. Pennsylvania



Not Reported in F.Supp.    Page 307
(Cite as: 1993 WL 431208, *1 (D.Del.))

Elec. Co., 840 F.2d 1108, 1115 n. 9 (3d Cir.1988), cert. denied, 492 U.S. 905 (1989).

*2 While mitigation is plaintiff's duty, "[i]t is the defendant's burden to establish that plaintiff failed to mitigate his damages in order to successfully limit plaintiff's back-pay award." Carden v. Westinghouse Elec. Corp., 850 F.2d at; Robinson v. Southeastern Pennsylvania Transp. Authority, Red Arrow Div., 982 F.2d 892, 897 (3d Cir.1993). Defendants may satisfy this burden by showing "other substantially equivalent positions were available to [plaintiff] and he failed to use reasonable diligence in attempting to secure such a position." Anastasio v. Schering Corp., 838 F.2d 701, 708 (3d Cir.1988) (citations omitted and emphasis added). [FN2] See Wehr v. Burroughs Corp., 619 F.2d 276, 278 n. 3 (3d Cir.1980) (defendant's burden to show both plaintiff's failure to exercise reasonable diligence and reasonable likelihood that plaintiff would have found comparable work).

Defendants do not argue that they are prepared to satisfy both criteria. Instead, defendants argue that if they show plaintiff made no effort to mitigate damages, they are relieved of the burden to show "other substantially equivalent positions were available". Anastasio, 838 F.2d at 708. To support their argument, defendants rely upon a case arising under the National Labor Relations Act (NLRA). Tubari Ltd., Inc. v. NLRB, 959 F.2d 451, 459 (3d Cir.1992). In Tubari, the United States Court of Appeals for the Third Circuit stated, "although [defendant] has not submitted proof that other work was available and it is normally the employer's burden to establish this element of mitigation ... this is irrelevant where, as here, the [plaintiff] made no search for comparable interim employment." Id.

While other courts have likewise altered the defendant's burden in discrimination cases, see, e.g., Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1527 (11th Cir.1991); Sellers v. Delgado Community College, 839 F.2d 1132, 1139 (5th Cir.1988), the Court of Appeals for the Third Circuit has only altered the defendant's burden in Tubari in the NLRA context involving a back-pay award to striking workers. The issue then becomes whether to treat the duty to mitigate differently in discrimination cases than in NLRA cases.

The mitigation provision of the NLRA "served as the model for Title VII's back-pay provisions." Maxfield v. Sinclair Int'l., 766 F.2d 788, 793 (3d Cir.1985), cert. denied, 474 U.S. 1057 (1986). It is not surprising, therefore, that courts have treated the duty to mitigate similarly under Title VII and the NLRA. For instance, in outlining the duty to mitigate under Title VII in Ford Motor Co. v. EEOC, the Supreme Court relied extensively on cases arising under the NLRA. Ford Motor Co. v. EEOC, 458 U.S. 219, 231-34. While this legal similarity alone may justify extension of Tubari into civil rights cases, support for altering the rationale for the mitigation of damages doctrine also supports extending the doctrine.

*3 In a NLRA case, upon which the Supreme Court relied in Ford Motor Co. v. EEOC, that Court, by Justice Frankfurter, explained the reasoning behind mitigation of damages:
> Making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the [National Labor Relations] Board enforces. Since only actual losses should be made good, it seems fair that deductions should be made not only for actual earnings by the worker but also for losses he willfully incurred.

Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197-98 (1941) quoted in Ford Motor Co. v. EEOC, 458 U.S. at 231, n. 15. In considering what amounts to "actual damages", it is difficult to justify awarding plaintiff those damages which plaintiff himself could have avoided and a statute, or case law, requires him to avoid. Unlike the lost earnings incurred because of discrimination, the losses incurred by plaintiff's failure to mitigate are incurred at plaintiff's own choice. When a plaintiff chooses not to seek better employment, the loss of earnings he suffers occurs at his hands, and the law does not compensate such injury. [FN3]

In light of plaintiff's decision not to seek other employment, defendants are entitled to a jury instruction on failure to mitigate regardless of the availability of equivalent work. Plaintiff's decision to remain in his current employment makes it pointless for defendants to offer evidence of the potential job opportunities plaintiff may have found. No matter what opportunities awaited plaintiff, plaintiff had made his choice not to seek them out. As in Tubari, evidence of the work available is

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                      Page 308
(Cite as: 1993 WL 431208, *3 (D.Del.))

"irrelevant where, as here, the [plaintiff] made no search for comparable interim employment." 959 F.2d at 459.

For the forgoing reasons, the Court will grant defendants' request that the jury be allowed to decided whether plaintiff failed to mitigate damages when he chose to remain at his current position.

> FN1. The respective salary figures are based on the stipulation of facts contained in the parties' pretrial order. D.I. 37. The figures represent the years 1990, 1991 and 1992.
>
> FN2. As the appellate court explained in Anastasio, defendant could also satisfy the burden by showing "it offered [plaintiff] a job that was substantially equivalent" to the disputed position. Anastasio, 838 F.2d at 708. This means of satisfying the burden is not at issue in this case.
>
> FN3. This reasoning would not apply when plaintiff had a legitimate reason for not seeking other employment. For instance, in denial of promotion cases, courts have recognized that plaintiff should not have to jeopardize seniority or status with the company in order to mitigate damages. See, e.g., EEOC v. Safeway Stores, Inc., 634 F.2d 1273, 1285 (10th Cir.1980) (finding plaintiff's decision to remain "secure in a long-term position" was "prudent under the circumstances"), cert. denied sub nom. Safeway Stores, Inc. v. Crespin, 451 U.S. 986 (1981). Such reasoning, applicable in failure to promote cases, does not apply to plaintiff's claim for failure to hire. See Jurgens v. EEOC, 903 F.2d 386, 389 n. 4 (5th Cir.1990) (finding duty to mitigate satisfied by remaining on the job in failure to promote case and expressly distinguishing cases of "persons not in an existing relationship with the discriminating employer"). Similarly, there could be other factual scenarios which would excuse the duty to mitigate.

1993 WL 431208 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Wo



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KENNETH COLE,<br>BRIGITTE L. BROWN,<br><br>      Plaintiffs,<br><br>      v.<br><br>DELAWARE TECHNICAL AND<br>COMMUNITY COLLEGE,<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)  C. A. No. 05-270 KAJ<br>)<br>)<br>)<br>)<br>) |

### CERTIFICATE OF SERVICE

I, James H. McMackin, III, hereby certify that on April 17, 2006, I electronically filed the attached **COMPENDIUM OF UNREPORTED OPINIONS CITED IN DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Jeffrey K. Martin, Esquire
> Lori A. Brewington, Esquire
> Margolis and Edelstein
> 1509 Gilpin Avenue
> Wilmington, DE  19806

> MORRIS, JAMES, HITCHENS & WILLIAMS LLP

> _/s/ James H. McMackin_
> David H. Williams (#616)
> dwilliams@morrisjames.com
> James H. McMackin, III, Esquire
> jmcmackin@morrisjames.com
> 222 Delaware Avenue
> P.O. Box 2306
> Wilmington, DE 19899
> (302) 888-6900/5849
> Attorneys for Defendant

Dated:  April 17, 2006