# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KENNETH COLE,<br>BRIGITTE BROWN, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-270 (KAJ) |
| | ) | |
| DELAWARE TECHNICAL AND | ) | |
| COMMUNITY COLLEGE, | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

David H. Williams (#616)
dwilliams@morrisjames.com
James H. McMackin, III ) (#4284)
jmcmackin@morrisjames.com
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900/5849
Attorneys for Defendant

Dated:  April 17, 2006

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................ i

NATURE AND STAGE OF THE PROCEEDINGS ....................................................1

STATEMENT OF FACTS ..........................................................................2

SUMMARY OF ARGUMENT .........................................................................8

ARGUMENT.....................................................................................10

I.     SUMMARY JUDGMENT SHOULD BE GRANTED IF
THERE IS NO GENUINE ISSUE AS TO ANY
MATERIAL FACT AND THE MOVING PARTY IS
ENTITLED TO JUDGMENT AS A MATTER OF LAW....................10

II.    THE ABSENCE OF AN ADVERSE EMPLOYMENT
ACTION IS FATAL TO A TITLE VII EMPLOYMENT
DISCRIMINATION CLAIM ................................................................11

    A.    The Elements Of A Title VII *Prima Facie* Case .......................11

    B.    Absent Extraordinary Circumstances, The Relocation
Or Assignment Of Office Space Is Not An Adverse
Employment Action ..................................................................11

        1.    Introduction...................................................................11

        2.    An Objective Standard Must Be Applied In
Determining Whether There is Adverse Employment
Action............................................................................12

        3.    Extraordinary Circumstances Surrounding This
Office Relocation Are Absent Here................................16

        4.    Plaintiffs Who Establish An Office Relocation Was
Inconvenient And Made Them Unhappy Are Inviting
The Court To Improperly Trivialize Title VII ...............17

        5.    Plaintiffs' Effort to Contend The Office Relocation
Was Discriminatory Is Inconsistent With Their
Initial Argument The Relocation Was Inefficient
And Would Impact Morale ............................................18

6.     The Circumstances Surrounding The Relocation Of The UBMS Department Do Not Give Rise To An Inference Of Discrimination Because Plaintiffs Admit The Alleged Discrimination Did Not Involve Them, But Instead Involved Non-Party Employees ......20

7.     The Plan to Relocate The UBMS Department Long Predated Brown and Cole's Employment......................20

C.    Insisting The Plaintiffs Adhere To College Policies And Be Accountable Is Not Adverse Employment Action ...............21

III.    PLAINTIFFS CANNOT ESTABLISH A *PRIMA FACIE* CASE OF RACE DISCRIMINATION REGARDING THE MORRIS RECLASSIFICATION BECAUSE THE COLLEGE COULD NOT HAVE KNOWN COLE WANTED THE POSITION, HE COULD NOT HAVE WORKED THE HOURS REQUIRED OF THE POSITION, AND THE COLLEGE WAS NOT SEEKING APPLICANTS FOR THE POSITION....................................................22

A.    The College Could Not Have Known Cole Was Interested In Morris' Position .....................................................22

B.    Cole Could Not Have Accepted Morris' Position, Even If It Was Posted And He Was Awarded The Job ..........................24

C.    The College Was Not Seeking Applicants At The Time Morris Became The Special Program Manager ...............24

IV.    TO STATE A RETALIATION CLAIM, PROTECTED ACTIVITY MUST PRECEDE AND BE CAUSALLY LINKED TO ADVERSE ACTION ...........................................................................25

A.    Elements Of A *Prima Facie* Claim Of Retaliation....................25

B.    Employment Action Which Predates Protected Activity Cannot Constitute The Basis For A Retaliation Claim ......................................................................26

               C.      Requiring A Plaintiff To Work The Same Hours Required
Of All College Employees Is Not Retaliation Or Adverse
Employment Action ................................................................. 29

V.      A PLAINTIFF WHO NEVER SOUGHT A TRANSFER CANNOT
ASSERT THE EMPLOYER'S FAILURE TO TRANSFER
THE PLAINTIFF CONSTITUTES RETALIATION ........................... 30

VI.     A PLAINTIFF WHO FAILS TO APPLY FOR A PROMOTION
CANNOT MEET HIS BURDEN OF ESTABLISHING A
*PRIMA FACIE* CASE OF RETALIATION OR RACE
DISCRIMINATION BY CLAIMING HE WAS DENIED
THE PROMOTION ............................................................. 31

VII.    PLAINTIFFS CANNOT ESTABLISH RETALIATION BASED
UPON A HOSTILE WORK ENVIRONMENT .................................... 34

VIII.   WHERE PLAINTIFFS FAIL TO ALLEGE FRAUD, DECEIT
OR MISREPRESENTATION, THERE IS NO BREACH OF
THE COVENANT OF GOOD FAITH AND FAIR DEALING ........... 36

IX.     CLAIMS FOR PROSPECTIVE EARNINGS MUST BE
DENIED WHEN A PLAINTIFF RESIGNS, FAILS TO
MITIGATE, AND OFFERS NO EVIDENCE TO SUPPORT
A CLAIM FOR PROSPECTIVE EARNINGS ...................................... 36

CONCLUSION .............................................................................................. 40

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................................10, 19

*Annett v. Univ of Kansas*,
82 F. Supp. 2d 1230 (D. Kan. 2000)............................................................19

*Baselice v. Philadelphia Federation of Teachers Health*,
2002 WL 827128 (E.D.PA.) ...........................................................................37

*Bishop v. Inacom, Inc.*,
1999 WL 1416919 (D.N.J. Dec. 1, 1999).....................................................35

*Bickerstaff v. Vassar College*,
354 F. Supp. 2d 276, n. 6 (S.D. NY 2004),
*aff'd* 160 Fed. Appx. 61 (2nd Cir. 2005) ......................................................13, 14, 17

*Bray v. Marriott Hotels*,
110 F.3d 986 (3rd Cir. 1997) .........................................................................19

*Buffa v. NJ Dept. of Judiciary*,
56 Fed. Appx. 571 (3rd Cir. 2003)..................................................................21

*Bulkoski v. Bacharach, Inc.*,
1 F. Supp. 2d 484 (W.D.Pa., 1997),
*aff'd* 149 F3d 1163 (3rd Cir. 1998)..................................................................37

*Bullock v. Children's Hosp. of Phila.*,
71 F. Supp. 2d 482 (E.D. Pa. 1999) ..............................................................32

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................10

*Clary v. Marley Cooling Tower Company*,
1997 WL 150048 (D. Kan. March 12, 1997)................................................15, 18

*Daniel v. Skudder Kemper Investments, Inc.*,
2002 WL 1160934 (N.D. Ill. May 23, 2002) .................................................17

*Daves v. Payless Cashways, Inc.*,
661 F.2d 1022 (5th Cir. 1981) ........................................................................23, 25

*Durham Life Ins. Co. v. Evans,*
 166 F.3d 139 (3rd Cir. 1999) ...............................................................................14

*E.I. DuPont de Nemours & Co. v. Pressman,*
 679 A.2d at 436 (Del. 1996) ............................................................................36

*Faragher v. City of Boca Raton,*
 524 U.S. 775 (1998)..........................................................................17, 22, 34

*Farrell v. Planters Lifesavers Co.,*
 206 F.3d 271 (3d Cir. 2000)..............................................................................25

*First Nat'l Bank of Arizona v. Cities Services Co.,*
 391 U.S. 253  (1968)..........................................................................................39

*Floyd v. Mellon Bank,*
 1991 WL 30755 (E.D.PA.1991) ........................................................................39

*Fuentes v. Perskie,*
 32 F.3d 759 (3d Cir. 1994)..............................................................................33

*Gomez v. Alleghany Health Services, Inc.,*
 71 F.3d 1079 (3rd Cir. 1995) ............................................................................38

*Goosby v. Johnson and Johnson Medical, Inc.,*
 228 F.3d 313 (3rd Cir. 2000) ...........................................................................34

*Goss v. Exxon Office Systems Co.,*
 747 F.2d 885 (3rd Cir. 1984) ...........................................................................37

*Grande v. State Farm Mut. Auto. Ins. Co.,*
 83 F. Supp. 2d. 559 (E.D. PA. 2000).............................................................12, 13

*Gray v. York Newspapers, Inc.,*
 957 F.2d 1070 (3rd Cir. 1992) ..........................................................................37

*Green v. Edward J. Bettinger Co.,*
 608 F. Supp. 35 (E.D. PA 1984),
 *aff'd* 791 F.2d 917 (3d Cir. 1986)....................................................................25

*Haimovitz v. US Dept. of Justice,*
 720 F. Supp. 516 (W.D. PA 1989),
 *aff'd* 902 F.2d 1560 (3d Cir. 1990)................................................................13, 17

*Hamlett v. Gonzales,*
  2005 WL 1500819 (N.D. Tex, June 15, 2005) .................................................14, 18

*Hampton v. Tokai Fin. Servs.,*
  2001 WL 881443 (E.D. PA. May 7, 2001)........................................................31

*Harris v. Forklift Sys., Inc.,*
  510 U.S. 17 (1993)..........................................................................................34

*Hay v. GMAC Mortg. Corp.,*
  2003 WL 22133801 (E.D.PA. Sept. 15, 2003) ...................................................28

