**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KENNETH COLE, | ) | |
| BRIGITTE BROWN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No.  05-270 (KAJ) |
| | ) | |
| DELAWARE TECHNICAL AND | ) | |
| COMMUNITY COLLEGE, | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO
DEFENDANT'S OPENING BRIEF IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

David H. Williams (#616)
dwilliams@morrisjames.com
James H. McMackin, III ) (#4284)
jmcmackin@morrisjames.com
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900
Attorneys for Defendant

Dated:  April 17, 2006

# TABLE OF CONTENTS

**PAGE**

Excerpts from the Deposition of Susan Elizabeth Zawislak.................................A 1-4

Documents Produced by Defendant........................................................................A 5-12

Excerpts from the Deposition of Kenneth Cole.....................................................A 13-28

Documents Produced by Defendant........................................................................A 18-47

Document Produced by Plaintiffs ...........................................................................A 48

Complaint Filed by Plaintiff Kenneth Cole ...........................................................A 49-67

Exhibits to Complaint Field by Plaintiff Kenneth Cole........................................A 68-70

Documents Produced by Defendant........................................................................A 71-88

Documents Produced by Plaintiffs..........................................................................A 88-89

Documents Produced by Defendant........................................................................A 91-98

Documents Produced by Plaintiffs..........................................................................A 99-101

Documents Produced by Defendant........................................................................ A 102-112

Complaint File by Plaintiff Brigitte Brown ...........................................................A 113-133

Exhibits to Complaint File by Plaintiff Brigitte Brown........................................ A 134-136

Excerpts from Deposition of Brigitte L. Brown ................................................... A 137-158

Documents Produced by Defendants.......................................................................A 159-157

Plaintiff Brigitte Brown's Response to Defendant's First Set of
    Interrogatories Directed to Plaintiff Brigitte Brown.........................................A178-194

1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KENNETH COLE and                    )  CONFIDENTIAL
BRIGITTE L. BROWN,                   )
                                     )
              Plaintiffs,            )
                                     )
                                     )  C.A. No. 05-270 (KAJ)
v.                                   )     (Consolidated)
                                     )
DELAWARE TECHNICAL AND               )
COMMUNITY COLLEGE,                   )
                                     )
              Defendant.             )

          Deposition of SUSAN ELIZABETH ZAWISLAK,
taken pursuant to notice at the offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 3:00 p.m. on Friday, January 27, 2006,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.

APPEARANCES:

          LORI A. BREWINGTON, Esquire
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware  19806
             on behalf of the Plaintiffs,

          JAMES H. McMACKIN, III, Esquire
          Morris JAMES HITCHENS & WILLIAMS, LLP
             222 Delaware Avenue
             P.O. Box 2306
             Wilmington, Delaware  19899-2306
             on behalf of the Defendant.

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters



A 1

1    Q.   And with respect to reclassification, is there

2    a requirement that an employee must be able to

3    complete the additional job duties within their

4    regular working hours?

5              MR. McMACKIN:   I'm going to object to

6    form.

7    BY MS. BREWINGTON:

8    Q.   You can answer.

9    A.   Could you repeat the question again?

10   Q.   My question is, with respect to

11   reclassification and the policy on reclassification,

12   isn't there a requirement that, in order for an

13   individual or an employee to be reclassified into

14   another position, they must be able to work those

15   additional duties of that other position within their

16   regular working hours, is that correct?

17   A.   I was not aware of that.

18   Q.   You were not aware of that, but is that true?

19   A.   Based on the information that was communicated

20   by our campus director, it has -- it has been

21   determined it is true.

22   Q.   Now, could Paul Morris work the additional job

23   duties that a special programs director requires

24   during his normal work hours?



A 2

Susan Elizabeth Zawislak - Brewington                    14

1          A.     He completed those tasks required, but in order

2     to fulfill additional responsibility of his

3     position --

4          Q.     His position meaning?

5          A.     The Educational Talent Search program

6     manager --

7          Q.     Okay.

8          A.     -- functions.

9          Q.     I'm not sure I understand.

10         A.     The educational program manager functions are

11    the functions of a person who oversees one program.

12    The special programs director has the responsibility

13    not only for one program but for additional programs

14    as well of which there are separate program managers

15    for those parts of the position.  It is, again, called

16    a special programs director.

17         Q.     I'm not sure you answered my question, though.

18    My question was, prior to being reclassified, did Paul

19    Morris -- or was he able to perform those additional

20    job duties of special programs director prior to being

21    classified as special programs director within those

22    work hours?

23              MR. McMACKIN:  Objection to form.

24              I don't understand the question either.



A 3

1    I'm sorry.

2    BY MS. BREWINGTON:

3        Q.    All right.  I'll try this again because I

4    really want to make sure you understand the question.

5    Prior to the reclassification -- okay?  That's what we

6    are talking about -- was Paul Morris able to perform

7    the additional job duties of special programs director

8    within his regular work hours?

9        A.    The duties of a special programs director

10   include coordinating responsibilities, best practices,

11   some of the responsibilities that he did perform

12   during the work hours.

13       Q.    Is it fair to say that he was not able to

14   perform all the duties of special programs director

15   within his regular work hours?

16       A.    That is not fair to say.

17       Q.    Why not?

18       A.    Because there is a position that he had been

19   reclassified to that is called special programs

20   director, which would be a position that would be a

21   37 1/2 hour, full-time position.  Am I missing

22   something?

23              MR. McMACKIN:    Off the record for a

24   second.



A 4



*Corporate & Community Programs Division Stanton/Wilmington August 2002 Update*

## PEOPLE

Diana Ritchie and Mary Beth Vore are welcome additions to the CCP Wilmington office staff. Diana is working in the Upward Bound Classic program, and Mary Beth will be helping with WIA programs. Stop by and say hi!

Paul Morris has been promoted to Special Programs Director, and in addition to Educational Talent Search, has oversight responsibilities for the Federal Trio programs, headed by Upward Bound Math/Science (Rose Henderson, Program Manager) and Upward Bound Classic (Kate Sullivan, Program Manager).

Olive Robbins has undergone surgery, and has come through fine—please keep her in your thoughts as she continues to recuperate. She hopes to be back part-time on August 26th.

Let's welcome back Peggy Jones to the CCP office – she's been recuperating from surgery and returned to full duty on Wednesday July 31st. We're glad she's back!!!

Please extend your best wishes to Dionna Harris, who has accepted a new position with the Christina School District effective August 30th. She will be working as a counselor with at-risk and special needs children.

## PROGRAMS

During the summer, while the pace of our non-credit professional and personal development classes slows down, summer youth programs really take off. Some (and certainly not all!) of the highlights:

➢ ## SUMMER CAMPS

New Camps were added this year, which included Kids in the Kitchen, Wonders of Web Design, Girl Scout, Build It, Bank It (in partnership with JP Morgan Chase), Health Careers, and Computer Camp (one of which was provided for the Girl Scouts). All in all, JP Morgan Chase and the Girl Scouts provided scholarships for 37 students to attend camps, and campers who attended the JP Morgan Chase camp received a computer (free of charge!) donated through the Educational Foundation. Wow!

DEF 000284

A 5

GRIEVANCE FORM

_____neth Cole_____ POSITION _Student Enrichmt_

DATE OF OCCURRENCE _Mid to late Augu___

(Circle One)    (FIRST)    SECOND    THIRD

__ OF GRIEVANCE _I am exercising my rights from UT&CC Personn___

_licy Manual Sect XIII titled "Grievances, 13.01, 13.02 & 13.03___
_I am filing a policy interpretation grievance because I feel t__
_the terms and conditions of my employment by the college ha_
_been materially adversely affected by a violation in policy_
_(see attachments for detailed explanations) In the promot__

SPECIFIC REMEDY DESIRED _of Paul Morris into "Special Programs Direct_
_position._

INFORMAL DISCUSSION HAS FAILED TO SATISFACTORILY RESOLVE THE PROBLEM. ALL INTERMEDIATE
SUPERVISORS (IF ANY) HAVE BEEN NOTIFIED IN WRITING THAT A FORMAL GRIEVANCE IS BEING
FILED.

