department would be relocated from their offices to the cubicles that were occupied by the Upward Bound Classic Program personnel. Plaintiff was informed that the reason for the move was to bring the TRIO programs together.

9.      Disappointed, and somewhat surprised by the announcement that they would potentially be losing their offices, Plaintiff and the other members of his department requested a meeting with Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs for Defendant.

10.      As a result of that meeting, the move was halted; instead, only Ms. Tonia Conley, Student Enrichment Coordinator with the Upward Bound Classic Program, was relocated next to her Program Manager, Ms. Kate Sullivan.

11.      In or around July 2002, Mr. Paul Morris, a Caucasian, Program Manager for Educational Talent Search, was promoted to Special Program Director, a position that oversees all of the TRIO Programs, including Plaintiff's.

12.      On or about August 7, 2002, Plaintiff sent an e-mail to Mr. Morris regarding some of his concerns and issues and asked if they could meet to discuss same.

13.      On or about August 8, 2002, Morris went to Plaintiff's office to speak with him about the impending move, and informed Plaintiff that the move was his [Morris'] decision and was going to go forward despite Plaintiff's opposition to same.

14.      On or about August 12, 2002, Paul Morris met with Plaintiff and the other members of his department and informed them that he had unilaterally made a decision to relocate the Upward Bound Math and Science Program from their current multiple offices to the single office that had been occupied by the SOAR Program.

15.     That same day, Plaintiff and the other members of his department visually surveyed the office space they were being forced into, and determined that it was completely inadequate to house two (2) full time employees, one (1) part time employee, two (2) student co-ops, student participants, visitors, files and equipment and other resources.

16.     Specifically, Plaintiff's new office space was approximately thirty-six (36) square feet less than what his department had in its original office space, a decrease from a combined total of 211 square feet to 175 square feet. In fact, Plaintiff's office space was so much smaller that partitions could not even be set up in the room.

17.     On or about August 13, 2002, the UBMS team (Plaintiff, Ms. Brigitte Brown, and Ms. Liz Wilson) met together to discuss the proposed move and the fact that they believed there were being unfairly discriminated against and treated differently from the other TRIO programs when they were forced into a smaller, single office.

18.     After speaking with their Program Manager, Plaintiff and the remaining UBMS staff prepared an agenda to discuss with management; the agenda was submitted via e-mail to Ms. Sue Zawislak, a Caucasian, and Defendant's CCP Director, on or about August 14, 2002.

19.     In response to their concerns, the UBMS group was later told by Mr. Paul Morris to "put it in black and white" and to "explain where it stated in [their] job description that [they couldn't be moved]." Plaintiff and his colleagues were eventually granted a meeting with upper management (Paul Morris and Ann Del Negro) on or about August 29, 2002, just two (2) working days before the proposed move.

20.    On or about August 29, 2002, the UBMS staff met with Ms. Ann Del Negro and Paul Morris. Plaintiff and his group tried to explain that the proposed move would affect employee relations, morale and productivity, not to mention, the small space would make it extremely difficult to protect students' privacy which was necessary.

21.    The office that the UBMS Group was being forced to move into had been Ann Del Negro's former single office; it was an office with only two wall sockets as it designed for occupancy by only one individual. Instead, Defendant was putting the three (3) African-American members of the UBMS Program into a small, inadequate office space, despite their previous objections and their complaints that this move was discriminatory in nature.

22.    Ann Del Negro got very upset and expressed her feelings to the UBMS Group of how disappointed she was that they felt their move would affect employee relations, morale and productivity. Plaintiff and the rest of the UBMS staff went on to explain how they felt that they were being treated unfairly and unequally and that they believed that there were ulterior motives for the move. Plaintiff explained that by putting all three people in such a small, confined space, they felt as if they were being punished.

23.    Plaintiff and the rest of his group informed Del Negro that they felt the move was partially motivated by a conflict that existed between Ms. Kate Sullivan, a Caucasian employee and Ms. Tonia Conley, an African-American employee, and that Plaintiff's UBMS Group, which was comprised of all African-American employees, was subjected to relocation as a result of this conflict, despite the fact that they had provided reasonable alternatives to avoid the move.

24.     By the end of the meeting, Del Negro decided that the move would still continue as scheduled, never having addressed the group's issues of being punished, being discriminated against, being treated unfairly and unequally, and the effect that this move would have on employee relations, morale and productivity.  Plaintiff left the meeting feeling that his concerns were unheard.

25.     On Tuesday, September 3, 2002, the day before the move, Plaintiff went to Human Resources and met with Cara J. Stanard, Human Resource Specialist, to discuss the "move" and asked her to schedule an urgent meeting with Dr. Connie Winner, Assistant Campus Director, in an effort to file an additional complaint and hopefully halt the move which was scheduled for the next day.

26.     On September 4, 2002, the move was to take place, but it did not, presumably as a result of Plaintiff's complaint to Dr. Winner.  Instead, maintenance men were sent around to measure Plaintiff's group's offices.  As the maintenance crew was measuring, Ann Del Negro, Assistant Director of CCP, arrived and took over the job of measuring the office spaces herself.

27.     On September 5, 2002, Plaintiff filed a grievance against Ms. Zawislak, Director of CCP, alleging, *inter alia*, personal discrimination, and regarding Paul Morris's promotion to Special Program Director, which Plaintiff believed to be in violation of Defendant's Personnel and Policy Manual.  Plaintiff further alleged in his grievance that he was never afforded the opportunity to apply for the position because Defendant failed to properly post the position.

28.     On September 5, 2002, Sue Zawislak and Ann Del Negro called for Plaintiff, Liz Wilson, secretary, and the other members of the UBMS group for separate,

individual meetings at different times to discuss the proposed "move". Zawislak and Del Negro refused to believe Plaintiff, or even investigate his allegation that there was a conflict between Kate Sullivan and Tonia Conley that may have been the driving force behind the loss of their office space. Plaintiff's meeting, however, was put off until the following day, September 6, 2002.

29.     During those meetings, Plaintiff, along with the other members of his team, introduced clear alternatives to their proposed move. He gave Zawislak and Del Negro the measurements of their office spaces compared with the measurements of the proposed new office space. Zawislak insisted in the meeting that the proposed move was due to downsizing and because of allocation of space, and insisted that the move made sense, which was once again in direct contradiction to what Paul Morris said; that the move was his "vision" to have the TRIO Programs together.

30.     The proposed move consisted of moving eight (8) people as opposed to the alternative proposed by Plaintiff and his department which involved moving only two (2) people, and simultaneously achieving the same goal of having the TRIO programs together as well as achieving more cost effectiveness overall. Despite his best efforts, Plaintiff could not convince Defendant to entertain his suggestions.

31.     In the end, the individual meetings came across as a "witch hunt;" Plaintiff felt intimidated, interrogated and that Defendant was on a search and destroy mission. Plaintiff also felt as if he was being talked down to and belittled because he was African-American, and that nothing he said made any difference. Most of Plaintiff's answers to Defendant's questions were turned around and restated.

32.    On or about September 9, 2002, subsequent to Plaintiff's grievance filed on September 5, 2002 alleging that Morris was improperly placed in his position, Zawislak issued a memorandum via e-mail on September 11, 2002, dated September 9, 2002, entitled "CCP August Update Revision" which stated that Morris was "reclassified" to Special Programs Director, "not promoted," as a pretext to hide Defendant's discriminatory motive.

33.    On or about September 12, 2002, in another attempt to prevent the loss of his office space, Plaintiff once again met with Zawislak and Del Negro to present alternatives to the move, which included graphical representations of cost analysis, resources, computer equipment, telecommunication equipment needs, and the anticipated loss of productivity, to no avail.

34.    On or about September 19, 2002, Plaintiff received an e-mail from his Program Manager, Ms. Rosetta Henderson, stating that Zawislak informed her [Henderson] that Plaintiff's work hours began at 8:30 a.m. and not 8:00 a.m., as they had been since his date of hire in 1999. Plaintiff's hours had consistently been 8:00 a.m. to 2:00 p.m., but for some unknown reason, Zawislak informed Henderson that Plaintiff's hours were to be from 8:30 a.m. to 2:30 p.m. Plaintiff believes that his hours were changed in retaliation for the grievance he filed against Zawislak.

35.    On or about October 2, 2002, a meeting took place between Sue Zawislak, Ann Del Negro, and Paul Morris, Plaintiff and the rest of the UBMS team. Zawislak announced that the UBMS team would still be relocated according to the plan because she had "not heard anything that would change [her] mind."

