REDACTED

REDACTED

REDACTED

REDACTED

12/16/2002  15:42    3025773827              DEL TECH              PAGE  02/03
12/16/2002  15:36    3024533094              DTCC COP/STANTON      PAGE  02

## MEMORANDUM

**DATE:**    December 12, 2002

**TO:**      Jacqueline Jenkins
             Director of Human Resources
             Stanton/Wilmington Campus

**FROM:**    Dr. Susan E. Zawislak
             Director of Corporate & Community Programs
             Stanton/Wilmington Campus

**SUBJECT:** Upward Bound Math Science

As a result of the meeting with you, Ann Del Negro and myself on Monday, December 9, I am providing additional information related to the UBMS staff work calendar submission. In particular, I was asked to substantiate why the staff was required to produce a 90-day versus a 30-day calendar for school visits. I want to reiterate that at no point was a 90-day calendar requested. The request I made was to the Program Manager for a fall visitation schedule that is an essential component to the proper operation of the program.

In all youth programs, Student Enrichment Coordinators are responsible for developing schedules to provide in-school services to students during the academic year. All youth programs providing in-school services are expected to pre-plan their school visits and submit their schedule to their Program Manager. For UBMS, the Program Manager is Rose Henderson and she is expected to oversee the details of the entire program from school visits to the summer component.

As Division Director, I typically am not involved in the program details of the many grants, contracts and courses under my supervision. However, when issues related to the office moves were brought to my level, I had direct contact with Rose. During these communications, Rose brought to my attention many issues that warranted follow-up. One issue focused on school visitation schedules.

At a meeting on September 11, Rose Henderson informed me that the UBMS school visit plan was not yet prepared. I expressed concern that she had no plan in place to provide in-school services during the fall semester and asked her to develop the schedule and provide me with a copy. This was needed in order to respond to any request for flexible working hours when coordinators are doing their in-school visits.

At another meeting on September 26, Rose said her staff had not prepared their fall schedules, but did plan to go to the schools during the third and fourth week of October. I expressed concern that as of September 26 no formalized plan was in place for how and when services would be delivered to the schools. We agreed she would provide me with a copy of the fall school visit's schedule on October 14 that would include school visits through December 2002.

I am not aware of anyone assigning additional workloads to UBMS staff. The staff at Delaware Tech must work with the schools, to ensure that their school visits do not conflict with the districts' calendars. Therefore, pre-planning of schedules is essential. All other youth program staff who provide in-school services to youth prepared and submitted school visitation calendars. Proper planning is necessary to allow for timely preparation and approval of travel requests, requests for flex time and reservation of fleet vehicles. It has an impact on staff time, hours worked and fiscal accountability. This is very important in dealing with a regional program when visitation schedules are not the same each week. A fall schedule is needed to reflect total coverage of targeted schools. It is the Program Manager's responsibility to oversee the program and insure that this occurs.

DEF 000402

12/16/2002  15:42    3025773827              DEL TECH                    PAGE  03/03
12/16/2002  15:36    3024533094              DTCC CCP/STANTON            PAGE  03

It has been well documented that Rose has weaknesses as a Program Manager in the area of fiscal management; i.e., program closeout of December 2000, her performance appraisals for 2001 and 2002, and an internal fiscal audit in October 2001. In addition, her 2002 review notes that "Rose has experienced some difficulties in managing the programmatic areas of the UB Math/Science program. She has also experienced difficulties in managing the work hours of her staff." As Division Director, I am aware of deviations from satisfactory performance and work with all members of my supervisory team to reinforce behaviors that lead to the desired fiscal and programmatic outcomes. Asking the Program Manager to provide fall visitation schedules was in no way related to the office move issues. It was related to my interest in insuring that desired programmatic outcomes for UBMS were achieved in order to comply with the grant.

# MEMORANDUM

**DATE:**      October 22, 2002

**TO:**      Lawrence Miller
             Vice President/Campus Director
             Stanton/Wilmington Campus

**FROM:**      Dr. Susan E. Zawislak
             Director of Corporate & Community Programs
             Stanton/Wilmington Campus

**SUBJECT:**      Upward Bound Math/Science Employees

Below are my responses to the issues raised in your memorandum of October 17, 2002.

**Issue #1 – Change in Ken Cole's working hours**

On September 11, Rose Henderson, Program Manager for the UBMS program, informed me that Ken Cole would be unable to meet in the afternoon as his work day ended at noon per his request due to a recent illness. When I asked Rose what specific hours Ken now worked, she told me that they were 8:00 am to 12 noon. At that point, I informed her that these work hours did not comply with college policy as stated in Section 6.01 of the Personnel Policy Manual, which indicates that "the Vice President and Campus Director in charge of the campus, is authorized to establish working periods and to designate work assignments in the best interests of the College." At the Stanton/Wilmington Campus you have communicated that the established work hours are 8:30 am to 4:30 pm. I had no direct communication with Ken regarding his work hours.

**Issue #2 – Change in Elizabeth's Wilson's working hours**

I verbally approved an adjusted work schedule for Liz Wilson in early 2001 when she was in the position of secretary for the Workforce Training Department. At that time, she was caring for an ill mother. I did not communicate this request to the Campus Director. When she was transferred to the Upward Bound Math/Science Program in March 2001 she maintained those working hours. When Rose Henderson informed me on September 11 that Liz was still working the adjusted schedule, I advised her to have Liz put that request in writing. I received that request on September 16, 2002. This request followed the one made by Brigitte Brown (Issue #3). Consistent with the response provided to Brigitte, I cited Section 6.01 of the Personnel Policy Manual.

**Issue #3 – Revoked Brigitte Brown's request for change in working hours**

Prior to responding to Brigitte's request for a change in working hours, which was directed to you and received in my Wilmington Campus Office on September 3, 2002, I consulted with both Dr. Winner and you. Based on our discussion, I did not recommend approval of her request for a change in hours, because it was for personal reasons and she did not indicate how this change would be in the best interest of the College as required in Section 6.01 of Personnel Policy Manual.

DEF 000398

Prior to approving her annual leave, I first consulted with the Director of Human Resources. Following our discussion, I made the decision to approve the leave. Until I received your memo, I was unaware that she was working until 5:00 pm as stated since she was not given approval to work beyond 4:30 pm.

## Issue #4 – Micromanaging UBMS

All TRIO Program Managers are responsible for working with their staffs to develop school visitation schedules. Information regarding all topics addressed in the memo is to provided by the Program Manager. As in the past, this is a standard practice. In a meeting with the Assistant Director of CCP, the Special Programs Director and myself, Rose, not her staff, was asked to provide this information in order to administer the 2003 budget. Rose has weaknesses in the area of fiscal management, which are documented in her performance appraisals for 2000, 2001 and 2002 and an internal fiscal audit in October 2001. Rose was informed that the planning, organization and implementation of her program activities must be related to the budget, so that she does not again experience the same fiscal management issues that have occurred in the past. As Division Director, I am aware of deviations from satisfactory performance and work with all members of my supervisory team to reinforce behaviors that lead to the desired fiscal and programmatic outcomes.

## Issue #5 – Conducted interrogating and intimidating "fact finding meeting

After reviewing information obtained from the previous group meetings, and consulting with the Assistant Campus Director, it was concurred that individual meetings would enable each employee to confidentially address their specific, individual concerns. Cara Stanard, Human Resources Officer, attended the meeting with Ken Cole, per his request.

