IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KENNETH COLE and | ) | |
| BRIGITTE L. BROWN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 05-270-KAJ |
| v. | ) | |
| | ) | CONSOLIDATED |
| DELAWARE TECHNICAL AND | ) | |
| COMMUNITY COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

———————————————————

Jeffrey K. Martin, Esq., Lori A. Brewington, Esq., Margolis Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware 19806; Counsel for Plaintiffs.

David H. Williams, Esq., James H. McMackin, III, Esq., Morris, James, Hitchens & Williams LLP, 222 Delaware Avenue, P.O. Box 2306, Wilmington, Delaware 19899; Counsel for Defendant.

———————————————————

October 6, 2006
Wilmington, Delaware



JORDAN, District Judge

## I.    INTRODUCTION

This is an employment discrimination case brought by Kenneth Cole ("Cole") and

Brigitte L. Brown ("Brown") (collectively, "Plaintiffs") against Delaware Technical and

Community College (the "College").  Plaintiffs, both African-American, claim that while

working for the College they were the target of discrimination based on race, in violation

of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq.

(Docket Item ["D.I."] 1 in C.A. No. 05-270-KAJ at ¶¶ 69-71; D.I. 1 in C.A. No. 05-271-

SLR at ¶¶ 84-86.)[1]  Plaintiffs also allege that, in violation of Title VII, the College

retaliated against them for filing charges of discrimination.  (D.I. 1 at ¶¶ 74-76.)

Pursuant to Delaware state contract law, Plaintiffs claim that the College breached its

implied covenant of good faith and fair dealing.  (*Id.* at ¶¶ 84-86.)  Before me now is the

College's Motion for Summary Judgment.  (D.I. 49; the "Motion".)  This court has

subject matter jurisdiction over the case pursuant to 28 U.S.C. §§ 1331 and 1367.  For

the reasons that follow, the Motion will be granted in part and denied in part.

## II.    BACKGROUND[2]

Cole began working for the College in November 1999 as a part-time Student

Enrichment Coordinator for the Upward Bound Math and Science Program ("UBMS"),

---

[1]The complaints in C.A. No. 05-270-KAJ and C.A. No. 05-271-SLR were consolidated by order dated August 25, 2005.  (D.I. 14 in C.A. No. 05-270-KAJ.) Unless otherwise noted, citations herein are to the docket in C.A. No. 05-270-KAJ.

[2]The following background information is taken from the parties' submissions and does not constitute findings of fact.  It is cast in the light most favorable to the non-movants, the Plaintiffs.  *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

one of the three federally-funded TRIO programs[3] at the College. (D.I. 63 at ¶¶ III.1, III.7.) Brown began working for the College in January 2001 as a full-time Student Enrichment Coordinator for UBMS. (*Id.* at ¶ III.5.) Plaintiffs and two other employees, Rosetta Henderson and Liz Wilson, comprised the entire UBMS department during part of the period relevant to the complaint. (*Id.* at ¶¶ III.8, III.11.) All of them are African-American. (*Id.* at ¶ III.8.)

A.    *Office Relocation*

Prior to 2002, each staff member of UBMS occupied an individual office at the College's facilities. (D.I. 58 at B-0030-0031.) On August 12, 2002, Paul Morris, the Special Programs Director for TRIO, informed the UBMS staff that the program would be relocated. (D.I. 63 at ¶ III.11.) Over the protests of UBMS staff members, including Plaintiffs, the program moved into a single office on October 8, 2002 (*id.* at ¶¶ III.12-17, III.19, III.21, III.25), after which, two staff members of the other TRIO programs moved into the vacated UBMS offices. (D.I. 58 at B-0078, ¶ 6.) Rachel Hamalak, a Student Enrichment Coordinator for Educational Talent Search ("ETS"), began using Cole's former office, and Kate Sullivan, the Program Manager for Upward Bound Classic ("UBC"), moved into Brown's former office. (*Id.*)

B.    *Promotion of Paul Morris to Special Programs Director*

In August 2002, the College promoted Paul Morris ("Morris") from Program Manager of ETS, one of the three TRIO subdivisions, to Special Programs Director for

---

[3] The TRIO programs are "educational opportunity outreach programs designed to motivate and support students from disadvantaged backgrounds." Federal TRIO Programs - Home Page, http://www.ed.gov/about/offices/list/ope/trio/index.html (last visited Aug. 31, 2006).

