**TAB F**

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1941365 (N.D.Ill.))

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

**Sandra NIELSEN, Plaintiff,**
v.
**ACORN CORRUGATED BOX CO., Defendant.**

**No. 01 C 1988.**

Aug. 21, 2002.

Employee brought action against employer alleging retaliation under Title VII for employee's sexual harassment complaints. On employer's motion for summary judgment, the District Court, Hibbler, J., held that: (1) employee's complaints of sexual harassment to company's president were statutorily protected expressions; (2) one half hour switch of employee's work hours did not constitute adverse employment action; (3) moving employee to broken-down, smaller, and less stable workstation, which made it more difficult for her to do her job, was not adverse employment action; (4) employer's instruction to other employees to avoid employee was not adverse employment action; and (5) employee failed to rebut employer's legitimate nondiscriminatory reason for terminating employee.

Motion granted.

West Headnotes

**[1] Civil Rights    1244**
78k1244
(Formerly 255k30(6.10) Master and Servant)
Employee's complaints of sexual harassment to company's president, which were followed up by her filing of charge of sexual harassment with Equal Employment Opportunity Commission (EEOC), were statutorily protected expressions under Title VII, even though her reports of sexual harassment to her supervisor, as person who was allegedly harassing her, was not protected activity since her supervisor was not in authorized position to address problem. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[2] Civil Rights    1246**
78k1246
One half hour switch of employee's work hours did

not constitute "adverse employment action," for purpose of employee's Title VII retaliation claim, where employee's pay and job title remained same and employer did not significantly decrease her job responsibilities. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[3] Civil Rights    1246**
78k1246
(Formerly 255k30(6.10) Master and Servant)
Moving employee to broken-down, smaller, and less stable workstation, which made it more difficult for her to do her job, was not "adverse employment action," for purpose of employee's Title VII retaliation claim, since other than discomfort resulting from having to work in tighter space, with no privacy, employee could not explain how changed desk caused any material loss to her and her job responsibilities, title and pay remained the same. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[4] Civil Rights    1246**
78k1246
Employer's alleged instruction to other employees to avoid employee was not "adverse employment action," for purpose of employee's Title VII retaliation claim, since employee did not show that she suffered material harm as result of it, such as reduction in salary, benefits or responsibilities. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[5] Civil Rights    1247**
78k1247
(Formerly 255k40(4) Master and Servant)
Employee failed to establish prima facie case of Title VII retaliation, even though she did show that she suffered adverse employment action, since employer proffered legitimate nondiscriminatory reason for terminating employee and employee did not offer any evidence on issue of her job performance. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[6] Civil Rights    1246**
78k1246
(Formerly 255k40(4) Master and Servant)
Employee failed to show that she was treated less favorably than other employee who occasionally filled in for her at switchboard during lunchtime who did not engage in statutorily protected activity,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1941365 (N.D.Ill.))

in lawsuit employee's Title VII retaliation claim; employees were not similarly situated with respect to their performance, qualifications and conduct since other employee's regular position was not as switchboard operator. Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

### MEMORANDUM OPINION AND ORDER

HIBBLER, District J.

*1 Plaintiff Sandra Nielsen ("Nielsen") filed this lawsuit against her former employer, Defendant Acorn Corrugated Box Company ("Acorn"), alleging retaliation in violation of 42 U.S.C. § 2000e-3(a)(1), for complaining about sexual harassment. Acorn now moves for summary judgment. The Court has examined the submissions by the parties, and concludes that Nielsen has neither satisfied her threshold burden of establishing a prima facie case, nor rebutted Acorn's legitimate nondiscriminatory reason for its actions. Accordingly, Acorn's motion for summary judgment is granted.

### BACKGROUND [FN1]

FN1. The facts below are taken from Acorn's Local Rule 56.1(a) statement of undisputed material facts and Nielsen's Local Rule 56.1(b) counter-statement of material facts. In responding to Nielsen's LR 56.1(b) counter-statement, Acorn raised numerous objections to practically every "fact" asserted, and thus neither admitted nor denied the statements. Many of Acorn's objections are valid, as statements of material facts (1) should contain only factual allegations, not legal conclusions; (2) should be limited to material facts (e.g., this case is not about sexual harassment or gender discrimination); and (3) must be supported by admissible evidence, which hearsay is not. See generally Malec v. Sanford, 191 F.R.D. 581 (N.D.Ill.2000). However, it would have been more appropriate, albeit inconvenient, for Acorn to attempt to respond to the counter-statement in accordance with LR 56.1(b)(3), and then file a separate motion to strike. Regardless, this Court will limit its consideration to only those material factual contentions that are supported by admissible evidence.

Nielsen began working for Acorn in January 1995 as a switchboard operator. Her primary responsibilities included answering the telephone and directing calls. In January 2000, Acorn decided to upgrade its telephone system with voicemail. Because this change reduced Nielsen's workload, Acorn assigned her additional work duties under a new supervisor, Ron Danczyk ("Danczyk"). Nielsen alleges that shortly after she began working for Danczyk, he began to sexually harass her. She complained to Danczyk about his offensive behavior, but when he persisted, she wrote a letter to Phil Goldstein ("Goldstein"), Acorn's President, dated February 22, 2000, informing him of Danczyk's inappropriate conduct. Nielsen says she gave the letter to David Ainsley ("Ainsley"), Goldstein's personal driver who also handled the mail at Acorn. However, Goldstein claims that he did not see Nielsen's letter in February, but some months later. According to Nielsen, the harassment persisted, but she did not attempt to talk to Goldstein or any other member of management about it, as Acorn's February 1994 written sexual harassment policy instructed her to do, because she feared losing her job.

On August 7, 2000, Danczyk and Steve Toffler ("Toffler"), a design manager at Acorn, called Nielsen into a meeting regarding her work assignments. Nielsen was asked if she was willing to be a "team player" to which she responded "definitely." Danczyk then informed Nielsen that she would be getting additional work to do at the switchboard, and that in light of those extra duties, she would no longer be able to do any homework at the switchboard. While working for Acorn, in January 1997, Nielsen had begun attending college part-time in the evenings. Acorn's then Vice-President, Marianne Malaychuck, told Nielsen she could do her homework at her desk when things were slow, so long as she completed her work. After the August meeting with Danczyk and Toffler, though, Nielsen says she only did homework during lunchtime.

In late September 2000, Nielsen's work hours were changed from 7:30 am4:00 pm to 8:00 am4:30 pm because Goldstein wanted the switchboard to be covered for calls received after 4:00 pm. Nielsen, however, did not like her new hours because most employees left at 4:00 p.m., and thus she was left alone in the building with Danczyk (and a few other employees) between 4:00 and 4:30 pm.

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**\*2** On October 2, 2000, Danczyk suspended Nielsen for one day without pay for doing homework during work hours and for not completing her work assignments. Nielsen maintains that she was suspended in retaliation for threatening to report Danczyk to Roseann Hopkins ("Hopkins"), a member of company management, if he did not stop sexually harassing her. The very next day, on October 3, 2000, Nielsen in fact met with Hopkins and Norine Gomoll, Acorn's Personnel Director, and filed a formal complaint of sexual harassment against Danczyk. An investigation followed and Danczyk admitted making comments of a sexual nature towards Nielsen. Acorn then suspended Danczyk for three days without pay from October 5th through October 7th. Nielsen, however, was not satisfied with that result, so she retained an attorney and filed a charge of discrimination alleging sexual harassment and retaliation with the EEOC. Although the charge is dated October 5, 2000, the EEOC marked it as received on October 24, 2000.

Nielsen contends that after she formally complained of sexual harassment, Acorn retaliated against her in several ways. First, on October 9, 2000, Acorn changed Nielsen's work area. Acorn says it did so as part of an ongoing remodeling project, while Goldstein testified at his deposition that Nielsen's counter was removed so that they could see what she was doing. Prior to the change, the switchboard area had a half-wall around Nielsen's desk. (See Pl.'s App. to LR56.1(B) Statement in Opp'n to Def.'s Mot. for Summ. J., Exs. 26, 27 (before and after photographs of Nielsen's work station)). Nielsen maintains her desk was changed because she complained to management about Danczyk. Nielsen concedes she was aware that Acorn had been remodeling its office space, but insists she was told her work area would not be changed. Nielsen described the replacement desk as a "broken down tiny little makeshift desk" that had "dangerous wires all over the place." (Pl.'s 56.1(b) Counter-Statement of Material Facts, ¶¶ 148-49). She contends the desk was so small and unstable that it interfered with her ability to do her job. After Nielsen left Acorn, though, her replacement continued to use the same desk until all switchboard operations were relocated from the first floor (where Nielsen had worked) to the second floor.

Next, Nielsen alleges that on or about October 10, 2000, several co-workers told her Goldstein instructed them not to speak with her or eat lunch with her. However, Goldstein maintains that he only told employees not to hang around the switchboard and to remain at their own desks if they did not have any work to do.

Finally, Nielsen claims she was subjected to false accusations of doing homework at her desk. On October 19, 2000, though, Hopkins actually observed Nielsen doing homework at the switchboard. Hopkins then warned Nielsen not do homework at her desk any more, even during lunchtime, although she could read while waiting for additional work. On December 5, 2000, Donna Quinlan, another Acorn employee, attests that saw Nielsen doing homework at her desk and told Hopkins. Consequently, on December 6, 2000, Hopkins met with Nielsen and Toffler and told her, once again, to stop doing homework at her workstation during regular work hours. Nielsen responded by denying that she had been doing homework. On December 7, 2000, Goldstein claims he saw Nielsen doing homework at her desk and thus directed Hopkins and Toffler to terminate Nielsen's employment. Nielsen was discharged on that same day.

**\*3** Nielsen denies doing homework at her desk and maintains that if those accusing her had confronted her at the time, she would have been able to prove otherwise. She also points out that Lori Zygaldo, an Acorn employee who occasionally relieved her at the switchboard during the lunch hour, would read a magazine or do personal things at the switchboard, but was not reprimanded.

### STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving title is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute about a material fact is "genuine" if the

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1941365, *3 (N.D.Ill.))

evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has met the initial burden, to avert summary judgment, the party opposing the motion must go "beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial." Anderson, 477 U.S. at 248. The nonmoving party cannot rest on its pleadings, Weichering v. Riegel, 160 F.3d 1139, 1142 (7th Cir.1998); Waldridge v. American Hoechst Corp., 24 F.3d 918, 920-21 (7th Cir.1994), nor may that party rely upon conclusory allegations in affidavits, Smith v. Shawnee Library Sys., 60 F.3d 317, 320 (7th Cir.1995). However, in determining if a genuine issue of material fact exists, the Court will draw all reasonable inferences in a light most favorable to the non-movant. Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir.1991).

## ANALYSIS

In Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640 (7th Cir.2002), the Seventh Circuit recently clarified the proper standard for analyzing retaliation claims on summary judgment. Previously, a plaintiff had to show that he opposed an unlawful employment practice, and, as a result, was subjected to an adverse employment action. Cullom v. Brown, 209 F.3d 1035, 1040 (7th Cir.2000). Proving causation required a plaintiff to demonstrate that his employer would not have taken the adverse action but for the plaintiff engaging in protected activity. Id. (quotation omitted).

Stone now sets forth two routes to summary judgment for retaliation claims. Id. at 644. Under the first method, a plaintiff may present direct evidence that he engaged in protected activity and as a result suffered some adverse employment action. Id. If the evidence is uncontradicted, plaintiff is entitled to summary judgment; but if defendant presents unrebutted evidence that it would have take the adverse employment action against plaintiff regardless of any retaliatory motive, defendant would be entitled to summary judgment. Id.

*4 Under the second method or the indirect method, an adaptation of McDonnell Douglas to the

retaliation context, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) he was subjected to adverse employment action, (3) he was performing his job in a satisfactory manner, and (4) he was treated less favorably than any other similarly situated employee who did not engage in such protected activity. Stone, 281 F.3d at 644; Smith v. Allstate Ins. Corp., No. 99 C 0906, 2002 WL 485374, at *16 (N.D.Ill. Mar.29, 2002). If plaintiff establishes a prima facie case of retaliation, the burden then shifts to defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, [it] is entitled to summary judgment. Otherwise there must be a trial." Stone, 281 F.3d at 644. Establishing a causal link between the protected expression and adverse employment action is not required under the second method. Id.; McKay v. Town & Country Cadillac, Inc., No. 97 C 2102, 2002 WL 664024, at *4 (N.D.Ill. Apr.23, 2002).

