IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KENNETH COLE and, BRIGITTE BROWN      Plaintiffs, <br><br> v. <br><br> DELAWARE TECHNICAL AND COMMUNITY COLLEGE      Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> :    C.A. No. 05-270(KAS) <br> (Consolidated) <br><br> JURY TRIAL DEMANDED |

PLAINTIFFS' TRIAL BRIEF

MARGOLIS EDELSTEIN

Herbert W. Mondros, Esquire (#3308)
750 South Madison Street, Suite 102
Wilmington, DE 19801
(302) 888-1112

- and –

Ralph R. Smith 3rd, Esquire (admitted pro hac vice)
Sentry Office Plaza
216 Haddon Avenue, 2nd Floor
P.O. Box 92222
Westmont, NJ 08108
(856) 858-7200

AUGUST 31, 2007

## NATURE OF THE CASE

The evidence will demonstrate conclusively that plaintiffs, Kenneth Cole and Brigitte L. Brown, were subjected to wrongful discrimination and retaliation due to their race while employed by Delaware Technical and Community College ("Del Tech" or "Defendant"), in violation of the Civil Rights Act of 1964 ("Title VII"). Plaintiffs seek the panoply of remedies available to them under that act.

## THE CONTESTED FACTS TO BE PROVEN AT TRIAL

Plaintiff Kenneth Cole ("Cole"), an African-American, was hired by Defendant as a part-time Student Enrichment Coordinator for the Upward Bound Math and Science Program ("UBMS") in or around November 1999. Cole has been continuously employed by Del Tech since that time. Plaintiff Brigitte L. Brown ("Brown"), an African-American, was hired by Defendant as a full-time Student Enrichment Coordinator for the UBMS on or about January 8, 2001. Since the start of Brown's employment at Delaware Tech Brown has had very good performance evaluations. Brown resigned from her employment at Delaware Tech in or around June of 2005 due to work-related stress stemming from the racial discrimination and retaliation she experienced as a result of filing a charge of discrimination against her employer, which is now the topic of this trial.

Defendant is a local community college providing academic, technical, continuing education, and industrial training to students. At all relevant times, Del Tech had three (3) federal grant TRIO programs: the Educational Talent Search ("ETS") Program, the Upward Bound Classic ("UBC") Program and the UBMS Program. Brown and Cole were student enrichment coordinators in the UBMS which consisted of only African-American employees, including an African-American Program Manager, Rosetta Henderson. The other two TRIO programs, ETS

1

and UBC, had white Program Managers. At all relevant times, Sue Zawislak (Caucasian) served as Defendant's Corporate and Community Programs ("CCP") Director, Ann Del Negro (Caucasian) served as the Assistant Director of CCP, and Paul Morris (Caucasian) served as the Program Manager for Educational Talent Search and subsequently, the Special Programs Director for all of the TRIO programs.

On or about August 12, 2002, Paul Morris, acting as Special Programs Director, met with Plaintiffs and the other two (2) members of their department, Rosetta Henderson (African-American) and Liz Wilson (African-American), and informed them that he had made a decision to relocate the UBMS group from their current multiple offices to a single office that had been occupied by the SOAR Program. Plaintiffs met with their Program Manager, Henderson, and expressed to her their feelings of being racially discriminated against by Del Tech as a result of being forced to move into an inadequate work space. Plaintiffs also met with Paul Morris and Ann Del Negro on August 29, 2002 to express their concerns about the pending move. Plaintiffs expressed feelings of being treated differently, unfairly, unequally and their belief that there were ulterior motives for the move. Also, Plaintiffs and Liz Wilson met with Del Negro and Zawislak individually in or around September 5, 2002, to discuss viable alternatives to accomplish Morris' goal of "defined space" and their other concerns. According to the meeting minutes, Plaintiff Brown told Zawislak and Del Negro that she felt that UBMS was being "targeted" and being "treated unfairly", that UBMS "have rights" and that "someone should listen to their rights and that the UBMS feels that they are being "*punished*". Notwithstanding Plaintiffs' concerns, the move went forward.

