LEXSEE 2002 U.S. DIST. LEXIS 1639

**LEO BAZILE, Plaintiff, -against- NEW YORK CITY HOUSING AUTHORITY; JOHN G. MARTINEZ, Individually, and in his official capacity as New York City Housing Authority Chair and Board Member; EARL ANDREWS, JR. Individually, and in his official capacity as New York City Housing Authority Vice-Chair and Board Member; KALMAN FINKEL, Individually, and in his official capacity as New York City Housing Authority Board Member; AMY L.W. HOSIER; WILLIAM Steinmann; PAUL T. GRAZIANO; and RUBEN FRANCO, Defendants.**

00 Civ. 7215 (SAS)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 1639*

**February 1, 2002, Decided
February 1, 2002, Filed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment denied with respect to all claims except those based on retaliation and emotional distress. Defendants' motion granted. Summary judgment granted in favor of Finkel and Andrews.

**COUNSEL:** For Plaintiff: Randall D. Bartlett, Esq., Bartlett & Bartlett LLP, New York, NY.

For Defendants: Jeffrey Niederhoffer, Esq., New York City Housing Authority, New York, NY.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

*OPINION AND ORDER*

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

On September 25, 2000, Leo Bazile sued his employer, the New York City Housing Authority ("NYCHA" or "Housing Authority"), as well as various officers, directors, and supervisors, for discrimination based on his race in violation of Title VII of the 1964 Civil Rights Act, *sections 1981* and *1983*, the New York City Human Rights Law, the New York State Executive Law, and the New York State Constitution. Bazile has also alleged that defendants intentionally caused him emotional distress in violation of state law. [1] Defendants now move for summary judgment on all claims. For the reasons stated below, defendants' motion is denied in part, and granted in part.

> 1   Since filing his Complaint, Bazile has voluntarily withdrawn his claims under *42 U.S.C §§ 1985* and *1986* against all defendants. See 7/3/01 Stipulation of Dismissal. Plaintiff has also withdrawn his hostile work environment claims against all defendants, as well as all claims under Title VII against Ruben Franco, John G. Martinez, Earl Andrews, Jr., and Kalman Finkel, and his claims under *42 U.S.C. §§ 1981* and *1983* against William Steinmann. See id.

[*2] **I. FACTS**

**A. Plaintiff and His Employment History at NYCHA**

Bazile, an African-American male, began working for the Housing Authority in 1987 as a staff analyst in its Personnel Department. *See* Complaint ("Compl.") PP 11, 30; Defendants' Rule 56.1 Statement ("Def. 56.1") P 8. Bazile received a Bachelor's Degree in Business Administration in 1981. *See* Compl. P 11; 8/9/01 Declaration of Leo Bazile ("Baz. Decl.") P 7. Bazile also received a certificate as a Financial Planner in 1998. *See* Baz. Decl. P 7. He completed computer courses in basic and intermediate Microsoft Access, Microsoft Excel, Word and Powerpoint, as well as a course in SAS, a software program for conducting statistical analysis. *See* Plaintiff's Rule 56.1 Statement ("Pl. 56.1") P 47.

Case 1:05-cv-00270-GMS    Document 91-6    Filed 08/31/2007    Page 2 of 14

Page 2
2002 U.S. Dist. LEXIS 1639, *

In October 1989, Bazile transferred from the Personnel Department to the Research Department -- specifically, the Management Plan and Reporting System Division ("Reports Division"). *See* Baz. Decl. P 9. A year later, in December 1990, the Housing Authority promoted him to his current position as Assistant Chief of the Reports (now Data Management) Division. *See id.* P 10; *see* Defendants' Memorandum [*3] of Law in Support of their Motion for Summary Judgment ("Def. Mem.") at 2.

As Assistant Chief, Bazile's responsibilities have included supervising professional and clerical staff, collecting data, creating monthly and quarterly reports and working with computer programmers to create and maintain a Project Indicator Report. *See* Plaintiff's Opposition to Summary Judgment ("Pl. Opp.") at 2. Bazile reported directly to Shamima Abid, Chief of the Reports Division, until June 1997 when she was transferred out of the Department. *See* Baz. Decl. P 12; *see also infra* Part I.C. Bazile kept the position as Assistant Chief when the Reports Division was renamed the Data Management Division in 1998. *See id.*

Bazile's work has been described by his direct supervisor as satisfactory. *See* 6/29/01 Declaration of Laurence Wilensky ("Wilensky Decl.") P 7. His computer skills have been described as good. *See id.* Another manager and a co-worker have described him as competent, reliable, a team player, and cooperative. *See* 8/9/01 Declaration of Ruby Cunningham, Retired Assistant Director in the Research and Budget Departments at NYCHA ("Cunningham Decl.") P 6; 8/8/01 Declaration [*4] of Jacqueline V. Barley, former NYCHA staff member ("Barley Decl.") PP 43-44. Cunningham offered her opinion that Bazile was qualified to perform the duties of Chief of the Data Management Division. *See* Cunningham Decl. P 7.

**B. Defendants and NYCHA Employment Policy**

As a public agency, the defendant Housing Authority's main responsibility is to provide housing for low-income residents within the five Boroughs of New York City. *See* Def. 56. *1 P 1*. The Housing Authority has approximately a dozen departments as well as divisions and units within each department. A three-member board composed of a Chairman and two other individuals sets the policy for the Housing Authority. 7/2/01 Declaration of Ruben Franco, Former NYCHA Chairman and Member of the Board ("Franco Decl.") PP 1, 9. [2] The Board's approval is required for all hiring and promotion decisions. *See* Martinez Dep. at 80.

> 2   Board Member John Martinez recalls Board meetings held for the purpose of discussing the racial make-up of NYCHA. *See* 3/5/01 Deposition of John Martinez ("Martinez Dep.") at 63. Martinez voiced his concern at one of those meetings that persons of color were not being given adequate training to ensure that they had "complete skill sets." *Id. at 79-80*.

[*5] In addition to the individual defendants whose job descriptions are listed in the caption, the following NYCHA employees are also defendants. Ruben Franco was the NYCHA Chairman and Member of the Board from January 1994 to January 1999. *See id.* P 1. [3] General Manager Paul Graziano helped shape the policy for the restructuring of the Research Department and acted as direct supervisor to Amy Hosier during her tenure. *See id.* PP 2, 6. From October 1997 to April 2001 when she resigned, Amy Hosier was Director of the Research Department, which encompassed Bazile's Division. [4] *See* 7/12/01 Declaration of Amy L.W. Hosier, Former Director of NYCHA Research Department ("Hosier Decl.") P 1.

> 3   Ruben Franco, as Chairman of the Board, had the right of final approval of new hires and other employment decisions made with respect to the Research Department. *See* 3/6/01 Deposition of Ruben Franco ("Franco Dep.") at 22; Martinez Dep. at 13.
>
> 4   Bazile's Division, formerly the Reports Division, was renamed the Data Management Division.

