BRIGITTE L. BROWN

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE


KENNETH COLE, BRIGITTE L. BROWN,)
                              ) C.A. No. 05-270 KAJ
         Plaintiffs,     )
                              )
v.                            )
                              )
DELAWARE TECHNICAL AND COMMUNITY)
COLLEGE,                      )
                              )
         Defendant.     )

Deposition of BRIGITTE L. BROWN pursuant to notice at the law offices of MORRIS JAMES HITCHENS & WILLIAMS, LLP, 222 Delaware Avenue, 10th Floor, Wilmington, Delaware, beginning at 10:00 a.m. on Monday, February 6, 2005, before Renee A. Meyers, Registered Professional Reporter and Notary Public.

APPEARANCES:

         MARGOLIS EDELSTEIN
         LORI A. BREWINGTON, ESQ.
           1509 Gilpin Avenue
           Wilmington, Delaware  19806
           for the Plaintiffs,

         MORRIS, JAMES, HITCHENS & WILLIAMS LLP
         DAVID H. WILLIAMS, ESQ.
           222 Delaware Avenue, 10th Floor
           Wilmington, Delaware  19899
           for the Defendant.

ALSO PRESENT:

  KENNETH COLE
  PAUL MORRIS

### CORBETT & WILCOX
1300 French Street - Wilmington, Delaware 19801
(302) 571-0510


CORBETT & WILCOX

BRIGITTE L. BROWN

1                    BRIGITTE L. BROWN,

2            the witness herein, having first been

3            duly sworn on oath, was examined and

4            testified as follows:

5    BY MR. WILLIAMS:

6        Q.    Have you ever been deposed or testified?

7        A.    No, sir.

8        Q.    I am going to ask you a series of questions.

9    As you know, I represent the defendant in this case.

10   If you don't understand a question, tell me that you

11   don't understand.

12       A.    Okay.

13       Q.    If you answer the question, I am going to

14   assume that you did understand the question and that

15   your answer is responsive to the question.

16       A.    Okay.

17       Q.    Is there any reason why you can't testify

18   truthfully and fully today?

19       A.    No.  No reason why I can't.

20       Q.    If you, at any point during the deposition, you

21   want to take a break, just tell me that you want to

22   take a break.

23       A.    Okay.

24       Q.    It's not an endurance contest.

BRIGITTE L. BROWN

1    A.    Thank you.

2    Q.    If you need anything, water or anything like

3    that --

4    A.    Could I get some before we start?

5    Q.    Sure.

6          The other thing I wanted to tell you, just

7    as a ground rule, is that you have to verbalize all of

8    your answers.

9    A.    Okay.

10    Q.    If you nod your head --

11    A.    Okay.

12    Q.    -- she can't hear your head nod.

13    A.    Right.

14    Q.    So you need to articulate your answers.

15          I am handing you --

16          MS. BREWINGTON:  Shut off your cell phone.

17          THE WITNESS:  I need to do that.

18    BY MR. WILLIAMS:

19    Q.    I am handing you a document that's marked for

20    identification Brown/Cole 93 and 94.  And I would ask

21    if you can identify that document?

22    A.    It's my resume.

23    Q.    When was this prepared?

24    A.    Updated or prepared?  I have had my resume.  I

BRIGITTE L. BROWN

1    have just updated my resume.  This particular one, I

2    am not sure if this is the one that I submitted when I

3    first started at DelTech or if it was the one when I

4    applied for the position.  I am not sure.

5                Actually, yeah.  This is the one I used

6    because I see my TRIO achievements on here.  So, this

7    is the one I probably used when I --

8    Q.    Incidently, what you are referring to is on the

9    second page under the category "Honors, Awards, and

10   Memberships"?

11   A.    Yes.

12   Q.    The Delaware State TRIO Achievers Award, am I

13   correct that in order to be eligible for that award,

14   you have to be an alumnus of the --

15   A.    Yes.

16   Q.    -- TRIO program?

17   A.    Alumnus that has provided community service

18   and, you know, all that stuff that goes along with,

19   you know, achievement like that.

20   Q.    So, would it be fair to say, then, that that's

21   not necessarily reflective of the college's evaluation

22   of your performance?

23   A.    Oh, this is not -- this is for our federal TRIO

24   program.

BRIGITTE L. BROWN

1      Q.    And when I say "college," I am referring to

2    Delaware Technical and Community College; do you

3    understand that?

4      A.    Yes.

5      Q.    The Dimensional Enterprises, Inc., does that

6    business still exist?

7      A.    Yes.  This was a business that I have had since

8    I graduated from college on a side.  I did graphic and

9    advertising.  I have a United States patent and I have

10   worked with that.

11     Q.    Did you have any employees?

12     A.    No.  If I needed some extra help, there is

13   times where I had, like, hired, like, a subcontractor,

14   which are usually artists or something, graphic

15   designers to help.

16     Q.    During what time period did you work for the

17   college?

18     A.    The college, from January 8th, 2001, until the

19   end of June 2005.

20     Q.    During that time period, how much time, on

21   average, did you devote to this business that you have

22   been operating?

