BRIGITTE L. BROWN

Page 41

1    Q.    You say that, "I am a single mother of four

2    children with three small children in elementary

3    school."

4              You mention in that that you were married

5    to Don Evans.  Were you not married to him --

6    A.    I wasn't with Donald Evans at that time.  We

7    were not together.  We had broken up in like 1998.

8    Q.    And you had, as of the date of this letter, you

9    had four children?

10   A.    Mm-hmm.  Yes, sir.

11   Q.    And what were their ages?

12   A.    I had one that was five, that was seven, that

13   was eight, and ten.

14   Q.    I am placing before you a document that's

15   marked for identification Brown/Cole 138, and ask you

16   to -- if you can identify that document?

17   A.    Okay.

18   Q.    Did you receive that?

19   A.    Yes.  This is when I submitted my letter for

20   Mr. Miller, to go to Mr. Miller, Dr. Sue Zawislak took

21   my letter, received the letter, and she didn't send it

22   to Mr. -- this was just her way of saying her reason

23   of why she didn't send it on to Mr. Miller.

24   Q.    Did you understand, in fact, that the normal

BRIGITTE L. BROWN

1    working hours of the college, at your campus, was 8:30

2    to 4:30?

3        A.    I understood it completely, but Sue Zawislak

4    had already authorized our secretary to come in from

5    nine to five and she had authorized that and had been

6    -- and my secretary had been doing that for years.

7    There was other people at the college coming in at

8    different times.

9        Q.    And you don't know whether, in those cases,

10    there was a determination made that the modification

11    of work hours was in the best interest of the college

12    as opposed to the best interest of the employee?

13        A.    Our secretary was strictly personal.  It wasn't

14    her -- her reason for working nine to five was because

15    she helped her mother, who had a stroke.

16        Q.    But you weren't involved in approving that

17    change in work hours?

18        A.    Oh, no.  Dr. Zawislak did that.

19        Q.    I am going to hand you a document that's

20    identified as Brown/Cole 143 and 144.  Now, first of

21    all, this is -- this is something you prepared?

22        A.    Correct.  I was asked to.

23        Q.    In the first paragraph, say that, On August 12,

24    2002, it was brought to our attention that a move was

BRIGITTE L. BROWN

1    scheduled for your Upward Bound Math/Science program;

2    is that correct?

3    A.    Yes.

4    Q.    So, that's when you knew that that decision was

5    made to the program?

6    A.    Actually, this was written the day before we

7    moved.

8    Q.    But you knew as of August 12 that there was a

9    decision made to move you into 408?

10   A.    I knew there was a preliminary decision, yes, a

11   vision, Paul's vision.  He took us in the room and

12   said he had a vision that all TRIO programs be

13   together, and that was his vision, and -- so we knew

14   it that day.

15   Q.    And you have a list here of issues that you

16   were presenting as of October 7th, 2002.

17   A.    Yes, sir.

18   Q.    And you talked about employee relations being

19   affected; is that correct?

20   A.    Yes, sir.

21   Q.    And employee moral?

22   A.    Yes, sir.

23   Q.    And employee productivity?

24   A.    Yes, sir.

BRIGITTE L. BROWN

1    Q.    You don't mention race in this document; isn't

2    that correct?

3    A.    That's correct, in this document.  As I stated

4    before, she told me she was going to have a meeting

5    with me within a week.  That's where I would have

6    verbally spoke to her about it.

7    Q.    The college offered to erect cubicles in Room

8    408, did it not?

9    A.    I don't know.  We asked for cubicles.  We

10   begged for cubicles.  I don't know whatever happened

11   because we just needed space.  Even though you look at

12   the room, it didn't seem like it could be put in

13   there, but we asked for cubicles.

14   Q.    Did you ever put that request in writing?

15   A.    No.  We told Paul Morris at that meeting on

16   April 12th if we could have cubicles.

17   Q.    Who else did you make that request to?

18   A.    Paul was the one, it was his vision.  He was

19   the one who put us there.  Right after that meeting,

20   he said we could see the room.  And we all went to see

21   the room because we all stated at that meeting, Well,

22   if we got to move, we don't have a problem with

23   moving.  We looked at the room and we could not

24   believe that that was the room they were going to put

BRIGITTE L. BROWN

Page 45

1    our entire federal program in.  And all those issues

2    were with Paul at that time.

3        Q.   You didn't make that request to anybody other

4    than Paul?

5        A.   I don't think -- to my program manager.

6    That's, you know, we were coordinators.  We had upper

7    level, so I am sure we made that request to our

8    program manager.  We made it to Paul.  But it almost

9    seems like they said we couldn't get petitions because

10   of the grant.  It wasn't part of the grant.

11       Q.   Who said that?

12       A.   It seems like Paul said it.  Paul was the one

13   that was dealing with us.

14       Q.   I am going to hand you a document marked

15   Brown/Cole 146.

16       A.   Yes, sir.

17       Q.   Did you prepare that document?

18       A.   Yes, this is the answer, that's right, that she

19   asked me that I need to have by 10/15 because she had

20   written me back from this letter that was dated

21   October 7th.

22       Q.   And this memo doesn't talk about race either,

23   does it?

