BRIGITTE L. BROWN

1    A.    I am not sure at this very moment.  Hopefully

2    in the very near future.

3    Q.    Is that something you are working on?

4    A.    Yes.  It's on my mind, yes.  It is something

5    that we are working on.

6    Q.    How much are you seeking -- are you seeking

7    lost salary?

8    A.    I am, you know, I am not sure how to answer the

9    question as far as, you know, I still really need to

10   discuss with my attorneys and everything what I am

11   seeking.  I really can't answer that question right

12   now.

13   Q.    So you don't know what damages you are seeking?

14        MS. BREWINGTON:  I am going to object.

15   You can answer.

16   BY MR. WILLIAMS:

17   Q.    I am asking for your understanding.

18   A.    Okay.

19   Q.    You don't know what damages you are seeking?

20   A.    Not all the damages, no.  No, I do not know.

21   Q.    Are you seeking damages for pain and suffering

22   or humiliation?

23        MS. BREWINGTON:  I am going to object.

24   She said she is not sure.

BRIGITTE L. BROWN

1          THE WITNESS:  Do I answer?

2     BY MR. WILLIAMS:

3     Q.   You don't know?

4     A.   I don't know.

5     Q.   Have you incurred medical expenses that you are

6     seeking to recover for?

7     A.   Not many.  I don't have many.  My -- Tamala

8     Robinson was -- she didn't take my insurance, so it's

9     not much medical because I had insurance.

10     Q.   You mentioned a couple times about your hair

11     falling out.

12          When did that start and when did that

13     stop?

14     A.   I notice a lot of hair start coming out in my

15     comb when I get really stressed.  In the beginning of

16     September, I think I really noticed my hair starting

17     to -- extra hair coming out when I comb my hair.

18     Q.   When did that stop?

19     A.   I don't know.  I still had hair come out for a

20     while.  It's not coming out like that now or anything.

21     I think that was just a symptom of everything going

22     on, but I really can't tell you the day or when it

23     actually stopped.

24     Q.   On page 11, the answer to interrogatory No. 9

 1    talks about an antidepressant medication.

 2    A.   Yes.

 3    Q.   Is that something different than what you

 4    talked about a few minutes ago that you took for

 5    difficulty sleeping?

 6    A.   No.  That's the same.

 7    Q.   And when you say that the name of the

 8    medication is in your medical records, are you talking

 9    about doctor --

10    A.   Senu-Oke.

11    Q.   Dr. Senu-Oke's records?

12    A.   Dr. Senu-Oke's records, yes.

13    Q.   Have you requested a copy of those records?

14    A.   No, I haven't.  I haven't been asked to.

15    Q.   Your counsel hasn't suggested that you request

16    those records?

17    A.   She said it would be a good idea, but nobody

18    requested it -- told me to request them.

19    Q.   Nobody told you to request them?

20    A.   Correct.

21    Q.   You talk about the fact that you have had two

22    biopsies and an examination of the thyroid glands.

23         What does that have to do with this case?

24    A.   My whole point of putting it in there, I didn't

BRIGITTE L. BROWN

1    have any problems prior to this situation, and I know

2    stress happens in many different ways and I had a

3    full, complete physical in June of 2001, that can show

4    that my thyroid, everything -- since then, since the

5    stress and everything that I went through, all kinds

6    of things happened to me.

7       Q.   And what evidence do you have that --

8       A.   A large thyroid gland that's sticking out of my

9    neck and I keep getting biopsies now.  That's that

10   evidence.

11      Q.   And what evidence do you have that that's

12   related to this?

13      A.   Oh, I don't have evidence that it's related.

14   It happened during the same time, and I know stress

15   happens in many forms, but I know prior, I have

16   documented that I have documentation that I had a

17   complete and thorough physical with no problems prior

18   to this.

19      Q.   In answer to paragraph 12 on page 13.

20      A.   Yes.

21      Q.   The question is:  "Describe in detail each and

22   every action taken by defendant in which you claim was

23   motivated by an intent to discriminate on the basis of

24   race"; do you see that?

