IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

BRIGITTE L. BROWN,     )
     )
     Plaintiff,     )     C.A. NO. _____
     )
     v.     )
     )     JURY TRIAL DEMANDED
DELAWARE TECHNICAL AND     )
COMMUNITY COLLEGE,     )
     )
     Defendant.     )

## COMPLAINT

### INTRODUCTION

1.     This is a Complaint brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, codified as 42 U.S.C. § 2000(e) et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) and 42 U.S.C. § 1981.

### PARTIES

2.     Plaintiff, Brigitte L. Brown (hereinafter "Plaintiff"), is and was at all times relevant to this Complaint, a resident of the State of Delaware, residing at 1321 West 8th Street, Wilmington, Delaware 19806.

3.     Defendant, Delaware Technical & Community College (hereinafter "Defendant"), is a statewide institution of higher education, i.e., a local community college, providing academic, technical, continuing education, and industrial training, and at all times relevant to this Complaint, the employer of Plaintiff Brigitte L. Brown. Defendant is subject to service of process through Delaware Technical & Community College; c/o Larry Miller, Office of the Campus Director, 333 Shipley Street, Wilmington, Delaware 19801.



DEPOSITION
EXHIBIT
Brown

### JURISDICTION

4.      Jurisdiction is founded on the existence of a question arising under federal statutes. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) of Title VII of the Civil Rights Act. The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights secured by federal and state law which prohibits discrimination against employees because of their race.

5.      The state law claim regarding the breach of the implied Covenant of Good Faith and Fair Dealing is brought pursuant to the pendant jurisdiction of this Court.

### FACTUAL BACKGROUND

6.      Plaintiff was hired by Defendant as a full-time Student Enrichment Coordinator for the Upward Bound Math and Science Program (hereinafter "UBMS") at the Wilmington, Delaware campus on or about January 8, 2001. Plaintiff has been continuously employed by Defendant for four (4) years.

7.      When Plaintiff began her employment, Defendant had three (3) federal-grant TRIO programs: the Educational Talent Search Program, managed by Mr. Paul Morris, a Caucasian; the Upward Bound Classic Program, managed by Ms. Kate Sullivan, a Caucasian female; and the Upward Bound Math and Science Program, managed by Ms. Rosetta Henderson, an African-American female.

8.      In or around February 2001, a proposal was introduced by Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs, to move the Upward Bound Classic Program staff into the offices that were occupied by Plaintiff and the other members of the Upward Bound Math and Science Program. In turn, Plaintiff's

department would be relocated from their offices to the cubicles that were occupied by the Upward Bound Classic Program personnel.

9.    Disappointed, and somewhat surprised by the announcement that they would potentially be losing their offices, Plaintiff and the other members of her department requested a meeting with Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs for Defendant.

10.    As a result of that meeting, the move was halted; instead, only Ms. Tonia Conley, Student Enrichment Coordinator with the Upward Bound Classic Program, was relocated next to her Program Manager, Ms. Kate Sullivan.

11.    In or around October 2001, Plaintiff successfully completed the Educational Technology Certificate Program with the hope that possession of such a certificate would result in career advancement.

12.    In or around November 2001, Plaintiff was nominated for, and the recipient of the 2001 Delaware State TRIO Organization's Achiever's Award.[1]

13.    In or around April 2002, Plaintiff received the Mid-Eastern Association of Educational Opportunity Program Personnel Award, a regional TRIO award.

14.    In or around July 2002, Mr. Paul Morris, a Caucasian, Program Manager for Educational Talent Search, was promoted to Special Program Director, a position that oversees all of the TRIO Programs, including Plaintiff's.

15.    On or about August 12, 2002, Paul Morris met with Plaintiff and the other members of her department and informed them that he had unilaterally made a decision

---

[1] The Delaware State Trio Organization is the organization that is responsible for all federal TRIO Programs throughout the State of Delaware.

to relocate the Upward Bound Math and Science Program from their current multiple offices to the single office that had been occupied by the SOAR Program.