*Kidd. v. Pennsylvania,*
  2002 WL 1343624 (3rd Cir. June 19, 2002) .......................................................35

*Lafate v. Chase Manhattan Bank (USA),*
  123 F. Supp. 2d 773 (D. Del. 2000)....................................................................16

*Lawrence v. Nat'l Westminster Bank N.J.,*
  98 F.3d 61 (3d Cir. 1996)....................................................................................33

*Leibovitz v. New York City Transit Auth.,*
  252 F.3d 179 (2d Cir. 2001)...............................................................................35

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)...........................................................................................20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986)...........................................................................................10

*McBride v. Hospital of the University of Pennsylvania,*
  2001 WL 1132404 (E.D.PA. September 21, 2001) ...........................................28

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973)...................................................................................11, 12, 21,
                                                 22, 31

*McLaughlin v. Rose Tree Media School Dist.,*
  52 F. Supp. 2d 484 (E.D.PA.1999) .....................................................................37

*Mobley v. City of Atlantic City Police Dept.,*
  2000 WL 363692 (D.N.J. March 30, 2000).........................................................17

*Muller v. United States Steel Corp.,*
  509 F.2d 923 (10th Cir.), *cert. denied,* 423 U.S. 825 (1975)..............................37

*Murray v. City of Winston-Salem,*
  203 F. Supp. 2d 493 (M.D. NC 2002) ................................................................15

*Narin v. Lower Merion School Dist.,*
  206 F.3d 323 (3rd Cir. 2000) .............................................................................25

*Nielsen v. Acorn Corrugated Box Co.,*
  2002 WL 1941365 (N.D. Ill. Aug. 21, 2002) ......................................13, 14, 17

*Obi v. Anne Arundel County, MD,*
  142 F. Supp. 2d 655 (D. MD 2001),
  *aff'd* 28 Fed. Appx. 333 (4th Cir. 2002) ............................................................18

*Olabode v. William Hecht Inc.,*
  1997 WL 805187 (E.D. PA Dec. 30, 1997)........................................................38

*Parker v. Univ. of Penn.,*
  128 Fed.Appx. 944 (3rd Cir. 2005)..............................................................23, 31

*Penn State Police v. Suders,*
  542 U.S. 129 (2004)...........................................................................................39

*Pivirotto v. Innovative Sys., Inc.,*
  191 F.3d 344 (3d Cir. 1999)...............................................................................32

*Reed v. Agilent Technologies, Inc.,*
  174 F. Supp. 2d 176 (D. Del. 2001)....................................................................36

*Robinson v. BT Financial Corporation,*
  2003 WL 288402 (W.D. PA Feb. 11, 2003)........................................................13

*Robinson v. City of Pittsburgh,*
  120 F.3d 1286 (3rd Cir. 1997) ...........................................................................12

*Schafer v. Board Of Public Education of the School District of Pittsburgh, Pa.,*
  903 F.2d 243 (3rd Cir. 1990) .............................................................................37

*Seely v. Runyon,*
  966 F. Supp. 1060 (D. Utah, 1997),
  *aff'd* 166 F.3d 248 (10th Cir. 1998)....................................................................15

*Singletary v. District of Columbia,*
  351 F.3d 519 (D.D.C. 2003) ..............................................................................18

*Slagle v. County of Clarion,*
  435 F.3d 262 (3rd Cir. 2006) .............................................................................28

*Taylor v. Proctor & Gamble Dover Wipes,*
  184 F. Supp. 2d 402 (D. Del. 2002),
  *aff'd* 53 Fed. Appx. 649 (3[d] Cir. 2002) ....................................................................11

*Thomas v. Secretary of Health and Human Services,*
  1999 WL 637214 (D. OR. Aug. 20, 1999) ...............................................................15

*Walden v. Georgia Pacific Corporation,*
  126 F.3d 506 (3rd Cir.1997) ....................................................................................19

*Wanamaker v. Columbian Rope Company,*
  108 F.3d 462 (2nd Cir. 1997) .......................................................................... 25, 29

*Weston v. Pennsylvania,*
  251 F.3d 420 (3d Cir. 2001)....................................................................................25

*Woodson v. Scott Paper Co.,*
  109 F.3d 913 (3d Cir.1997)......................................................................................38

*Wooley v. Colonial School Dist.,*
  1993 WL 431208 (D. Del. 1993) ............................................................................10

## Statutes and Other Authorities

Fed. R. Civ. P. 56(c) ................................................................................................10

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs in this case claim the assignment of office space rises to the level of a Title VII violation. Plaintiffs also allege retaliation and racial discrimination in connection with the failure to promote or transfer to positions they did not, with one exception, apply for; and requiring the Plaintiffs to comply with the policies applicable to other employees. On May 5, 2005, Plaintiff Brigitte L. Brown ("Brown") and Plaintiff Kenneth Cole ("Cole", and together with Brown, the "Plaintiffs") each filed a complaint (respectively, the "Brown Complaint" and the "Cole Complaint," and collectively, the "Complaints") alleging racial discrimination, retaliation, failure to promote, and breach of the covenant of good faith and fair dealing against Delaware Technical and Community College (the "College"). On July 8, 2005, the College answered each of the Complaints and asserted affirmative defenses. On August 25, 2005, the Court ordered that Brown's case and Cole's case be consolidated. Discovery is complete. This is the College's brief in support of its motion for summary judgment (the "Motion").

1

## STATEMENT OF FACTS

### Paul Morris' "Promotion"

The Complaints dispute Paul Morris' ("Morris") reclassification in 2002 to Special Programs Director. In July 2002, Dr. Ann DelNegro ("DelNegro"), a Special Programs Director at the College, was promoted to Assistant Director of the College's Corporate and Community Programs division ("CCP"). Shortly thereafter, Morris, a Program Manager for Educational Talent Search, one of CCP's programs, took on some of DelNegro's duties. (A 2-3)[1].

On July 8, 2002, a memo was issued which reclassified Morris from Program Manager to Special Programs Director. (A 5). This reclassification was announced in an August 12, 2002 newsletter, issued by Dr. Susan Zawislak, ("Zawislak") but it mistakenly announced Morris was "promoted" to Special Programs Director, rather than reclassified as such.

On September 5, 2002, Cole filed a grievance, claiming the Morris "promotion" to Special Programs Director violated College policy because the position was not posted. (A 6-9). On September 9, 2002, Zawislak sent a memo to all CCP staff clarifying that Morris' position was reclassified. (A 10). Cole's grievance was ultimately found by the College to be without merit because Morris was not "promoted," and, therefore, no violation of College policy occurred in not posting the position. (A 11).

On October 15, 2002, Cole filed a charge of discrimination with the Delaware Department of Labor, alleging, *inter alia*, that he was not provided an opportunity to post or apply for the position of Special Programs Director. (A 12). The College had no

---

[1] Citations to the Appendix, filed contemporaneously herewith, are designated "(A __)".

2

reason to suspect he wanted the position. Cole was a part-time employee who never applied for a full-time position, or expressed a desire to work full-time (A 17). Moreover, it is doubtful that he could have worked the full-time hours demanded of Morris' position. Cole was a part-time employee because he owned and operated a business. Cole left his College job each day and reported to work at his business. (A 14-16).

**The Office Relocation**

The Complaints dispute the location of Plaintiffs' office and allege they were assigned to the office because they are African-American, and the office was occupied previously by Caucasians. A program report was issued on October 18, 1998 for program years 2000-2005 indicating that the Upward Bound Math/Science ("UBMS") department, a subset of CCP, eventually would be located in a central office. (A 29-30). Cole started working at the College in 1999. (A 31). Brown started working at the College in 2001. (A 32). Both worked in the UBMS department. (A 33).

Going back to at least 1999, it was a continuing goal of the College to "reexamine existing office space and reallocate where appropriate." (A 37). The Fund Year 2000 achievement report repeated the plan to examine and relocate the UBMS office space. (A 40). The same goal appears in the Fund Year 2001 report. (A 43).

On August 5, 2002, the relocation of the UBMS department was discussed at a Program Manager's meeting. (A 45-47). It was determined that the UBMS department would be relocated to office 408 ("Office 408") at the College's Wilmington campus. Before being relocated, UBMS staff were in "semi-private" offices. (A 48). The UBMS

3

staff was informed of the relocation to Office 408 on August 12, 2002. (A 51). Brown and Cole immediately expressed their displeasure.

The following communications and meetings addressed Brown and Cole's concerns about the relocation of UBMS staff:

1.     On August 13, 2002, the former Program Manager for UBMS, Rosetta Henderson ("Henderson"), informed Morris that the UBMS staff wanted to discuss the proposed relocation. (A 71).

2.     On August 14, 2002, the UBMS staff sent an e-mail to Zawislak claiming the relocation would impact "employee relations, employee morale, and employee productivity." (A 72).

3.     Upon her return from vacation on August 23, 2002, Zawislak received the August 14th e-mail and asked Henderson, the UBMS supervisor, to handle the matter. (A 73).