EMPLOYEE'S SIGNATURE _Kenneth Cole_    DATE _9-5-02_

DATE RECEIVED

RECEIVED BY

POSITION

DECISION

DATE OF DECISION    SIGNATURE

Rev. 2/1/83    POSITION

RECEIVED
SEP 0 5 2002
BY: MBV

TOTAL P.02

DEF 000318

A 6

3127                     DEL TECH WILM HR                          PAGE   02

PAGE 1

# GRIEVANCE FORM

It is my belief that promoting Paul Morris into the position of Special Programs Director violated section III, 3.01 titled **Position in Salary Plans A and B**.

Because the Special Programs Director Position existed and the Special Programs Director's position was not posted (it has been thoroughly investigated via Human Resources), there was a violation of Section III **3.01 Positions in Salary Plans A and B** which states:  Regular, full-time position vacancies shall be posted for a minimum of fifteen (15) calendar days.

The following exceptions (1.) do not apply because we were told by Ann Del Negro and Sue Zawislak in a mandatory meeting approximately a year ago that Paul Morris will be a liaison between the Program Managers and Ann Del Negro.

3. When a position is posted internally for regular, full time and regular, part-time DTCC employers, it shall be posted for a minimum of ten (10) days.

This did not happen.

It is also my belief that promoting Paul Morris into the position of Special Programs Director violated section IV titled **Promotions and Transfer Policy.**

4.01 Promotion Policy

States:  In filling vacancies, qualified regular college employees will receive equal consideration for promotion, in accordance with the College's Statement of Affirmative Action Policy, regardless of race, color creed, sex national origin, etc.;

and

4.02 Transfer of Full-Time Employees

1. Transfer from One Position Classification to Another

If Paul Morris was reclassified, policy was violated because Paul Morris went from a Program Manager pay grade 16 to the Special Programs Director pay grade 17, and "quantum leaped" into a new position (that has been investigated as well, via Human Resources).

**DEF 000319**

A 7



Exhibit "A"

*Corporate & Community*
*Programs Division*
*Stanton/Wilmington*
*August 2002*
*update*

## PEOPLE

Diana Ritchie and Mary Beth Vore are welcome additions to the CCP Wilmington office staff. Diana is working in the Upward Bound Classic program, and Mary Beth will be helping with WIA programs. Stop by and say hi!

Paul Morris has been promoted to <u>Special Programs Director</u>, and in addition to Educational Talent Search, has oversight responsibilities for the Federal Trio programs, headed by Upward Bound Math/Science (Rose Henderson, Program Manager) and Upward Bound Classic (Kate Sullivan, Program Manager).

Olive Robbins has undergone surgery, and has come through fine—please keep her in your thoughts as she continues to recuperate. She hopes to be back part-time on August 26th.

Let's welcome back Peggy Jones to the CCP office – she's been recuperating from surgery and returned to full duty on Wednesday July 31st. We're glad she's back!!!

Please extend your best wishes to Dionne Harris, who has accepted a new position with the Christina School District effective August 30th. She will be working as a counselor with at-risk and special needs children.

## PROGRAMS

During the summer, while the pace of our non-credit professional and personal development classes slows down, summer youth programs really take off. Some (and certainly not all!) of the highlights:

➢ <u>SUMMER CAMPS</u>
New Camps were added this year, which included Kids in the Kitchen, Wonders of Web Design, Girl Scout, Build It, Bank It (in partnership with JP Morgan Chase), Health Careers, and Computer Camp (one of which was provided for the Girl Scouts). All in all, JP Morgan Chase and the Girl Scouts provided scholarships for 37 students to attend camps, and campers who attended the JP Morgan Chase camp received a computer (free of charge!) donated through the Educational Foundation. Wow!

DEF 000320

A 8

## GRIEVANCE FORM (con't)

Finally, It is my belief that promoting Paul Morris into the position of Special Programs Director violated section I **Policies to Nondiscrimination and Affirmative Action**

   1.01   Statement of Affirmative Action Policy

It is also my belief that promoting Paul Morris into the Special Programs Director's position and still allowing him to function as Educational Talent Search Program Manager is a conflict of interest and violates Policy by not affording me the opportunity to apply for that position.

See Exhibit "A", which is the only formal announcement of his position other than Paul Morris relaying the information to Upward Bound Math/Science (UBMS) Program Manager, who relayed the information to the UBMS group.

An attempt to resolve or even discuss the grievance has failed.  Telephone calls and e-mails have failed.  I have the necessary documentation of e-mails dates and telephone calls if needed.

A copy of the Grievance Form has been submitted to the appropriate managers/supervisors;

DEF 000321

**A 9**

**MEMORANDUM**

TO:        CCP Staff

FROM:     Susan E. Zawislak
          Director

DATE:     September 9, 2002

SUBJ:     CCP August Update Revision

In a memo dated May 15, 2002, issued by Karen Stone, Associate Vice President for Human Relations, to Salary Plan B Merit Comparable Employees and Salary Plan C Regular, Part-Time Merit Comparable Employees, the open period for reclassification review was announced to be held May 16-May 31, 2002.

According to Karen's memo – *In order to be eligible for a classification review, there must have been a <u>SIGNIFICANT</u> change in the duties and responsibilities of the position since <u>last</u> evaluated and classified/reclassified. Reclassification requests may be initiated by either the employee or the supervisor. In either case, a "DTCC Position Classification Review Statement of Significant Change" form must be completed. This form is available in each campus Human Resources Office.*

As a result of this process, as of July 1, 2002, Paul Morris was reclassified to Special Programs Director, not promoted, as noted in the CCP August update.

SZ:lg

DEF 000329

A 10

# Memorandum

**To:**    Kenneth Cole, Student Enrichment Coordinator
Upward Bound Math Science Program

**From:** Susan E. Zawislak, Ed.D., Director
Corporate & Community Programs Division

**Date:**  September 25, 2002

**Re:**    GRIEVANCE (W03-102)

I have completed the review of your grievance, and related attachments, and offer the following information to clarify the issues you raised.

It is important to know that job postings or transfers for regular full-time positions can only occur when a *vacancy* exists for a specific position, and when the *vacancy* is assigned a *LAP* number. Since there was no *vacancy* or *LAP* number that existed at the Stanton/Wilmington Campus for a Special Projects Director, a promotion or transfer was not possible.

Paul Morris' revised employment status resulted from the annual reclassification process open to Salary Plan B Merit Comparable Employees and Salary Plan C Regular, Part-time Merit Comparable Employees. It was incorrectly stated in the August 2002 CCP Update e-mail that Paul Morris received a promotion. A revised Update was e-mailed to all CCP staff on September 11th clarifying that Paul's position was reclassified (See Attachment I.)

Based on this information, I believe that the employment action taken is not in violation of college policy.