36.    On or about Monday, October 7, 2002, Plaintiff filed a supplement to his original grievance, alleging Defendant's retaliatory actions, including, but not limited to, the changing of Plaintiff's work hours.

37.    On or about Tuesday, October 8, 2002, Plaintiff, and the other members of the UBMS group reluctantly spent the entire day moving into their new one-room office, room 408 E; a small, open room with inadequate space. The move required the assistance of five (5) maintenance workers, one (1) telecommunication person and three (3) computer services people to complete.

38.    As a result of being placed into such a small and inadequate workspace, Plaintiff, along with his co-workers Brigitte Brown and Liz Wilson, are subjected to each other's conversations, phone calls and visitors. There is no privacy whatsoever, which is in direct violation of Defendant's federal grant that requires that each Student Enrichment Coordinator have privacy for confidential communications. The noise from the shredding machines and electric staplers echoes throughout the small room, which is extremely distracting and counterproductive. Plaintiff strongly believes that his group has been placed in the confined office space because they are all African-Americans.

39.    Due to the fact that there was not enough space for Plaintiff's department's files, they were instructed by Defendant to use the extra file drawers on the third floor in the CCP office.

40.    Plaintiff feels degraded each day he goes to work. The UBMS group is subjected to negative comments as Del Tech students walk by his small office. Often, other employees of Del Tech will come by just to look at Plaintiff's space and comment

on how small it is, causing Plaintiff to feel embarrassed, humiliated and experience stress related symptoms because of this situation.

41.    Also on or about Tuesday, October 8, 2002, Plaintiff, Ms. Brigitte Brown, and Liz Wilson, secretary, received separate letters from Mr. Lawrence Miller, vice president and campus director, stating that Plaintiff had filed a supplement to his grievance stating that upper management was retaliating against Plaintiff's department.

42.    Lawrence Miller asked Plaintiff and the others to respond to his questions concerning Plaintiff's allegations of retaliation by upper management, and to submit their responses by October 15, 2002.  Miller said in his letter that if there were no retaliatory actions directed to them, that he would consider the case closed.

43.    On or about October 15, 2002, Plaintiff and the others submitted their responses to Miller confirming retaliatory actions by upper management.  As of the date of the filing of this lawsuit, Plaintiff has yet to receive a response from Miller.

44.    On or about October 15, 2002, with no other administrative remedy available to him, Plaintiff filed a Charge of Discrimination against Defendant with the Delaware Department of Labor alleging race discrimination and retaliation.

45.    Eventually, upper-management began to scrutinize UBMS Program Manager Rosetta Henderson, reprimanding her for being "unable to control [her] staff."

46.    Plaintiff also began to experience further acts of retaliation from Zawislak. For example, when his doctor ordered reduced work hours, Plaintiff was asked to provide justification for same repeatedly, despite the fact that his previous doctor's notes contained the necessary information.  Plaintiff's hours were questioned, as were the validity and longevity of his necessity for reduced hours and the nature of his medical

condition. Plaintiff was also threatened with termination due to his need for reduced work hours and occasional absences due to illness, despite documentation from his doctor justifying same.

47.    In or around December 2002, Plaintiff and the rest of his department were also informed that they were not allowed to continue to use the Blanket Travel Requests, as did all the TRIO programs; instead, only Plaintiff's department was required to submit separate Travel Requests as needed.

48.    In or around August 2003, Kate Sullivan, Upward Bound Classic Program Manager, resigned and went to another job with the State of Delaware. Her position as Program Manager of Upward Bound Classic was posted internally not long after she left.

49.    Ann Del Negro became the Director of Corporate and Community Programs (CCP) at the Del Tech Owens Campus. Ms. Jacquita Wright was promoted to Del Negro's former position, Acting Assistant Director of CCP.

50.    Paul Morris became Acting Department Chair of Community and School Programs, Jacquita Wright's former position. In addition, Morris was formally made Supervisor over the other TRIO Programs, with the exception of UBMS, which was assigned to Jacquita Wright, an African-American. Morris was basically offered the same position that he previously held in the prior year until Plaintiff filed his grievance regarding Morris' position. Roseanna Brown-Simmons, Student Enrichment Coordinator of Educational Talent Search, became Acting Program Manager to replace Paul Morris.

51.    Plaintiff believed that Morris was not made supervisor of his group due to their complaint, which caused Defendant to separate the programs and put a different person (an African-American) over the UBMS Program who had no prior experience

with TRIO programs, while Paul Morris oversaw the Upward Bound Classic Program and Educational Talent Search. Plaintiff was once again being treated differently by Defendant, this time with the assignment of his supervisor.

52.    In or around September 2003, the Upward Bound Classic Program Manager position became available. The position was posted internally only. Angi McCloskie, Andrea Coleman and Crystal Heath, the Student Enrichment Coordinators for that program, all applied for the position. Angi McCloskie was subsequently chosen as Program Manager.

53.    Andrea Coleman, who was hired with a special grant for the Upward Bound Classic Program was put in the position of Program Manager for summer youth camps once her grant monies ran out.

54.    In or around November 2003, Plaintiff's Program Manager, Ms. Henderson, went out on sick leave for scheduled surgery. She did not return to work until after the holiday break in January 2004, working part-time for the first couple of weeks.

55.    On or about February 4, 2004, UBMS Program Manager Rosetta Henderson resigned from her position after almost 9 years with Defendant, informing Plaintiff that she just couldn't take it anymore, referring to how she was being treated by Defendant after her employees filed their complaint.

56.    Plaintiff was never asked to become Acting Program Manager, despite his qualifications. Plaintiff had several years of experience and had always received exemplary performance evaluations.

57. In or around February 2004, Defendant promoted the new Acting Assistant Director of Corporate and Community Programs, Jacquita Wright-Henderson, to the position of Acting Program Manager for UBMS, despite having no TRIO or Upward Bound Math Science experience.

58. Wright-Henderson's office was four (4) floors lower, so she would spend approximately only 5% of her time upstairs with the UBMS program, especially since she had so many other responsibilities as the Assistant Director of Corporate and Community Programs.

59. In or around March 2004, the Program Manager's position became available and applications were being accepted for the position until March 29, 2004. Plaintiff had the qualifications outlined in the job description. Plaintiff had been a Student Enrichment Coordinator since November of 1999; he had always received very good evaluations; and he always maintained an excellent rapport with the students, parents and counselors.

60. To Plaintiff, it seemed only natural for one of the Student Enrichment Coordinators in a TRIO program to apply for and receive the Program Manager position once that manager had left the program. This succession occurred when Kate Sullivan, Program Manager for Upward Bound Classic left, and Angi McCloskie, SEC, became the new Program Manager. It also occurred when Rosanna Brown-Simmons, the Student Enrichment Coordinator for ETS, became acting Program Manager, then applied for and received the position of Program Manager for Talent Search when Paul Morris was made Acting Department Chair of Community and School Programs.

61. The Delaware Department of Labor investigated Plaintiff's Charge of Discrimination alleging race discrimination and retaliation and found in favor of Plaintiff, finding reasonable cause to believe that violations of Title VII and 19 Del. C. § 711 had occurred. A copy of the Delaware Department of Labor Notice of Reasonable Cause Finding dated July 30, 2004 is attached hereto as Exhibit "A".

62. In or around late December 2004, before the holiday break, Plaintiff and the rest of the UBMS group were told that a new Program Manager had been hired and that she would start on January 3, 2005.

63. In January 2005, when the UBMS staff returned from break, they were informed that the new Program Manager decided not to take the position, leaving the Program Manager position vacant once again.

64. On or about January 26, 2005, Sue Zawislak and Jacquita Wright-Henderson announced in a meeting that Andrea Coleman, an African-American, who had been a former Student Enrichment Coordinator for the Upward Bound Classic Program was transferred into the UBMS Program Manager's position.

65. Coleman had been managing youth camps for CCP prior to being named the new UBMS Program Manager. Coleman originally applied for Program Manager for her Upward Bound Classic Program in or around October 2003, but was not chosen for the position. Coleman was also hired after Plaintiff; therefore, she had less seniority. Coleman also had no math/science background, and never applied for the position.

66. Despite having more seniority and years of experience in the Upward Bound Math/Science Federal Trio Program, Plaintiff was denied the opportunity for

advancement to the position of Program Manager, in what Plaintiff believes was

retaliation for his grievances and his complaint with the Delaware Department of Labor.