## Item #6 – Asking members of the UBMS team to move without due consideration of their concerns.

These employees had the opportunity to address their concerns in meetings with their Program Manager and the Special Programs Director. This was followed by a meeting with the employees, the Program Manager, the Special Programs Director and the Assistant Director of CCP. I then became directly involved as this issue moved to my level within the established protocol. At that point, I put the scheduled move on hold until additional information could be obtained. Individual meetings were held with the Assistant CCP Director and myself so that each employee would have the opportunity to voice his/her specific concerns.

I carefully reviewed the concerns that were voiced, analyzed the available facts and consulted with my supervisor. Based on this information, the four UMBS staff members were relocated, as previously recommended, to office space previously occupied by four staff members from the "To the Max" program, a program no longer offered through DTCC.

DRAFT

## MEMORANDUM

**DATE:** December 4, 2002

**TO:**       **Jacqueline Jenkins**
             **Director of Human Resources**
             **Stanton/Wilmington Campus**

**FROM:**    **Dr. Susan E. Zawislak**
             **Director of Corporate & Community Programs**
             **Stanton/Wilmington Campus**

**SUBJECT:**   **Brigitte Brown**

This is in response to the questions that you asked me on December 2, 2002, relating to Brigitte Brown. If additional information is needed please let me know.

**Work calendar submission.**

All TRIO Program Managers are responsible for working with their staffs to develop school visitation schedules as part of their annual plan. This is a standard practice to be completed at the beginning of each program year. When it was brought to my attention by Rose Henderson in a meeting with Ann DelNegro and myself on September 11 that she had not developed an annual plan, Rose was asked to provide the information regarding the fall visitation schedule. Rose indicated that her staff visited their schools once in the fall and once in the spring. Since Upward Bound Math/Science is a regional program that does not make the same weekly visits to each respective school a calendar is needed which reflects all schools visited in the designated time frame. Student Enrichment Coordinators in this program visit schools in Pennsylvania, New Jersey, Maryland and Delaware. Therefore, their visitation schedules are not the same each week and a full fall schedule is needed to reflect total coverage. This schedule would provide specific information regarding the actual visits and provide Rose with a Program Manager's view of the activities needed to administer the 2003 annual plan and corresponding budget and monitor and assess service delivery and determine its compliance with the program goals.

It has been well documented that Rose has weaknesses as a Program Manager in the area of fiscal management, i.e., program closeout of December 2000, her performance appraisals for 2001 and 2002, and an internal fiscal audit in October 2001. In addition, her 2002 review notes that "Rose has experienced some difficulties in managing the programmatic areas of the UB Math/Science program. She has also experienced difficulties in managing the work hours of her staff." As Division Director, I am aware of deviations from satisfactory performance and work with all members of my supervisory team to reinforce behaviors that lead to the desired fiscal and programmatic outcomes.

**Request for change in working hours.**

Brigitte Brown's written request for change in working hours was addressed to Mr. Miller with an approval line for my signature. It was received in my Wilmington Office on September 3, 2002. I did not recommend approval of her request for a change in hours because it was for personal reasons and she did not indicate how this change would be in the best interest of the College as required in Section 6:01 of the Personnel Policy Manual.

She submitted requests for .5 hours annual leave daily during the period September 26 through October 31 (with the exception of September 30, October 1 and October 17), which I approved. In a memo from Mr. Miller dated October 30, 2002, I was advised that Brigitte's taking leave to accommodate her coming into work at 9 am on a daily basis was to be stopped. I advised her of this in a memo dated November 4, 2002. She has not submitted this type of leave since that date.

A 109

DEF 000401

# MEMORANDUM

**TO:**      Susan Zawislak
Director of Corporate and Community Programs

**FROM:**   Lawrence H. Miller
Vice President and Campus Director

**SUBJECT:** Ken Cole's Grievance

**DATE:**   October 30, 2002

As a result of my review of Ken Cole's Grievance and information submitted by Elizabeth Wilson and Brigitte Brown and your response to these allegations, I am asking you to take the following steps:

- You are to reinstate Elizabeth Wilson's working hours to 9 a.m. – 5 p.m. to accommodate the agreement that was reached with her two years ago. This working arrangement is to be evaluated within six months to determine its impact on the operation of the program she is assigned to.

- Brigitte Brown's submission of Leave Forms in order to accommodate her coming into work at 9 a.m. on a daily basis is to be stopped. It has been determined by you that she is needed on campus between 8:30 a.m. and 4:30 p.m. and those are to be her working hours.

- In the case of Ken Cole, he informed me that his working hours changed due to his illness and that he is unable to work his normal 8 a.m. – 2 p.m. shift because of his illness. I would like to see what documentation we have in the file that supports the adjustment of these working hours due to illness and information that verifies that the tasks assigned to Mr. Cole are being completed during his reduced hours.

You are to implement these changes and begin your review of Mr. Cole's status immediately. Please contact me to discuss the results of your review as soon as possible.

ms



# UPWARD BOUND
## MATH/SCIENCE INITIATIVE

## MEMORANDUM

**TO:** Jackie Jenkins
Director of Human Resources

**FROM:** Kenneth Cole    *K.C.*
Student Enrichment Coordinator
Upward Bound Math/Science

**DATE:** December 4, 2002

**RE:** Physician's Statement

I am in receipt of your letter dated November 27, 2002 and have enclosed per your request a copy of the signed document from my doctor's office.

My doctor and I feel that you have been provided with the necessary information that was initially requested. All questions about the actual number of hours I am able to work and to what extent is full activity is covered under "Patient Discussion". Any liability issues that may concern you about my presence at DelTech has been addressed as well.

In reference to your comment about me being able to resume my temporary part-time Student Enrichment Coordinator's schedule of 29 hours is contrary to my contract and DelTech's Personnel & Policy Manual (P&PM). I have fulfilled all terms and conditions of my contract and the requirements as a part-time employee working 15-29 hours per week as stated in the P&PM, Section II, 2.02 and my contract Section 5, (g).

In addition, Mrs. Henderson, my immediate supervisor stated in a letter dated November 13, 2002 and e-mail dated October 30, 2002 that she supports my request to work reduced hours and indicated that she is satisfied with the quality and quantity of my work. She also stated to me that she felt the doctor's note is adequate and should answer all questions pertaining to working hours.

DELAWARE TECHNICAL & COMMUNITY COLLEGE
333 SHIPLEY STREET • WILMINGTON, DELAWARE 19801
TELEPHONE (302) 830-5220 • FAX (302) 657-5187

DEF 000107

A 111

It is my belief that these continued requests are "Acts of Retaliation" and request that you as Director of Human Resources conduct an investigation and stop them.

It is also my request to you to reply back to me with the status of Step 3 of Grievance No. W03-102, which was hand delivered to Mr. Miller's office on Monday, November 4, 2002 and confirmed by telephone on Wednesday, November 6, 2002 by Monica Staszesky that it was delivered to Mr. Miller via Connie Winner.

If you have any questions, please call me at 302-434-5561 or e-mail at kcole@college.dtcc.edu.


c:  Orlando George
    Lawrence Miller
    Sue Zawislak
    Rose Henderson

DEF 000108

A 112

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

BRIGITTE L. BROWN,                    )
                                      )
        Plaintiff,                    )        C.A. NO. _____
                                      )
            v.                        )
                                      )        JURY TRIAL DEMANDED
DELAWARE TECHNICAL AND                )
COMMUNITY COLLEGE,                    )
                                      )
        Defendant.                    )

## COMPLAINT

### INTRODUCTION

1.      This is a Complaint brought pursuant to Title VII of the Civil Rights Act

of 1964, as amended, codified as 42 U.S.C. § 2000(e) et seq., as amended by the Civil

Rights Act of 1991, 42 U.S.C. § 704(a) and 42 U.S.C. § 1981.