2

the entire TRIO program. (*Id.* at B-0068.) The College did not post the opening for Special Programs Director, so Cole did not have the opportunity to apply for the position. (D.I. 63 at ¶ III.29.) On September 5, 2002, Cole filed a grievance with the College, claiming that the promotion violated school policy. (*Id.* at ¶ III.30.) Subsequently, on September 9, 2002, staff members received a memorandum from Susan Zawislak, the College's Director of Corporate and Community Programs, stating that Morris's promotion had actually been a reclassification. (D.I. 58 at B-0083.) Cole filed a second grievance on October 22, 2002 regarding the promotion or reclassification of Mr. Morris. (D.I. 63 at ¶ III.33.) After an investigation, the College rescinded Morris's reclassification, and he resumed his previous duties as Program Manager of ETS on December 1, 2002. (*Id.* at ¶¶ III.33, III.36, III.39.)

      C.   *Post-Grievance Management of UBMS Program*

      On September 19, 2002, shortly after Cole filed his first grievance, Rosetta Henderson informed Cole that he could no longer work from 8:00 a.m. to 2:00 p.m. (D.I. 58 at B-0015.) Rather, according to instructions from Ms. Zawislak, he could only work during the College's formal hours of 8:30 a.m. to 4:30 p.m. (*Id.*) On October 15, in formal charges filed with the Delaware Department of Labor, Cole accused the College of racial discrimination and retaliation. (D.I. 63 at ¶ III. 53.) Thereafter, in November 2002, Cole requested that his hours be reduced to 8:30 a.m. through 12:30 p.m., and he provided a doctor's recommendation in support of that request. (D.I. 58 at B-0017-0018.) In response, the College informed Cole that he would be terminated unless he worked his regular hours or provided additional medical documentation

specifying the exact number of hours that he should be working. (*Id.* at B-0016, B-0020.)

Not long after Cole filed his grievance and discrimination charge, the College changed some of its established policies regarding the UBMS program. (*Id.* at B-0079, ¶ 9.) In particular, UBMS employees, who were responsible for visiting high schools in order to meet with students already involved in the program and to recruit other eligible students (*id.* at B-0237, 6:19-7:4, 8:4-17), had been required to give 30 days advance notice for scheduling these school visits. (*Id.* at B-0079, ¶ 9.) However, the College increased that requirement to 90 days. (*Id.*) In addition, the UBMS department previously had operated on the basis of blanket travel requests when frequent school visits were made. (*Id.*) However, in late 2002, the College began requiring individual travel requests for each school visit to be made by UBMS employees. (*Id.*)

Brown filed formal charges with the Delaware Department of Labor on November 8, 2002, in which she alleged that the College's decision to relocate her office was racially discriminatory. (D.I. 51 at A134, ¶ II.1; D.I. 63 at ¶ III.55.) Over a year later, in early 2004, the position of Program Manager of the UBMS program became open when the College terminated Ms. Henderson's employment in that position. (D.I. 58 at B-0206, 124:2-8.) The College formed a hiring committee to select a replacement, and that committee included Paul Morris, who knew about Brown's discrimination charge. (D.I. 63 at ¶ III.47.) The first posting for the open position occurred on March 15, 2004. (*Id.* at ¶ III.46.) Brown applied, but did not receive an interview. (D.I. 58 at B-0002.) The College posted the position again on June 14, 2004. (D.I. 63 at ¶ III.48.) Although

4

Brown received an interview, the committee ultimately declined to hire her.  (D.I. 58 at

B-0003-0004.)  When the committee failed to find a replacement after the third posting,

Andrea Coleman ("Coleman"), a member of the hiring committee, laterally transferred

into the position from the Youth Camp program.  (D.I. 63 at ¶¶ III.49-50.)  In contrast to

Brown, who had worked for UBMS since 2001, Coleman had no experience with the

UBMS program.  (D.I. 58 at B-0209, 137:16-23.)  Furthermore, the College previously

had declined to hire Coleman as Program Manager of one of the other TRIO programs,

during the time she worked in that program.  (D.I. 63 at ¶ III.51.)