The Seventh Circuit decided Stone after Acorn moved for summary judgment, but before Nielsen responded to the motion. In fact, it is clear that Nielsen was aware of Stone because she cited to the case in her response. But Nielsen did not present her rebuttal arguments in the framework adopted by Stone, but instead used the old test. Nevertheless, the Court will assume, because Nielsen has not pointed to any direct evidence of a retaliatory motive by Acorn     [FN2], that the indirect McDonnell Douglas method articulated in Stone applies to her case.

> FN2. See Fyfe v. City of Fort Wayne, 241 F.2d 597, 602 (7th Cir.2001) ("When a plaintiff proceeds under the direct proof method, allegedly discriminatory statements are relevant only if they are both made by the decisionmaker and related to the employment decision at issue."); Radue v. Kimberly Clark Corp., 219 F.3d 612, 616 (7th Cir.2000) ("Direct evidence essentially requires an admission by the decision-maker that his actions were based on the prohibited animus.").

### A. Prima Facie Case
### 1. Statutorily Protected Activity

[1] For purposes of retaliation claims, statutorily protected activity generally consists of either an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1941365, *4 (N.D.Ill.))

employee filing a charge with the EEOC or opposing any practice made unlawful under 42 U.S.C. § 2000e-3(a). See Rizzo v. Sheahan, 266 F.3d 705, 714-15 (7th Cir.2001); EEOC v. Yellow Freight Sys., Inc., 253 F.3d 943, 952 (7th Cir.2001). It is undisputed that when Nielsen formally complained to Acorn on October 3, 2000, and filed her charge of sexual harassment with the EEOC on October 24, 2000, she was engaging in statutorily protected activity. However, Nielsen contends the complaints about sexual harassment that she made to Danczyk from January to September 2000, and Goldstein in February 2000, also constitute protected activities. The issue that must be decided, then, is whether those complaints were sufficient to put Acorn on notice of Nielsen's sexual harassment claim.

The Court first looks at whether Acorn has designated channels for reporting sexually harassing conduct. Parkins v. Civil Constructors of Ill. Inc., 163 F.3d 1027, 1035 (7th Cir.1998). Where an employer identifies a person to accept these complaints, under normal circumstances, the employee should complain to the designated individual. Id. If no person is identified or that person is not easily accessible, notice can still be imputed upon an employer if the employee reasonably believed that he or she complained to someone who is authorized to receive and forward the complaint to the employer. Id.

*5 According to Acorn's written sexual harassment policy, an employee subjected to such harassment should contact "Marianne Malaychuck or any other member of management she/he feels comfortable speaking with." (Pl.'s App. to LR56.1(B) Statement in Opp'n to Def.'s Mot. for Summ. J., Ex. 13). Plaintiff contends her oral and written complaints to Danczyk, her supervisor, were sufficient to impute notice to Acorn, but the Court disagrees. Complaining to Danczyk would not qualify as notice to Acorn because it would be unreasonable to believe Danczyk would forward a complaint of sexual harassment against himself to company management. See Parkins, 163 F.3d at 1037 (plaintiff's complaint of sexual harassment to foreman against foreman did not impute notice to employer). Other than refraining from the complained of conduct, Danczyk was not in an authorized position to address the problem. Nielsen's complaints to Danczyk, therefore, are not

statutorily protected expressions. See McKay, 2002 WL 664024, at *10.

The February 2000 letter Nielsen wrote to Goldstein in which she complains about Danczyk sexually harassing her is a different matter, though, since Goldstein, as Acorn's President, was a member of management authorized to investigate such a complaint. Nevertheless, there is some question as to when Goldstein actually saw the letter. Although Nielsen says she gave the letter to Goldstein's personal driver, who also delivered the mail at Acorn, Goldstein denies receiving the letter in February. However, he does admit to having seen it at a later point in time. Exactly how many months later is not clear from his testimony, though. But in light of the fact that all reasonable inferences must be drawn in favor of the nonmoving party when determining whether a genuine issue of material fact exists, the Court will assume that Goldstein received the letter sometime after February. Bartman v. Allis-Chalmers Corp. ., 799 F.2d 311, 312 (7th Cir.1986). Hence, Nielsen engaged in statutorily protected activity in February 2000, and October 2000.

2. Adverse Employment Action

A materially adverse employment action may include termination of employment, demotion evidenced by decrease in wages or salary, material loss of benefits, or significantly diminished responsibilities. Ribando v. United Airlines, Inc., 200 F.3d at 507, 511 (7th Cir.1999). Although adverse employment actions may include more forms of adversity than quantifiable reduction of pay or benefits, minor or trivial actions that make the employee unhappy are not sufficient to qualify. See Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir.1996); McKay, 2002 WL 664024, at *15. It is undisputed that Nielsen's December 2000 termination qualifies as an adverse action. Nielsen also alleges that after she complained of sexual harassment and filed an EEOC charge, Acorn subjected her to four other adverse employment actions as well.

[2] First, Nielsen contends the September 2000 switch in her work hours from 7:30am-4pm to 8am-4:30pm constitutes an adverse action. However, Nielsen's pay and job title remained the same, and Acorn did not significantly decrease her job



Not Reported in F.Supp.2d

(Cite as: 2002 WL 1941365, *5 (N.D.Ill.))

responsibilities. Such a minor shift in her work schedule, therefore, does not rise to the level of an adverse employment action. [FN3] Grube v. Lau Indus., Inc., 257 F.3d 723, 728 (7th Cir.2001).

> FN3. Additionally, the Court finds nothing suspicious about Acorn's business justification of wanting switchboard coverage for that additional 30 minute period, even though voicemail was available, as many consumers still prefer talking to a live person.

*6 Second, Nielsen points to her one-day suspension without pay on October 2, 2000, arguing that it qualifies as an adverse action. In cases involving disciplinary suspensions with a loss of pay ranging from five to nine days, the Seventh Circuit has found an adverse employment action occurred. See Russell v. Bd. of Trustees of Univ. of Ill. at Chicago, 243 F.3d 336, 341 (7th Cir.2001) (collecting cases). But it has not yet considered if a one day suspension is sufficient. See Tan v. City of Chicago, No. 00 C 1470, 2001 WL 1012586, at *5 (N.D.Ill. Aug.30, 2001). Nevertheless, because "the Seventh Circuit has defined 'broadly' what constitutes an adverse employment action," Id., the Court will simply assume for the sake of argument that a one-day suspension without pay is sufficient for material adversity.

[3] Next, Nielsen argues that Acorn's change to her workstation on October 9, 2000 was an adverse action. Nielsen claims the new desk was broken-down, smaller and less stable, which made it more difficult for her to do her job. No doubt, the before and after pictures of Nielsen's workstation show a less aesthetically pleasing and cramped work area, but "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience." Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir.1993). Other than the discomfort resulting from having having to work in a tighter space, with no privacy, Nielsen has not explained how the changed desk caused any material loss to her. Indeed, while the change may have made her unhappy, her job responsibilities, title and pay remained the same. Thus, the change to her workstation area does not rise to the level of an adverse employment action. See, e.g., Daniel v. Skudder Kemper Investments, Inc., No. 00 C 5961, 2002 WL 1160934, at *6 (N.D.Ill. May 23, 2002) (seat reassignment from

window closer to supervisor does not constitute an adverse employment action).

[4] Finally, Nielsen asserts that Goldstein's alleged October 2000 instruction to other employees to avoid her is an adverse action. However, shunning by other employees is not actionable unless Nielsen also shows that she suffered material harm as a result of it, such as a reduction in salary, benefits or responsibilities. Parkins, 163 F.3d at 1039. Once again, because Nielsen has not demonstrated any resultant material effect, even if Goldstein did tell employees not to speak with her, his conduct does not qualify as an adverse job action. [FN4]

> FN4. Nielsen actually concedes that these each action standing alone may not be actionable, but nonetheless argues that when viewed collectively, they all rise to the level of adverse employment actions. In support of this position, Nielsen cites to Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) and Saxton v. American Tel. & Tel. Co., 10 F.3d 526 (7th Cir.1993). However, those cases are distinguishable since the courts there considered the totality of circumstances in order to determine if a work environment was hostile and abusive, not whether the plaintiff had been subjected to an adverse employment action. See Harris, 510 U.S. at 23; Saxton, 10 F.3d at 533-34.

At most, then, Nielsen has identified two adverse employment actions, her one-day suspension, and her termination.

### 3. Performing to Employer's Expectations

[5] Nevertheless, Nielsen has not presented any objective evidence whatsoever to suggest that she was performing according to Acorn's expectations. In fact, the focus of her response brief is on Acorn's alleged retaliatory motive. But to meet her burden of establishing a prima facie case of retaliation, Nielsen must also demonstrate that her work performance was satisfactory. See Stone, 281 F.3d at 644. The record reflects that Nielsen was specifically told on August 7, 2000 by Danczyk and Toffler not to do homework at the switchboard during work hours, suspended for one-day without pay on October 2, 2000 by Danczyk for doing homework at her desk and not completing her work assignments, warned

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1941365, *6 (N.D.Ill.))

again on October 19, 2000 by Hopkins about doing homework at her desk, allegedly seen doing homework at her desk on December 5, 2000 by Donna Quinlan, an Acorn employee who filed an affidavit attesting to that fact, warned once more by Hopkins and Toffler, and allegedly seen again doing homework at her desk on December 7, 2000 by Goldstein, who also submitted an affidavit attesting to that fact.

*7 To create a genuine issue of material fact and thereby defeat summary judgment, Nielsen must "make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] bears the burden of proof at trial." McKenzie v. Illinois Dept. of Transp., 92 F.3d 473, 479 (7th Cir.1996). By not offering any evidence on the issue of her job performance, Nielsen fails to establish a prima facie case of retaliation.

#### 4. Treated Less Favorably than Similarly Situated Employee

[6] Moreover, even if Nielsen had demonstrated a satisfactory job performance, she still has not satisfied her burden of showing that she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. See Stone, 281 F.3d at 644. Nielsen maintains that Lori Zygaldo, an Acorn employee who occasionally filled in for her at the switchboard during lunchtime, was allowed to read a magazine or do other personal things. However, the Court does not believe Nielsen has established that she and Zygaldo were similarly situated with respect to their performance, qualifications and conduct. See Radue, 219 F.3d at 617. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id. Because Zygaldo's regular position was not as a switchboard operator, she and Nielsen were not in comparable situations.

#### B. Legitimate Non-discriminatory Reason for Action by Employer

Finally, even if Nielsen could make out a prima facie case of retaliation, Acorn is still entitled to summary judgment because, as the Court noted

above, Nielsen has not offered any evidence to rebut its legitimate non-discriminatory reason for the one-day suspension and termination of her employment. Stone, 281 F.3d at 644. Both adverse employment actions resulted from Acorn's belief that Nielsen had continued to do homework at her desk during work hours, even though she had been warned on several occasions not to do so.

Nielsen does deny that she was doing homework at her desk, and maintains that she could have proven this if Acorn management had confronted her with the accusations at the time. In support of her contention, she points only to a letter she wrote to her attorney denying Acorn's allegations. However, an employee's self-serving statements cannot be used to defeat a summary judgment motion. See Billups v. Methodist Hosp. of Chicago, 922 F.2d 1300, 1303 (7th Cir.1991) ("[Plaintiff's] own self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination.").

Moreover, the Court's concern is with whether Acorn honestly believed Nielsen was doing her homework during work hours. See, e.g., Essex v. United Parcel Serv., 111 F.3d 1304, 1310 (7th Cir.1997) ("The fact that the employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes nowhere as evidence that the proferred explanation is pretextual."). Nielsen has not presented any evidence to suggest that Acorn harbored a dishonest motive when the company suspended her, and then subsequently terminated her employment, for continuing to engage in conduct that she had been told was prohibited. As such, she has not shown that genuine issues of material fact exist that warrant a trial. See Stone, 281 F.3d at 644.

#### CONCLUSION

*8 For all of the foregoing reasons, this Court finds that Acorn is entitled to summary judgment on Nielsen's claims.

IT IS SO ORDERED.

2002 WL 1941365 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**TAB G**

Not Reported in F.Supp.
75 Fair Empl.Prac.Cas. (BNA) 1555
(Cite as: 1997 WL 805187 (E.D.Pa.))

United States District Court,
E.D. Pennsylvania.

**Babatunde Olatunji OLABODE**
v.
**WILLIAM HECHT INC., et al.**

**No. CIV. A. 95-6221.**

Dec. 30, 1997.

MEMORANDUM

O'NEILL

*1 Babatunde Olatunji Olabode, an African-American immigrant from Nigeria, brought this Title VII and 42 U.S.C. § 1981 action alleging that his employer, defendant William Hecht, Inc., ("WHI") discriminated against him because of his race and national origin. Plaintiff's complaint alleged that he was hired to and did perform architectural drafting for WHI, but was paid substantially less than another full-time architectural draftsman then employed by WHI. Plaintiff also contended that he performed tasks similar to those performed by union members employed by WHI, but that WHI refused to sponsor him for the union. Plaintiff claimed that the wage disparity and the refusal to sponsor him for the union resulted from race and national origin discrimination.