Other reasons proffered by Morris for the relocation of the UBMS Program were: (i) the rooms that the members of UBMS were currently occupying were "a loan from another

2

department"; and (ii) the original UBMS offices did not provide for "defined space" because it was not a space that the TRIO Programs (UBMS, ETS and UBC) were guaranteed to have for a long time. However, after the UBMS group moved to Room 408, Kate Sullivan (Caucasian) Program Manager of UBC moved into Brigitte Brown's former office and Rachel Hamalak, (Caucasian) part-time Student Enrichment Coordinator for ETS, moved into Ken Cole's former office.

In spring of 2001, Ann Del Negro, Department Chair for Youth Programs at the College, was promoted to Assistant Director of the College's Corporate and Community Programs division ("CCP"). On August 5, 2002, in the August *2002 Update* newsletter, Zawislak announced that, "Paul Morris had been promoted to Special Programs Director." (emphasis added). Del Tech did not post the position of Special Programs Director. Thus, neither Brown nor Cole had an opportunity to "post" or "apply" for that position.

On September 5, 2002, Cole filed a grievance, alleging that the promotion of Paul Morris to Special Programs Director violated (i) Section III 3.01 Positions in Salary Plans A and B which states: "Regular, full-time position vacancies shall be posted for a minimum of fifteen (15) calendar days"; (ii) 4.01 Promotion Policy which states: "Qualified regular college employees will receive equal consideration for promotion, in accordance with the College's Statement of Affirmative Action Policy, regardless of race, color, creed, sex national origin, etc; (iii) 4.02 Transfer of Full-Time Employees because Paul Morris went from a Program Manager pay grade 16 to the Special Programs Director pay grade 17; and (iv) 1.01 Statement of Affirmative Action Policy by not affording Plaintiff Cole the opportunity to apply for the position.

Four days later, on September 9, 2002, Zawislak sent a memo to all CCP staff advising that as of July 1, 2002, Paul Morris was "reclassified" to Special Programs Director, not

3

promoted, as noted in the CCP August update. On September 25, 2002, in response to Cole's grievance, Zawislak sent Plaintiff Cole a memo stating that Morris' revised employment status to Special Programs Director resulted from the annual "reclassification process" and therefore, Morris' position change to Special Programs Director was not a violation of college policy. In order for an employee to be "reclassified" into a different position at Del Tech, the employee must be able to work the additional job duties of the new position within the employee's regular working hours. Ken Cole filed a Step 2 Grievance in or around October 22, 2002.

Morris' promotion or "reclassification" was investigated by Jacqueline D. Jenkins, Director of Human Resources at the request of Lawrence H. Miller, Vice President & Campus Director. The investigation determined that Morris had been approached by Zawislak and Del Negro shortly after Del Negro's promotion in 2001 to assist with the fiscal and management responsibilities that had been previously managed by Del Negro. According to Morris, "Ann Del Negro's promotion left a void within the department." In filling vacancies, qualified regular college employees will receive equal consideration for promotion, in accordance with the College's Statement of Affirmative Action Policy, regardless of race, color, creed, sex national origin, etc. Further, Morris had to request permission from Zawislak through Del Negro to work additional hours beyond the normal business day to complete his assignments timely which is contrary to Del Tech's Reclassification Policy. Also, Morris' salary increased from a pay grade of B-16 to a pay grade of B-17. Effective December 1, 2002, Paul Morris was returned to his position of Program Manager and removed from the position of Special Program Director. However, in late August 2003 or the beginning of September, Morris became "acting" Department Chair for Community School Projects and in April 2004, he became Department Chair for Community School Projects.

4

After Cole's September 5, 2002 grievance, and after Brown had voiced her concerns with the UBMS move, Defendant changed several material terms and conditions of Plaintiffs' employment. When Cole began working part-time at the College in November 1999, he entered into a verbal agreement with his Program Manager, Henderson which allowed him to work from 8:00am until approximately 2:00pm. However, shortly after Cole filed his grievance, Zawislak informed Henderson that Cole must begin work at 8:30am rather than 8:00am. Thus, Zawislak reduced both Cole's work hours and his income. Cole and his Program Manager, Henderson, both felt this reduction in Cole's work hours was in retaliation for his grievance filing and for expressing his concerns about the move to Room 408.