[*6] **C. The Restructuring of the Research Department and Related Employment Actions**

In 1997, the Housing Authority began to implement its plan to transform the Research Department "into a first-rate, academically-oriented 'think tank'" envisioned by then-Chairman Franco. Franco Decl. P 4; *see also* Def. 56.1 PP 2, 11; Pl. 56.1 PP 2, 11. The purpose of the restructuring was "to improve the delivery of services to [the Housing Authority's] residents and to take a leading role in the national debate about public housing." Franco. Decl. P 4. The first step of the plan involved splitting off the Energy Division from the Research Department to create a separate Energy Department. *See* Pl. Opp. at 4; Franco Decl. P 3.

When the Energy Department was formed in June 1997, the Housing Authority filled newly-created positions primarily with employees from the Research Department. *See* 7/10/01 Declaration of William Steinmann ("Stein. Decl.") P 5. Out of nineteen people transferred to the Energy Department from the Research Department, only two were African-American. *See* Baz. Decl. P 18. The nineteen individuals who transferred were given promotions and salary increases. *See* [*7] *id. P 18*. Ba-

zile claims that some of the Caucasians promoted to positions within the Energy Department were not qualified. For example, Thomas Walsh, who did not have a college degree, and James Scanlon, who did not pass the civil service exam, were both transferred and promoted. *See* Pl. Opp. at 5.

After the creation of the Energy Department, in mid-1997 the Housing Authority turned its attention to the Research Department itself. Franco wished to reduce the number of reports the Department generated. *See* Pl. 56. *1 P 52*; Franco Decl. P 4 (claiming that he also wished to improve the reports' overall level of quality, sophistication and responsiveness to the needs of managers). The Board maintains that it sought to hire a new Director with the kind of substantial academic background that would enable him or her to achieve these goals. *See* Franco Decl. P 4. Sometime in mid-1997 the Board decided to hire Dr. Amy Hosier, who holds a Ph.D. *See id.*

Franco claims that to "enable [Hosier] to get off to a good start," he transferred several employees out of the Research Department prior to the beginning of Hosier's arrival. *See id. P 5.* [*8] [5] Bazile, on the other hand, attributes many of these decisions to Hosier. *See* Pl. 56. *1 P 16*. Thus, Hosier or Franco, or both, were responsible for transferring Shamima Abid (an Indian-American woman), the Chief of the Reports Division, to Operations Services. *See* Franco Decl. P 5. The Research Department's Assistant Director, Ruby Cunningham (an African-American woman), was transferred out of the Research Department after twenty years. *See id.* Finally, five clerical staff members (all African-American women) were involuntarily transferred from the Research Department's Transcript Unit to various departments. *See id.*; Baz. Decl. P 15.

> [5] In September 1997, Franco collaborated with Martinez, and possibly Hosier, concerning the reorganization of the Research Department and the resulting involuntary transfers of several African-American employees. *See* Franco Decl. P 5.

Hosier officially began work on October 6, 1997. *See* Pl. 56. *1 P 12*; Franco Decl. P 5. Franco claims [*9] that at the beginning of Hosier's employment, she reported to the three members of the Housing Authority's Board -- Chairman Franco, Paul Graziano and John Martinez. *See* Franco Decl. P 6. Franco also states that Hosier reported mainly to Graziano. *See id. P 4.*

One of her first tasks was to produce a reorganization plan. *See* Hosier Decl. P 3. Prior to starting work, on September 12, 1997, Hosier received from the Board a set of general objectives pertaining to the reorganization of the Research Department. *See* Pl. 56. *1 P 15*; Report Entitled "Update on Scope of Work for Nine Month Plan," Memorandum from Amy Hosier to Paul Graziano ("1998 Reorg. Rpt."), Ex. B to Hosier Decl. Hosier states that she observed that the Research Department, specifically the Reports Division, was evolving from simply compiling data, manually correcting errors and generating reports containing raw data, toward conducting more sophisticated research and data analysis. *See* Hosier Decl. P 4. Hosier maintains that, to fully realize these goals, NYCHA's existing databases required updating and better integration. *See id.* In March 1998, she submitted her reorganization [*10] plan, which summarized these observations and recommended personnel and structural changes to the Research Department. *See* 1998 Reorg. Rpt. Around the same time, the Reports Division was renamed the Data Management Division. *See id.*; Pl. 56. *1 P 19*.

In 1998, Franco informed Jacqueline Barley, an African-American woman, that she was being transferred out of the Department. *See* Barley Decl. P 25; Cunningham Decl. P 15. In her March 1998 report, Hosier had stated that she wanted Barley transferred out because she was dissatisfied with Barley's analytical abilities, work ethic, attitude, and experience. *See* 1998 Reorg. Rpt. at 5. [6] Because Barley had filed a complaint of racial discrimination with the NYCHA Office of Equal Opportunity and the Federal Equal Opportunity Commission in 1997, *see* Barley Decl. PP 29, 31, Bazile claims that Hosier retaliated by transferring Barley. *See* 3/8/99 Statement by Bazile Filed With State Division of Human Rights ("Baz. Stmt."), Ex. F to 7/16/01 Declaration of Jeffrey Niederhoffer ("Nieder. Decl."), at 1. Hosier did not transfer any Caucasians out of the Department. *See id.* Shortly after she arrived, she gave a [*11] raise to Kevin Kearney, who is Caucasian. *See id.* During Hosier's tenure, four Caucasians were promoted to Chief position in various divisions, including two Caucasians who Bazile claims were not qualified for the position. *See* Baz. Decl. P 68; Pl. Opp. at 5, 8-9. [7]

> [6] In that report Hosier also writes: "The entire current Reports Division would go if I were starting from scratch (Leo Bazile, Ted Reich, Asthma Sayad, Sam Gonzalez, Keywall Kapoor). I need true "data managers," with experience and training in the creation and maintenance of large databases." Reorg. Rpt. at 5 (alteration in original). She adds: "However, each of the current Reports staff are good at quality control/ monitoring and I think that for the time being, they can be utilized profitably in archiving, evaluating, scanning, and uploading raw data and reports." *Id. at 5-6.*

> [7] Steinmann promoted Walsh, who did not have a college degree, and Scanlon, who did not pass the Civil Service exam, to Chief positions within

the new Energy Department. *See* Pl. Opp. at 5. Hosier promoted Anne Pechstein and Susan Neuffer, both Caucasians, to Chief of the Grants and MPRS Divisions, respectively. *See* Pl. Opp. at 8-9. Neither woman had previous experience with the Division in which they were promoted to the Chief position. *See id.* Several African-Americans with experience within the respective Divisions were passed up for these promotions. *See id.; see also* Barley Aff. PP 7-9, 40.

[*12] **D. Bazile's Grievances**

As a result of Shamima Abid's transfer out of the Department, her position as Chief of the Reports Division was vacant. *See* Baz. Decl. P 22. In early 1998, Bazile had several conversations with Hosier concerning his promotion to that position. *See id.* P 23. At the time, Hosier responded positively. *See id.* She encouraged Bazile to submit plans detailing his vision for the Research Department and justifying why he should be promoted so that she could present his case to higher management. *See* Baz. Decl. P 24. In the summer of 1998, Bazile sent two memoranda to Hosier detailing his plans for the Division and why he should be promoted. *See id.* P 25. Bazile maintains that for the past twelve years, incumbent Assistant Chiefs have always been promoted to the Chief position when it opened. *See id.* P 22, 35. Steinmann disagrees, claiming that he recalls at least four instances during his tenure when a vacant Department Chief position was filled with someone other than the Assistant Chief of the Department. *See* 3/13/01 Deposition of William Steinmann ("Stein. Dep.") at 15-17; 8/20/01 Supplemental [*13] Declaration of William Steinmann ("Stein. Supp. Decl.") P 3.