23     A.    My business was, basically, a weekend business.

24   I did my business on, like, weekends, and when -- if I

BRIGITTE L. BROWN

1    -- when I came home, if I had any after -- I mean any

2    computer business in the evening or something like

3    that, so it varied on what I did with that business.

4        Q.    The experience that you had with the Red Clay

5    School District, you were a teacher there; is that

6    correct?

7        A.    Correct.

8        Q.    You didn't have any administrative or

9    managerial responsibilities when you worked for the

10    Red Clay School District?

11        A.    As far as an administration, no.  Managing the

12    students, yes.

13        Q.    But you didn't manage employees?

14        A.    Not in -- no.

15        Q.    When you worked for the college, you were, as I

16    understand it, an Upward Bound Math/Science

17    coordinator; is that correct?

18        A.    Correct.

19        Q.    And can you just briefly describe what it is

20    you did in that position?

21        A.    It was a federal TRIO program.  I was the

22    coordinator.  We would get students who were

23    disadvantaged, low income disadvantaged who met the

24    requirements to be part of the company -- program.  I

BRIGITTE L. BROWN

1   would be in charge.  I recruited students for the

2   program.  We followed students who had been in the

3   program who had graduated from the program.  We gave

4   them enrichment things.

5           Our -- our program was, mainly, we had a

6   summer residency program, excuse me, which they stayed

7   six weeks where they came and they lived on campus and

8   -- at Goldey Beacom College and they would be there

9   and they would taken enrichment programs, like math

10  and science and things like that.  And we would have

11  trips and things like that.

12  Q.    During that summer program that you just

13  described, you spent time in the classroom with the

14  students over there?

15  A.    No.  I -- I was a coordinator.  I helped manage

16  the instructors.  I helped manage, you know, the

17  students on a whole that -- the classroom had

18  instructors, so we managed the instructors and -- and

19  tutors and just made everything -- make sure

20  everything was working correctly and monitored the

21  students, things like that.

22  Q.    Where did the classroom work take place?

23  A.    The classroom -- in the classrooms.

24  Q.    The classrooms were on what campus?

BRIGITTE L. BROWN

1    A.    It depends on -- oh, our Wilmington campus is

2    where that happened, and it just depends on what year

3    it was, either fourth floor, first floor.

4    Q.    Now, part of your responsibilities involved

5    visiting with high school students off site; is that

6    correct?

7    A.    Correct.  Correct.  We would go to different

8    sites.  We had a regional program, so our students

9    were within a 50 mile radius, and so, at certain

10    times, like, during, I think it started around October

11    or November, December, we would go to each student out

12    of the 50 students that we had, and, actually, we got

13    a little bit more students in there, and we would just

14    travel to their schools.

15            When I say "regional," we are talking

16    about New Jersey, Pennsylvania, Maryland, and

17    Delaware.

18    Q.    Did you resign from your position with the

19    college?

20    A.    Yes, I did.

21    Q.    When was that?

22    A.    The end of June of this year.

23    Q.    Did you submit a resignation letter?

24    A.    Yes, I did.

BRIGITTE L. BROWN

1    Q.    Do you know whether that document has been

2    produced in this litigation?

3    A.    No, I don't know if it has.

4    Q.    Have you provided it to counsel?

5    A.    Did I ever give you my resignation letter?

6           MS. BREWINGTON:  I can't help you answer

7    those questions, unfortunately.

8    BY MR. WILLIAMS:

9    Q.    Have you provided the document to your counsel?

10   A.    I am not sure.

11          MR. WILLIAMS:  If I represent to you that

12   I don't believe we received it, can we get a copy of

13   her letter of resignation?

14          MS. BREWINGTON:  I don't believe I have

15   it, but if -- we can get it to you.

16          MR. WILLIAMS:  Okay.

17   BY MR. WILLIAMS:

18   Q.    Is it your claim that your resignation was not

19   voluntary?

20   A.    I don't understand that question.

21   Q.    Did you voluntarily resign from the college?

22   A.    I voluntarily resigned, yes.

23   Q.    Are you claiming that you resigned because your

24   working conditions were intolerable?

BRIGITTE L. BROWN

1    A.    Basically.

2    Q.    And tell me --

3    A.    When I -- go ahead.

4    Q.    Describe to me what was intolerable about the

5    working conditions as of the time that you resigned.

6    A.    Well, this was built up over the years from

7    when we had moved into an inadequate office space that

8    was very small, that was very difficult, very, very

9    stressful, very humiliating.  People -- we would have

10    our doors open in an office where, because it's in a

11    college, where students are walking past.  One

12    particular time, all -- a whole group of students

13    walked past, and it was like, Oh, oh, oh, they look

14    like monkeys in there.

15          From that day on, I was very humiliated

16    and really asked to keep the door closed because I

17    didn't even want people to see me in that office

18    because it was very -- it was very cramped, very

19    small.

20          We didn't really have privacy.  We didn't

21    have -- as far as dealing with our students or

22    talking.  If I am on the phone, the secretary would,

23    you know, she will be on the phone with her laughing

24    or talking, whatever she is doing or she is shredding

1  papers.  It was just -- it was very hard.

2           There was, to me, retaliation.  There was,

3  all of a sudden, micro managing came in.  Things had

4  changed after we moved into this office and we had

5  made a formal complaint, and it just got very

6  difficult.