24       A.   No.  Those weren't her specific questions.  She

BRIGITTE L. BROWN

Page 46

1    wanted to know the things that I outlined in my letter

2    so it wouldn't have been the time.  Again, the week

3    later that I had my meeting with her, that would have

4    been the time I would have presented.

5    Q.   I am handing you a document identified as

6    Brown/Cole 161 and 162.

7          Is that a memo you prepared and sent to

8    Mr. Miller?

9    A.   Yes, sir.  This also, I think, because --

10    Mr. Miller sent a letter to Liz Wilson and myself

11    saying that Ken had said there was retaliation, a

12    supplement to his grievance or something, and to

13    answer those allegations.

14    Q.   Now, at the bottom of the page, and perhaps

15    elsewhere in -- well, in a couple places in the

16    document, several places, you talked about retaliatory

17    action, it's at the end of numbered paragraph one, at

18    the very bottom of the page, at the end of paragraph

19    two, actually, as well.

20          Up until this point of October 15th, 2002,

21    you had not complained about discrimination on the

22    basis of race; isn't that correct?

23    A.   Up until this -- up until this point?

24    Q.   Yes.

BRIGITTE L. BROWN

1    A.    I didn't come right out and say, "This is a

2    black and white issue," no, I did not.  But I alluded

3    to the fact.

4    Q.    How did you allude to the fact?

5    A.    Basically letting them know that Upward Bound

6    was an all black program and we are feeling punished.

7    I mean, just all the words.  I mean -- and I believe,

8    really, that I -- what we need to discuss was for

9    upper administration, which was Connie Winners and

10   Larry Miller.  I mean, all this -- a lot of -- I

11   looked at it that there was no checks and balances

12   because we even sent this letter saying there was

13   retaliation happening, and -- and situations and even

14   this other issue, but we never heard from these people

15   again.

16   Q.    Would it be fair to say that your program

17   manager, Rose Henderson, gave you a lot of

18   flexibility?

19   A.    I think all the programs had flexibility.  I am

20   not sure what you mean by that.  But I think everybody

21   had flexibility.

22   Q.    Were you aware of the fact that the Federal

23   Government conducted audits of the programs it funded?

24   A.    Yes.

BRIGITTE L. BROWN

1    Q.    And were you aware of the fact that there were

2    a number of exceptions or problems with the audit of

3    your particular program during the time that Rose

4    Henderson was program manager?

5    A.    No.

6    Q.    You weren't aware of that?

7    A.    No.  I remember one time they had -- they did

8    an audit and there was some numbers came back.  And it

9    was numbers for our campus, it was numbers for campus

10   -- all DelTech's, Owens campus, all the different

11   campuses and it was just showing the different things,

12   Well, maybe this wasn't signed, this wasn't signed,

13   but I really never saw anything that was any -- of any

14   significance, no.

15           I wasn't aware of anything of any great

16   significance dealing with the audit.  I know there was

17   some -- like, we had to use some tax forms and I think

18   the tax forms that was given to us to use one time was

19   like the wrong form from a different year, and things

20   like that.

21   Q.    Were you privy to all of the feedback that the

22   auditors provided the college?

23   A.    No.  Not to my knowledge.  They -- they

24   eventually sent something on the Internet, but I am

BRIGITTE L. BROWN

1    not -- I don't know how much of that information.

2      Q.    I am handing you a document that is marked for

3    identification Brown/Cole 165.  Again, this was among

4    documents produced by your counsel.  Is this your

5    handwriting?

6      A.    Yes, it is.

7      Q.    This appears to be maybe a part of a larger --

8    a document that included additional pages.

9            Do you know what it is from?

10     A.    No.  This was just something off the Internet

11   and the LAN.  This had nothing to do with any other

12   pages.

13     Q.    So, you printed this off the Internet, you

14   think?

15     A.    Yes.

16     Q.    And at the end of the first paragraph, right

17   before you wrote the word "false"?

18     A.    Mm-hmm.

19     Q.    It talks about the fact that other TRIO

20   programs chose to divide their space utilizing

21   petitions, Upward Bound Math/Science did not; do you

22   see that?

23     A.    I see that.

24     Q.    And it's your claim that that's false?

BRIGITTE L. BROWN

1    A.    Yes.

2    Q.    And you have put a footnote, it looks like

3    there is an asterisk, and then at the bottom, next to

4    another asterisk, it says "room too small."  What does

5    that mean, room too small for cubicles?

6    A.    The way the room was set up at that time when

7    we was in there, it didn't look like there was any

8    possible way for a cubicle, so I am saying room is too

9    small for cubicles.

10   Q.    So, it's your position that cubicles were not

11   offered to you, but it wouldn't have mattered because

12   the room was too small for them anyway?

13   A.    No.

14   Q.    I am just trying to understand here.

15   A.    That's not my position.

16   Q.    I am trying to understand your note here.

17   A.    All I wanted to do was be treated fairly.  When

18   I came up -- when I started at the college, everybody

19   already had their spaces.  The programs, they already

20   had their cubicles.  I don't know who put their

21   cubicles there.  They were already established and

22   they were already there.