BRIGITTE L. BROWN

Page 85

1    A.    Sorry.  You said paragraph --

2    Q.    At the top of the page.

3    A.    Okay.

4          MS. BREWINGTON:  I think you are on a

5    different page.

6          MR. WILLIAMS:  Page 13.

7          THE WITNESS:  Oh, I am sorry.  No wonder I

8    don't see it.

9    BY MR. WILLIAMS:

10   Q.    At the top.

11   A.    Yes.  Okay.

12   Q.    Now, you say, in addition to the office space

13   issue, you say that the plaintiff feels that the

14   following promotions were discriminatory, and, again,

15   this is asking you about discrimination on the basis

16   of race, "The promotion of Paul Morris without

17   posting."  It's your position that that was

18   discriminatory on the basis of race?

19   A.    It blocked out any black person from applying

20   for that position.

21   Q.    And that happened -- recognizing that there was

22   an issue about whether he was promoted or reclassified

23   and not, I don't have a desire to get into a debate

24   with you about that, but the -- when was it that this

BRIGITTE L. BROWN

1  -- what you allege to be a promotion occurred?

2    A.   I am not actually sure.  June, May.  I have

3  some e-mails -- I have a particular e-mail, I am not

4  sure if it was May or June, that Paul Morris wrote

5  giving everybody directives to keep their door open.

6  So that was way before we had heard in a news letter

7  that Paul was promoted.  He was already giving out

8  directives before that was issued to us.

9    Q.   So, what you characterize as a promotion that

10  you are complaining about happened way before your

11  move, way before you were informed that you were going

12  to be moved to new office space?

13    A.   No.  I am just saying I don't know when it

14  happened.  I know May or June that Paul wrote this

15  directive to us, and we were notified, I think, in

16  July of newsletter, but I am not sure exactly when

17  that took place.

18    Q.   July of 2002?

19    A.   2002, correct.

20    Q.   So, my question is:  What you characterize as a

21  promotion of Paul Morris happened before you were told

22  that you were going to be moved?

23    A.   Yes.

24    Q.   And before you were moved in October of 2002?

BRIGITTE L. BROWN

Page 87

1    A.    Yes.  I am sorry.  Yes.

2    Q.    And before you filed a charge of discrimination

3    in November of 2002?

4    A.    Correct.

5    Q.    Now, the next promotion that you claim was

6    discriminatory was the acting position of Jacquita

7    Wright-Henderson.  I think we talked about that

8    earlier.

9    A.    Yes.

10    Q.    She is African-American, is she not?

11    A.    Correct.

12    Q.    Am I correctly understanding your response to

13    the question in paragraph 12 that you believe that

14    that promotion decision was discriminatory on the

15    basis of race?

16    A.    That was one that I put in there, yes.

17    Q.    And you think that that discriminated against

18    you on the basis of your race?

19    A.    I think putting her -- I think it all -- I am

20    not going to say directly.  I think it all falls into

21    one big jumbled mess.  Again, like I said, if you know

22    anything about black history, the blacks were the ones

23    put in charge of the blacks to keep them in place.

24    Why was everybody else -- Paul Morris was in charge of

BRIGITTE L. BROWN

1    everyone else except us.

2           A black person was put in our place to

3    take care of us.  No. 1, we didn't understand why we

4    were separated there.  No. 2, there was no promotions

5    or anything prior to us complaining.  And then, all of

6    a sudden, there is a black person promoted, but, yet,

7    she is promoted not to take care of all TRIO and youth

8    programs but to deal with Upward Bound Math and

9    Science.

10   Q.   If the college placed a white employee in the

11   acting position that Jacquita Wright-Henderson

12   received, would that have been discrimination on the

13   basis of race?