16.     That same day, Plaintiff and the other members of her department visually surveyed the office space they were being forced into, and determined that it was completely inadequate to house two (2) full time employees, one (1) part time employee, two (2) student co-ops, student participants, visitors, files and equipment and other resources.

17.     Specifically, Plaintiff's new office space was approximately thirty-six (36) square feet less than what her department had in its original office space, a decrease from a combined total of 211 square feet to 175 square feet. In fact, Plaintiff's office space was so much smaller that partitions could not even be set up in the room to allow for the necessary privacy.

18.     On or about August 13, 2002, the UBMS team (Plaintiff, Mr. Ken Cole, and Ms. Liz Wilson) met together to discuss the proposed move and the fact that they believed there were being unfairly discriminated against and treated differently from the other TRIO programs when they were forced into a smaller, single office.

19.     After speaking with their Program Manager, Plaintiff and the remaining UBMS staff prepared an agenda to discuss with management; the agenda was submitted via e-mail to Ms. Sue Zawislak, Defendant's CCP Director, on or about August 14, 2002.

20.     In response to their concerns, the UBMS group was later told by Mr. Paul Morris to "put it in black and white" and to "explain where it stated in [their] job description that [they couldn't be moved]." Plaintiff and her colleagues were eventually

granted a meeting with upper management (Paul Morris and Ann Del Negro) on or about August 29, 2002, just two (2) working days before the proposed move.

21.    On or about August 29, 2002, the UBMS staff met with Ms. Ann Del Negro and Paul Morris. The group tried to explain that the proposed move would affect employee relations, morale and productivity, not to mention, the small space would make it extremely difficult to protect students' privacy.

22.    The office that the UBMS Group was being forced to move into had been Ann Del Negro's former single office; it was an office with only two wall sockets as it was designed for occupancy by only one individual. Instead, Defendant was putting the three (3) African-American members of the UBMS Program into a small, inadequate office space, despite their previous objections and their complaints that this move was discriminatory in nature.

23.    Ann Del Negro got very upset and expressed her feelings to the UBMS Group of how disappointed she was that they felt their move would affect employee relations, morale and productivity. Plaintiff and the rest of the UBMS staff went on to explain how they felt that they were being treated unfairly and unequally and that they believed that there were ulterior motives for the move. Plaintiff explained that by putting all three people in such a small, confined space, they felt as if they were being punished.

24.    Plaintiff and the rest of her group informed Del Negro that they felt the move was partially motivated by a conflict that existed between Kate Sullivan and Tonia Conley, and Plaintiff's UBMS Group, which was comprised of all African American employees, was subjected to relocation as a result of this conflict, despite the fact that in that meeting, they had provided reasonable alternatives to avoid the move.

25.    By the end of the meeting, Del Negro decided that the move would still continue as scheduled, never having addressed the group's issues of being punished, being discriminated against, being treated unfairly and unequally, and the effect that this move would have on employee relations, morale and productivity.  Plaintiff left the meeting feeling that her concerns were unheard.

26.    On or about August 30, 2002, Plaintiff sent Ms. Sue Zawislak, Director of CCP, an e-mail asking for a meeting with the UBMS team.  On the same day, Sue Zawislak called Plaintiff in response to her e-mail.  Zawislak said the group had not followed proper protocol.  However, Plaintiff specifically followed the protocol procedures directly from Defendant's Policy Manual

27.    Zawislak also stated during her conversation with Plaintiff that the "proposed move" was due to downsizing and the allocation of space, and informed her that because of those reasons, the move made sense; this explanation, however, was in direct contradiction to what Paul Morris had said about the move being his "vision" to have the Youth Programs together.

28.    On Tuesday, September 3, 2002, the day before the move, Plaintiff went to Human Resources and met with Cara J. Stanard, Human Resource Specialist, to discuss the "move" and asked her to schedule an urgent meeting with Dr. Connie Winner, Assistant Campus Director, in an effort to file an additional complaint and hopefully halt the move which was scheduled for the next day.