4.     On August 28, 2002, Henderson sent an e-mail to Morris and DelNegro requesting they meet with the UBMS staff. (A 74). The next day, Morris and DelNegro met with the UBMS staff and discussed the office relocation. (A 75-76). Plaintiffs complained in this meeting about employee relations, morale and productivity. (A 75-76). At the end of the meeting, DelNegro stated there was no credible reason to change plans and she would recommend to Zawislak that the relocation proceed. (A 75-76).

5.     On August 30, 2002, Brown sent an e-mail asking Zawislak to meet with UBMS staff concerning the relocation. (A 77).

4

6.    On September 3, 2002, Plaintiffs met with the College's Human Resources department to discuss the relocation. (A 78-80). At this meeting, Cole revealed his intent to file a grievance. (A 80).

7.    Subsequently, Dr. Connie Winner ("Winner"), the Assistant Campus Director, directed Zawislak to meet with UBMS staff, one on one, to explore their complaints about the relocation.

8.    At another supervisor's meeting on September 4, 2002, DelNegro, Henderson, Morris, and Zawislak once again discussed the relocation. (A 81-84).

9.    On September 5, 2002, Zawislak and DelNegro met with Brown individually to discuss the relocation. (A 85-87). That same day, Cole filed his first grievance.

10.    On September 11, 2002, Zawislak, DelNegro and Cara Stanard ("Stanard") met with Cole and discussed his objections to the move. (A 88).

11.    On October 2, 2002, Zawislak and DelNegro met with Plaintiffs and their secretary, Liz Wilson ("Wilson"), to explain the office relocation was going forward on October 8th. (A 89-90).

12.    The day before the move, Plaintiffs contacted Winner to request another meeting regarding the relocation. Winner confirmed the relocation was approved. (A 91).

13.    On October 7, 2002, Cole filed a supplement to his grievance. (A 92).

The UBMS department was relocated to Office 408 on October 8, 2002. (A 57). Thereafter, Brown and Cole contacted the Fire Marshall, who evaluated Office 408 and confirmed the occupancy of Room 408 by the UBMS staff presented no safety issues. (A

5

93-94).  Brown worked in Office 408 until she resigned on June 27, 2005, almost 3 years

after the relocation.  Cole continues to work in Office 408 with a full-time secretary and

Brown's replacement – neither of whom are parties to this case, and both of whom are

African-American.                    **REDACTED**

**"Micro-Management"**

At all relevant times until                    in February 2004,             was

the Program Manager for the UBMS department.  (A 95-98).              failed to

supervise the UBMS department adequately.  (e.g., A 95-98; 99-101).  In or around

September 2002,              ineffectiveness as a manager surfaced and corrective

action was pursued. (A 96; 102-104).  In order to provide for accountability and ensure

compliance with the Federal education grant which funded the UBMS department, the

College determined more oversight of the UBMS department was necessary.  (A 105-

106).  This oversight revealed, among other things, that leave from work was being

granted without adequate documentation, travel request forms were not being completed

as required, and employees were working hours other than the College's required working

hours (i.e. from 8:30 a.m. through 4:30 p.m.).  (A 107-108).  An investigation led the

College to take remedial action. Plaintiffs, unaware due to employee confidentiality that

                    was under scrutiny for her ineffective management skills, assumed

incorrectly the enhanced scrutiny over their department was due to their race.[2] Plaintiffs

complained about their working hours to various administrators at the College, who

concluded that Brown was to work the hours of 8:30 a.m. through 4:30 p.m. because her

---

[2] The College recognizes that the Plaintiffs' lack of knowledge of
employment issues is a factual matter, and therefore, not presented for summary
judgment.

6

DHW/007409-0132/1351021/7

request for an alternate schedule was for personal reasons. (A 109). The College maintained its request that Cole provide documentation to support his contention he was unable to work regular College hours due to illness. (A 110). He refused to provide this information. (A 111-112).

**Promotions and Transfers**

Both Brown and Cole allege they were denied promotions and transfers on the basis of race and retaliation. (A 64; A 130). Cole never requested a promotion or transfer, and Brown never requested a transfer. (A 22; A 152-153). Brown applied for the position of Program Manager when the position became vacant as a result of termination in February 2004. (A 159-163).

The Program Manager position was posted from March 15, 2004 through March 29, 2004. (A 164). Brown applied, but did not receive the position. (A 165). The final candidate was African-American, with a master's degree and prior supervisory experience. This candidate did not accept the position. (A 166).

The Program Manager position was posted again from June 14, 2004 through June 28, 2004. (A 167). Brown applied and received an interview, but was not selected. (A 168). The final candidate, an African-American, was scheduled for a final interview, but canceled the interview. (A 169).

The Program Manager position was posted a third time from September 4, 2004 through September 20, 2004. Brown did not apply. Ultimately, Andrea Coleman, an African-American, was awarded the position. (A 128).

REDACTED

DHW/007409-0132/1351021/7

## SUMMARY OF ARGUMENT

1.      The relocation of Plaintiffs' office space is not adverse employment action because it made Plaintiffs unhappy, and at most presented an inconvenience.

2.      The relocation of Plaintiffs' office space cannot constitute retaliation for protected activity given the fact that the decision to relocate preceded the protected activity.

3.      Insisting Plaintiffs adhere to College policies was not adverse employment action.

4.      A half-hour switch in working hours is not adverse employment action.

5.      The failure to promote a plaintiff to a full-time position was not discriminatory or retaliatory given the fact the plaintiff was part-time and never expressed an interest in a full-time position.

6.      Plaintiffs who do not seek transfers or promotions cannot claim the failure to be awarded such transfers or promotions constitutes race discrimination or retaliation.

7.      A stray, isolated remark by a student coupled with an office location Plaintiffs found inconvenient and caused Plaintiffs to be unhappy, does not even approach the showing required to establish a hostile work environment.

8.      When a promotion sought by a Plaintiff is awarded to a member of the protected class, the absence of any evidence of a discriminatory or retaliatory motive dictates the conclusion plaintiff fails to establish an inference of discrimination.

9.      The absence of allegations of fraud, deceit or misrepresentation is fatal to a claim based on a breach of the covenant of good faith and fair dealing.

8

10.    A plaintiff's voluntary resignation precludes an award of damages for loss of pay subsequent to the resignation.

11.    Plaintiffs' inability to substantiate prospective earnings with expert testimony bars claims for such relief.

## ARGUMENT

I.  **SUMMARY JUDGMENT SHOULD BE GRANTED IF THERE IS NO GENUINE ISSUE AS TO ANY MATERIAL FACT AND THE MOVING PARTY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW**

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment against a party who fails to offer admissible evidence sufficient to establish the existence of every element essential to that party's case and on which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 327 (1986) (the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action'") (internal citations omitted). Thus, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In responding to a motion for summary judgment, a plaintiff must "make a showing sufficient to establish the existence of [every] element essential to his case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To avoid summary judgment, a plaintiff must offer "concrete evidence from which a reasonable [trier of fact] could return a verdict in his favor" and may not rely on unsupported assertions, conclusory allegations, or mere suspicions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

10

The Plaintiffs allege the College discriminated against them in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") by (i) relocating their department's workspace, (ii) micro-managing the UBMS department, (iii) changing their working hours, (iv) "promoting" Morris to Special Programs Director, and (v) failing to promote Brown. As demonstrated below, Plaintiffs cannot carry their burden of coming forward with facts to support their claims, and, therefore, the Court should grant summary judgment to the College.

## II.    THE ABSENCE OF AN ADVERSE EMPLOYMENT ACTION IS FATAL TO A TITLE VII EMPLOYMENT DISCRIMINATION CLAIM

### A.    The Elements Of A Title VII *Prima Facie* Case

To establish a *prima facie* case, a plaintiff must initially introduce evidence showing that (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he suffered an adverse employment action, and (4) that the circumstances surrounding the adverse action give rise to an inference of unlawful discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Taylor v. Proctor & Gamble Dover Wipes*, 184 F. Supp. 2d 402, 408-409 (D. Del. 2002), aff'd 53 Fed. Appx. 649 (3rd Cir. 2002). If the plaintiff is able to establish a *prima facie* case, the burden of production then shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the employment action. *Id.* Then the plaintiff must point to sufficient evidence to cast sufficient doubt that the reason proffered by the employer is a pretext. *Id.*

### B.    Absent Extraordinary Circumstances, The Relocation Or Assignment Of Office Space Is Not An Adverse Employment Action

#### 1.    Introduction

11

Here, Plaintiffs attempt to carry the burden of establishing a *prima facie* case by alleging the relocation of the UBMS department to Office 408 in October 2002 was an act of racial discrimination because the UBMS department was composed of African-American employees, the Plaintiffs allegedly felt embarrassed and humiliated and experienced stress as a result of the relocation of the UBMS office space and felt they had to keep the door to the office closed because they allegedly were subject to remarks and stares by students walking by Office 408.[3]  (A 121-122).   These allegations fall far short of establishing a *prima facie* case of racial discrimination.   The absence of an adverse employment action is the missing element of a *prima facie* case.