SEZ

cc:    Kathi Karsnitz, Chief Legal Counsel &
Associate Vice-President for Human Resources

DEF 000348

A 11

11/04/2002  08:55    3025773827              DEL TECH                    PAGE  03/03

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**ENTER CHARGE NUMBER**

☐ FEPA  0910686
☐ EEOC  17CA3000 43    and EEOC

### Delaware Department of Labor
(State, or local Agency, if any)

| NAME (Indicate Mr., Mrs., Ms) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Mr. Kenneth Cole | 302-477-1788 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 3102 Wilmont Drive  Wilmington DE 19810  NCC | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

| NAME | NO. OF EMPLOYEES OR MEMBERS 15+ | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| Delaware Technical & Community College | | 302-454-3916 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 333 Shipley Street, Wilmington, DE 19801 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☐ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

**DATE DISCRIMINATION TOOK PLACE**
EARLIEST 8/1/2002
LATEST 10/8/2002
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

I. I am black male individual who began my employment with Respondent on October 1999, as a Student Enrichment Coordinator at the Wilmington Campus. On or about August 2002, I was not provided the opportunity to post or apply for the position of Special Program Director because Respondent failed to post the position. Shortly thereafter, Paul Morris, Program Manager (white male) was promoted to the position of Special Program Director. On 09/05/02, I filed a grievance with Human Resources with regard to the position not being posted. Furthermore, in August of 2002, Paul Morris, Progam Manager (white male) informed me and similarly situated co-workers who are all black: Bridgitte Brown, Elizabeth Wilson, Rosetta Henderson that we were being moved out of our offices. Respondent met with everyone except Tonia Conley, on a one on one basis. Respondent would not meet with everyone collectively. Ultimately, on 10/08/02, myself and all of my similarly-situated black co-workers were all moved out of our offices into a small confined space and our offices were given to the following individuals: Rachel (last name unknown, white female), Temporary Part-Time employee who has only been employed for approximately 3 months, Peter Lonie (white male) and Crystal Heath (black female)
II. Paul Morris explanation was that it was his vision to have all trio programs together & in a define space. However, Director of CCP, Sue Zawsilak, stated that the move was based on downsizing in the area and the allocation of space.
III. I believe I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Delaware Discrimination in Employment Act because: In the August newletter it was announced that Paul Morris was being promoted to Special Programs Director, a position which was not posted. After I filed the grievance I was told that Mr. Morris was not promoted, that it was a reclassification. In October all of the blacks were moved into a small confined space and our officed were given to all white individuals except one, who have less seniority and less experience.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

| I declare under penalty of perjury that the foregoing is true and correct. | NOTARY - (When necessary to meet State and Local Requirements) |
|---|---|
| 10-15-02          *Kenneth Cole* | |
| Date          Charging Party (Signature) | Subscribed and sworn to before me this date          (Day, month, and year) |

EEOC FORM 5
REV 6/92

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

DEF 000366

A 12

KENNETH COLE

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
 2

 3    KENNETH COLE,                    : C.A. No.:

 4    BRIGITTE L. BROWN,               : 05-270 KAJ

 5              Plaintiffs,            :

 6    v.                              :

 7    DELAWARE TECHNICAL AND           :

 8    COMMUNITY COLLEGE,               :

 9              Defendant.             :

10              Deposition of KENNETH COLE, taken pursuant

11    to notice before Tanya M. Congo, a Notary Public and

12    Certified Shorthand Reporter, at the offices of

13    Morris, James, Hitchens & Williams, LLP, 222 Delaware

14    Avenue, 10th Floor, Wilmington, Delaware, on Tuesday,

15    February 7, 2006, beginning at approximately 1:05

16    p.m., there being present:

17    APPEARANCES:

18              MARGOLIS, EDELSTEIN
                1509 Gilpin Avenue
19              Wilmington, Delaware 19806
                BY:  LORI A. BREWINGTON, ESQUIRE
20              Attorney for Plaintiffs

21              MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
                222 Delaware Avenue, 10th Floor
22              Wilmington, Delaware 19899
                BY:  DAVID H. WILLIAMS, ESQUIRE
23              Attorney for Defendant