67. The United States Equal Employment Opportunity Commission ("EEOC")

issued a Notice of Right to Sue Letter on February 2, 2005, received by Plaintiff's

counsel on February 4, 2005, attached hereto as Exhibit "B."

## COUNT I
### (Racial Discrimination)

68. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1

through 67 by reference as if specifically set forth herein.

69. The practices of Defendant as complained of above, had the effect of

depriving Plaintiff of equal employment opportunities and otherwise affected his

employment because of his race. The practices employed by Defendant were intentional

and were done with malice and/or reckless indifference to the federally-protected rights

of Plaintiff.

70. The practices of Defendant as complained of above caused Plaintiff to

experience conscious pain and suffering and other emotional harm.

71. The practices of Defendant as described above are imputable to Defendant

in violation of 42 U.S.C. § 2000e-2(a) and 3(a).

72. As a direct and proximate result of said acts, Plaintiff has suffered, and

continues to suffer, loss of employment opportunities, loss of income, loss of other

employment benefits, and has suffered, and continues to suffer, distress, humiliation,

great expense, embarrassment and damages to his reputation.

**COUNT II**
**(Title VII – Retaliation)**

73.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 72 by reference as if specifically set forth herein.

74.    This cause of action arises under Title VII, 42 U.S.C. § 2000e(2)(a).

75.    Defendant intentionally and maliciously discriminated against Plaintiff in retaliation for his complaints in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(2)(a) when it:

    (a)    denied Plaintiff promotions and transfers despite his qualifications;

    (b)    forced Plaintiff to work in a hostile work environment; and

    (c)    forced Plaintiff to relocate to a workspace that was inadequately designed and obviously too small to house Plaintiff and the other members of his department.

76.    Defendant acted with discriminatory motive and the reasons provided by Defendant for failing to promote and/or transfer Plaintiff are pretextual.

77.    As a result of Defendant's unlawful retaliation against Plaintiff, Plaintiff has suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

**COUNT III**
**(Failure to Promote)**

78.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 77 by reference as if specifically set forth herein.

79.     Defendant denied Plaintiff numerous opportunities for career advancement despite his qualifications.

80.     Defendant denied Plaintiff career advancement opportunities by denying his requests for promotion.

81.     As a result of Defendant's discrimination, Plaintiff suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

82.     Defendant's discrimination was willful, wanton and malicious.   As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

## COUNT IV
### (Breach of the Covenant of Good Faith and Fair Dealing)

83.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 82 by reference as if specifically set forth herein.

84.     The actions of Defendant constitute a violation of the *Covenant of Good Faith and Fair Dealing* implicit in every employment agreement.

85.     Defendant breached the *Covenant of Good Faith and Fair Dealing* to Plaintiff by discriminating against him on the basis of his race, and/or based upon retaliatory motives.

86.     Defendant's discrimination was willful, wanton, and malicious.  As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

87.    The above-stated damages were not the result of any act or omission on the part of the Plaintiff.

WHEREFORE, Plaintiff, Kenneth Cole, respectfully requests that this Court enter judgment in his favor and against Defendant, Delaware Technical and Community College:

(a)    Declaring that the conduct engaged in by the Defendant to be in violation of Plaintiff's rights;

(b)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide appropriate back pay with pre- and post-judgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(c)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for non-pecuniary losses, including, but not limited to, pain, suffering, and humiliation, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(d)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for past and future pecuniary losses, in amounts to be determined at trial;

(e)    Issuing a judgment in Plaintiff's favor ordering Defendant to pay punitive damages for its malicious and/or reckless conduct in amounts to be determined at trial;

(f)     Issuing a judgment in Plaintiff's favor ordering the Defendant to pay the costs of reasonable attorneys' fees and expenses and the costs of this litigation; and

(g)     Granting such other further relief as this Court deems just and proper.

MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Keri L. Morris, Esquire (#4656)
1509 Gilpin Avenue
Wilmington, Delaware 19806
302-777-4680 phone
302-777-4682 facsimile
jmartin@margolisedelstein.com
Attorneys for Plaintiff Kenneth Cole

Dated:  May 5, 2005

A 67



**STATE OF DELAWARE**
**DEPARTMENT OF LABOR**
**DIVISION OF INDUSTRIAL AFFAIRS**
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

## NOTICE OF REASONABLE CAUSE FINDING

RE: Cole v. DE Technical & Community College          State Case No.: 0210686

On October 15, 2002, Mr. Kenneth Cole filed a charge of discrimination against DE Technical & Community College. The Charge of Discrimination is hereby incorporated by reference.

**Reasonable Cause Finding:**

On July 30, 2004 the Department of Labor concluded it investigation and now finds, based on the following facts, that there is reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.  **Undisputed Facts:**
   1. Charging Party began his employment in 1999 as a Part-time Student Enrichment Coordinator in the Upward Bound Math/Science Program
   2. Charging Party is currently employed in the same position.

II. **Disputed Facts:**
   1. Charging Party claims that he endured racial discrimination because of denial of promotional opportunities and allocation of inappropriate office space with his other black similarly situated co-workers.
   2. Respondent states that Charging Party was not denied a promotional opportunity because the position of a white male, Paul Morris, was re-classified and not upgraded.
   3. Respondent states that Charging Party and other black similarly situated employees were moved to one office because other employees under the "To The Maxx Program" were terminated when the grant ended, thus leaving a vacant office space. Respondent states that the office move was an effort to group persons employed under particular grants in the same geographical area.

III. **Resolution of Material Facts in Dispute:**
   1. Observation site visit on 4/12/04 revealed that the previous distribution of offices allowed Charging Party and his co-workers to perform effectively in the same geographical area.
   2. Observation revealed that other white similarly situated workers have their own offices or share offices which allow confidentiality, adequate space and safety conditions unlike Charging Party's office that he shares with his group of black co-workers.
   3. Observation revealed that one of Charging Party's co-workers was moved to the current space while her old office is currently vacant with boxes.
   4. Observation revealed that Respondent also has made room for a co-op worker to work in the same office that is already overcrowded and has cramped working conditions (wires in walking areas, draws and file cabinets can open blocking exits).
   5. Charging Party submitted evidence that the grant did not specifically state that all staff in the Program needed to be in the same office rather than a suite of offices or cubicle style offices to provide privacy for confidential conversations when servicing center participants.
   6. Charging Party provided evidence that Paul Morris' position was called a promotion and was not posted according to company policy.

**EXHIBIT**
**A**

Cole v. DE Technical & Community College
May 12, 2004
Page 2

7.    Charging Party provided corroborated evidence that Mr. Morris' position was rescinded only after Charging Party and Ms. Brown complained that his position was not posted.

8.    Charging Party has provided substantiated evidence that after he complained about his work conditions, he was subjected to changes in his work schedule and his work was scrutinized despite his excellent work performance.

IV.    Resolution:

Charging Party submitted a preponderance of evidence that supported his claim of racial discrimination. Charging Party proved that he suffered adverse actions and his allegations were corroborated by investigative observations and substantial evidence.

The administrative process will now proceed to the conciliation phase pursuant to 19 Del. C. Section 712 (c).

_7/14/04_
DATE

_1/30/04_
DATE

_B. Sands_
Brenda Sands
Labor Law Enforcement Officer

_Julie K. Cutler_
Julie Cutler
Labor Law Enforcement Supervisor

A 69

EEOC Form 161-B (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Mr. Kenneth Cole
3102 Wilmont Drive
Wilmington, DE 19810

From: Equal Employment Opportunity Commission
Philadelphia District Office
The Bourse
21 S. Fifth Street, Suite 400
Philadelphia, PA  19106-2515

*RECEIVED FEB 0 4 2005 BY...*

[    ]    *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17CA300043 | Legal Unit | 215-440-2828 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ x ]    More than 180 days have passed since the filing of this charge.

[    ]    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[ x ]    The EEOC is terminating its processing of this charge.