### PARTIES

2.      Plaintiff, Brigitte L. Brown (hereinafter "Plaintiff"), is and was at all times

relevant to this Complaint, a resident of the State of Delaware, residing at 1321 West 8th

Street, Wilmington, Delaware 19806.

3.      Defendant, Delaware Technical & Community College (hereinafter

"Defendant"), is a statewide institution of higher education, i.e., a local community

college, providing academic, technical, continuing education, and industrial training, and

at all times relevant to this Complaint, the employer of Plaintiff Brigitte L. Brown.

Defendant is subject to service of process through Delaware Technical & Community

College; c/o Larry Miller, Office of the Campus Director, 333 Shipley Street,

Wilmington, Delaware 19801.

## JURISDICTION

4.      Jurisdiction is founded on the existence of a question arising under federal statutes.  This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) of Title VII of the Civil Rights Act.  The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights secured by federal and state law which prohibits discrimination against employees because of their race.

5.      The state law claim regarding the breach of the implied Covenant of Good Faith and Fair Dealing is brought pursuant to the pendant jurisdiction of this Court.

## FACTUAL BACKGROUND

6.      Plaintiff was hired by Defendant as a full-time Student Enrichment Coordinator for the Upward Bound Math and Science Program (hereinafter "UBMS") at the Wilmington, Delaware campus on or about January 8, 2001.  Plaintiff has been continuously employed by Defendant for four (4) years.

7.      When Plaintiff began her employment, Defendant had three (3) federal-grant TRIO programs: the Educational Talent Search Program, managed by Mr. Paul Morris, a Caucasian; the Upward Bound Classic Program, managed by Ms. Kate Sullivan, a Caucasian female; and the Upward Bound Math and Science Program, managed by Ms. Rosetta Henderson, an African-American female.

8.      In or around February 2001, a proposal was introduced by Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs, to move the Upward Bound Classic Program staff into the offices that were occupied by Plaintiff and the other members of the Upward Bound Math and Science Program.  In turn, Plaintiff's

department would be relocated from their offices to the cubicles that were occupied by the Upward Bound Classic Program personnel.

9.  Disappointed, and somewhat surprised by the announcement that they would potentially be losing their offices, Plaintiff and the other members of her department requested a meeting with Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs for Defendant.

10.  As a result of that meeting, the move was halted; instead, only Ms. Tonia Conley, Student Enrichment Coordinator with the Upward Bound Classic Program, was relocated next to her Program Manager, Ms. Kate Sullivan.

11.  In or around October 2001, Plaintiff successfully completed the Educational Technology Certificate Program with the hope that possession of such a certificate would result in career advancement.

12.  In or around November 2001, Plaintiff was nominated for, and the recipient of the 2001 Delaware State TRIO Organization's Achiever's Award.[1]

13.  In or around April 2002, Plaintiff received the Mid-Eastern Association of Educational Opportunity Program Personnel Award, a regional TRIO award.

14.  In or around July 2002, Mr. Paul Morris, a Caucasian, Program Manager for Educational Talent Search, was promoted to Special Program Director, a position that oversees all of the TRIO Programs, including Plaintiff's.

15.  On or about August 12, 2002, Paul Morris met with Plaintiff and the other members of her department and informed them that he had unilaterally made a decision

---

[1] The Delaware State Trio Organization is the organization that is responsible for all federal TRIO Programs throughout the State of Delaware.

to relocate the Upward Bound Math and Science Program from their current multiple offices to the single office that had been occupied by the SOAR Program.

16.     That same day, Plaintiff and the other members of her department visually surveyed the office space they were being forced into, and determined that it was completely inadequate to house two (2) full time employees, one (1) part time employee, two (2) student co-ops, student participants, visitors, files and equipment and other resources.

17.     Specifically, Plaintiff's new office space was approximately thirty-six (36) square feet less than what her department had in its original office space, a decrease from a combined total of 211 square feet to 175 square feet. In fact, Plaintiff's office space was so much smaller that partitions could not even be set up in the room to allow for the necessary privacy.

18.     On or about August 13, 2002, the UBMS team (Plaintiff, Mr. Ken Cole, and Ms. Liz Wilson) met together to discuss the proposed move and the fact that they believed there were being unfairly discriminated against and treated differently from the other TRIO programs when they were forced into a smaller, single office.

19.     After speaking with their Program Manager, Plaintiff and the remaining UBMS staff prepared an agenda to discuss with management; the agenda was submitted via e-mail to Ms. Sue Zawislak, Defendant's CCP Director, on or about August 14, 2002.

20.     In response to their concerns, the UBMS group was later told by Mr. Paul Morris to "put it in black and white" and to "explain where it stated in [their] job description that [they couldn't be moved]." Plaintiff and her colleagues were eventually

granted a meeting with upper management (Paul Morris and Ann Del Negro) on or about August 29, 2002, just two (2) working days before the proposed move.

21.     On or about August 29, 2002, the UBMS staff met with Ms. Ann Del Negro and Paul Morris. The group tried to explain that the proposed move would affect employee relations, morale and productivity, not to mention, the small space would make it extremely difficult to protect students' privacy.

22.     The office that the UBMS Group was being forced to move into had been Ann Del Negro's former single office; it was an office with only two wall sockets as it was designed for occupancy by only one individual. Instead, Defendant was putting the three (3) African-American members of the UBMS Program into a small, inadequate office space, despite their previous objections and their complaints that this move was discriminatory in nature.

23.     Ann Del Negro got very upset and expressed her feelings to the UBMS Group of how disappointed she was that they felt their move would affect employee relations, morale and productivity. Plaintiff and the rest of the UBMS staff went on to explain how they felt that they were being treated unfairly and unequally and that they believed that there were ulterior motives for the move. Plaintiff explained that by putting all three people in such a small, confined space, they felt as if they were being punished.

24.     Plaintiff and the rest of her group informed Del Negro that they felt the move was partially motivated by a conflict that existed between Kate Sullivan and Tonia Conley, and Plaintiff's UBMS Group, which was comprised of all African American employees, was subjected to relocation as a result of this conflict, despite the fact that in that meeting, they had provided reasonable alternatives to avoid the move.

25.    By the end of the meeting, Del Negro decided that the move would still continue as scheduled, never having addressed the group's issues of being punished, being discriminated against, being treated unfairly and unequally, and the effect that this move would have on employee relations, morale and productivity. Plaintiff left the meeting feeling that her concerns were unheard.

26.    On or about August 30, 2002, Plaintiff sent Ms. Sue Zawislak, Director of CCP, an e-mail asking for a meeting with the UBMS team. On the same day, Sue Zawislak called Plaintiff in response to her e-mail. Zawislak said the group had not followed proper protocol. However, Plaintiff specifically followed the protocol procedures directly from Defendant's Policy Manual.

27.    Zawislak also stated during her conversation with Plaintiff that the "proposed move" was due to downsizing and the allocation of space, and informed her that because of those reasons, the move made sense; this explanation, however, was in direct contradiction to what Paul Morris had said about the move being his "vision" to have the Youth Programs together.

28.    On Tuesday, September 3, 2002, the day before the move, Plaintiff went to Human Resources and met with Cara J. Stanard, Human Resource Specialist, to discuss the "move" and asked her to schedule an urgent meeting with Dr. Connie Winner, Assistant Campus Director, in an effort to file an additional complaint and hopefully halt the move which was scheduled for the next day.

29.    On September 4, 2002, the move was to take place, but it did not, presumably as a result of Plaintiff's complaint to Dr. Winner. Instead, maintenance men were sent around to measure Plaintiff's group's offices. As the maintenance crew was

measuring, Ann Del Negro, Assistant Director of CCP, arrived and took over the job of measuring the office spaces herself.