## III.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary

judgment if a court determines from its examination of "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,"

that there are no genuine issues of material fact and that the moving party is entitled to

judgment as a matter of law.  In determining whether there is a triable dispute of

material fact, a court must review the evidence and construe all inferences in the light

most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.*, 534 F.2d

566, 573 (3d Cir. 1976).  However, a court should not make credibility determinations or

weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150

(2000).  To defeat a motion for summary judgment, Rule 56(c) requires that the non-

moving party "do more than simply show that there is some metaphysical doubt as to

the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586-87 (1986) (internal citation omitted).  The non-moving party "must set forth specific

facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV.    DISCUSSION

### A.    *Disparate Treatment*

Plaintiffs allege that the College discriminated against them on the basis of race by requiring them to move from individual offices into a single, shared office space. (D.I. 57 at 12, ¶¶ 1-4.) In addition, Cole alleges that the failure to promote him to Special Programs Director constitutes racial discrimination.[4] (*Id.* at 12, ¶ 5.) These disparate treatment claims are analyzed under the *McDonnell Douglas* burden shifting framework. *See Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999) (referring to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Under that framework, Plaintiffs establish a prima facie case of employment discrimination based on race by showing: (1) that they are members of a protected class; (2) that they are qualified for the position; (3) that they suffered an adverse employment action; and (4) that the action occurred under circumstances that give rise to an inference of unlawful discrimination, such as might occur when a similarly situated person not of the protected class is treated differently. *Jones*, 198 F.3d at 410-11; *Boykins v. Lucent*

---

[4]Brown does not assert a racial discrimination claim on the basis that the College failed to promote her to Special Programs Director. (D.I. 57 at 12, ¶ 5.)

*Techs., Inc.*, 78 F. Supp. 2d 402, 409 (E.D. Pa. 2000).[5]  If Plaintiffs succeed in establishing a prima facie case, then the College must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  *Jones*, 198 F.3d at 410.  If the College meets that burden, then Plaintiffs must show by a preponderance of the evidence that those legitimate reasons were a pretext for discrimination.  *Id.*  More specifically, Plaintiffs may overcome a summary judgment motion with evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).[6]

---

[5]The features of a prima facie case are not set by a rigid rule, and the elements "depend on the facts of the particular case."  *Jones*, 198 F.3d at 411.  Specifically, the elements are flexible when the employment action at issue is not a hiring decision.  *See, e.g., id.* at 411-12 (holding that employment actions such as transfers and demotions can satisfy the elements of a prima facie case); *see also Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994) (holding that reformulation of an element of a prima facie case is appropriate in cases involving a reduction in force).

[6]In *Watson v. Southeastern Pennsylvania Transp. Authority*, 207 F.3d 207 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit confronted the question of whether an amendment to Title VII "had changed the standard of causation in Title VII 'pretext' cases from a requirement that the illegitimate [employment decision] criterion be a 'determining' factor of the adverse action to a requirement that the illegitimate criterion be merely a 'motivating' factor."  *Id.* at 213.  The court concluded the amendment had not and that the "motivating" factor test applies to so-called "mixed-motive" cases, while the "determinative" factor test continues to apply in "pretext" cases.  *See id.* at 220 (Title VII amendment "does not alter the distinction in standards of causation that apply to 'pretext' and 'mixed-motive' cases and, accordingly, ... the 'determinative' factor jury instructions in this case were correct.").