A jury trial resulted in a verdict for plaintiff on both the Title VII and the § 1981 claims. Pursuant to the verdict, I entered judgment for plaintiff in the amount of $410,644. Subsequent to entry of judgment, WHI moved for a new trial and timely renewed its motion for judgment as a matter of law. In the alternative, WHI seeks a substantial remittitur.

I. The Parties

Plaintiff is forty-one years old and immigrated to the United States in 1979. He worked at WHI from 1980 until 1994 when he was injured on the job. Since that time he has been receiving workers' compensation benefits.

WHI is a small business located in Philadelphia, Pennsylvania that designs, manufactures and installs cabinets and other wooden fixtures. Stuart Hecht is the founder's son and president of the company; Neil Hecht, Stuart's brother, is the vice-president of WHI; and Celia Hecht, Stuart's and Neil's mother, is the bookkeeper for WHI.

II. Plaintiff's Claims and the Jury's Verdict

Plaintiff's complaint contained two counts. The first alleged that WHI discriminated against him because of his race in violation of 42 U.S.C. § 1981, and the second alleged race and/or national origin discrimination in violation of Title VII. Plaintiff originally sought damages beginning in 1980 through the date of trial and into the future. Title VII, however, while allowing recovery for race or national origin discrimination, limits recovery of back pay damages to two years before plaintiff filed his complaint with the Equal Employment Opportunity Commission. See 42 U.S.C.2000e-5(g)(1). Plaintiff filed his complaint with the EEOC on January 31, 1995, and recovery was therefore limited to the period after January 31, 1993. Section 1981, on the other hand, permits recovery for race discrimination only [FN1] and limits recovery for back pay damages to the date of enactment, November 21, 1991. [FN2] Title VII and § 1981 are similar in virtually all respects, but these two differences required a fairly complex jury questionnaire. [FN3] Also adding to the complexity of the jury questionnaire was my decision to separate the amount of back pay damages from the back benefits damages, [FN4] and to charge the jury on front pay damages.

FN1. 42 U.S.C. § 1981 reads as follows: (a) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and territory to make and enforce contracts ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens....

FN2. Section 101 of the Civil Rights Act of 1991 broadened § 1981's definition of "make and enforce contracts." Employees could bring claims under § 1981 for acts occurring prior to enactment of the Civil Rights Act of 1991 only if they alleged discrimination in the formation of the employment contract, as opposed to claims based on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *1 (E.D.Pa.))

Page 152

discrimination while working. Strother v. Southern California Permanente Med. Group, 79 F.3d 859, 875-76 (9th Cir.1996). Because § 101's more expansive definition of "make and enforce contracts" was not made retroactive, Rodriguez v. General Motors Corp., 27 F.3d 396, 398 (9th Cir.1994), and because plaintiff did not allege discrimination in the formation of the employment contract, his § 1981 claim is limited to acts occurring after November 21, 1991.

FN3. See Appendix A.

FN4. See infra note 20.

*2 The jury awarded $50,830 in back pay damages and $74,520 in back benefits damages for the period between November 21, 1991 and the date of the verdict, and attributed $40,511 and $59,392, respectively, of those amounts to the period between January 31, 1993 and the date of the verdict. The jury awarded $250,000 in front pay damages, but made no award of front benefits. The jury also awarded $100,000 in punitive damages, attributing $35,294 of that amount to the period between November 21, 1991 and the date of the verdict. Therefore, the jury awarded $449,902 under the Title VII claim and $410,644 under the § 1981 claim. [FN5] The Title VII claim, unlike the § 1981 claim, has a combined $50,000 limit on front pay and punitive damages for a company the size of WHI which would limit the total amount plaintiff could recover under Title VII to $149,903. [FN6] The total recoverable damages were therefore greater under the § 1981 claim and judgment was entered for plaintiff in the amount of $410,644.

FN5. See Appendix B.

FN6. See 42 U.S.C. § 1981a(b)(3)(A) which limits recovery for front pay, emotional pain and suffering and the amount of punitive damages against an employer "who has more than 14 and fewer than 101 employees" to $50,000. The parties do not dispute that this limitation applies to plaintiff's Title VII claim. The limitation provision does not apply to the § 1981 claim: "In an action brought [pursuant to Title VII] against a respondent who engaged in unlawful intentional discrimination .... and provided that the complaining party cannot recover under section 1981 on this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section...." Plaintiff recovered under § 1981 and therefore the limitation provision of subsection (b) does not apply. Defendant did not contend in its post-trial motions or otherwise that subsection (b)'s limitation provision applied to plaintiff's § 1981 claim.

I will first examine defendant's contention that the weight of the evidence does not support the jury's verdict of intentional race discrimination, and that therefore it is entitled to a new trial. I will next consider defendant's motion for judgment as a matter of law. Resolution of these motions necessarily require an understanding of the facts presented to the jury. Lastly, I will review plaintiff's claim for a new trial or a substantial remittitur based on the contention that the jury's award of damages is not supported by the evidence.

III. Motion for New Trial--Race Discrimination [FN7]

FN7. I will examine only the weight of the evidence supporting the § 1981 claim (race discrimination) and not the Title VII claims (race discrimination and/or national origin discrimination) because I entered judgment based on the jury's verdict on the § 1981 claim, and, as discussed below, this verdict is supported by the evidence.

WHI contends that the jury's finding of intentional race discrimination is against the clear weight of the evidence. While the evidence need not be viewed in the light most favorable to the verdict winner when deciding a motion for a new trial. Smith v. General Elec. Corp., 1996 WL 24762 (E.D.Pa.1996). I must not substitute my judgment of the facts and the credibility of the witnesses for that of the jury. Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1076 (3d Cir.1996) (en banc), cert. denied, 117 S.Ct. 2532 (1997). I should grant a motion for a new trial on the basis that the verdict was against the weight of the evidence "only where a miscarriage of justice would result if the verdict were to stand." Id; see also Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1353 (3d Cir.1991).

A. Factual Background [FN8]

FN8. Because I am required to give deference to

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.

**(Cite as: 1997 WL 805187, *2 (E.D.Pa.))**

the jury's finding of race discrimination, I will present primarily plaintiff's version of events to the extent evidence in the record supports it. Guess v. Pfizer, Inc., 971 F.Supp. 164, 167 n. 3 (E.D.Pa.1996); see also Hurley v. Atlantic City Police Dept., 933 F.Supp. 396, 404 n. 4 (D.N.J.1996).

Prior to coming to the United States, plaintiff attended and graduated from a technical college in his native Nigeria. His courses at the technical college included physics, carpentry and joinery, architectural drawing and surveying and leveling. He also took a construction course for which he received a certificate. After he completed his course work, he worked for a group of architects as a professional draftsman, and also worked part-time for his father's construction business where he worked as a draftsman, a carpenter and a cabinetmaker. While working in Nigeria plaintiff prepared intricate technical drawings for various buildings including an apartment, a library for the Nigerian Army Academy, a Nigerian courtroom, and a chemical laboratory.

**\*3** After his arrival in the United States, plaintiff worked as a dishwasher and took classes at the Pennsylvania Institute of Technology. He began studies in pursuit of an advanced degree in architectural engineering but did not complete the program.

Plaintiff interviewed for a position at WHI in 1980. During the interview he presented to Stuart, Neil and Celia Hecht numerous examples of the drafting work which he did while in Nigeria. They immediately hired him as a draftsman and furnished him with a drawing table. Initially WHI did not provide any benefits to plaintiff contending he would have to become an American citizen before WHI would pay him benefits. Plaintiff immediately began the process of becoming a citizen, and he became a citizen on December 2, 1992. He again requested benefits, but Stuart Hecht refused and plaintiff never received any type of benefits from WHI.

Plaintiff testified about various projects on which he performed drafting work and introduced into evidence in numerous examples of his work while at WHI. One of these projects was the Douglas & Walters project which was a $125,000 job

performed in early 1993 that required numerous technical drawings. [FN9] The other draftsman employed by WHI was either laid off or on vacation during this period and plaintiff did all the drawings for this project. In total plaintiff estimated that he drew over 3,000 drawings during his employment at WHI.

FN9. Stuart Hecht testified as follows: Q Now, can you give the jury an idea, what would you say the average order you get on the drafting or manufacturing job really is? What is the average price on it? A Of the jobs? Q Yes. A They can run anywhere from $1,000 to $100,000. Q So when it gets to $100,000, that's a very big job; is that right? A Yes. To us it is, yes.

Although plaintiff was initially hired as a draftsman, he began to perform numerous other tasks for the company when there was not enough drafting work or when one of the Hechts requested that he perform other duties. His various odd jobs included shoveling snow, cleaning the bathrooms, sweeping the floors, delivering materials to the various job sites, purchasing materials, and running various errands. He also performed semi-skilled labor including plumbing, electrical and carpentry work in WHI's factory, and occasionally drove a truck. He also went to job sites to unload trucks, install fixtures and clean. Plaintiff testified in detail about how he used various pieces of equipment in the factory including a table saw, sanders, radial saw, etc. from the mid-1980s until his disabling injury in November 1994. Plaintiff also performed minor electrical, carpentry and maintenance work on the Hechts' private properties. In his testimony, plaintiff estimated that he spent 60-80% of time doing drafting work and the other 40-20% performing these various tasks.

The employees who worked in the factory as cabinetmakers, carpenters, and general laborers were members of a union and WHI paid for their health and pension benefits through the union. A general laborer at WHI loads and unloads trucks, assists in the installation of fixtures, cleans job sites, and receives and distributes materials. The only qualification necessary is that the employee must be physically fit and strong.

When plaintiff was not drafting he was often performing jobs that according to the collective



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *3 (E.D.Pa.))

bargaining agreement were to be performed only by union employees. These jobs included carpentry, cabinetmaking, installation, and janitorial work. Because he was performing these union jobs, plaintiff requested of Stuart Hecht that WHI sponsor him for union membership. Stuart Hecht said that would not sponsor him for the union because he was not an American citizen. After plaintiff became a citizen in 1992 he again asked Stuart Hecht to sponsor him for union membership. Stuart Hecht refused and threatened to fire plaintiff if he continued to bother him about joining the union. Plaintiff spoke to the union representative and was told that he must get sponsored by WHI before he would be admitted into the union. [FN10]

> FN10. Uncontroverted evidence presented at trial established that there were two ways of joining the union. The first was through an employer who would sponsor the employee for union membership after satisfactorily working for the employer for a period of time. The second was through the union's apprenticeship program, which was much more lengthy process. Plaintiff never applied for the apprenticeship program. This omission is not fatal to plaintiff's claim because, as discussed below, he demonstrated that he was qualified for sponsorship and his claim is not based on a failure to admit him into the apprenticeship program.

*4 Plaintiff continued to work at WHI for $350 per week without any benefits until November 1994, when he injured his lower back while performing some electrical work in the factory. Since this disabling injury, plaintiff has been unable to return to work and has received workers' compensation benefits; he has not been terminated by WHI. Plaintiff failed to present any evidence of what the worker's compensation benefits would have been had he been earning a higher salary prior to his injury.

Plaintiff testified that a white employee at WHI, Richard Nickels, started working as a driver for WHI around 1992 and shortly thereafter became a member of the union. WHI provided him benefits after he had worked there for thirty days and paid him $13 to $14 per hour (approximately $520-560 per week). Plaintiff also testified that another white employee, William Hughs, who worked as a general laborer, was sponsored by WHI for the union, received union benefits and was paid more than

plaintiff during the same time period. Plaintiff was making $8.75 per hour (approximately $350 per week).

WHI employed another draftsman, Amado Acuno, who is Filipino. Mr. Acuno did not perform any duties other than drafting. While Mr. Acuno, unlike plaintiff, was an architect and had a undergraduate degree, they both performed the same duties at WHI. Plaintiff testified that WHI provided Mr. Acuno with benefits, and other testimony established that WHI paid him approximately $520 per week or $170 more per week the plaintiff as of November 1994.

Plaintiff claims that the wage disparity between Mr. Acuno and himself, the refusal to provide him benefits as WHI did for Mr. Acuno, and the failure to sponsor him for the union, all resulted from intentional racial discrimination.

B. Prima Facie Case

To recover under a claim of disparate treatment in the terms and conditions of employment because of race discrimination, plaintiff must prove a prima facie case of discrimination under the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and as recently explained in Sheridan. Under this framework plaintiff must establish that: (1) he was a member of a protected class; (2) he was qualified to receive the terms and conditions of employment to which he claims he was entitled; and (3) other employees of a different race with similar qualifications as plaintiff received those terms and conditions and he did not.