In November 2002, Cole requested to reduce his hours of work from 8:30am to 12:30pm because of medical reasons. Cole explained that he was willing to stay until all work was completed, but he would not exceed his 29 hours as a part-time employee. Cole's Program Manager Henderson supported his request to work a reduced schedule until he was feeling "100%" as Cole was one of the most "reliable, dedicated, and dependable employees." On or about November 25, 2002, Cole provided medical documentation from his treating physician indicating that he should "titrate return to full activity which may take several more months."

On or about November 27, 2002, Jackie Jenkins, Director of Human Resources, informed Cole that his doctor needed to amend the doctor's note of November 25, 2002, to include the specific number of hours Cole may work and when he would be able to resume the temporary part-time Student Enrichment Coordinator schedule. Prior to August of 2002, Cole had taken off from work for three or four days consecutively and it was never an issue with the College. Additionally, other full-time employees during November of 2002 and prior to 2002 had been out of work for extended periods of time without being asked for medical documentation.

5

Zawislak testified that Cole was never threatened with termination as a result of not providing additional medical documentation. However, in a letter dated December 13, 2002, which was carbon copied to Zawislak and Larry Miller, Jacqueline Jenkins advised Cole that if he did work from 8:30am to 2:30pm without providing additional medical documentation, his "employment may be terminated." On or about December 16, 2002, Rose Henderson presented an additional doctor's note to the College on behalf of Cole.

On or about September 3, 2002, Brown sent a written request addressed to Larry Miller for a change in her working hours from her current schedule of 8:30-4:30 to 9:00 to 5:00pm. Zawislak did not recommend Brown's request because it was for "personal reasons" and would not be in the best interest of the College, even though changing Brown's hours to 9:00am to 5:00pm, would have allowed Brown to make calls later in the day to those students who may attend extra curricula activities. Zawislak had previously approved Liz Wilson's request to work from 9:00 to 5:00 to care for the purely personal reason of caring for a sick relative. In any event, Zawislak denied Brown's request.

Further, Plaintiffs have always submitted travel requests as a procedural process for visiting their respective schools. Every year, prior to 2002, Plaintiffs would get an open or "blanket" Travel Request for three months so that Plaintiffs could visit with their students, promote the UBMS program and give presentations. However, shortly after 2002, Del Tech drastically changed the procedure in which Plaintiffs submitted travel requests. Rather than the standard "blanket travel request" as Plaintiffs had completed in the past, Plaintiffs now had to submit an individual travel request for each appointment or visit to the schools. The UBMS program has at least 50 students in 20 different schools in 4 different states. This change unnecessarily increased the risk of errors and the amount of paperwork that had to be completed.

Thereafter, Zawislak, without any justification or explanation, changed the UBMS program calendars for on-site school visits from 30 days to 90 days, making it extremely difficult for Plaintiffs to schedule school visits 90 days in advance. Many of Plaintiffs' schools' counselors indicated that they could not schedule these visits 90 days in advance because it was just too far in advance. The other TRIO programs, Upward Bound Classic (UBC) and Educational Talent Search (ETS) were not treated in this same manner.

In or around April 2004, Rose Henderson, UMBS Program Manager was terminated from her position at Del Tech. When her position became vacant, neither Brown nor Cole was chosen to be Acting Program Manager of UBMS, despite the facts that both were qualified for the position and both had good performance evaluations. However, in 2003, when Jacquita Wright-Henderson was promoted to Acting Assistant Director of Corporate and Community Programs, Paul Morris was promoted to Acting Department Chair of Community and School Projects. As a result, there was a vacancy in the Program Manager position in ETS. Roseanna Brown Simmons was afforded the opportunity to act in that position. She later became Program Manager of ETS. When Kate Sullivan, Program Manager of UBC, left Del Tech, her position was posted and Angie McCloskey, Andrea Coleman and Crystal Heath, the Student Enrichment Coordinators were all granted an interview and Angie McCloskey, a Student Enrichment Coordinator in UBC, received the position.