At some point after Bazile applied for the Chief position, Hosier eliminated it. She states that originally, in early 1998, she planned to slot in a System Administrator position above the Division Chief position. *See* Hosier Decl. P 7. She claims to have decided later in 1998 to replace the Data Management Division Chief position with a position entitled "Data Management Administrator," which called for more advanced computer skills and different responsibilities, including supervision of data management, data warehousing and management information system projects for the Research Department. *See id.* P 7, 9. Hosier eventually decided that no *Chief* was needed to replace the former Chief of the Reports Division, because Data Management was intended to be a much different division than its predecessor Division. *See id.* P 11.

In August 1998, the Housing Authority placed an advertisement for the position of Data Management Administrator in the New York Times but did not post the opening at the Housing Authority. *See* Baz. Decl. P 31. Bazile states he would have applied for the position [*14] but that Hosier told him that it would merely be an 18 to 24-month consultant position. *See id.* P 31. The Data Management Administrator position was never filled because applicants responding to the August 1998 newspaper advertisement sought greater salaries than NYCHA was willing to pay. *See* Def. 56.1 PP 21, 23; Hosier Decl. P 9. Further, defendants claim that Miguel Ballena, while he served as Chief of the Analysis Division (another division within the Research Department), assumed through his own initiative many of the functions that Hosier had in mind for the Data Management Administrator position. *See* Hosier Decl. P 9.

While waiting to hear back from Hosier regarding a promotion to Chief of Data Management, Bazile assumed and performed all the duties of the Chief's job. *See* Baz. Decl. PP 21-2. He did not, however, receive a promotion or a salary increase, and became increasingly dissatisfied with his job and the way he was being treated. *See id.* In December 1998, Bazile requested an increase in salary to a level comparable to the white managers. *See id.* P 28. He was the lowest paid managerial employee at the time. *See id.* P 29. [*15] The Housing Authority paid Bazile's subordinate, Theodore Reich (a white man), more than him. *See id.* Bazile's request was denied on the ground that he had received a 3% across-the-board salary increase. *See id.* P 30. Because this increase was given to all employees, Bazile's salary ranking remained the same. *See id.*

In early 1999, Bazile approached Hosier about his plans and promotion, but she claimed that she never received the two memoranda he submitted to her in 1998 at her request. *See id.* P 27. Bazile resubmitted the memoranda, but believes that Hosier never spoke to anyone about his plan or promotion. *See id.* Hosier states that she reviewed Bazile's proposal and concluded that Bazile neither understood the direction she wanted the Department to go in, nor was he qualified for the Chief position. *See* 3/20/01 Deposition of Amy L.W. Hosier ("Hosier Dep.") at 227-40. Hosier contends that her vision for the department, to conduct more sophisticated analysis, automate more reports, and reduce the need for manual error-checking, required the integration of data systems that were then not compatible. *See* Hosier Decl. PP 4-6. She [*16] claims that Bazile demonstrated his lack of understanding of departmental goals by submitting a plan that both called for the hiring of more personnel to manually check errors, and failed to address the need to integrate systems to prevent coding errors, automate more reports, and respond more effectively to the needs of managers. *See* Hosier Dep. at 227-40.

At some point in 1998 or 1999, Hosier also modified the civil service title of Research Assistant to City Research Scientist ("Research Scientist"). The NYCHA

Case 1:05-cv-00270-GMS    Document 91-6    Filed 08/31/2007    Page 5 of 14

Page 5
2002 U.S. Dist. LEXIS 1639, *

Personnel Department had a list of employees who had passed the civil service examination for the Research Assistant position, many of whom were African-American, including plaintiff and two others. *See* Compl. PP 73-75. Hosier had been informed by Human Resources that in order to fill the five Research Assistant vacancies, she was required to hire or promote candidates from the Civil Service List. *See* Baz. Decl. P 38. Instead of using the list, Hosier created the Research Scientist position which required substantially more education. *See id.* P 39; *see also* City Scientist and Research Assistant Job Description and Qualification Sheets, Ex. [*17] B to 8/22/01 Supplemental Declaration of Amy L.W. Hosier ("Hosier Supp. Decl.") (requiring master's degree for Scientist whereas Research Assistant only requires a baccalaureate degree). As a result, neither Bazile nor the two other African-Americans who would have been qualified for the Research Assistant position, were considered for promotions to Research Scientist. *See* Baz. Decl. P 43. Instead, Bazile claims, Hosier ultimately hired or promoted seven Caucasians to these positions, and their starting salaries exceeded those of Research Assistants. *See* Compl. PP 77, 79-80; Pl. Opp. at 7.

Following Hosier's decision to create a Research Scientist position and the subsequent hiring of Caucasians for this position, Bazile complained to his direct supervisor, Laurence Wilensky, about the Research Department's discriminatory practices. *See id.* P 90; Wilensky Decl. P 18. Wilensky claims that he did not discuss these complaints with any of his superiors because Bazile did not ask him to investigate any particular action or incident. *See id.* P 18. Bazile claims that defendants have not responded or taken action regarding any of Bazile's complaints. [*18] *See* Compl. P 91.

Bazile states that Hosier has never hired, promoted or financially rewarded any African-American in the Research Department, *see* Baz. Decl. P 36; *see also* 8/9/01 Declaration of Gail Quets ("Quets Decl.") P 22 (stating the same), but rather has treated African-Americans poorly. Jacqueline Barley, an African-American, describes feeling ignored by Hosier, and not assigned any responsibility. *See* Barley Decl. P 32. Quets observed that Hosier isolated African-Americans in general by creating a "caste system" within NYCHA, and ignored Bazile in particular, treating him as though he were "inconsequential and invisible." Quets Decl. PP 18, 27. [8]

> 8 Quets, a Caucasian, also describes a situation where one of her former co-workers, Mary Valmont, who applied for a position at NYCHA at the same time Quets did, felt that Hosier discriminated against her. *See* Quets Decl. PP 4-13. Hosier told Valmont, an African-American with the same qualifications as Quets, that Hosier had not begun interviewing yet -- when in fact Quets had already been called in to interview. *See id.* PP 10-13. Quets was hired for the job and Valmont never received an interview. *See id.* PP 13-14. This statement is, however, excludable hearsay and therefore may not be considered for the purposes of this summary judgment motion. *See Fitzgerald v. Henderson, 251 F.3d 345, 360-61 (2d Cir. 2001)*(stating that a court may consider only admissible evidence in ruling on a summary judgment motion).