7           And I had started going to the doctor

8  because of stress related issues and they had put me

9  on some medication.  And I am not a medicated type

10 person, but I -- I took that for a while.

11          And, you know, just one thing from

12 another.  Again, a situation came up where my program

13 manager wasn't there.  I am a coordinator, been there

14 four years.  I had good evaluations, everything.  So I

15 applied for the position, and, again, this is during

16 the whole thing, I am standing in there, I am still

17 doing what I am supposed to do, hanging in there

18 regardless of how I felt about working in that

19 environment, and it came to the point where I -- I

20 submitted my application and I never even got an

21 interview for the position that I had been in for four

22 years.

23          Then I re-submitted an application, and I

24 end up getting an interview with some people,

BRIGITTE L. BROWN

Page 12

```
 1    including Paul Morris, who was also on my complaint,

 2    and another girl, Andrea Coleman, was in my interview

 3    who came into the Upward Bound Classic Program as a

 4    coordinator after I did, and she was on my

 5    interviewing committee.  But then after -- I don't

 6    know what happened as far as how the process works, no

 7    program manager came in, and then we were introduced

 8    that Andrea would be our new program manager for this

 9    program.  And we were just in -- we had it for a year

10    where we had Jacquita Wright as acting program manager

11    who really wasn't up there who -- it just was not a

12    good working environment.

13    Q.    So you resigned?

14    A.    Yes.

15    Q.    And you moved to Texas?

16    A.    Not right away.  I am back and forth from Texas

17    and Delaware right now.  I have a very ill brother

18    down there.  He has congestive heart failure.  So --

19    and my -- I have a child up here, so I am in Texas and

20    I have a place in Delaware, so I am back and forth.

21    Q.    Are you working?

22    A.    No, I am not working.  I am just doing my

23    little graphics that I do that's computer graphic

24    oriented.
```

BRIGITTE L. BROWN

1    Q.    Have you had any employment since --

2    A.    No, I have not.

3    Q.    Let me finish.  The other --

4    A.    I am sorry.

5    Q.    -- ground rule, even though you think you know

6    what I am going to say, you have to let me finish my

7    question.

8    A.    Okay.  I am sorry.

9    Q.    Have you had any employment other than your

10   business that you owned since the time that you

11   resigned from Delaware Tech.?

12   A.    No.

13   Q.    Have you applied for any employment since the

14   time you left Delaware Tech.?

15   A.    Yes.  Yes.  Yes, I have.

16   Q.    Where have you applied?

17   A.    Oh, I go through the newspaper, and, I mean, I

18   have applied at different colleges.  I have applied,

19   actually, another program, Upward Bound Program down

20   in Texas.  I am trying to get there.  And, really, I

21   can't really remember all the places because I go in

22   and most of them is all Internet.  I have to apply on

23   the Internet now mostly.  So, those kind of places, I

24   -- it's been colleges, sending to O'Neill College up

BRIGITTE L. BROWN

1    here.  I had applied to a couple places that actually,

2    I can't even remember which ones, I had never heard

3    back from them.  So --

4        Q.    Have you submitted written applications to

5    someone in these jobs?

6        A.    Internet related, yes.

7        Q.    Do you have copies of applications you have

8    submitted?

9        A.    Not with me, but, yes, I do have copies of a

10   few applications.  Not with me.

11       Q.    Have you provided those documents to your

12   counsel?

13       A.    No.  I was never asked to.

14       Q.    How much money have you earned since you left

15   Delaware Tech. as a result of activities that you have

16   engaged in for your business that you own?

17              MS. BREWINGTON:  Objection, relevance.

18              MR. WILLIAMS:  Pardon me?

19              MS. BREWINGTON:  Objection, relevance.

20   You can answer.

21              MR. WILLIAMS:  You can answer.

22              THE WITNESS:  Oh.  Now, what was the

23   question again?

24   BY MR. WILLIAMS:

BRIGITTE L. BROWN

1    Q.   How much income have you generated from this

2    business that you own since the time that you left

3    Delaware Tech.?

4    A.   Not much, and I can't -- I don't know for sure.

5    Q.   Do you file income tax returns?

6    A.   No, I haven't filed that for this business this

7    year.  Have I ever?  Is that -- I don't understand the

8    question.  No, I have not filed income tax for that

9    business this year.

10   Q.   Give me some idea of what "not much" means?

11   A.   I mean, it just varies.  Just maybe a couple

12   hundred dollars a month.  It's, right now, I am not

13   really doing much work in that business.

14   Q.   What other source of income do you have?

15   A.   My Social Security benefits.  My children's

16   father, Donald Evans, he was an attorney, he past

17   away.  And my children, we have Social Security

18   benefits that helps with the child support, and that's

19   income that comes into my home.

20   Q.   I am going to hand you a document which has

21   been marked for identification Brown/Cole 98 through

22   101, and ask if you can identify that for me.

23   A.   Yes.  This was a charge of discrimination that

24   I had filed with the Department of Labor.

BRIGITTE L. BROWN

Page 16

1    Q.    Is it accurate, to the best of your knowledge?

2    A.    To the best of my knowledge, it's accurate.

3    Q.    Did you review it before --

4    A.    Let me --

5    Q.    -- you signed it?

6    A.    Yes.  As far as I know, I reviewed it before I

7    signed it.