23          Then Mr. Morris said that we were going to

24   go in this room.  We asked about partitions.  We

BRIGITTE L. BROWN

1    looked at the room as like, How in the world are

2    partitions going to be put into this room?  But the

3    only thing I wanted to do was be treated fairly and

4    have the same things that anybody else had.  If I

5    needed, if it was a cubicle, then it was a cubicle.

6    But I wasn't -- I don't know why we never got cubicles

7    because we definitely asked, and I know for a fact we

8    asked Mr. Morris at that meeting for cubicles.

9    Q.   Why did you write "room too small"?

10    A.   Because the room was too small.

11    Q.   For cubicles?

12    A.   That's just my opinion.

13    Q.   That's all I am trying to get.  I am handing

14    you a document identified as Brown/Cole 172.

15         Did you prepare this document?

16    A.   Just a minute.  Yes, I did.

17    Q.   What is the date on the bottom?

18    A.   2/8, 2005.

19    Q.   Now, which transfer are you complaining about

20    in this document?

21    A.   Again, this grievance -- Andrea Coleman's

22    transfer.  Andrea Coleman was a student enrichment

23    coordinator that came in to DelTech after I did.  She

24    came about five months after I did.  Andrea Coleman

BRIGITTE L. BROWN

1    had -- had applied for her program manager's position

2    after her former program manager left.  Andrea Coleman

3    did not get her program manager's position.  Angi

4    McCloskey did over Andrea Coleman.

5              Andrea Coleman had a contract with their

6    special grant funding, it was running out, they needed

7    someone for camp program manager.  They gave her a

8    position of a camp program manager.

9              Andrea Coleman was on my -- was on my

10   interviewing committee.  Again, not only did she come

11   in after me, she didn't get program manager's position

12   for Upward Bound, she was on my committee, and they

13   made her my program manager.

14             I was the one who had been there.  I was

15   the one with the knowledge, especially over Andrea as

16   far as the program, how the program worked, and I just

17   didn't feel that was fair, so I filed a grievance.

18   And the only way I could file a grievance was as far

19   as according to policy.  So --

20   Q.    What is Andrea Coleman's race?

21   A.    She is black.

22   Q.    Now, was there more than one posting for the

23   program manager?

24   A.    There was three postings.

BRIGITTE L. BROWN

1    Q.    And you were not an applicant for the third

2    posting?

3    A.    No, I was not.  But Andrea Coleman never

4    applied for the program manager's position.

5    Q.    I am handing you a document that's identified

6    Brown/Cole 193 through 204.

7              Did you prepare this document?

8    A.    Yes, sir.

9    Q.    For what purpose did you prepare it?

10   A.    This was my complaint with the Department of

11   Labor, I believe.

12   Q.    Do you remember when it was prepared?

13   A.    I think in November.  This is when I filed,

14   November 8th, this is what I used.

15   Q.    So, this is what you initially submitted to the

16   Department of Labor, and then, ultimately, it was

17   reduced to the charge of discrimination?  Is that my

18   understanding correctly?

19   A.    I don't understand that question.

20   Q.    I asked you earlier about the charge of

21   discrimination that -- the formal charge on your

22   form --

23   A.    Yes.

24   Q.    -- the document, Delaware Department of Labor's

BRIGITTE L. BROWN

1    form?

2        A.    Yes.

3        Q.    Was this submitted prior to the preparation of

4    the charge of discrimination?

5        A.    No.  Along with it.

6        Q.    And did you provide this to anyone other than

7    the Delaware Department of Labor?

8        A.    No.  That's who I was -- that's the only person

9    I was dealing with, people I was dealing with.

10        Q.    I asked you earlier about what you were told by

11    Paul Morris on August 12th.  If you could turn to

12    page 3.

13        A.    Mm-hmm.

14        Q.    Sub paragraph D.

15        A.    Yes.

16        Q.    It talks about August 12th and the fact that

17    Paul Morris met with the UBMS Group; do you see that?

18        A.    Yes, sir.

19        Q.    And at the end, it says "Paul stated to the

20    group that the move had already been approved"; do you

21    see that?

22        A.    Yes, sir.

23        Q.    So, in fact, that's what he told you on August

24    12th, 2002?

BRIGITTE L. BROWN

Page 55

1    A.    Yes.

2    Q.    On the next page, page 4, sub paragraph H.

3    A.    Yes.

4    Q.    You say that on August 13, 2002, the UBMS Team,

5    apparently, had a discussion.  And then you say,

6    quote, We talked about how we were being unfairly

7    treated and believed that we were being discriminated

8    against because of race.

9    A.    Yes.

10   Q.    "Liz Wilson and I did not want to go to upper

11   management with race issues in fear of retaliation";

12   do you see that?

13   A.    Yes, sir.

14   Q.    And, in fact, you didn't go -- you did not go

15   to upper management with race issues until you filed

16   the charge of discrimination?

17   A.    But I would have gone if they would have got in

18   touch with me.

19   Q.    But you didn't?

20   A.    Excuse me?

21   Q.    But my statement is correct, you did not go to

22   upper management with race issues until you filed the

23   charge of discrimination in November?

24   A.    Correct.  And please understand, upper

BRIGITTE L. BROWN

1    management is also Paul and also Ann and also Sue at

2    that time.