14           MS. BREWINGTON:  Objection.

15           THE WITNESS:  I don't know.  All I know is

16   how we feel and how I felt when Jacquita was put over

17   us and the history of slavery and all that.  So, I

18   really can't answer that question on how I would feel

19   if a white person was put in because a white person

20   wasn't put in, and I am talking about every day of my

21   life dealing with this at that time.

22   BY MR. WILLIAMS:

23   Q.   The next thing you complain about is the

24   promotion of Andrea Collins.

BRIGITTE L. BROWN

1          She is also African-American, is she not?

2     A.    Correct.

3     Q.    And is it because she is African-American that

4     you believe that the decision by the college to

5     promote her was discriminatory on the basis of race?

6     A.    I believe if Andrea Coleman wasn't black, there

7     may be a chance she wouldn't have been there.  Again,

8     it feels like they are going to -- they filed

9     discrimination, so let us keep the blacks in there.

10    That's in their thinking.  But as far as black people,

11    it's like getting the blacks to take care of the

12    blacks.

13          I mean, and then she didn't even -- she

14    didn't even become manager of her own program that she

15    had worked with for three years as program manager.

16    You know, she didn't have any Upward Bound

17    Math/Science position, but, yet, they walked Andrea

18    Coleman in and it's like, Why?  And there was another

19    black person.

20          I probably would have thought actually

21    about that one differently if it was a white person

22    that walked in, but, again, it was another black

23    person that they are trying to get us to -- to keep

24    us, I don't know.

BRIGITTE L. BROWN

1    Q.    So, if the college promoted a white employee in

2    that circumstance, it would not have been

3    discrimination against you on the basis of your race?

4                    MS. BREWINGTON:   Objection.

5                    THE WITNESS:   I can't answer that.

6    BY MR. WILLIAMS:

7    Q.    The next one is the lateral move of Rosanna

8    Brown-Simmons.

9                    She is also African-American; correct?

10   A.    Correct.

11   Q.    And you believe that that decision by the

12   college discriminated against you on the basis of your

13   race?

14   A.    I believe that it was a, I don't want to say

15   racist decision, but Rosanna, again, she is getting

16   promoted.  Student enrichment coordinator, same thing

17   I am, acting where I wasn't, but, yet, there is the

18   black getting put into that position.  And none of

19   these blacks held any program -- we had one program

20   manager that was black prior to us complaining.

21   Q.    We talked a little bit earlier about your hours

22   and you wanted to work nine to five; is that what you

23   wanted to do?

24   A.    I asked that and -- yes.

BRIGITTE L. BROWN

Page 91

1    Q.    And you understood that the campus director had

2    the authority and responsibility to determine working

3    hours for the campus?

4    A.    Yes.  That's why I sent a letter to him, but it

5    was rejected.  It didn't even get to him until after

6    later when I wrote him another letter.

7    Q.    You talk about program calendars for on-site

8    school visits were changed from 30 days to 90 days.

9    A.    Where is that?

10   Q.    The end of the paragraph we were just looking

11   at in answer to --

12   A.    Okay.

13   Q.    Do you know why that decision was made?

14   A.    I don't know because it was very difficult to

15   try to get appointments.  Our program was different

16   than the regular programs.  Our program was a program

17   where we just went to visit the students like in the

18   beginning -- end of October until around the beginning

19   of December.  So -- and we had, like, some students --

20   a lot of schools we only had one student in and it was

21   very difficult arranging a program calendar where all

22   -- trying -- counselors wouldn't do that.  I mean, it

23   just got very difficult.

24            The other programs would be in the school.

BRIGITTE L. BROWN

1    That was designated.  Classic and Upward Bound, they

2    knew they were going to be at Howard at 8:00.  They

3    knew they were going to be at DelCastle.  They were

4    all local.  We were regional, 50 miles out.  So we

5    would call just to meet with John Doe, and it's like,

6    Well, I can't have that on my schedule right now;

7    that's too far in advance.  We had a difficult time

8    and we tried to explain that we can't just get

9    calendars like that.