29.    On September 4, 2002, the move was to take place, but it did not, presumably as a result of Plaintiff's complaint to Dr. Winner.  Instead, maintenance men were sent around to measure Plaintiff's group's offices.  As the maintenance crew was

measuring, Ann Del Negro, Assistant Director of CCP, arrived and took over the job of measuring the office spaces herself.

30.    On September 5, 2002, Sue Zawislak and Ann Del Negro called for Plaintiff, Liz Wilson, secretary, and the other members of the UBMS group for separate, individual meetings at different times. Plaintiff went first to discuss the proposed "move". Zawislak and Del Negro refused to believe Plaintiff, or even investigate her allegation that there was a conflict between Kate Sullivan and Tonia Conley that may have been the driving force behind the loss of their office space.

31.    During that meeting, Plaintiff introduced clear alternatives to their proposed move. She gave Zawislak and Del Negro the measurements of their office spaces compared with the measurements of the proposed new office space. Zawislak insisted in the meeting that the proposed move was due to downsizing and because of allocation of space, and insisted that the move made sense, which was once again in direct contradiction to what Paul Morris said; that the move was his "vision" to have the Youth Programs together.

32.    The proposed move consisted of moving eight (8) people as opposed to the alternative proposed by Plaintiff and her department which involved moving only two (2) people, and simultaneously achieving the same goal of having the TRIO programs together as well as achieving more cost effectiveness overall. Despite her best efforts, Plaintiff could not convince Defendant to entertain her suggestion.

33.    On September 5, 2002, Mr. Kenneth Cole informed Plaintiff that he had filed a grievance alleging personal discrimination, and regarding Paul Morris's promotion to Special Program Director.

34.     In the end, the individual meetings came across as a "witch hunt;" Plaintiff felt intimidated, interrogated and that Defendant was on a "search and destroy" mission. Plaintiff also felt as if she was being talked down to and belittled because she was African-American, and that nothing she said made any difference.  Most of Plaintiff's answers to Defendant's questions were turned around and restated.

35.     On or about October 2, 2002, a meeting took place between Sue Zawislak, Ann Del Negro, and Paul Morris, Plaintiff and the rest of the UBMS team.  Zawislak announced that the UBMS team would still be relocated according to the plan because she had "not heard anything that would change [her] mind."

36.     In or around October 2002, just prior to the move, Plaintiff's Program Manager, Rosetta Henderson, told Plaintiff that Paul Morris had come to her [Henderson] and said, "[Plaintiff] will never go far at Del Tech doing the things that she is doing."

37.     Plaintiff went to the Human Resource Department and spoke with Ms. Cara Standard, Human Resources Specialist, to tell her what Henderson had told Plaintiff about the remark made by Paul Morris, and to see if documentation of this comment could be put into her file.

38.     On or about Monday, October 7, 2002, the day before the move, Plaintiff made one last appeal to Dr. Connie Winner.  Winner responded promptly (the same day) to inform Plaintiff that she and Lawrence Miller had approved the move and it would go forward as scheduled.  Winner submitted several questions to Plaintiff via e-mail and asked that Plaintiff respond to her questions so that she [Winner] could schedule a meeting the following week with Sue Zawislak and herself.  On or about October 15,

2002, Plaintiff submitted responses to Dr. Winner. As of the filing of this lawsuit, Plaintiff still has not received a response from Winner.

39.    On or about Monday, October 7, 2002 Mr. Kenneth Cole informed Plaintiff that he had filed a supplement to his grievance alleging Defendant's retaliatory actions.

40.    On or about Tuesday, October 8, 2002, Plaintiff, and the other members of the UBMS group reluctantly spent the entire day moving into their new one-room office, room 408 E; a small, open room with inadequate space. The move required the assistance of five (5) maintenance workers, one (1) telecommunication person and three (3) computer services people to complete.

41.    At the completion of the move, a maintenance worker informed Plaintiff that there was a potential fire hazard in the new office space because there were only two (2) wall sockets, and approximately 22 electrical items that needed to be plugged in. Mr. Ed Cunningham, Superintendent of Buildings and Grounds, assured Plaintiff that the move was not based on his measurements.