### 2.    An Objective Standard Must Be Applied In Determining Whether There Is Adverse Employment Action

Plaintiffs bear the burden of establishing, among other things, that the relocation of the UBMS office space to Office 408 was an adverse employment action. *McDonnell Douglas*, 411 U.S. at 802.  Adverse employment action is "conduct other than discharge or refusal to rehire [which] alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affect[s] his [or her] status as an employee.'" *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3rd Cir. 1997).  Stated another way, adverse action "must be serious and tangible enough to alter an employee's compensation, terms, conditions or privileges of employment." *Grande v. State Farm Mut. Auto. Ins. Co.,* 83 F. Supp. 2d. 559, 563-564 (E.D. PA. 2000). Importantly, "not everything that makes an employee unhappy" is an adverse employment action. *Robinson* at 1300. Any other rule would allow "minor

---

[3] Additionally, Plaintiffs have alleged that they were punished.  However, the Plaintiffs were never disciplined.  (A 27).

12

and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like" to result in a discrimination suit.  *Id.*  As a consequence, whether or not an adverse employment action has occurred must be decided using an objective standard. *Haimovitz v. US Dept. of Justice*, 720 F. Supp. 516, 526-527 (W.D. PA 1989), aff'd 902 F.2d 1560 (3rd Cir. 1990); *Grande,* 83 F. Supp. 2d. at 564; *Robinson v. BT Financial Corporation*, 2003 WL 288402 at *5 (W.D. PA Feb. 11, 2003)[4] (subjective evidence, including that the plaintiff "intensely dislike[s]" a relocation, is insufficient to show an adverse employment action).

Application of an objective standard to the relocation of the UBMS department leads to the inescapable conclusion the office move was not an adverse employment action.

Office 408 plainly was not an inferior workspace and did not change a term, condition or privilege of their employment as evidenced by the undisputed record and relevant caselaw.  Indeed, Plaintiffs admit:

• The equipment available to the UBMS department is equal to the equipment available to other TRIO departments. (A 141). Each member of the UBMS staff had in Office 408 their own furniture, desk, chair, computer, and phone. (A 25-26). Indeed, the UBMS department may even have more computer equipment than do the other TRIO programs. (A 26; A 141). These facts show that Office 408 was equipped adequately. *See Bickerstaff v. Vassar College*, 354 F. Supp. 2d 276, n. 6 (S.D. NY 2004), aff'd 160 Fed. Appx. 61 (2nd Cir. 2005) (finding  no adverse employment action even when plaintiff was denied equipment, such as a printer); *Nielsen v. Acorn Corrugated Box Co.,*

---

[4] Unreported cases are located in the Compendium, filed contemporaneously herewith.

13

2002 WL 1941365 at *2, 6 (N.D. Ill. Aug. 21, 2002) (finding that moving the plaintiff to a "'broken down tiny little makeshift desk' that had 'dangerous wires all over the place'" did not amount to adverse employment action for purposes of a summary judgment motion even though the desk was "so small and unstable that it interfered with [plaintiff's] ability to do her job."). Here, the UBMS department brought with them to Office 408 new furniture. (A 144).

• The office was lit adequately and provided direct sunlight. (A 142). *See Bickerstaff*, 354 F. Supp. 2d at 282 (finding that a relocation of office space was not an adverse employment action because, *inter alia*, plaintiff had sufficient lighting to complete her job duties).

• The office was accessible by two different entry doors. (A 143). *See Hamlett v. Gonzales*, 2005 WL 1500819, *15 (N.D. Tex, June 15, 2005) (granting summary judgment to defendant because, *inter alia*, office space of which plaintiff complained was accessible easily).

• The UBMS department was located in a private office as opposed to a hallway. (A 144). *See Nielsen*, 2002 WL 1941365 at 6* (finding that moving the plaintiff to a less pleasing workspace that lacked privacy was not adverse employment action).

• The UBMS staff members had a secretary both before and after the relocation to Office 408. (A 144). *Compare Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153 (3rd Cir. 1999) (finding that taking away a secretary could amount to adverse employment action when having a secretary was a negotiated condition of employment).

• There was no loss of salary, benefits, title or responsibilities as a result of the office relocation. (A 28; A 146). *See Nielsen*, 2002 WL 1941365 at *6 (finding for

14

purposes of summary judgment that a move to a less pleasing workspace was not adverse employment action when the plaintiff's responsibilities, title and pay did not change); *Seely v. Runyon*, 966 F. Supp. 1060, 1065 (D. Utah, 1997), aff'd 166 F.3d 348 (10th Cir. 1998) (same).

• The offices from where the UBMS department was relocated to Office 408 were small offices, as is Office 408. (A 150).

• There were no safety concerns in Office 408. (A 25). *See Clary v. Marley Cooling Tower Company*, 1997 WL 150048 at *18 (D. Kan. March 12, 1997) (granting summary judgment to defendant on retaliation claim after finding, *inter alia*, the disputed office space did not present a violation of federal or state safety standards).

• Before the UBMS department was relocated to Office 408, it was occupied by two full-time employees and a secretary. Once the UBMS department was relocated to Office 408, it was occupied by one full-time employee, one part-time employee, and one secretary. (A 20; A 148). This indicates that in a snapshot of a typical day, Office 408 is less crowded at any particular time than it was before the UBMS relocation.

• Even assuming that Plaintiffs' former offices were private, the fact they were moved to a non-private office from a private office is not indicative of adverse employment action. *See Thomas v. Secretary of Health and Human Services*, 1999 WL 637214 at *7 (D. OR. Aug. 20, 1999) ("The loss of a private office is not a significant enough change in the conditions of employment to be considered an adverse employment action."); *Murray v. City of Winston-Salem*, 203 F. Supp.2d 493, 502 (M.D. NC 2002) ("relocating Plaintiff's work space from a private office to a cubicle is not sufficient to constitute adverse employment action.").

3.    **Extraordinary Circumstances Surrounding This Office
Relocation Are Absent Here**

In sharp contrast to the facts in this case, *Lafate v. Chase Manhattan Bank (USA)*,

123 F. Supp. 2d 773 (D. Del. 2000) presents the extraordinary circumstances which must

surround office location in order to establish adverse employment action.  In *Lafate*, the

plaintiff brought a Title VII claim alleging retaliatory conduct subsequent to filing a race

and age discrimination charge.  *Id.* at 776.  More specifically, the plaintiff alleged she

was isolated and ignored by her managers, her subordinates resisted her authority, she

was switched to an inferior cubicle in the middle of an aisle without furnishings

comparable to those of her co-workers, the cubicle was immediately across from the

person who was the impetus for the charge, she was assigned work for which she was

never trained, she was belittled by her supervisor in front of her peers, and her

confidential personnel file was shared with co-workers.  *Id.* at 778-779.  On this showing,

the Court found the plaintiff presented sufficient evidence an adverse employment action

occurred.  *Id.* at 778.  The present case is wholly distinguishable from the facts present in

*Lafate*.  *Lafate* was a case that presented numerous, significant retaliatory actions by the

defendant.  Indeed, the Court in *Lafate* recognized that "the Plaintiff's office space

relocation was only a small part of the conduct at issue."  *Id.* at n.2.  Here, relocating the

UBMS department to Office 408 was a single trivial act- not an element, as in *Lafate*, in a

sequence of conduct including being ignored by supervisors, untrained for work assigned,

belittled by supervisors, and having confidential personnel information shared

improperly.  Furthermore, Office 408 was not "inferior" or "without furnishings" as was

the cubicle in *Lafate*.  Therefore, this single, trivial act, cannot equate to the adverse

employment action suffered in *Lafate*.

4.    **Plaintiffs Who Establish An Office Relocation Was
Inconvenient And Made Them Unhappy Are Inviting
The Court To Improperly Trivialize Title VII**

Courts evaluating allegations of racial discrimination claims are encouraged to
"filter out" complaints based on nothing more than "the ordinary tribulations of the
workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation
omitted). This is necessary "to ensure that Title VII does not become trivialized as a
'general civility code'" for the workplace. *Mobley v. City of Atlantic City Police Dept.*,
2000 WL 363692 (D.N.J. March 30, 2000) (quoting *Faragher*, 524 U.S. at 88). The
Court must reject the Plaintiffs' invitation to trivialize Title VII.

At worst, the relocation was merely an inconvenience. Courts have repeatedly
rejected claims that inconvenient relocations demonstrate adverse employment action.
*See Haimovitz v. US Dept. of Justice*, 720 F. Supp. 516, 526-527 (W.D. PA 1989) (noting
that the destination was "no Garden of Eden," but finding that a *prima facie* case of age
discrimination was not established when the plaintiff set forth no objective evidence that
a relocation to another state was an adverse employment action other than his own
"subjective and conclusory antipathy toward a reassignment."); *see also Daniel v.
Skudder Kemper Investments, Inc.*, 2002 WL 1160934 at *6 (N.D. Ill. May 23, 2002)
("Daniel's seat assignment may have made her unhappy because she no longer had a
window seat, but it certainly did not rise to the level of an adverse employment action.");
*Bickerstaff*, 354 F. Supp. at n. 6 ("in order to be 'materially adverse,' a change in working
conditions must be more disruptive than a mere inconvenience."); *Nielsen*, 2002 WL
1941365 at *6 (finding for purposes of summary judgment that a move to a less pleasing
workspace did not amount to adverse employment action even though the plaintiff was

17

inconvenienced and unhappy); *Obi v. Anne Arundel County, MD*, 142 F. Supp.2d 655, 674 (D. MD 2001), aff'd 28 Fed. Appx. 333 (4th Cir. 2002) (granting defendant summary judgment where plaintiff alleged, *inter alia*, that an office relocation caused him inconvenience and to feel cramped); *Hamlett*, 2005 WL 1500819 at *15 ("occupying less desirable office space does not constitute an adverse employment action" even if it is inconvenient and undesirable); *Clary*, 1997 WL 150048 at *18 ("The fact that plaintiff's cubicle for three or four months may have been darker, or located outside the central path of traffic, is a trivial inconvenience that does not warrant a trial.").