24              Also present:  Brigitte L. Brown
                               Paul Morris
```

A 13

1      Q.    During your years of employment by the

2   college, you've continuously operated that business

3   in addition to working for the college?

4      A.    Yes.

5      Q.    How many employees do you have?

6      A.    Right now?

7      Q.    Yes.

8      A.    One, but we hire summer help when needed,

9   and a secretary when needed, and consultants because

10  sometimes we do quarterly inspections, so we'll hire

11  consultants to do the quarterly inspections.

12     Q.    Describe, at least generally, the nature

13  of the business?

14     A.    Like I said before, it's a -- we're a

15  credit reporting agency.  It started off with real

16  estate investment, and we are now a credit reporting

17  agency, and we provide background screening,

18  employment screening, credit checks, criminal

19  reports, criminal background checks, to the

20  government, to industry, local, federal government,

21  and corporations.

22     Q.    Is the business a corporate entity?

23     A.    Yes.

24     Q.    Is it wholly owned by you?

KENNETH COLE

1        A.    No.

2        Q.    Do you have partners, or other people that

3    have an equity interest?

4        A.    Yes.

5        Q.    Are they actively involved in the business

6    as well?

7        A.    Part time.

8        Q.    And you're engaged in that business part

9    time?

10       A.    Yes.

11       Q.    Over the years -- you're still employed by

12   the college today?

13       A.    Yes.

14       Q.    Over the years that you have been employed

15   by the college, have you devoted about the same

16   amount of time to this business on average over those

17   years, or has it varied from year to year and month

18   to month?

19       A.    It varies from year to year and month to

20   month.

21       Q.    Let's take 1995.  Can you approximate how

22   much time you devoted to your outside business during

23   1995?

24       A.    In the year of 1995?

1      Q.   Yes.

2      A.   An educational guess, I was on about 29

3  hours a week at Del Tech, come to the business about

4  2:00, 2:30.   Sometimes go from that time till 6

5  o'clock, 7 o'clock, 8 o'clock, or 9 o'clock, 10

6  o'clock.  Some days 5:30, some days 10:30.   It

7  varied.   It depends on the work, you know.   When I

8  walk into the office it depends on the workload and

9  what kind of issues and concerns we had to -- I had

10 to manage.

11     Q.   Would it be fair to say on average you

12 devote 3 1/2 to 5 or 6 hours a day to your business?

13     A.   It's hard to say.  I mean, I never thought

14 about averaging the time.  I would like to average a

15 couple hours a day because the business is fairly

16 simplified, meaning that our clients pretty much go

17 to our website and download credit reports or

18 criminal reports.  And if they have issues, I have to

19 address those issues, but they're not many.

20          But there's another part of the

21 business.  The real estate business may require some

22 time.  So, I mean, it's hard to say.  I mean, to give

23 you a number it wouldn't be fair to me because it may

24 not reflect the true hours that I put into the

1    business.

2         Q.    From the outset of your employment by the

3    college, you've been part time; isn't that correct?

4                   You're a part-time employee at the

5    college?

6         A.    Yes.

7         Q.    Meaning no more than 29 hours a week with

8    -- I understand there have been some exceptions to

9    that, but generally speaking?

10        A.    Yes.

11        Q.    And is it not also correct that you have

12   never applied for a full-time position at the

13   college?

14        A.    Yes.

15        Q.    Would it also be fair to say that given

16   your outside business interest that you've described,

17   that you have not had a desire to be a full-time

18   employee of the college?

19        A.    It depends on what's available.  If, for

20   instance, the Special Programs Director position

21   interests me, and I would have to make a decision,

22   analyze where the business is and who can manage that

23   business, and what the income level of the position

24   like a Special Program Director would generate.  What

KENNETH COLE

Page 48

1    page.   It states, in filling vacancies qualified

2    regular college employees receive equal consideration

3    for promotion in accordance with the college's

4    statement of affirmative action policy, regardless of

5    race, color, creed, sex or national origin.

6                    And go to page 3, finally, it's my

7    belief that promoting Paul Morris into the position

8    of Special Programs Director violated Section 1

9    policy to non-discrimination affirmative action.  And

10   that's the statement.

11        Q.   So you're telling me that if, in fact,

12   this position had been posted, you would have

13   applied?

14        A.   I'm telling you the fact -- I'm sorry.  I

15   sort of jumped the gun.  Repeat that for me.  I'm

16   sorry.

17        Q.   Are you telling me that if this position

18   had been posted, at that time you would have applied?

19        A.   I'm telling you that I would have

20   evaluated the situation -- it was an interesting

21   position -- and taken into consideration and factor

22   in the business, and factor in the wage increase, how

23   much the wage increase would have been at that time.

24                    I would have weighed all the options

KENNETH COLE

Page 53

1      Q.    And the college was asking you for medical

2    documentation that you couldn't work your full

3    schedule, and how long was that going to last, and

4    what were the restrictions in terms of how many hours

5    you could work?

6      A.    You mean Sue, Sue Zawislak, I guess?

7      Q.    Yes.    That's what she was asking of you?

8      A.    There were a lot of E-mails in between

9    here.    What's the date of this?

10            Yeah, there's some E-mails in between

11    here, but basically, with this E-mail, yes.

12      Q.    This actually looks like it's a

13    memorandum, not an E-mail.

14      A.    Yeah, I'm sorry, memo.

15      Q.    And if I understand what this document

16    says about the position you took, first of all, it

17    was your position that as long as you worked anywhere

18    between 15 and 29 hours, that you had a right to do

19    that?

20      A.    Right to do what?

21      Q.    Work however many hours you chose to work

22    as long as it fell between 15 and 29 hours a week?

23      A.    Yes, per my contract.    I signed a

24    contract.

1        You have it.  In paragraph 21 of the

2   Complaint, but it's not paginated, so I don't know

3   what page it is, you talk about the fact that Room

4   408 had been Ann Del Negro -- was at one time Ann Del

5   Negro's single office; is that correct?

6        A.   This is not -- it looks like this was

7   merged, and it's not -- this is not my statement

8   there.  The document was merged.

9             What was your question again, I'm

10  sorry.

11       Q.   Paragraph 21 says that the office that

12  UBMS group was being forced to move into, had been

13  Ann Del Negro's former single office?

14       A.   Yes, I agree with that.

15       Q.   It was not Ann Del Negro's office

16  immediately prior to UBMS group moving into 408, was

17  it?

18       A.   No.

19       Q.   In fact, it had been occupied by a program

20  called To the Max, which ceased to exist because of

21  funding issues, and, then it became SOAR?

22       A.   I don't know about it ceased to exist.  I

23  know that it was To the Max and, then SOAR.

24       Q.   And when To the Max was in there, there

1    were about -- there were two full-time Coordinators

2    occupying the space that you currently occupy -- you

3    and others currently occupy?

4         A.    Two full-time African American

5    Coordinators, and one, sometime, secretary.

6         Q.    Paragraph 22, I think, is talking about

7    the meeting that you described with Ann Del Negro

8    when you were reading from a piece of paper, and

9    talking about employee relations, morale,

10   productivity --

11        A.    Yes.

12        Q.    -- treated unfairly, unequally, ulterior

13   motives; that's an accurate allegation?

14        A.    Yes.

15        Q.    And prior to your being moved to Room 408,

16   you occupied a small office on kind of the opposite

17   hallway from where Room 408 is located?

18        A.    Well, it's not sort of opposite.  It's

19   sort of across the hall.  But, yes, we did occupy --

20        Q.    The hall goes in a square?

21        A.    Right.

22        Q.    And you were at the southwest corner of

23   that square, your former office?

24        A.    Yes, at the end where 408 is is north

KENNETH COLE

1      Q.    Because you never requested a promotion?

2      A.    No.

3      Q.    This document talks about in paragraph 77,

4   and also it talks about humiliation, mental anguish

5   and emotional pain.  Is that another mistake, or --

6      A.    Oh, no.  That's two different issues.

7      Q.    Do you have a claim for mental distress,

8   humiliation?

9      A.    Oh, no, that's another piece that was

10  merged.  No, the mental anguish and emotional stress

11  is Ms. Brigitte.

12     Q.    So you're telling me you have no such

13  claim for damages?

14     A.    Well, I have a claim for damages, yes.

15     Q.    For --

16     A.    I'm looking at compensatory and punitive.

17     Q.    Do you have a claim for damages arising

18  out of humiliation, mental anguish and emotional

19  pain?

20     A.    Yes.

21     Q.    I may have given you a copy of this

22  earlier, but perhaps not.  This is a copy of your

23  response to Answers to Interrogatories filed in this

24  case.  It's been marked for identification as Cole-2.

KENNETH COLE

1              O P E N   S E S S I O N

2              (Thereupon, the confidential section

3    of the deposition was concluded, and the deposition

4    proceeded as follows:)

5    BY MR. WILLIAMS:

6         Q.    How are you paid currently?

7              Hourly would be a part-time employee

8    and you're paid for each hour that you work?

9         A.    Correct.

10        Q.    You're not paid by salary?

11        A.    No.

12        Q.    And from October, 2002 until the present,

13   there was obviously a time in 2003 when you were

14   working less than 29 hours a week; isn't that right?

15        A.    Yes.

16        Q.    You were working how many hours, 20 hours

17   a week?

18        A.    Yes.

19        Q.    How long did that go on?

20        A.    September of 2002, I recall, till about

21   March or April of 2003.

22        Q.    You were only able to work 20 hours a week

23   for health reasons?

24        A.    Yes.

A 23

KENNETH COLE

1    Q.    You would not have, during that period of

2    time, been able to fulfill the requirement of working

3    in a full-time position at the college?

4    A.    I didn't know that in 2000 -- I didn't

5    know the illness was going to occur at that time.

6    Q.    When did you first become ill?

7    A.    It was end of August, I think it was.

8    Q.    End of August, 2002?

9    A.    Yes.

10    Q.    And were you hospitalized for awhile?

11    A.    Three days.

12    Q.    And after you came out of the hospital, is

13    when you were working a reduced schedule?

14    A.    Yes.

15    Q.    Of about 20 hours a week?

16    A.    Yes.

17    Q.    So my question again is, as of that time,

18    end of August, September, and right through whatever

19    date it is you identified in 2003, you would not have

20    been able to fulfill the requirement of working in a

21    full-time position at the college?

22    A.    On the doctor's orders, no.

23    Q.    So in other words, my statement is

24    correct?

KENNETH COLE

1        A.    The -- whatever you asked me.  You asked

2   me -- I think you asked me if the results of the Fire

3   -- the Fire Inspector's results, were they -- did I

4   see the documentation of the findings.

5        Q.    Well, that was two or three questions ago.

6   The question that's pending now is, are you aware of

7   any agency outside the college which has determined

8   that there's a safety issue with Room 408?

9        A.    That there is a safety issue?

10       Q.    Yes.

11       A.    No.

12       Q.    In Room 408 you have furniture?  You have

13  a desk and a chair?

14       A.    Yes.

15       Q.    Computer?

16       A.    Yes.

17       Q.    What other equipment is in that room?  Fax

18  machine?

19       A.    No, there's no fax machine.

20       Q.    Is that in the side office, the small side

21  office?

22       A.    No, we don't utilize that.

23       Q.    Is there a fax machine there?

24       A.    I'm not so sure any more because it

**A 25**

KENNETH COLE

```
 1    doesn't have a dedicated fax line, so we have to go

 2    to Room 430.

 3         Q.    But you have your own computer?

 4         A.    Yes.

 5         Q.    Phone?

 6         A.    Yes.

 7         Q.    The equipment that you have is similar to

 8    the equipment that other TRIO employees have?

 9         A.    Yes, I think we may have a little bit

10    more.  I think we have a scanner that Ms. Brown was

11    using.

12         Q.    Is there sufficiently lighting in the

13    room?