[    ]    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[ x ]    The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[    ]    The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*

Marie M. Tomasso, District Director

*February 2, 2005*

*(Date Mailed)*

Enclosure(s)

Information Sheet

cc:    Jeffrey Martin, Esq for Charging Party
Brian D. Shirey, Esq for Respondent

**EXHIBIT**

**B**

A 70

whose decision it was. I responded by saying it was my decision, but that Ann Del Negro and Susan Zawislak approved the decision. I stated that it was the vision of the Department to get defined space for all of the TRIO programs. I stated that 408 housed a program with 4 staff members and that it was adequate space for the Upward Bound Math/Science staff because they had 4 staff members. I also stated that this move would progress us toward reaching the goal of having all of the individual TRIO programs together, and collectively on the 4th floor. Each staff member responded with concerns about the move. Ken stated that it would affect program morale. Brigitte Brown stated that the move would affect her job negatively because the space is not adequate enough for her to perform her job according to her job description. She stated that she markets the program and has a lot of equipment. Liz Wilson stated that she believed the move had to do with the problems that allegedly exist between Kate Sullivan and Tonia Conley. She said that she believed that they were being punished because Kate wanted to mess with Tonia. She went on to further say, "Kate is putting that poor girl through hell". At the end of the meeting the entire staff agreed that they would go through with the move. The left the meeting headed towards 408 to survey the space.

- August 13, 2002 — Met with Rose in my office. Rose stated that her staff wanted to take their concerns to the next level. I stated that because Ann Del Negro was on Leave, the next level would be Dr. Zawislak. I said that I would talk with Dr. Zawislak and find out what would be the next step. I spoke with Dr. Zawislak on the phone and recommended that the Upward Bound Math/Science Staff put their concerns in writing. I later talked with Rose in my office and told her that Dr. Zawislak recommended that her staff put their concerns in writing. I asked Rose to recommend some dates for the move. Rose stated that because of vacations, September 3rd and the 4th would be good.

- August 14, 2002 — Was carbon copied on an email from Ken Cole, Brigitte Brown, and Liz Wilson to Dr. Zawislak asking for a meeting. (See attached email)

- August 22, 2002 — I emailed Peter Lone asking for his assistance in getting work orders completed for the upcoming move on Sept. 3rd and 4th. (See attached email)

- August 27, 2002 — Spoke with Rose Henderson in her office about the email that Dr. Zawislak sent regarding the request made by her staff to meet with her. I stated that Rose should have her Staff put their concerns in writing, and also if they contend that they would not fit in 408, they should put the reasons why in writing.

- August 28, 2002 — I was emailed (along with Ann Del Negro) from Rose Henderson requesting a meeting with Ann and myself. (See attached email)

- August 28, 2002 — Spoke with Ann Del Negro about Rose Henderson's request. Ann stated that Rose needs to have her staff verbalize their concerns to her and then put those concerns in writing. After we had the chance to review the concerns we would get back to her about a meeting.

- August 28, 2002 — I emailed Rose Henderson telling her that she needs to have her staff verbalize their concerns and then put them in writing. I also reminded her about the scheduled move on September 4th. (See the attached email)

DEF 000323

A 71

Meeting Request

**Subject:** Meeting Request
**From:** "Kenneth Cole" <kcole@college.dtcc.edu>
**Date:** Wed, 14 Aug 2002 12:27:01 -0400
**To:** "Susan E. Zawislak" <zawislak@college.dtcc.edu>
**CC:** "Paul Morris" <pmorris@hopi.dtcc.edu>, "Rose Henderson" <rhenders@hopi.dtcc.edu>, "Ann Delnegro" <delnegro@hopi.dtcc.edu>

We are requesting a meeting to discuss some issues that we attempted to resolve with Paul Morris. Our issues are legitimate and valid. They impact employee relations, employee morale, and employee productivity. These issues cannot be conveyed on paper and just submitted, because we feel that they are important and warrant a meeting. We feel that we are being denied due process by not being giving the opportunity to meet with you to express our concerns.

The mission of the Corporate & Community Programs Division, Stanton/Wilmington Campus, is to provide lifelong learning opportunities to a diverse population through quality education and training programs. We are proud to be apart of such a diverse and innovative program division by working in the TRIO program. We support your vision and mission to the fullest by putting in 150% of ourselves daily. All we are asking is for fairness and consideration.

Brigitte Brown
Ken Cole
Elizabeth Wilson

DEF 000292

A 72

Re: Meeting Request

Subject: Re: Meeting Request
Date: Fri, 23 Aug 2002 14:16:07 -0400
From: Susan Zawislak <zawislak@hopi.dtcc.edu>
Organization: Delaware Technical & Community College
To: rhenders@hopi.dtcc.edu
CC: "Susan E. Zawislak" <zawislak@college.dtcc.edu>,
    Paul Morris <pmorris@hopi.dtcc.edu>, Rose Henderson <rhenders@hopi.dtcc.edu>,
    Ann Delnegro <delnegro@hopi.dtcc.edu>, "Cole, Ken" <kcole@college.dtcc.edu>

Rose - Please see Ken's email below. As Ken's direct supervisor, if you
feel that this needs to be addressed further, please contact Paul and
Ann to arrange a meeting.  Sue

Kenneth Cole wrote:
>
> We are requesting a meeting to discuss some issues that we attempted to
> resolve with Paul Morris.  Our issues are legitimate and valid.  They impact
> employee relations, employee morale, and employee productivity.  These issues
> cannot be conveyed on paper and just submitted, because we feel that they
> are important and warrant a meeting.  We feel that we are being denied due
> process by not being giving the opportunity to meet with you to express our
> concerns.
>
> The mission of the Corporate & Community Programs Division,
> Stanton/Wilmington Campus, is to provide lifelong learning opportunities to
> a diverse population through quality education and training programs.  We
> are proud to be apart of such a diverse and innovative program division by
> working in the TRIO program.  We support your vision and mission to the
> fullest by putting in 150% of ourselves daily.  All we are asking is for
> fairness and consideration.
>
> Brigitte Brown
> Ken Cole
> Elizabeth Wilson

A 73

Re: Meeting Request

Subject: Re: Meeting Request
From: Rose Henderson <rhenders@college.dtcc.edu>
Date: Wed, 28 Aug 2002 08:34:36 -0400
To: Susan Zawislak <zawislak@hopi.dtcc.edu>
CC: rhenders@hopi.dtcc.edu, "Susan E. Zawislak" <zawislak@college.dtcc.edu>, Paul Morris
<pmorris@hopi.dtcc.edu>, Ann Delnegro <delnegro@hopi.dtcc.edu>, Cole Ken
<kcole@college.dtcc.edu>

Paul and Ann,

In response to Dr Zawislak's email, I would like to arrange a meeting,
for me and my staff to with you.

Susan Zawislak wrote:

> Rose - Please see Ken's email below. Aa Ken's direct supervisor, if you
> feel that this needs to be addressed further, please contact Paul and
> Ann to arrange a meeting.. Sue
>
> Kenneth Cole wrote:
>
>> We are requesting a meeting to discuss some issues that we attempted to
>> resolve with Paul Morris.  Our issues are legitimate and valid.  They impact
>> employee relations, employee morale, and employee productivity. These issues
>> cannot be conveyed on paper and just submitted, because we feel that they
>> are important and warrant a meeting.  We feel that we are being denied due
>> process by not being giving the opportunity to meet with you to express our
>> concerns.
>>
>> The mission of the Corporate & Community Programs Division,
>> Stanton/Wilmington Campus, is to provide lifelong learning opportunities to
>> a diverse population through quality education and training programs.  We
>> are proud to be apart of such a diverse and innovative program division by
>> working in the TRIO program.  We support your vision and mission to the
>> fullest by putting in 150% of ourselves daily.  All we are asking is for
>> fairness and consideration.
>>
>> Brigitte Brown
>> Ken Cole
>> Elizabeth Wilson

Rosetta M. Henderson
Program Manager
Upward Bound Math Science
Del Tech & Community College
302-657-5110
fax 657-5187

DEF 000297

A 74

Upward Bound Math/Science Program
CCP Administration
Minutes of Staff Meetings

August 29, 2002

Attendance:   Brigitte Brown, Ken Cole, Ann Del Negro, Rose Henderson, Paul Morris and
Liz Wilson

Overview

On August 23, 2002 Dr. Zawislak received an e-mail (Attachment I) from Ken Cole requesting a meeting to discuss the proposed move on four East. In the e-mail, Ken indicated that the UBMS staff wanted to discuss issues that were unresolved with Paul Morris. According to Ken the issues impact employee relations, employee morale, and employee productivity. He indicated that the issues could not be conveyed on paper, because the staff feels the issues are important and warrant a meeting.