30.     On September 5, 2002, Sue Zawislak and Ann Del Negro called for Plaintiff, Liz Wilson, secretary, and the other members of the UBMS group for separate, individual meetings at different times.  Plaintiff went first to discuss the proposed "move".  Zawislak and Del Negro refused to believe Plaintiff, or even investigate her allegation that there was a conflict between Kate Sullivan and Tonia Conley that may have been the driving force behind the loss of their office space.

31.     During that meeting, Plaintiff introduced clear alternatives to their proposed move.  She gave Zawislak and Del Negro the measurements of their office spaces compared with the measurements of the proposed new office space.  Zawislak insisted in the meeting that the proposed move was due to downsizing and because of allocation of space, and insisted that the move made sense, which was once again in direct contradiction to what Paul Morris said; that the move was his "vision" to have the Youth Programs together.

32.     The proposed move consisted of moving eight (8) people as opposed to the alternative proposed by Plaintiff and her department which involved moving only two (2) people, and simultaneously achieving the same goal of having the TRIO programs together as well as achieving more cost effectiveness overall.  Despite her best efforts, Plaintiff could not convince Defendant to entertain her suggestion.

33.     On September 5, 2002, Mr. Kenneth Cole informed Plaintiff that he had filed a grievance alleging personal discrimination, and regarding Paul Morris's promotion to Special Program Director.

34.     In the end, the individual meetings came across as a "witch hunt;" Plaintiff felt intimidated, interrogated and that Defendant was on a "search and destroy" mission. Plaintiff also felt as if she was being talked down to and belittled because she was African-American, and that nothing she said made any difference. Most of Plaintiff's answers to Defendant's questions were turned around and restated.

35.     On or about October 2, 2002, a meeting took place between Sue Zawislak, Ann Del Negro, and Paul Morris, Plaintiff and the rest of the UBMS team. Zawislak announced that the UBMS team would still be relocated according to the plan because she had "not heard anything that would change [her] mind."

36.     In or around October 2002, just prior to the move, Plaintiff's Program Manager, Rosetta Henderson, told Plaintiff that Paul Morris had come to her [Henderson] and said, "[Plaintiff] will never go far at Del Tech doing the things that she is doing."

37.     Plaintiff went to the Human Resource Department and spoke with Ms. Cara Standard, Human Resources Specialist, to tell her what Henderson had told Plaintiff about the remark made by Paul Morris, and to see if documentation of this comment could be put into her file.

38.     On or about Monday, October 7, 2002, the day before the move, Plaintiff made one last appeal to Dr. Connie Winner. Winner responded promptly (the same day) to inform Plaintiff that she and Lawrence Miller had approved the move and it would go forward as scheduled. Winner submitted several questions to Plaintiff via e-mail and asked that Plaintiff respond to her questions so that she [Winner] could schedule a meeting the following week with Sue Zawislak and herself. On or about October 15,

2002, Plaintiff submitted responses to Dr. Winner. As of the filing of this lawsuit, Plaintiff still has not received a response from Winner.

39.    On or about Monday, October 7, 2002 Mr. Kenneth Cole informed Plaintiff that he had filed a supplement to his grievance alleging Defendant's retaliatory actions.

40.    On or about Tuesday, October 8, 2002, Plaintiff, and the other members of the UBMS group reluctantly spent the entire day moving into their new one-room office, room 408 E; a small, open room with inadequate space. The move required the assistance of five (5) maintenance workers, one (1) telecommunication person and three (3) computer services people to complete.

41.    At the completion of the move, a maintenance worker informed Plaintiff that there was a potential fire hazard in the new office space because there were only two (2) wall sockets, and approximately 22 electrical items that needed to be plugged in. Mr. Ed Cunningham, Superintendent of Buildings and Grounds, assured Plaintiff that the move was not based on his measurements.

42.    As a result of being placed into such a small and inadequate workspace, Plaintiff, along with her co-workers Kenneth Cole and Liz Wilson, are subjected to each other's conversations, phone calls and visitors. There is no privacy whatsoever, which is in direct violation of Defendant's federal grant that requires that each Student Enrichment Coordinator have privacy for confidential communications. The noise from the shredding machines and electric staplers echoes throughout the small room, which is extremely distracting and counterproductive. Plaintiff strongly believes that her group has been placed in the confined office space because they are all African-Americans.

43.    Due to the fact that there was not enough space for Plaintiff's department's files, they were instructed by Defendant to use the extra file drawers on the third floor in the CCP office.

44.    Plaintiff feels degraded each day she goes to work. The UBMS group is subjected to negative comments as Del Tech students walk by her small office. Often, other employees of Del Tech will come by just to look at Plaintiff's space and comment on how small it is, causing Plaintiff to feel embarrassed, humiliated and experience stress related symptoms because of this situation.

45.    Within her first two years working for Defendant, Plaintiff won two (2) TRIO Achievement Awards; one from the State of Delaware and the other was a Mid-Eastern Regional Achiever's Award. She was nominated and was accepted as the Secretary of the Delaware State TRIO Organization (DSTO), an Executive Board position, and she is also a member of COE Council on Education.

46.    On or about Tuesday, October 8, 2002, Plaintiff and Liz Wilson, secretary, received separate letters from Mr. Lawrence Miller, vice president and campus director, stating that Kenneth Cole had filed a supplement to his grievance stating that upper management was retaliating against Plaintiff's department.

47.    Lawrence Miller asked Plaintiff and Liz Wilson to respond to his questions concerning Cole's allegations of retaliation by upper management, and to submit their response by October 15, 2002. Miller said in his letter that if there were no retaliatory actions directed to them, that he would consider the case closed.

48.    On or about October 15, 2002, Plaintiff submitted a three-page response to Miller confirming retaliatory actions by upper management. As of the date of the filing of this lawsuit, Plaintiff has yet to receive a response from Miller.

49.    As a result of the added stress at work from Defendant's actions, Plaintiff began to experience sleep depravation, upset stomach, loss of hair and irritability, and went to see her physician. Plaintiff's physician referred her to a psychologist.

50.    On or about October 22, 2002, Plaintiff began seeing a psychologist for work-related stress; her treatment for same continues to date.

51.    Shortly after moving into the new office, Plaintiff began to keep the office door closed due to the humiliation of the room. Plaintiff overheard students who were walking past the office make comments about all the people in the small room looking like a bunch of monkeys. Plaintiff is/was also subjected to various remarks and stares as students walk by the office, feeling extreme humiliation.

52.    In or around November 2002, the maintenance department installed an additional electrical outlet, bringing the total of electrical outlets in the office to three.

53.    On or about November 8, 2002, with no other administrative remedy available to her, Plaintiff filed a Charge of Discrimination against Defendant with the Delaware Department of Labor alleging race discrimination and retaliation.

54.    Eventually, upper-management began to scrutinize UBMS Program Manager Rosetta Henderson, reprimanding her for being "unable to control [her] staff."

55.    In or around August 2003, Kate Sullivan, Upward Bound Classic Program Manager, resigned and went to another job with the State of Delaware. Her position as Program Manager of Upward Bound Classic was posted internally not long after she left.

56.    Ann Del Negro became the Director of Corporate and Community Programs (CCP) at the Del Tech Owens Campus.  Ms. Jacquita Wright was promoted to Del Negro's former position, Acting Assistant Director of CCP.