1.    *Office Relocation*

With respect to the claim based on the office relocation, the College argues that Plaintiffs have not established the third and fourth elements of a prima facie case, namely that they suffered an adverse employment action and that the circumstances give rise to an inference of unlawful discrimination.  (D.I. 50 at 11-20.)  The College also argues that it had a legitimate nondiscriminatory reason for relocating Plaintiffs' offices. (*Id.* at 20-21.)  In response, Plaintiffs contend that the proffered reason was pretextual. (D.I. 57 at 21-23.)

Plaintiffs contend that the relocation of four UBMS employees to a single office constitutes an adverse employment action sufficient to establish a prima facie case of racial discrimination.  (*Id.* at 14-18.)  The definition of adverse employment action goes beyond firing to reach conduct that "'alter[s] an employee's compensation, terms, conditions, or privileges of employment.'"  *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)).  Courts have found an adverse job impact when an employer, without reducing salary or benefits, moved an employee's office to an undesirable or isolated location. *See Collins v. Illinois*, 830 F.2d 692, 703 (7th Cir. 1987).  In particular, substantial interference with work facilities that are important to the performance of an employee's job can constitute a material change in the terms and conditions of employment and thereby qualify as an adverse employment action.  *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000).  Therefore, depending on the circumstances, an office relocation, alone, may constitute an adverse employment action.

8

In line with such precedent, Plaintiffs contend that being placed in a single office prevented them from being able to adequately perform their employment duties. Specifically, according to Plaintiffs, the office did not provide enough privacy for UBMS employees to have confidential communications with students, because there were no partitions between their desks.  (D.I. 58 at B-0200, 98:23-99:2.)  Also, Plaintiffs say, the size and conditions of the office generally impeded their ability to work.[7]  (Id. at B-0078, ¶ 5; id. at B-0251, 64:1-9.)  On the other hand, the College presented evidence that the new office space was sufficient because it contained the necessary electronic equipment and furniture, provided privacy from other non-UBMS staff and students, and did not present any safety concerns.  (D.I. 51 at A25-26, 114:5-115:11; id. at A144, 66:12-15.)  The College also contends that the UBMS staff simply failed to order partitions.  (D.I. 58 at B-0200, 99:5-6.)  The competing evidence, when viewed in the light most favorable to Plaintiffs, raises genuine issues of material fact as to whether the relocation constituted an adverse employment action.

With respect to the fourth element of the prima facie case, Plaintiffs argue that the College provided similarly situated employees outside of Plaintiffs' protected class with superior office space.  (D.I. 57 at 21.)  If Plaintiffs' pictures of empty offices at the College (D.I. 58 at B-0044-0053) were the only relevant evidence, I question whether they would have established an inference of unlawful discrimination, particularly since the College has articulated a legitimate nondiscriminatory reason for the office moves.

---

[7]These conditions allegedly include: lack of space for file storage, several instances of blown circuit breakers and employees tripping over electrical cords, and inadequate temperature control.  (D.I. 58 at B-0078, ¶ 5; id. at B-0251, 64:1-9.)

9

The College asserts that the UBMS move was part of a larger plan to locate the members of each TRIO program in a single, designated area. (*Id.* at B-0150, 15:8-16:15.) However, Plaintiffs have submitted additional evidence to discredit this claimed purpose and to support the claim that similarly situated non-minority employees enjoyed better offices. In response to Cole's charge of discrimination, the Delaware Department of Labor concluded that there was a preponderance of evidence to support Cole's claim of racial discrimination regarding the office relocation. (D.I. 51 at A69, ¶ IV.) Specifically, the Department of Labor's investigator determined that, unlike Plaintiffs, other similarly situated white employees had their own offices or shared offices that allowed for confidentiality, adequate space, and safety conditions. (*Id.* at A68, ¶ III.2.) There is thus sufficient evidence[8] to raise an inference of unlawful discrimination and to create a genuine issue of material fact as to whether the College's purpose was pretextual. Accordingly, I will deny the Motion as to the disparate treatment claim based on the relocation of Plaintiffs' offices.