WHI first argues that the weight of the evidence shows that plaintiff was not qualified for the position of architectural draftsman because he did not possess an undergraduate degree. I disagree. Plaintiff testified that his educational background included completion of technical college in Nigeria where he took courses in carpentry, architectural drawing and surveying. After graduation he also took a course in construction, and began technical school in the United States and he worked as a professional draftsman for a group of architects in Nigeria. He also worked part time for his father's construction firm as a draftsman and as a carpenter. Plaintiff presented the jury with extensive examples

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *4 (E.D.Pa.))

Page 155

of his work both in this country and in Nigeria. The drawings from Nigeria included a drawing of an apartment, a library for the Nigerian Army Academy, a courthouse, and a chemical laboratory. Plaintiff testified that he presented these drawings to the Hechts and that they hired him as a draftsman immediately after the interview.

*5 Moreover, plaintiff testified that he worked at WHI as a draftsman for approximately fourteen years. He presented to the jury numerous drawings of projects that he did while at WHI, and testified about other projects. Plaintiff estimated that he produced a total of approximately 3,000 drawings in his time at WHI, including all of the drawings for the significant Douglas & Walters project. Plaintiff therefore presented evidence not only that he was qualified to perform the job of draftsman, but that he actually performed the job to the satisfaction of WHI. [FN11]

> FN11. WHI also contends that plaintiff failed to prove that Amado Acuno was not a member of the protected class and that this failure is fatal to plaintiff's claim. WHI argues that because Acuno was not a Caucasian but of Philippine national origin plaintiff failed to establish any legally actionable disparate treatment. This argument is without merit because § 1981 requires that plaintiff prove that defendant intentionally discriminated against him because of his race regardless of the race of the person to whom plaintiff is comparing himself. See Douglas v. Evans, 888 F,Supp. 1536, 1548 (M.D.Ala.1995); Baca v. Butz, 394 F.Supp. 888, 890 (D.N.M.1975). All that is required is that plaintiff prove that he is a member of a protected class. Therefore, plaintiff's claim that he, as an African-American, was treated disparately from a person of another race, in this case a Filipino, is actionable pursuant to § 1981.

Defendant also contends that plaintiff was not qualified to join the union because he was not sufficiently skilled and because he performed union work only part-time while union membership required full-time performance of union-type work. Plaintiff, however, presented sufficient evidence from which the jury could conclude that he was suitably skilled to join the union. By Stuart Hecht's own testimony, the only qualifications for general laborer union members, who load and unload trucks and distribute materials, are general

physical fitness and strength. Plaintiff also presented evidence from which a jury could conclude that he was qualified to perform more skilled carpentry work, testifying that he performed those duties and explaining in detail how many of the machines in the plant operated and their function.

Plaintiff testified that he spent 60-80% of his time doing drafting work and 40-20% performing various other tasks, some of which were union-type jobs. If full-time employment performing union work were a requirement for union membership plaintiff would not quality, but the evidence on this point is capable of multiple interpretations. Defendant points to the following testimony of Mr. Mario Venneri, a union official who is the liaison between the union and the workers at the WHI shop, as establishing full-time union work as a prerequisite to union membership:

Q Now, you saw Olabode in the shop a number of times. I take it that if you saw him doing work which would have qualified as union work, you would not have stood still for that, would you?
A. That's right.
Q. Did you make any inquiries when you saw him in the shop as to exactly what he was doing?
A. Yes, I did.
Q. And as a result of your finding out as what he was doing, did you feel that he was doing what you would consider to be union work?
A. I believe that once or twice he was sweeping up, and I inquired about it, and the shop steward said to me, "He only comes here once in a blue moon." He wasn't full-time. He led me to believe, my shop steward, that, you know, if they needed something, you know, they would bring him in.
Q. And that was sufficient for you not to bother about Mr. Olabode; isn't that correct?
A. That's correct. He wasn't a full-time employee doing that constantly as a laborer or a janitor.

Contrary to defendant's assertion, this testimony does not unequivocally establish that an employee must perform union work full-time before he can become a member of the union. Moreover, the bargaining agreement between the union and WHI does not include a requirement of full-time union work and does include a table of hourly wage rates for each type of union member and thus a reasonable juror could interpret this agreement as allowing part-



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *5 (E.D.Pa.))

Page 156

time performance of union functions. [FN12] Therefore a jury could reasonably conclude that plaintiff was qualified for union membership and that plaintiff established a prima facie case. [FN13]

>FN12. For instance, the minimum hourly rate of wages for a laborer was $11.85 on May 1, 1992, $12.15 on November 1, 1993, and $12.45 on November 1, 1994.

>FN13. Defendants also argue that plaintiff failed to demonstrate that he was rejected for a union position while other non-members of the protected class were treated more favorably. This argument is without merit because the uncontroverted evidence established that Mr. Hughs and Mr. Nickels were sponsored for union membership soon after becoming employed by WHI. WHI also contends that plaintiff failed to affirmatively take any of the required steps which were prerequisites to becoming a member of the union. This argument is also without merit because plaintiff testifies that he asked Stuart Hecht to sponsor him for the union, but that he refused and threatened to fire plaintiff if he persisted with attempts to have WHI sponsor him for the union.

C.  Ultimate Burden of Pretest or Intentional Discrimination

*6  Pursuant to the shifting burden analysis of McDonnell Douglas, once plaintiff establishes a prima facie case of discrimination, defendant must articulate a non-discriminatory reason for the disparate treatment. If defendant articulates a legitimate non-discriminatory reason for the disparate treatment, the burden then shifts to plaintiff to prove that proffered reasons are not credible. If a jury disbelieves defendant's proffered reasons, it is "permitted, but not required, to draw an inference leading it to conclude that there was intentional discrimination." Sheridan, 100 F.3d at 1066.

Defendant did articulate a non-discriminatory reason for the disparate treatment of plaintiff. First, with respect to paying the plaintiff less than Amando Acuno, the defendant claimed that Mr. Acuno was more skilled and more qualified than plaintiff. Acuno had an undergraduate degree in architecture that plaintiff lacked, and Stuart Hecht testified that plaintiff's drawings were not as crisp as

Mr. Acuno's. Defendant also claimed that Mr. Acuno and plaintiff performed different functions with Mr. Acuno actually creating original designs and plaintiff merely tracing or creating shop drawings from others' original work. [FN14] Second, with respect to sponsorship in the union, defendant claimed that plaintiff was not qualified for union work at WHI's shop and did not perform union labor. Stuart Hecht testified that plaintiff performed some minor maintenance work and that he would occasionally sweep the shop when there was no other work for him to do, but that he was not qualified to perform the union jobs in the shop.

>FN14. Defendant did not present examples of Mr. Acuno's work. The jury may have found this omission significant.

Plaintiff, however, presented sufficient evidence from which a reasonable juror could conclude that these proffered reasons were not credible. As discussed above, plaintiff presented evidence that he was as qualified as Mr. Acuno to perform as a draftsman for WHI and that he was qualified to join the union.

Plaintiff also proffered affirmative evidence of intentional discrimination. Plaintiff and Clyde Charles testified that both Stuart and Neil Hecht both directed racial slurs at African-American employees. [FN15] Plaintiff also presented evidence of a pattern of disparate treatment directed at African-American employees. Plaintiff testified that in his fourteen years with WHI, with the exception of a single African-American employee, Floyd Cheeks, none of the employees that WHI sponsored for union membership or paid benefits was African-American. Plaintiff also testified that all African-American employees other than himself and Mr. Cheeks were paid "under the table" and not kept on the official payroll records, and that, with the exception of the three other African-American employees and Mr. Acuno, all of the other employees at WHI were white. [FN16] While defendants did dispute the testimony concerning racial slurs, plaintiff's testimony concerning the treatment of African-Americans was not controverted by payroll records or any contradictory testimony. [FN17]

>FN15. Mr. Charles, and African-American former employee, worked as a truck driver for WHI for

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.

**Page 157**

(Cite as: 1997 WL 805187, *6 (E.D.Pa.))

approximately five years. WHI did not sponsor him for the union or provide him benefits.

FN16. Plaintiff also presented uncontroverted evidence that he was required to do menial labor like cleaning bathrooms and running errands for the Hechts that white employees or Mr. Acuno were not asked to do. This testimony of disparate treatment also buttresses the jury's finding of intentional discrimination.

FN17. Both Stuart and Neil Hecht denied using racial slurs, and WHI presented the testimony of several employees of various ethnic backgrounds who stated that they never heard either of the Hechts utter a racial slur and that WHI was an enjoyable place to work where everyone got along.

*7 Based on the evidence introduced at trial as outlined above, allowing the jury's verdict to stand would not be a "miscarriage of justice." Dunn v. HOVIC, 1 F.3d 1362, 1364 (3d Cir.) (en banc), modified on other grounds, 13 F.3d 58 (3d Cir.1993) (citations omitted). Nor is there any basis for me to "substitute [my] 'judgment of the facts and the credibility of the witnesses for that of the jury.' " Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 211 (3d Cir.1992) (quoting Lind v. Schenley Indus., Inc., 278 F.2d 79, 90 (3d Cir.1960) (en banc)). Accordingly, I conclude that the jury's conclusion that WHI intentionally discriminated against plaintiff is supported by the evidence.

IV. Judgment as a Matter of Law

In deciding a motion for judgment as a matter of law, I must look at the evidence in the light most favorable to plaintiff, the verdict winner, and draw all reasonable inferences in his favor. Sheridan, 100 F.3d at 1072. I must determine whether "the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.' " Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 691 (3d Cir.1993) (quoting Keith v. Truck Stops Corp., 909 F.2d 743, 745 (3d Cir.1990) (citation omitted)). Further, I am not to weigh the evidence, determine the credibility of witnesses, or substitute my judgment for that of the jury. Id. The evidence discussed above provided the jury with ample evidence to afford relief under § 1981, and, accordingly, defendant's motion for

judgment as a matter of law is denied.

V. Damages

Defendant seeks a new trial or a substantial remittitur because of the jury's award of damages. While I have "a responsibility to review a damage award to determine if it is rationally based," Williams v. Martin Marietta Alumina, Inc., 817 F.2d 1030, 1038 (3d Cir.1987), I may not disturb a jury's award "merely because [I] would have granted a lesser amount of damages." Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir.1989); Hurley v. Atlantic City Police Dep't. 933 F.Supp. 396, 423 (D.N.J.1996). Where, however, the verdict is so excessive that it finds no rational support in the record, I may order the plaintiff "to remit the portion of the verdict in excess of the maximum amount supportable by the evidence or, if the remittitur [is] refused, to submit to a new trial." Dunn v. HOVIC, 1 F.3d 1371, 1383 (3d Cir.) (en banc), modified on other grounds, 13 F.3d 58 (3d Cir.1993); Kazen v. Wolinski, 721 F.2d 911, 914 (3d Cir.1983). I must decide whether the award of $410,644 is, as defendant contends, clearly unsupported by the evidence. Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1101 (3d Cir.1995). [FN18]

FN18. Plaintiff "must prove entitlement to back pay by providing information from which [his] damages can be determined." EEOC v. Wilson Metal Casket Co., 24 F.3d 836, 841 (6th Cir.1994). On post-trial motions, however, "any ambiguity in what the claimant would have received but for discrimination should be resolved against the discriminating employer." Mason v. Association for Independent Growth, 817 F.Supp. 550, 555 (E.D.Pa.1993) (citation omitted).

A review of the special interrogatories and the evidence makes clear how the jury arrived at its back pay and back benefits damages amounts. The back pay award of $50,830 is equal to $170 per week for a period of 299 weeks. The $170 represents the difference between plaintiff's salary, $350 per week, and Mr. Acuno's salary, $520 per week, and the 299 weeks represents the number of weeks between November 21, 1991 and the date of the verdict. It is therefore clear that the jury calculated back pay as the difference between plaintiff's and Mr. Acuno's salary over the relevant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *7 (E.D.Pa.))

Page 158

time period.

**\*8** The jury awarded back benefits of $74,520, which amounts to $249.23 per week over the same 299 week period. Plaintiff presented evidence that WHI paid the union $1080 per month for benefits for an employee named Richard Nickels. $1080 times twelve divided by 52 weeks equals $249.23 per week, and this is the amount the jury used to calculate back benefits damages. It is unclear, however, how the jury arrived at the front pay damages award.

A. Back Pay

Defendant contends that the jury's award of back pay damages of $50,820, representing the difference between Mr. Acuno's salary over the applicable time period, is without adequate support in the record. Defendant argues that the evidence lacks the specificity to support this award because plaintiff performed drafting work only 60-80% of the time and the remaining 40-20% was spent performing various tasks, and because plaintiff failed to present evidence of Mr. Acuno's salary in 1991.