Zawislak and Wright-Henderson made a recommendation to post the position of Program Manager for UBMS both internally and externally, rather than post the position internally first, to determine if there were qualified applicants within the college. The first posting for the Program Manager of UBMS occurred between March 12, 2004 through March 26, 2004. Paul Morris served as the Committee Chair on the Hiring Committee for this position and was fully aware

that Brown had filed an EEOC Charge against Del Tech because of the move to the Room 408 and the retaliation she experienced. Previously, Morris had advised Rose Henderson that Brown will never go far at Del Tech "doing the things that she is doing." Brown was denied an interview for this position. The second posting for the Program Manager of UBMS position occurred between June 14, 2004 and June 28, 2004. Again, Paul Morris served on the Hiring Committee. However, this time Brown was granted an interview but later denied the position. The position was posted a final time between September 3, 2004 and September 20, 2004.

Thereafter, in January 2005, the UBMS Program Manager position was filled by Andrea Coleman who transferred to this position based on a recommendation from Sue Zawislak. Andrea Coleman was previously Program Manager of Youth Camp Programs. Interestingly, Andrea Coleman also served on the interview committee for the UBMS Program Manager position, the very same position for which she was hired. Andrea Coleman did not have any experience with UBMS when she requested a transfer in 2005. Plaintiff Brown, on the other hand, had worked in the UBMS Program since 2001. Also, Andrea Coleman did not receive the UBC Program Manager position when she interviewed for the Program Manager position in that group as a Student Enrichment Coordinator.

On or about February 8, 2005, the Plaintiffs filed grievances concerning Andrea Coleman's transfer to Program Manager of UBMS claiming a violation of Section IV, 4.02 titled Transfer of Full-time Employees, specifically the "Field of Expertise" requirement. "Vice Presidents and Campus Directors may transfer employees…with their pay grades/levels and "Fields of Expertise" from one position to another" (emphasis added). Andrea Coleman's field of expertise was not math and science. In response to Brown's grievance, Zawislak sent a memo to Brown informing her that the complaint is not a grievance because, according to Zawislak,

"the terms and conditions of your employment have not been affected, materially or otherwise", as a result of Ms. Collin's (also known as "Ms. Coleman") transfer to the UBMS Program Manager position.

## THEORIES OF LIABILITY

### I.  Racial Discrimination - Move to Room 408

The United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 793 (1973), has set forth a three-step burden shifting analysis for Title VII employment discrimination claims. First, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. Id. at 802. This is done by showing that the plaintiff: 1) is a member of a protected class; 2) was qualified for the position; 3) suffered an adverse job action; and 4) was treated differently than employees who are not members of his protected class. Id. Whether the plaintiff has established a prima facie case of discrimination is a question of law for the court. *Sarullo v. United States Postal Serv.*, 352 F. 3d 789, 798 (3d Cir. 2003). If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant-employer to articulate a legitimate, non discriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S. at 802. If the employer meets its burden of articulating a legitimate reason for the employment decision, the burden shifts back to the plaintiff to show "by a preponderance of the evidence" that the nondiscriminatory reason offered by the employer was a mere pretext for racial discrimination. Id.

The first element of a *prima facie* case of racial discrimination is met in that the Plaintiffs are African-American and therefore, are members of a protected class. *Bazile v. New York City Housing Authority*, 2002 U.S. Dist. LEXIS 1639 (February 1, 2002). Plaintiffs bear the burden of establishing that the relocation of the UBMS office space to Office 408 was an adverse

9

employment action. *McDonnell Douglas,* 411 U.S. at 802. Adverse employment action is "conduct other than discharge or refusal to hire [which] alters the employee's 'compensation, terms, conditions, or privileges of employment that 'deprives him or her of 'employment opportunities,' or 'adversely affects[s] his or [her] status as an employee.'" *Robinson v. City of Pittsburgh,* 120 F. 2d 1286, 1300 (3d Cir. 1997). The Supreme Court has held that "this not only covers 'terms' and 'conditions' in the narrow sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment….in employment." *Oncale v. Sundowner Offfshore Servs., Inc.,* 523 U.S. 75, 78, 140 L. Ed. 2d 201, 118. The removal of or substantial interference with work facilities important to the performance of the job constitutes a material change in the terms and conditions of a person's employment. *Chuang v. University of California Davis,* 225 F. 3d 1115, 1124 (9th Cir. 2000). Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of "adverse". *Welsh v. Derwinski,* 14 F.3d 85 (1st Cir. 1994).