[*19] Hosier claims, to the contrary, to have hired several African-Americans during her tenure. *See* 2/13/01 Deposition of Amy Hosier ("2/13/01 Hosier Dep.") at 178 (listing Celeste Glenn, Sloane Fields, Rafaa McCrae, Ramona Burleson, Yvette Clark, Sandy Gorham); *see also* 8/22/01 Supplemental Declaration of Amy Hosier ("Hosier Supp. Decl.") P 2 (listing African-Americans as well as other minorities whom she has hired or promoted). [9] Hosier states that in 2001 she recommended that Celeste Glenn, an African-American woman, be promoted to Acting Director of the Research Department upon Hosier's leaving the organization. *See id.* P 3. [10] Hosier also extended a verbal offer of employment as a City Research Scientist to an African-American woman, Michelle Thomas, who subsequently withdrew her name from consideration. *See id.* P 4; Wilenksy Decl. P 19. She claims that she actively recruited Luan Lubuele, an African-American, for the position of City Research Scientist, but was ultimately unsuccessful. *See* 10/28/98 Memorandum from Hosier to Graziano entitled "Approval for new hires in Research and Policy" ("1998 Research Scientist Memo"), Ex. E to 8/23/01 Supplemental Declaration [*20] of Jeffrey Niederhoffer, Defendants' Counsel ("Nieder. Supp. Decl."). She also claims that she interviewed another African-American, Alfred Poku, for the Research Scientist position. *See* 2/13/01 Hosier Dep. at 78-82. [11]

> 9 Bazile states that each of these individual's was hired or promoted by someone other than Hosier. *See* 5/10/01 Letter from Randall Bartlett, Bazile's Attorney, to the Court at 3.
>
> 10 Upon Hosier's departure, Celeste Glenn did, in fact, assume the title and duties of Acting Director of the Research Department.
>
> 11 Poku had a master's degree in urban policy from M.I.T., but was turned down because Hosier determined that he would be "very difficult to work with." Hosier Dep. at 79.

In 1998 and 1999, Bazile became increasingly dissatisfied with the way he was being treated by his employer. NYCHA claims that after the restructuring, Bazile's Division was no longer responsible for ensuring the promptness, accuracy and quality of the statistical reports from other divisions, once [*21] a key function of the Division. In particular, Hosier took away work on the Tenant Data System ("TDS") from Bazile's Data Management staff members, and reassigned it to the Computer Services division. *See* Baz. Decl. PP 44, 47. In place of that work, Hosier gave them data-entry and other clerical and menial tasks to perform. *See id.* P 45. [12] She did not invite Bazile to attend the management meetings he used to attend. *See id.* P 49. Bazile, humiliated, often sat idle at his desk without any work to do because of the reduced workload. *See id.* P 50.

> 12   Hosier claimed that because reports previously generated by Bazile and his staff were now automatically generated from the PIMS (not defined by the parties) system, Bazile had much less to do. *See* Hosier Dep. at 186. She maintained that this is why she devised data-entry assignments for him and his staff to complete. *See id.* "We were struggling to find work for [Bazile and his staff] to do, given the fact that the functions of the department had changed dramatically." *See id.*

[*22] In February 1999, the day after Bazile had complained to his direct supervisor Wilensky that his Division was being passed over for promotions and salary increases, Hosier sent an email to Bazile and the Data Management Division denying their requests. 2/5/99 Email from Amy Hosier to Leo Bazile re: "Data Management Division and your unhappy campers" ("2/5/99 Hosier Email"), Ex. 1 to Baz. Decl. [13] Bazile also claims that since then, Hosier has sent him similar emails, often copying the entire Department, reprimanding him whenever he attempted to gain anything for, or defend, his staff members. *See* Baz. Stmt. at 2. Bazile perceived the 2/5/99 Hosier Email, and those that followed, as unprofessional and belittling. *See id.*

> 13   On February 4, 1999, as a result of his dissatisfaction with Hosier and the lack of salary increases and promotions for him and his staff members, Bazile met with his direct supervisor, Laurence Wilensky, to discuss the situation. *See* Baz. Decl. P 46. Hosier learned of the meeting either that day or the next day. *See* 2/4/99 Hosier Email ("I understand that you and Larry had a rather contentious discussion yesterday.").

[*23] Bazile claims that his division was unfairly burdened with clerical tasks. *See* Pl. 56. *1 P 50*; Def. 56. *1 P 50*. On one occasion in early 1999, Bazile prevented a Caucasian staff member from another Division, from asking one of Bazile's subordinates, a professional-level African American, to do some copying for her. *See* Baz. Stmt. at 3. Bazile claims that this incident prompted Hosier to send another Department-wide email. *See id.* (referring to 2/23/99 Email from Hosier to Research Department Re: "Everyone Has to Pitch In" ("2/23/99 Hosier Email"), Ex. J to Hosier Decl.). Hosier responds that her email shows that she did not assign any extra clerical work to Bazile or his staff members, but rather asked everyone to help out with clerical work. *See* Hosier Decl. P 19 (referring to 2/23/99 Hosier Email).

In June 2000, the Research Department moved from the second floor at 75 Park Place, New York, New York, where it had been since November 1999, to the tenth floor of that same building. *See* Def. 56. *1 P 30*. This tenth floor location was intended to be temporary space for the Research Department in anticipation of moving to its permanent [*24] quarters on the eleventh floor of 250 Broadway. *See id.* P 31. Bazile claims that his division in general, and he in particular, were assigned busy, public space on the tenth floor, while Caucasians at his managerial level were assigned private space. *See* Compl. P 61. Defendants dispute that Bazile's work space was inferior to that of anyone else, and claim that everyone, including upper-level managers, had less than ideal workspace. *See* 6/27/01 Declaration of Yvette Andino, Assistant Director for Administration and Special Projects in the Research Department ("Andino Decl.") P 2. The Research Department's move from 75 Park Place to 250 Broadway was delayed until February 2001 because renovations took longer than expected. *See* Def. 56. *1 P 32*.

Bazile claims that he was not given equipment necessary to his work and the work of his department, including a computer with Internet access. *See* Compl. P 59. He was assigned a stand-alone computer to share with six people, whereas, he claims, every other manager at his level had his or her own computer equipped with Internet access. *See* Baz. Decl. P 60; Pl. Opp. at 10. Defendants assert that [*25] Bazile did not need routine Internet access to do his job, and that the Department is afforded very few telephone lines. *See* Wilensky Decl. P 16. Even though he would sometimes attend meetings with outside vendors, he did not receive business cards, which were issued to the non-African American supervisors at his level. *See id.* P 62. Defendants claim that Celeste Glenn (an African-American manager) received business cards, but Rachael Buchard (a Caucasian manager) in the Research Department did not. *See* Def. 56.1 PP 39, 38; Pl. 56. *1 P 39*; Hosier Supp. Decl. P 5. Defendants claim that business cards are very difficult to obtain for employees and must be justified by showing that

an employee regularly meets with governmental officials or hardware or software vendors. *See* Def. 56. *1 P 36*.