8    Q.    Is that your signature?

9    A.    That's my signature.

10    Q.    And by signing it and dating it, you declared,

11    under penalty of perjury, that the foregoing is true

12    and correct; do you see that?

13    A.    Yes.

14    Q.    Did you understand that at the time you signed

15    it?

16    A.    Yes, sir.

17    Q.    Am I correct in saying that on August 12th,

18    2002, Paul Morris informed you that you would be

19    moving to the new office space?

20    A.    Yes.

21    Q.    And, specifically, that was a move to Room 408;

22    is that correct?

23    A.    Yes.  Yes.

24    Q.    And after being informed of that move, did you

BRIGITTE L. BROWN

Page 17

1    complain about the fact that the program was going to

2    be moved to Room 408?

3        A.    I didn't understand the question.

4        Q.    Did you lodge a complaint with any supervisor

5    or manager at the college --

6        A.    Did you say after the move?

7        Q.    Let me finish.  -- with respect to the move?  I

8    am talking now about the August/September/October time

9    frame before you filed this charge of discrimination?

10       A.    Oh, yes.  Yes, sir.

11       Q.    And isn't it correct that in complaining about

12   the move, and, now, again, this is prior to filing the

13   charge of discrimination, you never claimed that it

14   was your belief that the move was based upon race?

15       A.    No.  That's not true, for the simple fact as I

16   followed protocol.  I -- I tried to -- first, we went

17   to -- we were told by our manager that Mr. Morris had

18   said, Put it in black and white, about our complaints.

19   We put it in black and white.  We had a meeting with

20   Mr. Morris and Ms. Ann Del Negro and we had a document

21   with everything we put in black and white.

22              We explained to them that you are treating

23   us different.  We explained to them that we are

24   feeling punished.  We said all the words as far as

BRIGITTE L. BROWN

Page 18

1   discrimination.  But they weren't the ones that I

2   wanted to deal with that.  Paul Morris -- as far as I

3   knew, Paul Morris was a program manager and I am

4   having a meeting with him.  I didn't understand how

5   the layers worked.

6           Then we, Sue Zawislak, Dr. Sue Zawislak,

7   we also had a group meeting with Dr. Sue Zawislak and

8   we were telling her the same thing.  I ended up having

9   a single meeting with Sue Zawislak.  I told her the

10  same thing.  I appealed to -- sent an e-mail

11  requesting a meeting with campus director, Dr. Connie

12  Winners, and Lawrence Miller.  That's where I was

13  going to let them know exactly, you know, how I felt.

14          I had a letter -- I wouldn't have -- if

15  this could have been taken care of, I don't think it

16  would have gotten this far.  I wanted to explain, yes,

17  we were -- and it's hard to come up with just saying,

18  God, are they racists?  What we were doing, we were

19  saying, and we discussed it, we discussed it, I went

20  to discuss this with Dr. Winners and this is exactly

21  what I was going to discuss how I felt about being

22  discriminated and saying, Four black people feel like

23  they are being discriminated against.

24          Dr. Winners sent me a letter and said that

BRIGITTE L. BROWN

1   I have her letter back by the October 15th, and she

2   would give me a meeting in one week with Dr. Zawislak.

3   That meeting never happened.  I never heard from

4   Dr. Winners again.

5            Larry Miller wrote to us, saying that

6   Mr. Cole had claimed retaliation.  He says, If this

7   was over, if there was no retaliation, this is over.

8   He sent this to our secretary, Liz Wilson, and myself.

9            I sent a three-page letter back because a

10  lot of stuff had changed, a lot of, to me, micro

11  managing, retaliation, a lot of stuff had changed, and

12  I informed him of this.  I never heard from Mr. Miller

13  ever.

14           These are the people I needed to take to

15  the next level and these people have never got back in

16  touch with me.

17    Q.   Is it not correct that prior to filing this

18  charge of discrimination on November 8th, 2002, you

19  never, in writing, alleged that the move of the

20  program to Room 408 was based upon race?

21    A.   I wasn't going to do that, no.  And no, I did

22  not.

23    Q.   So my statement is correct?

24    A.   I did not put that in writing, no.

BRIGITTE L. BROWN

Page 20

1    Q.    And isn't it also true that prior to filing

2    this charge of discrimination, in whatever meetings

3    you had with supervisors at the college, you never

4    claimed orally that the move was based upon race?

5    A.    No.  We were talking about, basically, moving

6    the four African-Americans into a space like this.  At

7    that point, when we were -- we felt -- I had to find a

8    dictionary definition.  I felt that I was being

9    punished.  I felt humiliated.  I have felt I was being

10   ostracized from the other federal groups.  I felt

11   discriminated against, sir.

12   Q.    Putting to the side what you felt, isn't it

13   correct that you never said, prior to November 8,

14   2002, to anyone, any of the supervisors at the

15   college, that you felt that --

16   A.    I said it to my manager.

17   Q.    And who is that?

18   A.    Rose Henderson.

19   Q.    You didn't say it to Mr. Morris or Sue Zawislak

20   or to Ann Del Negro?