3        Q.    Now, on page 5, sub paragraph L, you talk about

4    the fact that the To The Max program had been located

5    in Room 408E?

6        A.    Yes.

7        Q.    And is it your understanding that the To The

8    Max program lost federal funding?

9        A.    Yes.

10        Q.    As of July of 2002?

11        A.    I am not sure exactly the date of when they

12    lost their funding.  All we heard is they had lost

13    their funding prior to -- they had lost their funding

14    prior to that, prior to the move.  Way prior to the

15    move, come to think of it.

16        Q.    Now, when the To The Max program was located in

17    Room 408E -- and I have been saying 408, we are

18    talking about the same place, aren't we?

19        A.    We understand, yes.

20        Q.    They had a total of four people in 408, the

21    little side office for the program manager, and then

22    three people in the larger room where you were

23    located?

24        A.    Yeah.  It's really hard to do it that way

BRIGITTE L. BROWN

Page 57

1    because I see it as two offices because they are two

2    offices.  So, 408E, and whatever that other one, 408A

3    or whatever, that's one separate office, one person

4    there.

5              To The Max was up in 408E.  They had been

6    there.  Prior to that was Ann Del Negro's office,

7    private office.  To The Max had come up there -- I am

8    not even sure of that program, but I know that they

9    had, you know, two coordinators, two black

10   coordinators, and a roving, roaming secretary.

11   Q.   So, on the same room that you were located in

12   after the October of 2002 move, there were -- when To

13   The Max was there, they had two full-time

14   coordinators?

15   A.   Two full-time black coordinators.

16   Q.   And a secretary?

17   A.   The secretary wasn't always there.  She had

18   another office.  It's a fact, in the directory, it

19   shows that Cathy Hagan had two offices.  So, she

20   wasn't in that office always.  In the directory, it

21   shows that Cathy Hagan had Room 408 and also 125.

22   Q.   I think you mentioned earlier that you kept the

23   door closed to the office most of the time?

24   A.   Most of the time because it was humiliating.

BRIGITTE L. BROWN

Page 58

1    Q.   On page 9, at that sub paragraph I at the top

2   of the page, we talked about this earlier, but you

3   talk about the TRIO achievement awards, and that was,

4   in order to be eligible, you had to be an alumnus of

5   the TRIO program?

6    A.   Yes, sir.

7    Q.   On that same page, under the heading,

8   "Conclusion," paragraph B.

9    A.   Yes.

10    Q.   These acts of upper management that you talked

11  about, talk about there, it is your position, is it

12  not, that that started to happen immediately after

13  there were complaints about the move?

14    A.   When we saw -- when we met with Paul on the

15  12th, we saw that office -- when we saw that office

16  and we met together, we couldn't believe it.  We

17  really couldn't believe it.  At that point, we were

18  trying to say, Okay, let's not what we think it is,

19  and let's have a meeting.

20         We had a meeting with Paul.  We had a

21  meeting with Ann together.  At that point, Ann and

22  Paul -- basically, there is nothing that we heard that

23  would stop the move.  And it's like we would go to

24  them, but then, all of a sudden, they were the ones

BRIGITTE L. BROWN

1    that started retaliating against us, which I say the

2    retaliation started more in the end of August,

3    beginning of September.

4    Q.   I am sorry for skipping around, I don't mean to

5    confuse you, but if you go back to the first page.

6    A.   Yes, sir.

7    Q.   The end of the first paragraph, you talk about

8    the fact that, "It is apparent that there had been and

9    continues to be a systematic removal of qualified

10   minority employees within CCP that have been replaced

11   with Caucasian counterparts."

12             Which qualified minority employees are you

13   referring to?

14   A.   There was one Gene Barnes, who was a program

15   manager, black manager for one of the TRIO programs,

16   replaced with a white female.  There was one Charles

17   Madden, a black program manager, replaced with another

18   white female.  There was a student enrichment program

19   coordinator who was part time who applied for the job

20   for Upward Bound Classic who was replaced with a white

21   female.  And there is just other history there.

22   Q.   When does the Gene Barnes' situation occur?

23   A.   Those happened right before I got there, so I

24   can't tell you the date.

BRIGITTE L. BROWN

1    Q.   So this all predates your arrival at the

2    college?

3    A.   The systematic, yes.

4    Q.   And those are the people that you are referring

5    to, the ones that you have mentioned to me?

6    A.   Yes.  There is history there.

7    Q.   Anybody else that you are referring to when you

8    talk about removal of qualified minority employees?

9    A.   I am thinking.  Basically.

10   Q.   Now, at the bottom of that page, sub paragraph

11   B, you talk about your belief that the reasons and

12   motives for the move was due to Kate Sullivan and her

13   issues with Tonia Conley?

14   A.   Yes.

15   Q.   Isn't it fair to say that you are speculating

16   about what motivated those decisions?

17   A.   Yes.

18   Q.   Yes?

19   A.   Yes.  There was constant turmoil between Kate

20   Sullivan and Tonia.  And Paul and Kate were always in

21   conference together about the situation.  The next

22   thing you know, Upward Bound Math/Science was the one

23   who was impacted due to Kate and Tonia.  And prior to

24   that, a year prior to that, we had almost been

BRIGITTE L. BROWN

Page 61

1   impacted again when they want to flip-flop our

2   offices.