10            So, a lot of the stuff we did, we did our

11    best to do what they were asking so we end up getting

12    a lot of tentative things.  You know, we -- I mean, it

13    was just like we would call, we would make our

14    appointment, nobody would call, but I am trying to

15    meet with this person.  I haven't heard from the

16    counselor.  I am trying to make an appointment for six

17    weeks in advance and nobody is calling me back so I

18    put that tentative on my calendar.  It just -- it was

19    never like that before.

20            We made 30-day calendars so we could focus

21    30 days, and, that way, we can achieve the best for

22    our students.  And then from that 30 days, we would go

23    onto the next 30 days and the next group.

24    Q.    The paragraph 13, the answer, again, this talks

BRIGITTE L. BROWN

1    about each and every action taken by defendants which

2    you claim was motivated by an intent to retaliate.

3    Your answer to that question is, No. 1, your work

4    hours were changed.  We just talked about that a

5    minute ago; is that correct?

6      A.    Yes.

7      Q.    Your work hours, during the time that you were

8    working from nine to five, were those work hours ever

9    approved by the campus?

10     A.    I wasn't working nine to five.  I worked 8:30

11   to 4:30.

12     Q.    What change are you talking about here then?

13     A.    That one, looking at this, "Answering

14   plaintiff's work hours were changed," that wasn't me.

15   That one should be Ken Cole.  He is the one who had

16   change in work hours.

17     Q.    But this is your answer?

18     A.    Yes, I see that.

19     Q.    So you are saying this shouldn't be in here?

20     A.    This one here -- my work hours were not

21   changed.  I know Ken Cole's were changed.  So I must

22   -- when I signed this, I didn't realize that one

23   because mine was not.

24     Q.    So it was an oversight?

BRIGITTE L. BROWN

1    A.    Mm-hmm.

2    Q.    You are saying that shouldn't be here?

3    A.    For me, yes.

4    Q.    Now, the next thing you say is "she," and I

5    assume this refers to you, "was harassed through

6    e-mail"; do you see that?

7    A.    Yes.

8    Q.    Which e-mail are you talking about?

9    A.    I don't know.  "She was harassed through

10   e-mail."  I guess the -- I don't know.  I am not sure

11   what that means right there.  What I would say is just

12   the scrutiny of, like you said, our calendars, when we

13   did them, we got e-mails if this needs to be done.  If

14   it wasn't done, we got more e-mails as far as that's

15   concerned.  E-mail after e-mail about, No, this is not

16   done right; we need it done over because of the

17   changes, and then all of the changes that took place

18   all of a sudden, I am assuming that's what that is.

19   Q.    But you don't know what it is?  When you say,

20   "I am assuming that's what it is," is that what it is?

21   A.    The e-mails -- that's the only thing it could

22   be, yes, sir.

23   Q.    So, the e-mails that you are describing relate

24   to managing -- the way in which the program was

BRIGITTE L. BROWN

Page 95

```
 1   managed and the way in which you were held

 2   accountable?

 3       A.   No.  Not how -- no.  No.  No.  No.  Not

 4   accountable.  I think because there was so many

 5   changes that happened and we wasn't understanding all

 6   of the changes to the, you know, how they wanted it

 7   because, don't forget, it had been to be eliminated

 8   down to us, so when we did something -- we were just

 9   lost.  We just didn't understand.  Our program manager

10   took a lot of that weight and said, We need this, we

11   need that.  This is not right, no, you need to do it

12   right.  This is not right, you need to do it again.

13   This is not right, you need to do it again.  So that's

14   what we were going through.

15       Q.   And is that also what you are talking about

16   when you refer to a scrutiny of her work schedule?

17       A.   Yes.

18       Q.   A scrutiny of what your schedule was, what you

19   were doing on any given day?

20       A.   Yes.  I mean, we -- we, since I have been

21   there, as any coordinator, we would go, we would

22   reserve our car, we would go see our student, we would

23   get all our paperwork signed, and we would come back.

24   We would notate everything in our folders and put all
```

BRIGITTE L. BROWN

1   our comments down.