42.    As a result of being placed into such a small and inadequate workspace, Plaintiff, along with her co-workers Kenneth Cole and Liz Wilson, are subjected to each other's conversations, phone calls and visitors. There is no privacy whatsoever, which is in direct violation of Defendant's federal grant that requires that each Student Enrichment Coordinator have privacy for confidential communications. The noise from the shredding machines and electric staplers echoes throughout the small room, which is extremely distracting and counterproductive. Plaintiff strongly believes that her group has been placed in the confined office space because they are all African-Americans.

43.     Due to the fact that there was not enough space for Plaintiff's department's files, they were instructed by Defendant to use the extra file drawers on the third floor in the CCP office.

44.     Plaintiff feels degraded each day she goes to work. The UBMS group is subjected to negative comments as Del Tech students walk by her small office. Often, other employees of Del Tech will come by just to look at Plaintiff's space and comment on how small it is, causing Plaintiff to feel embarrassed, humiliated and experience stress related symptoms because of this situation.

45.     Within her first two years working for Defendant, Plaintiff won two (2) TRIO Achievement Awards; one from the State of Delaware and the other was a Mid-Eastern Regional Achiever's Award. She was nominated and was accepted as the Secretary of the Delaware State TRIO Organization (DSTO), an Executive Board position, and she is also a member of COE Council on Education.

46.     On or about Tuesday, October 8, 2002, Plaintiff and Liz Wilson, secretary, received separate letters from Mr. Lawrence Miller, vice president and campus director, stating that Kenneth Cole had filed a supplement to his grievance stating that upper management was retaliating against Plaintiff's department.

47.     Lawrence Miller asked Plaintiff and Liz Wilson to respond to his questions concerning Cole's allegations of retaliation by upper management, and to submit their response by October 15, 2002. Miller said in his letter that if there were no retaliatory actions directed to them, that he would consider the case closed.

48.     On or about October 15, 2002, Plaintiff submitted a three-page response to Miller confirming retaliatory actions by upper management. As of the date of the filing of this lawsuit, Plaintiff has yet to receive a response from Miller.

49.     As a result of the added stress at work from Defendant's actions, Plaintiff began to experience sleep depravation, upset stomach, loss of hair and irritability, and went to see her physician. Plaintiff's physician referred her to a psychologist.

50.     On or about October 22, 2002, Plaintiff began seeing a psychologist for work-related stress; her treatment for same continues to date.

51.     Shortly after moving into the new office, Plaintiff began to keep the office door closed due to the humiliation of the room. Plaintiff overheard students who were walking past the office make comments about all the people in the small room looking like a bunch of monkeys. Plaintiff is/was also subjected to various remarks and stares as students walk by the office, feeling extreme humiliation.

52.     In or around November 2002, the maintenance department installed an additional electrical outlet, bringing the total of electrical outlets in the office to three.

53.     On or about November 8, 2002, with no other administrative remedy available to her, Plaintiff filed a Charge of Discrimination against Defendant with the Delaware Department of Labor alleging race discrimination and retaliation.

54.     Eventually, upper-management began to scrutinize UBMS Program Manager Rosetta Henderson, reprimanding her for being "unable to control [her] staff."

55.     In or around August 2003, Kate Sullivan, Upward Bound Classic Program Manager, resigned and went to another job with the State of Delaware. Her position as Program Manager of Upward Bound Classic was posted internally not long after she left.

56.     Ann Del Negro became the Director of Corporate and Community Programs (CCP) at the Del Tech Owens Campus.  Ms. Jacquita Wright was promoted to Del Negro's former position, Acting Assistant Director of CCP.