Plaintiffs are unable to even approach the high bar of establishing working conditions found to consist of adverse employment action. In *Singletary v. District of Columbia*, 351 F.3d 519, 528 (D.D.C. 2003), the Court found merit in the plaintiff's claims that an unheated, unventilated, poorly lit storage closet, containing brooms and debris, which was inaccessible to the plaintiff, and where other workspace was available, constituted adverse employment action. *Compare* Brown's Complaint ("Plaintiff[s]...are subjected to each other's conversations, phone calls and visitors."). (A 121). Office 408 was an objectively reasonable place to work and relocating the UBMS department to this office was not an adverse employment action. Therefore, summary judgment is warranted.

5.    **Plaintiffs' Effort To Contend The Office Relocation Was Discriminatory Is Inconsistent With Their Initial Argument The Relocation Was Inefficient And Would Impact Morale**

Plaintiffs initially stated the relocation of the UBMS department to Office 408 "would effect employee relations, morale and productivity" and would create difficulties - not that it was motivated by race. (A 117). They also allege that "the move

18

was partially motivated by a conflict that existed" between two employees in another department. (A 53). Plaintiffs attempt to shift gears by complaining about the office relocation on the basis of efficiency or a personality clash that did not involve them, and then filing a lawsuit claiming the relocation was discriminatory.

Alleging the office relocation was inefficient, even if true, is irrelevant. A "plaintiff cannot prevail under Title VII merely by establishing that the employer made a decision that was wrong or mistaken." *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3rd Cir. 1997). It is manifest that it is within the purview of an employer's discretion to locate employees as an employer chooses. *See Annett v. Univ of Kansas,* 82 F. Supp. 2d 1230, 1244 (D. Kan. 2000) ("It is an employer's prerogative to assign its employees such office space as is necessary to do the job.").[5] Employees do not have a right to locate their workspace as they choose. Instead, "[t]he realities of the workplace…dictate that employees do not always have the option to work in the location they desire." *Robinson*, 2003 WL 288402 at *6 (citation omitted).

There is no dispute the College was experiencing growing pains, and was struggling to find enough space to accommodate all of its programs. (A 144). Under these circumstances, it is not surprising that Plaintiffs, and perhaps other employees, were unhappy and inconvenienced. For these reasons, this case underscores the wisdom of decisions declining, in the absence of extreme circumstances, to find adverse employment action in cases involving plaintiffs who are inconvenienced by and unhappy about their office space. Accepting such inconvenience and unhappiness as adverse

---

[5] In fact, an employer can take from an employee both an office and a telephone and still not adversely affect the employee for purposes of Title VII. *See Wanamaker v. Columbian Rope Company*, 108 F.3d 462, 466-467 (2nd Cir. 1997) (decided under the ADEA).

19

employment action would open the floodgates to a wave of litigation focusing on disputes over office locations and assignments of workspace.

> 6. **The Circumstances Surrounding The Relocation Of The UBMS Department Do Not Give Rise To An Inference Of Discrimination Because Plaintiffs Admit The Alleged Discrimination Did Not Involve Them, But Instead Involved Non-Party Employees**

Plaintiffs have stated numerous times that the UBMS department was relocated to Office 408 because of a conflict between an African-American employee, Tonia Conley, and a Caucasian supervisor, Kate Sullivan, who worked in another CCP program. (A 53; A 119; A 140). This allegation, even if true, does not help the Plaintiffs meet their burden of establishing a *prima facie* case of racial discrimination. Standing for purposes of Title VII is established at the pleading stage by setting forth specific facts which indicate the **party** was injured as a result of discrimination. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). This allegation with respect to an alleged racial incident between two other employees does not help Plaintiffs meet this burden. In fact, it does just the opposite. Conceding for the sake of argument that there was a racial conflict between Kate Sullivan and Tania Conley, and the UBMS department was relocated in a manner so as to alleviate the conflict between Sullivan and Conley, then what Plaintiffs allege shows that Plaintiffs were not the victims of racially discriminatory action.

> 7. **The Plan to Relocate The UBMS Department Long Predated Brown And Cole's Employment**

Plaintiffs cannot establish an inference of discrimination regarding the relocation to Office 408 because the undisputed record makes clear the relocation was contemplated since, at least, 1998. (A 29-30). Indeed, one of the goals in the College's Fund Year 1999 Achievement report for CCP, dated October 18, 1998, was to reorganize the

20

division to provide more effective and efficient delivery of services. A continuing objective from year to year was to "Reexamine existing office space and reallocate where appropriate." (A 36-44). Some CCP programs were relocated in previous years so that individual programs would be in closer working proximity to each other. By the time it was UBMS' turn to relocate, both Plaintiffs were in the department, but the pre-existing plan of reorganization ultimately resulting in the relocation of the UBMS department four years later could not possibly have been an act of discrimination targeted against the Plaintiffs. Indeed, Cole started working at the College in 1999 (A 31), and Brown did not start working at the College until 2001 (A 32), three years after the CCP Programs started relocating.

**C.    Insisting The Plaintiffs Adhere To College Policies And Be Accountable Is Not Adverse Employment Action**

Plaintiffs allege the College micro-managed the UBMS department, and the alleged micro-management amounts to racial discrimination. (A 58; A 123). The alleged micro-management took the form of scrutinizing the former UBMS supervisor. (A 58; A 123). Cole also alleges that he was the victim of racial discrimination because the College asked him to document his reduced work hours, questioned his working hours, and changed the manner in which travel requests were completed. (A 58-59). In order to establish the alleged micro-management was an act of racial discrimination, Plaintiffs bear the burden of establishing, among other things, that the micro-management was an adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. Just as the relocation of the UBMS office space to Office 408 was not an adverse employment action because it was trivial, demanding of its employees that they follow procedures and be accountable is not an adverse employment action. *See Buffa v. NJ Dept. of Judiciary*, 56 Fed. Appx.

21

571, 576 (3rd Cir. 2003) (finding that a plaintiff's allegations that she was scrutinized intensely and subject to overly-critical supervision as a result of having filed grievances was insufficient to show adverse employment action). Furthermore, an employer that requires employees to document their whereabouts and be accountable for their job duties is not placing a burdensome demand on its employees – just an inconvenience that is not actionable for purposes of Title VII. *See Faragher*, 524 U.S. at 788.

**III.    PLAINTIFFS CANNOT ESTABLISH A *PRIMA FACIE* CASE OF RACE DISCRIMINATION REGARDING THE MORRIS RECLASSIFICATION BECAUSE THE COLLEGE COULD NOT HAVE KNOWN COLE WANTED THE POSITION, HE COULD NOT HAVE WORKED THE HOURS REQUIRED OF THE POSITION, AND THE COLLEGE WAS NOT SEEKING APPLICANTS FOR THE POSITION**

Plaintiffs allege that Morris' "promotion" to Special Programs Director was an act of racial discrimination. (A 56; A 64-65; A 115). As set forth more fully in the Statement of Facts, Morris was reclassified to the position of Special Programs Director notwithstanding an erroneous, retracted announcement he was promoted. Assuming for purposes of this Motion that Morris was promoted, Plaintiffs bear the burden of establishing, among other things, that the circumstances surrounding the promotion give rise to an inference of unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802. For the following reasons, they cannot meet this burden.

**A.    The College Could Not Have Known Cole Was Interested In Morris' Position**

The Special Programs Director position which Cole alleges was awarded in a racially discriminatory manner was a full-time position. (A 4). Cole at all times has been a part-time employee (A 17) who has never applied for a full-time position at the College (A 17), nor has he ever requested a promotion. (A 22). Cole testified that he signed a

22

contract obligating him to work between 15 and 29 hours per week. (A 19). The Special

Programs Director position was full-time requiring Cole to work more than 29 hours per

week.    Under these circumstances, it is unreasonable to impute omniscience to the

College.  The College had no way of "knowing" Cole wanted Morris' job.  Cole's

Complaint, however, suggests the College is required to be clairvoyant and know Cole[6]

was interested in the Special Programs Director position.  Clairvoyance and omniscience

are not the standards under Title VII.  Indeed, the law requires a Title VII plaintiff to

have applied for a job before knowledge of an employee's desire to be hired for a position

can be imputed to the employer.  *See Parker v. Univ. of Penn.*, 128 Fed.Appx. 944, 946

(3rd Cir. 2005) (Plaintiff "did not actually apply for any open or available position. To

make out a *prima facie* case of discrimination in a failure to hire case where no

employment application has been submitted, a plaintiff must show that he generally made

his interest in the position known to the prospective employer.").  The undisputed record

makes clear Cole never applied for a full-time job such as the Special Programs Director

position, never requested a promotion and never made interest in another position known

to the College.  Even as recently as his deposition, Cole would not commit to an interest

in the Special Programs Director position.  (A 18 (Q. "Are you telling me that if this

position had been posted, at that time you would have applied?" A: "I'm telling you that I

would have evaluated the situation")).  By the same token, Brown never expressed an

interest in the Special Programs Manager position.  As a consequence, Plaintiffs have

failed to set forth their *prima facie* case because the College had no reason to know they

were available for the position.  *See Daves v. Payless Cashways, Inc.*, 661 F.2d 1022,

---

[6] The College moves for summary judgment on both Complaints because the Complaints
are unclear whether both, or just Cole's Complaint, seek redress for Morris' promotion.