14         A.    Yes.

15         Q.    It is, in fact, a room.  It's not --

16    you're not sitting out in the hallway?

17         A.    Say again.

18         Q.    It is, in fact, an enclosed room.  You're

19    not sitting out in the hallway?

20         A.    Right.

21         Q.    There are two doors in and out?

22         A.    Yes.

23         Q.    It's your belief, obviously, that Room 408

24    is an uncomfortable place to work?
```

A 26

KENNETH COLE

1        A.    I'm sorry.  Repeat that, please.

2        Q.    Is it your belief that Room 408 is an

3   uncomfortable place to work?

4        A.    Yes, absolutely.  It's just -- that's just

5   a light term.  Yes, no doubt about it.  I think it's

6   a little bit stronger than uncomfortable, but.

7        Q.    Have you ever been disciplined by the

8   college?

9        A.    No.

10        Q.    Have you been threatened with termination?

11        A.    Yes.

12        Q.    That was in connection with the medical

13   documentation?

14        A.    Yes.

15        Q.    The numbers of hours you were working per

16   week, did that change as a result of your move to

17   408?

18        A.    Direct result, it has changed.  My hours

19   have changed.

20        Q.    The start time?

21        A.    The start time.  I don't understand your

22   question.

23        Q.    The starting time of your hours is that

24   what has changed?

KENNETH COLE

```
 1        A.    Yes.

 2        Q.    The move to Room 408 did not result in the

 3   loss of salary or pay?

 4        A.    No.

 5        Q.    As a part-time employee, do you receive

 6   benefits?

 7        A.    No.

 8        Q.    Did you receive benefits before you were

 9   moved to Room 408?

10        A.    No.

11        Q.    Did your title change as a result of the

12   move?

13        A.    No.

14        Q.    Did your responsibilities change?

15        A.    No.

16              MR. WILLIAMS:  Give me a few minutes

17   and I'll check through and make sure I don't have any

18   other questions.

19              MS. BREWINGTON:  That's fine.

20              (Recess)