Ken Cole started the meeting by reading from a written statement (Attachment II). Ken said Paul Morris informed them that Ann was "out of the loop" and, in an effort to have their concerns heard, they e-mail Sue Zawislak requesting a meeting. Ann informed everyone at the meeting that she is not "out of the loop" and explained that protocol is to address concerns with the Special Programs Director first. Unresolved issues should be brought to Ann's attention. She will, in turn, discuss issues with the Division Director. If needed, the Division Director will contact the Campus Assistant Director and/or Campus Director.

Ken indicated that moving UBMS staff will affect employee morale, productivity, and employee relations. Ken said they feel there are ulterior motives behind the move. Rose indicated that she did not feel the move was "equal treatment of TRIO".

Brigitte expressed her concern that moving UBMS would "swish" all of the employees together and she would not be comfortable working under those conditions.

There was a discussion about how often the Student Enrichment Coordinators (SEC) are out of the office visiting schools. According to the UBMS staff, SEC's only visit schools two months out of the year (October & March).

All of the UBMS staff tried to initiate conversation about employees of other youth programs. Ken, Brigitte, and Liz all tried to talk about perceived friction between the UBC program manager and an UBC SEC. Ann would not permit dialogue about programs or staff outside of UBMS to be discussed.

UBMS staff felt as though they were being denied fair treatment because they were not permitted to talk about their perceptions of work relationships between staff of other programs. Ken introduced three alternatives to the proposed office relocations.

1.   Leave everyone where they are and move Tonia back to 430 and bring Liz to Tonia's office space.

DEF 000300

A 75

Upward Bound Math/Science Program
CCP Administration
Minutes of Staff Meetings

2.   Move Tonia back to 430 and move UBMS SEC & secretary to that space leaving Mrs. Henderson where she is along with other Program Managers.

3.   Leave everyone where they are because it is not cost effective.

In sum, Ken Cole indicated that employee morale, productivity, and relations would be affected if the staff were made to move. Ann voiced a grave concern over the fact that physical location would affect their work productivity, morale, and relations.

Ann advised the staff that the purpose of the move was to replace a program of four into an office space previously occupied by a program of four. There were no other motives for the moves. In light of the fact, that no credible issues were discussed that would suggest that the move be cancelled, Ann advise the staff that should would recommend to Dr. Zawislak that the relocation move forward. Staff were advised that could discuss issues with Dr. Zawislak if they were not satisfied with the outcome of this meeting.

DEF 000301

**A 76**

Mail :: henderson: RE:?Pending?Move                                    Page 1 of 1

hen

This message to

Delete | Reply | Reply to All | Forward | Redirect | Blacklist | Message Source | Save as | Print |          Back to henderson
Report as Spam

**Date:** Fri, 30 Aug 2002 14:39:58 -0400 (EDT)
**From:** Brigette Brown <bbrown@college.dtcc.edu>
**To:** zawislak@college.dtcc.edu
**Cc:** rhenders@college.dtcc.edu
**Subject:** RE:?Pending?Move

We appreciated the opportunity to meet with Ann and Paul on Thursday A
ugust 29, 2002 at 1:00 pm. I am respectfully requesting a meeting with
you for our staff ASAP concerning the pending move. We were originally t
old by Paul in a meeting that the move would not take place until Octobe
r. Now, knowing that we (Kenneth Cole, Liz Wilson and myself) have issu
es and concerns that still has not been addressed, all of a sudden the o
ffice move has been moved up quickly from October to this Tuesday, Septe
mber 3rd. We feel that this is totally unfair to us and we respectfully
asked that you put a hold to the move that is schedule for the day after
Labor Day.

I personally love my job working with TRIO and the benefits it gives to
our students. I feel by being awarded Delaware State TRIO Achiever out
of all others in the state of Delaware proves my dedication and loyalty
to this program, not to mention Delaware Tech Wilmington. There are now
three employees that are very unhappy because we feel that we are being
treated unfairly and need to be heard by someone on your level or above
. I am coming to you humbly and ask that you grant us a meeting and del
ay the move until we speak with you personally.

Sincerely,
Brigitte Brown
Kenneth Cole
Liz Wilson

Delete | Reply | Reply to All | Forward | Redirect | Blacklist | Message Source | Save as | Print |          Back to henderson
Report as Spam

This message to

DEF 000303

A 77

## NOTES FROM MEETING WITH BRIGITTE BROWN AND KENNETH COLE

On Tuesday, September 3rd, 2002 at approx. 10:00 a.m., Brigitte Brown (RFT Student Enrichment Coordinator) and Kenneth Cole (TPT Student Enrichment Coordinator), both in the Upward Bound Math/Science Program, came to the Human Resources Office and asked to speak with me in Jackie Jenkins' absence. Brigitte was visibly upset. We sat around the table in Ms. Jenkins' office and I explained to them that I would be glad to listen and would be taking notes and would try to assist them to the best of my ability but advised them that this was not something I normally do, so I may need to call my superiors for guidance once all of the information was obtained. Brigitte and Ken began to share their concerns regarding several issues.

**Issue 1:** They have tried unsuccessfully to discuss their concerns with their superiors. They had met with their immediate supervisor, Rose Henderson, on several occasions. She supported them in pursuing more answers. Rose's immediate supervisor is Paul Morris, but since some of their issues revolved around him, they requested a meeting with Sue Zawislak. She did not respond to their requests (both voice mail and email) for over a week, and when she did, it was via an email to Rose to review their request and if she, as their immediate supervisor, felt this warranted further consideration, to set up a meeting with Paul Morris and Ann Del Negro. Brigitte and Ken had not gone to Ann Del Negro because when Paul Morris was reclassified to Special Programs Director with oversight of TRIO programs, he told them that Ann was "out of the loop" and that everything went through him now. When they met with Ann and Paul, they felt that Ann was very stern with them, berated them for trying to meet with Sue without meeting with her first, did not listen to all of their concerns, cut them short on several occasions, spoke to them like children, and repeatedly expressed that she was "very disappointed" in how they had handled things. They were very frustrated by the lack of direct communication and run-around they felt they were getting. Following their meeting with Paul and Ann, they requested another meeting with Sue, and she told Brigitte that she would be speaking with Ann on 9/3/02, but that Brigitte needed to follow protocol. They felt that Sue was avoiding/refusing to meet with them, so they were coming to Human Resources and then planned to request a meeting with Dr. Winner, Assistant Campus Director.

**Issue 2:** Subsequent to Paul Morris being reclassified to Special Programs Director, he shared in a meeting with the TRIO programs that part of his vision for the department was for each program to have a distinct office area. The Upward Bound Math/Science program employees (Rose, Ken, Brigitte and Liz Wilson) were told that they would be switching offices with the employees of the SOAR program. Currently, Rose, Ken and Brigitte all have individual offices on the same hallway, and their secretary, Liz Wilson, is in the Upward Bound Classic office. The office space they were being told to move to would be one larger office to be shared by Ken, Brigitte and Liz, and an adjoining office for Rose. The SOAR employees (Peter Lonie and Crystal Heath) would be moving into the individual offices and Tonia Perry Conley (Upward Bound Classic) would be moving from her individual office on the same hallway into the space currently used by Liz Wilson in the Upward Bound Classic office.

A 78

Ken and Brigitte strongly believe that the space issues are largely a result of the continuing tension between Kate Sullivan and Tonia Perry Conley, who also have individual offices on the same hallway. They feel that they have received unfair and unequal treatment as a result of superiors trying to handle the Kate/Tonia issue. They suggested that if Tonia was going to move back to the Upward Bound Classic main office where Liz Wilson currently was, Liz could just move into Tonia's office, and then all of Upward Bound Math/Science staff would be on the same hallway. They were told that secretaries don't get offices. They also suggested as another alternative that they (Brigitte, Ken and Liz) could move to the office currently occupied by SOAR, but leave Rose in her own office, which would allow them less cramped quarters in the shared office space and would also allow for three Program Managers (Rose, Peter and Kate) to have offices on the same hallway.

Ken discussed concerns regarding the move with Paul in a meeting earlier this month, but was told that it was still going to happen. Rose went to Paul to request a meeting with Sue to discuss the move, and was told to have Ken and Brigitte submit in writing how the move would impact their job description. They all measured their office space and their recently purchased office furniture and found that they would be losing at least 30 square feet of office space, and there seemed to be no ability to install partitions. They feel that this move will impact morale and productivity. Their alternatives were suggested to Paul and Ann in their meeting, but they were told that they move was still on as scheduled. Their understanding from Paul was that the move would not occur before October, but were informed last week that the move was to occur September 3rd, 2002. They clarified that they were not refusing to move, but just were requesting that the move be put on hold until they had been heard by someone higher up.