57.    Paul Morris became Acting Department Chair of Community and School Programs, Jacquita Wright's former position.  In addition, Morris was formally made Supervisor over the other TRIO Programs, with the exception of UBMS, which was assigned to Jacquita Wright, an African-American.  Morris was basically offered the same position that he previously held in the prior year until Kenneth Cole filed his grievance regarding Morris' position.  Roseanna Brown-Simmons, Student Enrichment Coordinator of Educational Talent Search, became Acting Program Manager to replace Paul Morris.

58.    Plaintiff believed that Morris was not made supervisor of her group due to their complaint, which caused Defendant to separate the programs and put a different person (an African-American) over the UBMS Program who had no prior experience with TRIO programs, while Paul Morris oversaw the Upward Bound Classic Program and Educational Talent Search.  Plaintiff was once again being treated differently by Defendant, this time with the assignment of her supervisor.

59.    In or around September 2003, the Upward Bound Classic Program Manager position became available.  The position was posted internally only.  Angi McCloskie, Andrea Coleman and Crystal Heath, the Student Enrichment Coordinators for that program, all applied for the position.  Angi McCloskie was subsequently chosen as Program Manager.

60.    Andrea Coleman, who was hired with a special grant for the Upward Bound Classic Program was put in the position of Program Manager for summer youth camps once her grant monies ran out.

61.    In or around November 2003, Plaintiff completed her second certificate program, entitled "Guiding our Youth: A Professional Approach" again with the hope that possession of such a certificate would result in career advancement.

62.    In or around November 2003, Ms. Henderson went out on sick leave for scheduled surgery. She did not return to work until after the holiday break in January 2004, working part-time for the first couple of weeks.

63.    On or about February 4, 2004, UBMS Program Manager Rosetta Henderson resigned from her position after almost 9 years with Defendant, informing Plaintiff that she just couldn't take it anymore, referring to how she was being treated by Defendant after her employees filed their complaint.

64.    Plaintiff was never asked to become Acting Program Manager, despite her qualifications. Plaintiff had several years of experience and had always received exemplary performance evaluations.

65.    In or around February 2004, Defendant promoted the new Acting Assistant Director of Corporate and Community Programs, Jacquita Wright-Henderson, to the position of Acting Program Manager for UBMS, despite having no TRIO or Upward Bound Math Science employment experience.

66.    Wright-Henderson's office was four (4) floors lower, so she would spend approximately only 5% of her time upstairs with the UBMS program, especially since she

had so many other responsibilities as the Assistant Director of Corporate and Community Programs.

67.    In or around March 2004, the Program Manager's position became available and applications were being accepted for the position until March 29, 2004. Plaintiff had the qualifications outlined in the job description. Plaintiff had been the full time Student Enrichment Coordinator since January 8, 2001; she had always received exemplary evaluations; and she always maintained an excellent rapport with the students, parents and counselors. Although the position should have only been initially posted internally, it was posted both internally and externally, unlike postings for the Classic and ETS Programs, which were posted internally only, and if a qualified candidate was not available, were then posted externally. Plaintiff believes Defendant posted the position internally and externally from its initial posting to prevent Plaintiff from obtaining the position.

68.    To Plaintiff, it seemed only natural for one of the Student Enrichment Coordinators in a TRIO program to apply for and receive the Program Manager position once that manager had left the program. This succession occurred when Kate Sullivan, Program Manager for Upward Bound Classic left, and Angi McCloskie, SEC, became the new Program Manager. It also occurred when Rosanna Brown-Simmons, the Student Enrichment Coordinator for ETS, became acting Program Manager, then applied for and received the position of Program Manager for Talent Search when Paul Morris was made Acting Department Chair of Community and School Programs.

69.    During a conference in West Virginia in or around mid-April 2004, Plaintiff heard a conversation between Paul Morris and other TRIO personnel from

lower-Delaware. Morris was explaining the TRIO programs at Defendant's Wilmington Campus, and told the individuals with whom he was speaking that he was in charge of UBC, ETS and the other youth programs, but not UBMS. When asked why, he said that he would also be in charge of UBMS within a couple of months.

70.     On or about April 29, 2004, only a month after Plaintiff handed in her application for the Program Manager position, she received a letter from Human Resources thanking her for applying for the position but informing her that they had chosen a more qualified candidate. Plaintiff was denied an opportunity to even interview for the Program Manager position. Plaintiff later discovered that Paul Morris was on the interviewing committee.

71.     Plaintiff contacted Jacquita Wright and Jackie Jenkins, head of Human Resources to discuss the hiring process for the Program Manager position. She never received an adequate response; Plaintiff merely received a standard form letter as a response.

72.     Plaintiff also learned that several interviews were conducted, and that the candidate who was selected, declined the position.

73.     The Delaware Department of Labor investigated Plaintiff's Charge of Discrimination alleging race discrimination and retaliation and found in favor of Plaintiff, finding reasonable cause to believe that violations of Title VII and 19 Del. C. § 711 had occurred. A copy of the Delaware Department of Labor Notice of Reasonable Cause Finding dated July 30, 2004 is attached hereto as Exhibit "A".

74.     Also in or around July 2004, the UBMS Program Manager position became available for a second time. Plaintiff's immediate supervisor, the Assistant

Director of CCP, Jacquita Wright-Henderson, suggested to Plaintiff that she re-apply for the position, citing that Plaintiff had a good personality and dealt with the students and the parents well.

75.    Plaintiff re-applied for the position and was granted an interview on or about July 23, 2004. Once again, however, Paul Morris was one of the interviewers. Within two days after her interview, Plaintiff received a letter from Defendant stating that there were more qualified applicants for the position. However, the position was still not filled and the job was posted a third time in or around October 2004. Plaintiff believes she was denied the position in retaliation for her complaint and subsequent Notice of Reasonable Cause Finding from the Delaware Department of Labor.

76.    In or around late December 2004, before the holiday break, Plaintiff and the rest of the UBMS group were told that a new Program Manager had been hired and that she would start on January 3, 2005.

77.    In January 2005, when the UBMS staff returned from break, they were informed that the new Program Manager decided not to take the position, leaving the Program Manager position vacant once again.

78.    On or about January 26, 2005, Sue Zawislak and Jacquita Wright-Henderson announced in a meeting that Andrea Coleman, an African-American, who had been a former Student Enrichment Coordinator for the Upward Bound Classic Program was transferred into the UBMS Program Manager's position.

79.    Coleman had been managing youth camps for CCP prior to being named the new UBMS Program Manager. Coleman originally applied for Program Manager for her Upward Bound Classic Program in or around October 2003, but was not chosen for

the position. Coleman was also hired after Plaintiff; therefore, she had less seniority. Coleman also had no math/science background, and never applied for the position.

80.    Plaintiff filed a grievance in response to Coleman's transfer to UBMS, especially due to the fact that Coleman was also on the interviewing committee. Sue Zawislak, Director of Corporate and Community Programs, denied Plaintiff's grievance.

81.    Despite having more seniority and years of experience in the Upward Bound Math/Science Federal Trio Program, Plaintiff was denied the opportunity for advancement to the position of Program Manager, in what Plaintiff believes was retaliation for her complaint with the Delaware Department of Labor.

82.    The United States Equal Employment Opportunity Commission ("EEOC") issued a Notice of Right to Sue Letter on February 2, 2005, received by Plaintiff's counsel on February 4, 2005, attached hereto as Exhibit "B."

**COUNT I**
**(Racial Discrimination)**

83.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 82 by reference as if specifically set forth herein.

84.    The practices of Defendant as complained of above, had the effect of depriving Plaintiff of equal employment opportunities and otherwise affected her employment because of her race. The practices employed by Defendant were intentional and were done with malice and/or reckless indifference to the federally-protected rights of Plaintiff.

85.    The practices of Defendant as complained of above caused Plaintiff to experience conscious pain and suffering and other emotional harm.