### 2.    *Failure to Promote*

Cole claims that the promotion of Paul Morris, a Caucasian, to Special Programs Director constituted racial discrimination because the College did not afford an equal opportunity for others, including Cole, to obtain the position. (D.I. 57 at 23.) Although Cole never applied for the position, "when the failure to promote arises out of an informal, secretive selection process ... a plaintiff may raise an inference of intentional, racially-disparate treatment without proving that he technically applied for ... the

---

[8]In making this observation, I do not intend to prejudge any issue regarding the admissibility of evidence.

promotion." *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 350 (3d Cir. 1990) (citing *Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793, 797 (11th Cir. 1988)). It is undisputed that the College selected Morris for the position without posting the opening. (D.I. 63 at ¶ III.29.) Accordingly, there is a sufficient evidentiary foundation from which Cole may argue for an inference of discrimination, even though he did not apply for the position.

Although the College proffered nondiscriminatory reasons for its action, there is sufficient evidence for a reasonable factfinder to conclude that those reasons were a pretext for racial discrimination. Specifically, after Cole's first grievance, the College issued a correction stating the Morris had been reclassified, rather than promoted, and, following Cole's second grievance, the College returned Morris to his original position. (*Id.* at ¶¶ III.30-31, III.33, III.39.) Cole offered evidence that the College's job action with respect to Morris violated school regulations, regardless of whether it is considered a "promotion" or "reclassification." (D.I. 58 at B-0082.) The College's alleged efforts to keep the position from being posted and to circumvent school policy are sufficient evidence of pretext to survive summary judgment. Therefore, I will deny the Motion with respect to the disparate treatment claim based on the failure to promote Cole to Special Programs Director.

    B.    *Retaliation*

Plaintiffs allege that the College retaliated against them because they filed charges of racial discrimination against the school. (D.I. 57 at 25-26.) To establish a prima facie case for discriminatory retaliation, Plaintiffs must show that: "(1) [they] engaged in protected activity; (2) [they] suffered adverse employment actions; and (3) a causal link exists between the employment actions and the exercise of the protected

activity." *Price v. Del. Dep't of Corr.*, 40 F. Supp. 2d 544, 551-52 (D. Del. 1999).  The

College takes issue with Plaintiffs' evidence on all three elements of the prima facie

case.

First, Plaintiffs contend that they engaged in protected activity by opposing the

office relocation.[9]  (D.I. 57 at 26.)  However, the College points out that Plaintiffs never

explicitly claimed any form of racial discrimination during their initial opposition to the

office move.  (D.I. 51 at A72, A75, A78-80, A85-87, A89-90).  Rather, the first express

claim of racial discrimination occurred when Cole filed a grievance on September 5,

2002 regarding the Paul Morris promotion.  (D.I. 58 at B-0082.)  Under Title VII, a

person engages in "protected activity" when he or she opposes discrimination based on

membership in a protected class.  *Lamb-Bowman v. Del. State Univ.*, 152 F. Supp. 2d

553, 560 (D. Del. 2001).  General complaints of unfair treatment do not constitute an

explicit charge of illegal race discrimination.  *Cf. id.* ("A general complaint of unfair

treatment does not translate into a charge of illegal *age* discrimination." (original

emphasis)).  However, there are genuine issues of material fact as to whether Plaintiffs'

complaints that the office relocation was "unfair" were such that those complaints could

fairly be said to amount to an implicit assertion of racial discrimination.  In any case,

Cole's first grievance with the College on September 5, 2002 does allege racial

discrimination (D.I. 63 at ¶ III.30), and therefore, constitutes protected activity, and

---

[9]Plaintiffs admit that the office relocation itself is not a basis for their
discriminatory retaliation claim.  (D.I. 57 at 25-26.)  Rather, Plaintiffs argue that the
actions taken by the College after the move constitute retaliation.  (*Id.*)

Brown's charge of racial discrimination on November 8, 2002 also constitutes protected activity. (*Id.* at ¶ III.55.)