The jury, however, could have reasonably concluded that a non-discriminatory wage for the 40-20% of the time that plaintiff was not performing drafting work was at least $520 per week because of the union wages presented into evidence. [FN19] The jury, therefore, could have reasonably found that plaintiff would have been paid at least $520 per week if not for the discrimination while performing non-drafting work.

> FN19. The collective bargaining agreement in effect between May 1, 1992, and April 30, 1995 included hourly wages of between $15.52 and $16.12 for a Journeyman Millman & Cabinetmaker and $11.85 to $12.45 for a laborer. Using a forty hour week, these hourly wages equate to weekly salaries of between $620.80 and $644.80 for a Journeyman Millman & Cabinetmaker and between $474.00 and $498.00 for a laborer.

Defendant's argument that plaintiff failed to establish Mr. Acuno's salary in 1991 is also unavailing. The jury's determination of back pay was not based on Mr. Acuno's salary, but on the differential between Mr. Acuno's and plaintiff's salary. This differential was $170 as of November,

1994 and the evidence supported an inference that this differential existed throughout plaintiff's tenure.

B. Back Benefits

Defendant contends that plaintiff failed to present adequate evidence to support the jury's award of back benefits. As discussed above, the jury calculated the back benefits amount based on the $1,080 monthly payments that WHI made to the union for benefits for a truck driver named Richard Nickels for the month of October, 1994. [FN20] These payments to the union included payments for health and welfare benefits and for pension benefits, and they were based on hourly amounts included in the collective-bargaining agreement. In the collective-bargaining agreement truck drivers and laborers were categorized together for the purposes of paying health and pension benefits. [FN21]

> FN20. During a charge conference held off the record the parties and I discussed the charge related to the valuation of the benefits. Defendant sought a charge that the health insurance benefits would be limited to the amount of out-of-pocket expenses plaintiff incurred either acquiring health insurance or paying for health services. Plaintiff sought a charge that stated the jury was to value the health benefits as the amount defendant would have had to pay for plaintiff's health insurance. I instructed the jury in accordance with plaintiff's requested charge because plaintiff did not plan to present any evidence of out-of-pocket expenses and because if my instruction were improper it could be corrected in the post-trial motions. This decision also mandated use of separate interrogatories on the benefits in the jury questionnaire. I was prepared to decide the propriety of this instruction post-trial, but defendant failed to raise this issue in its post-trial motions thereby waiving any objection it had to the instruction.

> FN21. Plaintiff failed to present evidence from which a reasonable juror could conclude that he was qualified to join the union as a truck driver, but he did present sufficient evidence that he was qualified to join the union as a general laborer.

Defendant first contends that Mr. Acuno did not receive any benefits and therefore the jury could not have awarded back benefits by comparing plaintiff's benefits to Mr. Acuno's benefits. My review of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *8 (E.D.Pa.))

record did not reveal any evidence that Mr. Acuno did not receive benefits. On the contrary, the only evidence concerning Mr. Acuno's benefits was plaintiff's testimony that Mr. Acuno received benefits. [FN22] There was no evidence presented at trial, however, that established the value of Mr. Acuno's benefits leaving the jury to speculate as to that value.

> FN22. Defendant contends that it is noteworthy that Mr. Acuno testified in his deposition that he did not receive any benefits in addition to his salary. This evidence, however, was not presented at trial.

*9 Apparently because the jury was not provided with the value of Mr. Acuno's benefits, the jury awarded plaintiff the full value of union health and pension benefits. Defendant argues that this award is not supported by the evidence because plaintiff only performed union-type work on the part-time basis. It is unclear how much of his time was spent performing union-type labor because he testified that he spent 40-20% of his time performing non-drafting work, but did not provide an estimate of the percentage of that time he spent performing union-type work. Defendant argues that the award of the total amount of the union benefits when plaintiff spent an undetermined amount of time performing work covered by the collective bargaining agreement is unreasonable. I agree. The evidence simply does not support an award of the total union benefits because plaintiff spent the vast majority of his time performing jobs that were not union jobs and because the record is devoid of a valuation of the benefits Mr. Acuno received.

Plaintiff contends that the jury reasonably could have concluded that plaintiff would have worked full-time as a union employee but for the discrimination, and therefore an award of full-time union benefits is supported by the evidence. I do not agree because plaintiff never sought to work as a full-time union employee. On the contrary, plaintiff took great pride in his drafting qualifications and skills and worked for the majority of the time as a draftsman. Although exactly what plaintiff claimed would have occurred absent the discrimination is not entirely clear, all of the evidence indicates that plaintiff sought to be paid equal to Mr. Acuno when performing draftsman work and equal to the union employees when performing his other duties. For the jury to

conclude that plaintiff would have worked as a full-time union employee would therefore contradict plaintiff's theory of liability and damages and his own testimony. I thus conclude that the jury could not have reasonably found that but for the discrimination plaintiff would have worked as a full-time union employee.

Having concluded that the jury's award of back benefits is without adequate support in the record, I must determine the maximum amount of back benefits that is supportable. Gumbs, 823 F.2d at 771-74. As determined above plaintiff testified that he spent 40-20% of his time doing work other than drafting. Plaintiff, however, failed to provide the jury with an estimate of the portion of 40-20% that he spent performing union work. [FN23] Plaintiff did testify extensively about his work using several machines in the factory and a number of job sites where he assisted union members and performed union work. He also testified that a number of the non-union duties that he performed took relatively little time. [FN24] Bearing in mind that the jury retains "broad discretion to calculate damages" and that its award may not be reduced below "the maximum amount ... the jury could reasonably find," id., I conclude that the maximum percentage of time plaintiff spent performing union duties that the jury could rationally find based on the evidence is 30%. It follows from this conclusion that a remittitur of $52,164 is appropriate. [FN25]

> FN23. Plaintiff testified under cross examination as follows: Q Of the remaining 20 percent of the work that you were performing, what portion of that absolute sum was involving carpentry work? A I cannot give you a percentage because its a systematic system, do this, do this, do this, do this, do this. And I carried out automatically. Q Of the remaining 20 percent of the absolute remaining period of time, what percentage of that time did you engage in electrical work? A Electrical work comes with cabinet making and other assignment that was assigned me. I cannot give you a percentage in my hands because I don't have no records.

> FN24. Plaintiff testified under cross-examination as follows: Q Can you estimate the percentage as to the time spent on plumbing? A Plumbing, its about 15, 20 minutes job, its no big deal. Q And what percentage of the time was spent sweeping, running

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



errands, shoveling snow, fixing toilets?    A Shoveling snow if there is snow coming down now.... That takes about ten minutes to just shovel a 16 to 20-foot pathway, about 16 inches wide, just quickly down and put the salt rock, that's no big deal.

FN25. The back benefits award of $74,520 multiplied by 70% equals $52,164.

C. Back Pay and Back Benefits After Disability

**\*10** Defendant also contends that plaintiff is not entitled to back pay and benefits damages after November 1994 when the plaintiff was injured and began receiving workers' compensation benefits.  I instructed the jury on this point as follows:

There are three types of compensatory damages that are potentially recoverable.    The first is called back pay.   If you find that defendant acted unlawfully, than plaintiff is entitled to all the back pay and benefits plaintiff would have received from defendant if defendant had not discriminated against plaintiff.    This amount should then be reduced by the amount plaintiff actually received during the same period.    During the period plaintiff was on disability, this amount is measured by any additional money that plaintiff would have received had he been earning a non-discriminatory income prior to the injury that caused him to be disabled.

Defendant contends that this instruction was erroneous because, as a matter of law, plaintiffs are not entitled to any damages during the period of disability.

Defendant is correct that the general rule is that a plaintiff "will not be allowed back pay during any periods of disability."   Mason v. Association for Independent Growth, 817 F.Supp. 550, 554 (E.D.Pa.1993) (citations omitted).    The rationale behind this rule is that a plaintiff should not be able to receive back pay for a period when he was unable to work for reasons unrelated to the employment discrimination.   Id.   Plaintiff, however, did not contend that he was entitled to a full, non-discriminatory salary while receiving workers' compensation benefits.    Rather, he contended that he would have been earning significantly more than $350 but for the discrimination and therefore would have received a larger amount of workers' compensation benefits while disabled. [FN26]

Plaintiff thus sought an instruction that would allow for recovery of the additional amount of workers' compensation benefits that he would have earned absent the discrimination.    I agreed and gave the above-quoted instruction.

FN26. See 77 P.S. § 511 (setting compensation for total disability at 66.67% of the wages of the injured employee with certain minimums and maximums)

I believe that I gave the proper instruction.    The underlying premise in computing an employment discrimination plaintiff's award is to restore the employee to the economic position in which the employee would have been but for the discrimination.    Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975);   Maxfield v. Sinclair Int'l, 766 F.2d 788, 796 (3d Cir.1985).    "The appropriate standard for the measurement of a back pay award is to take the difference between the actual wages earned and the wages the individual would have earned in the position that, but for the discrimination, the individual would have attained."   Gunby v. Pennsylvania Elec. Co., 840 F.2d 1108, 1119 (3d Cir.1988).

The instruction is consistent with this underlying premise and this standard for measurement of a back pay award because it provides a formula for restoring plaintiff to the financial position he would have been in but for the discrimination.    Had he not been subject to discrimination, plaintiff would have been earning a higher salary prior to his injury, and would have received greater workers' compensation benefit.    Therefore, an award of this incremental amount of workers' compensation benefits would restore him to the position he would have been but for the discrimination.

**\*11** The propriety of the above-quoted jury instruction does not end the inquiry into the award of back pay and benefits for the period after the disabling injury to the date of the verdict.    To properly calculate the proper award during this period, the jury should have been instructed on how to calculate the amount of benefits due under Pennsylvania's workers' compensation law. Neither of the parties requested and I did not give such a charge.    In addition, plaintiff failed to present any evidence of the amount of workers' compensation benefits he would have received had

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                          **Page 161**
**(Cite as: 1997 WL 805187, \*11 (E.D.Pa.))**

he been earning a higher salary prior to his disabling injury. Without this evidence and without the proper instruction, the jury was forced to speculate as to the amount of workers' compensation benefits plaintiff would have received absent the discrimination. Accordingly, I must conclude that the evidence was insufficient to support the jury's award of back pay after the date of the injury.

The jury's award indicates that it believed that the same differential in salary as existed prior to plaintiff's injury would exist in the workers' compensation benefits. A review of Pennsylvania's workers' compensation law, however, reveals that the jury's award is excessive. Subject to certain limitations and caps inapplicable in this situation, workers' compensation benefits are calculated as 67% as the average weekly salary. See 77 P.S. § 511. Because the jury concluded that plaintiff would have been earning $520 per week absent the discrimination as apposed to his salary of $350 per week, the jury, had it been properly instructed, should have awarded $113.90 [FN27] per week after November, 1994 rather than the $170 per week actually awarded. A remittitur of $7,910 is therefore required. [FN28]

> FN27. $520 per week multiplied by 67% less $350 per week multiplied by 67% equals $113.90.

> FN28. $170 less $113.90 equals $56.10, and there are 141 weeks between the date of the injury, November 3, 1994, and the date of the verdict. $56.10 multiplied by 141 weeks equals $7,910.10

A remittitur for back benefits after the injury date is also appropriate because the award is without adequate support in the record. Plaintiff presented no evidence that he would have maintained union benefits while on disability had he been receiving them prior to his injury, and if so, what the value of those benefits would have been. On the contrary, the only evidence on the point suggests that the union benefits would not have continued during the period of disability. Pursuant to the collective-bargaining agreement, WHI contributed to the union's health and pension benefit fund based on the number of hours an employee works during the applicable pay period and it does not contain a provision that required the employer to continue paying benefits for a disabled employee. Because nothing in the record supports an award of back

benefits after the injury and because the only evidence is contrary to such a finding, I conclude that a remittitur of $10,507 is mandated. [FN29]

> FN29. $22.356 multiplied by 47% equals $10,507.32, $22.356 equals the $74,520 back benefits award less $52,164, the remittitur calculated in section V.B. of this memorandum. The $22,356 figure thus represents the remaining award of back benefits. 47% is the percentage of weeks after the injury (141) as compared to the total number of weeks the jury used in its damages calculation (299).

**D. Front Pay**

The jury awarded $250,000 in front pay and nothing for front benefits. Unlike the award for back pay and benefits, it is unclear how the jury arrived at the $250,000 figure. Based on the $170 weekly differential between Mr. Acuno's salary and plaintiff's salary that the jury used to calculate the back pay award, the $250,000 represents over 28 years of income. [FN30] Defendant contends that this award is excessive and unsupported by the evidence. [FN31] Plaintiff argues that the award is a reasonable estimation of the difference between the pay plaintiff would have received absent the discrimination and the pay he would receive until retirement.