Plaintiffs' employment was adversely affected when they were forced to relocate to Room 408. The UBMS Program is a federally funded program and the federal grant for the members of the UBMS Program specifically stated in part that, "The <u>suite of offices</u> provides privacy for confidential conversations" between Student Enrichment Coordinators and center participants (emphasis added). The Defendant violated the terms of this Federal grant, and as a consequence, changed the terms and conditions of Plaintiffs' employment when it moved the members of the UBMS team into one small office without taking into account the privacy needs of the UBMS staff and its students.

Further, Room 408 was a wholly inadequate work space for the needs of the UBMS Program and the basic functionality of the program. Prior to Plaintiffs' move to Room 408, each

Plaintiff had an individual office that provided for confidential communications with students and counselors; adequate space for their files and furniture, and adequate temperature control.

The Third Circuit has stated that "[a] disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated" on the basis of race. *E.E.O.C. v. Metal Serv. Co.*, 892 F. 2d 341 (3d Cir. 1990). Under *McDonnell Douglas*, a plaintiff must show that an employer treated similarly situated individuals outside the plaintiff's protective class less favorably, not that the employer treated all other members within the class less favorably. *Chuang*, 225 F. 3d at 1124. The other similarly situated Caucasian members of the UBC Program and the ETS Program have their own offices or share offices which allow for confidentiality, adequate space for files and other office equipment and cubicle style work conditions. The Student Enrichment Coordinators in the other (2) TRIO Programs each had partitions separating them from the other Student Enrichment Coordinators in their group which provided for confidential communications. However when Liz Wilson, the secretary in the UBMS group, requested that their group have partitions similar to the other groups during a meeting in or around August 2002, Paul Morris advised that the federal grant would not allow partitions. Clearly, the Plaintiffs were treated less favorably than the employees in the College's other TRIO Program.

## II. Retaliation

Plaintiffs can also meet their burden of establishing a *prima facie* case of retaliation with respect to the change in their work hours. As previously noted, Plaintiffs met with Paul Morris and Ann Del Negro on August 29, 2002 to express their concerns about the pending move. Also, Plaintiffs and Liz Wilson met with Ann Del Negro and Sue Zawislak individually in or around September 5, 2002. According to the meeting minutes, Brown told Zawislak and Del Negro she

11

felt UBMS was being "targeted" and being "treated unfairly", that UBMS "have rights" and that "someone should listen to their rights and also that the UBMS group feels that they are being "punished." Also, on September 5, 2002, Cole filed a grievance, claiming Morris' promotion to Special Programs Director violated Del Tech's Policy, specifically, 1.01 Statement of Affirmative Action Policy which states: "Qualified regular college employees will receive equal consideration for promotion, in accordance with Del Tech's Statement of Affirmative Action Policy." Thus, the earliest protected activity for Plaintiffs occurred in or around September 2002.