Bazile also claims that he was denied training he requested, while Caucasians were groomed and trained for promotions to Chief in divisions in which they had no experience. *See* Baz. Decl. PP 65-6; *supra* note 7 (discussing relative lack of qualifications of several Caucasians promoted to Chief). In particular, Bazile was turned down for training [*26] on Housing and Urban Development ("HUD") databases. *See* Baz. Decl. P 65. Andino states that the training was only for people with HUD database experience, which Bazile had. *See id.*

## II. STANDARD OF REVIEW

*Rule 56 of the Federal Rules of Civil Procedure* provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law[,]' [while] an issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))*.

In determining whether issues of material fact are in dispute, a court must view the evidence "in the light most favorable" to the nonmovant. *See* [*27] *Breland-Starling v. Disney Publishing Worldwide, 166 F. Supp. 2d 826, 829 (S.D.N.Y. 2001)*(citing *Anderson, 477 U.S. at 255*). A court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino, 238 F.3d 145, 150 (2d Cir. 2001)*. Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)* (quoting *Anderson, 477 U.S. at 256*).

The non-moving party may not "rest upon . . . mere allegations or denials." *St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir. 2000)*. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999), cert. denied, 530 U.S. 1242, 147 L. Ed. 2d 960, 120 S. Ct. 2688 (2000)*; *see* [*28] *also Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)* ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (quotation marks, citations, and alterations omitted).

"The salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation." *Nicastro v. Runyon, 60 F. Supp. 2d 181, 183 (S.D.N.Y. 1999)* (citing *Dister v. Continental Group, Inc., 859 F.2d 1108 (2d Cir. 1988))*. Caution must be exercised, however, in granting summary judgment in employment discrimination cases where the employer's intent is at issue. *See Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999)*. Summary judgment is only appropriate if the plaintiff has failed to produce sufficient evidence for a rational juror to find in his favor. *See Windham v. Time Warner, Inc., 275 F.3d 179, 2001 U.S. App. LEXIS 26429, 2001 WL 1580123, at \*7 (2d Cir. 2001)*.

## III. Title VII

It shall be unlawful employment practice for an employer to discriminate [*29] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . .

*42 U.S.C. § 2000e-2(a)*. The statute's plain language shows that every Title VII case raises two significant questions: *First*, did the alleged behavior affect the "terms or conditions" of the plaintiff's employment? *Second*, did the alleged behavior happen because of a protected characteristic such as the individual's race or sex? To prevail in the face of a motion for summary judgment, a plaintiff must present sufficient evidence such that a rational juror could find in his favor, *i.e.*, raise a genuine issue of material fact, as to each question. [14]

> 14   Bazile alleges both federal and state law claims, which are subject to the same analysis. *See Cruz v. Coach Stores Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000)*. Additionally, the reach of the state *equal protection clause* is co-extensive with federal law. *See Great Atlantic & Pacific Tea Co. v. East Hampton, 997 F. Supp. 340, 351 (E.D.N.Y. 1998)*; *Lang v. Pataki, 176 Misc. 2d 676, 674 N.Y.S.2d 903, 913 (Sup. Ct. N.Y. Co. 1998)*.

[*30] Where there is no direct evidence of discrimination, *i.e.*, only circumstantial evidence, courts apply the three-stage burden-shifting framework that the supreme Court first set forth in *McDonnell Douglas v.*

Case 1:05-cv-00270-GMS   Document 91-6   Filed 08/31/2007   Page 8 of 14

Page 8
2002 U.S. Dist. LEXIS 1639, *

*Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); *Tappe v. Alliance Capital Mgt.*, 198 F. Supp. 2d 368, 2001 U.S. Dist. LEXIS 21036, 2001 WL 1631405, at *4-*5 (S.D.N.Y. 2001). Under this framework, a plaintiff makes a prima facie case of discrimination by showing:

> (1) he is within a protected group,
>
> (2) he is qualified for the position,
>
> (3) he was subject to an adverse employment action,
>
> (4) and the adverse action occurred under circumstances giving rise to an inference of discrimination based on membership in the protected group

*See Windham*, 275 F.3d 179, 2001 U.S. App. LEXIS 26429, 2001 WL 1580123, at *7; *see also Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). The burden of making out a prima facie case for discrimination is "minimal." *Bickerstaff*, 196 F.3d at 446. "If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant [*31] to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination." *Farias*, 259 F.3d at 98 (2d Cir. 2001). If the defendant meets this burden of production, "the presumption drops out of the analysis," *id.*, and the plaintiff must meet his ultimate burden of proving that he was the victim of intentional discrimination. *See id.*

As an African-American, Bazile is a member of a protected class -- which satisfies the first prong of the prima facie test for all of his Title VII claims.

**A. Failure to Promote**

Bazile claims that, because of his race, NYCHA and its officers and directors never promoted him to Division Chief or offered to pay him a Division Chief's salary, but instead fabricated a new position for which he was not qualified. [15] To establish a prima facie case for failure to promote, Bazile must show in addition to the prima facie case for discrimination: (1) that he applied for an available position; (2) that he was qualified for the position; (3) that his application was rejected; and (4) that after the rejection, the employer either continued to seek applicants for the position or hired a person outside [*32] of the protected class with the same qualifications as plaintiff. *See Brown v. County of Oneida*, 2000 U.S. Dist. LEXIS 14799, No. 99 Civ. 1064, 2000 WL 1499343, at *12 (N.D.N.Y. Sept. 28, 2000)(citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 177, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989)).

> 15  Bazile contends that Hosier similarly refashioned the Research Assistant position to avoid promoting African-Americans.

Bazile has demonstrated the availability of the Chief position in each Division in the Research Department. Further, Bazile's conversations with Hosier indicate that he applied for Chief of Data Management. Bazile thus satisfies the first two prongs of the prima facie test for failure to promote. [16]

> 16  Bazile does not satisfy this prong with respect to the City Research Assistant position, or any position within the Energy Department, because he did not apply for them.
>
> I do not reach the defendants' statute of limitations argument because the only claimed adverse action that occurred before September 25, 1997, the cut-off date, is NYCHA's alleged failure to promote Bazile to the Energy Department in June 1997.

[*33] Bazile has also demonstrated that he was qualified to be Division Chief. He had been at the NYCHA for over ten years. His direct supervisor, Lawrence Wilensky, stated in his affidavit that Bazile's work was satisfactory. When Abid left the Chief position, Bazile assumed many of her duties. Further, Bazile has established that it is the norm at NYCHA for the incumbent assistant chief of a Division to be promoted to Chief when that position becomes vacant. Bazile has also shown that his application was rejected. Hosier admits receiving his proposal, which she elicited from him to present his case for promotion to upper management. He never heard back from her, and was not promoted.