21   A.    No.  I was going to say it to Larry Miller and

22   Connie Winners.

23   Q.    And this charge of discrimination, as I

24   understand it, claims that retaliation occurred prior

BRIGITTE L. BROWN

1    to November 8th, 2002?

2        A.    Yes, sir.

3        Q.    And it is your claim that the retaliation was a

4    result of what activity?

5        A.    I don't understand that question.

6        Q.    Well, your -- on November 8th, 2002, you are

7    claiming that you were the victim of retaliation;

8    correct?

9        A.    I am saying discrimination with their -- plus

10   there was retaliation.

11       Q.    And --

12       A.    The retaliation came after I -- we started

13   complaining about the move.

14       Q.    But before November 8th?

15       A.    Yes.

16       Q.    And before you told anybody other than Rose

17   Henderson that it was your belief that the move was

18   motivated by consideration of race?

19       A.    I was told by Dr. Winners that I would have a

20   meeting in the next week.  I waited for her meeting.

21   You can look at the records, October 15th, I had to

22   have my letter in to her.  She says, Next week, I will

23   make a meeting with Sue Zawislak -- Dr. Sue Zawislak

24   and myself.  At that meeting, I would have stressed

BRIGITTE L. BROWN

Page 22

1    and I would have articulated that I feel like I am

2    being discriminated against.

3            This was a higher level person.  That's

4    who I wanted to go to.  If you can look at the

5    records, I did not file my suit, my discrimination

6    complaint until after two weeks or so after she said

7    she would have a meeting with me.

8            We had waited -- we had gone through

9    layers, we had gone to Paul Morris, Sue, Ann, and we

10   were getting nowhere.  After this campus director, I

11   think she is campus director, after she said she would

12   give me a meeting within the week, and over two weeks

13   later or so and the retaliation was still happening,

14   the micro managing was still happening, I went on and

15   filed because it just got too difficult.  And I

16   believed that once I filed, some of that would have

17   let up, will alleviate what was happening to us.

18   Q.   So, would it be fair to say that it's your

19   claim that retaliation was occurring as a result of

20   the fact that you complained about the move and that

21   was the case even though you had not, at that point,

22   prior to November 8th, alleged that the move was based

23   on race?

24   A.   Before I -- before I articulated it, yes.

BRIGITTE L. BROWN

Page 23

1    Q.   The hallway where room 401 is located --

2    A.   408, you mean?

3    Q.   408, I am sorry.  Thank you.  There are no

4    classrooms on that hallway, are there?

5    A.   Yes.  There is classrooms all over.

6    Q.   On that particular hallway?

7    A.   Well, it's really hard when you say "particular

8    hallway" because I see the whole thing as a big

9    circle.  So, I mean, there is a conference room, there

10   is the rooms, that's the hallway, and we were like

11   right on the end, and there is a long hall and there

12   were classrooms for DelTech on that hall.  So --

13   Q.   Let me show you a document that's marked for

14   identification Brown/Cole 103 and 104 and ask if you

15   can identify that document.

16   A.   This was an update to the complaint.

17   Q.   Did you prepare the document?

18   A.   Yes.

19   Q.   And was it prepared on September 30, 2003?

20   A.   Yes.

21   Q.   Who was provided with a copy of the document?

22   A.   Stephen Willis, Department of Labor Law

23   Enforcement.

24   Q.   There was a conference room adjacent to Room

BRIGITTE L. BROWN

1    408, was there not?

2    A.    Right.

3    Q.    And you had access to that conference room?

4    A.    Not unless we made -- we had to -- if a child

5    came up, we couldn't go in that conference room.  We

6    had to make an appointment for that conference room.

7    That conference room was used by almost everybody in

8    the school.  They did interviews there.  They

9    conducted meetings there.  So we had to get on the

10   list to use that conference room.

11   Q.    So you had to reserve it?

12   A.    Yes.  Thank you, reserve it.

13   Q.    And if you reserved it, you had access to the

14   conference room?

15   A.    If we had reserved it ahead of time.

16   Q.    Now, during the school year, September through

17   May, at least, the students that you were working with

18   were not students at the college, they were students

19   in high school, for the most part?

20   A.    Yes.

21   Q.    So, they were not present at your site --

22   A.    Right.

23   Q.    -- during the school year; is that correct?

24   A.    That's correct.

BRIGITTE L. BROWN

Page 25

1    Q.    The only time they might be present would be

2    during the six weeks of classroom instruction you have

3    described during the summer?

4    A.    Yes and no.  Because they could come to the

5    school.  We had students that still came to our

6    school.  The youth programs had tutoring, so we did

7    have our students coming to that tutoring.  I remember

8    particularly Mark LeaBough always there.  We had not

9    many Delaware students, but the Delaware students had

10   access to the tutoring, so every now and then, they

11   would come.  But some of our students who were

12   deficient would come often for their tutoring.

13   Q.    For the most part, though, you went to see the

14   students?

15   A.    Yes.

16   Q.    Rather than the students coming to see you?

17   A.    Correct, during the year.

18   Q.    How much time, in an average week, how much

19   time did you spend on the road or at various schools

20   visiting students?