3       Q.   I am going to hand you a document identified

4   Brown/Cole 205.   Is this another update that you

5   prepared for the Delaware Department of Labor?

6       A.   Yes.

7       Q.   And it was prepared on or about February 1,

8   2005?

9       A.   Yes.   I am sure I prepared this for the simple

10  fact I continued to update on my case and now I had an

11  issue because of Andrea Coleman coming in and I

12  probably was -- and other things.

13      Q.   What was Andrea Coleman's experience in

14  managing employees?

15      A.   I don't know.   She wasn't -- she worked in high

16  school.   She came as a coordinator.   And in September

17  -- excuse me.   In -- well, August of 2003, when her

18  grant ran out, she was part of a granted, special

19  supplemental grant program with Upward Bound Classic.

20              They -- she interviewed for the Upward

21  Bound manager's program.   She did not receive that

22  manager's position.   They saw Andrea and said,

23  basically, you know, we could probably use her over at

24  the camps.   And that's how -- they put her in that

BRIGITTE L. BROWN

Page 62

1    position.  I don't know exactly what she did in that

2    camp.  I know she had children.  I don't know how many

3    -- she probably did youth workers and stuff like we

4    did, but I am not sure as far as her responsibilities.

5        Q.    You didn't review her qualifications or her

6    resume?

7        A.    No, I didn't have to.

8        Q.    Did you contact the fire marshal about Room

9    408?

10       A.    I never called the fire marshal's office.  I

11   was talking to my now fiancee's father who just

12   happens to be a State Fire Marshal.  I was over his

13   house and I was talking about our situation.  He comes

14   up here.  He inspects different facilities.  And he

15   was in the area and he came in, stopped in.

16       Q.    What was the result of the inspection?

17       A.    I don't know.  He looked at it and sent it on

18   to Wilmington Fire Department.

19       Q.    Are you aware of the fact that the Wilmington

20   Fire Department inspected the room and determined that

21   there was no violation?

22       A.    I am aware of that, but I do not -- I could

23   argue with that.  They came in.  Right after they, did

24   they started putting sockets in our office.  They

BRIGITTE L. BROWN

Page 63

1  start putting -- covering the wires up.  They made

2  changes.  If it did nothing, it made changes.  It gave

3  us a couple more wall sockets, which we only had two

4  in our entire office, and even after they put another

5  wall socket in, when we turn our little space heater,

6  because we had space heaters, it would get cold, we

7  would blow out the circuit, and we were always, in the

8  wintertime, calling maintenance to turn the circuits

9  back on.

10     Q.    You had a computer in the room?

11     A.    Yes.

12     Q.    And a desk and a chair?

13     A.    Yes, file cabinet and a couple chairs and

14  desks.

15     Q.    Fax machine?

16     A.    Bookshelf.  There was a fax machine in the

17  other room, yes.

18     Q.    Right in the adjacent room?

19     A.    Where the program manager was had the fax

20  machine.

21     Q.    Did you have equipment similar to the equipment

22  that other TRIO employees had?

23     A.    Yes, I did.  Maybe a little more computer

24  equipment.

BRIGITTE L. BROWN

Page 64

1    Q.   The room that you occupied after the October

2    2002 move was heated and cooled and ventilated the

3    same way other rooms were?

4    A.   I don't know.  It was terrible as far as the

5    heating and the cooling.  It was extremely cold one --

6    in the wintertime and it was extremely hot.  It just

7    changes temperatures.  Mr. Cole was always covering

8    the vents or taking it down because it was either too

9    much or too little.  It was uncomfortable in there.

10   Q.   And you don't know whether that was any

11   different than other similar rooms occupied by TRIO

12   employees?

13   A.   No.  It wasn't like that in my last office,

14   and, no, I don't.  We were in the -- I never noticed

15   it in any other offices, so --

16   Q.   You had adequate lighting?

17   A.   Yes, we did.  I turned my fluorescent -- it was

18   a fluorescent light right over my desk that I had them

19   undo the bulbs because the lighting was making my head

20   hurt.  I couldn't even concentrate.  So once they

21   turned that lighting off right over my desk, it helped

22   a little more because I had direct sunlight also

23   coming in.

24   Q.   And you mentioned in previous testimony that

BRIGITTE L. BROWN

Page 65

1    the space was previously occupied as an office by the

2    To The Max program and then the SOAR program?

3    A.    Yes.    When it became SOAR, it was only one

4    coordinator in there.    It had been there -- see, you

5    got to find out when To The Max and SOAR became who

6    they are.    They lost their funding, To The Max, and

7    then SOAR became SOAR.    They got rid of one of their

8    coordinators and they maintained that office for a

9    good another, I guess, seven to nine months.

10    Q.    The space where you were housed was accessible

11    by two doors?

12                MS. BREWINGTON:    Are we talking about the

13    current space, the new space?

14    BY MR. WILLIAMS:

15    Q.    The space you moved into in October of 2002?

16    A.    It was accessible -- there was one door to go

17    outside and then one door to go into the other little

18    office.