2          We got it where they wanted us to sign in

3   at a certain time, sign in the school, have the

4   student sign in at what time we was there or -- I

5   mean, it just got so much that they were asking, and,

6   to me, that's part of the work schedule, the sign in

7   and the sign out every single time we did something,

8   which we had never done before.  So, with everything

9   that was added to what we were doing on top of that,

10  it just got really stressful.

11  Q.   Turn to page 14.

12  A.   (Witness complies.)

13  Q.   Paragraph 15.  First of all, the question says,

14  "Describe in detail the 'employment opportunities'

15  referred to in paragraph 87 of the complaint."

16          Paragraph 87 of the complaint, which is on

17  -- it's not numbered by pages, but if you turn to

18  paragraph 87 of the complaint, which is in Brown No.

19  1.

20  A.   Mm-hmm.

21  Q.   It talks about continuing to suffer loss of

22  employment opportunities, loss of income, loss of

23  other benefits; do you see that?

24  A.   Yes.

BRIGITTE L. BROWN

1    Q.    Your answer talks about the program manager

2    position; is that the one where --

3    A.    That's one of them.

4    Q.    Who got that?

5    A.    No one.

6    Q.    Pardon me?

7    A.    No one.  I don't know who got that.  I wasn't

8    even given an interview.

9    Q.    That was the one that was posted three times?

10   A.    Yes.

11   Q.    And the third time, you didn't apply?

12   A.    The third time, I didn't, and then Andrea

13   Coleman came in.

14   Q.    And is it your understanding that your

15   complaint is that that was race discrimination or

16   retaliation or both?

17   A.    Retaliation.

18   Q.    Not race?

19   A.    As far as my -- no.  I would say that's

20   retaliation.

21   Q.    And the next sentence says, "This has resulted

22   in the loss of additional pay and additional stress

23   related symptoms; this ongoing retaliation has led

24   answering plaintiff to resign which would eliminate

BRIGITTE L. BROWN

 1    future opportunities for advancement."

 2              Was it this program manager's decision

 3    that really triggered your resignation?

 4    A.    There was so much going on there with us, and

 5    that was the last straw.  Absolutely.  Absolutely.

 6    And then after all -- and not getting an interview,

 7    No. 1, knowing Paul Morris is on the committee,

 8    screening committee, No. 2, finally getting an

 9    interview, within the next two to three days getting a

10    letter, no one is coming in, no one is coming in, and

11    then they bring Andrea Coleman in who started after I

12    who never even got her program manager's position, it

13    just --

14    Q.    Turn to page 15 and 16.  Interrogatory No. 18

15    asks about -- asks for you to detail every attempt you

16    have made to find employment, seek a promotion, or

17    pursue education or training?

18    A.    This is page 15, you said?

19    Q.    The question is on page 15.  The answer is on

20    the next page, page 16.

21    A.    Okay.

22    Q.    Is this a complete listing of every attempt you

23    have made to find employment, seek a promotion, or

24    pursue education or training?

BRIGITTE L. BROWN

1    A.    Yeah.    There was a couple other things that's

2    not included that I asked for, but, to me, it was no

3    big deal.    Like when I wanted to help with certain

4    things, they were having -- redoing our grant, and,

5    you know, I let her know I was open because they were

6    all stressed out trying to get this grant completed

7    and I knew I had very good computer skills and they

8    were having training that if I could go to the

9    training and help with any of the things that they

10   needed, but that's no big deal.    It's not on there.

11   But, yes, this is --

12       Q.    And tell me again when you resigned.

13       A.    June 27th, I think.    The end of June.

14       Q.    Of 2005?

15       A.    Yes.

16       Q.    And the question asks about every attempt you

17   made to find employment or pursue education or

18   training since January 1, 2001, to the present.