57.     Paul Morris became Acting Department Chair of Community and School Programs, Jacquita Wright's former position.  In addition, Morris was formally made Supervisor over the other TRIO Programs, with the exception of UBMS, which was assigned to Jacquita Wright, an African-American.  Morris was basically offered the same position that he previously held in the prior year until Kenneth Cole filed his grievance regarding Morris' position.  Roseanna Brown-Simmons, Student Enrichment Coordinator of Educational Talent Search, became Acting Program Manager to replace Paul Morris.

58.     Plaintiff believed that Morris was not made supervisor of her group due to their complaint, which caused Defendant to separate the programs and put a different person (an African-American) over the UBMS Program who had no prior experience with TRIO programs, while Paul Morris oversaw the Upward Bound Classic Program and Educational Talent Search.  Plaintiff was once again being treated differently by Defendant, this time with the assignment of her supervisor.

59.     In or around September 2003, the Upward Bound Classic Program Manager position became available.  The position was posted internally only.  Angi McCloskie, Andrea Coleman and Crystal Heath, the Student Enrichment Coordinators for that program, all applied for the position.  Angi McCloskie was subsequently chosen as Program Manager.

60.     Andrea Coleman, who was hired with a special grant for the Upward Bound Classic Program was put in the position of Program Manager for summer youth camps once her grant monies ran out.

61.     In or around November 2003, Plaintiff completed her second certificate program, entitled "Guiding our Youth: A Professional Approach" again with the hope that possession of such a certificate would result in career advancement.

62.     In or around November 2003, Ms. Henderson went out on sick leave for scheduled surgery.  She did not return to work until after the holiday break in January 2004, working part-time for the first couple of weeks.

63.     On or about February 4, 2004, UBMS Program Manager Rosetta Henderson resigned from her position after almost 9 years with Defendant, informing Plaintiff that she just couldn't take it anymore, referring to how she was being treated by Defendant after her employees filed their complaint.

64.     Plaintiff was never asked to become Acting Program Manager, despite her qualifications.  Plaintiff had several years of experience and had always received exemplary performance evaluations.

65.     In or around February 2004, Defendant promoted the new Acting Assistant Director of Corporate and Community Programs, Jacquita Wright-Henderson, to the position of Acting Program Manager for UBMS, despite having no TRIO or Upward Bound Math Science employment experience.

66.     Wright-Henderson's office was four (4) floors lower, so she would spend approximately only 5% of her time upstairs with the UBMS program, especially since she

had so many other responsibilities as the Assistant Director of Corporate and Community Programs.

67.    In or around March 2004, the Program Manager's position became available and applications were being accepted for the position until March 29, 2004. Plaintiff had the qualifications outlined in the job description. Plaintiff had been the full time Student Enrichment Coordinator since January 8, 2001; she had always received exemplary evaluations; and she always maintained an excellent rapport with the students, parents and counselors. Although the position should have only been initially posted internally, it was posted both internally and externally, unlike postings for the Classic and ETS Programs, which were posted internally only, and if a qualified candidate was not available, were then posted externally. Plaintiff believes Defendant posted the position internally and externally from its initial posting to prevent Plaintiff from obtaining the position.

68.    To Plaintiff, it seemed only natural for one of the Student Enrichment Coordinators in a TRIO program to apply for and receive the Program Manager position once that manager had left the program. This succession occurred when Kate Sullivan, Program Manager for Upward Bound Classic left, and Angi McCloskie, SEC, became the new Program Manager. It also occurred when Rosanna Brown-Simmons, the Student Enrichment Coordinator for ETS, became acting Program Manager, then applied for and received the position of Program Manager for Talent Search when Paul Morris was made Acting Department Chair of Community and School Programs.

69.    During a conference in West Virginia in or around mid-April 2004, Plaintiff heard a conversation between Paul Morris and other TRIO personnel from

lower-Delaware. Morris was explaining the TRIO programs at Defendant's Wilmington Campus, and told the individuals with whom he was speaking that he was in charge of UBC, ETS and the other youth programs, but not UBMS. When asked why, he said that he would also be in charge of UBMS within a couple of months.