23

1026 (5th Cir. 1981) ("Appellant has fallen short of meeting her *prima facie* burden for a very simple, and fundamental, reason. She failed in the first instance to place herself in a position where Payless' promotion policy would have considered her available for the job she sought."). Therefore, Plaintiffs' claims regarding the Morris reclassification must be dismissed.

**B.    Cole Could Not Have Accepted Morris' Position, Even If It Was Posted And He Was Awarded The Job**

Despite the fact Cole was, and remains, a part-time employee, he claims that not posting a full-time position was an act of discrimination against him. This dubious claim conveniently ignores the fact that Cole operated another business throughout the entire time he has been employed by the College. (A 14). Cole worked for the College as a part-time employee to accommodate his commitment to operate a separate business. (A 16-17). Furthermore, shortly after Morris was reclassified to Special Program Director in July 2002, Cole was unable to work more than 20 hours per week upon doctor's orders. (A 26 (Q: "When did you first become ill?" A: "It was end of August, I think it was." Q: "End of August, 2002?" A: "Yes"); A 23 (Q: "You were only able to work 20 hours a week for health reasons?" A: "Yes")). If he was only able to work 20 hours per week, Cole could have not performed the Special Programs Manager position for long even if there was a vacant position, the College was clairvoyant in knowing Cole may have an interest in the position, Cole did in fact have an interest, Cole committed to work full-time, and Cole was the most qualified applicant.

**C.    The College Was Not Seeking Applicants At The Time Morris Became The Special Program Manager**

24

To meet their *prima facie* burden, Plaintiffs must show, among other things, that the position held by Morris was a position for which the College was seeking applicants. *Green v. Edward J. Bettinger Co.*, 608 F. Supp 35 (E.D. PA 1984), aff'd 791 F.2d 917 (3rd Cir. 1986). Plaintiffs cannot meet this burden because there was no open position for which they could have applied. *See Daves,* 661 F.2d at 1026 (holding that a plaintiff could not meet the burden of establishing a *prima facie* case of failure to hire when the employer was not seeking applications); *Narin v. Lower Merion School Dist.*, 206 F.3d 323, 334 (3rd Cir. 2000) (affirming summary judgment in favor of employer for failure to hire under the ADEA when there was no open position for which the claimant applied). The undisputed record makes clear the College was not seeking applicants to fill the Special Programs Director. Therefore, Plaintiffs cannot establish a *prima facie* case and summary judgment is warranted.

## IV. TO STATE A RETALIATION CLAIM, PROTECTED ACTIVITY MUST PRECEDE AND BE CAUSALLY LINKED TO ADVERSE ACTION

### A. Elements Of A *Prima Facie* Claim of Retaliation

The Plaintiffs cannot establish their *prima facie* case with respect to their retaliation claims. To establish a *prima facie* case of retaliation, Plaintiffs must show: "(1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action." *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000)); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir.1997). Once a plaintiff establishes a *prima facie* case, the employer must proffer a

25

legitimate, non-discriminatory reason for the adverse action. The burden then shifts back

to the plaintiff to show that the proffered reason is pretextual. *Id.*

### B. Employment Action Which Predates Protected Activity Cannot Constitute The Basis For A Retaliation Claim

The Plaintiffs' retaliation claim is fatally damaged by a glaring timing

flaw. The office relocation was approved and announced long before the Plaintiffs'

protected activity. The relevant events are as follows:

| | |
|---|---|
| October 18, 1998 | In a program report for program years 2000-2005, the UBMS department issued a report indicating that the UBMS department would be located in a central office. (A 29-30). |
| 1999 | In the Fund Year 1999 achievement report, the College indicated that it was a goal of the department to "reexamine existing office space and reallocate where appropriate." (A 37). |
| 2000 | The Fund Year 2000 achievement report indicated, again, that office spaces would be examined and reallocated. (A 40). |
| 2001 | The same goal appears in the Fund Year 2001 report. (A 43). |
| August 5, 2002 | Minutes of the Program Manager's Meeting indicate that the office relocation was discussed. (A 45-47). |
| August 12, 2002 | UBMS staff was informed of the relocation to Office 408. (A 51). |
| August 13, 2002 | Henderson informs Morris that UBMS staff wanted to discuss the proposed move. (A 71). |
| August 14, 2002 | UBMS staff sent an e-mail to Zawislak asking for a meeting to discuss the relocation - claiming it would impact "employee relations, employee morale, and employee productivity." **(No mention of race).** (A 72). |
| August 23, 2002 | Zawislak forwarded the August 14, 2002 e-mail to Henderson to handle the matter because she was their direct supervisor. (A 73). |
| August 28, 2002 | Henderson sent an e-mail to Morris and DelNegro requesting a meeting with them and the UBMS staff. (A 74). |

26

| | |
|---|---|
| August 29, 2002 | Morris and DelNegro met with the UBMS staff and discussed the office relocation. Plaintiffs complained about employee relations, morale and productivity **(No mention of race)**. At the end of the meeting, DelNegro stated there was no credible reason to change plans and she would recommend to Zawislak that the relocation proceed. (A 75). |
| August 30, 2002 | Brown sent an e-mail to Zawislak asking for a meeting with UBMS staff to protest the move. (A 77). |
| September 3, 2002 | Plaintiffs reported to Human Resources to discuss the relocation **(No mention of race)**. At this meeting, Cole indicated his desire to file a grievance. (A 78-80). |
| September 3-4, 2002 | Winner directed Zawislak to meet with UBMS staff, one on one, to explore their complaints over the relocation. |
| September 4, 2002 | A supervisor's meeting was held. DelNegro, Henderson, Morris, and Zawislak attended. The office relocation was discussed again. (A 81-84). |
| September 5, 2002 | Zawislak and DelNegro met with Brown individually and discussed the relocation **(She did not mention race)**. (A 85-87). |
| September 5, 2002 | Cole filed a grievance (#W03-102), claiming Morris' promotion to Special Programs Director violated College policy. (A 54). |
| September 11, 2002 | Zawislak, DelNegro and Stanard met with Cole and discussed his protest to move **(He did not mention race)**. (A 88). |
| October 2, 2002 | Zawislak and DelNegro met with Plaintiffs and Wilson to explain the office relocation was going forward as planned on October 8th. (A 89-90). |
| October 7, 2002 | UBMS staff e-mailed Winner to request another meeting regarding the relocation **(No mention of race)**. (A 89-90). |
| October 7, 2002 | Winner sent a memo to the UBMS staff to confirm the relocation was approved. (A 91). |
| October 7, 2002 | Cole filed a supplement to his grievance, claiming he was retaliated against for complaining about the office relocation. He claimed the following retaliatory actions – (1) changing his work hours; (2) changing Wilson's work hours; (3) revoking Brown's request for change in working hours; (4) micro-managing UBMS; and (5) conducting interrogating meetings. (A 92). |

27

October 8, 2002        UBMS staff relocated to Office 408. (A 57).

October 10-11, 2002  Brown and Cole contacted the Fire Marshall.  The Fire Marshall
                     evaluated Office 408 and confirmed in a report that there was no
                     validity to the complaint. (A 93-94).

October 15, 2002       Plaintiffs and Wilson submitted a memo to Miller describing
                       alleged retaliatory action. Miller forwarded it to Zawislak for more
                       information.  (A 170-171).

October 15, 2002       Cole filed a charge of discrimination, alleging he was not provided
                       an opportunity to post or apply for the position of Special
                       Programs Director, and African-American workers were moved
                       into small confined office space.  (A 12).

November 8, 2002      Brown files charge of discrimination. (A 123).

        These undisputed facts show two things.  First, protected activity occurred, at the

earliest, on September 5, 2002.  In order to engage in activity protected by Title VII, a

plaintiff alleging retaliation must have submitted a grievance that is actionable under

Title VII.  *Hay v. GMAC Mortg. Corp.*, 2003 WL 22133801 at \*7 (E.D.PA. Sept. 15,

2003); *Walden v. Georgia Pacific Corporation*, 126 F.3d 506, 513 n. 4 (3rd Cir.1997);

*Slagle v. County of Clarion* 435 F.3d 262, 267 (3rd Cir. 2006) (holding that filing a

facially invalid charge was not protected activity for purposes of Title VII).  Plaintiffs'

complaints about the relocation of the UBMS department workspace to Office 408 being

"unfair" are insufficient to amount to protected activity.  *See McBride v. Hospital of the*

*University of Pennsylvania*, 2001 WL 1132404 at \*7 (E.D.PA. September 21, 2001)

(holding that complaining about unfair treatment on at least one other occasion did not

constitute a protected activity for Title VII purposes).  In this Circuit, unless a plaintiff

"mention[s] race or discrimination," complaints do not suffice for purposes of

establishing protected activity. *Id.*

28

In this case, Cole did not mention race, file a grievance, or otherwise engage in protected activity until September 5, 2002.[7]  Brown did not engage in protected activity until November 8, 2002.  Second, the decision to relocate the UBMS department was announced on August 12, 2002.[8]  Thus, the relocation decision preceded any protected activity.    The inescapable conclusion is that the decision to relocate the UBMS department was made before protected activity occurred, and protected activity is a temporal pre-requisite to retaliatory conduct. *See Weston*, 251 F.3d 420 at 430. Therefore, Plaintiffs cannot establish that the relocation of the UBMS office space to Office 408 was retaliatory.