21   BY MR. WILLIAMS:

22        Q.    Mr. Cole, are you able to point to or

23   refer me to any document which indicates that

24   Jacquita Wright Henderson was acting Program Manager?
```

A 28



DELAWARE TECHNICAL
& COMMUNITY COLLEGE
WILMINGTON CAMPUS
WILMINGTON, DE 19801

# UPWARD BOUND
# MATH AND SCIENCE
# CENTER

**PROGRAM YEARS**
**2000 - 2005**

**OCTOBER 2, 1998**

DEF 000018

A 29

The college provides the Upward Bound Math and Science Center with a suite of offices conveniently located in the East Wing of the Wilmington Campus (Please see floor plans on the following page). In the same building with the cafeteria, student services, library, career center and academic skills laboratories and with easy access to the West Building with the library and fitness center, the Upward Bound Math and Science Center will be within easy reach of students. The Center also has access to all other college facilities, and the use of college vehicles for transportation.

The East Wing is easily accessible and offers many educational advantages. The office suite provides space for the secretary's office together with file cabinets and office equipment. The counselor will use one of the cubical style offices. The Center Director occupies the large office; it has space for staff meetings, storage and tutoring. The suite of offices provides privacy for confidential conversation with center participants. In addition, space in the Basic Skills Center, library and campus classrooms is available for tutoring purposes and group meetings.

By placing the Upward Bound Math and Science Center in the same building with other student support services, such as the financial aid and admissions offices, both the Upward Bound Math and Science staff and the participants have ready access to information. Access to these offices is vital, and college staff have already shown their support for the program by offering assistance in retrieving and clarifying information and by supporting students who are referred to them. In particular, the Financial Aid Office, Marketing Office and Counseling staff have agreed to extend to the program materials and hours to provide all participants with better information.

DEF 000019

A 30

**DELAWARE TECHNICAL AND COMMUNITY COLLEGE**
**HOURLY EMPLOYEES-PERSONNEL DATA FORM**

REASON FOR PDF
86    NEW HIRE HOURLY
9998

CAMPUS
104
9916

PDF EFFECTIVE DATE
1999/11/01
9935

SOCIAL SECURITY NUMBER
-2919
9510

CAMPUS PHONE NUMBER
302-571-5300
9945

HOME PHONE NUMBER
302 477-1788
9841

NAME
COLE          KENNETH
9520

SEX
M
9540

EMPLOYEE MAILING ADDRESS - STREET 1
3102 WILMONT DRIVE          BLACK
9610

ETHNIC ORIGIN
1
9570

DATE OF BIRTH
9550

STREET 2
9611

COUNTY
N    NEW CASTLE
9617

MARITAL
M
9550

CITY
WILMINGTON
9615

STATE
DE
9616

ZIP CODE
19810
9660

ZIP + 4
9662

TYPE EMPLOYEE
14    Temporary, P
9929

STATUS EMPLOYEE
01    Active (Currently
9935

EEO-6 CATEGORY
3    Professional

HOURLY HIRE DATE
9566

AGENCY HIRE DATE
1999/11/01
9603

STATE EMP DATE
1999/11/01
9650

LEVEL OF EDUCATION
06    Associate De
9671

CLASSIFICATION CODE (HOURLY)
3533    STUDENT ENRICHMENT COO
9623

IBU/MBU CODE
2499    CONTINUING EDUCATION
9532

DEPARTMENT CODE
1100    CORPORATE AND COMMUNITY P
9556

PAY GRADE
C13
9793

PRIMARY FUND
1750
9771

SECOND FUND
9781

# FED. W/H
06
9597

# STATE W/H
06
9596

LOCAL TAX
Y
9598

PAYS FICA
Y
9593

PAYS PENSION
N
9534

PAYS MEDICARE
Y

TAX CODE
H

EARLIEST PENSION - COVERED STATE EMPLOYMENT:

BEFORE 07/01/76 = B
AFTER 07/01/76 = A
NO PENSION COVERAGE = X
9599

AMOUNT OF CONTRACT
$ 0.00
9761

O
R

HOURLY RATE
$ 14.88
9751

FOR REGULAR PART-TIME
EMPLOYEES ONLY:          _____ % OF CONTRACT

POSITION #
9826

R
E
M
A
R
K
S

1861    UPWARD BOUND

APPROVALS

EMPLOYEE SIGNATURE          DATE

DTCC SIGNATURE          DATE

H 46 REV (11/23)

REDACTED

DELTA FORMS INC. 302-892-2288



REDACTED

DEF 000148

A 32

# NOTES FROM MEETING WITH BRIGITTE BROWN AND KENNETH COLE

On Tuesday, September 3rd, 2002 at approx. 10:00 a.m., Brigitte Brown (RFT Student Enrichment Coordinator) and Kenneth Cole (TPT Student Enrichment Coordinator), both in the Upward Bound Math/Science Program, came to the Human Resources Office and asked to speak with me in Jackie Jenkins' absence. Brigitte was visibly upset. We sat around the table in Ms. Jenkins' office and I explained to them that I would be glad to listen and would be taking notes and would try to assist them to the best of my ability but advised them that this was not something I normally do, so I may need to call my superiors for guidance once all of the information was obtained. Brigitte and Ken began to share their concerns regarding several issues.

**Issue 1:** They have tried unsuccessfully to discuss their concerns with their superiors. They had met with their immediate supervisor, Rose Henderson, on several occasions. She supported them in pursuing more answers. Rose's immediate supervisor is Paul Morris, but since some of their issues revolved around him, they requested a meeting with Sue Zawislak. She did not respond to their requests (both voice mail and email) for over a week, and when she did, it was via an email to Rose to review their request and if she, as their immediate supervisor, felt this warranted further consideration, to set up a meeting with Paul Morris and Ann Del Negro. Brigitte and Ken had not gone to Ann Del Negro because when Paul Morris was reclassified to Special Programs Director with oversight of TRIO programs, he told them that Ann was "out of the loop" and that everything went through him now. When they met with Ann and Paul, they felt that Ann was very stern with them, berated them for trying to meet with Sue without meeting with her first, did not listen to all of their concerns, cut them short on several occasions, spoke to them like children, and repeatedly expressed that she was "very disappointed" in how they had handled things. They were very frustrated by the lack of direct communication and run-around they felt they were getting. Following their meeting with Paul and Ann, they requested another meeting with Sue, and she told Brigitte that she would be speaking with Ann on 9/3/02, but that Brigitte needed to follow protocol. They felt that Sue was avoiding/refusing to meet with them, so they were coming to Human Resources and then planned to request a meeting with Dr. Winner, Assistant Campus Director.

**Issue 2:** Subsequent to Paul Morris being reclassified to Special Programs Director, he shared in a meeting with the TRIO programs that part of his vision for the department was for each program to have a distinct office area. The Upward Bound Math/Science program employees (Rose, Ken, Brigitte and Liz Wilson) were told that they would be switching offices with the employees of the SOAR program. Currently, Rose, Ken and Brigitte all have individual offices on the same hallway, and their secretary, Liz Wilson, is in the Upward Bound Classic office. The office space they were being told to move to would be one larger office to be shared by Ken, Brigitte and Liz, and an adjoining office for Rose. The SOAR employees (Peter Lonie and Crystal Heath) would be moving into the individual offices and Tonia Perry Conley (Upward Bound Classic) would be moving from her individual office on the same hallway into the space currently used by Liz Wilson in the Upward Bound Classic office.

DEF 000305

**A 33**

Ken and Brigitte strongly believe that the space issues are largely a result of the continuing tension between Kate Sullivan and Tonia Perry Conley, who also have individual offices on the same hallway. They feel that they have received unfair and unequal treatment as a result of superiors trying to handle the Kate/Tonia issue. They suggested that if Tonia was going to move back to the Upward Bound Classic main office where Liz Wilson currently was, Liz could just move into Tonia's office, and then all of Upward Bound Math/Science staff would be on the same hallway. They were told that secretaries don't get offices. They also suggested as another alternative that they (Brigitte, Ken and Liz) could move to the office currently occupied by SOAR, but leave Rose in her own office, which would allow them less cramped quarters in the shared office space and would also allow for three Program Managers (Rose, Peter and Kate) to have offices on the same hallway.

Ken discussed concerns regarding the move with Paul in a meeting earlier this month, but was told that it was still going to happen. Rose went to Paul to request a meeting with Sue to discuss the move, and was told to have Ken and Brigitte submit in writing how the move would impact their job description. They all measured their office space and their recently purchased office furniture and found that they would be losing at least 30 square feet of office space, and there seemed to be no ability to install partitions. They feel that this move will impact morale and productivity. Their alternatives were suggested to Paul and Ann in their meeting, but they were told that they move was still on as scheduled. Their understanding from Paul was that the move would not occur before October, but were informed last week that the move was to occur September 3rd, 2002. They clarified that they were not refusing to move, but just were requesting that the move be put on hold until they had been heard by someone higher up.

**Issue 3:** Ken expressed his concern that Paul's promotion was a violation of policy and that he (or anyone else) should have had the opportunity to apply for it. I explained that the position was not a promotion, but was part of the annual reclassification review process which is open to all Plan B employees. He showed me the CCP newsletter, which indicated that Paul had been promoted and I informed him that "promoted" was an improper term for them to use. His concern with the reclassification is that if a position is reclassified to a higher paygrade it should be open for application. Also, it should be reclassified based on additional duties that the employee is currently performing, not that the employee will be expected to perform. According to Ken, last year TRIO employees were informed that Paul was serving as a liaison between Ann and the Program Managers, but he had no direct authority. Now he is issuing directives which is a marked change in job responsibilities. Brigitte and Ken both expressed concern that Paul is now serving in dual positions as Program Manager of Talent Search as well as Special Programs Director, and did not see how he could be a peer and a supervisor to the other Program Managers. In addition, they felt that he was essentially taking up two positions, and if his new title was Special Programs Director, then the Program Manager position should be available.

DEF 000306

A 34