**Issue 3:** Ken expressed his concern that Paul's promotion was a violation of policy and that he (or anyone else) should have had the opportunity to apply for it. I explained that the position was not a promotion, but was part of the annual reclassification review process which is open to all Plan B employees. He showed me the CCP newsletter, which indicated that Paul had been promoted and I informed him that "promoted" was an improper term for them to use. His concern with the reclassification is that if a position is reclassified to a higher paygrade it should be open for application. Also, it should be reclassified based on additional duties that the employee is currently performing, not that the employee will be expected to perform. According to Ken, last year TRIO employees were informed that Paul was serving as a liaison between Ann and the Program Managers, but he had no direct authority. Now he is issuing directives which is a marked change in job responsibilities. Brigitte and Ken both expressed concern that Paul is now serving in dual positions as Program Manager of Talent Search as well as Special Programs Director, and did not see how he could be a peer and a supervisor to the other Program Managers. In addition, they felt that he was essentially taking up two positions, and if his new title was Special Programs Director, then the Program Manager position should be available.

DEF 000306

A 79

Ken expressed that he wanted to file a grievance, and had already reviewed the Personnel Policy Manual. I spoke to Karen Stone, and relayed as much of the situation as I could without using names per Ken and Brigitte's request. Karen said that it was difficult for her to advise without specifics, but that based on what I told her, they did not seem to be grievable issues. She referred to the PPM, which designates that grievances must either be based on policy interpretation or disciplinary action. She further explained that in the reclassification process, a position that is reclassified to a higher paygrade does not need to be posted and that a person serving as a Special Programs Director could also serve as a Program Manager as part of his/her duties. She suggested that the most appropriate next step would be for them to meet with Sue Zawislak, and that in Jackie's absence, I should advise Dr. Winner of the situation. I relayed this information to Ken and Brigitte and put a call in to Dr. Winner's office, and was advised that she would return my call after 2:00 pm. Ken was scheduled to leave work at noon, so he agreed to keep in touch with Brigitte, and Brigitte said she would return to her office and wait to hear back from me. Ken said he was still interested in filing a grievance and asked that I obtain the necessary form for him, and I told him I would do so.

Cara Stanard
HR Specialist II
September 5, 2002

Upward Bound Math/Science Program
CCP Administration
Minutes of Staff Meetings

September 4, 2002

Attendance:  Ann Del Negro, Rose Henderson, Paul Morris, and Susan Zawislak

Sue Zawislak (SZ) opened the meeting by informing Rose Henderson (RH) that this is first management team meeting to discuss the proposed move on the fourth floor.  SZ explained to RH that one of the goals of the CCP Division is to annually re-evaluate how existing staff can be "moved" together to operate more effectively as a team.

SZ said the when the To The Max program was downsized from a four-to-two person staff, she was faced with the challenge of how to efficiently utilize the office space.

SZ indicated that it was her understanding that she was informed at the August 5, 2002 Program Manager's meeting that office moves were forthcoming.  According to the minutes of that meeting, Paul Morris (PM) advised the Program Managers that moves would take place before the end of September.  October was not a viable time to move since UBMS fiscal year would end, and SEC's would start their school visits.

According to RH, one of her goals is to have all of her files in one place.  RH said she can work with her staff wherever they are located.  RH also said it was her understanding that the "end of September meant October."  RH said PM did not tell her where she would be moving.

According to RH, Brigitte Brown (BB) said she overheard Tonia talking about the move, and that the impending move was supposed to be confidential.  RH said when BB approached her about what she overheard from Tonia, RH "kept quiet" because PM instructed the Program Managers not to talk about the move.  RH said she denied admitting she knew anything about the move to BB.

According to RH, PM told her he was not going to elaborate about the specifics of the move.  He advised her that the move was firm.  She said PM indicated that is SZ was to change her mind, it would be admitting a mistake.  RH said she asked PM if she was moving to third floor West.  She said PM did say that was not where she would be relocating.  She said PM said there are other places UBMS could move, but he was not going to discuss it with her at that time.

PM said he didn't discuss where RH and her staff would be relocated to, because he was waiting to hear back from Jacquita Wright regarding the proposed move for Peter Lonie and Crystal Heath.

PM said he denies making any type of statement that alluded to the idea that if SZ changed her mind about the move that it would be an "admission of mistake."  RH said she told Jacquita Wright what PM said about making a mistake.  RH said that the only man who can make a mistake is the man upstairs.

DEF 000311

A 81

Upward Bound Math/Science Program
CCP Administration
Minutes of Staff Meetings

PM said he met with RH and her staff on August 12, 2002 regarding the move. RH said she would have appreciated it if she was told in advance without her staff present. RH clarified that if was quite possible that PM told her in advance, but couldn't swear to it. RH said she would have liked the opportunity to inform her staff of the move, prior to their meeting with PM.

PM said he asked RH if she had any questions after she learned where UBMS would be relocated and the RH said "no".

RH was asked if BB knew that RH was award of the move prior to the meeting with PM. Rose said "no." RH said she doesn't think she told her staff about the move prior to the meeting.

RH doesn't know whether she went back to her staff, or her staff came to her after BB overhead Tonia and Kate talking about the move. RH said if Ken Cole knew about the move, then BB or Tonia Conley must have told him.

RH doesn't remember if Ken talked to her about the move before the August 12th meeting. RH said she doesn't remember if Liz Wilson approached her about the move.

RH said she was not given permission to talk about the move, nor did she ask for permission to talk about the move even though her staff was aware of the move.

RH said her response probably was to "smile" when she observed her staff talk among themselves. RH said BB probably did tell Ken Cole about the move. RH doesn't remember her staff confronting her about the move.

Ken Cole (KC) contacted PM on Friday, August 9 to talk over an issue related to the UBMS summer program in which Ken felt his credibility was being looked over. According to PM, KC brought up the move as a topic of discussion. According to PM, KC seemed to know a lot about the move.

According to RH, BB is the only one who "officially" talked to her about the move. If anyone else talked to RH about the move ("can't swear, not sure, don't recall"), she would have denied it. RH said she felt denying it was a better approach.

PM said he was concerned that people had different levels of knowledge about the move. RH told PM that BB overhead Kate Sullivan (KS) say to Tonia Conley (TC)– "you are going to move, but I will not be moving." PM said his response was no one was to discuss the move.

PM talked about the August 12th meeting. He said the reaction by UBMS was not pleasant. PM said he explained that the vision is to define space for each program, and because of an unexpected downsizing, an opportunity arose. PM said he gave everyone an opportunity to speak and voice his or her concerns. SZ asked if there is a record of the

DEF 000312

A 82

Upward Bound Math/Science Program
CCP Administration
Minutes of Staff Meetings

concerns that were raised. PM answered. He said BB said it would affect her job by moving. KC said he was comfortable where he was. Liz Wilson (LW) brought up unrelated issues regarding UBC.

RH said that at the August 12th meeting all of her staff members told PM they wanted to meet with AD and was told AD was out of the loop. RH said that is why her staff went right to SZ.

PM said RH approached him on Tuesday, August 13th and informed him that her staff was unhappy and wanted to talk with Dr. Zawislak. PM said he didn't recommend that. He said he would speak with SZ and get back to RH. PM said when he spoke with SZ he was advised to have UBMS staff put their issues in writing.

SZ explained to RH that she and her staff should follow protocol. RH said PM told her that Ann Del Negro (AD) was out of the loop. PM said that outside of the fact that AD was off campus on vacation, the words "out of the loop" were never mentioned.

RH said she advised her staff to move and let everyone see the "mess". BB said "no". PM said during the August 12th meeting, the UBMS staff said they were not happy about the move, but would go ahead and relocate. Following the meeting UBMS went to canvass the new office space and did not like the size of the space they would be moving in to. It was at that time they requested a meeting with SZ.

RH said PM told her that the space in 408 was roughly six inches smaller than his space and the furniture was she same. RH said she was willing to move, but supported her staff's opposition to the move. RH said KC measured the area and disagreed with PM. PM asked to see KC's measurements. Nothing was provided to PM.

RH said PM asked RH to put in writing how this move will affect their job description. Staff said they will not put it in writing. PM denies mentioning or saying anything about "job description."

RH said her "heart, mind, and eyes" is where she sees it. They are telling her that things will not fit in 408. RH said it is her belief that there is no other group on this campus that is made to work in that confined space with that much furniture.