86.     The practices of Defendant as described above are imputable to Defendant in violation of 42 U.S.C. § 2000e-2(a) and 3(a).

87.     As a direct and proximate result of said acts, Plaintiff has suffered, and continues to suffer, loss of employment opportunities, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment and damages to her reputation.

## COUNT II
### (Title VII – Retaliation)

88.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 87 by reference as if specifically set forth herein.

89.     This cause of action arises under Title VII, 42 U.S.C. § 2000e(2)(a).

90.     Defendant intentionally and maliciously discriminated against Plaintiff in retaliation for her complaints in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(2)(a) when it:

(a)     denied Plaintiff promotions and transfer requests despite her qualifications;

(b)     forced Plaintiff to work in a hostile work environment; and

(c)     forced Plaintiff to relocate to a workspace that was inadequately designed and obviously too small to house Plaintiff and the other members of her department.

91.     Defendant acted with discriminatory motive and the reasons provided by Defendant for failing to promote and/or transfer Plaintiff are pretextual.

92.    As a result of Defendant's unlawful retaliation against Plaintiff, Plaintiff has suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

## COUNT III
### (Racial Discrimination – Failure to Promote)

93.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 92 by reference as if specifically set forth herein.

94.    Defendant denied Plaintiff numerous opportunities for career advancement despite her qualifications.

95.    Defendant denied Plaintiff career advancement opportunities by denying her requests and applications for promotion, and by failing to even grant Plaintiff an interview for said positions.

96.    As a result of Defendant's discrimination, Plaintiff suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

97.    Defendant's discrimination was willful, wanton and malicious. As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

## COUNT IV
### (Breach of the Covenant of Good Faith and Fair Dealing)

98.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 97 by reference as if specifically set forth herein.

99.    The actions of Defendant constitute a violation of the *Covenant of Good Faith and Fair Dealing* implicit in every employment agreement.

100.    Defendant breached the *Covenant of Good Faith and Fair Dealing* to Plaintiff by discriminating against her on the basis of her race, and/or based upon retaliatory motives.

101.    Defendant's discrimination was willful, wanton, and malicious.  As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

102.    The above-stated damages were not the result of any act or omission on the part of the Plaintiff.

WHEREFORE, Plaintiff, Brigitte L. Brown, respectfully requests that this Court enter judgment in her favor and against Defendant, Delaware Technical and Community College:

(a)    Declaring that the conduct engaged in by the Defendant to be in violation of Plaintiff's rights;

(b)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide appropriate back pay with pre- and post-judgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(c)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for non-pecuniary losses, including, but not limited to, pain, suffering, and humiliation, in amounts to be determined at trial,

and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(d)     Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for past and future pecuniary losses, in amounts to be determined at trial;

(e)     Issuing a judgment in Plaintiff's favor ordering Defendant to pay punitive damages for its malicious and/or reckless conduct in amounts to be determined at trial;

(f)     Issuing a judgment in Plaintiff's favor ordering the Defendant to pay the costs of reasonable attorneys' fees and expenses and the costs of this litigation; and

(g)     Granting such other further relief as this Court deems just and proper.

MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Keri L. Morris, Esquire (#4656)
1509 Gilpin Avenue
Wilmington, Delaware 19806
302-777-4680 phone
302-777-4682 facsimile
jmartin@margolisedelstein.com
Attorneys for Plaintiff Brigitte Brown

Dated: May 5, 2005

A 133



**STATE OF DELAWARE**
**DEPARTMENT OF LABOR**
**DIVISION OF INDUSTRIAL AFFAIRS**
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

*Winner, Delaware Quality Award of Merit*

## NOTICE OF REASONABLE CAUSE FINDING

RE: Brown v. DE Technical & Community College          State Case No.: **0211731**

On November 1, 2002, Ms. Brigitte L. Brown filed a charge of discrimination against DE Technical & Community College. The Charge of Discrimination is hereby incorporated by reference.

**Reasonable Cause Finding:**

On July 30, 2004, the Department of Labor concluded it investigation and now finds, based on the following facts, that there is reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.    **Undisputed Facts:**

1. Charging Party began her employment in 2000 as a Student Enrichment Coordinator for Respondent's federal Upward Bound Program.
2. Charging Party is currently employed in the same position.

II.   **Disputed Facts:**

1. Charging Party claims that she endured racial discrimination because she was moved to inadequate office space while being replaced by less tenured white co-workers in individual offices or offices with adequate space. Also, after complaining about her conditions, Respondent scrutinized her work and denied her promotions and scheduling opportunities.

2. Respondent states that Charging Party and other black similarly situated employees were moved to one office because other employees under the "To The Maxx Program" were terminated when the grant ended, thus leaving a vacant office space. Respondent states that the office move was in effort to group persons employed under particular grants in the same geographical area. Respondent states that before the move, Charging Party and her co-workers were scattered among non-contiguous offices.

III.  **Resolution of Material Facts in Dispute:**

1. Observation site visit on 5/12/04 revealed that the previous distribution of offices allowed Charging Party and her co-workers to perform effectively in the same geographical area.
2. Observation revealed that other white similarly situated workers have their own offices or share offices which allow confidentiality, adequate space and cubicle style work conditions unlike Charging Party's office that she shares with her group of black co-workers.
3. Observation revealed that one of Charging Party's co-workers was moved to the current space while her old office is currently vacant with boxes.
4. Observation revealed that Respondent also has made room for a co-op worker to work in the same office that is already overcrowded and appears to have cramped working conditions (wires in walking areas, draws and file cabinets can open blocking exits).
5. Charging Party submitted evidence that the grant did not specifically state that all staff in the Program needed to be in the same office rather than a suite of offices or cubicle style offices to provide privacy for confidential conversations when servicing center participants.



EXHIBIT

A

Brown v. DE Technical & Community College
May 12, 2004
Page 2

6.   Charging Party provided evidence that adequate office space is required to conduct
     interviews and perform necessary business functions. In addition, Charging Party provided
     evidence that her position requires more than two hours per day inside the office and
     periodic visits to onsites.

7.   Charging Party has provided evidence that Respondent has previously allocated this office
     space to other black employees along with one white worker who was a floater and not
     permanently placed in that office.

8.   Site observation has confirmed that although other clusters are grouped together, there is
     adequate space and cubicles to work efficiently. Charging Party provided evidence that
     previous clusters placed in the same office (permanently) were also black.

9.   Respondent provided no evidence regarding the denial of promotional or scheduling
     opportunities.

IV.  **Resolution:**
     Charging Party submitted a preponderance of evidence that supported her claim of racial
     discrimination. Respondent did not prove that the office move, denial of promotional
     opportunities and scheduling changes were based solely on business reasons. Charging
     Party proved that she suffered adverse actions and her allegations were corroborated by
     investigative observations and substantial evidence.

     The administrative process will now proceed to the conciliation phase pursuant to 19 Del. C. Section
     712 (c).

_7/14/04_
DATE

_7/30/04_
DATE

_3.) Sands_
Brenda Sands
Labor Law Enforcement Officer

_Julie K. Cutler_
Julie Cutler
Labor Law Enforcement Supervisor

A 135

EEOC Form 161-B (10/96)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:Ms. Brigitte L. Brown
    1321 West 8th Street
    Wilmington, DE 19806

From: Equal Employment Opportunity Commission
    Philadelphia District Office
    21 South Fifth Street
    Philadelphia, PA 19106-2515

RECEIVED FEB 04 2005 BY:

[   ]    *On behalf of person(s) aggrieved whose identity is*
    *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17C-2003-00086 | Legal Unit | (215) 440-2828 |

*(See also the additional information attached to this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

    [ **X** ]     More than 180 days have passed since the filing of this charge.