Plaintiffs argue that the actions taken by the College after September 5 constitute an adverse employment action. Plaintiffs contend that shortly after the filing of the grievance, the College changed Cole's working hours, denied Cole's request for reduced hours based on his doctor's recommendation, and imposed more stringent reporting requirements on UBMS employees. (D.I. 58 at B-0015-0020; *id.* at B-0079, ¶ 9.) Furthermore, in 2004, the College denied, on two separate occasions, Brown's application to become the UBMS Program Manager. (*Id.* at B-0002, B-0004.) Although each of the above instances, when considered independently, may not rise to the level of an adverse employment action, the employer's actions should not be viewed in isolation. *Lafate v. Chase Manhattan Bank (USA)*, 123 F. Supp. 2d 773, 778 (D. Del. 2000). Rather, courts "should analyze all of the acts collectively." *Id.* The evidence submitted, when viewed together and in the light most favorable to Plaintiffs, could support a rational conclusion that the College did alter the "terms and conditions" of Plaintiffs' employment and thus took adverse employment actions against Plaintiffs.

With respect to the causal link element of a retaliation claim, the focus is generally on two factors: (1) the "temporal proximity between [the] protected activity and [the] allegedly retaliatory conduct" and (2) the existence of a "pattern of antagonism" in the intervening period. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997). Timing alone may raise the requisite inference when it is "unusually suggestive" of retaliatory motive. *Id.* at 503. In the absence of these two factors, the proffered

13

evidence, when viewed as a whole, may still be sufficient to establish causation. *Farrell*

*v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000).

Cole submitted evidence which demonstrates that, for the first 3 years of his

employment, the College did not prevent him from working outside formal hours and did

not require him to provide extensive documentation for medical excuses. (D.I. 58 at B-

0015; *id.* at B-0278, 55:9-18.) Similarly, during the entire time that Plaintiffs worked at

the College, the UBMS program operated under a 30-day scheduling time frame for

school visits and under blanket travel requests. (*Id.* at B-0079, ¶ 9.) However,

according to Plaintiffs, in the months immediately following Cole's first grievance, the

College, for the first time, added restrictions to Cole's working hours and UBMS's

reporting procedures. Thus, there is a genuine issue of material fact as to whether the

temporal proximity and nature of this change in policy is suggestive of retaliation.

In addition, although the failure to promote Brown[10] to UBMS Program Manager

occurred over one year later, there is also an issue of material fact as to whether the

circumstances surrounding that decision are suggestive of retaliation. For example, the

College hired Andrea Coleman, who had no UBMS experience, over Brown, who had

worked in the UBMS program for over 3 years. (*Id.* at B-0209, 137:16-23.) The College

had previously denied Coleman's application to be the Program Manager in her own

department, but she was selected over Brown to be the UBMS Program Manager. (D.I.

63 at ¶ III.51.) I make no comment on the strength of this evidence except to say it is

_____

[10]Plaintiffs do not argue that Cole applied for the posted opening for UBMS
Program Manager, and therefore, cannot claim that the failure to promote was
retaliatory. (D.I. 57 at 8-10, 29-31.)

enough to raise genuine issues of material fact as to retaliation, and I will therefore deny the Motion as to the claim for discriminatory retaliation.

C.   *Hostile Work Environment*

A hostile work environment may form the basis of a Title VII discrimination claim against an employer. *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-68 (1986)). The inquiry into whether an environment is hostile requires the consideration of "all the circumstances ... [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). That analysis "must concentrate not on individual incidents, but on the overall scenario." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 149 (3d Cir. 1999). To establish a Title VII claim based upon a hostile work environment, a plaintiff must show: "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996).