> FN30. Plaintiff was 41 years old at the date of the verdict and the 28 years of income would have brought him to the age of 69. But see Floyd v. Mellon Bank, 1991 WL 30755, \*4 (E.D.Pa.1991) ("A front pay award may be made "for a reasonable future period required for the victim to reestablish [his] rightful place in the job market," quoting Goss v. Exxon Office Sys. Co. 747 F.2d 885, 889 (3d Cir.1984); award of front pay for eighteen months fully compensates plaintiff).

> FN31. Defendant also contends that the award of front pay is unwarranted because the plaintiff was not terminated. I disagree. Plaintiff's claims for front pay is unusual because plaintiff has not been terminated and he will receive workers' compensation benefits into the future. By contrast, in the Title VII and § 1981 claims of which I am aware, the front pay issue arises where an employee has been actually or constructively terminated from his position for an illegal discriminatory reason. If

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *11 (E.D.Pa.))

the defendant is found liable in that situation the Court then determines whether reinstatement or front pay is the appropriate remedy taking into consideration whether animosity between the parties renders reinstatement infeasible and whether the same or a comparable position is available. Here, there is a great deal of animosity between the parties and the record is devoid of any indication whether plaintiff's former position remains open or whether there is another position available to him. Traditional reinstatement is therefore not a proper remedy because plaintiff has not been terminated and because reinstatement if infeasible. Traditional front pay, however, is also not a proper remedy because plaintiff will be receiving workers' compensation benefits. I therefore instructed the jury similarly to the instruction on back pay after the disability: "To calculate [the amount of front pay damages] you should calculate the value of the total wages and benefits [plaintiff] would have received in the future absent the discrimination and reduce that amount by the amount of actual wages and benefits that he will receive." I conclude that this instruction was proper and conforms to the compensatory purpose of front pay damages for the same reasons discussed in section V.C. of this Memorandum.

**\*12** The jury's award of front pay damages is entitled to deference because of the inherent speculation involved in the prospective calculation. In addition, the "risk of lack of certainty with respect to projections of lost income must be borne by the wrongdoer, not the victim." Wulf v. City of Wichita, 883 F.2d 842, 873 (10th Cir.1989); See also Goss v. Exxon Office Sys. Co., 747 F.2d 885, 889 (3d Cir.1984). "Accordingly, [I] should not disturb the award of future damages absent a conclusion that the jury engaged in 'unreasonable' or 'wild' speculation." Marchese v. Goldsmith, 1994 WL 263301, *4 (E.D.Pa.1994); see also Green v. USX Corp., 843 F.2d 1511, 1532 (3d Cir.1988); Blum v. Witco Chem. Corp., 829 F.2d 367, 375 (3d Cir.1987).

I conclude that the jury relied on unreasonable speculation in awarding front pay damages because of plaintiff's failure to produce evidence on which the jury could have reasonably based a calculation of front pay damages. Plaintiff failed to present any medical or other testimony about how long plaintiff was likely to remain on disability, how long

plaintiff intended to work at the company, and when he planned to retire. [FN32] In fact, the record contains no information as to the extent of plaintiff's injury and the likely prognosis. Plaintiff also did not present expert testimony concerning his future economic losses. [FN33] Without this evidence, the record is devoid of any information that the jury could use to determine the length of time over which to award front pay damages. [FN34] Plaintiff, therefore, failed to meet his initial burden of proof of "providing information from which [his] damages [could] be determined," Wilson Metal Casket Co., 24 F.3d at 841, and is not entitled to an award of front pay damages. See Eldred v. Consolidated Freightways Corp. Of Delaware, 907 F.Supp. 26, 28 (D.Mass.1995) (lengthy period and speculative inquiry preclude award of front pay). A remittitur of $250,000 is thus ordered. [FN35]

FN32. Plaintiff argues that he was foreclosed from presenting this evidence at trial by arguing that: When plaintiff was testifying about the effect of his work-related disability and his inability to return to work, the court sustained defendant's objection. Defendant cannot now argue plaintiff did not introduce evidence that the defendant did not object to. Plaintiff then references a portion of plaintiff's testimony which reads: Q As a result of that injury, was there any treatment that you received for that? A I had two surgeries. I spent about--almost three months in the hospital. THE COURT: Here again, I don't see the relevance of it. I think you ought to move on. It is clear from the above quote that the defendant did not object to the testimony and that the plaintiff was not testifying about when he would be able to return to work. It is also clear that I was limiting plaintiff's testimony about the length of his hospital stay and the number of surgeries. This testimony was not relevant because the pain and suffering damages from plaintiff's injuries are not recoverable under § 1981 because they were not caused by racial discrimination.

FN33. See Scarfo v. Cabletron Sys. Inc., 54 F.3d 931, 954-55 (1st Cir.1995) (affirming award of front pay based on expert testimony): Young v. Lukens Steel Co. 881 F.Supp. 962, 976 (E.D.Pa.1994) (upholding award of front pay damages based on jury's acceptance of plaintiff's economic loss expert).

FN34. See Hansel v. Public Serv. Co. of Colorado,

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *12 (E.D.Pa.))

778 F.Supp. 1126, 1135-36 (D.Colo.1991) (quantification of front pay damages requires "some basis upon which to base an award of future earnings [and] must specify an ending date."); Rosemond v. Cooper Indus. Prods., 612 F.Supp. 1105, 1117 (D.Ind.1985) ("The court simply has before it no evidence from which it could determine an appropriate award of front pay for a reasonable future period.); see also Wilcox v. Stratton Lumber, Inc., 921 F.Supp. 837, 844 (D.Me.1996) (plaintiff not entitled to front pay award where offered no expert testimony or evidence on economy of the region or employment availability, plaintiff who was 37 years old was not too old to seek and begin new employment, employer was a small company with limited income and had not been profitable during the last two years, court was not convinced that employer would exist for another ten years, and plaintiff's generous back pay award of $41,210 sufficed to make her whole).

FN35. Even if plaintiff were entitled to front pay damages award, the award would be subject to substantial remittitur because of my failure to properly instruct the jury on the proper method for calculation of workers' compensation damages as discussed in section V.C. of this Memorandum. An award of front pay while plaintiff is disabled necessarily involves the calculation of the amount the benefits he would have received had he not been discriminated against less the amount of benefits he would actually receive. The plaintiff failed to present any evidence of the amount of benefits he would actually receive. The plaintiff failed to present any evidence of the amount of benefits he would actually receive. The plaintiff failed to present any evidence of the amount of benefits he was likely to receive absent the discrimination, and I failed to instruct the jury on how to calculate workers' compensation benefits. Without this evidence and these instructions the jury was forced to impermissibly speculate as to the amount of workers' compensation benefits plaintiff would have received absent the discrimination.

E. Punitive Damages

The jury awarded $35,294 [FN36] in punitive damages and defendant contends that plaintiff failed to present evidence of the necessary degree of malice or reckless disregard for plaintiff's right's to warrant an award of punitive damages. [FN37] I disagree.

As discussed above plaintiff presented evidence of various racial slurs directed at African-American employees and a long history of maltreatment of plaintiff and other African-American employees. From this evidence, a jury could have reasonably concluded that defendant acted with the requisite malice or reckless disregard for plaintiff's rights.

FN36. The jury awarded a total of $100,000 in punitive damages, but attributed only $35,294 of the amount to conduct after November 21, 1991. Because § 1981 limits recovery under plaintiff's claim to conduct after November 21, 1991 and because the award under § 1981 was larger than the Title VII award, I entered judgment on the punitive damages claim for $35,294. See section II and Appendix B of this Memorandum.

FN37. Defendant who contends that the award of punitive damages in excessive. This argument is without merit because the award is far less than the back pay and front pay awards, and it in no way shocks the judicial conscience. See Edynak v. Atlantic Shipping, Inc., 562 F.2d 215, 225-26 (3d Cir.1977).

VII. Conclusion

I will therefore vacate the judgment entered on August 18, 1997 and present plaintiff with a choice. He may either accept a remittitur in the amount of $320,581 for an award of $90,063 or opt for a new trial. [FN38]

FN38. See Appendix C for calculation of remittitur and final award.

I note that the peculiar factual situation presented by this case requires that a new trial encompass all issues in the case, both liability and damages. In Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494 (1931), the Supreme Court held that where errors occurred in the damages portion of the trial and not the liability portion, the court may order a new trial on damages only. Id. at 499. The Court, however, concluded that the record in that case did not contain jury findings necessary for a damages only trial. Id.; see also Williams v. Rene, 72 F.3d 1096 (3rd Cir.1995). The record in this case also lacks the jury findings which would allow for a damages only trial. Plaintiff's claim is not a wrongful termination or a failure to promote or hire



Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *12 (E.D.Pa.))

case where the liability and damages phases of the
trial are easily segregated.    Plaintiff claimed that
the defendant discriminated against him by failing to
sponsor him for the union and by failing to pay him
an equal amount to the other draftsman employed by
WHI.    It is not clear from the jury questionnaire
whether the jury found that WHI discriminated
against plaintiff by failing to sponsor him for the
union, or by not paying him like the other draftsman
employed, or both. [FN39]    Without this
information, I cannot order a new trial on damages
only because plaintiff is entitled only to the damages
attributable to the discrimination that the jury found.

> FN39. Neither of the parties requested separate
> questions on plaintiff's two theories of liability, and
> I, not anticipating this problem, neglected to include
> separate questions.

*13 Moreover, "[i]f the issue of damages ... is so
intertwined with liability that one cannot be
submitted to the jury independently of the other
without confusion and uncertainty, then a new trial
must extend to all issues." Rene, 72 F.3d at 1101.
[FN40]   The damages and liability issues are so
interwoven here as to make a damages only trial
impracticable because of the confusion and
uncertainty that would inevitably follow.    In
addition, I cannot envision a principled way to
segregate the damages and liability issues so as to
proceed in a damages only trial that would
sufficiently mitigate that confusion and uncertainty.
See also Geuss v. Pfizer, Inc., 971 F.Supp.  164,
179 (E.D.Pa.1996) (ordering new trial if remittitur
not accepted because the issues of liability and
damages too interwoven to allow fair determination
of damages apart from liability);   Hurley, 933
F.Supp. at 426 (same).

> FN40. See also Simone v. Golden Nugget Hotel &
> Casino, 844 F.2d 1031, 1040 (3d Cir.1988);
> Vizzini v. Ford Motor Co., 569 F.2d 754, 759 (3d
> Cir.1977);  Fed.R.Civ.P. 59(a) ("A new trial may
> be granted to all or any of the parties and on all or
> part of the issues[.]").

Appendix A:  Jury Questionnaire

1. Did defendant intentionally discriminate against
plaintiff because of plaintiff's race and/or national
origin in violation of Title VII?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

YES    X    NO
       ----       ----

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

   2. Did defendant intentionally discriminate against plaintiff because of plaintiff's race after November 21, 1991 in violation of § 1981?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                            **Page  167**
**(Cite as: 1997 WL 805187, *13 (E.D.Pa.))**

YES     X     NO
        ----          ----

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.                                              **Page  168**
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

   3. Did the intentional discrimination you found in
question 1 and/or question 2 legally cause injury or
damages to plaintiff?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Westlaw®

Not Reported in F.Supp.
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

YES    X    NO
   ----        ----

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.

**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

4. What amount of back pay and benefits do you award plaintiff that would have been earned after November 21, 1991?

a. Amount of back pay without benefits from November 21, 1991 up to the date of the verdict? $50,830

b. Amount of back benefits from November 21, 1991 up to the date of the verdict? $74,520

5. Of the damages awarded in response to question 4, what portion of that amount is attributable to the period between January 31, 1993 and the date of the verdict?

a. Portion of the back pay damages without benefits attributable to the period from January 31, 1993 to the date of the verdict? $40,511

b. Portion of the back benefits damages attributable to the period from January 31, 1993 to the date of the verdict? $59,392

6. What amount of front pay and benefits, if any, do you award plaintiff?

a. Amount of front pay without benefits? $250,000

b. Amount of front benefits? $0

7. What amount of other compensatory damages, if any, do you award plaintiff?

a. Amount of other compensatory damages from date of discrimination? $0

b. Portion of the amount of other compensatory damages awarded in response to question 7(a) attributable to conduct after November 21, 1991? $0

8. Punitive Damages

a. Did defendant act with malice, for the purpose of causing harm, or with reckless disregard for plaintiff's rights?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                              **Page  171**
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

YES    X      NO
       ----          ----

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.                                                   **Page 172**
**(Cite as: 1997 WL 805187, \*13 (E.D.Pa.))**

   b. Amount of punitive damages from the date of discrimination?  $100,000

   c. What portion of the amount of punitive damages awarded in response to question 8(b) is attributable to conduct after November 21, 1991? $35,294

   **\*14** Appendix B:  Damages

   The total amount of damages awarded under the Title VII and the § 1981 were:

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.
(Cite as: 1997 WL 805187, *14 (E.D.Pa.))

|                  | Title VII | s 1981   |
|------------------|-----------|----------|
| Back Pay         | $ 40,511  | $ 50,830 |
| Back Benefits    | $ 59,392  | $74,520  |
| Front Pay        | $250,000  | $250,000 |
| Punitive damages | $100,000  | $ 35,294 |
|                  | $449,902  | $410,644 |

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                                      Page  174
**(Cite as: 1997 WL 805187, \*14 (E.D.Pa.))**

   Appendix C:  Calculation of Remittitur and Final
Damages Award

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.