Shortly after Cole filed a grievance regarding Paul Morris' promotion in September 2002, Zawislak informed Rose Henderson, Plaintiff's Program Manager, that Cole must begin working at 8:30 a.m. rather than his normal hours which began at 8:00 a.m. Thus, reducing both his work hours and his income. The Third Circuit has stated that: "temporal proximity between the protected activity and the [adverse employment action] is sufficient to establish a causal link" between the plaintiff's protected activity and the alleged adverse employment action. *Woodson v. Scott Paper Co.*, 109 F. 3d 913, 920 (Cir. 1997). Courts are quick to draw an inference of causation when the alleged retaliation occurs only a short time after the employer received notice of the employee's protected activity. *Jalil v. Avdel Corp., 873 F. 2d 701*, 708 (3d Cir. 1997) (holding that two days between notice of the protected activity and the retaliation led to inference of causation). Moreover, an employer may not escape liability for discrimination against an African-American employee on the basis of race with evidence that it promoted other African-Americans. *Bazile*, 2002 U.S. Dist. LEXIS 1639 (February 1, 2002). "Given the obvious incentive in such circumstances for an employer to take corrective action in an attempt to shield itself from liability, it is clear that nondiscriminatory employer actions occurring subsequent to the filing of a discrimination complaint will rarely even be relevant as circumstantial evidence in

favor of the employer." *Gonzalez v. Police Dept. City of San Jose,* 901 F.2d 758, 761-62 (9th Cir. 1990).

The Third Circuit has recently emphasized that courts should not analyze the employer's individual acts in isolation, but should analyze all of the facts collectively in deciding whether there has been adverse employment action. *Lafate*, 123 F. Supp. 2d 773, 778 (D. Del. 2000). When analyzing all Defendant's acts collectively (the move to inadequate office space; the failure to promote Cole to Special Programs Director; Cole's reduction in hours; the failure to change Brown's work hours as compared to similarly situated employees; the change in Plaintiffs' work assignments, procedures and job responsibilities; failure to promote either Plaintiff to Acting Program Manager of UBMS; failure to promote Brown to Program Manager of UBMS; and the unusual demand for additional medical documentation from Cole), the obvious conclusion is that Plaintiffs have experienced adverse employment action.

Moreover, to establish a *prima facie* case for failure to promote under the *McDonnell Douglas* burden shifting analysis, a plaintiff must show that (1) he applied for an available position; (2) he was qualified for the position; (3) his application was rejected; and (4) after the rejection, the employer continued to seek applicants for the position.

Both Plaintiffs were qualified for the position of UBMS Program Manager.

Brown applied for the first posting of the UBMS Program Manager position but was not even granted an interview. Interestingly, Paul Morris served as the Hiring Chair on the Hiring Committee for this position and was fully aware that Plaintiff had filed an EEOC Charge against the Defendant. What is perhaps more telling is the fact that Morris advised Rose Henderson that Brown will never go far at Del Tech doing the things that she is doing. Brown applied for the second posting for this position. Again, Morris served on the Hiring Committee. However, this

time Brown was granted an interview but later denied the position. After rejecting Brown, the Defendant continued to seek applicants.

In January 2005, the UBMS Program Manager position was filled by Andrea Coleman who transferred to this position based on a recommendation from Zawislak. It is important to note that Andrea Coleman also served on Brown's interview committee. In addition, Coleman did not have any experience with UBMS when she was hired as Program Manager of UBMS. Coleman was also hired after Brown; therefore, she had less seniority. Brown, on the other hand, had worked in the UBMS Program since 2001. Additionally, Coleman never applied for the position. What is more, Coleman was previously denied the UBC Program Manager position when she interviewed for the Program Manager position in the UBC group as a Student Enrichment Coordinator. If Coleman did not have the skills necessary to become Program Manager of her own group (UBC), why would she be placed in the position of Program Manager over a different group (UBMS); a field in which she has no expertise? Surely, Brown has produced sufficient evidence to "allow a factfinder reasonably to infer that the employer's proffered non-discriminatory reason" for hiring Coleman as the Program Manager of UBMS was a pretext for retaliatory action.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request judgment be entered in their favor.

Respectfully submitted,

MARGOLIS EDELSTEIN

_/s/ Herbert W. Mondros_

Herbert Mondros, Esquire
Ralph R. Smith, 3rd, Esquire
(Admitted Pro Hac Vice)
Margolis Edelstein
750 S. Madison Street
Wilmington, DE 19801
Attorneys for Plaintiffs
(302)888-1112 phone
(302)888-1119 facsimile

Attorneys for Plaintiff, Kenneth Cole and Plaintiff Brigitte Brown

Dated: August 31, 2007

15