The fourth prong of the prima facie test for failure to promote presents an obstacle because Bazile must show that NYCHA either continued to seek applicants for the position or hired a person outside Bazile's protected class, with the same qualifications as Bazile. The problem is that between the time Bazile approached Hosier in 1999 and his rejection for the position, Hosier eliminated the position and discontinued the applicant search for the replacement position, Data Management Administrator. Bazile's [*34] evidence creates an inference that NYCHA's so-called restructuring plan, including the decision to eliminate the Division Chief position after he applied for it, was in fact a discriminatory policy or was being implemented in a discriminatory fashion. [17] This evidence, as presented more fully below, meets the minimal burden required to make out a prima facie test for failure to promote because Bazile raises a genuine

factual issue as to whether NYCHA *eliminated* the position because of Bazile's race. [18]

> 17  See, e.g., Robinson v. Time Warner, 92 F. Supp. 2d 318, 330 (S.D.N.Y. 2000)(denying summary judgment on failure to promote claim where plaintiff, presenting circumstantial evidence, raised triable issue of fact as to whether his employer's reorganization plan was racially-motivated).

> 18  Courts holding that a failure to promote claim cannot lie where the position has been eliminated, have noted that the plaintiff was aware that the position had been eliminated before applying for a promotion, or that the position was eliminated before its last incumbent left. *See, e.g., James-Gray v. Hanes Hosiery, Inc., 1998 U.S. Dist. LEXIS 13016*, No. 95 Civ. 9950, 1998 WL 525819, at *9 (S.D.N.Y. Aug. 21, 1998)(ruling that plaintiff failed to make out *prima facie* case where plaintiff was aware that the position no longer existed and position had been eliminated a year earlier). Defendant presents no evidence of either circumstance here.

[*35] In turn, defendants have articulated a legitimate, non-pretextual reason for their failure to promote Bazile -- the desire to transform Research into an academic-quality department, to reduce the number of reports that the Department generates and to make the remaining reports more sophisticated and responsive to the needs of managers. Hosier describes in great detail what she perceived to be the inadequacy of Bazile's proposal for the Data Management Division. She states that updating and integrating the databases would reduce the need for manual correction of facts; Bazile's proposal did not discuss either, but instead proposed that additional personnel be hired to manually correct errors.

The burden now falls on Bazile to show that a rational juror could conclude that he could meet his ultimate burden of proving intentional discrimination. To do this, he must adduce enough evidence that a rational juror could find that (1) the *terms or conditions* of Bazile's work were affected (2) *because of* his race.

The first prong is not in dispute. NYCHA's failure to promote Bazile or offer him a Chief's salary clearly affected the terms of his employment. [19]

> 19  The full phrase is "compensation, terms, conditions or privileges of employment . . . ." *42 U.S.C. § 2000e-2(a)*.

[*36] The second question is whether NYCHA failed to promote Bazile or pay him a salary commensurate with his work [20] because he is African-American. Here Bazile offers circumstantial evidence, including the sworn statements of three former and current NYCHA employees, of NYCHA's motive in restructuring the Research Department and in failing to promote Bazile or pay him a salary commensurate with his duties. Bazile need not disprove that NYCHA acted to improve the quality of the Division and reduce the number of reports generated. *See Holtz v. Rockefeller & Co., 258 F.3d 62, 81 (2d Cir. 2001)*("Proof that the employer's proffered justification is false. . . is simply one form of circumstantial evidence that is probative of intentional discrimination."). Bazile need only present evidence from which a jury could find that his race was a *motivating factor* in NYCHA's decisions to eliminate the Chief position he applied for and not pay him a salary commensurate with his duties. *See id.* ("The plaintiff may instead rely on evidence - circumstantial or otherwise - showing that an impermissible reason was a motivating factor, without providing that the employer's proferred [*37] explanation played no role in its conduct.").

> 20  Or, in this case, whether NYCHA eliminated the position so that it would not have to promote Bazile.

Viewing the evidence in the light most favorable to plaintiff and drawing every reasonable inferences in plaintiff's favor as the Court is required to do, Hosier's actions, approved by Graziano and the Board, indicated an animus toward African-Americans in general and Bazile in particular. Quets, a high-ranking manager at NYCHA who is Caucasian, stated in her affidavit that Hosier created a "caste system" in the office by isolating the African-Americans from Caucasian post-doctorates. [21] Jacqueline Barley stated that as an African American, she felt that Hosier ignored her and did not assign her significant responsibility. Both Quets and Cunningham, a former manager who is African-American, observed that Hosier treated Bazile as invisible and inconsequential; Quets also sensed that Hosier humiliated Bazile by not assigning him tasks and making him sit at his desk [*38] every day with nothing to do.

> 21  While neither Quets nor any lay witness may offer her opinion as to whether Bazile was treated differently on the basis of race, Quets and Barley may certainly offer their observations based on personal knowledge. *See Hester v. BIC Corp., 225 F.3d 178, 181-84 (2d Cir. 2000)*(discussing lay opinion testimony in discrimination cases).

The strongest evidence that NYCHA's decisions regarding restructuring and eliminating the Chief position were racially motivated is the following. Bazile was denied a raise despite the fact that he was performing the

Case 1:05-cv-00270-GMS   Document 91-6   Filed 08/31/2007   Page 10 of 14

Page 10
2002 U.S. Dist. LEXIS 1639, *

duties of Division Chief, while Ted Reich, one of Bazile's subordinates and a Caucasian, earned more money than he did. Bazile was denied training that he requested on at least one occasion. In contrast, NYCHA promoted four Caucasians who lacked either qualifications or training to Chief positions in the course of restructuring the Research Department. *See supra* note 7 (detailing the promotions and relative lack of [*39] qualifications or training of Susan Neuffer, Anne Pechstein, Thomas Walsh and William Scanlon). The Court may reasonably infer that NYCHA's restructuring plan favored Caucasians and was based in part on a determination that African Americans are somehow less "trainable" than Caucasians.

There is additional circumstantial evidence of racial animus. When Hosier learned of Bazile's complaints of racial discrimination in the hiring of Research Scientists and his request for promotions and raises for his staff, she sent a belittling email to Bazile in which she referred to him and his staff as "unhappy campers." Further, Hosier referred to two African-Americans, including Barley and Research Scientist candidate Alfred Poku, as having a "bad attitude" or seeming "very difficult to work with." Hosier took from Bazile the report functions that he used to perform, did not invite him to management meetings he used to attend, assigned an undue amount of clerical work to him and his department, and sent him at least one unprofessional message via email in which she copied the entire Department.

Hosier, with Graziano's and the Board's approval, refashioned two NYCHA positions with the result [*40] that otherwise qualified African-American employees could not compete for them. Rather than promote Bazile to Division Chief when Abid was transferred, Hosier created a new position that required computer skills that Bazile did not possess. When Bazile inquired about the new position, she informed him that it would be a temporary, 18-24 month consultant position. Hosier also changed the qualifications for Research Assistant, instead of choosing from among the many qualified African-Americans who comprised the Civil Service list, and proceeded to hire *only* Caucasians for the new Research Scientist position. Moreover, the NYCHA's new vision for the Research Department led to the involuntary transfer of many of its African-American and other minority employees. [22]

> 22  Hosier did not start until October 6, 1997, but Graziano's September 12 communication with her indicates that she may well have been involved in employment decisions prior to her official start date.