21   A.    That really varied.  We traveled for, like,

22   between the end of October to, like, the beginning of

23   December.  We would make our appointments.  In an

24   average week, during -- just during that time, it

BRIGITTE L. BROWN

1    really varies.  It depended on when you could get an

2    appointment.  Sometimes I may be out at a school twice

3    in this week, three times the next week, maybe twice

4    the next week, could have even have been four times

5    the next week.  We just went to our different schools.

6    We met with our kids.  We had IEPs, individual

7    education progress reports that we would talk to them

8    and fill them out, and we would be with our students

9    about 45 minutes to an hour each, and we would come

10   back.  And since the way our students work, I may have

11   a student in Rancaucus, New Jersey, and I just had

12   one, so I would go there and I would come back.  Or I

13   would have a couple students at DelCastle, I would go

14   meet with them, and I would come back.

15       Q.   And you were full time?

16       A.   Yes, sir.

17       Q.   And Mr. Cole, who worked with you, was part

18   time?

19       A.   Yes.

20       Q.   And the other individual in 408 was the

21   secretary?

22       A.   Yes.

23       Q.   Is that correct?

24       A.   Yes.

BRIGITTE L. BROWN

1    Q.    And the program manager was in a side office?

2    A.    Yes.

3    Q.    Which was part of the 408?

4    A.    Yes.  It -- it -- it was his own separate

5    office, but they had the No. 408 on it.

6    Q.    In the last paragraph of the document, you say

7    that you have always received outstanding and

8    excellent evaluations; do you see that?

9    A.    Yes, sir.

10    Q.    Did you ever receive a bad evaluation during

11    your tenure --

12    A.    A bad evaluation?

13    Q.    Let me finish my question, please.  -- during

14    your time at the college?

15    A.    A bad evaluation?

16    Q.    Yes.

17    A.    No, sir.

18    Q.    Were all your evaluations good?

19    A.    Yes, sir.

20    Q.    During your time at the college, was there ever

21    a reduction in your salary?

22    A.    No.

23    Q.    Was there ever a reduction in your benefits?

24    A.    No.

BRIGITTE L. BROWN

Page 28

1    Q.    Did you receive any salary increases during

2    your time at the college?

3    A.    Just what everybody would receive, like, I

4    think, around July.

5    Q.    So, you received the same increases everybody

6    else received?

7    A.    Correct.

8    Q.    And was it your understanding that your

9    particular program was funded by a federal grant?

10   A.    Correct.

11   Q.    Let me hand you a document that's marked for

12   identification Brown/Cole 105 and 106 and ask if you

13   can tell me whether that is also a document that you

14   prepared and submitted to the Delaware Department of

15   Labor?

16   A.    Yes, sir.

17   Q.    You talked about the fact that Jacquita Wright,

18   now Jacquita Wright-Henderson moved into Ann

19   Del Negro's former position; is that correct?  That's

20   in the third bullet point on the first page.

21   A.    As an acting person, yes.

22   Q.    And why did you note that move in updating your

23   discrimination complaint?

24   A.    Why did I note that?

1    Q.    Yes.

2    A.    Because I wanted just to update what was going

3    on because Jacquita moved up.  Ann moved out.  She was

4    on my complaint.  And Paul moved up.  He was on my

5    complaint.

6    Q.    Now, the fact that Jacquita Wright moved into

7    Ann Del Negro's position, you don't claim that that is

8    an act of discrimination on the part of the college,

9    do you?

10    A.    No.  I have never given that part much thought.

11    Q.    In fact, she's African-American, is she not?

12    A.    Yes, she is.

13    Q.    And you also note that Rosanna Brown-Simmons

14    took Paul Morris' position?

15    A.    She became acting.

16    Q.    What is her race?

17    A.    She is also African-American.  She was the

18    student enrichment coordinator like I was.

19    Q.    The program that you worked in, Upward Bound

20    Math/Science, was one program under an umbrella at the

21    college called Corporate and Community Programs; is

22    that correct?

23    A.    Yes, sir.

24    Q.    And focusing on the Corporate and Community

BRIGITTE L. BROWN

Page 30

1    Programs that were housed at the same campus that

2    you --

3        A.    Okay.

4        Q.    -- worked at, do you know what was the racial

5    composition of the employees in the corporate and

6    community programs?

7        A.    The employees in CCP?  I really don't know,

8    sir.  I know there was no African-American

9    administrators until after we filed our complaint and

10    Jacquita moved up.

11        Q.    And in the third paragraph on the first page of

12    the document, you talk about the fact that Jacquita

13    became acting program manager for Upward Bound

14    Math/Science?

15        A.    The second paragraph?  This one right here?

16        Q.    Yes.  Actually, I think it's the third, but I

17    won't quarrel with you.  That's the paragraph I am

18    talking about.

19        A.    Yes.  Jacquita became acting program manager

20    for Upward Bound.

21        Q.    And you had a problem with that?

22        A.    I didn't understand why they would put Jacquita

23    as an acting program manager for our program when I

24    was a coordinator, and in the way, just as Rosanna

BRIGITTE L. BROWN

Page 31

1    moved into an acting position, Jacquita moved into

2    acting program manager, and I -- I didn't understand

3    that because she had nothing to do with, really, our

4    TRIO program prior to September of '04 -- I mean

5    September of '03, when there was some more changes,

6    and, for some reason, Jacquita was over Upward Bound

7    where Paul was over all the other programs.