19    Q.    As of 2002, you were aware, were you not, that

20    the college had some space issues; in fact, another

21    building was in the process of being built?

22    A.    Space -- no.

23    Q.    Pardon me?

24    A.    No.

BRIGITTE L. BROWN

Page 66

1    Q.    You weren't aware of any --

2    A.    Any space issues?

3    Q.    Yes.

4    A.    I know, you know, I mean, just with any

5    facility or anything like that, you are constantly

6    moving and constantly changing.  If you are saying

7    that, yes.  But anything specific, no.  I remember in

8    an employee meeting, Mr. Miller was saying that they

9    wanted to some more building on Stanton.  That's all I

10   ever heard about it was at that meeting.  So I don't

11   really know anything.

12   Q.    Just so we are clear, though, this was -- this

13   wasn't -- you weren't sitting out in the hallway or at

14   the end of a hallway?  You were in an office area?

15   A.    We were inside, yeah, a room, yes.

16   Q.    And not too long before you moved, as I

17   understand it, some new furniture was secured for the

18   Upward Bound Math/Science program?

19   A.    It was before we moved.  It was probably a year

20   prior or more.

21   Q.    I understand that you believe that Room 408 was

22   not a comfortable place to work?

23   A.    Yes.

24   Q.    Is that correct?

BRIGITTE L. BROWN

Page 67

1    A.    At the state it was in with all the people and

2    the situation, yes, sir.

3    Q.    And --

4    A.    It was more than just uncomfortable.  It was

5    humiliating.

6    Q.    And are you aware that other employees have

7    worked in Room 408 without complaining?

8    A.    I understand that two black employees were in

9    there and I understand that they didn't complain.  A

10   lot of people don't complain.  I understand before

11   they were in there, it was Ann Del Negro's single

12   office.  So, when they put the To The Max program

13   there anyway, in my head and my personal thoughts, I

14   was like, Wow.

15   Q.    There was a secretary assigned to the program

16   before the move?

17   A.    Which program?

18   Q.    To your program?

19   A.    Well, we didn't have an assigned -- we had a

20   secretary.

21   Q.    Yes.

22   A.    Yes.

23   Q.    And you continued to have a secretary after the

24   move in October?

BRIGITTE L. BROWN

1    A.    Yes.

2    Q.    2002?

3    A.    Yes, full time.

4    Q.    And I think I asked you earlier about the fact

5    that you didn't lose any salary or benefits after the

6    move?

7    A.    No, I didn't.

8    Q.    And your title remained the same?

9    A.    Yes, sir.

10   Q.    Your responsibilities remained the same?

11   A.    Yes.

12   Q.    Were you ever disciplined during your -- I am

13   sorry.

14   A.    When you say my responsibility, I just wanted

15   to add, yes, up to a point.  I had more responsibility

16   that was not on paper when our program manager left

17   and Jacquita became acting program manager, but she

18   was running CCP.  She wasn't really running Upper

19   Bound Math/Science, so, not on paper, written, but I

20   did end up having more responsibilities.

21          I conducted all the faculty meetings each

22   week, and, you know, maintained all the faculty, make

23   sure they have anything ordered, all the supplies.

24   So, I did a little more during that time.

BRIGITTE L. BROWN

Page 69

1    Q.   But no responsibilities were taken away?

2    A.   None was taken away, no.

3    Q.   I started to ask whether, during your

4    employment by the college, you were ever disciplined?

5    A.   No.

6              MR. WILLIAMS:   Do you want to take a break

7    for five minutes?

8              (Recess taken.)

9    BY MR. WILLIAMS:

10   Q.   Have you seen a document called the Fiscal Year

11   1999 Achievement Report of Delaware Tech. for the

12   corporate and community programs division for the

13   Stanton/Wilmington campus?

14   A.   I am not sure.  I may, but I can't recall.

15   Q.   I am going to place before you a copy of the

16   complaint that was filed in this lawsuit, and because

17   it doesn't have any identifying numbers on it, perhaps

18   we ought to mark this as a deposition exhibit.

19             (Brown Exhibit No. 1 entitled "Complaint"

20   was marked for identification.)

21   BY MR. WILLIAMS:

22   Q.   I represent to you that this is a copy of the

23   complaint that was filed in this lawsuit --

24   A.   Yes.

BRIGITTE L. BROWN

Page 70

```
 1     Q.    -- on your behalf.

 2           Did you review the complaint before it was

 3     filed?

 4     A.    Yes, sir.

 5     Q.    And is it accurate, to the best of your

 6     knowledge?

 7     A.    To the best of my knowledge.

 8     Q.    Did I give you a highlighted version of it?

 9           MS. BREWINGTON:  No.  This is my own.

10     BY MR. WILLIAMS:

11     Q.    You have talked about this, perhaps, a couple

12     times.

13     A.    Okay.

14     Q.    But in paragraph 15, it is alleged that, On or

15     about August 12, 2002, Paul Morris met with you and

16     other members of the department and informed you that

17     he made a decision to relocate the program; do you see

18     that?

19     A.    Yes.

20     Q.    And you would agree with that statement?

21     A.    Yes.

22     Q.    And then paragraph 21 talks about a meeting

23     which occurred on or about August 29th with Ann

24     Del Negro and Paul Morris; do you see that?
```

BRIGITTE L. BROWN

1    A.    Yes.

2    Q.    And the second sentence, "The group tried to

3    explain that the proposed move would affect employee

4    relations, morale, and productivity, not to mention,

5    the small space would make it extremely difficult to

6    protect students' privacy."