19   Nothing is listed subsequent to January 2005.    I

20   assume, if this is a complete list, that means that

21   you haven't sought any employment opportunities since?

22       A.    Well, sir, after January, 2005, I realized

23   there was no way I was going to put myself through

24   that ever again.    I had been stressed.    Like you said,

BRIGITTE L. BROWN

Page 100

1    my stomach, my hair.

2              After they got Andrea Collins in there, I

3    knew there was no way, and I knew there was no way I

4    was going to even continue or even try.  I was told

5    earlier by my program manager once that Paul Morris

6    had mentioned to her that if I continued doing things,

7    like not conforming, that Brigitte won't go far at

8    DelTech.  Those words echoed through my ears after I

9    saw Andrea Coleman walk in.

10   Q.   Well, the question, though, is, this asked for

11   every attempt you have made to find employment

12   beginning January 1, 2001, to the date of the answer

13   of the answer to the interrogatory.  And my question

14   is:  Is it correct that you haven't made any effort to

15   seek other employment subsequent to the time you

16   resigned?

17   A.   You mean at DelTech?

18   Q.   Anywhere.

19   A.   No.

20   Q.   So this is not a complete answer?

21   A.   I am getting a little confused.  I don't know

22   what you are saying.

23             MS. BREWINGTON:  Can you back up?  I think

24   she is confused.

1          THE WITNESS:  I am totally confused.

2          MS. BREWINGTON:  Back it all the way up.

3    BY MR. WILLIAMS:

4     Q.   The question that you are responding to,

5    Interrogatory No. 18 --

6          MS. BREWINGTON:  Can I interrupt?  I think

7    what she thinks is -- you are asking her about

8    positions at DelTech?

9          THE WITNESS:  Yes.

10          MS. BREWINGTON:  I think you kind of need

11    to explain you are talking about.

12          MR. WILLIAMS:  Let me, between you and I,

13    say that it seems to me that what we are hearing is

14    that this is not a complete answer to the

15    interrogatory, and either we need to get an update or

16    she needs to update it now.

17          MS. BREWINGTON:  No.  She is telling you

18    that she thought -- I guess she is thinking DelTech.

19          MR. WILLIAMS:  That's not what the

20    interrogatory says.

21          MS. BREWINGTON:  We need to find out what

22    she understood at the time she completed that.

23          THE WITNESS:  Yes.  In fact, I did seek

24    other things on the Internet.  I sought other

BRIGITTE L. BROWN

1    positions through the Internet, yes, I did.

2              MR. WILLIAMS:  Well, what I am suggesting

3    to you is we need a listing -- if you are going to

4    answer the interrogatory fully and completely, we need

5    a listing of what they are and we haven't received it

6    to date.

7              MS. BREWINGTON:  Can you confirm that

8    there are additional from January to October?

9              THE WITNESS:  We are talking about until

10   now?  I don't understand.

11             MS. BREWINGTON:  You said "until present,"

12   but present on this is October 31st, 2005.  So the

13   question is:  Did she seek employment from January 1,

14   2001, through October, 2005, outside of Delaware

15   Tech.?

16   BY MR. WILLIAMS:

17   Q.    Between the time that you resigned and the time

18   that you signed this affirmation on October 31, 2005,

19   did you seek other employment opportunities?

20   A.    Yes.

21   Q.    And are they listed here?

22   A.    No.

23   Q.    And subsequent to October 31, 2005, between

24   that date and today, have you sought other employment

1  opportunities?

2      A.    Yes.

3      Q.    Are they listed here?

4      A.    No.

5      Q.    Well, I will send you a letter, but, I mean,

6  it's clear to me that we have an incomplete answer to

7  this interrogatory, and I'd, when we get a complete

8  answer, reserve my right to ask her questions about

9  whatever other employment opportunities she has sought

10  since then.