70.    On or about April 29, 2004, only a month after Plaintiff handed in her application for the Program Manager position, she received a letter from Human Resources thanking her for applying for the position but informing her that they had chosen a more qualified candidate. Plaintiff was denied an opportunity to even interview for the Program Manager position. Plaintiff later discovered that Paul Morris was on the interviewing committee.

71.    Plaintiff contacted Jacquita Wright and Jackie Jenkins, head of Human Resources to discuss the hiring process for the Program Manager position. She never received an adequate response; Plaintiff merely received a standard form letter as a response.

72.    Plaintiff also learned that several interviews were conducted, and that the candidate who was selected, declined the position.

73.    The Delaware Department of Labor investigated Plaintiff's Charge of Discrimination alleging race discrimination and retaliation and found in favor of Plaintiff, finding reasonable cause to believe that violations of Title VII and 19 Del. C. § 711 had occurred. A copy of the Delaware Department of Labor Notice of Reasonable Cause Finding dated July 30, 2004 is attached hereto as Exhibit "A".

74.    Also in or around July 2004, the UBMS Program Manager position became available for a second time. Plaintiff's immediate supervisor, the Assistant

Director of CCP, Jacquita Wright-Henderson, suggested to Plaintiff that she re-apply for the position, citing that Plaintiff had a good personality and dealt with the students and the parents well.

75.     Plaintiff re-applied for the position and was granted an interview on or about July 23, 2004. Once again, however, Paul Morris was one of the interviewers. Within two days after her interview, Plaintiff received a letter from Defendant stating that there were more qualified applicants for the position. However, the position was still not filled and the job was posted a third time in or around October 2004. Plaintiff believes she was denied the position in retaliation for her complaint and subsequent Notice of Reasonable Cause Finding from the Delaware Department of Labor.

76.     In or around late December 2004, before the holiday break, Plaintiff and the rest of the UBMS group were told that a new Program Manager had been hired and that she would start on January 3, 2005.

77.     In January 2005, when the UBMS staff returned from break, they were informed that the new Program Manager decided not to take the position, leaving the Program Manager position vacant once again.

78.     On or about January 26, 2005, Sue Zawislak and Jacquita Wright-Henderson announced in a meeting that Andrea Coleman, an African-American, who had been a former Student Enrichment Coordinator for the Upward Bound Classic Program was transferred into the UBMS Program Manager's position.

79.     Coleman had been managing youth camps for CCP prior to being named the new UBMS Program Manager. Coleman originally applied for Program Manager for her Upward Bound Classic Program in or around October 2003, but was not chosen for

the position. Coleman was also hired after Plaintiff; therefore, she had less seniority. Coleman also had no math/science background, and never applied for the position.

80.     Plaintiff filed a grievance in response to Coleman's transfer to UBMS, especially due to the fact that Coleman was also on the interviewing committee. Sue Zawislak, Director of Corporate and Community Programs, denied Plaintiff's grievance.

81.     Despite having more seniority and years of experience in the Upward Bound Math/Science Federal Trio Program, Plaintiff was denied the opportunity for advancement to the position of Program Manager, in what Plaintiff believes was retaliation for her complaint with the Delaware Department of Labor.

82.     The United States Equal Employment Opportunity Commission ("EEOC") issued a Notice of Right to Sue Letter on February 2, 2005, received by Plaintiff's counsel on February 4, 2005, attached hereto as Exhibit "B."

## COUNT I
### (Racial Discrimination)

83.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 82 by reference as if specifically set forth herein.

84.     The practices of Defendant as complained of above, had the effect of depriving Plaintiff of equal employment opportunities and otherwise affected her employment because of her race. The practices employed by Defendant were intentional and were done with malice and/or reckless indifference to the federally-protected rights of Plaintiff.

85.     The practices of Defendant as complained of above caused Plaintiff to experience conscious pain and suffering and other emotional harm.

86.    The practices of Defendant as described above are imputable to Defendant in violation of 42 U.S.C. § 2000e-2(a) and 3(a).

87.    As a direct and proximate result of said acts, Plaintiff has suffered, and continues to suffer, loss of employment opportunities, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment and damages to her reputation.