**C.    Requiring A Plaintiff To Work The Same Hours Required Of All College Employees Is Not Retaliation Or Adverse Employment Action**

Cole alleges his hours were changed from 8:00 a.m. to 2:00 p.m., to 8:30 a.m. to 2:30 p.m. as an act of retaliation on or about September 19, 2002. (A 56).  However, all employees of the College were required to maintain the working hours of 8:30 a.m. to 2:30 p.m.[9]  Prior to this change, :          .ı disregarded College policy in permitting Cole to work hours other than the hours of 8:30 a.m. through 4:30 p.m.   This error on the part of          s documented in an email to Cole from          ., wherein ı states that she did not have authority to allow him to work hours other than the working hours of the College.  (A 172).  Furthermore, the College did not foreclose the chance

REDACTED

---

[7] The College reserves its right to contest at trial whether or not Cole's September 5, 2002 grievance constituted protected activity.

[8] The College recognizes that the physical relocation occurred on October 8, 2002. However, it is the decision to relocate, not the physical relocation, which is important. Any rule to the contrary would enable plaintiffs to hijack disagreeable employer decisions by objecting to the decision between the time of announcement and the time of implementation.

[9] Certain exceptions are made with supporting documentation or to meet College needs.

that Cole would be allowed to continue to work hours outside of established College working hours. Rather, the College requested, on numerous occasions, that Cole provide medical documentation to support his desire to work an alternate schedule. (A 173-175 ("You will not be excused from adhering to [regular working hours] absent an appropriately documented request for an alternate schedule for a finite period of time.")). Cole refused to provide the requested documentation. (A 176-177). Because Cole cannot establish that asking him to work the same hours required of all College employees is an act of retaliation, he cannot meet his burden of establishing a *prima facie* case with respect to the changed working hours. Therefore, the College is entitled to judgment as a matter of law in this regard.

In all events, the one-half hour change in Cole's working hours is not an adverse employment action. *See Nielsen,* 2002 WL 1941365 at *5,6 (finding that a one half-hour change in working hours did not amount to adverse employment action for purposes of a retaliation claim). Thus, Cole cannot meet his burden of establishing a *prima facie* case with respect to the changed working hours. Therefore, the College is entitled to judgment as a matter of law on this claim.

V.    **A PLAINTIFF WHO NEVER SOUGHT A TRANSFER CANNOT ASSERT THE EMPLOYER'S FAILURE TO TRANSFER THE PLAINTIFF CONSTITUTES RETALIATION**

Cole and Brown allege retaliation in the form of being denied transfers. (A 64; A 130). Neither Cole, nor Brown, requested a transfer (A 22; A 152; A 159-163). Moreover, as a practical matter, Cole could not have worked hours additional to those he was already working due to his desire to work part-time, as well as medical issues.

30

Therefore, the College should be granted judgment as a matter of law with respect to these retaliation claims.

VI.   **A PLAINTIFF WHO FAILS TO APPLY FOR A PROMOTION CANNOT MEET HIS BURDEN OF ESTABLISHING A *PRIMA FACIE* CASE OF RETALIATION OR RACE DISCRIMINATION BY CLAIMING HE WAS DENIED THE PROMOTION**

Cole alleges discrimination and retaliation in the form of being denied promotions. (A 64).  However, he never applied for a promotion (A 22) and as previously discussed, could not have worked hours additional to those he was already working.  The law requires a Title VII plaintiff to have applied for a job before knowledge of an employee's desire to be hired for a position can be imputed to the employer.  *Parker v. Univ. of Penn., supra.*  Therefore, the College should be granted judgment as a matter of law with respect to his claims the denial of promotions constituted race discrimination and retaliation.

Turning to the one promotional opportunity Brown applied for, Brown cannot establish her *prima facie* case of failure to promote either and her claims she was denied promotions in violation of Title VII must be dismissed.  To establish a prima facie case on her failure to promote claim, Brown must show that "(1) she is a member of a protected class, (2) that she was qualified for the position in question, (3) that she suffered an adverse employment decision, and (4) that the circumstances give rise to an inference of unlawful discrimination."  *Hampton v. Tokai Fin. Servs.*, 2001 WL 881443 at *2 (E.D. PA. May 7, 2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972)).  Assuming for purposes of the Motion that Brown was qualified for the

DHW/007409-0132/1351021/7

supervisor position filled by Andrea Coleman,[10] the "circumstances" surrounding Brown's denial of the Program Manager position do not give rise to an inference of unlawful discrimination.

Circumstances that give rise to an inference of discrimination include, for example, "similarly situated individuals who are not in the protected class [who] were treated more favorably than [the plaintiff]." *Id.* A plaintiff generally satisfies this prong of her *prima facie* burden with evidence that she was replaced by an individual outside of her protected class. *See Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999). Although the Third Circuit has held that replacement by an individual outside of the plaintiff's protected class is not required to establish a *prima facie* case of discrimination, *see Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 354 (3d Cir. 1999), the absence of such evidence is meaningful in the analysis of the circumstances that the plaintiff claims give rise to an inference of discrimination. *See id.* (recognizing the possible "evidentiary force" of a replacement from within a plaintiff's protected class and explaining that "it would be prudent for a plaintiff in this situation to counter (or explain) such evidence").

Here, insofar as her failure to promote claim is grounded in race discrimination, Brown cannot sustain her claim because someone of her same protected class received the promotion (Andrea Coleman, the individual the College hired for the position, is also African American) she sought and Brown has offered no counter, or explanation, to such

---

[10] The College assumes that it is the promotion of Andrea Coleman to Program Manager that Brown disputes in Count III, because Brown applied for no other positions while employed at the College. If in her answering brief Brown claims she was denied other promotional opportunities, the College reserves its right to respond accordingly in further briefing.

32

fact. (A 151). Brown cannot possibly counter this undisputed fact, and her failure to promote claim should thus fail because she will not be able to establish a *prima facie* case.

Even to the extent Brown can establish a *prima facie* case of race discrimination for failure to promote, she will not be able to show the College's reasons for not hiring her for the supervisor position were pretextual. This requires Brown to produce sufficient evidence to "allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons" was a pretext. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). In other words, Brown must present evidence from which a factfinder reasonably could disbelieve the College's articulated legitimate reasons, from which it may be inferred reasonably that the real reason was discriminatory, or from which one could otherwise reasonably conclude that discrimination was more likely than not a motivating or determinative factor in the employer's decision. *See Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 66 (3d Cir. 1996). Brown has presented no such evidence here, and therefore, her failure to promote claim fails even if she could set forth a *prima facie* case.

By the same token, Brown cannot establish the award of this promotion of another African-American employee constituted retaliation. Among her other burdens, Brown must establish that "a causal link exists between the protected activity and the adverse action." *Weston*, 251 F.3d at 430. The only promotion for which she applied was the Program Manager position vacated in February 2004. (A 159-165). Brown's protected activity occurred in November 2002. The allegedly retaliatory act (denying her the Program Manager position) occurred fifteen months later. A fifteen month period has

33

been found in this Circuit to be too attenuated for purposes of establishing that adverse action was linked to protected activity. *See, Goosby v. Johnson and Johnson Medical, Inc.*, 228 F.3d 313, 323 (3rd Cir. 2000). Therefore, the College should be granted judgment as a matter of law with respect to this claim.

## VII.    PLAINTIFFS CANNOT ESTABLISH RETALIATION BASED UPON A HOSTILE WORK ENVIRONMENT

Plaintiffs allege retaliation based upon a hostile work environment. (A 64; A 130). To state a Title VII claim based on hostile work environment, an employee must show that the workplace was "permeated by discriminatory intimidation, ridicule and insult that [was] sufficiently severe and pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Title VII is not "a general civility code," and it was not meant to "purge the workplace of vulgarity." *Faragher*, 524 U.S. at 787. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" and are not actionable. *Faragher*, 524 U.S. at 788. "These standards for judging hostility are sufficiently demanding . . . . Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (citation and quotation omitted).

The conduct alleged by the Plaintiffs does not meet the standard necessary to establish a hostile work environment. Nowhere in Cole's Complaint does he allege any "discriminatory intimidation, ridicule [or] insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21. Furthermore, he still works at the College and has done so for the 3 ½ years since the

34

allegedly discriminatory and retaliatory conduct commenced. Therefore, he cannot establish a claim based on hostile work environment.