Ken expressed that he wanted to file a grievance, and had already reviewed the Personnel Policy Manual. I spoke to Karen Stone, and relayed as much of the situation as I could without using names per Ken and Brigitte's request. Karen said that it was difficult for her to advise without specifics, but that based on what I told her, they did not seem to be grievable issues. She referred to the PPM, which designates that grievances must either be based on policy interpretation or disciplinary action. She further explained that in the reclassification process, a position that is reclassified to a higher paygrade does not need to be posted and that a person serving as a Special Programs Director could also serve as a Program Manager as part of his/her duties. She suggested that the most appropriate next step would be for them to meet with Sue Zawislak, and that in Jackie's absence, I should advise Dr. Winner of the situation. I relayed this information to Ken and Brigitte and put a call in to Dr. Winner's office, and was advised that she would return my call after 2:00 pm. Ken was scheduled to leave work at noon, so he agreed to keep in touch with Brigitte, and Brigitte said she would return to her office and wait to hear back from me. Ken said he was still interested in filing a grievance and asked that I obtain the necessary form for him, and I told him I would do so.

Cara Stanard
HR Specialist II
September 5, 2002

DEF 000307

A 35

**ATTACHMENT #1**

# FY99

# ACHIEVEMENT REPORT

# DELAWARE TECHNICAL
# & COMMUNITY COLLEGE

## STANTON/WILMINGTON CAMPUS

DEF 000001

A 36

11/14/2002  10:56    3024533020    DEL TECH STANTON HR    PAGE  05

# CORPORATE AND COMMUNITY PROGRAMS DIVISION
## STANTON/WILMINGTON CAMPUS

### COLLEGE EFFECTIVENESS

**Goal 1**    Complete the reorganization of the Corporate & Community Programs Division to provide more effective and efficient delivery of services. __Campus Plan Goal__

    **Objective 1**    Review current organizational structure and staffing needs.

- *The new Educational Training Specialist position category and coordinator/department chair structure was approved in July 1998. Assignments were allocated by program unit/departments within the CCP division. This provided for more accountability in budgets and staffing. As a result, some staff was reassigned based on workload and funding streams; other positions will be posted as part-time. Greater coordination and grouping of similar programs occurred in some areas while other areas of program overlap are under review. Our greatest challenge is to continue to modify the structure as new programs/funding streams are added or eliminated.*

    **Objective 2**    Reexamine existing office space and reallocate where appropriate.

- *The CCP offices at both the Stanton and Wilmington campuses have become more efficient as a result of the reallocation of space to create neighboring programmatic working groups. Specifically: The Program Developers work adjacent to the office support staff (that handles inquiries and processes registrations) at Stanton. The Bell Atlantic Project team has moved into the A-wing at Stanton adjacent to the office support staff. The Camp on Campus staff now works adjacent to the office support staff. A three-room office suite in the A-wing was added to allow the cluster of ABC Programs and*

DEF 000002

A 37

FY 1999 Achievement Report
Corporate and Community Programs Division

potential Vista employees at Stanton. The entire TRIO staff is now
housed in the East-wing at Wilmington and while they are located on
different floors, the individual programs are now in closer working
groups. The Community Programming staff has moved into the
Southeast-wing at Wilmington, and is now adjacent to CCP
classrooms and facilities.

**Objective 3**    Evaluate current operational procedures and develop more
uniformity throughout the division.

- The Community Program component of CCP had completed a draft
  "process map" that explains the responsibilities and actions of core
  functions. This document helped to identify several key areas such
  as cash handling procedures, processing of registrations, and
  database management that lacked uniformity. We have since
  conducted meetings, drafted policies, and implemented procedures
  with the full intent of uniformity, yet have allowed a small degree of
  autonomy for programs that must follow different rules for different
  program/funding reasons. Standardization has also been discussed
  related to incoming software and internal systems.

**Objective 4**    Analyze computer hardware and software needs and
develop a division plan for future purchases.

- A survey was drafted and conducted in the Fall that queried all CCP
  employees of the capabilities of their existing hardware and
  software. A report was compiled that identified our Division-wide
  needs for new and additional hardware and software. As a result of
  this plan eight new computers were purchased in April, which
  enabled us to give staff members significantly improved equipment.
  The use of compatible software versions will make the transfer of
  files more efficient and more frequent. While this reflects some
  progress, additional work is needed.

---

**FY 99 Achievement Report**                          **Stanton/Wilmington Campus**

DEF 000003

A 38

11/14/2002  10:56    3024533828    DEL TECH STANTON HR    PAGE  07

# ACHIEVEMENT REPORT        FY2000

## Delaware Technical & Community College  ◆  Stanton/Wilmington Campus



DELAWARE &
TECH

DEF 000004

A 39

FY 2000 Achievement Report
Corporate and Community Programs Division

- DABC "To the Max" program added one full-time Student Enrichment Coordinator and three part-time SEC's. Housed at Wilmington Campus Corporate & Community Programs area.

- TRIO Upward Bound Math/Science hired 14 temporary part-time summer staff, including four Youth Care Workers, six Instructors, and four Tutors.

- Increased staffing of summer Camp Youth Programs to accommodate the increased enrollments in Camp-on-Campus, and to staff three newly organized specialty camps including Writer-Illustrator, Science, and Basketball. A total of ten temporary part-time counselors were added to the summer staff camp. The number of additional hires complies with standards set forth by State of Delaware Regulations Governing the Sanitation of Recreational Camps, Section 483.101 Ratio of Counselor to Campers.

- Hired one full-time Secretary to support the Program Manager and Student Enrichment Coordinator(s). Filled vacant Program Manager's position through in-house promotional opportunities. Continuing process to hire one full-time Student Enrichment Coordinator and one temporary part-time secretary.

- Hired one full-time Student Enrichment Coordinator and seven temporary part-time summer staff, including four Instructors and three Tutors.

**Objective 1.2**  Re-examine existing office spaces and reallocate where appropriate.

- Instituted dialogue with Administrative Services concerning office space needs of the three TRIO programs. Developing plans for reconfiguration of staff placement to promote highly efficient work groups.

- Secured space for supplies purchased from the Food Bank for TRIO and other youth programs' students.

- Camp Program office is under construction.

DEF 000005

A 40

11/14/2002  10:56     3024533028          DEL TECH STANTON HR          PAGE  89



# OPERATIONAL PLAN                    FY2001

**Delaware Technical & Community College  ✦  Stanton/Wilmington Campus**

DELAWARE TECH

DEF 000006

A 41

❖                              | **Corporate and Community Programs**

# PROMOTE ORGANIZATIONAL SYNERGY

### Goal 13

Modify the Corporate & Community Programs organizational structure to provide effective and efficient delivery of services in a changing external environment.

*Objective 13.1*     Review current organizational structure and staffing needs.

*Objective 13.2*     Re-examine existing office space and reallocate where appropriate.

### Goal 14

Re-examine evening and weekend support services in conjunction with other campus divisions.

*Objective 14.1*     Identify desired levels of service and support and review associated costs.

*Objective 14.2*     Review and improve communication process with credit and non-credit evening faculty.

### Goal 15

Identify processes to interface more effectively with campus Student Services, Human Resources, and Business Offices.

*Objective 15.1*     In conjunction with Student Services, Instruction and the Business Offices, establish processes for the effective implementation of programs offered through the Workforce Investment Act (WIA).

*Objective 15.2*     Work with Human Resources to streamline hiring practices, background checks, leave reconciliation, and payroll related issues.

*Objective 15.3*     Work with the Business Office to streamline petty cash, deposits, and Supercard processes.

---

DEF 000007

A 42

*2002 — Achievement Report*

- ❖ Established internal disbursement system in collaboration with the Business Office to disburse stipend and transportation expenses for Upward Bound Math/Science six-week summer program.
- ❖ Developed grant/contract closeout process in collaboration with Business Office to ensure that all outstanding documents efficiently process through the OMS/DFMS system.
- ❖ Implemented revenue deposit system to ensure that summer camp receipts are deposited in a timely manner.
- ❖ Continued to work with Business Office to refine third party billing procedures.
- ❖ Examined systems and controls that will enable CCP and Business Office to operate more efficiently and effectively.
- ❖ Meetings have been held between C&CP and the Campus Business Office and procedures outlined to streamline the WIA voucher process.

## PROMOTE ORGANIZATIONAL SYNERGY

### Goal 13

Modify the Corporate & Community Programs organizational structure to provide effective and efficient delivery of services in a changing external environment.

**Objective 13.1**   Develop procedures for continued periodic review of organizational structure and staffing needs.
- ❖ This is ongoing as a result of funding opportunities and challenges.

**Objective 13.2**   Continue to re-examine existing office space and reallocate where appropriate to meet changing needs of the Division.
- ❖ Additional office space for camp has been identified at Stanton.
- ❖ Computer rooms at Stanton and Wilmington have been upgraded.
- ❖ Youth computer lab was established at Wilmington.
- ❖ Tutoring Center has been upgraded.
- ❖ Relocated faculty office space has created an additional classroom in ITD.

### Goal 14

Re-examine evening and weekend support services in conjunction with the Campus Director and other campus divisions.

DEF 000008

A 43

*2003 Operational Plan*

❖ ## Corporate and Community Programs Division

### Goal 12
Strategic Goal 4.5

Implement the new administrative software system tool to create an interactive college community that optimizes the effectiveness of transactions for students, the use of information by employees, and the efficiency of business practices.

**Objective 12.1**    Play an active role in developing processes for CCP web registration and web payment.

**Objective 12.2**    Collaborate with the Business Office to identify and implement procedures for handling financial transactions in an efficient and timely manner.


## PROMOTE ORGANIZATIONAL SYNERGY

### Goal 13

Modify the Corporate & Community Programs organizational structure and processes to provide effective and efficient delivery of services in a changing external environment.