SZ said she understands one of the primary roles of the SEC is to be in the schools. If that is not factual, then we need to address this understanding.

(Back to meeting on August 12, 2002) RH insists that PM mentioned that the move would be at the end of October. PM said he did not say that, as October is not a good time for UBMS to move.

RH said she felt pressured to give a confirmed move date to Paul. She said when staff learned about the date, she recommended they all proceed with the move. The action to pursue this further was initiated by staff. RH said she told her staff they have a "right" to

DEF 000313

A 83

Upward Bound Math/Science Program
CCP Administration
Minutes of Staff Meetings

pursue this. She said, "I will defend your right to pursue this." RH said she is obeying protocol and she has given her staff permission to pursue this further.

RH said she after meeting with AD, she did not feel she had an advocate. RH said AD said she felt RH was behind it. AD said that is a false statement, and that those words were never said to RH.

DEF 000314

A 84

Upward Bound Math/Science Program
CCP Administration
Minutes of Staff Meetings

September 5, 2002

Attendance:   Brigitte Brown, Ann Del Negro, and Susan Zawislak

SZ recapping events that led to this meeting. She said she spent roughly 20 minutes on the telephone with Brigitte on Friday. SZ reiterated that concerns about the move should have been addressed to PM by her immediate supervisor. If issues were still unresolved, her supervisor should have contacted, AD followed by SZ.

SZ explained that she learned on Wednesday, August 28th, that RH left a message on Tuesday, August 27th with Olive Robbins for her to contact RH. SZ said she had not received the message from Olive, prior to her 42-minute conversation with Brigitte.

According to BB, she does not mind moving. She thinks there are other things happening on the fourth floor. BB finds the space in 408 is inadequate. She said the UBMS staff took measurements and the furniture will not fit in the space.

SZ asked where the measurements were. She explained that she received no information from UBMS about room measurements. BB said she was not aware that the measurements had not been turned over.

BB outlined her concerns:  1) space itself, 2) timing of move and how it was communicated, 3) she feels as though her Program Manager should stay where she is currently situated.

SZ explained that RH recommendation is to move forward with the move. According to BB, RH did say they should move forward with the move, but only so people could see how "swished" they would be.

SZ said that the goal of the Division, as outlined in the Operational Plan and Achievement Plan was to place program staff in close physical proximity to one another. This is part of a continuous improvement plan and it looked at annually. SZ explained that a recommendation was made to relocate a program that was downsized from four staff to two staff out of 408, since 408 had been set up for a four-person program. The recommendation was to have a four-person program occupy 408.

SZ explained that DTCC owns the campus buildings and CCP uses rooms in the buildings. She talked about "ranges" of space that are allocated to departments and divisions. Even though Brigitte's perception may be that the space is inadequate, the reality is the space falls within the range of space allocations for faculty and staff.

BB said UBMS would be losing 30 feet. Sue reiterated that the room size in 408 was within the range of space allocation for faculty and staff. BB said that the space in inadequate because of UBMS resources and equipment. She feels all of their furniture will not fit. She feels the office is a fire hazard, because the file cabinet protrudes behind the door. As a result

A 85

Upward Bound Math/Science Program
CCP Administration
Minutes of Staff Meetings

the door is not open 100% and could block a person from leaving in the event of an emergency.

SZ repeated that the space is larger than some faculty offices on this campus. She said she acknowledges what BB said about the fire hazard, and would have the area looked at for protruding furniture and doors that do not open all the way. BB acknowledged that she understood what BB was communicating about the "range" of space and that she would look into BB's allegations about the fire hazard.

BB said she feels she is being punished. She suggested that the three staff members move to 408 and that the Program Manager stay where she is. She said she and her peers discussed how the furniture might be set up in 408. BB said the Secretary or an SEC could use the separate office.

BB said she feels the SEC are being targeted. She said no other youth program is "taking a move." She said there is "tension between Classic." She said they are being asked to move to an area in which they won't fit.

BB said she feels they are being treated unfairly and that they have rights. She said she thinks someone "should listen to their rights."

SZ asked BB if she acknowledges that her concerns are being taken seriously. BB said she just wants her concerns taken into consideration.

BB said PM told her that AD was out of the loop, so they went to PM. BB said PM told them that it was his vision to move the program, and that the move would happen.

BB said RH came back from PM office with a "sticky" that said to explain how your morale would be affected by the move.

SZ said her goal is to have each program work as a team and have the ability to collaborate on projects.

BB said there is "no tensions" within UBMS. She said her perception of other programs is that Angie McCloskey ran the summer program. BB said what she overhears she keeps to herself and does not say anything. She said the tension on the fourth floor does not bother her. It didn't bother her until, all of a sudden, everyone but Kate Sullivan are told they are moving. Tonia is moving back and Kate Sullivan is taken out of the loop.

SZ wanted to acknowledge BB concern is not about "moving", it is about "space." BB said she wants to go on record to say the space is "inadequate", because there is a space deemed appropriate to the college community. Furniture makes you feel good.

BB said UBMS feels they are being punished because of Upward Bound Classic. SZ said space at DTCC does not belong to the people that occupy it. It is important to know that people do often move, and change is imminent.

DEF 000316

A 86

Upward Bound Math/Science Program
CCP Administration
Minutes of Staff Meetings

SZ explained that CCP has programs that fluctuate in time and in staff. One of the great hallmarks of her job is to make sure that CCP is responsive, adaptable, and flexible.

BB said the reason she brought up the prior move is because it appears that UBMS is affected. She said, "at this point, these are all of my issues."

DEF 000217

A 87

[~ed: Meeting on 9/11/02]

**Subject:** [Fwd: Meeting on 9/11/02]
**From:** Ann DelNegro <delnegro@college.dtcc.edu>
**Date:** Thu, 12 Sep 2002 16:24:33 -0400
**To:** zawislak@college.dtcc.edu

Sue:  Is the date in #1 (8/18) a typo?  If not, was KC off without pay for that day?  Just trying to figure out this very complicated situation.  Thanks. Ann

---

**Subject:** Meeting on 9/11/02
**From:** Rose Henderson <rhenders@college.dtcc.edu>
**Date:** Thu, 12 Sep 2002 16:17:11 -0400
**To:** zawislak@college.dtcc.edu, delnegro@college.dtcc.edu, rhenders@college.dtcc.edu

As a result of our meeting yesterday, I am responding to the questions that you  asked me to get back to you on.

1. When was Kenneth Cole Hospitalized?
   Ken was in the hospital from 8/18 through the 22nd.

2. It was noted that Ken used banked flex time hours on his time sheet for 8/19, 8/20, 8/21 and 8/22. This should not have been done. Rose needs to check with HR to see how this should have been documented. HR informed me that part time employees cannot bank flex time hours. They must be paid for the time they work. Cara could not tell me where I could have found that information in writing.

3. What are Ken's working hours?  Presently Ken is working from 8:00-12:00. I informed him on 9/12 that working hours are from 8:30 to 4:30.

4. Liz is presently working 9:00-5:00 ( permission given by Dr Zawislak). Rose is to inform Liz that working hours are from 8:30-4:30. Liz is going to send a memo to Larry Miller requesting that she be allowed to continue her present working hours, because of the medical condition of her mother.

5. Rose Henderson needs to send a memo to Larry Miller requesting flexible working hours for the UBM/S coordinators, when they are doing in-school visits. This will be taken care of before they start their visits.

6. Rose needs to look into the working hours for the Youth Care Workers. Ann had a suggestion. I will also do some research on other residential programs, as to how they deal with problem.

If I missed anything, please let me know.

Rosetta M. Henderson
Program Manager
Upward Bound Math Science
Del Tech & Community College
302-657-5110
fax 657-5187

| Meeting on 9/11/02.eml | Content-Type: | message/rfc822 |
|---|---|---|
| | Content-Encoding: | 7bit |

of 2

DEF 000342

A 88

**Subject: RE: East Building Youth Program Move 10/08/02**
**Date: Mon, 7 Oct 2002 10:57:34 -0400 (EDT)**
**From: Brigette Brown <bbrown@college.dtcc.edu>**
**To: winner@college.dtcc.edu**
**CC: rhenders@college.dtcc.edu, zawislak@college.dtcc.edu**

We are writing this e-mail to inform you of a situation that we feel
has not been given the appropriate consideration or attention. On
August 12, 2002 it was brought to our attention that a major move was
scheduled for the majority of the youth programs housed on the 4th
floor.  Because of several factors listed below, our department –
Upward Bound Math/Science – questioned the move and followed procedures
to have our issues addressed by our supervisors.  Ultimately, Dr.
Zawislak spent time investigating; however, none of our issues or
concerns were specifically addressed.