    [   ]     Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

    [ **X** ]     The EEOC is terminating its processing of this charge.

    [   ]     The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

    [   ]     The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

    [   ]     The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_Marie M. Tomasso_, District Director

February 2, 2005
*(Date Mailed)*

Enclosure(s)

cc:   Delaware Technical & Comm College
      Jeffrey K. Martin, Esquire (For Charging Party)

**EXHIBIT**
**B**

A 136

BRIGITTE L. BROWN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


KENNETH COLE, BRIGITTE L. BROWN,)
                                ) C.A. No. 05-270 KAJ
          Plaintiffs,           )
                                )
v.                              )
                                )
DELAWARE TECHNICAL AND COMMUNITY)
COLLEGE,                        )
                                )
          Defendant.            )
          Deposition of BRIGITTE L. BROWN pursuant
to notice at the law offices of MORRIS JAMES HITCHENS
& WILLIAMS, LLP, 222 Delaware Avenue, 10th Floor,
Wilmington, Delaware, beginning at 10:00 a.m. on
Monday, February 6, 2005, before Renee A. Meyers,
Registered Professional Reporter and Notary Public.

APPEARANCES:

          MARGOLIS EDELSTEIN
          LORI A. BREWINGTON, ESQ.
            1509 Gilpin Avenue
            Wilmington, Delaware  19806
            for the Plaintiffs,

          MORRIS, JAMES, HITCHENS & WILLIAMS LLP
          DAVID H. WILLIAMS, ESQ.
            222 Delaware Avenue, 10th Floor
            Wilmington, Delaware  19899
            for the Defendant.

ALSO PRESENT:

     KENNETH COLE
     PAUL MORRIS

               CORBETT & WILCOX
     1300 French Street – Wilmington, Delaware 19801
                  (302) 571-0510


               CORBETT & WILCOX

A 137

BRIGITTE L. BROWN

Page 9

1    Q.    Do you know whether that document has been

2    produced in this litigation?

3    A.    No, I don't know if it has.

4    Q.    Have you provided it to counsel?

5    A.    Did I ever give you my resignation letter?

6          MS. BREWINGTON:  I can't help you answer

7    those questions, unfortunately.

8    BY MR. WILLIAMS:

9    Q.    Have you provided the document to your counsel?

10   A.    I am not sure.

11         MR. WILLIAMS:  If I represent to you that

12   I don't believe we received it, can we get a copy of

13   her letter of resignation?

14         MS. BREWINGTON:  I don't believe I have

15   it, but if -- we can get it to you.

16         MR. WILLIAMS:  Okay.

17   BY MR. WILLIAMS:

18   Q.    Is it your claim that your resignation was not

19   voluntary?

20   A.    I don't understand that question.

21   Q.    Did you voluntarily resign from the college?

22   A.    I voluntarily resigned, yes.

23   Q.    Are you claiming that you resigned because your

24   working conditions were intolerable?

BRIGITTE L. BROWN

1    A.    Basically.

2    Q.    And tell me --

3    A.    When I -- go ahead.

4    Q.    Describe to me what was intolerable about the

5    working conditions as of the time that you resigned.

6    A.    Well, this was built up over the years from

7    when we had moved into an inadequate office space that

8    was very small, that was very difficult, very, very

9    stressful, very humiliating.  People -- we would have

10   our doors open in an office where, because it's in a

11   college, where students are walking past.  One

12   particular time, all -- a whole group of students

13   walked past, and it was like, Oh, oh, oh, they look

14   like monkeys in there.

15              From that day on, I was very humiliated

16   and really asked to keep the door closed because I

17   didn't even want people to see me in that office

18   because it was very -- it was very cramped, very

19   small.

20              We didn't really have privacy.  We didn't

21   have -- as far as dealing with our students or

22   talking.  If I am on the phone, the secretary would,

23   you know, she will be on the phone with her laughing

24   or talking, whatever she is doing or she is shredding

BRIGITTE L. BROWN

1    Q.    So this all predates your arrival at the

2    college?

3    A.    The systematic, yes.

4    Q.    And those are the people that you are referring

5    to, the ones that you have mentioned to me?

6    A.    Yes.    There is history there.

7    Q.    Anybody else that you are referring to when you

8    talk about removal of qualified minority employees?

9    A.    I am thinking.    Basically.

10    Q.    Now, at the bottom of that page, sub paragraph

11    B, you talk about your belief that the reasons and

12    motives for the move was due to Kate Sullivan and her

13    issues with Tonia Conley?

14    A.    Yes.

15    Q.    Isn't it fair to say that you are speculating

16    about what motivated those decisions?

17    A.    Yes.

18    Q.    Yes?

19    A.    Yes.    There was constant turmoil between Kate

20    Sullivan and Tonia.    And Paul and Kate were always in

21    conference together about the situation.    The next

22    thing you know, Upward Bound Math/Science was the one

23    who was impacted due to Kate and Tonia.    And prior to

24    that, a year prior to that, we had almost been

BRIGITTE L. BROWN

Page 63

1    start putting -- covering the wires up.  They made

2    changes.  If it did nothing, it made changes.  It gave

3    us a couple more wall sockets, which we only had two

4    in our entire office, and even after they put another

5    wall socket in, when we turn our little space heater,

6    because we had space heaters, it would get cold, we

7    would blow out the circuit, and we were always, in the

8    wintertime, calling maintenance to turn the circuits

9    back on.

10      Q.    You had a computer in the room?

11      A.    Yes.

12      Q.    And a desk and a chair?

13      A.    Yes, file cabinet and a couple chairs and

14   desks.

15      Q.    Fax machine?

16      A.    Bookshelf.  There was a fax machine in the

17   other room, yes.

18      Q.    Right in the adjacent room?

19      A.    Where the program manager was had the fax

20   machine.

21      Q.    Did you have equipment similar to the equipment

22   that other TRIO employees had?

23      A.    Yes, I did.  Maybe a little more computer

24   equipment.

BRIGITTE L. BROWN

1    Q.    The room that you occupied after the October

2    2002 move was heated and cooled and ventilated the

3    same way other rooms were?

4    A.    I don't know.  It was terrible as far as the

5    heating and the cooling.  It was extremely cold one --

6    in the wintertime and it was extremely hot.  It just

7    changes temperatures.  Mr. Cole was always covering

8    the vents or taking it down because it was either too

9    much or too little.  It was uncomfortable in there.

10    Q.    And you don't know whether that was any

11    different than other similar rooms occupied by TRIO

12    employees?

13    A.    No.  It wasn't like that in my last office,

14    and, no, I don't.  We were in the -- I never noticed

15    it in any other offices, so --

16    Q.    You had adequate lighting?

17    A.    Yes, we did.  I turned my fluorescent -- it was

18    a fluorescent light right over my desk that I had them

19    undo the bulbs because the lighting was making my head

20    hurt.  I couldn't even concentrate.  So once they

21    turned that lighting off right over my desk, it helped

22    a little more because I had direct sunlight also

23    coming in.

24    Q.    And you mentioned in previous testimony that

Page 65

1    the space was previously occupied as an office by the

2    To The Max program and then the SOAR program?

3    A.    Yes.    When it became SOAR, it was only one

4    coordinator in there.    It had been there -- see, you

5    got to find out when To The Max and SOAR became who

6    they are.    They lost their funding, To The Max, and

7    then SOAR became SOAR.    They got rid of one of their

8    coordinators and they maintained that office for a

9    good another, I guess, seven to nine months.

10    Q.    The space where you were housed was accessible

11    by two doors?

12                MS. BREWINGTON:    Are we talking about the

13    current space, the new space?

14    BY MR. WILLIAMS:

15    Q.    The space you moved into in October of 2002?

16    A.    It was accessible -- there was one door to go

17    outside and then one door to go into the other little

18    office.

19    Q.    As of 2002, you were aware, were you not, that

20    the college had some space issues; in fact, another

21    building was in the process of being built?

22    A.    Space -- no.

23    Q.    Pardon me?

24    A.    No.

BRIGITTE L. BROWN

1    Q.    You weren't aware of any --

2    A.    Any space issues?

3    Q.    Yes.

4    A.    I know, you know, I mean, just with any

5    facility or anything like that, you are constantly

6    moving and constantly changing.  If you are saying

7    that, yes.  But anything specific, no.  I remember in

8    an employee meeting, Mr. Miller was saying that they

9    wanted to some more building on Stanton.  That's all I

10    ever heard about it was at that meeting.  So I don't

11    really know anything.

12    Q.    Just so we are clear, though, this was -- this

13    wasn't -- you weren't sitting out in the hallway or at

14    the end of a hallway?  You were in an office area?

15    A.    We were inside, yeah, a room, yes.

16    Q.    And not too long before you moved, as I

17    understand it, some new furniture was secured for the

18    Upward Bound Math/Science program?

19    A.    It was before we moved.  It was probably a year

20    prior or more.

21    Q.    I understand that you believe that Room 408 was

22    not a comfortable place to work?

23    A.    Yes.

24    Q.    Is that correct?

BRIGITTE L. BROWN

Page 67

1    A.    At the state it was in with all the people and

2    the situation, yes, sir.

3    Q.    And --

4    A.    It was more than just uncomfortable.  It was

5    humiliating.

6    Q.    And are you aware that other employees have

7    worked in Room 408 without complaining?

8    A.    I understand that two black employees were in

9    there and I understand that they didn't complain.  A

10   lot of people don't complain.  I understand before

11   they were in there, it was Ann Del Negro's single

12   office.  So, when they put the To The Max program

13   there anyway, in my head and my personal thoughts, I

14   was like, Wow.

15   Q.    There was a secretary assigned to the program

16   before the move?

17   A.    Which program?

18   Q.    To your program?

19   A.    Well, we didn't have an assigned -- we had a

20   secretary.

21   Q.    Yes.

22   A.    Yes.

23   Q.    And you continued to have a secretary after the

24   move in October?

A 145

BRIGITTE L. BROWN

Page 68

1    A.    Yes.

2    Q.    2002?

3    A.    Yes, full time.

4    Q.    And I think I asked you earlier about the fact

5    that you didn't lose any salary or benefits after the

6    move?

7    A.    No, I didn't.

8    Q.    And your title remained the same?

9    A.    Yes, sir.

10   Q.    Your responsibilities remained the same?

11   A.    Yes.

12   Q.    Were you ever disciplined during your -- I am

13   sorry.

14   A.    When you say my responsibility, I just wanted

15   to add, yes, up to a point.  I had more responsibility

16   that was not on paper when our program manager left

17   and Jacquita became acting program manager, but she

18   was running CCP.  She wasn't really running Upper

19   Bound Math/Science, so, not on paper, written, but I

20   did end up having more responsibilities.

21          I conducted all the faculty meetings each

22   week, and, you know, maintained all the faculty, make

23   sure they have anything ordered, all the supplies.

24   So, I did a little more during that time.

BRIGITTE L. BROWN

1    Q.    But no responsibilities were taken away?

2    A.    None was taken away, no.

3    Q.    I started to ask whether, during your

4  employment by the college, you were ever disciplined?

5    A.    No.

6            MR. WILLIAMS:   Do you want to take a break

7  for five minutes?

8            (Recess taken.)

9  BY MR. WILLIAMS:

10   Q.    Have you seen a document called the Fiscal Year

11  1999 Achievement Report of Delaware Tech. for the

12  corporate and community programs division for the

13  Stanton/Wilmington campus?

14   A.    I am not sure.   I may, but I can't recall.

15   Q.    I am going to place before you a copy of the

16  complaint that was filed in this lawsuit, and because

17  it doesn't have any identifying numbers on it, perhaps

18  we ought to mark this as a deposition exhibit.

19            (Brown Exhibit No. 1 entitled "Complaint"

20  was marked for identification.)

21  BY MR. WILLIAMS:

22   Q.    I represent to you that this is a copy of the

23  complaint that was filed in this lawsuit --

24   A.    Yes.

BRIGITTE L. BROWN

Page 71

1    A.    Yes.

2    Q.    And the second sentence, "The group tried to

3    explain that the proposed move would affect employee

4    relations, morale, and productivity, not to mention,

5    the small space would make it extremely difficult to

6    protect students' privacy."

7              Was that a fair summary of what was

8    presented by the group at that meeting?

9    A.    Yes.  On a small scale.  There was more.

10    Q.    What else?

11    A.    I mean, we had issues about Kate and Tonia,

12    what precipitated the move.  That was -- that went on

13    for a while because our secretary was very adamant

14    about what triggered all this and why were we being

15    affected.  So, I mean, we -- we definitely said all

16    these things in the meeting, but we also had other

17    items that we covered, yeah.

18    Q.    Anything else?

19    A.    I am sure there is more, but I can't remember

20    the entire meeting.

21    Q.    Nothing else you remember at this point?

22    A.    Just explained about the room, the move, the

23    size, productivity, just things like that.

24    Q.    And in paragraph 22, you talk about the fact

BRIGITTE L. BROWN

1    that you were being forced to move into Ann

2    Del Negro's former single office.   I think we have

3    already talked about the fact that To The Max had two

4    full-time coordinators and a secretary in that same

5    room you occupied at least on a part-time basis?

6      A.    Correct, blacks.

7      Q.    Paragraph 33 says that on September 5th,

8    Mr. Cole informed you that he filed a grievance

9    regarding the Paul Morris promotion?

10     A.    Yes.

11     Q.    Did he show you the grievance?

12     A.    No.

13     Q.    What did he tell you about the grievance?

14     A.    He just told me according to the 1965

15   Affirmative Action, that that should have been posted

16   and he should have had a chance to apply for that

17   position.

18     Q.    That, as a matter of policy, it should have

19   been posted?

20     A.    I think.

21     Q.    Is that your understanding?

22     A.    Yes.   That if he was promoted to a -- if he was

23   promoted, then that, since it was a state position, it

24   should have been posted.

BRIGITTE L. BROWN

Page 76

1   Q.   And I have seen the office.  Would you agree

2   that it was a very small office?

3   A.   Yes.  I agree it was small.

4   Q.   When was the last time a Delaware Tech. student

5   made any kind of negative comment when walking by?

6   A.   I heard it early on when we got in there.

7   Q.   You didn't hear it in the later years?

8   A.   I kept the door closed.  I mean, everybody who

9   came in that office said something about our office.

10  We had people coming in asking, What did we do?  What

11  did you guys do?  In fact, Paul Morris' secretary,

12  Brigitte Staabs, came in, and she just couldn't

13  believe it.

14  Q.   We talked about this earlier.  Paragraph 49

15  talks about sleep deprivation.

16  A.   I lost a lot of sleep.  I couldn't sleep.

17  Q.   When did that begin?

18  A.   This was all during the time with the stress.

19  I really think it really started happening like after

20  the meeting with Paul and trying to appeal to people

21  and what's happening here and going from Sue's -- that

22  meeting, that witch hunt meeting.  It just was very

23  stressful to me.  And I lost sleep, hair.

24  Q.   For what period of time did you suffer sleep