Cole has failed to establish that the College created a hostile work environment. He provided details of his personal feelings of embarrassment and humiliation. (D.I. 1 at ¶ 31, 40.) Specifically, Cole says he felt that he was "talked down to and belittled

because he [is] African-American," "that nothing he said made any difference," and that

he was "degraded each day he [went] to work." (*Id.*)  However, he has not adequately

substantiated that those feelings are objectively reasonable, in that the alleged

discrimination was pervasive or would detrimentally affect a reasonable person of the

same race in the same position.[11]

Importantly, a plaintiff's subjective reaction is not enough to establish a hostile

work environment; there must also be objective proof.  *Harris*, 510 U.S. at 21-22.  In

terms of objective evidence, Cole vaguely alleged in his Complaint that students of the

College made "negative comments" regarding the size of his office, and other

employees noted that the office was "small." (D.I. 1 at ¶ 40.)  Even if accepted as true,

"'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)"

do not create a hostile work environment.  *Faragher v. City of Boca Raton*, 524 U.S.

775, 788 (1998) (internal citation omitted).  Cole also provided evidence that the

College threatened to terminate him if he did not provide adequate medical

documentation to support his request for reduced hours.  (D.I. 58 at B-0020.)  The

College had demanded specific documentation in order to determine the exact number

of hours that Cole could work. (*Id.* at B-0016, B-0020.)  Such a request is not a severe

or pervasive burden that a reasonable person would find hostile.  *See, e.g., Childs-*

*Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 79 (D.D.C. 2005) (holding

that an employer's demand for medical documentation to support an employee's

_____

[11]In reaching this conclusion, I do not intend to denigrate Cole's personal
feelings.  However, for a hostile work environment claim to survive summary judgment,
the law requires more than a statement of the plaintiff's subjective reaction. *See Harris*,
510 U.S. at 21-22.

request for sick leave is not sufficiently severe or pervasive to constitute a hostile work environment). As a result, Cole has not set forth evidence sufficient to demonstrate pervasive discrimination that would detrimentally affect a reasonable person of the same race in his same position. Therefore, there is no genuine issue of material fact, and I will grant the Motion with respect to Cole's hostile work environment claim.

Similarly, Brown's hostile work environment claim is unsupported by allegations of pervasive discrimination that would detrimentally affect a reasonable person of the same race in the same position. Like Cole, Brown says she felt belittled and humiliated. (D.I. 57 at 32.) Brown alleges that her individual meetings with the College's staff regarding the office relocation came across as a "'witch hunt'" and a "'search and destroy'" mission, but she provided no objective evidence to support her impression. (D.I. 58 at B-0097, ¶ 30; *id.* at B-0098, ¶ 34.) She also claims that she experienced headaches, nervousness, and other symptoms of work-related stress. (*Id.* at B-0075-B-0076.) However, this subjective evidence alone is insufficient. *See Harris*, 510 U.S. at 21-22 (holding that objective proof is required to establish a hostile work environment). Although Brown did provide evidence that, on one occasion, she overheard students direct an insult at her (D.I. 58 at B-0238, 10:11-14), that isolated insult does not rise to the level of "pervasive" discrimination that is required for a hostile work environment claim. *See Faragher*, 524 U.S. at 788 (holding that isolated comments do not create a hostile work environment). Similarly, Brown alleges that Morris, through an intermediary, expressed the view that "Brown will never go far at [the College] doing the things that she is doing." (D.I. 58 at B-0080, ¶ 14.) Again, this comment, either in isolation or in combination with the aforementioned student insult,

cannot be viewed as "pervasive" or such as would detrimentally affect a reasonable person of the same race in the same position. Accordingly, I will also grant the Motion as to Brown's hostile work environment claim.

     D.    *Constructive Discharge*

     Brown alleges that her resignation from the College in June of 2005 was the product of constructive discharge.[12] (D.I. 57 at 33-34.) To establish a claim for constructive discharge, an employee must show that working conditions became so intolerable that a reasonable person would be compelled to resign. *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). This inquiry is an objective one. *Id.* "Mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 374 (4th Cir. 2004).

     Under this standard, Brown cannot argue that the office relocation compelled her to resign, because she continued to work at the College for nearly 3 years after her office was moved. (D.I. 58 at B-0237, 5:16-19; D.I. 63 at ¶ 25.) Further, two isolated remarks, the student insult and the comment by Mr. Morris (D.I. 58 at B-0238, 10:11-14; *id.* at B-0080, ¶ 14), do not constitute intolerable working conditions. Perhaps recognizing that, Brown relies on evidence that she began experiencing stress-related symptoms while working at the College. (D.I. 57 at 10.) Nevertheless, she has failed to present any objective basis for claiming that her working conditions were such as to be

---

    [12]Brown did not expressly set forth a claim for constructive discharge in her Complaint (D.I. 1 in C.A. No. 05-271-SLR), but for purposes of the Motion, the court will assume that the claim was properly plead.

intolerable to a reasonable person. Since Brown has not raised a genuine issue of material fact on that issue, I will grant the Motion on her claim for constructive discharge.

     E.    *Breach of Covenant of Good Faith and Fair Dealing*

     Finally, in addition to their claims under Title VII, Plaintiffs make a claim for breach of the covenant of good faith and fair dealing, pursuant to Delaware state law. (*Id.* at 32-33.) Delaware law recognizes four situations where the implied covenant of good faith and fair dealing may be breached with respect to an at-will employee: (i) "the termination violated public policy;" (ii) "the employer misrepresented an important fact and the employee relied thereon either to accept a new position or remain in a present one;" (iii) "the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service;" and (iv) "the employer falsified or manipulated employment records to create fictitious grounds for termination." *Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318 (3d Cir. 2003) (citing *Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000)). Plaintiffs rely solely on a variation on category (i), claiming that the College's racial discrimination and retaliation violate public policy. (D.I. 57 at 33.) However, a claim under category (i) requires that the defendant employer have terminated the plaintiff, and that the termination was in violation of public policy. *Moon v. Del. River and Bay Auth.*, No. Civ.A. 05-261-JJF, 2006 WL 462551 *4 (D. Del. 2006). Since the College did not terminate Cole or Brown, their claim for a breach of the covenant of good faith and fair dealing must fail, and I will grant the College's Motion as to that claim.

F.    *Proof of Damages*

The College contends that Plaintiffs' failure to provide expert testimony prohibits the Plaintiffs from claiming prospective damages. (D.I. 50 at 38.) However, the absence of expert testimony does not prevent a jury from rendering an award for prospective earnings. *See Paolella v. Browning-Ferris, Inc.*, 158 F.3d 183, 194-95 (3d Cir. 1998) (upholding the jury's award of front pay and explaining that "we do not believe the absence of expert testimony renders the jury calculation improper."). A jury can reasonably calculate front pay, based on evidence of past earnings, and can reduce the award to present value without expert testimony. *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 797 (3d Cir. 1985); *see also Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 772 n.11 (3d Cir. 1989) (holding that a jury's calculation of front pay is permissible). Plaintiffs apparently have evidence establishing the salaries for the positions at issue in their failure to promote claims, which, with evidence of appropriate discount rates, would be sufficient to enable a jury to calculate an award. (D.I. 58 at B-0298-0299, B-0302.) Accordingly, the Motion will be denied as to the argument that the Plaintiffs are required to present expert testimony regarding damages.[13]

## V.    CONCLUSION

Accordingly, I will grant the Motion for Summary Judgment as to Plaintiffs' hostile work environment claim, their claim for breach of the covenant of good faith and fair

---

[13]The College also argues that Brown's failure to mitigate losses after her resignation precludes her from obtaining front pay. (D.I. 50 at 38-39.) As discussed above, the Motion will be granted with respect to Brown's claim for constructive discharge. Since Brown presents no other basis for front pay, the issue of mitigation is moot.

dealing, and Brown's constructive discharge claim.  I will deny the Motion in all other respects.  An appropriate order will follow.