(Cite as: 1997 WL 805187, *14 (E.D.Pa.))

Page  175

|                  | Award      | Remittitur     | Final Damages Award |
|------------------|------------|----------------|---------------------|
| Back Pay         | $ 50,830   | $  7,910 *     | $42,920             |
| Back Benefits    | $ 74,520   | $ 62,671 **    | $11,849             |
| Front Pay        | $250,000   | $250,000 ***   | --                  |
| Punitive damages | $ 35,294   | --             | $35,294             |
|                  | $410,644   | $320,581       | $90,063             |

```
 *   See section V.C of this Memorandum.
 **  See Sections V.B($52,164) and V.C.($10,507) of this Memorandum.
 *** See section V.D of this Memorandum.
```

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



ORDER

AND NOW this 30 day of December, 1997, upon consideration of defendant's motion for judgment notwithstanding the verdict, defendant's motion for a new trial and plaintiff's motion for attorney fees, and the parties' filings related thereto, it is hereby ORDERED that:

(1) The judgment entered by Order of August 18, 1997 is VACATED;

(2) If plaintiff, within twenty (20) days of the date of this Order, files an acceptance of remittitur in the amount of $320,581, defendant's motion for new trial will be DENIED in all respects and judgment will be entered on plaintiff's claims in favor of plaintiff and against defendant in the amount of $90,063;

(3) If plaintiff declines to accept the remittitur, a new trial will be granted as all issues, both liability and damages;

(4) Defendant's motion for judgment as a matter of law is DENIED;  and

(5) Plaintiff's motion for attorney fees is DENIED without prejudice to its renewal if plaintiff accepts the remittitur.

1997 WL 805187 (E.D.Pa.), 75 Fair Empl.Prac.Cas. (BNA) 1555

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**TAB H**

Not Reported in F.Supp.2d
(Cite as: 2003 WL 288402 (W.D.Pa.))

Only the Westlaw citation is currently available.

United States District Court,
W.D. Pennsylvania.

Loretta L. ROBINSON, Plaintiff,
v.
BT FINANCIAL CORPORATION, et al.,
Defendants.

Civil Action No. 01-574.

Feb. 11, 2003.

Former bank teller supervisor sued employer bank, claiming violation of Age Discrimination in Employment Act (ADEA). Employer moved for summary judgment. The District Court, Standish, J., adopting Report and Recommendation of Francis X. Caiazza, United States Magistrate Judge, held that supervisor was not subject of adverse employment action, when she was required to transfer to another location without sustaining any loss of title, salary or benefits.

Judgment for employer.

West Headnotes

**[1] Civil Rights    1203**
78k1203
Bank teller supervisor was not subject of adverse employment action, as required for suit under the ADEA, when she was transferred to another employer location without loss of title, salary or benefits, and only problem was her aversion to driving longer commute. Age Discrimination in Employment Act of 1967, § 2 et seq, 29 U.S.C.A. § 621 et seq.

Neal A. Sanders, Law Office of Neal Alan Sanders, Butler, PA, for plaintiff.

Hayes C. Stover, Kirkpatrick & Lockhart, Pittsburgh, PA, for defendants.

MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION

FRANCIS X. CAIAZZA, Magistrate Judge.

I. RECOMMENDATION

*1 For the reasons stated below, it is respectfully recommended that the District Court grant the Defendants' Motion for Summary Judgment (Doc. 13) and dismiss this case with prejudice.

II. REPORT

BACKGROUND

The Plaintiff Loretta L. Robinson ("Ms. Robinson" or "the Plaintiff") has filed this age discrimination lawsuit against her former employer(s), BT Financial Corporation and Laurel Bank ("the Bank"). [FN1] See generally Compl. (Doc. 1). Ms. Robinson asserts parallel claims of discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("the ADEA") and the Pennsylvania Human Relations Act, 43 Pa. Cons.Stat. § 951, et seq. ("the PHRA"), and her pleadings state the following allegations in support thereof.

> FN1. The Defendant-financial institutions indicate that they became the Plaintiff's employer through "[a] series of mergers and acquisitions." See generally Defs.' Br. in Supp. of Mot. for Summ. J. (Doc. 14, hereinafter cited as "Defs.' Br.") at 1-2. For the sake of simplicity, Defense counsel's papers refer to the Defendants collectively as "the Bank," see id. at 2, and the court follows counsel's lead.

In 1963, the Plaintiff began working for the Bank at its branch in Kittanning, Pennsylvania ("the Kittanning Branch"). See Compl. at ¶ 9. She worked at the Kittanning Branch until approximately December 2, 1999, when her employment was terminated. See id. at ¶¶ 13, 20. At the time of her termination, Ms. Robinson was fifty-four years old and she held the title of "Supervisor of Tellers" at the Kittanning Branch, a position she acquired through a series of promotions. See generally id. at ¶¶ 8, 10-14.

The Plaintiff describes the circumstances leading to her termination as follows. On approximately November 19, 1999, the Bank informed Ms. Robinson that she "would be required to transfer" to one of three other branches, "any of which would require [her] to engage in substantial additional travel." See id . at ¶ 15. The Bank informed her that, "if she did not transfer to one of the other [three] branch[es] ..., her employment would be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo


Not Reported in F.Supp.2d

**Page 100**

(Cite as: 2003 WL 288402, *1 (W.D.Pa.))

terminated." See id. at ¶ 16.

At the time this "ultimatum was issued," the Bank "was aware that [Ms. Robinson] was not comfortable driving long distances and would not be able to make the commute." See id. at ¶ 17. On this basis, the Plaintiff "requested on numerous occasions to be assigned to a position at the Kittanning [Branch,] as she did not want to commute to any of the other [three] branch[es]." See id. at ¶ 19. The Bank declined Ms. Robinson's requests, and it terminated her employment when she refused to accept the transfer. See id. at ¶ 20.

In support of her discrimination claims, the Plaintiff alleges that: at the time she was terminated, "employees who were substantially younger than" her "were treated more favorably in that they were hired or retained to work in the Kittanning" Branch, see id. at ¶ 21; the Bank's denial of her requests to remain in Kittanning was "motivated by ... age," see id. at ¶ 22; and the Bank's decision to terminate her was similarly motivated. See id. at ¶ 23.

The Defendants filed their Motion for Summary Judgment on June 27, 2002. See Defs.' Mot. for Summ. J. (Doc. 13). Among other things, their counsel asserts that the Plaintiff has failed to sufficiently refute the Bank's legitimate, non-discriminatory reason for terminating her employment. See generally, e.g., Defs.' Br. at 22. The undersigned agrees, and therefore recommends that the Defendants' Motion for Summary Judgment be granted.

## ANALYSIS

*2 The age discrimination claims presented in this case are subject to analysis under the familiar McDonnell Douglas framework. Cf. generally Fakete v. Aetna, Inc., 308 F.3d 335, 337-38 & n. 3 (3d Cir.2002). [FN2] First, the Plaintiff must establish her prima facie case by showing that: "(1) [she] was a member of a protected class, i.e., ... she was over forty, (2) [she wa]s qualified for the position, (3)[she] suffered an adverse employment decision, (4) and [she] was ultimately replaced by[, or treated less favorably than,] a person sufficiently younger to permit an inference of age discrimination." See Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir.2001) (citation omitted). If the Plaintiff makes her prima facie case,

the burden shifts to the Defendants to identify "a legitimate, nondiscriminatory reason" for the adverse employment action. See generally Fakete, 308 F.3d at 338, n. 3. Once the Defendants proffer a legitimate, nondiscriminatory reason, the Plaintiff "must demonstrate that the proffered reason was merely a pretext for unlawful discrimination." See Hubbard v. Ashcroft, 2002 WL 1769003, *1 (3d Cir. Aug.1, 2002) (citation omitted). To show pretext, the Plaintiff "must submit evidence [that] ... casts sufficient doubt upon ... the legitimate reason[ ]" identified by the Defendants or that "allows the factfinder to infer ... discrimination was more likely than not a motivating or determinative cause of the adverse employment action." See id. (citation and internal quotations omitted).

> FN2. "There is no need to differentiate between" Ms. Robinson's ADEA and PHRA claims because "the same analysis is used for both." See generally Connors v. Chrysler Fin. Corp., 160 F.3d 971, 972 (3d Cir.1998) (citations omitted).

In this case, the undersigned has serious doubts regarding Ms. Robinson's ability to satisfy one of her prima facie elements, namely that she "suffered an adverse employment decision." See generally discussion supra. [FN3] Even assuming the Plaintiff has made her prima facie case, however, she has completely failed to meet her burden on pretext.

> FN3. As further addressed below, it was the Bank's decision to transfer Ms. Robinson, not her being terminated for refusing the transfer, that forms the crux of the Plaintiff's discrimination claims. See generally discussion infra. As also seen below, the Bank's decision to transfer her does not qualify as an "adverse employment decision." See id. Thus, if the court focuses on the true employment decision being challenged, the Plaintiff fails even to state a prima facie case. Nevertheless, the fact that Ms. Robinson ultimately was terminated, an archetypical adverse employment decision, causes the undersigned sufficient pause to forego a recommendation of dismissal based on her prima facie case, alone. At a minimum, however, the shortcoming in Ms. Robinson's prima facie case provides additional grounds for entering summary judgment against her.

At the onset, the court notes that the parties have expended the bulk of their energy debating whether

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



the Bank was justified in requiring Ms. Robinson to transfer. Compare Defs.' Br. at 20-23 (arguing that Bank had legitimate reasons for transferring Plaintiff and for not requiring younger employees to transfer) with Pl.'s Opp'n Br. at 4-5, 8-11 (arguing opposite). Although ultimately misguided, this approach is somewhat understandable in light of the express allegations of the Complaint. See, e.g., Compl. at ¶ 21 (asserting that "substantially younger" employees "were treated more favorably" because they were "retained to work in ... Kittanning"). As seen below, however, the Bank's decision to transfer Ms. Robinson has no bearing on whether it had a legitimate, non-discriminatory reason for terminating her employment.

The flaw in the Plaintiff's reasoning is best exemplified through the Pennsylvania district courts' analyses in Hussein v. Genuardi's Family Mkts., 2002 WL 56248 (E.D.Pa. Jan.15, 2002) and in Grande v. State Farm Mut. Auto. Ins. Co., 83 F.Supp.2d 559 (E.D.Pa.2000). In Hussein, the plaintiff was transferred from one of the defendant-employer's stores to another, while retaining "the same responsibilities and pay as [she had in her former] position...." See id. at *2. Shortly thereafter, she was terminated by her employer when she "abandon[ed]" the new position. See id.

*3 In the lawsuit that followed, the plaintiff sought to establish that her former employer discriminated against her by requiring the transfer. The Hussein court rejected this approach, reasoning:
[Although the p]laintiff ... establishes the [adverse employment decision] element of [her] prima facie case because[,] as a formal matter, she was terminated[, her transfer to another store] .... do[es] not constitute [an] adverse employment action[ ]....
[T]he record indicates that [she] was provided essentially the same job with the same responsibilities at the same pay at th[e] new location. ... Even viewing the evidence in the light most favorable to [the p]laintiff, an essentially lateral transfer such as this does not equal an adverse employment action. ... This is true even if ... [the d]efendant forced [the p]laintiff to accept [the] transfer ... against her will.
See id., 2002 WL 56248 at *5-6 (citation omitted, some emphasis added, some in original).

The Hussein Court's holding that an "essentially lateral transfer" does not constitute an adverse employment decision is hardly unique. As seen below, a multitude of federal courts have issued decisions, both before and after Hussein, reaching the very same conclusion. See generally discussion infra. Hussein is particularly instructive here, though, in its recognition that an employer "need not offer legitimate, nondiscriminatory reasons for" a decision to transfer that "ultimately do[es] not constitute [an] adverse employment action[ ] ." See id. at *5 (emphasis added). This conclusion demonstrates why the parties' debate as to whether the Bank's proposed transfer was supported by a legitimate, non-discriminatory reason (as opposed to pretext) misses the mark.

Of course, this conclusion is based on the undersigned's finding that Ms. Robinson's anticipated transfer did not rise to the level of an adverse employment decision. The Pennsylvania district court's analysis in Grande further supports this proposition.

In Grande, the plaintiff "was offered a lateral transfer to another" of the defendant-employer's offices. See id., 83 F.Supp.2d at 561. When the plaintiff "decided not to report" to the new location, his employer "fired [him] ... for his failure to" show. See id.

In his discrimination lawsuit, the plaintiff "argue[d] that the long commute to" the new location "made [the] transfer an adverse employment decision." The court disagreed:
To be an adverse action, an employment decision must be serious and tangible enough to alter an employee's compensation, terms, conditions or privileges of employment. ... [Although the court declines to hold that] a lateral transfer can never constitute an actionable employment decision, .... [none of the requisite] qualifying circumstances exist[.] ...
[The] plaintiff has presented no evidence suggesting that the transfer was anything but a full-fledged job. [He] conceded in his deposition ... that he did not believe the transfer was a first-step towards a termination or demotion. ... [The] plaintiff has provided no evidence suggesting that his pay, promotion, or other benefits would have been harmed by [the] transfer .... In fact, in his deposition ..., he conceded that there would have

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



been no difference in pay or benefits and that he could have performed the job, which would have had the same title ....

**\*4** He also stated that he could have made the commute to [said location], ... although he stressed that the drive would have been longer....

In these circumstances, ... there has been no adverse employment decision. While the court does not minimize the effect of a lengthened commute ..., without some evidence of actual harm to [the] plaintiff's career or some indication that he could not perform the job, these factors do not create ... a prima facie case. [FN4] ...

> FN4. As a purely technical matter, the plaintiff in Grande suffered an adverse employment action in that he was terminated for his failure to appear at the new location. See generally discussion supra in text. The Grande Court nevertheless held that the plaintiff could not state a prima facie case, implicitly recognizing that his termination was a mere formality resulting from his refusal to appear. Cf. Grande. This court is inclined to agree with Grande, and disagree with Hussein, that Ms. Robinson's ability to state a prima facie case should not turn on whether she was terminated, as opposed to having resigned, based on the anticipated transfer. Indeed, to entertain such a distinction would be to elevate form over substance. For this reason, the undersigned's recommended dismissal of the Plaintiff's discrimination claims would be equally justified at the prima facie stage of the McDonnell Douglas analysis. Cf.   Grande, 83 F.Supp.2d at 564.

[Relatedly, t]he simple increase in the commuting distance is not enough to find [a] constructive discharge .... While [the plaintiff] may have found the [additional] distance impossible to tolerate, ... the test looks to the reasonable person. ... [Thus, for example,] ... while an employer cannot transfer an employee to a job the employee cannot do, a desire to live in a certain city is not a job-related factor supporting a claim of constructive discharge. ... Similarly, subjective feelings, on their own, are insufficient to find [a] constructive discharge.

See id. at 563-64 (citations and internal quotations omitted, emphasis added).

As referenced above, the holdings in Hussein and Grande are far from unique. A number of other federal courts, in Pennsylvania and elsewhere, have likewise concluded that a truly "lateral" transfer is not converted to an adverse employment decision, notwithstanding complaints regarding additional commute time. See, e.g., Jenkins v. Philadelphia Housing Auth., 2001 WL 1298988, *5 (E.D.Pa. Oct.24, 2001) (transfer to "division [that] was less geographically convenient" to plaintiff did not constitute adverse employment action because her "assigned shift, days off, pay [and] responsibilities [did not] change[ ] depending on [the] site at which she work[ed]"); Spears v. Missouri Dep't. of Corr. & Human Res., 210 F.3d 850, 853-54 (8th Cir.2000) (transfer resulting in "mere[ ] ... inconvenience" to plaintiff, absent "any impact on her job title, salary, benefits, or any other material aspect of her employment," was not adverse employment decision); Anzaldua v. Chicago Transit Auth., 2002 WL 31557622, *3-4 (N.D.Ill. Nov.15, 2002) (even transfer "add[ing] up to an hour and a half each way to [plaintiff's] daily commute" was insufficient to establish adverse employment decision; such increased commute is "merely an inconvenience," not an actionable employment decision) (emphasis added); Johnson v. Eastchester Union Free Sch. Dist., 211 F.Supp.2d 514, 517-18 (S.D.N.Y.2002) (plaintiff's "mere dissatisfaction" with transfer, based on "inconvenience of the change in location," was not actionable as adverse employment decision). [FN5]

> FN5. In Hussein, the district court stated in dicta that the failure to show the "new location was particularly inconvenient for or placed a[n undue] burden on" the plaintiff further supported the court's conclusion that her lateral transfer was not an adverse employment decision. See id., 2002 WL 56248 at *6. In light of the numerous court decisions holding that mere "inconvenience" fails to establish an adverse employment decision, however, the undersigned cannot agree with the dicta in Hussein. Thus, even assuming Ms. Robinson can satisfy the overly-liberal standards suggested in Hussein, the District Court should decline to adopt them here. Cf. generally cases cited supra in text (repeatedly concluding that mere inconvenience does not constitute adverse employment decision).

Under the aforementioned standards, Ms. Robinson has failed to show that the Bank's ordered transfer rose to the level of an adverse employment decision. Her counsel has neither urged nor shown

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



that the transfer would have "any [adverse] impact on her job title, salary, benefits, or any other material aspect of her employment." See Spears, 210 F.3d at 853-54. In fact, Ms. Robinson has expressly admitted that the proposed transfer to the Bank's branch in Sarver, Pennsylvania would have resulted in a job promotion. Compare Defs.' Am. Statement of Uncontested Material Facts (Doc. 17) at ¶ 33 (stating that Plaintiff "would receive a promotion" upon transfer to Sarver) with Pl.'s Resp. to Defs.' Statement of Material Facts (Doc. 21) at ¶ 33 (stating that said "averment [was] admitted ") (emphasis added). Simply put, there is no evidence in the record that the Bank's proposed transfer would have had any negative impact on Ms. Robinson's present or future conditions of employment. [FN6]

> FN6. This conclusion renders inapposite the holding in Torre v. Casio, Inc., 42 F.3d 825 (3d Cir.1994), the only potentially relevant decision cited in the Ms. Robinson's opposition papers. In Torre, the plaintiff was transferred "to [a] dead-end position, … from which he could [more easily] … be fired." See id. at 827 (emphasis added). Indeed, the plaintiff's employment was terminated within five weeks of the transfer, see id., and the Torre Court considered the "transfer [ ] and … discharge[ ]" collectively when discussing the adverse employment decision presented. See id. at 831. In this case, no evidence exists that the Bank sought to transfer Ms. Robinson into a "dead-end position" or to make easier a later discharge. The Plaintiff's refusal to accept the transfer, moreover, negates any speculative allegations regarding the same.

**\*5** The only other conceivable basis for distinguishing Ms. Robinson's claims is her counsel's bald assertion that "Sarver was too far for her to drive." See generally, e.g., Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 20, hereinafter cited as "Pl.'s Opp'n Br.") at 10. Unfortunately for the Plaintiff, however, she has failed to show that her purported difficulties in driving are relevant to the adverse employment inquiry.

At the onset, the undersigned finds telling the Plaintiff's express averment in her pleadings that she "was not comfortable driving long distances…." See Compl. at ¶ 17 (emphasis added). And while this averment is followed by the bare assertion Ms. Robinson "would not be able to make the

commute," see id . (emphasis added), there is absolutely no evidence supporting this conclusion. To the contrary, the record plainly reveals that Ms. Robinson "has been a licensed driver since the age [of] 18," she has "no restrictions on her driver's license," and she has no medical restrictions regarding her ability to drive. See Defs.' Br. at 11 (citing evidentiary support in record). In addition, the record confirms that the additional commute required by the transfer to Sarver would have been a mere nineteen miles, the difference between a seven-mile drive from her home to the Kittanning Branch and a twenty-six mile drive to Sarver. See id. at 11-12 (citing record support).

As just seen, the Plaintiff has failed to identify any evidence supporting her assertion she was unable to make the additional commute: no restrictions on her driver's license, no findings or testimony of a medical health professional establishing her inability to drive the additional distance, et cetera. Instead, she offers only her subjective statements that the additional commute would be "difficult[ ]" and that she "intensely dislike[s] driving." See Pl.'s Opp'n Br. at 10. This type of evidence is insufficient for the purposes of establishing an adverse employment action. Cf., e.g., Grande, 83 F.Supp.2d at 564 ("subjective feelings, on their own, are insufficient to find" an adverse employment decision); see also, e.g., Pimentel v. City of New York, 2002 WL 977535, \*4 (S.D.N.Y. May 14, 2002) ("purely subjective feelings about a transfer which, by objective standards, [do] not negatively alter the terms and conditions of [the plaintiff's] employment in any respect have no bearing on whether an adverse employment action has occurred "; "[i]nterference with sleeping, therapy, eating and medication schedules are purely subjective matters that [unrelated discrimination statutes] do[ ] not address") (citations and internal quotations omitted, emphasis added).

For all of these reasons, the Plaintiff has failed to show that the Bank's proposed transfer constituted an adverse employment decision. [FN7] Even assuming this conclusion is not fatal to her prima facie case, the Bank owed no duty to "offer legitimate, nondiscriminatory reasons for" its decision to transfer the Plaintiff. See Hussein, 2002 WL 56248 at \*5.

(C) 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2003 WL 288402, *5 (W.D.Pa.))

FN7. As referenced above, the undersigned concludes that the Bank's proposed transfer, and not the mere formality of Ms. Robinson's being terminated based on her refusal to accept it, constitutes the purported adverse employment decision placed before the court. See generally discussion supra. The undersigned also has doubts regarding the Plaintiff's ability to show that younger employees were treated more favorably. See generally Compl. at ¶ 21 (alleging that "substantially younger" employees "were treated more favorably in that they were hired or retained to work in ... Kittanning ") (emphasis added). Ms. Robinson's supposition that working in Kittanning would, in fact, be more favorable to younger employees enjoys no evidentiary support. Stated differently, there is no reason for the court to presume that younger workers likewise would have preferred to stay in Kittanning; it seems equally likely that working in one or more other location(s) may have been of greater convenience to any given worker. This analytical disconnect further evidences the infirmity of Ms. Robinson's approach.

**\*6** The proper inquiry is whether the Defendants have proffered, and whether the Plaintiff has sufficiently refuted, the Bank's non-discriminatory reason for Ms. Robinson's termination. The bank's stated reason is clear, and it seems beyond meaningful dispute: the Plaintiff was terminated for refusing to accept the transfer. And though the Plaintiff's Complaint alleges that the termination was "motivated by ... age," see id. at ¶ 23, her counsel has failed to identify one shred of evidence supporting this assertion and/or refuting the Bank's stated non-discriminatory reason. See generally Pl.'s Opp'n Br. Rather, in arguing that the transfer was not supported by legitimate reasons, Ms. Robinson implicitly concedes that her termination was based on her refusal to agree to the same. See id.

As seen above, the Bank's decision to transfer was not an adverse employment action, and it therefore is not subject to the "legitimate non-discriminatory reason" analysis under McDonnell Douglas. See discussion supra. Having failed to identify evidence that she was terminated for any reason other than her refusal to transfer, the Plaintiff cannot meet her burden on pretext.

In conclusion, Ms. Robinson's grievances boil down to her displeasure with the Bank's reassigning her to a different location. "The realities of the workplace," however, "dictate that employees do not always have the option to work in the location they desire." See Nonnenmann v. City of New York, 174 F.Supp.2d 121, 133 (S.D.N.Y.2001) (citation and internal quotations omitted, emphasis added) (holding that employer's denial of request for transfer to facility "13.5 miles closer to [plaintiff's] home [wa]s insufficient to constitute an adverse employment action"). Nothing in the ADEA bestows upon Ms. Robinson the right to demand employment at the Bank branch of her choosing, and for this reason, as well as the others stated above, the Defendants' Motion for Summary Judgment is well taken.

CONCLUSION

For the reasons stated above, it is recommended that the District Court grant the Defendants' Motion for Summary Judgment (Doc. 13) and dismiss this case with prejudice.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the local Rules for Magistrates, objections to this report and recommendation are due by February 27, 2003. Responses to objections are due by March 10, 2003.

2003 WL 288402 (W.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Wo