That Hosier brought in several African-Americans [*41] to interview for the Research Scientist position and recommended Celeste Glenn, an African-American, to succeed her as Director, weighs against Bazile's circumstantial evidence that Hosier's reasons for not promoting Bazile were pretextual. On the other hand, NYCHA may not escape liability for discrimination against Bazile on the basis of race because it can prove that it promoted other African-Americans. *See Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000). [23] NYCHA also offers evidence, in the form of affidavits by key personnel and Hosier's March 1998 Reorganization Report, of its decision to transform the Research Department into a more academic facility. Further, Hosier wrote in her March 1998 Report that Bazile and several others were not what she wanted for the Department because they were not "true database managers." None of the other professionals mentioned in that report -- Sam Gonzalez, Ted Reich, Asthma Sayad, Keywall Kapoor - is African-American. Ted Reich is Caucasian.

> 23  *Graham* stated in full:
>
> > Since Title VII's principal focus is on protecting individuals, rather than a protected class as a whole, an employer may not escape liability for discriminating against a given employee on the basis of race simply because it can prove it treated other members of the employee's group favorably.
>
> *Graham*, 230 F.3d at 43 (reversing district court's grant of summary judgment in Title VII action on ground that circumstantial evidence raised factual issues as to whether white employees were treated more leniently with respect to drug testing program).

[*42] Some may dismiss Hosier's behavior as discourteous but not discriminatory. Viewing all of the evidence in the light most favorable to Bazile, and drawing all reasonable inferences in his favor, I conclude that a rational juror could come to the opposite conclusion. All of the circumstantial evidence, viewed in combination, could support a jury finding that NYCHA eliminated the Chief position and failed to pay Bazile a salary commensurate with his work because Bazile is an African-American. Defendants' motion for summary judgment on this claim is denied.

**B. Disparate Treatment**

A Title VII disparate treatment claim can be asserted if the employer "simply treats some people less favorably than others because of their race, color, [or] religion."

*Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609, 123 L. Ed. 2d 338, 113 S. Ct. 1701 (1993). To establish a prima facie case of disparate treatment, Bazile must show that: (1) he is a member of a protected class; (2) he satisfactorily performed the duties of his position; (3) he was subject to an adverse employment action; and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination. [*43] *See Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 63 (2d Cir. 1997).

The first two prongs are essentially undisputed. Again, Bazile is a member of a protected class. He also satisfies the second prong of the prima facie case for disparate treatment by presenting ample evidence that he has performed his job satisfactorily.

An employee experiences an adverse employment action where he endures a "materially adverse change" in the terms or conditions of employment. *See Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2001). [24] Materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities . . ." *Id.* at 640; *see also Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)(holding that a materially adverse employment action is one which "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, [*44] or a decision causing a significant change in benefits.")

> 24 "Not every unpleasant matter short of [discharge or demotion] creates a cause of action." *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir. 1998)(quotation marks omitted, brackets in original). To rise to the level of a "materially adverse" action, "the change in working conditions must be more disruptive than a mere inconvenience or an alteration in job responsibilities." *Galabya,* 202 F.3d at 640 (quotation marks omitted).

Bazile points to the following adverse employment actions to satisfy the third prong: Bazile was not promoted and was denied a raise, he was given inferior work space during the agency's move, he had work taken away from him and his staff while at the same time was assigned a disproportionate load of clerical work, he was not invited by Hosier to management meetings he used to attend, he was not given an adequate computer to perform his work, he was denied computer training, and he [*45] was embarrassed by the Department's denial of business cards when dealing with outside vendors. These actions, taken together, rise to the level of adverse employment action for the purposes of Bazile's prima facie case.

Finally, Bazile must make out the fourth prong of his prima facie case for disparate treatment for claims other than failure to promote. Bazile presents evidence that (1) Caucasians were given private work space during the company's move whereas he was placed in an open, busy space; (2) other African-Americans felt that they were not assigned responsibility that they had previously; (3) he was paid less because of his race in that one of his subordinates, Ted Reich, a Caucasian, was paid more than him; and (4) he was forced to share a 75 mhz computer with six other employees, while non-African Americans at his level received their own 200 mhz computers for Internet access. [25]

> 25 Bazile is unable, however, to satisfy the fourth prong of his prima facie case with respect to the other alleged instances of disparate treatment because he does not present any evidence that would support a jury finding that NYCHA took these actions against him because of his race.

[*46] Defendants, in turn, articulate legitimate, nondiscriminatory reasons for the disparate treatment. These reasons include integrating the PIMS and TDS systems, which resulted in a workload reduction for Bazile's Division. In addition, defendants dispute Bazile's contention that his work space was inferior to that of anyone else during the agency's move.

Bazile adduces evidence going to the first question, whether the adverse employment actions affected the *terms or conditions* of Bazile's employment, such that a rational juror could find that these actions, taken together, worked a materially adverse change to the terms or conditions of his employment. The circumstances detailed above, *see supra* Part VI.A. (discussing circumstantial evidence on which a rational juror could find that NYCHA failed to promote Bazile because of his race), are also sufficient to allow a rational juror to find that NYCHA also took these adverse actions against Bazile because he is an African-American. Defendants' motion for summary judgment on Bazile's disparate treatment claim is denied.

## C. Retaliation

Bazile claims that the NYCHA and its officers and directors retaliated against him because [*47] he protested the alleged discrimination internally and filed a complaint with the New York State Department of Human Rights ("SDHR"). He states that the NYCHA, as a result of his complaints, gave him inferior work space and a substandard computer without access to the Inter-

Case 1:05-cv-00270-GMS   Document 91-6   Filed 08/31/2007   Page 12 of 14

Page 12
2002 U.S. Dist. LEXIS 1639, *

net, did not give him business cards, and transferred employees and work out of his Division.

To make out a prima facie claim of retaliation, a plaintiff must present evidence on each of the following elements: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995)*.

*First*, it is unclear whether NYCHA knew of Bazile's complaints. Bazile offers no evidence showing that NYCHA was aware of his SDHR filing in March 1999. However, during Bazile's February 3, 1999 conversation with his direct supervisor, Wilensky, Bazile complained that he and his staff were being overlooked for pay raises and promotions, and also raised concerns about racial discrimination against applicants for the [*48] Research Scientist position. Apparently, Wilensky informed Hosier of the conversation because Hosier emailed Bazile the next day referring to the "contentious meeting" Bazile had with Wilensky. However, Wilensky states he did not pass on to Hosier Bazile's complaint regarding discrimination. On the other hand, it is reasonable to infer that Wilensky discussed Bazile's informal complaint of racial discrimination when he talked to Hosier about the February 3, 1999 conversation. For the purposes of summary judgment, I accept that management was aware of the informal complaint, which is a form of protected activity. Accordingly, the first prong is satisfied.

*Second*, the only adverse employment action that Bazile shows occurred *after* his informal complaint to Wilensky and his SDHR filing in March 1999, was the provision of inferior workspace during the agency's move in the summer of 2000. This occurrence, standing alone, is neither an adverse employment action nor close enough in time to show that it is causally related to the complaint. Even viewing this evidence in the light most favorable to Bazile, it would not support a jury verdict in Bazile's favor on his claim for retaliation. [*49] Bazile's retaliation claim is dismissed as to all defendants.

### IV. CLAIMS UNDER *42 U.S.C. §§ 1981* AND *1983*

Bazile makes claims against the NYCHA as a municipal governmental entity as well as against several of its officers and directors in both their official and individual capacities.

#### A. *42 U.S.C. § 1983* (Against All Defendants)

Bazile alleges that defendants have violated his rights under *section 1983* for retaliating against him after he complained of discrimination. *Section 1983* allows suits against persons who, acting under color of state law, cause another person to be deprived "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *42 U.S.C. § 1983*. In his Complaint, Bazile's *section 1983* claim presumes violation of his *First Amendment* right to complain of discriminatory treatment. However, as discussed earlier, Bazile does not offer evidence of precise times and dates, or of having complained to anyone other than Wilensky, which might show that the adverse employment decisions resulted from his complaints of discriminatory treatment. Thus, Bazile's [*50] *section 1983* claim must be dismissed in its entirety.

#### B. *42 U.S.C. § 1981*

Bazile alleges that the defendants have deprived Bazile of rights, benefits, privileges, terms or conditions of his employment because of his race, in violation of *section 1981*. In addition, Bazile alleges that defendants have deprived him of the ability to make, perform and modify his employment contract or relationship with NYCHA because of his race, in violation of *section 1981*. Bazile alleges that defendants have so deprived him directly, as well as pursuant to a discriminatory custom or official policy of NYCHA.

Under *section 1981*,

> all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .

*42 U.S.C. § 1981*. *Section 1981* has been construed as prohibiting racial discrimination. *See Brown, 2000 U.S. Dist. LEXIS 14799, 2000 WL 1499343*, at *11 (citing *Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 608-10, 95 L. Ed. 2d 582, 107 S. Ct. 2022 (1987))*. It requires that any discrimination must have been intentional, [*51] and that the plaintiff's race must have been the motivating factor behind the defendant's discriminatory acts. *See Brown, 2000 U.S. Dist. LEXIS 14799, 2000 WL 1499343*, at *11 (citing *Albert v. Carovano, 851 F.2d 561, 571 (2d Cir. 1988))*. "Naked assertions by a plaintiff that race was a motivating factor -- without a fact specific allegation of a causal link between a defendant's conduct and the plaintiff's race -- are too conclusory to allege a *§ 1981* violation." *Brown, 2000 U.S. Dist. LEXIS 14799, 2000 WL 1499343*, at *11. In analyzing *section 1981* claims, a court applies the same standard as it would in a Title VII case. *See 2000 U.S. Dist. LEXIS 14799*, [WL] at *12.

#### 1. Municipal Defendant NYCHA and Defendants in Their Official Capacity

As a municipal entity, NYCHA may be held liable under *section 1981* only if Bazile can prove that the violation was committed pursuant to a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Servs., 436 U.S. 658, 690, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978)*; see also *Jett v. Dallas, 491 U.S. 701, 734-36, 105 L. Ed. 2d 598, 109 S. Ct. 2702 (1989)*. [*52] In addition, Bazile must prove that the NYCHA, as a municipal defendant, was the "moving force," through "deliberate conduct," behind the alleged discrimination. *Murray v. Board of Educ. of the City of New York, 984 F. Supp. 169, 181-82 (S.D.N.Y. 1997)*.

Here, Bazile has offered evidence to support his claim that his alleged injuries resulted from an official NYCHA policy. Martinez (as Chairman and Board Member of NYCHA), Andrews (as Vice-Chair and Board Member of NYCHA), and Finkel (as Board Member of NYCHA), acting in their official capacities, made or approved a plan to make the Research Department "first-rate" that involved removing or demoting its African-American employees. [26] The Board also approved all of Hosier's hiring and promotion decisions. It can be reasonably inferred that these officers and directors approved both Hosier's reworking of the Data Management Chief and Research Scientist positions, and the resulting exclusion of African-Americans from both positions. Further, the circumstantial evidence that could support a jury verdict of racial animus, *see supra* Part IV, applies to NYCHA and the other defendants in their official capacity.

> 26  Franco served as Chairman of NYCHA, but was not named in his official capacity in the Complaint. *See* Compl. P 1.

[*53] Viewed in the light most favorable to Bazile, his evidence raises an issue of fact as to whether the reorganization plan was in actuality a strategy to remove African-American employees from the Department. A rational jury could find that NYCHA, and its officers and directors acting in their official capacities, were the "moving force" behind the alleged race-based policy and resulting adverse employment actions affecting Bazile.

**2. Officers and Directors as Individuals**

Under *section 1981*, the officers and directors of the NYCHA cannot be held liable in their individual capacity based solely on their supervisory positions. *See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996)*. Rather, they may only be held liable for their personal involvement in the alleged discriminatory conduct. *See id.*

Martinez and Franco communicated transfer decisions directly to employees in September 1997 and later. Hosier prepared her 1998 Reorganization Report pursuant to guidelines Graziano gave her. The Court must therefore infer that Hosier carried out the reorganization plan with the participation and personal involvement of Graziano, Martinez and Franco. Because the standard [*54] under Title VII and *Section 1981* is the same, summary judgment is denied with respect to Martinez, Franco, Graziano and Hosier.

However, Finkel and Andrews can only be held responsible in their official capacity. Plaintiff does not allege that Finkel or Andrews had any involvement in NYCHA's alleged discriminatory practices beyond approving the implementation of Hosier's reorganization plan. Defendants' motion for summary judgment on Bazile's *section 1981* claim is therefore denied with respect to all defendants except Finkel and Andrews, Board Members who have not been shown to have had any personal involvement in NYCHA's alleged discriminatory practices.

**V. COMMON LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL HARM (AGAINST ALL DEFENDANTS)**

Bazile claims that defendants intentionally or with reckless disregard of the mental, emotional, and physical harm caused by their illegal conduct, did nothing to remedy the racial discrimination inflicted upon him. To sustain a claim for intentional infliction of emotional distress under New York law, a plaintiff must demonstrate: (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability [*55] of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *See Howell v. New York Post Co., 81 N.Y.2d 115, 121, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993)*. "Where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation, a remedy is available in the form of an action for the intentional infliction of emotional distress." *Nader v. General Motors Corp., 25 N.Y.2d 560, 569, 307 N.Y.S.2d 647, 255 N.E.2d 765 (1970)*; see also *Vasarhelyi v. New Sch. for Social Research, 230 A.D.2d 658, 646 N.Y.S.2d 795, 797 (1st Dep't 1996)*.

Bazile does not adduce evidence such that a rational juror could find that the employment actions taken by the NYCHA or its officers or directors approach the requisite level of "extreme and outrageous" conduct. Thus, Bazile's intentional infliction of emotional harm claim must be dismissed.

**VI. CONCLUSION**

Defendants' motion for summary judgment is denied with respect to all claims except those based on retalia-

2002 U.S. Dist. LEXIS 1639, *

tion and emotional distress. With respect to Bazile's Title VII retaliation claim, his *section 1983* [*56] claim and his state law claim for emotional distress, defendants' motion is granted. Summary judgment is granted in favor of Finkel and Andrews for Bazile's 1981 claim against them in their individual capacities only.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

February 1, 2002