8            And then our program manager left, and the

9    next thing we know, they said Jacquita is going to be

10   acting program manager.

11   Q.   Would it be fair to say that as of the date of

12   this -- that you prepared this document, you had no

13   prior experience in managing employees?

14   A.   Oh, no.  I would not say that.  I --

15   Q.   Tell me about your prior experience as a

16   manager of employees.

17   A.   You said "managing."  I have been in the

18   program -- I managed the instructors.

19   Q.   Let's stop.  I said "managing employees."

20   Let's focus on my question.

21           Is it fair to say that prior to May of

22   2004, you had no prior experience managing employees?

23   A.   That's not true.  We managed summer programs.

24   We helped manage the youth care workers.  That's who

BRIGITTE L. BROWN

1    was called.  The youth care workers, even during the

2    summer program, Jacquita wasn't there, I was helping

3    manage the instructors.  I mean, that was our job.  We

4    were -- the youth care workers reported to us,

5    basically, when they needed things.  The tutors

6    reported to us when they needed things.  Ultimately,

7    it was the program manager who would ultimately say,

8    This is the way it is, but we managed the youth care

9    workers.

10    Q.    Did you evaluate them?

11    A.    No, we didn't.  They didn't -- they were part

12    time.  They didn't get evaluated.  Only the students

13    evaluated them.  No administrators.

14    Q.    Apart from that, what experience did you have

15    managing employees?

16    A.    Not -- I mean, from what I have done and my job

17    is just my little contractors and dealing with people,

18    I haven't had a job where I was a manager.  So,

19    that's, I mean, we managed -- I managed children.  I

20    was a teacher.  I managed people.  And compared to the

21    other coordinator who got the position for Upward

22    Bound Classic, she had less experience and she hadn't

23    managed, so I didn't believe -- I never saw that as a

24    problem.

BRIGITTE L. BROWN

1    Q.    The fact that Jacquita was placed in this

2    acting program manager position, you don't believe

3    that was an act of racial discrimination --

4    A.    Oh --

5    Q.    Can I finish my question, please?

6    A.    Sorry, sir.

7    Q.    -- on the part of the college?

8    A.    If you are asking me my personal belief?  My

9    personal belief is that Jacquita was the black woman

10    who was put over the black program.  My personal

11    belief is that if anything was going to happen or --

12    if anything was going to happen, the black woman would

13    do that.  That's my personal belief.  She would be the

14    one who would hire, fire.  She would be the one -- you

15    know, I am sorry to equate it to the slaves in the

16    field, but they always put the blacks over the slaves

17    in the field, and I am sorry to say, but that's how I

18    saw that.

19    Q.    So, are you saying, then, that the college

20    discriminated against white applicants because it

21    wanted to place an African-American person in that

22    position?

23    A.    I am not saying that.  I am just telling you my

24    personal beliefs on how I felt.

BRIGITTE L. BROWN

1    Q.    Do you feel that you were a victim of

2    discrimination on the basis of your race with respect

3    to the decision to put Jacquita in the acting program

4    manager position?

5    A.    I don't look at that as race.  I look at that

6    as retaliation on that part.  I see race and

7    retaliation.  Now, whether you want to join the two

8    because we complained it was a black program, then

9    yes.  But I see that as retaliation.

10    Q.    I am going to hand you a document that's marked

11    for identification Brown/Cole 111, and ask if you can

12    identify this document.

13    A.    Yes.  That's a doctor -- that's a letter from a

14    therapist that I had gone to, started seeing.

15    Q.    How many times did you see this therapist?

16    A.    This particular person, as far as just going to

17    talk, I went to her about three or four times.  My

18    doctor is the one who referred, and he is the one I

19    went to because he is the one who prescribed the

20    medication, and I went to him more often than I went

21    to Tamala, Dr. Walker.

22    Q.    When did you first go to Dr. Walker?

23    A.    I went to my regular doctor in October, and

24    Dr., he referred me to Dr. Walker and October 22nd is

BRIGITTE L. BROWN

Page 35

1    when I went to Dr. Walker.

2      Q.    And when is the last time you went to see

3    Dr. Walker?

4      A.    I am not sure as far as the last time I saw

5    her, particularly, because she ended up -- she ended

6    up leaving after a certain while and I think she went

7    down to Middletown at some point.  But probably --

8    probably in 2004.  I think it was 2004 is the last

9    time I --

10      Q.    So, and you went to see her for the first time

11    in October of 2002?

12      A.    Yes.

13      Q.    And the last time sometime in 2004?

14      A.    Yes.  I think so.

15      Q.    And you only visited with her a total of three

16    times?

17      A.    Three or four times, but I went to my doctor.

18    She -- the doctor is who prescribed the medicine.  She

19    was one I could talk to.  So I would go to my doctor

20    more often than to her.

21      Q.    Was there any other psychologist or

22    psychiatrist that you saw other than Dr. Walker?

23      A.    No.  It was not -- it was not -- just her.

24      Q.    Did she ever provide you with any reports

BRIGITTE L. BROWN

Page 36

1    concerning conclusions that she might have reached

2    about your condition?

3        A.    She didn't give it to me.  She put it in her

4    files.  She put anything that she wrote about my case

5    and how she felt in her file.  She did not give it to

6    me, just as my doctor don't give me his reports.

7        Q.    But you believe that she has reports in her

8    file?

9        A.    I believe she should.

10        Q.    And you believe that she --

11        A.    I believe that because I didn't see her more

12    often, that doctor -- my doctor -- what's his name --

13    that my doctor would be the one that has more

14    references, actually, of me coming.  Because I was

15    getting problems, I would get major headaches all the

16    time, so I was going to him.  I was getting certain

17    things in my head, little firings in my head.  You

18    know, he is just like, Calm down.  So I would go to

19    him more often than I went to Tamala.

20        Q.    And you don't recall your doctor's name?

21        A.    Yes.  Dr. Senu-Oke.

22        Q.    Dr. Senu-Oke.

23        A.    And it -- Dr. Senu-Oke and that group, yes,

24    because sometimes it wasn't him.  I would see another

BRIGITTE L. BROWN

1    doctor, and his name just -- it just got away from me.

2    I can't remember his name.

3    Q.    What was the first doctor you mentioned?

4    A.    Senu-Oke.

5    Q.    How do you spell that?

6    A.    S-e-n-u-O-k-e.

7    Q.    And what kind of doctor is he?  Is he an

8    internist?  A family doctor?

9    A.    He is a family doctor.  He is --

10   Q.    How long were you a patient of Dr. Senu-Oke's?

11   A.    Since June of 2001 until my insurance ran out.

12   Q.    When is the last time you saw him or someone in

13   his group?

14   A.    I saw him probably in May of 2005.

15   Q.    And can you tell me how often you saw him in

16   2002?

17   A.    I really can't tell you how often I went to

18   him.  I mean, there was -- I went to him -- I really

19   can't -- I really don't know.  I mean, he prescribed

20   medication for me, so that medication helped even

21   though I hated taking medication.

22   Q.    What medication did he prescribe?

23   A.    That gets away from me, too, but I think it was

24   Paxil, but -- I think it was Paxil.

BRIGITTE L. BROWN

Page 38

1    Q.    What else?

2    A.    That.

3    Q.    That's it?

4    A.    He has it.  I don't know the names of the

5    medication.  I really can't -- I really don't know.

6    Q.    Do you have records that tell you what the

7    names of the medication are?

8    A.    In his office, there is definitely records.  I

9    mean, I don't have records on me.

10    Q.    And can you tell me for what period of time you

11    were taking medication?

12    A.    Two and a half, three years.

13    Q.    Are you taking medication today?

14    A.    No.  I was one that didn't like medication, so,

15    you know, I -- I'd rather not take medication.  Since

16    I have left DelTech, I am not taking the medication.

17    By choice.

18    Q.    You may have answered this already, but what

19    problems or conditions did he treat you for?

20    A.    As far as my anxieties, my depression.  I got

21    very depressed.  I got very stressed.  I got very

22    anxious.  I would get headaches a lot.  I got really

23    weird things in my head, firings in my head.  I mean,

24    I had a physical, literally had a physical June of

BRIGITTE L. BROWN

Page 39

1   2001, and I was in A1 condition.

2            Since all this has happened, I feel I have

3   been diagnosed with thyroid problems and maybe

4   biopsies.  Stress causes a lot of things, and I am not

5   sure where all these problems that I have had prior to

6   that came from prior to before -- I mean before I went

7   -- since my move, since all this situation with

8   DelTech is what I mean.

9     Q.   What medical or psychological conditions were

10  you treated for prior to August of 2002?

11    A.   None.

12    Q.   Pardon me?

13    A.   None.

14    Q.   I am going to hand you a document that's marked

15  Brown/Cole 137.  Did you author that document?

16    A.   Yes.  I wrote it.

17    Q.   At the bottom, there is as handwritten note

18  that says, "Never sent to Mr. Miller"; do you see

19  that?

20    A.   Yes, sir.

21    Q.   Is that your handwriting?

22    A.   Yes.

23    Q.   Pardon me?

24    A.   Yes.

BRIGITTE L. BROWN

Page 40

1    Q.    So, was this or was this not sent to

2  Mr. Miller?

3    A.    No.   It was sent back to me.   My original was

4  sent back to me.   And Dr. Sue Zawislak said it had no

5  interest in the college, so she didn't recommend it so

6  she wasn't sending it on, so she didn't send it to

7  Mr. Miller.   But when I wrote to Mr. Miller, when he

8  wrote to us about our retaliation that Mr. Cole had

9  submitted and wanted us to send him a letter, this was

10 one of the things I sent to him and said, This is even

11 one of the incidents, that I sent you this and it

12 never even made it to you.   So, he ultimately saw

13 that.

14   Q.    It has a date stamp of September 3, 2002, up in

15 the right-hand corner; do you see that?

16   A.    Yes.

17   Q.    That's when it was received by you?

18   A.    No, by CCP.   It went to Sue Zawislak's office.

19   Q.    So, does that -- you prepared this, it's not

20 dated, but would it be fair to say that you prepared

21 this sometime in early September 2002?

22   A.    Yes, sir.

23   Q.    Yes?

24   A.    Yes.