7              Was that a fair summary of what was

8    presented by the group at that meeting?

9    A.    Yes.  On a small scale.  There was more.

10    Q.    What else?

11    A.    I mean, we had issues about Kate and Tonia,

12    what precipitated the move.  That was -- that went on

13    for a while because our secretary was very adamant

14    about what triggered all this and why were we being

15    affected.  So, I mean, we -- we definitely said all

16    these things in the meeting, but we also had other

17    items that we covered, yeah.

18    Q.    Anything else?

19    A.    I am sure there is more, but I can't remember

20    the entire meeting.

21    Q.    Nothing else you remember at this point?

22    A.    Just explained about the room, the move, the

23    size, productivity, just things like that.

24    Q.    And in paragraph 22, you talk about the fact

BRIGITTE L. BROWN

Page 72

1    that you were being forced to move into Ann

2    Del Negro's former single office.  I think we have

3    already talked about the fact that To The Max had two

4    full-time coordinators and a secretary in that same

5    room you occupied at least on a part-time basis?

6    A.    Correct, blacks.

7    Q.    Paragraph 33 says that on September 5th,

8    Mr. Cole informed you that he filed a grievance

9    regarding the Paul Morris promotion?

10    A.    Yes.

11    Q.    Did he show you the grievance?

12    A.    No.

13    Q.    What did he tell you about the grievance?

14    A.    He just told me according to the 1965

15    Affirmative Action, that that should have been posted

16    and he should have had a chance to apply for that

17    position.

18    Q.    That, as a matter of policy, it should have

19    been posted?

20    A.    I think.

21    Q.    Is that your understanding?

22    A.    Yes.  That if he was promoted to a -- if he was

23    promoted, then that, since it was a state position, it

24    should have been posted.

BRIGITTE L. BROWN

Page 73

1    Q.    Did you ever review the grievance?

2    A.    Ken's, no.  I never looked at Ken's grievance.

3    Q.    You have never seen it?

4    A.    No.

5    Q.    So, all you know about that grievance is what

6    he told you?

7    A.    Yes.

8    Q.    In paragraph 34, you talk about the individual

9    meetings, and I -- first of all, the individual

10   meetings are, that you are referring to, I believe,

11   are a series of meetings that you had in August,

12   September, and October with upper management about the

13   move?

14   A.    It was just one day, it was in September, out

15   of the clear blue sky, I got a call saying Sue

16   Zawislak wants to meet with you, her and Ann, and be

17   in her office in five minutes when -- concerning a

18   move.  When we went -- when I went down there, because

19   I went first, the secretary went next, and Ken, I

20   think, was the next day, I was in there for about

21   two-and-a-half hours.  We had gone over, I mean, I --

22   I had the alternative, I told her everything, how I

23   was feeling.

24              All my words got turned around.  When I

1    was talking to her, she would turn my words around.

2    She wanted to know who put me up to this.  Did my

3    program manager put me up to this?  And everything I

4    said, it was just like she would turn around, turn my

5    words around, so it just was very, very difficult in

6    that meeting trying to get to anything.  So, "Oh, what

7    I am hearing is that," and that's what she kept doing

8    through the whole thing.

9          Even when I said to her, like, you know, I

10    -- I showed her alternatives, and I said, Well, our

11    program manager -- and I had a color copy -- I said,

12    The program manager could actually have the row down

13    here, program managers, especially since you already

14    have two program managers there, and she says, Well,

15    who would occupy these offices?  I said, Well, it

16    doesn't matter.  Then there is two coordinators and a

17    secretary.  I said, Maybe the secretary could have

18    that single office.  Then she is like, Secretaries

19    don't have single offices.  And I told her, I said,

20    Cathy Hagan had that single office.  She was a

21    secretary.  Then she acted like she never heard that

22    before and asked Ann to write it down.

23          So that's the kind of stuff I was going

24    through.  It wasn't -- I would not call it a

BRIGITTE L. BROWN

Page 75

1    professional meeting.  It was -- it was, to me, more

2    like a witch hunt because, I mean, we had valid, valid

3    issues, but she just acted like it was nothing.

4        Q.    Before the move in October of 2002, you were in

5    a small, single office?

6        A.    Mm-hmm.

7        Q.    Is that correct?

8        A.    That's correct.

9        Q.    And was it on the fourth floor?

10       A.    Yes, sir.

11       Q.    But it was a round -- you have kind of called

12   it a square?

13       A.    Yes.

14       Q.    With a courtyard in the middle?

15       A.    Yes.  I guess you could --

16       Q.    And where was your program manager's office?

17       A.    Two doors up.  Two doors up.

18       Q.    And you were towards the end of a hallway?

19   Your office was towards the end of the hallway?

20       A.    Yes.  Ken's office was on the corner.  My

21   office was next to him.  There was classic program

22   managers, there was a classic person, enrichment

23   coordinator, and there was my program manager.

24   (Indicating.)

BRIGITTE L. BROWN

1    Q.    And I have seen the office.  Would you agree

2    that it was a very small office?

3    A.    Yes.  I agree it was small.

4    Q.    When was the last time a Delaware Tech. student

5    made any kind of negative comment when walking by?

6    A.    I heard it early on when we got in there.

7    Q.    You didn't hear it in the later years?

8    A.    I kept the door closed.  I mean, everybody who

9    came in that office said something about our office.

10   We had people coming in asking, What did we do?  What

11   did you guys do?  In fact, Paul Morris' secretary,

12   Brigitte Staabs, came in, and she just couldn't

13   believe it.

14   Q.    We talked about this earlier.  Paragraph 49

15   talks about sleep deprivation.

16   A.    I lost a lot of sleep.  I couldn't sleep.

17   Q.    When did that begin?

18   A.    This was all during the time with the stress.

19   I really think it really started happening like after

20   the meeting with Paul and trying to appeal to people

21   and what's happening here and going from Sue's -- that

22   meeting, that witch hunt meeting.  It just was very

23   stressful to me.  And I lost sleep, hair.

24   Q.    For what period of time did you suffer sleep

BRIGITTE L. BROWN

1    deprivation?

2    A.    Probably up to the time that my lawyer -- I

3    mean, my lawyer, sorry -- that my doctor gave me

4    medication because that was one of the things he says,

5    Take it before bed and you will be able to sleep

6    better, which it did work better.

7    Q.    Do you remember what that medication was?

8    A.    That's why I am saying no.  I think it was

9    Paxil, but I am not sure.

10    Q.    How long did you take that?

11    A.    A couple years.

12    Q.    When did you --

13    A.    Off and on.

14    Q.    When did you begin taking it?

15    A.    I don't know the exact date.  It was -- it was

16    somewhere in -- during that time, but I am sorry, I

17    don't know the exact date of when I started this

18    medication.

19    Q.    You talk about upset stomach.  When did you

20    first begin to suffer?

21    A.    Same time.

22    Q.    And for what period of time?

23    A.    I kept a nervous stomach.  I mean, I can get

24    really hyper energy, I get nervous very easily, and

BRIGITTE L. BROWN

1    that would come on at certain times when it got really

2    stressful.

3        Q.    Things in your personal life bring that on as

4    well?

5        A.    A little bit of everything, yeah.

6        Q.    Do you still suffer from that?

7        A.    From nervous stomach?

8        Q.    Yes.

9        A.    Well, I haven't really.  I haven't really been

10   too stressed lately.

11       Q.    Before you went to work for the college, that

12   was something you would suffer from?

13       A.    No.  I wouldn't -- I really can't say.  I am

14   not sure.  But I, you know, stress comes on.  Of

15   course, I had stress even before I worked for the

16   college because I was a single mom of four, but I

17   can't really say that I had a nervous stomach before I

18   started working with the college.  That -- I can't

19   recall that.

20            MR. WILLIAMS:  Can you mark this as Brown

21   No. 2, please.

22            (Brown Exhibit No. 2 entitled "Plaintiff

23   Brigitte Brown's Response to Defendant's First Set of

24   Interrogatories Directed to Plaintiff, Brigitte Brown"

BRIGITTE L. BROWN

1    was marked for identification.)

2    BY MR. WILLIAMS:

3        Q.    Brown Deposition Exhibit No. 2 are answers to

4    interrogatories filed --

5        A.    Okay.

6        Q.    -- in this case.  And on page 17, there is an

7    affirmation.  You represent that you read the

8    responses?

9        A.    Correct.

10       Q.    And know the contents thereof and that they are

11   true and correct to the best of your knowledge and

12   belief; do you see that?

13       A.    Correct.

14       Q.    And that affirmation applies to this document?

15       A.    Yes.

16       Q.    In answer to paragraph three on page 7, where

17   we inquired about whether an expert has been consulted

18   regarding this case, the answer was, "No expert

19   witnesses have been identified at this time."  And

20   that was as of October of 2005.

21             Is that still correct?

22       A.    Yes.  I haven't -- to the best of my knowledge.

23   I am not sure what my attorneys do.

24       Q.    Your attorneys keep you informed about what's

BRIGITTE L. BROWN

1    going on in the case?

2       A.    Yes.  But to the best of my knowledge, they

3    haven't gotten any experts' testimony or anything like

4    that.

5       Q.    Paragraph five inquires about the types and

6    amounts of damages you are seeking.

7       A.    Mm-hmm.

8       Q.    And the calculation of those damages.

9       A.    Mm-hmm.

10      Q.    The answer says you are unable to determine the

11    exact amount of damages at this time?

12      A.    Mm-hmm.

13      Q.    Is that still the case?

14      A.    Yes, it is, sir.

15      Q.    The next sentence says, "When answering

16    plaintiff is in a better position to determine and/or

17    approximate total damages for this matter, the

18    information will be provided as a supplement to this

19    interrogatory"; do you see that?

20      A.    Where is that?

21      Q.    The bottom of page 8?

22      A.    Oh, okay.  Yes.

23      Q.    When is the answering plaintiff going to be in

24    a better position to determine the amount of damages?