11     A.    You don't want to ask that now?

12     Q.    I tried to ask earlier and you told me that you

13  didn't really -- couldn't tell me.  If you can give

14  me --

15     A.    I sent to TRIO programs at colleges.  I have

16  been looking under the TRIO program.

17     Q.    I want to know what colleges, when you

18  submitted applications, and for what positions?

19     A.    Okay.

20     Q.    Can you tell me?

21     A.    Not offhand.  I have -- I do have a file.

22     Q.    You have a file?

23     A.    At home, mm-hmm.

24     Q.    Do you have, apart from that file, do you have

BRIGITTE L. BROWN

1  other documents that are relevant to this litigation

2  which you have not provided to your counsel?

3  　　A.　　Like what?　If I thought they were relevant, I

4  submitted them.　And you say I have an incomplete

5  answer; I never understood the question.　So up until

6  January -- this whole thing, even sitting here talking

7  to you, and reading it, I thought it meant DelTech.

8  That's why.

9  　　Q.　　With respect to your claim that you have

10 suffered pain, suffering, humiliation, other than your

11 testimony about that, are there other witnesses that

12 you intend to offer if this case goes to trial?

13 　　A.　　My coworker, Ken Cole, my secretary, my

14 children, my fiancee.

15 　　Q.　　Can you identify your children and fiancee?

16 　　A.　　Okay.　Yes.　Anthony Brown, Eyan, E-y-a-n.

17 　　Q.　　I am sorry?

18 　　A.　　E-y-a-n, Eyan Evans Brown.

19 　　Q.　　Okay.

20 　　A.　　Brigitte, same name, Evans Brown.　Eli is too

21 small.　I have one more child, but that's Eli Evans

22 Brown.　Jimmy Bunkley.

23 　　Q.　　Jimmy Bunkley?

24 　　A.　　Yes, my fiancee.　Ken Cole, he is a witness.

BRIGITTE L. BROWN

1    Liz Wilson.

2       Q.    Have you talked to Liz Wilson about testifying?

3       A.    Who?  Me?

4       Q.    Yes.

5       A.    No.  I haven't spoken to her lately.

6       Q.    How old are your children?

7       A.    At this point, Anthony is 17.  Eyan just turned

8    12.  "Bri" just turned 11.  And Eli is eight.

9       Q.    Do they live with you?

10      A.    Yes.

11      Q.    In Texas?

12      A.    They are in Texas.  My son isn't in Texas.

13      Q.    Your oldest?

14      A.    Anthony is here.

15      Q.    Given the obligations that you have assumed

16   caring for your brother, are you able to work now?

17      A.    I am not caring for him.  I am there for

18   support.  My brother has all his medical, all his

19   everything that he needs taken care of.  My brother

20   went through a major depression and I am there to

21   support him fully.  And I am not literally medicating

22   him or anything like that.  But the answer to that is

23   yes.

24      Q.    You are able to work?

BRIGITTE L. BROWN

1    A.    Yes.   Another person for that list who knows is

2    my cousin, her name is Renee.   My mother passed away

3    and Renee is my cousin who was my mother's age who is

4    real close to me, Renee DuJean, D-e-J-e-a-n, DuJean.

5    Q.    Where does Renee live?

6    A.    Wilmington.

7    Q.    Where does your fiancee live?

8    A.    Texas.   He is strictly in Texas.

9    Q.    When did you get engaged?

10         MS. BREWINGTON:   Objection.

11   BY MR. WILLIAMS:

12   Q.    Was he a part of your life during the time you

13   worked for the college?

14   A.    Yes, he was.

15   Q.    Is he from Delaware?

16   A.    Yes.

17   Q.    Who did you talk to about your decision to

18   resign from the college before you resigned?

19   A.    My father, my sister.   I talked to Ken.   And

20   probably, of course, my fiancee and probably some

21   other friends.

22         MR. WILLIAMS:   I think I may be done.   Let

23   me just take five minutes to make sure.

24         (Recess taken.)

BRIGITTE L. BROWN

1  BY MR. WILLIAMS:

2     Q.   I just have two or three more questions.

3          You made a statement that there were no

4  African-American managers until after you filed the

5  complaint; do you remember saying that?

6     A.   Well, in our TRIO program, except for my

7  program manager.

8     Q.   Then, prior to that, I asked you about your

9  statement that you made about African-Americans being

10  systematically removed, and you mentioned Gene Barnes

11  and Charles Madden?

12     A.   And I mentioned that was before I got there.

13     Q.   And they were African-American managers in the

14  TRIO program?

15     A.   To my knowledge.

16     Q.   And in answering my question, or making the

17  statement about African-American managers, did you

18  limit your response to just the youth programs

19  division of CCP or were you talking about --

20     A.   Yes.  I don't know anything else about it.  I

21  am only --

22     Q.   CCP is a big program?

23     A.   Right.  And I don't know what they have.

24     Q.   So you don't know about who the managers were

BRIGITTE L. BROWN

Page 108

```
 1   outside of your youth --

 2      A.   I am up there in the federal youth program.

 3              MR. WILLIAMS:  I have no further

 4   questions.

 5              (The deposition was concluded at 12:35

 6   p.m.)

 7                      INDEX

 8


 9

     DEPOSITION OF: BRIGITTE L. BROWN
10
     EXAMINATION                            PAGE
11
        Examination by Mr. Williamn           2
12
     Brown Exhibit No. 1 entitled "Complaint" was marked
13   for identification............................. 69

14   Brown Exhibit No. 2 entitled "Plaintiff Brigitte
     Brown's Response to Defendant's First Set of
15   Interrogatories Directed to Plaintiff, Brigitte Brown"
     was marked for identification.................... 78
16

17

18

19

20

21

22

23

24
```

## Corbett & Wilcox

**The Team to Trust in Court Reporting**

1400 N. French St., Wilmington, DE 19801
phone 302.571.0510  fax 302.571.1321
15 North Street.Dover. DE 19901
phone 302.734.3534  fax 302.734.3552

e-mail: info@corbettreporting.com

Ellen Corbett Hannum -- President
June E. Griffith -- Business Manager

### Errata Sheet

Attach to the deposition of: _Brigitte L. Brown_

In the Matter of: _Cole/Brown v. Delaware Technical Community College_

Date of Deposition: _2/6/2006_   Reporters initials: _____

**Instructions: After reading the transcript of your deposition, please note any changes or corrections and the reasons therefor on this errata sheet. Please _sign_ and _date_ the errata sheet and _return a copy to our offices. Attach the original errata to the original transcript_. Thank You.**

| Page & Line | Change/Correction | Reason |
|---|---|---|
| Cover | "2006" to "2000" | Wrong date |
| 35 / 18 | "--" to "wasn't" | no word |
| 82 / 7 | "Tamala" / "Tamara" | wrong word (name) |
| 82 / 8 | "Robinson" / "Walker" | wrong name |
| 95 / 18 | "eliminate" / disseminate | wrong word |
| 106 / 4 | "D-e-j-e-a-n" / "D-u-j-e-a-n" | misspelled |
| 108 / 11 | "Williamn" / "Williams" | misspelled |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I have read the foregoing transcript of my deposition and, except for any corrections or change noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Date: _3/15/06_ Signature: _Brigitte L. Brown_

Sworn to and subscribed before me this_____ day of _____ 20____

Notary _____

BRIGITTE L. BROWN

Page 110

Brigitte L. Brown

State of Delaware )
                 )
New Castle County )

CERTIFICATE OF REPORTER

I, Renee A. Meyers, Registered Professional
Reporter and Notary Public, do hereby certify that
there came before me on the 6th day of February, 2006,
the deponent herein, BRIGITTE L. BROWN, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed into
typewriting under my direction.

I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

Renee A. Meyers
Certification No. 106-RPR

DATED:  February 7, 2006

CORBETT & WILCOX