## COUNT II
### (Title VII – Retaliation)

88.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 87 by reference as if specifically set forth herein.

89.    This cause of action arises under Title VII, 42 U.S.C. § 2000e(2)(a).

90.    Defendant intentionally and maliciously discriminated against Plaintiff in retaliation for her complaints in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(2)(a) when it:

(a)    denied Plaintiff promotions and transfer requests despite her qualifications;

(b)    forced Plaintiff to work in a hostile work environment; and

(c)    forced Plaintiff to relocate to a workspace that was inadequately designed and obviously too small to house Plaintiff and the other members of her department.

91.    Defendant acted with discriminatory motive and the reasons provided by Defendant for failing to promote and/or transfer Plaintiff are pretextual.

92.    As a result of Defendant's unlawful retaliation against Plaintiff, Plaintiff has suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

## COUNT III
### (Racial Discrimination – Failure to Promote)

93.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 92 by reference as if specifically set forth herein.

94.    Defendant denied Plaintiff numerous opportunities for career advancement despite her qualifications.

95.    Defendant denied Plaintiff career advancement opportunities by denying her requests and applications for promotion, and by failing to even grant Plaintiff an interview for said positions.

96.    As a result of Defendant's discrimination, Plaintiff suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

97.    Defendant's discrimination was willful, wanton and malicious.  As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

## COUNT IV
### (Breach of the Covenant of Good Faith and Fair Dealing)

98.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 97 by reference as if specifically set forth herein.

99.     The actions of Defendant constitute a violation of the *Covenant of Good Faith and Fair Dealing* implicit in every employment agreement.

100.     Defendant breached the *Covenant of Good Faith and Fair Dealing* to Plaintiff by discriminating against her on the basis of her race, and/or based upon retaliatory motives.

101.     Defendant's discrimination was willful, wanton, and malicious. As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

102.     The above-stated damages were not the result of any act or omission on the part of the Plaintiff.

**WHEREFORE**, Plaintiff, Brigitte L. Brown, respectfully requests that this Court enter judgment in her favor and against Defendant, Delaware Technical and Community College:

(a)     Declaring that the conduct engaged in by the Defendant to be in violation of Plaintiff's rights;

(b)     Issuing a judgment in Plaintiff's favor ordering Defendant to provide appropriate back pay with pre- and post-judgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(c)     Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for non-pecuniary losses, including, but not limited to, pain, suffering, and humiliation, in amounts to be determined at trial,

and other affirmative relief necessary to eradicate the effects of

Defendant's unlawful employment practices;

(d)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide

compensation for past and future pecuniary losses, in amounts to be

determined at trial;

(e)    Issuing a judgment in Plaintiff's favor ordering Defendant to pay

punitive damages for its malicious and/or reckless conduct in amounts

to be determined at trial;

(f)    Issuing a judgment in Plaintiff's favor ordering the Defendant to pay

the costs of reasonable attorneys' fees and expenses and the costs of

this litigation; and

(g)    Granting such other further relief as this Court deems just and proper.


MARGOLIS EDELSTEIN


Jeffrey K. Martin, Esquire (#2407)
Keri L. Morris, Esquire (#4656)
1509 Gilpin Avenue
Wilmington, Delaware 19806
302-777-4680 phone
302-777-4682 facsimile
jmartin@margolisedelstein.com
Attorneys for Plaintiff Brigitte Brown


Dated: May 5, 2005



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

*Winner, Delaware Quality Award of Merit*
## NOTICE OF REASONABLE CAUSE FINDING

**RE: Brown v. DE Technical & Community College**          **State Case No.: 0211731**

On November 1, 2002, Ms. Brigitte L. Brown filed a charge of discrimination against DE Technical & Community College. The Charge of Discrimination is hereby incorporated by reference.

**Reasonable Cause Finding:**
On July 30, 2004, the Department of Labor concluded it investigation and now finds, based on the following facts, that there is reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.   Undisputed Facts:
  1. Charging Party began her employment in 2000 as a Student Enrichment Coordinator for Respondent's federal Upward Bound Program.
  2. Charging Party is currently employed in the same position.

II.   Disputed Facts:
  1. Charging Party claims that she endured racial discrimination because she was moved to inadequate office space while being replaced by less tenured white co-workers in individual offices or offices with adequate space. Also, after complaining about her conditions, Respondent scrutinized her work and denied her promotions and scheduling opportunities.

  2. Respondent states that Charging Party and other black similarly situated employees were moved to one office because other employees under the "To The Maxx Program" were terminated when the grant ended, thus leaving a vacant office space. Respondent states that the office move was in effort to group persons employed under particular grants in the same geographical area. Respondent states that before the move, Charging Party and her co-workers were scattered among non-contiguous offices.

III.   Resolution of Material Facts in Dispute:
  1. Observation site visit on 5/12/04 revealed that the previous distribution of offices allowed Charging Party and her co-workers to perform effectively in the same geographical area.
  2. Observation revealed that other white similarly situated workers have their own offices or share offices which allow confidentiality, adequate space and cubicle style work conditions unlike Charging Party's office that she shares with her group of black co-workers.
  3. Observation revealed that one of Charging Party's co-workers was moved to the current space while her old office is currently vacant with boxes.
  4. Observation revealed that Respondent also has made room for a co-op worker to work in the same office that is already overcrowded and appears to have cramped working conditions (wires in walking areas, draws and file cabinets can open blocking exits).
  5. Charging Party submitted evidence that the grant did not specifically state that all staff in the Program needed to be in the same office rather than a suite of offices or cubicle style offices to provide privacy for confidential conversations when servicing center participants.

EXHIBIT

A

Brown v. DE Technical & Community College
May 12, 2004
Page 2

6.    Charging Party provided evidence that adequate office space is required to conduct
      interviews and perform necessary business functions. In addition, Charging Party provided
      evidence that her position requires more than two hours per day inside the office and
      periodic visits to onsites.

7.    Charging Party has provided evidence that Respondent has previously allocated this office
      space to other black employees along with one white worker who was a floater and not
      permanently placed in that office.

8.    Site observation has confirmed that although other clusters are grouped together, there is
      adequate space and cubicles to work efficiently. Charging Party provided evidence that
      previous clusters placed in the same office (permanently) were also black.

9.    Respondent provided no evidence regarding the denial of promotional or scheduling
      opportunities.

IV.   <u>Resolution:</u>
      Charging Party submitted a preponderance of evidence that supported her claim of racial
      discrimination. Respondent did not prove that the office move, denial of promotional
      opportunities and scheduling changes were based solely on business reasons. Charging
      Party proved that she suffered adverse actions and her allegations were corroborated by
      investigative observations and substantial evidence.

The administrative process will now proceed to the conciliation phase pursuant to 19 Del. C. Section
712 (c).

_7/14/04_                              _3. Sands_
DATE                                   Brenda Sands
                                       Labor Law Enforcement Officer

_7/30/04_                              _Jullie K. Cutler_
DATE                                   Julie Cutler
                                       Labor Law Enforcement Supervisor

EEOC Form 161-B (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:Ms. Brigitte L. Brown
1321 West 8th Street
Wilmington, DE 19806

From: Equal Employment Opportunity Commission
Philadelphia District Office
21 South Fifth Street
Philadelphia, PA 19106-2515

RECEIVED
FEB 0 4 2005
BY:

[    ]   *On behalf of person(s) aggrieved whose identity is*
         *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17C-2003-00086 | Legal Unit | (215) 440-2828 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ X ]   More than 180 days have passed since the filing of this charge.

[   ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[ X ]   The EEOC is terminating its processing of this charge.

[   ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[   ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[   ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_____
Marie M. Tomasso, District Director

February 2, 2005
*(Date Mailed)*

Enclosure(s)

cc:   Delaware Technical & Comm College
      Jeffrey K. Martin, Esquire (For Charging Party)

EXHIBIT

B