Brown claims one single act of a student - not a College employee - that could be construed as insensitive or inappropriate. (A 123 ("Plaintiff overheard students who were walking past the office make comments about all the people in the small room looking like a bunch of monkeys.")). Brown cannot meet her burden of showing that her workplace was "permeated by discriminatory intimidation, ridicule and insult" based on this one incident. First, incidents or comments that are directed at another employee, or that occur outside the presence of a plaintiff, are of little significance and cannot substantiate Brown's claim. *See, e.g., Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 189-90 (2d Cir. 2001) (holding that harassment that did not happen in the immediate vicinity of plaintiff, and plaintiff heard about second- or third-hand, could not support a hostile work environment claim); *Bishop v. Inacom, Inc.*, 1999 WL 1416919 ,*7 (D.N.J. Dec. 1, 1999) (holding that comments made outside of plaintiff's presence constitute "'second-hand harassment' . . . the impact of which is not as great as comments directed at a plaintiff"). Second, Brown's claim fails because this was a single allegedly derogatory remark that happened "one particular time." (A 139). Such a single remark fails to show an environment permeated by hostility. *See Kidd. v. Pennsylvania*, 2002 WL 1343624, *2 (3rd Cir. June 19, 2002). Third, the individual who allegedly made the derogatory comment was a student, not an employee or agent of the College. Finally, Brown has shown no causal link between the allegedly hostile work environment and her resignation. Therefore, Brown's hostile work environment claim must fail.

35

## VIII. WHERE PLAINTIFFS FAIL TO ALLEGE FRAUD, DECEIT OR MISREPRESENTATION, THERE IS NO BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

Plaintiffs allege the College breached the covenant of good faith and fair dealing by discriminating against them on the basis of their race. (A 65-66; A 131). To state a claim of breach of the implied covenant of good faith and fair dealing, an employer's actions must "constitute an aspect of fraud, deceit or misrepresentation." *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 437 (Del. Supr. 1996). "The Delaware Supreme Court has *strictly limited* the application of the implied covenant of good faith and fair dealing in the employment context..." *Reed v. Agilent Technologies, Inc.*, 174 F. Supp. 2d 176, 190 (D. Del. 2001) (emphasis added). Plaintiffs do not allege fraud, deceit or misrepresentation, therefore their claims must fail. Furthermore, both Plaintiffs claim the College's discrimination is the basis of the allegations the College breached the covenant of good faith and fair dealing. (A 65; A 132). However, as set forth above, there was no discrimination. Therefore, even if the Plaintiffs had alleged fraud, deceit or misrepresentation, the Plaintiffs cannot meet their burden of establishing a breach of the covenant of good faith and fair dealing because they cannot meet their burden of establishing the underlying allegedly discriminatory acts.

## IX. CLAIMS FOR PROSPECTIVE EARNINGS MUST BE DENIED WHEN A PLAINTIFF RESIGNS, FAILS TO MITIGATE, AND OFFERS NO EVIDENCE TO SUPPORT A CLAIM FOR PROSPECTIVE EARNINGS

Brown resigned on June 27, 2005. (A 153). Brown does not allege that she was discharged constructively. (A 138 (Q: "Did you voluntarily resign from the College." A: "I voluntarily resigned, yes.")). Furthermore, even if she alleges her resignation (nearly three years after the alleged discriminatory and retaliatory conduct commenced) was a

36

constructive discharge, she cannot possibly meet her burden of establishing a constructive discharge. *See Baselice v. Philadelphia Federation of Teachers Health*, 2002 WL 827128 at n.5 (E.D.PA.) (constructive discharge is a high standard for a plaintiff to meet). The test for whether or not an employee resigned or was constructively discharged is whether "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 887-88 (3rd Cir. 1984); *accord Schafer v. Board Of Public Education of the School District of Pittsburgh, Pa.*, 903 F.2d 243, 250 (3rd Cir. 1990). "To make this showing, more than subjective perceptions of unfairness or harshness or a stress-filled work environment are required." *McLaughlin v. Rose Tree Media School Dist.*, 52 F. Supp.2d 484, 493 (E.D.PA.1999). Indeed, a plaintiff claiming constructive discharge must show the working conditions were "intolerable." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1082 (3rd Cir. 1992).

Since it has been established that she was not subjected to a hostile workplace environment (see Argument VII), surely she cannot meet the much higher standard of constructive discharge because the UBMS department was not an intolerable place to work. *See, e.g. Bulkoski v. Bacharach, Inc.*, 1 F. Supp. 2d 484, 488 (W.D.Pa., 1997), aff'd 149 F.3d 1163 (3rd Cir. 1998) ("any claim by plaintiff of overzealous supervision would not qualify as an intolerable condition warranting a finding of constructive discharge."). As a consequence of her voluntary resignation, Brown cannot pursue front-pay for salary subsequent to the date she resigned. *See Muller v. United States Steel Corp.*, 509 F.2d 923, 930 (10th Cir. 1975), *cert. denied*, 423 U.S. 825 (1975). Therefore, Brown's damages, if any, must cease on June 27, 2005.

37

Plaintiffs present no evidence with respect to their claims for prospective earnings. (A 64; A 65; A 130-131). Summary judgment is warranted when the record is devoid of evidence from which the jury might reasonably afford relief. *Gomez v. Alleghany Health Services, Inc.*, 71 F.3d 1079, 1083 (3rd Cir. 1995). Additionally, Plaintiffs have not identified any expert witnesses with respect to their claims seeking damages for front-pay. *See Olabode v. William Hecht Inc.*, 1997 WL 805187 at *12 (E.D. PA Dec. 30, 1997) (in post-trial briefing, reversing a jury award of front-pay damages when the plaintiff failed "to produce evidence on which the jury could have reasonably based a calculation of front pay damages," and noting "[p]laintiff also did not present expert testimony concerning his future economic losses"). With respect to the plaintiff's failure to produce any evidence regarding prospective earnings, the Court in *Olabode* cited to two cases, both of which substantiated prospective earnings claims with expert testimony. *See Olabode*, n. 33. No such testimony or other evidence will be present here. Therefore, the College is entitled to a judgment that Plaintiffs cannot pursue damages for future economic losses because they have failed to produce any supporting evidence.

Additionally, Brown must not be permitted to pursue her claim for front-pay because she has not produced any evidence showing that she has attempted to mitigate her purported losses.[11] Indeed, Brown's interrogatory responses dated October 31, 2005 did not identify any employment sought by Brown subsequent to her resignation on

---

[11] While it normally is the defendant's burden to establish a failure to mitigate, when a plaintiff produces no evidence of seeking equivalent work, "the loss of earnings he suffers occurs at his own hands, and the law does not compensate such injury." *Wooley v. Colonial School Dist.*, 1993 WL 431208 at *3 (D. Del. 1993) (granting defendant's motion for a jury charge on failure to mitigate).

June 27, 2005. (A 192-193). Furthermore, in her deposition on February 6, 2006, Brown still was unable to identify any effort to seek employment subsequent to leaving the College. (A 152-158). To this date, no files or other evidence of attempts to seek employment have been produced, and the discovery cut-off in this matter has long passed. Attempted mitigation of economic losses is required by a plaintiff seeking front-pay damages. *See Floyd v. Mellon Bank*, 1991 WL 30755 at *4 (E.D.PA.1991) (front pay awards may be made "for a reasonable future period required for the victim to reestablish [his] rightful place in the job market"); *Penn. State Police v. Suders*, 542 U.S. 129, 152 (2004) ("the plaintiff who alleges no tangible employment action has the duty to mitigate harm"). Rule 56 does not "permit Plaintiffs to get to the jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations." *First Nat'l Bank of Arizona v. Cities Services Co.*, 391 U.S. 253 289-290 (1968). Because Brown cannot show that she attempted to mitigate her purported front-pay damages, she is not entitled to seek such damages. Therefore, the College is entitled to a judgment that Brown cannot pursue front-pay damages.

39

## CONCLUSION

For the foregoing reasons, the College requests that the Court grant its

motion for summary judgment.

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

David H. Williams (#616)
dwilliams@morrisjames.com
James H. McMackin, III (#4284)
jmcmackin@morrisjames.com
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900/5849
Attorneys for Defendant

Dated:  April 17, 2006

40

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

KENNETH COLE,                          )
BRIGITTE L. BROWN,                     )
                                       )
      Plaintiffs,           )
                                       )
    v.                          )   C. A. No.  05-270 KAJ
                                       )
DELAWARE TECHNICAL AND                 )
COMMUNITY COLLEGE,                     )
                                       )
      Defendant.            )

**CERTIFICATE OF SERVICE**

     I, James H. McMackin, III, hereby certify that on April 17, 2006, I served two

copies of **DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR**

**SUMMARY JUDGMENT** by hand delivery on the following counsel:

          Jeffrey K. Martin, Esquire
          Lori A. Brewington, Esquire
          Margolis and Edelstein
          1509 Gilpin Avenue
          Wilmington, DE  19806

          MORRIS, JAMES, HITCHENS & WILLIAMS LLP

          _James H. McMackin_
          David H. Williams (#616)
          dwilliams@morrisjames.com
          James H. McMackin, III, Esquire
          jmcmackin@morrisjames.com
          222 Delaware Avenue
          P.O. Box 2306
          Wilmington, DE 19899
          (302) 888-6900/5849
Dated:  April 17, 2006      Attorneys for Defendant