**Objective 13.1**    Continue to monitor the organizational structure and staffing needs.
**Objective 13.2**    Create a job shadowing experience for CCP staff to gain greater awareness of cross-divisional functions.

**Objective 13.3**    Continue to re-examine existing office space and lab areas and reallocate where appropriate to meet changing needs of Division.
**Objective 13.4**    Coordinate the purchase of divisional supplies, particularly across varying grant lines.


### Goal 14

Re-examine evening and weekend support services in conjunction with campus director and other campus divisions.

**Objective 14.1**    Identify desired functions and levels of service.

DEF 000009

A 44

# Youth Programs

Program Manager's Meeting
August 5, 2002
Summary of Minutes

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

**Attendance:** Rose Henderson, Paul Morris, Brigitte Staab, Kate Sullivan

The minutes from the last meeting were accepted.

**Old Business**

MBNA SAT Class - There were 13 students in the MBNA class – 12 from ETS and 1 from UB. 18 UBC students participated in the Summer Program. Paul's goal is to have 18 students take the SAT test.

School Evaluations - Paul asked that they be submitted to him. Kate asked if the evaluations go to the coordinators. Paul said that copies of the evaluations for their schools should go to the coordinators.

Summer Banner Registrations - Rose Henderson stated that Liz had 500 Banner registrations to do and may need help – some for ETS and some for UBC since Diana is not yet trained. She said that Ann Del Negro mentioned that it took only 20 minutes or so of training. Paul said that Diana is not yet set up to do Banner registrations. Rose stated that Ann indicated the budget is a priority. Paul agreed that the budget was a priority. Rose said she wanted clear directions on where emphasis is.. Paul indicated the emphasis was on both the budget and the Banner registrations. Paul said that the Banner registration deadline has been known for a month now. Rose will let Paul know on Wednesday where Liz is regarding the registrations. Rose indicated that Liz could come in on Saturday to get it done.

College In-Service - Paul indicated that it is mandatory unless approved by Mr. Miller. It is too late at this point to write Mr. Miller. Paul said that all Leave Forms need to be signed by Susan Zawislak. Rose said that Brigitte Brown had put in a Leave Form to go to Florida. Rose signed it in June and submitted it to Human Resources. Paul went on record to say that Mr. Miller will not approve a Leave Form for the In-Service date if it is not already in the pipeline. Paul asked Rose for a copy of Brigitte's Leave Form.

**New Business**

Criminal Background Information - Paul asked for input about putting a line on the application form regarding criminal background. Paul said that they were concerned with criminal activity such as assault and rape. Kate Sullivan brought up an incident where

DEF 000288

person had a drug possession charge. Kate asked if the line is on college applications. Kate and Rose support the idea. Paul indicated that he just wanted their feelings. Legal may need to become involved. Paul cautioned that if we have the information, we might need to act on it. There is an issue with TRIO that they may not allow someone not to be accepted. It may be best not to put it on the application – because otherwise we would be responsible.

Incident Report - Paul said that the Incident Report is not yet put together. He emphasized it is important to get written statements from every party involved. This is the minimum of what needs to take place.

Behavior Contracts - Paul stated that steps need to be in place for dealing with unacceptable behavior. Parents need to be notified in writing. Parents need to sign contract. There needs to be training on how to do discipline, steps to take, and terms and conditions, i.e., if A happens, then B and C consequences will take place. Paul said that kids are changing – they are punching each other. Kate said that girls are becoming more physical. Paul agreed. Paul indicated that we also need Event Contracts.

Accessibility of Staff - Paul stated that we are responsible for our staff at all times, including summer staff. We need to know how to get hold of them. Rose said that they need better quality cell phones. Paul said Nextel has a walkie-talkie also. Rose said that one time a staff member did not have the cell phone on since she had no belt. Paul and Kate thought that carrying the cell phone in a case would solve the problem. Rose said they still need another cell phone. Paul suggested that a staff member could be on duty at a landline - with rotations of staff during the night. He asked Rose to run it by her staff. Paul said a table could be set up in the hall near a phone. Paul said that he was of the mindset that we need to know where our staff is at all times.

CCP Computer Labs - Room 359 has brand new computers – Kate's program purchased some, and Rose's program purchased some. We also have new computers in 357. There will be new computers in 360 in the future. The computer labs need to be supervised at all times. There have been problems with the changing of settings. The students will not be able to change settings once the computers are networked.

CCP Storage Cage – Paul said there is some confusion as to which cage is for CCP. Kate's program had put items in the wrong cage – probably in the one for Student Services. Paul mentioned that one person from each program was to dress down on Friday and go down to clean up the CCP cage. Any student records need to be shredded. Paul was concerned about knowing what was even in the cage – we may be purchasing items that are already stored down there.

Speaker Database – Paul stated that a speaker database will be created with name, phone number, organization, title, etc. Susan would like columns for speakers – one column on what area the speaker spoke on, and another column on when the speaker spoke last. This way we can pick speakers we have not used for a few years in CCP. Kate suggested that whoever is responsible for database should probably confirm all phone

DEF 000289

A 46

numbers, etc. Paul asked for Kate and Rose to get as many names as possible and to give it to him by Friday.

CCP Director and CCP Assistant Director – Ann Del Negro and Susan Zawislak came in and announced that Paul was promoted to "Special Programs Director". Susan stated that Paul will now be directly supervising Rose Henderson and Kate Sullivan. Paul will also review all fiscal paperwork.

Other Business

Paul reminded everyone that the Equipment Supplies Inventory Sheet was due in August – he needs one for UBC. Kate indicated that Tonya was doing it.

Paul stated that it is a goal to define space for the TRIO programs by the end of September. ETS is lucky of have defined space. UB Math/Science needs defined space – with all personnel in the same area. Paul will let them know and ask for shared input. ETS needs space for part-time Program Coordinator. Rose's program will be affected the most. Paul said we do not have many options on defined space. He ran it past Sue and Ann, and they thought defined space was a great idea.

Kate brought up the subject of decorations for the tutoring room. The present decorations can be carried through the summer. UB Math/Science will do the fall decorations, UBC will do winter, and SOAR will do spring.

Rose brought up the fact that she still needs a date for the fiscal meeting with Cliff. Paul told Rose he would get a date, but advised Rose to be ready. Rose asked Paul to sit down with her before the meeting with Cliff. Kate and Paul have already met for Kate's program and will meet again before her meeting with Barry. Paul indicated that while he can provide guidance, he does not have time to manage other programs' budgets.

DEF 000290

A 47



Brown/Cole 209

**A 48**

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KENNETH COLE,                          )
                                       )
        Plaintiff,                     )       C.A. NO. _____
                                       )
            v.                         )
                                       )       JURY TRIAL DEMANDED
DELAWARE TECHNICAL AND                 )
COMMUNITY COLLEGE,                     )
                                       )
        Defendant.                     )

## COMPLAINT

### INTRODUCTION

1.      This is a Complaint brought pursuant to Title VII of the Civil Rights Act

of 1964, as amended, codified as 42 U.S.C. § 2000(e) et seq., as amended by the Civil

Rights Act of 1991, 42 U.S.C. § 704(a) and 42 U.S.C. § 1981.

### PARTIES

2.      Plaintiff, Kenneth Cole (hereinafter "Plaintiff"), is and was at all times

relevant to this Complaint, a resident of the State of Delaware, residing at 3102 Wilmont

Drive, Wilmington, Delaware 19810.

3.      Defendant, Delaware Technical & Community College (hereinafter

"Defendant"), is a statewide institution of higher education, i.e., a local community

college, providing academic, technical, continuing education, and industrial training, and

at all times relevant to this Complaint, the employer of Plaintiff Kenneth Cole.

Defendant is subject to service of process through Delaware Technical & Community

College; c/o Larry Miller, Office of the Campus Director, 333 Shipley Street,

Wilmington, Delaware 19801.

## JURISDICTION

4.    Jurisdiction is founded on the existence of a question arising under federal statutes.  This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) of Title VII of the Civil Rights Act.  The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights secured by federal and state law which prohibits discrimination against employees because of their race.

5.    The state law claim regarding the breach of the implied Covenant of Good Faith and Fair Dealing is brought pursuant to the pendant jurisdiction of this Court.

## FACTUAL BACKGROUND

6.    Plaintiff was hired by Defendant as a part-time Student Enrichment Coordinator for the Upward Bound Math and Science Program (hereinafter "UBMS") at the Wilmington, Delaware campus in or around November 1999.  Plaintiff has been continuously employed by Defendant for approximately five (5) years.

7.    When Plaintiff began his employment, Defendant had three (3) federal-grant TRIO programs: the Educational Talent Search Program, managed by Mr. Paul Morris, a Caucasian; the Upward Bound Classic Program, managed by Ms. Kate Sullivan, a Caucasian female; and the Upward Bound Math and Science Program, managed by Ms. Rosetta Henderson, an African-American female.

8.    In or around February 2001, a proposal was introduced by Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs, to move the Upward Bound Classic Program staff into the offices that were occupied by Plaintiff and the other members of the Upward Bound Math and Science Program.  In turn, Plaintiff's

**A 50**