We were called in for what amounted to a staff meeting on October 2,
2002.  The move was a small and a brief topic that was mentioned within
the meeting.  The way that it was mentioned was as follows, "as far as
the move is concerned, there is nothing I've heard that would make me
stop or change the move, the move goes on as planned."  None of our
specific concerns or proposed alternatives were ever discussed.

For the record the move is scheduled for Tuesday October 8, 2002. This
will be an eight employee move, 2 programs along with many files,
furniture and computers equipment, while faculty/students are moving
about and with classes in session.

Based on our reasons listed below, we feel that the proposed move is
inappropriate at this point.  The following are the issues that we
presented:

1.     Inadequate space for our program, the files and all of our
resources (we will then need off...)
2.     Feeling of being punished (every time there was a situation on the
fourth floor with the Upward Bound Classic Program, it seemed to affect
Upward Bound Math/Science)
3.   How employees relations were being affected
4.   How employee morale was being affected
5.   How employee productivity could be affected
6.   Other appropriate and viable alternatives were prepared and provided




(please note: we are NOT opposed to a move)
7.  Cost effectiveness of moving such a great number of people, one




person is moving back to the same space that they moved from a year




ago
8.  How we feel that we are being treated completely unfairly          **Brown/Cole 143**

Working for Delaware Technical & Community College has been an honor.
Having leaders such as Dr. George, Mr. Miller and yourself is a true
asset to this institution.  We listened wholeheartedly to Mr. Miller's
inservice day speech, when he said, "employees are the most important

A 89

RE: East Building Youth Program Move 10/08/02

aspect of this institution". He talked about characteristics of
excellence: respect, fairness, consideration, a strong sense of team
spirit and always looking for more ways of being productive. We look
at ourselves as possessing those qualities. Mr. Miller also stated,
"in times of adversity, true character is born".

Dr. Winner, we would like to meet with you on this urgent matter so
that you can listen to our issues and respond to accordingly. Please
advise us when your schedule allows for such a meeting. Thank you in
advance for your consideration in this matter and we look forward to an
expeditious resolution.

Brigitte L. Brown, Kenneth Cole and Elizabeth Wilson
Upward Bound Math/Science Staff

Brown/Cole 144

10/7/02 11:16 AM

Scanlon Camp DirOffice        (302)454-3194         P.2

**MEMORANDUM**

October 7, 2002

TO:      Brigette Brown
          Kenneth Cole
          Elizabeth Wilson

CC:      Rose Henderson
          Susan Zawislak

FROM:   Connie Winner

SUBJECT:  East Building Youth Program Move 10/8/02

This morning I received your email regarding the scheduled move of your offices tomorrow. Mr. Miller and I approved the move. As you are aware, the move was delayed to evaluate and assess your concerns raised with Dr. Zawislak, and it was decided to go ahead with the move. The move is scheduled and will take place tomorrow. Currently I have no reason to determine that this move should be delayed again.

Before we meet, I would like to know the following:
1. How many hours a day each of you spend on campus.
2. How this workspace is different from other assigned space on the campus.
3. Explain the feelings of being punished.

Once I receive your response, I will set up a meeting for next week with you, Dr. Zawislak, and me.

DEF 000352

**A 91**

Seancon Camp Dir Office        (302)454-3194              P.3

# MEMORANDUM

**TO:**        Ken Cole
            Student Enrichment Coordinator

**FROM:**    Lawrence H. Miller
            Vice President and Campus Director

**SUBJECT:**  Supplement to Grievance

**DATE:**    October 8, 2002

I am in receipt of the supplement to your grievance citing retaliatory actions that have been taken against you and other staff members. It is neither appropriate nor in the best interest of the College for me to address issues that you have raised for other employees. It is for this reason I am asking you to address specifically the issues you have cited as it relates to retaliatory actions taken against you.

Please provide to me the working hours that were changed or revoked in your case. It is my understanding that you are a part-time employee and your hours may be modified to accommodate the needs of the department.

Additionally, you cited interrogating and intimidating fact-finding meetings that the Director of Corporate and Community Programs held with you. Please note the date, time, and content of those meetings.

Also, you indicate that a move from your current location was undertaken without consideration for legitimate concerns of the staff. I want to inform you that the moves that you are referring to were delayed due to the concerns that the staff raised. After extensive review and analysis, these moves were approved by Dr. Winner and me.

It is my goal to run an organization that is effective, efficient, and focused on accomplishing the goals of Delaware Technical & Community College. However, I cannot address issues without the facts associated with the occurrences you are citing. Please provide this information no later than October 15. I look forward to your response.

ms

DEE 000353

[Fwd: Fwd: 408 east bldg.]

Subject: [Fwd: Fwd: 408 east bldg.]
Date: Fri, 11 Oct 2002 16:15:38 -0400
From: Susan Zawislak <zawislak@hopi.dtcc.edu>
Organization: Delaware Technical & Community College
To: "Morris, Paul" <pmorris@hopi.dtcc.edu>,
"DelNegro, Ann" <delnegro@hopi.dtcc.edu>

FYI -- Sue

Subject: Fwd: 408 east bldg.
Date: Fri, 11 Oct 2002 15:41:01 -0400 (EDT)
From: William Joseph Ayers <ayers@college.dtcc.edu>
To: zawislak@college.dtcc.edu
CC: ecunning@college.dtcc.edu, ehmann@college.dtcc.edu

Hi Sue: Apparently someone from the CCP program staff called the Fire
Marshall's office and indicated there were unsafe conditions in rm 408,
either out of frustration or due to a legitimate concern. In either
case I would appreciate it any of your staff have safety and/or
facility concerns in the future that they contact administrative
services first and give us a opportunity to correct the situation
before involving outside agencies.

Edward D. Cunningham wrote:

>Bill as you are aware on Tuesday we relocated some offices in the East
>building as requested by Paul Morris. Some of the employees that were
>moved were very upset and complained the whole time we were moving
>them. Today Gary Heller received a call  from Officer Danner from the
>Fire Marshals Office about unsafe conditions in room 408 where most of
>the people that complained were relocated.Gary and I met with Officer
>Danner this afternoon and he found nothing unsafe but did recommend we
>put in another electrical outlet.  I told him we would put in the
>additional electric outlet and he said he would close out the complaint.

| forward.cpm | Name: forward.cpm |
| Type: Outlook Express Mail Message (message/rfc822) |

A 93



# WILMINGTON FIRE DEPARTMENT
# FIRE MARSHAL'S OFFICE

## COMPLAINT REPORT

DATE: Oct. 10, 2002          CALL TAKER: Brady

ADDRESS: 333 N. Shipley St

NAME OF OCCUPANT/BUSINESS: DelTech College

DETAILED EXPLANATION OF COMPLAINT:

Mr. Bunkley received complaints that DelTech has moved 3 regular staff members and 2 student helpers into Room #463 and the space is currently. Additionally, they are using an excessive amount of extension cords (20 + 30 power bars), they have combustibles on heater space(s); and they have some electrical issues around fluorescent lights.

### CALLER INFORMATION

| NAME | ADDRESS | PHONE |
|------|---------|-------|
| Jim Bunkley, Sr. FPS FM23 | DE state FMO - Dover | (H) (W) (302) 739-4447 Returned Call: ☐ N/A ☑ Yes |

INSPECTOR ASSIGNED: R. Danner          DATE: Oct. 11, 2002

ACTION TAKEN:

10/11/02 @ 1040 - Call Mr. Bunkley to discuss complaint/concerns.

10/11/02 @ 1100 - Called and spoke with Gary Heller (573-5412) who stated that people moved into the space on Tuesday and he is unaware of any dangerous conditions. Scheduled walk through with this writer at 1330 hrs this date.

10/11/02 @ 1330 - Inspected space w/Mr. Heller and found no validity to the complaint. One outlet power two computers. Mr. Heller agreed to install another power outlet.

FOLLOW-UP INSPECTION DATE:          REFERRED TO:

N/A                                  N/A

INSPECTOR: _____ DATE: 10/11/02    REVIEWED BY: _____ DATE: 10/11/02

DEF 000356

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED