1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KENNETH COLE and BRIGITTE　）
L. BROWN,　　　　　　　　　）
　　　　　　　　　　　　　　）
　　　　　　　Plaintiffs,　）
　　　　　　　　　　　　　　）　Civil Action No.
v.　　　　　　　　　　　　　）　05-270 (KAJ)
　　　　　　　　　　　　　　）
DELAWARE TECHNICAL AND　　）　CONTAINS
COMMUNITY COLLEGE,　　　　）　CONFIDENTIAL
　　　　　　　　　　　　　　）　INFORMATION
　　　　　　　Defendant.　　）

　　　　　　　Deposition of DR. ANN DEL NEGRO taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 10:10 a.m. on Monday January 30, 2006,
before Kathleen White Palmer, Registered Merit Reporter
and Notary Public.

APPEARANCES:

　　　　　LORI A. BREWINGTON, ESQUIRE
　　　　　MARGOLIS EDELSTEIN
　　　　　　1509 Gilpin Avenue
　　　　　　Wilmington, Delaware　19899
　　　　　　for the Plaintiffs

　　　　　JAMES H. McMACKIN, III, ESQUIRE
　　　　　MORRIS, JAMES, HITCHENS & WILLIAMS
　　　　　　222 Delaware Avenue - Tenth Floor
　　　　　　Wilmington, Delaware　19899
　　　　　　for the Defendant

ALSO PRESENT:　KATHERINE E. GEPPERT, Paralegal
　　　　　　　　Margolis Edelstein
-----------------------------------------------------
　　　　　　　　WILCOX & FETZER
　　1330 King Street - Wilmington, Delaware 19801
　　　　　　　　　(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters



2

1    ALSO PRESENT:

2

3              KENNETH COLE
             BRIGITTE L. BROWN (Via telephone)

4                  - - - - -

5              DR. ANN DEL NEGRO,

6         the witness herein, having first been

7         duly sworn on oath, was examined and

8         testified as follows:

9    BY MS. BREWINGTON:

10     Q.    Good morning.  My name is Lori Brewington and I

11   have the privilege of taking your deposition this morning

12   in connection with discrimination charges filed against

13   DelTech by Brigitte Brown and Ken Cole.

14              Have you ever testified in a deposition

15   before?

16     A.    No.

17     Q.    I will ask you a series of questions.  My intent

18   is to ask them one at a time.  If you could respond to

19   the questions with a yes or a no, make sure that your

20   answers are clear.  No un-huhs and no mm-hmms.  They are

21   not very clear.  We have a court reporter here that will

22   be taking down everything that we are saying today.

23              If at any time you don't understand the

24   question, just let me know and I will try to explain it

1   for you.  If you do answer the question, then I'll assume

2   that we both understood the question and answer.

3       A.    Okay.

4       Q.    If at any time you would like to take a break or

5   you need to use the phone, just let me know.  The only

6   thing I ask is that you do not discuss your deposition

7   testimony with defense counsel here.

8       A.    Okay.

9              MR. McMACKIN:  I just want to state for the

10  record that during breaks we can talk about the subject

11  matter of the deposition, but to the extent that we do

12  and we are asked about it by Ms. Brewington, we would be

13  waiving the privilege at that time.  But we don't intend

14  to do so.

15  BY MS. BREWINGTON:

16      Q.    Please begin by stating your name and

17  professional title.

18      A.    Ann Del Negro, doctor of education.

19      Q.    Did you say director of education or doctor?

20      A.    Doctor.

21      Q.    Doctor of education?

22      A.    Yes.

23      Q.    How long have you been doctor of education?

24      A.    Officially?  Yesterday.



Dr. Ann Del Negro                                    4

1       Q.    Oh, congratulations.

2       A.    Thank you.

3       Q.    What was your title before you became doctor of

4    education?

5       A.    Well, maybe -- maybe I'm answering without -- my

6    official title is I'm the director of corporate and

7    community programs.

8       Q.    Okay.

9       A.    I thought you were asking my level of education.

10      Q.    I'll ask you about that, too, but I was just --

11      A.    Director of corporate and community programs for

12   Delaware Technical and Community College at the Owens

13   Campus.

14      Q.    How long have you been --

15      A.    Since August of 2003.

16      Q.    What was your title prior to director of

17   corporate and community programs at the Owens Campus?

18      A.    Prior to that, it was assistant director of

19   corporate and community programs for the Stanton

20   Wilmington Campus.

21      Q.    What is your educational background?

22      A.    Doctor of education.

23            MR. McMACKIN:  I think she wants:  Where

24   did you go to college?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1              THE WITNESS:   Oh.

2              MR. McMACKIN:   Et cetera.

3      A.    From undergraduate on?

4  BY MS. BREWINGTON:

5      Q.    Undergraduate on, please.

6      A.    Associate degree, Delaware Technical and

7  Community College.  Bachelor degree, Goldey Beacom

8  College.  One master degree in public administration from

9  Wilmington College.  One master degree in Wilmington

10  College in HR management.  And a doctor of education from

11  Wilmington College.

12     Q.    When did you begin working at DelTech?

13     A.    February of 2000.  It may have been March 1st.

14  March 1st was my official start date.

15     Q.    Okay.

16     A.    I was hired in February.

17     Q.    You were hired as an assistant director?

18     A.    No.

19     Q.    What were you hired as?

20     A.    I was hired as the department chair for youth

21  programs it was called at that time.

22     Q.    Then what did you become after that?

23     A.    Assistant director for corporate and community

24  programs.



Dr. Ann Del Negro                                    6

1      Q.    As assistant director of corporate and community

2    programs, who did you report to?

3      A.    I reported directly to Susan Zawislak,

4    Dr. Zawislak.

5      Q.    Who reported directly to you?

6      A.    The names of all the individuals?

7      Q.    Yes.

8      A.    At the time?  You have to bear with me because

9    this is several years ago.

10     Q.    Sure.

11     A.    For the Upward Bound Classic program it was

12   Eugene Barns.  For Upward Bound Math and Science program,

13   REDACTED      .  At the time I came on board, the other

14   youth program was Educational Talent Search and there was

15   no program manager at that point, so I had to assume

16   those responsibilities as the position was vacant.

17               In terms of timing, I can't speak directly,

18   but I inherited -- I started to, you know, assume more

19   responsibility of youth programs as different shifts took

20   place.  Charles Madden was the program manager for --

21   program manager for the To The Max program initially, but

22   he soon left and Peter Lonie became program manager.

23               Also, there was Dionna Harris, who was the

24   program manager at the time for camps.  I believe that's

Dr. Ann Del Negro                          7

1    all.  But without having an organizational chart before

2    me, I can't recall any others at this point.

3        Q.   How about Paul Morris, did he report to you?

4        A.   At the time I was hired, Paul Morris was a

5    student enrichment coordinator for Educational Talent

6    Search.

7             So again, in the absence of a program

8    manager, both he -- Urahn Roberts was the other student

9    enrichment coordinator, and Bridget Staab was the

10   secretary.

11       Q.   At any time when you were assistant director of

12   corporate and community programs, did he -- "he" meaning

13   Paul Morris -- become program manager of Talent Search?

14       A.   Yes.

15       Q.   Do you recall when that was?

16       A.   No.

17       Q.   What did you do in preparation for your

18   deposition testimony this morning?

19       A.   Looked over some documents that were provided

20   to, I believe, you.  Looked over records that were

21   provided, I believe, by -- yeah, by you.  It would have

22   had to come from you.

23       Q.   That were provided by me.

24             Did you review the complaint?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dr. Ann Del Negro                            8

1    A.   Would that be the interrogatory?

2    Q.   No, but you may have reviewed the

3  interrogatories, but -- did you review that document?

4          MR. McMACKIN:  Let the record reflect that

5  Ms. Brewington just showed to the witness Kenneth Cole's

6  complaint.

7    A.   I do not believe that I have seen this.  I

8  specifically remember the interrogatory, but I don't

9  specifically remember this.

10    Q.   Okay.

11    A.   Especially when I see jurisdiction and factual

12  background.  I don't recall.

13    Q.   Did you talk with anyone in preparation for your

14  deposition testimony today?

15    A.   I talked with, yes, Dr. Zawislak.

16          And if I could clarify, if you mean in

17  preparation for today, in preparation for the whole --

18  after we received the interrogatory is when we first

19  talked.  And, of course, the attorney when we went to the

20  meeting at Delaware Tech.

21          MR. McMACKIN:  I'm going to instruct the

22  witness not to comment on the subject or the topics or

23  what was said.

24          MS. BREWINGTON:  I understand.



WILCOX & FETZER LTD.
Registered Professional Reporters

1              THE WITNESS:  Okay.

2    BY MR. BREWINGTON:

3        Q.    When received the interrogatories, was that the

4    last time you spoke with Dr. Zawislak concerning this

5    matter?

6        A.    No.

7        Q.    Did you speak with her after that?

8        A.    To go over certain documents, as far as memory

9    recollection.

10       Q.    When is the most recent time you spoke with

11   Dr. Zawislak?

12       A.    Friday evening, whatever Friday, this past

13   Friday's date was.

14       Q.    Did you talk with Dr. Zawislak concerning her

15   deposition testimony?

16       A.    Concerning, again, memory, if I recalled certain

17   events.

18       Q.    Have you spoken with Paul Morris?

19       A.    Yes.

20       Q.    When did you talk with Paul Morris?

21       A.    I spoke with Paul Morris this morning.

22       Q.    Did you talk with Paul Morris concerning his

23   deposition testimony?

24       A.    No.



Dr. Ann Del Negro                           10

1    Q.    What did you speak with Paul Morris about?

2    A.    I asked him a question about educational

3 attainment.

4    Q.    Educational --

5    A.    Attainment.

6    Q.    Attainment.

7          Did you speak with Paul Morris about

8 Brigitte Brown or Ken Cole in this matter?

9    A.    Ken Cole.

10    Q.    What did you discuss?

11    A.    I asked Paul if he was aware whether Ken had an

12 associate's or a bachelor's, because on all of the PDFs

13 that were in the documents that were supplied by you, it

14 says his educational attainment was associate.

15    Q.    Did you discuss anything else?

16    A.    No.

17    Q.    That was this morning?

18    A.    Yes.

19    Q.    Did Paul Morris give you any information?

20    A.    His answer was it probably was moot because Ken

21 was a part-time employee and reference checks are not

22 typically done for part-time employment, but they are for

23 full-time employment.

24    Q.    Why did you ask him about Ken Cole's status?

1     A.    Because in reviewing the documents that you

2  supplied, there was reference that he was denied

3  opportunity to apply for a position that I knew required

4  a bachelor degree.  So it was for my own information.

5     Q.    What position were you concerned with or were

6  speaking about?

7     A.    None specifically, but I believe there's

8  reference somewhere in there that he was denied

9  opportunity to apply for other vacancies.  Which ones

10 they are, I don't know.

11    Q.    Have you told me everything that you and Paul

12 Morris discussed?

13    A.    The only other thing I asked Paul is whether he

14 could tell me whether or not in 2003 the Upward Bound

15 Math and Science budget was overspent.

16    Q.    I'd like to ask you about the 2001 proposed

17 move.  I know it was awhile ago.

18    A.    Yes, it was.

19    Q.    My first question is:  Was there, in fact, a

20 proposal to move the Upward Bound Math and Science

21 program in 2001?

22    A.    In 2001 there was a proposal to move multiple

23 people.

24    Q.    Well, tell me about who was proposed to move.



Dr. Ann Del Negro                    12

1      A.    That I can't recall exactly.  There were

2   multiple people involved.

3      Q.    Do you recall whether Upward Bound Classic was

4   going to move into the office space occupied by Upward

5   Bound Math and Science?

6      A.    I'm not sure exactly who was proposed to move

7   into which location.

8      Q.    Do you recall anything about that proposed move?

9      A.    Specifics?  No.  As I said, it was 2001.

10     Q.    Do you recall anything generally about that

11   proposal?

12     A.    That I believe additional hires came on board, a

13   new student enrichment coordinator, and a secretary

14   somewhere around that time.  Again, I don't have

15   specifics.

16     Q.    Whose idea was this move in 2001?

17     A.    As far as whose direct idea, I can't recall.  I

18   can only tell you from an operational perspective, we

19   were always asked to keep in mind spacing because spacing

20   is an issue on the campus.

21     Q.    Was the reason for the move because of spacing?

22           MR. McMACKIN:  Objection.  Foundation.

23   Proposed.

24           MS. BREWINGTON:  I'm sorry.  Let me



Dr. Ann Del Negro                    13

1   clarify.

2   BY MS. BREWINGTON:

3       Q.    Was the reason for the proposed move in 2001 for

4   spacing?

5       A.    Spacing in terms of the overall, overarching

6   goal was to try to group the programs together.

7   Personnel from the same program and area of personnel

8   from the same program.

9       Q.    Did you meet with Ken Cole and Brigitte Brown

10  and other members of the Upward Bound Math and Science

11  concerning this proposed move?

12      A.    I don't have any specific recollection of that,

13  nor do I have any notes in reference to that.  So, no, I

14  don't recall.

15      Q.    Do you recall whether the proposed move in

16  February 2001 ever took place?

17      A.    I believe some moves took place, but I don't

18  recall which moves took place.  You know, on a scale of

19  everything that we do in running the division, I don't

20  recall.

21      Q.    Do you recall whether Brigitte Brown and Ken

22  Cole moved their offices during that proposed move?

23      A.    I don't believe so, because the final move that

24  took place in 2002, I believe they were moved from the



Dr. Ann Del Negro                                        14

1  location that they were occupying in 2001.  I don't

2  recall, but from the best of my recollection, when they

3  moved in 2002, it was from where they were located at the

4  time I was hired.

5      Q.    I understand.

6            You mentioned that some people changed

7  offices at that time in 2001; is that correct?

8      A.    I believe so.

9      Q.    Was Tonia Conley relocated to be next to Kate

10 Sullivan at that time?

11     A.    I believe she was.

12           MR. McMACKIN:  Objection.  Are you talking

13 about -- I'm not following because you are talking

14 about --

15           MS. BREWINGTON:  I'm only talking about the

16 proposed move.

17           MR. McMACKIN:  So was she proposed to move

18 next to Kate Sullivan?  Is that your question?

19           MS. BREWINGTON:  No.  My question was:  Did

20 she, in fact, move as a result of that?

21 BY MS. BREWINGTON:

22     Q.    You mentioned that people had moved, but you

23 didn't believe that Upward Bound Math and Science had

24 moved or Ken Cole and Brigitte Brown.



1    A.    I don't recall.

2    Q.    Okay.

3    A.    Perhaps that's the better answer rather than I

4  believe so.  I don't recall.  If you could show me, you

5  know, the end results of the moves, but --

6    Q.    But you do recall Tonia Conley being relocated

7  next to Kate Sullivan; is that correct?

8    A.    I said I believe, but perhaps the better answer

9  was I don't recall.  Again, if you could show me a chart,

10  it would help.

11    Q.    Tonia Conley was student enrichment coordinator

12  for Upward Bound Classic?

13              MR. McMACKIN:  Objection to form.

14              THE WITNESS:  Does that mean I respond?

15              MR. McMACKIN:  Yes.

16    A.    Yes.

17  BY MS. BREWINGTON:

18    Q.    Kate Sullivan was the program manager for Upward

19  Bound Classic?

20    A.    Is that the same lines as he just objected to?

21    Q.    Is that correct?

22    A.    Is that correct?  Yes, that's correct.

23    Q.    Were you aware of any issues or problems between

24  Kate Sullivan and Tonia Conley?



Dr. Ann Del Negro                                    16

1     A.     There were problems -- could you clarify what

2   that means?

3     Q.     Problems meaning any issues, disagreements, work

4   performance issues, personnel issues.

5     A.     Am I at liberty to talk about --

6          MR. McMACKIN:  Let me jump in here for a

7   minute.  I'm sorry.  I'm going to instruct you to answer

8   the question, but before you do so, may I put on the

9   record that there is a confidentiality stipulation in

10   place between each of the plaintiffs and Delaware

11   Technical and Community College entered into on or about

12   January 16, 2006.

13          Pursuant to that confidentiality

14   stipulation, the college requests that some of the

15   testimony and/or questions recorded at this deposition be

16   placed under seal.  We are going to respectfully ask the

17   court reporter to mark periodically throughout the

18   deposition certain testimonies being under seal.  If the

19   court reporter could just make a notation on the record

20   each time such request is made, this way we'll have a

21   place holder and we'll know when we need to redact and

22   place things under seal.

23          The college reserves its right hereafter to

24   review the transcript and mark anything under seal that



Dr. Ann Del Negro                    17

 1   is encompassed by the confidentiality stipulation.

 2              You can answer the question to the extent

 3   you know the answer.

 4              MR. McMACKIN:  Can we go off the record for

 5   just a second?

 6              (Discussion off the record.)

 7              [CONFIDENTIAL ON]

 8   BY MS. BREWINGTON:

 9      Q.    I was asking you about whether you were aware of

10   any issues, problems, disagreements, grievances, formal

11   and informal, performance issues between Kate Sullivan

12   and Tonia Conley.

13      A.    Okay.  I wouldn't classify them as performance

14   issues.  I would say that there were challenges between

15   the program manager and the student enrichment

16   coordinator insofar as work standards.  I believe they

17   had different philosophies and there was a lot of

18   coaching that took place with both employees in those

19   areas to try to promote collaborative work environment.

20   And it was challenging because their standards were quite

21   different.

22      Q.    Tell me about Tonia Conley's standards versus

23   Kate Sullivan's standards.

24      A.    Okay.  I would say Kate Sullivan was very



Dr. Ann Del Negro                    18

1    accountability.  She believed in high standards, high

2    accountability.  Expected, had high expectations,

3    expected a lot of herself and expected a lot of her

4    staff.  And would get concerned when work plans were not

5    being followed as discussed and agreed upon.

6        Q.    What about Tonya Conley's philosophy?

7        A.    Tonia took a more indirect approach.  She

8    operated a lot more flexible that in terms of when the

9    job got done, there were practices that were -- that she

10   followed that were not always acceptable as far, again,

11   going back to high work standards.

12            I know a couple of instances that kept

13   resurfacing are that she would have certain school dates

14   on her calendar and the program manager would receive

15   calls from the school saying that Tonia never showed up.

16            And when we went back to try to figure out

17   what went wrong, why was there a disconnect between what

18   we had planned to do and what we actually did, Tonia

19   would -- Tonia's response would be, well, I had

20   preplanned the calendars and I had thought at the time I

21   prepared the calendars that I would be at that school.

22            And that to give you an example of the

23   difference between the standards, when Kate would have a

24   calendar, she would expect that calendar to be the plan



1   that you were going to work off for the week, not an at

2   the time I prepared it I thought I was going to go there,

3   not necessarily that I was really going to go there.

4              So that is an example that I specifically

5   remember that there was a back and forth between, you

6   know, how do we solve this challenge between the two

7   different work styles.

8        Q.   Now, you mentioned coaching.  Did you do the

9   coaching?

10       A.   Yes.

11       Q.   Did you coach both?

12       A.   Yes.

13       Q.   Was Tonia Conley ever written up formally or

14   informally reprimanded?

15              MR. McMACKIN:  We ask this be confidential

16   still.

17       A.   By me?

18       Q.   By anyone that you know of.

19       A.   I don't recall.

20              MS. BREWINGTON:  We can go off of

21   confidentiality now.

22              [CONFIDENTIAL OFF.]

23   BY MS. BREWINGTON:

24       Q.   But whose decision was it to move the Upward



Dr. Ann Del Negro                            20

1   Bound Math and Science program in August of 2002?

2       A.   The decision was the campus director's decision.

3   Only he can decide who moves and who doesn't move.

4       Q.   Did anyone make recommendations to the campus

5   director concerning this move?

6       A.   Yes.

7       Q.   Who made recommendations?

8       A.   The recommendation would have to come from the

9   division director.

10      Q.   Who at that time was...

11      A.   Dr. Zawislak.

12      Q.   Did anyone make any recommendation to

13  Dr. Zawislak, or did she make this recommendation to

14  Mr. Miller on her own?

15      A.   No.  It was a collaborative process.  There was

16  discussion.

17      Q.   Who was involved in the discussion?

18      A.   Paul Morris, myself.

19           MR. McMACKIN:  I object on foundation to

20  that question because this question and the previous

21  question presume that the move occurred in August 2002

22  and I was just looking at the complaint and it occurred

23  in September 2002.

24           MS. BREWINGTON:  Right.  That's fine.

Dr. Ann Del Negro                    21

1    BY MS. BREWINGTON:

2        Q.    But the discussions to move started in August of

3    2002.  That's also in the complaint?

4                MR. McMACKIN:  I'm sorry.  I thought you

5    said that the move occurred in August.

6                MS. BREWINGTON:  No.

7                MR. McMACKIN:  I apologize.

8                MS. BREWINGTON:  The decision to move, at

9    least our understanding of the decision was made around

10   that time because that's when Upward Bound Math and

11   Science were notified of that.

12   BY MS. BREWINGTON:

13       Q.    If I told you that I took Paul Morris'

14   deposition on Friday and he testified that it was his

15   recommendation to move the Upward Bound Math and Science

16   program to room 408, would you disagree with that?

17       A.    That it was his recommendation?  No.

18                MR. McMACKIN:  Objection.  Speculation.

19       Q.    You wouldn't disagree with that?

20       A.    Would I disagree with that?  I don't recall.

21   Paul was never in a position to make recommendations.

22       Q.    You mentioned that it was a collaborative

23   discussion; is that correct?

24       A.    Yeah, regarding space.



1      Q.    Who was involved in the collaborative

2   discussion?

3      A.    It would have been Paul and myself.

4      Q.    Anyone else?

5      A.    Well, then after looking, thinking things

6   through, talking with Dr. Zawislak.

7      Q.    What was the reason for this move?

8      A.    Space became available.

9      Q.    Is that the only reason for this move, that

10  space became available?

11     A.    Yes.

12     Q.    What space are we talking about when you say

13  "space became available"?

14     A.    I believe the numbers -- room 408.

15     Q.    Who was in that room previously?

16     A.    It had been occupied by -- they changed names.

17  I believe it was at the time called S.O.A.R.   It was

18  either called To the Max or S.O.A.R.

19     Q.    So the reason for the move was because space

20  became available; is that correct?

21     A.    Correct.

22     Q.    The reason why Upward Bound Math and Science was

23  moved to that room as opposed to any of the other trio

24  programs was because of what?



Dr. Ann Del Negro                          23

1      A.    Because they were the only program that had four

2   people.

3      Q.    How many people did Talent Search have?

4      A.    At the time Talent Search was already in an area

5   where all of the personnel were together, so that move

6   had taken place -- I don't recall exactly when, but that

7   was another program that was scattered.  They were down

8   on the first floor of the east building and separated and

9   they moved up to the fourth floor.  I don't know the room

10  number.  But they were then all together, the support

11  staff and the program manager.

12     Q.    How many people did Talent Search have?

13     A.    Four.

14     Q.    So both Talent Search and Upward Bound Math and

15  Science had four members; is that correct?

16     A.    That's correct.  Correct.

17     Q.    Upward Bound Math and Science was chose to move

18  into 408; is that correct?

19     A.    That is correct.  But did you understand what I

20  said preceding that?

21     Q.    I certainly did.

22           How many members did Upward Bound Classic

23  have?

24           MR. McMACKIN:  Objection.  Vague.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dr. Ann Del Negro                    24

1    Q.    Do you understand the question?

2    A.    I believe you need to explain it.

3    Q.    How many members did Upward Bound Classic have

4    at the time of the proposed move in August 2002?

5    A.    My answer is I don't recall because I know there

6    was a shift in -- I know one student enrichment

7    coordinator had resigned and I don't recall whether

8    Andrea Coleman was there at the time.  I don't recall.

9    Q.    Can you give me a range, like an approximate?

10   A.    Five, six, maybe.

11   Q.    Would this include the program manager and the

12   student enrichment coordinators?

13   A.    And the secretaries.

14   Q.    And the secretaries.

15          Could you tell me what your understanding

16   of the proposed move was in terms of who was to move

17   where?

18   A.    In -- could you clarify that a little bit more?

19   The reason I'm asking is I don't know if there were other

20   moves that were a part of that plan.

21   Q.    I guess what I'm talking about specifically is

22   the move that Upward Bound Math and Science program was

23   part of.

24   A.    Okay.  Then could you ask me that question

Dr. Ann Del Negro                                25

1    again, please?

2        Q.    My question is:  What's your understanding of

3    the proposed move in terms of who was going to move

4    where, if you could provide names to?

5        A.    Okay.  If I could start with To The Max or

6    S.O.A.R., I'm not sure what the name of the program was

7    at that time.  I believe one of the positions was

8    eliminated, which left them with one less employee.  So

9    the idea was, again, to try to cluster all the personnel

10   of each of the programs together to promote the teamwork

11   environment.

12              With the downsizing of a program of four to

13   a program of three, the intent was then to be in a

14   position to put all Upward Bound Math and Science

15   employees together in a location that was already set up

16   for four.

17       Q.    Okay.

18       A.    Which would be parallel to what Educational

19   Talent Search had attained.  We found space to put them

20   in an area where all four could be together.

21       Q.    So in terms of who was going to move, am I

22   correct that Upward Bound Math and Science was going to

23   occupy To The Max or S.O.A.R.'s location, and To The Max

24   or S.O.A.R. was going to occupy Upward Bound Math and

1    Science area?

2                    MR. McMACKIN:   Objection.   Foundation.

3                    To the extent you know, you can answer.

4                    THE WITNESS:   Okay.

5        A.    I don't recall exactly where To The Max was

6    going to be located.   I do know because there was a

7    program set up for four -- or an area set up for four,

8    that it was -- it appeared to us to be the ideal

9    opportunity to take what we were able to accomplish with

10    Educational Talent Search for Upward Bound Math and

11    Science.

12    BY MS. BREWINGTON:

13        Q.    You mentioned that the area was set up for four.

14    "Area" meaning room 408?

15        A.    Yes.

16        Q.    Okay.

17        A.    If that's the number.   I don't recall exactly.

18        Q.    I'll represent to you that that's the number.

19        A.    It was on the east side.

20        Q.    Can you provide for me the names of the people

21    who previously occupied the office space that upward

22    bound staff eventually moved into?

23        A.    For the S.O.A.R. program, Peter Lonie was the

24    program manager.   Crystal Heath was the student



Dr. Ann Del Negro                    27

1    enrichment coordinator.  I believe Carolyn Cave was the

2    other student enrichment coordinator.  And I'm not quite

3    sure who was the secretary then.  I believe it may have

4    been Diana Dyson, but I'm not absolutely positive.

5        Q.   What about Cathy Hagan, was she in that room at

6    that time?

7        A.   I don't recall.

8        Q.   Who is Cathy Hagan?

9        A.   Who is she?

10       Q.   Yes.  What's her title?

11       A.   I --

12       Q.   What was her title during this time?  I'm sorry.

13       A.   During that time?

14       Q.   Yes.

15       A.   Administrative assistant.

16       Q.   Was she an administrative assistant for the

17   To The Max program?

18       A.   I -- in terms of -- I don't recall because I

19   know she had multiple responsibilities.

20       Q.   So do you know whose administrative assistant

21   she was?

22       A.   I can't recall.  I know she worked at some point

23   with Upward Bound Math and Science.  I know she had some

24   work with me.  I know she supported somehow To The Max.

Dr. Ann Del Negro                    28

1      Q.    You mentioned that Cathy Hagan supported you.

2   At one point you occupy 408 as a single office; is that

3   correct?

4      A.    Yes.

5      Q.    When was that?

6      A.    I don't recall the dates.

7      Q.    Approximately.

8      A.    Probably a three-month period, four-month

9   period.  Might have been -- I don't recall.

10     Q.    Cathy Hagan was your secretary?

11     A.    Initially.

12     Q.    Did she occupy an area next to your office?

13     A.    Oh, yes.  In 408?

14     Q.    Yes.

15     A.    Yes.  For, again, for how long the duration was,

16  I don't recall.

17     Q.    So you occupied room 408 and she also had an

18  area in 408; is that correct?

19     A.    Again, for how many -- for how long, I don't

20  know, because she was called to help support other

21  programs as the needs arose.

22     Q.    But I want to get it correct that you occupied

23  it as did she; is that correct?  She supported you as a

24  secretary?



Dr. Ann Del Negro                    29

1      A.    Again, my answer is:  Conditionally.

2      Q.    I don't think I understand.

3      A.    Okay.  Could you ask me more specifics?  Like

4   did she support me full time?

5      Q.    That's not my question, though.

6      A.    Then I don't understand your question.

7      Q.    My question is:  Did she ever support you?

8      A.    Yes.

9      Q.    Did she ever occupy that office with you?

10     A.    Yes.

11     Q.    Thank you.

12     A.    You're welcome.

13     Q.    You also mentioned Peter Lonie, Crystal Heath,

14  Carolyn Cave, and Cathy Hagan were in that office.

15     A.    I believe I said perhaps Diana Dyson.

16     Q.    I'm sorry.  Yes, you did.  Diana Dyson.

17           So it was Diana Dyson or Cathy Hagan?

18     A.    Yes.  And you would have to check with HR to get

19  the specific dates.

20     Q.    Now, REDACTED          took over, moved into Peter

21  Lonie's area; is that correct?

22     A.    Correct.

23     Q.    Was Carolyn Cave there during this time?

24           MR. McMACKIN:  Objection.  Vague.



1    Q.    Do you understand?

2    A.    During which?  What time?

3    Q.    The time we are talking about here, in or around

4    August 2002 when there was this proposed move.

5    A.    I don't know.

6    Q.    As I understand it, your reason for moving

7    Upward Bound Math and Science was because four people

8    occupied the room previously; is that correct?

9    A.    That's correct.

10          MR. McMACKIN:  Objection.  I'm just going

11   to object to the form of the question.

12          MS. BREWINGTON:  Okay.

13   BY MS. BREWINGTON:

14   Q.    I'm going to ask that again.

15          Your reason for moving Upward Bound Math

16   and Science into that office space was because four

17   people occupied that space previously; is that correct?

18   A.    Correct.

19          MR. McMACKIN:  Objection.  Foundation.

20          MS. BREWINGTON:  Okay.

21   BY MS. BREWINGTON:

22   Q.    Now, Crystal Heath was a student enrichment

23   coordinator in that office; is that correct?

24   A.    She was an enrichment coordinator for that

Dr. Ann Del Negro                              31

```
 1   program.
 2        Q.    And Carolyn Cave, was she there full time?
 3        A.    I don't recall what her classification status
 4   was.
 5        Q.    Do you know whether if she left at any time?
 6        A.    I don't recall.
 7        Q.    Cathy Hagan, you mentioned that she was also or
 8   may have been in that office; correct?
 9        A.    Perhaps.
10        Q.    Perhaps.
11              Do you know whether Cathy Hagan had an
12   office elsewhere in the building?
13        A.    I don't recall.
14        Q.    You mentioned that she worked with To The Max
15   and at some point she worked with other programs;
16   correct?
17        A.    Yes.
18        Q.    Okay.
19        A.    Yes.
20        Q.    While she was in that office space, room 408,
21   did she work with other programs besides To the Max?
22        A.    I believe when she was in 408, she worked with
23   Upward Bound Math and Science in helping them get their
24   files in order.
```



Dr. Ann Del Negro                                  32

1      Q.    So did she work along with Liz Wilson?

2      A.    I don't believe Liz was there at the time.

3      Q.    Would it be fair to say that when the move

4   actually took place, that Liz Wilson, Brigitte Brown, and

5   Ken Cole occupied the space that Crystal Heath occupied

6   at that time?

7                MR. McMACKIN:   Objection.   Ambiguous.

8      A.    I don't understand the question.

9      Q.    Liz Wilson, Brigitte Brown, and Ken Cole moved

10   their offices; correct?  Moved their area?

11      A.    Yes.

12      Q.    Would it be fair to say that the space occupied

13   by Crystal Heath later became Liz Wilson, Brigitte Brown,

14   and Ken Cole's office space?

15      A.    Occupied only by Crystal Heath?

16      Q.    Yes.

17      A.    No.   That office was not occupied by a single

18   person for To the Max or S.O.A.R. or whatever it was

19   called at the time.

20      Q.    Well,   REDACTED        took over Peter Lonie's

21   area; is that correct?

22      A.    Mm-hmm.

23      Q.    Cathy Hagan was not there full time; correct?

24      A.    I can't recall.



1      Q.    Carolyn Cave had left.  Isn't that also correct?

2            MR. McMACKIN:  Objection.  Vague.

3      A.    These are HR questions.  I don't have that kind

4  of information.

5      Q.    But you are certain that four people occupied

6  that office; correct?

7      A.    Yes.

8      Q.    The rooms that Upward Bound Math and Science

9  used originally, in the area that they were originally

10 in, were they offices or cubicles?

11     A.    Could you identify which staff you are referring

12 to?

13     Q.    Upward Bound Math and Science.

14     A.    Okay.

15     Q.    Ken Cole.

16     A.    Okay.  Office.

17     Q.    Brigitte Brown?

18     A.    Office.

19     Q.    Office, office.

20            MR. McMACKIN:  You are talking about before

21 the move; right?

22            MS. BREWINGTON:  Yes.  I said "originally."

23 BY MS. BREWINGTON:

24     Q.    So Brigitte Brown and Ken Cole were originally



Dr. Ann Del Negro                    34

1    were in individual offices?

2        A.    Yes.

3        Q.    Is it fair to say that their original offices

4    accounted for privacy for students and student enrichment

5    coordinators?

6        A.    Are you asking for my personal opinion?

7                MR. McMACKIN:  Objection.  That calls for

8    speculation.

9        Q.    I'm asking for your opinion, yes.  I'm asking

10   for whether you thought that those offices accounted for

11   privacy.

12               You said that they were offices; correct?

13       A.    Well, I said they were offices, that is correct.

14       Q.    My question is:  Did these offices occupied by

15   Brigitte Brown and Ken Cole individually account for

16   privacy for students and their student enrichment

17   coordinators?

18               MR. McMACKIN:  Objection.  Vague.

19       A.    And again, I believe the questioning is asking

20   for my personal opinion.  And if --

21               THE WITNESS:  Am I supposed to give my

22   personal opinion?

23               MR. McMACKIN:  You are not qualified as an

24   expert.



1          THE WITNESS:  I am not.

2          MR. McMACKIN:  But if you can answer the

3    question, if you have knowledge, then you can answer it.

4    If you don't know, then you don't know.  And I'm not

5    trying to put words in your mouth.

6        A.    Then I don't know.

7    BY MS. BREWINGTON:

8        Q.    You don't know what?

9        A.    I don't know whether you would consider them

10   privacy or not.

11       Q.    Why not?

12       A.    There were no -- there was no ceiling.  Well,

13   there was a ceiling, but there were -- how can I say

14   this?  Partitions.  There were sort of like partitions

15   and then the ceiling.

16          So as far as privacy, in my opinion, not

17   totally.  They were not like enclosed offices like this.

18       Q.    So is it fair to say that they provided for some

19   confidentiality but not --

20       A.    I don't know.

21       Q.    There are no partitions to separate the office

22   space of the members of Upward Bound Science that they

23   moved into; correct?

24       A.    I have been gone from that campus for over two



Dr. Ann Del Negro                              36

1   years, two and a half years, so I don't know if there's

2   partitions or not.

3        Q.    Were you there when Upward Bound Math and

4   Science moved into that office space?

5        A.    Yes.

6        Q.    Were there partitions then?

7        A.    No.  At the choice of the program manager.

8        Q.    Were you aware that Liz Wilson requested

9   partitions from Paul Morris?

10        A.    No, I am not.  I'm not sure why she would ask

11   that of Paul Morris and not the program manager.

12        Q.    She had a meeting with Paul Morris.

13        A.    Okay.

14        Q.    Are you saying that the only reason why there

15   were no partitions there is because REDACTED              didn't

16   request them for her group?

17              MR. McMACKIN:   Objection.

18   Mischaracterizes.

19        A.    I'm not --

20        Q.    I'm asking if you're saying that.  If you're

21   not --

22        A.    I'm not saying that.  I don't know why there's

23   not -- if there weren't and if there still isn't, I don't

24   know whether there is or not.  I have no --

Dr. Ann Del Negro                                    37

1      Q.     So why weren't there partitions in that?

2      A.     Why weren't there?

3      Q.     Yes.

4      A.     I don't know.  I don't know what the reason is.

5      Q.     Wouldn't partitions have helped with providing

6   privacy for students?

7                  MR. McMACKIN:  Objection.  Calls for

8   speculation and argumentative.

9      A.     I don't know whether they would or not.

10     Q.     You don't know whether partitions would provide

11  privacy?

12     A.     I guess that's an opinion -- you know, you are

13  asking me --

14     Q.     You are allowed to give me your personal

15  knowledge.  If you think partitions would help account

16  for privacy, you can say that.  If you don't believe

17  that, then don't say that.

18                  Are you familiar with the EDGAR

19  regulations?

20     A.     That's pretty broad.  There are multiple EDGAR

21  regulations.

22     Q.     Okay.  Well, if I ask you if you are familiar

23  with the EDGAR regulations, your answer would be yes or

24  no.



Dr. Ann Del Negro                    38

1    A.    Okay.   Yes.

2    Q.    Okay.   Thank you.

3          Could you tell me what they are?

4    A.    The EDGAR regulations are regulations for

5    federal programs.

6    Q.    Do the EDGAR regulations have any stipulations

7    or rules with respect to construction and grants?

8    A.    I don't know.

9    Q.    Could you explain to me the setup of the Upward

10   Bound Classic program around -- and I'm going to give you

11   a time frame -- around August of 2002 when the proposed

12   move was to take place, the second proposed move?

13          MR. McMACKIN:  Objection as vague.

14          To the extent you can answer, you can

15   answer.

16   A.    When you say "setup," what are you asking me?

17          MR. McMACKIN:  The reason why I'm

18   objecting, just so you know, is the setup, the hierarchy

19   or the setup, the outlay of the room -- what do you mean

20   by "setup"?  That was the reason for my objection and

21   that's what causing the witness' confusion, as well.

22          MS. BREWINGTON:  Okay.  I apologize.

23   BY MS. BREWINGTON:

24   Q.    The layout of the room.



Dr. Ann Del Negro                    39

1      A.    Layout individual offices -- or individual space

2  separated by cubicles.  I don't recall how many, but....

3      Q.    So Upward Bound Classic had individual spaces

4  separated by cubicles; is that correct?

5      A.    That's correct.

6      Q.    Tell me about Talent Search and their setup as

7  far as their layout.

8      A.    Similar.  I mean, the configuration is different

9  because -- whereas one is oblong, the other one is

10 square.

11     Q.    But both individual setups for the student

12 enrichment coordinators along with cubicles; is that

13 correct?

14     A.    That's correct.

15     Q.    Then when we have the Upward Bound Math and

16 Science group, tell me about their setup in their new

17 office area.

18     A.    They were set up without cubicles.

19     Q.    Anything else?

20     A.    I'm not sure what that question means.

21     Q.    What else can you recall about their setup as

22 far as their layout?

23     A.    As far as where the furniture was positioned?

24     Q.    As far as anything that you can recall.



Dr. Ann Del Negro                                40

1      A.    I don't recall anything other than receiving a
2  call from administrative services saying that they were
3  very frustrated that they received no cooperation in
4  putting the furniture in the room.   That's the only thing
5  I can recall.
6      Q.    Who was very frustrated?
7      A.    Whoever the movers were that day.
8      Q.    They were frustrated because of what?
9      A.    They were attempting to put the furniture in the
10 room and they weren't getting assistance in where to put
11 which pieces.
12     Q.    Who told you this?
13     A.    Eddie Cunningham.
14     Q.    Let me follow up with that.
15           Were Ken Cole and Brigitte Brown
16 responsible for arranging the furniture in that room?
17     A.    I don't know.
18     Q.    Is it fair to say that the Upward Bound Math and
19 Science new office space provides little to no privacy?
20           MR. McMACKIN:   Objection.   Argumentative.
21     A.    I don't know which -- I'm not sure what your
22 line of questioning is.
23     Q.    Upward Bound Math and Science eventually moved
24 into room 408; correct?

Dr. Ann Del Negro                    41

1    A.    That's correct.

2    Q.    We talked about the office space and we

3  mentioned that Talent Search had cubicles and partitions.

4  Upward Bound Classic had cubicles and partitions.  And

5  when I asked you about the layout of Upward Bound Math

6  and Science, you indicated there were no cubicles and no

7  partitions; is that correct?

8    A.    That's correct.

9    Q.    So my question to you is:  Is it fair to say

10  that Upward Bound Math and Science, their new offices,

11  provided little to no privacy?

12              MR. McMACKIN:  Objection.  Argumentative.

13    A.    And I'm not an expert there.  I can't answer

14  that.

15    Q.    Based on your personal knowledge, would it be

16  fair to say that Upward Bound Math and Science's new

17  office provided little to no privacy?

18              MR. McMACKIN:  Objection.  Argumentative.

19              THE WITNESS:  Do I answer that?

20    Q.    Yes.  He can object, but you are to answer the

21  questions unless he instructs you not to answer the

22  question.

23    A.    Okay.  I got you.

24              In my personal opinion?  The other



Dr. Ann Del Negro                    42

1    coordinators that have similar space have partitions.

2    How much privacy that affords them, I don't know.

3    BY MS. BREWINGTON:

4        Q.    So --

5        A.    If your question is saying does a partition

6    equate to privacy?  I would have no idea.

7        Q.    Well, do you feel that the Upward Bound Math and

8    Science program, the student enrichment coordinators in

9    that program have less privacy than the others, than the

10   other programs because of their partitions?

11       A.    I don't feel one way or the other.

12       Q.    When students come in to visit these offices and

13   there are partitions there, can you necessarily see who

14   comes into each individual office with these partitions?

15           MR. McMACKIN:  Objection to foundation.

16       A.    I would have no idea.

17       Q.    You said you would have no idea; right?

18       A.    Mm-hmm.

19       Q.    Why would you have no idea?

20       A.    Because I'm not a student enrichment

21   coordinator.

22       Q.    You would have no idea because you are not a

23   student enrichment coordinator?

24           Did you see the office space of the Talent



1    Search program SECs and the Upward Bound Classic SECs?

2         A.    Yes.

3         Q.    So based on what you saw, is it fair to say that

4    when a student comes in and meets with them, that other

5    student enrichment coordinators wouldn't necessarily see

6    them in that area?

7              MR. McMACKIN:    Objection to foundation.

8    Objection to form.

9              You can answer to the extent you can.

10        A.    I'm not following the line of questioning.    Are

11   you saying that by not being able to see someone, that

12   means that that's private?

13        Q.    We moved away from the privacy and the

14   confidential communication.

15             Now I'm just simply asking you:    If there's

16   a partition there, isn't it fair to say that when that

17   student comes into that cubicle and that office, they

18   would not necessarily be seen by the other student

19   enrichment coordinators in that area?

20             MR. McMACKIN:    Objection to foundation.

21        A.    Again, I'm not sure if -- when you walk --

22        Q.    I'll move on.

23        A.    If the student --

24        Q.    I'll move on.    I'll move on.    You seem to be too

Dr. Ann Del Negro                                    44

1    confused.  I'll move on.

2        A.    I'm not confused.  It's the question I've been

3    asked.

4        Q.    Okay.  That's fine.

5              Did you meet with Ken Cole and Brigitte

6    Brown and the other members of Upward Bound Math and

7    Science program along with Paul Morris in August 2002?

8        A.    Yes, I did.

9        Q.    What do you remember about that meeting?

10       A.    I remember that --

11       Q.    First can I stop?

12             What do you remember about that meeting in

13   terms of what was said by Ken·Cole and Brigitte Brown.  I

14   want to be a little more specific with you.

15       A.    Okay.  There was a written document that one of

16   the members of Upward Bound Math and Science presented.

17   I'm not exactly sure who it was.  But it pretty much

18   identified what their reasons were for not wanting to

19   relocate.

20       Q.    What were some of their reasons?

21       A.    That it would impact their productivity, for

22   one, their morale, and their relations.

23       Q.    Going back to:  What do you recall them saying

24   at that meeting?



1    A.    That they felt as though those three areas would

2    be impacted if they were put in a different location than

3    where they currently were.

4    Q.    Did either person say that they felt that they

5    were being treated unfairly?

6    A.    I don't recall if those were the words that were

7    exactly said.  I do recall that there was an attempt to

8    bring up issues related to personnel in another program,

9    at which point it was made known that I was not at

10   liberty or no one in that room was at liberty to discuss

11   personnel issues related to another program.

12   Q.    When you say "personnel," do you mean Tonia

13   Conley and Kate Sullivan?

14   A.    Yes.

15   Q.    Did you investigate whether the issues between

16   Tonia Conley and Kate Sullivan may have had anything to

17   do with the proposed move?

18   A.    I had been working coaching with Tonia and Kate

19   over time, so it had absolutely nothing to do with the

20   proposed move.

21   Q.    Did either person -- and when I say "person," I

22   mean Brigitte Brown or Ken Cole -- say that they felt

23   they were being treated unequally?

24   A.    I believe they said that they were -- they felt



Dr. Ann Del Negro                                    46

1   impacted by Upward Bound Classic, and by "Upward Bound

2   Classic," that refers to Kate and Tonia.  That they felt

3   their move was being impacted by, again, personnel in

4   another program.

5       Q.    Did either Ken Cole or Brigitte Brown tell you

6   that the small space would make it difficult to protect

7   students' privacy, which was necessary?

8       A.    I don't recall, but there is a written statement

9   that they provided somewhere in that -- somewhere in the

10  documents.

11      Q.    Going back, you mentioned that they expressed to

12  you concerns about this move having an impact on

13  productivity and morale and relations; correct?

14      A.    That's correct.

15      Q.    How did you respond to their concerns about the

16  impact on productivity?

17      A.    I believe I responded that physical location

18  should not interfere with an employee's ability to be

19  productive.

20      Q.    How did you respond to their concerns about

21  employee morale?

22      A.    Similar.  That location should not impact

23  morale.

24      Q.    How did you respond to their concerns about



1    employee relations?

2        A.    Again, that location should not have an impact

3    on relations.

4        Q.    Did you say anything else in that meeting?

5        A.    That I was going to recommend to Dr. Zawislak

6    that the move go forward.

7        Q.    Did Paul Morris say anything in that meeting?

8        A.    I don't recall.

9        Q.    Why did you decide to go forward with the move

10   or to recommend to go forward with the move despite

11   Upward Bound Math and Science's concerns?

12               MR. McMACKIN:   Objection.   Compound.

13   Objection.

14        A.    I decided to go forward with the recommendation

15   for the program to move because I did not believe there

16   was anything of substance produced at that meeting as to

17   why I would recommend otherwise.

18        Q.    You eventually met with the Upward Bound Math

19   and Science group again in September 2002 with

20   Dr. Zawislak; correct?

21        A.    I don't recall the date, but, yes, we did meet.

22        Q.    You met with Ken Cole, Brigitte Brown, and Liz

23   Wilson separately; is that correct?

24        A.    Yes.



Dr. Ann Del Negro                48

1      Q.    Why did you meet with them separately rather

2   than as a group?

3      A.    That was a question for Dr. Zawislak, not for

4   me.

5      Q.    Why do you believe that or why do you think that

6   she --

7                MR. McMACKIN:   Objection.   Calls for

8   speculation.

9      A.    I don't know.

10     Q.    You don't know?

11     A.    No.

12     Q.    But it was her decision to meet with the group

13  individually?

14     A.    I don't know.   It could have come from the

15  campus director.   She also, you know, has supervisors

16  that she reports to.   I don't know.

17     Q.    Who did you meet with first?

18     A.    I don't recall.

19     Q.    I'll represent to you that you met with Brigitte

20  Brown on September 5th, 2002.   Okay?

21     A.    Okay.

22     Q.    What do you recall Brigitte Brown saying at that

23  meeting?

24     A.    That space -- I can't quote.   I know in general

Dr. Ann Del Negro                                    49

1    she was very concerned with her losing space.  She didn't

2    feel as though her furniture was going to fit.  Just that

3    space was very important to her.

4        Q.    How did you respond?

5        A.    Specific?  I don't remember, but the move -- I

6    believe we said the move would go forward.  The fact that

7    space is important as a matter of being productive, it

8    wasn't a justifiable reason to suggest that the person

9    stays where they are.

10       Q.    You met with Ken Cole the next day; correct?

11   Let me go back to Brigitte Brown's meeting.

12             Do you recall what Dr. Zawislak said?

13       A.    No, I don't.

14       Q.    Do you remember anything else about that meeting

15   with Brigitte Brown?

16       A.    Other than she was highly emotional and stood on

17   her position that her space was important to her.

18       Q.    Okay.

19       A.    And her equipment, her related equipment.

20       Q.    If I could go back, I forgot to touch upon

21   something.

22             At some point after the meeting that you

23   had with Paul Morris and the rest of the Upward Bound

24   Math and Science group, do you recall maintenance men

Dr. Ann Del Negro                        50

1   measuring the offices of Upward Bound Math and Science

2   group?

3       A.    I don't know when that space was measured.  I do

4   know that it was measured and it was measured by, I

5   believe, first Mr. Cole and then secondly by

6   administrative services.

7       Q.    Were you present when that space was being

8   measured?

9       A.    By who?

10      Q.    Excuse me?

11          MR. McMACKIN:    Objection.  Vague.  You said

12  it was measured by Mr. Cole and it was measured by

13  administrative services.  Are you asking her --

14      Q.    Were you present at any time during any

15  measuring of any offices?

16      A.    When administrative services initially measured,

17  no, but then someone made another call to administrative

18  services to come up and measure it yet again.

19      Q.    Who made that call?

20      A.    I don't know.  I received a phone call from

21  administrative services asking me to stop having that

22  space measured so many times.

23      Q.    So you were present when administrative services

24  came to measure the second time?



Dr. Ann Del Negro                                51

1      A.    Correct.

2      Q.    Why were you present?

3      A.    Because I received a phone call from

4  administrative services wondering why I was asking for

5  the space to be measured again.

6      Q.    Did they ask --

7      A.    Plus I believe this time it included some

8  furniture, too.

9      Q.    Did they ask you to come down?

10     A.    No.  I voluntarily went around.

11     Q.    Okay.

12     A.    And explained to whoever it was, and I don't

13  recall who from administrative services was there at that

14  time, but I told them it wasn't necessary.

15     Q.    It wasn't necessary to measure it again?

16     A.    Not again, no.  They had already provided the

17  dimensions of the rooms.

18     Q.    Did you begin measuring the office space

19  yourself?

20     A.    Not the space.  The desk, I believe it was.

21     Q.    So you began measuring the desk.  Why did you

22  measure the desk?

23     A.    Because there was a concern that the desk was

24  not going to fit into 408.



Dr. Ann Del Negro                                    52

1      Q.    Why didn't you allow administrative services to

2  measure the desk?

3      A.    Again, I received a phone call saying that they

4  have already been up there and measured the space.  They

5  provided the measurements.  Why would they be asked to

6  come up and do it again?

7      Q.    But they were there measuring the office space

8  when you got there?

9      A.    They were there.  What they were measuring, I

10  don't know.

11      Q.    Were they measuring at all?

12      A.    I don't remember.  I know they were there.  That

13  much I can tell you.

14      Q.    I'm sorry I had to go back.

15            But moving forward, you met with Brigitte

16  Brown individually and we discussed that.  I asked you

17  what Dr. Zawislak said and you couldn't recall; correct?

18      A.    No.

19      Q.    Am I correct in stating that once you finished

20  meeting with Brigitte Brown, you told her at that time

21  that the move would still go forward?

22      A.    Do I know that for certain?

23      Q.    Well, you mentioned it before and I just want to

24  make sure --



Dr. Ann Del Negro                    53

1    A.    I don't know if that was said exactly.  I don't

2  recall.

3    Q.    Do you recall whether you felt that the move

4  would go forward after that meeting?

5    A.    My personal opinion?

6    Q.    Yes.

7           THE WITNESS:  Again, am I permitted to say

8  my personal opinion?

9           MR. McMACKIN:  Yes.

10   A.    Based on what was conveyed by Brigitte Brown, I

11  saw no new information that hadn't already been shared as

12  far as the need for space and furniture and peripheral

13  equipment.

14  BY MS. BREWINGTON:

15   Q.    So is it fair to say that after this meeting

16  with Brigitte Brown, you felt that the move should still

17  go forward?

18   A.    I felt so.

19   Q.    Do you know whether Dr. Zawislak wanted the move

20  to go forward at that point?

21   A.    I don't know.  I don't know.

22   Q.    You're not certain as to whether you told

23  Brigitte Brown that the move would go forward at that

24  point?



WILCOX & FETZER LTD.
Registered Professional Reporters

Dr. Ann Del Negro                    54

1              MR. McMACKIN:   Objection to form.

2       A.    No, I'm not.

3       Q.    You met with Ken Cole the next day?

4       A.    I don't recall the date.

5       Q.    What did he say to you about the move?

6              MR. McMACKIN:   Objection to form.

7       A.    Specifically?  I don't know.

8       Q.    Generally, what you can recall.

9       A.    I know that he wasn't happy to move.  He liked

10  his office, as well.  I do know that there's notes of the

11  meeting somewhere in the packet that would be helpful,

12  but I don't -- I don't recall the specifics of the

13  meeting.

14      Q.    Did Ken Cole or Brigitte Brown discuss

15  alternatives to the move?

16      A.    Yes, they did.

17      Q.    Did they show you diagrams?

18      A.    Yes, they did.

19      Q.    Did you review those diagrams at all?

20      A.    Yes, we did.

21      Q.    When?

22      A.    I believe while they were there, and they were

23  reviewed again at some point.  I don't know exactly what

24  point.



Dr. Ann Del Negro                    55

1    Q.    Who were they reviewed by at some point?

2    A.    I reviewed them.  Dr. Zawislak reviewed them.

3    Q.    Did you review them together or separately?

4    A.    Separately, but then dialogued about them.

5    Q.    So you dialogued about these alternatives?

6    A.    Yes.

7    Q.    What was your opinion about these alternatives?

8    A.    That the initial recommendation was the best

9    recollection because it clustered a program of four

10   together as we did with Educational Talent Search, which

11   was leading us to our -- to succeed in our operational

12   plan, the goals set forth in that.

13                 MS. BREWINGTON:  Mark that.

14                 MR. McMACKIN:  We are going to object to

15   this document for the same reasons as we objected to what

16   appears to be the same document during the Paul Morris

17   and the Ann Zawislak depositions from Friday, the 27th.

18   But you can mark it.

19                 (Del Negro Exhibit 1 was marked for

20   identification.)

21   BY MS. BREWINGTON:

22   Q.    Could you please take an opportunity to review

23   alternative 1 and alternative 2?

24   A.    This is 1?



Dr. Ann Del Negro                    56

1      Q.    No.   It actually says it on the top.   I think

2    it's the third page.

3      A.    (The witness reviews the document.)   Can I ask

4    for clarification?

5      Q.    Sure.

6      A.    Is that area labeled "computer room" the tutor

7    room?

8      Q.    I believe so.

9      A.    And the area to the right that's labeled

10   "administrative offices," is that administrative

11   services?

12     Q.    Yes, it is.

13     A.    Okay.   I've looked at it.

14     Q.    Take a look at alternative 2 for me.

15     A.    (The witness reviews the document.)

16     Q.    Does this document look familiar?

17     A.    I know that a color-coded plan was submitted.

18   Whether this was the exact one, I don't recall.

19     Q.    But you reviewed a color coded --

20     A.    Yes.

21     Q.    My question to you is:   Why wasn't this

22   alternative used?

23     A.    Because it didn't --

24              MR. McMACKIN:   Objection.   Vague.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dr. Ann Del Negro                    57

1       Q.    You can answer.

2       A.    Okay.  Because it didn't accomplish the goal of

3   clustering an entire program in one location.

4       Q.    Is it true that all the student enrichment

5   coordinators and the secretary would be together?

6       A.    For --

7       Q.    I'm sorry.  All the Upward Bound Math and

8   Science student enrichment coordinators and the

9   secretary, Liz Wilson, would be together with adequate

10  space?

11      A.    Under which alternative?

12      Q.    Alternative 2.

13              MR. McMACKIN:  Objection to the extent that

14  the question is argumentative.

15      A.    Again, it does not cluster the entire program in

16  an area for themselves.

17      Q.    But my question to you was:  Would the Upward

18  Bound Math and Science student enrichment coordinators

19  and the secretary be together in one area?

20      A.    If that's what these four blue blocks represent.

21      Q.    We are looking at Upward Bound Math and Science,

22  which is the yellow.

23      A.    Oh, oh.  Over here?

24      Q.    Yes.



1              So my question, again, is:  Would

2     alternative 2 allow for the Upward Bound Math and Science

3     student enrichment coordinators and their secretary to be

4     together with adequate space?

5              MR. McMACKIN:  Objection.  Argumentative.

6       A.    From the document, yes.

7       Q.    I asked you why wasn't this alternative used;

8     correct?

9       A.    Yes, and I responded.

10      Q.    Your response was, as I understand it, because

11    it wouldn't allow for all the members of Upward Bound

12    Math and Science to be together; is that correct?

13      A.    Yes, similar to what we did with Educational

14    Talent Search.

15      Q.    How about Upward Bound Classic?  My question to

16    you is:  Is it true that the Upward Bound Classic student

17    enrichment coordinators and secretaries are together in

18    that area?

19      A.    That's correct.

20      Q.    And their program manager is not with them?

21      A.    That's correct.

22      Q.    Were they moved as a result of this proposed

23    move?

24      A.    They could not be moved into 408 because there



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    were too many of them.

2        Q.    I asked you before how many there were.

3        A.    I'm looking right here.

4        Q.    So it's four of them?

5        A.    And the program manager.

6        Q.    Did Upward Bound Math and Science have student

7    co-ops or work study individuals?

8        A.    I don't know.  I never approved any.

9        Q.    So you don't know whether they were there?

10       A.    No.

11       Q.    Would you be the person to have to approve them

12   if they were there?

13       A.    No.  I'm not -- I honestly don't know how that

14   works.

15              When you're saying "co-op," are you

16   referring to work studies?

17       Q.    Yes.

18       A.    Okay.  No.

19       Q.    No, you don't know or --

20       A.    No, I don't know if they had them, and I don't

21   know the process.  I just know that I was never involved

22   in a process of anyone having work studies.

23       Q.    So that would also include Upward Bound Classic?

24   You're not aware of them having work studies?



Dr. Ann Del Negro                    60

1    A.    No, nor Educational Talent Search.

2    Q.    Take a look for me at alternative 1.  Have you

3  had an opportunity to review that?

4    A.    No.  Let me just --

5    Q.    Okay.

6    A.    (The witness reviews the document.)  Okay.

7    Q.    Why wasn't this alternative used?

8    A.    Which was to switch only Tonia and Liz?  Again,

9  it's the same answer I gave you before.  It still didn't

10  help us reach our goal of clustering the entire program

11  grouping together as we did with Educational Talent

12  Search.

13    Q.    Is it fair to say that the program manager, the

14  secretary, and both student enrichment coordinators would

15  all be in the same area?

16            MR. McMACKIN:  Objection.  Vague.

17    A.    These along the wall here?

18    Q.    Yes.

19    A.    Would they be in the same area?

20    Q.    Yes.

21    A.    They would be in the same area according to the

22  chart, yes.

23    Q.    Wouldn't this be more cost-effective than the

24  move that actually took place?

Dr. Ann Del Negro                                    61

1      A.    Can you --

2            MR. McMACKIN:   Objection.   Argumentative.

3      A.    And I don't know what you mean by "cost

4   effective."

5      Q.    Is it fair to say that moving six or seven

6   people is more cost effective than moving two?

7      A.    I don't have a budget for moving.

8            MR. McMACKIN:   Objection to form.

9      Q.    What was your answer?

10     A.    I don't have a cost sheet for the expense of

11  moving individuals, so I don't have an answer.

12     Q.    You don't have an answer because you don't know

13  whether moving two people would be least cost-effective

14  than moving seven?

15     A.    No.

16     Q.    Did Ken Cole or Brigitte Brown give you

17  measurement of their office spaces compared with

18  measurements of the proposed?

19     A.    Yes, and I believe they are in the documents

20  that you supplied.

21     Q.    Did Dr. Zawislak tell Ken Cole or Brigitte Brown

22  that the reason for the move was due to downsizing?

23     A.    I can't speak for Dr. Zawislak.   I don't know

24  what she told them.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Dr. Ann Del Negro                                    62

1      Q.    So you don't recall?  You don't remember her

2   saying anything --

3      A.    I don't know what she told them.  I'm not with

4   Dr. Zawislak.

5      Q.    Here's my thing:  I'm talking about the meeting

6   that you had with Ken Cole individually, and also the

7   meeting that you had with Brigitte Brown.  You were there

8   with Dr. Zawislak, were you not?

9      A.    Oh, yes.

10     Q.    My question is:  Do you recall Dr. Zawislak

11  telling Ken Cole or Brigitte Brown that the reason for

12  the move was due to downsizing?

13     A.    Okay.  I don't remember specifically if she said

14  that at a meeting individually or if it was in a

15  collective meeting.

16     Q.    Okay.

17     A.    But, yes, because To The Max or the S.O.A.R. or

18  whatever it was called at the time had lost a position.

19     Q.    Did she say that the move was because of an

20  allocation of space?

21     A.    Again, I don't know what you mean by terms of

22  "allocation of space."

23          MR. McMACKIN:  Objection to form.

24     A.    Other than clustering a grouping of one entire



Dr. Ann Del Negro                              63

1    program together as we did with Educational Talent

2    Search.

3        Q.    At the end of either of those meetings, do you

4    recall yourself or Dr. Zawislak telling Brigitte Brown or

5    Ken Cole that the move would still be going forward

6    because there was nothing said to convince them, convince

7    you that the move should not go forward?

8              MR. McMACKIN:   Objection.   Compound.

9        A.    I don't recall that.

10       Q.    Are you aware that Dr. Zawislak sent out a

11   newsletter in August 2002 that indicated that Paul Morris

12   received a promotion to special programs director?

13       A.    The CCP newsletter?   Yes.

14       Q.    How often is the CCP newsletter sent out?

15       A.    Now or at that time?

16       Q.    At that time.

17       A.    I believe she was attempting to keep it up on a

18   monthly basis.

19       Q.    On a monthly basis.

20             Now, this promotion to special programs

21   director that Dr. Zawislak sent out in the newsletter,

22   were you aware that this position was not posted?

23       A.    There was no promotion.

24       Q.    But are you aware that this position was not



Dr. Ann Del Negro                                    64

1    posted?

2             MR. McMACKIN:   Objection to foundation.

3       A.   There was no position at that time to be posted.

4       Q.   Okay.

5       A.   Because there was no promotion.

6       Q.   But yet she sent out a letter indicating that

7    there was a promotion; correct?

8       A.   It was an error on words, or word.

9       Q.   Whose decision was it not to post this position?

10            MR. McMACKIN:   Same objection.

11      A.   There was no position.

12      Q.   The fact that Paul Morris received a change in

13   position to special programs director without it being

14   posted, was that a violation of DelTech's policy?

15            MR. McMACKIN:   Objection.   Foundation.

16      A.   Again, there was no position of special projects

17   director.   Paul Morris was reclassified.

18      Q.   Tell me about reclassification.

19      A.   It's an HR process.

20      Q.   Tell me more.

21      A.   That -- it's an annual -- annual -- I can't

22   think of another word other than "event."  It's an annual

23   process where -- once a year where there is a change of

24   duties and employees can submit paperwork.

Dr. Ann Del Negro                        65

1    Q.    Were you involved in his reclassification?

2    A.    Involved in it?  No.  It's reviewed by HR.

3    Q.    So Dr. Zawislak signed off on his

4  reclassification.  Did you have any part in signing off

5  on that?

6    A.    I may have.  I would hope I have because I could

7  explain the change of duties.

8    Q.    So Paul Morris reported to you at that time?

9    A.    Yes.

10    Q.    So do you know whether you signed off or you

11  don't recall?

12    A.    I don't recall.

13    Q.    Do you recall ever seeing any forms related to

14  reclassification of Paul Morris?

15    A.    Can I ask for a clarification?

16    Q.    Yes.

17    A.    Are you talking about while he was filling out

18  the forms or --

19    Q.    Yes.  Did you ever --

20    A.    -- or information we received back from the

21  president's office?

22    Q.    What I'm talking about is anything.  I'm talking

23  in the broader sense.

24            Do you recall receiving or filling out or



Dr. Ann Del Negro                                    66

1  completing or authorizing any forms dealing with Paul

2  Morris and his reclassification?

3          MR. McMACKIN:  Objection.  Compound.

4     A.   I don't know.  I do remember supporting him.

5  What I signed or didn't sign, I don't recall.  I don't

6  know whether it was at my level the signature process

7  would take place or at the director.

8     Q.   This classification was later rescinded by

9  Mr. Lawrence Miller in October 2002?

10    A.   Yes.

11         MR. McMACKIN:  Objection to form.

12    Q.   Why is that?

13         THE WITNESS:  Respond to that?

14         MR. McMACKIN:  Yes.  Unless I instruct you

15 not to answer, you should, yes, to the extent that you

16 can.

17         THE WITNESS:  Okay.

18    A.   Because we were told that individuals cannot be

19 reclassified if they were receiving compensation for the

20 extra work they took on or if they weren't able to

21 accomplish either their current or -- yes, their current

22 or their additional work duties within the 37 and a half

23 hour workweek.

24

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

Dr. Ann Del Negro                    67

1   BY MS. BREWINGTON:

2       Q.    Was Paul Morris able to accomplish his

3   additional job duties within the 37 and a half hour

4   workweek?

5       A.    No.  He was working beyond that.

6       Q.    Did you approve his extra hours?

7       A.    Dr. Zawislak would only have that authority.

8       Q.    With respect to job postings, who makes the

9   decision whether a position will be posted?

10      A.    Who makes the decision?  Well, first of all, a

11  vacancy has to occur.  And beyond that, that would be an

12  HR question.

13      Q.    So for all vacancies, are positions

14  automatically posted?

15      A.    For all vacancies, are -- I don't know.  At my

16  level it was not something that I dealt with.  It would

17  be an HR question.

18      Q.    As I understand it, some positions, when there

19  is a vacancy, there may be a posting or there may be

20  someone that moves into that position as an acting --

21      A.    Okay.  Yes.

22      Q.    Is that correct?

23      A.    Yes.  I believe it has to be a full-time

24  position.



Dr. Ann Del Negro                          68

1    Q.    Okay.    Who makes the decision whether the

2    position will be posted or whether someone will become

3    acting?

4    A.    Okay.    To the best of my knowledge, that final

5    decision has to come from the campus director.

6    Q.    Does someone make a recommendation to the campus

7    director?

8    A.    Yes.

9    Q.    Who?

10   A.    It would have to be whoever's at the highest

11   level of decision-making before you get to the campus

12   director.

13   Q.    So, for example, the campus director is Lawrence

14   Miller; correct?

15   A.    That's correct.

16   Q.    Then am I correct that Sue Zawislak is the

17   highest person in community programs and then she would

18   make a recommendation to Mr. Miller as to whether the

19   position should be posted or someone should move into

20   acting?

21   A.    That I can't -- I don't know exactly how that

22   works.

23   Q.    Did you ever make any recommendations in terms

24   of whether a position should be posted or whether someone



Dr. Ann Del Negro                        69

1    should move into an acting --

2        A.    No.

3        Q.    Are you aware of Dr. Zawislak making any

4    recommendations to Mr. Miller concerning whether a

5    position should be posted or whether someone should move

6    into the acting position?

7        A.    Specific?  No.  I may find out after the fact.

8        Q.    Okay.

9        A.    I'm not part of that decision-making, or I

10   wasn't.

11       Q.    With respect to all the trio programs -- and

12   when I say "all the trio programs," I'm talking about

13   Talent Search, Upward Bound Classic, and Upward Bound

14   Math and Science.

15       A.    Okay.

16       Q.    Do these programs use blanket travel requests?

17   Did they use blanket travel requests?

18       A.    Could you define what you mean by "blanket

19   travel request"?

20       Q.    What is your understanding of a blanket travel

21   request?

22       A.    My personal definition would be if there was a

23   consistent weekly schedule with defined times and defined

24   destinations.



Dr. Ann Del Negro                          70

1    Q.    So your definition of "blanket travel request"

2  is consistent weekly schedules with defined times and

3  defined regulations; is that correct?

4    A.    Destinations.

5    Q.    Destinations.  I'm sorry.

6          So did Upward Bound Classic have blanket

7  travel requests?

8    A.    When -- again, when you say "blanket," it would

9  be with defined -- if -- for the purposes of their

10 program, defined schools and defined times.

11   Q.    So is your answer yes or no?

12   A.    I'm sorry.  What was the question again?

13   Q.    Did Upward Bound Classic have blanket travel

14 requests?

15   A.    I believe they did.  I can't say with

16 100 percent certainty if you would say that was a blanket

17 travel request.

18   Q.    But they did?

19   A.    They had defined times and destinations, yes,

20 and locations.

21   Q.    Are you saying that because they had defined the

22 times and defined schools, they, in turn, had blanket

23 travel requests, or are you saying that's the same thing?

24   A.    Okay.  As far as the term "blanket travel

Dr. Ann Del Negro                    71

1    requests," I'm not -- I'm not accustomed to using that

2    word, so "blanket" -- "blanket" to me doesn't mean

3    anything.  A travel request I see come in two forms, and

4    that is whether you're going -- typically a travel

5    request is submitted.  If I'm going to a meeting, I

6    submit a travel request.  I say where I'm going and what

7    date I'm going, and typically it involved a state

8    vehicle, so you know when you're taking it out and when

9    you're returning it.

10              Going as a student enrichment coordinator

11   to the schools, it's typically defined where I'm going,

12   when I'm going to it.  And again, the state vehicles are

13   being used.  You know what time the state vehicle is

14   going to be checked out and what time it's going to be

15   returned.

16       Q.   Now, the Upward Bound Classic program that we

17   just spoke of, is that how they ran their program as far

18   as they would fill out travel requests and indicate where

19   they're going and what date they would be going and that

20   a state vehicle is being used?

21              MR. McMACKIN:  Objection.  Compound.

22       A.   Anyone that travels off the campus is required

23   to fill out a travel request form.  So the answer, then,

24   would be yes, it would include Upward Bound Classic.

Dr. Ann Del Negro                    72

1       Q.    Okay.   You are right.

2             How about Talent Search, is that the same

3   way?

4       A.    Yes, very similar.

5       Q.    How about Upward Bound Math and Science, how are

6   their travel requests?

7       A.    How are they?

8       Q.    I'm sorry.  Yes.  How were they?

9       A.    Well, theirs is a little bit different from the

10  other two programs because the other two programs had

11  weekly standardized schedules, whereas Upward Bound Math

12  and Science did not.

13      Q.    So how were their travel requests different as a

14  result?

15      A.    They would submit them without specifics, again,

16  whereas the other two programs had consistent regular

17  schedules.

18      Q.    So did --

19      A.    At the schools.

20      Q.    Did the other programs complete their travel

21  requests with specifics?

22      A.    I don't recall, but I know that there were

23  schedules, calendars, whatever, to support that, yes.

24      Q.    There were calendars to support their travel



Dr. Ann Del Negro                    73

1    requests; is that correct?

2        A.    Yes.    Each coordinator has a calendar to say

3    which schools they're in, which days.

4        Q.    But --

5        A.    And what time.

6        Q.    Is it your testimony that you are not sure

7    whether they complete the travel request with the details

8    and specifics?

9        A.    Without seeing one in front of me, I don't

10   recall.

11       Q.    So you know for sure or do you know for sure

12   that Upward Bound Math and Science completed travel

13   requests without specifics?

14       A.    Again, without seeing one in front of me, I

15   can't -- what I was saying there is they didn't have the

16   consistent standardized school visit calendars as the

17   other programs did.

18       Q.    And --

19       A.    And without seeing any travel requests for any

20   of the programs, I couldn't remember how they read.

21       Q.    Was there a problem with Upward Bound Math and

22   Science travel requests?

23       A.    There is a problem with the management of the

24   Upward Bound Math and Science program.



Dr. Ann Del Negro                    74

1      Q.    "Management" meaning REDACTED        ?

2      A.    Correct.

3                  MR. McMACKIN:  Confidential, please.

4                  THE WITNESS:  Yes.

5                  [CONFIDENTIAL ON.]

6   BY MS. BREWINGTON:

7      Q.    So my question to you was:  Was there an issue

8   or problem with --

9      A.    The travel requests?

10     Q.    Yes.

11     A.    Yes.

12     Q.    And the answer is --

13     A.    Yes.

14     Q.    Tell me about that.

15     A.    When I met with   REDACTED        on one of many

16  occasions, it became apparent that she wasn't as informed

17  as she should be from a management standpoint as to when

18  the school visits would take place.  And by that I mean

19  when and where and who would be seen and what would be

20  the nature of the call.

21     Q.    What would be the nature of the call?

22     A.    Call or visit to the school.

23     Q.    Oh, okay.

24     A.    I don't know if that answers your question, but



Dr. Ann Del Negro                    75

1   the issue surrounding REDACTED        relate to the travel

2   request forms insofar as she couldn't provide adequate

3   information about -- related to the travel request.

4            If that helps any, I don't know.

5       Q.   Well, let me ask you some questions.

6            Are you saying that REDACTED        did not

7   know where her student enrichment coordinators were?

8       A.   I believe she would just provide requests that

9   said "fall visits."

10      Q.   Had they always provided requests that said

11  "fall visits"?

12      A.   I don't know prior to when I got there.  I'm not

13  sure.  I'm not exactly sure if they did when I first got

14  there.

15      Q.   When did this become a concern of yours, the

16  travel requests of the Upward Bound Math and Science?

17      A.   It wasn't with just the Upward Bound Math and

18  Science.  There was a directive that the campus director

19  had handed down that was related to the use of fleet

20  vehicles.  And he expected all of his direct reports and

21  their direct reports to be more conscientious of the use

22  of fleet vehicles.

23      Q.   That was sent down by Mr. Miller?

24      A.   Yes.



Dr. Ann Del Negro                              76

1    Q.    Do you remember when, approximately?

2    A.    No, I do not.

3    Q.    So you mentioned there were some concerns with

4    REDACTED        and her inability to, as I understand it,

5    know where her staff is; is that correct?

6    A.    Well, to be able to answer any questions about

7    the yearly work plan.

8    Q.    What did you do as a result with respect to the

9    travel request?

10   A.    Oh, what did we -- expected to have more

11   details.

12   Q.    When you say "more details," what do you mean?

13   A.    To know which schools were going to be visited,

14   when and when, and what time.

15   Q.    How often did you want them to complete these

16   travel requests?

17   A.    Exact what I said, I don't recall, but I needed

18   to know whenever there was going to be travel, that a

19   travel request was on file.

20   Q.    So every time they were going to travel; is that

21   correct?

22   A.    If there wasn't any other -- if there wasn't any

23   other thing on record, yes, because the way it was

24   submitted wasn't acceptable in light of the fact that we

Dr. Ann Del Negro                          77

1    were being asked to be more conscientious of when we were

2    using vehicles.

3        Q.    You mentioned the way it was submitted it wasn't

4    acceptable.

5               Do you know how long it was submitted in

6    that unacceptable way?

7        A.    No, I do not.

8        Q.    Is it fair to say that it had been submitted

9    that way since you were in that role as assistant

10   director?

11       A.    I don't know.

12       Q.    When did you become aware of how it was

13   submitted in terms of the fact that it wasn't acceptable?

14       A.    Specific dates, I don't know.  I know that

15   everything sort of started to float to the surface.  The

16   more interaction I had with REDACTED          as the

17   manager, we started with fiscal issues in the year 2000

18   and progressively went into the programmatic components.

19   And working with her through the programmatic components,

20   those are the kind of issues that floated to the surface.

21       Q.    When you met with REDACTED          concerning

22   travel requests and you instructed her to give more

23   detail -- Is that correct? -- what was her response to

24   you?



Dr. Ann Del Negro

78

1      A.    She would work with me to make sure that that

2    happened.

3      Q.    Switching lanes, were you aware that Ken Cole's

4    doctor ordered reduced work hours around November of

5    2002?

6      A.    I don't recall when, but I do recall that there

7    was some reduced work hours.

8      Q.    Were you aware that he provided a doctor's note

9    that indicated he was not contagious and he should

10   titrate his return to full activity?

11     A.    I believe all of that was handled through the

12   human resources department.

13     Q.    Do you have any idea in terms of why this note

14   was not acceptable to DelTech?

15          MR. McMACKIN:   Objection.  Foundation.

16     A.    Again, that's an HR question, not a question for

17   me.

18     Q.    Were you aware that Ken Cole was threatened with

19   termination if he did not provide additional

20   documentation?

21     A.    I have no knowledge of that.

22     Q.    Isn't it true that you provided him the letter

23   from HR indicating that exact same thing?

24     A.    I don't recall that.



Dr. Ann Del Negro                          79

1           MR. McMACKIN:   Objection.   Foundation.

2     Q.    Did you present to Ken Cole any letters?

3     A.    I don't recall.

4     Q.    Who is responsible for approving a change in an

5  employee's work hours?

6     A.    Campus director.

7     Q.    At that time it was Mr. Miller; right?

8     A.    Correct.

9     Q.    Does Dr. Zawislak have the authority to approve

10 work hours?

11    A.    No.

12    Q.    Do you have the authority to approve work hours?

13    A.    No.  As I said, the campus director.

14    Q.    Okay.  I just wanted clarification.

15          Are you aware that Brigitte Brown requested

16 to change her hours to nine to five at some point?

17    A.    Not until I was looking over the documents.

18    Q.    Were you not there at that time?

19    A.    No.

20    Q.    Were you not involved in that?

21    A.    No.  I believe that was something that was

22 decided between her and her manager.  At that time it was

23 REDACTED

24    Q.    You did not play a role in that in any way?

Dr. Ann Del Negro                    80

1      A.    No, absolutely not.

2      Q.    At some point you became director of corporate

3  and community programs at the Owens Campus; is that

4  correct?

5      A.    That's correct.

6      Q.    When was that?

7      A.    It was in August of 2003.

8      Q.    Who was promoted to your former position,

9  assistant director of CCP?

10     A.    I don't exactly know how filling my vacancy, I

11 don't know how it was handled.

12     Q.    So you don't know who took your position and who

13 took the person's position -- .

14     A.    I know that Jacquita Wright-Henderson is

15 currently the assistant director of corporate and

16 community programs.

17     Q.    Which is your former position; right?

18     A.    For the Stanton Wilmington campus, correct.

19     Q.    Okay.

20     A.    But what the processes were, I don't know.

21     Q.    Do you know that Paul Morris was also promoted

22 at that time?

23     A.    I don't know when he was promoted.  I do

24 understand he is now a department chair, I believe.



Dr. Ann Del Negro                                81

1    Q.    Yes.

2    A.    Yes.

3    Q.    Were you aware that Upward Bound Math and

4  Science was not placed under Paul Morris' supervision

5  when he became department chair of community --

6              MR. McMACKIN:  Objection.  Foundation.

7    A.    Is this after I left the campus?  No.  I was no

8  longer associated with the campus.

9              MR. McMACKIN:  Can we go off for a second?

10             (A recess was taken at this time.)

11             MS. BREWINGTON: I don't have anything

12 further.

13             MR. McMACKIN:  I have no redirect.

14             I just wanted to reserve our right to read

15 and sign.  That's it.

16             MS. BREWINGTON:  Okay.  Thank you.

17             (The deposition was then concluded at

18 12:05 p.m.)

19                    - - - - -

20

21

22

23

24

82

1              INDEX TO TESTIMONY

2

3

4   DR. ANN DEL NEGRO                                    PAGE

5   Examination by Ms. Brewington                           2

6

7                    - - - - -

8              INDEX TO EXHIBITS

9

10  DEL NEGRO EXHIBIT NO.:                               PAGE

11  1    A four-page color copy of a document entitled
         "Present set Up on 4th Floor"                     55
12

13                   - - - - -

14

15

16

17

18

19

20

21

22

23

24

83

1

2

3

4

5

6

7

8          REPLACE THIS PAGE

9

10         WITH THE ERRATA SHEET

11

12         AFTER IT HAS BEEN

13

14         COMPLETED AND SIGNED

15

16         BY THE DEPONENT.

17

18

19

20

21

22

23

24

ATTACH TO THE DEPOSITION OF:    Dr. Ann Del Negro

DATE TAKEN: January 20, 3006

IN THE MATTER OF:  Cole and Brown v. Delaware Technical & Community College

### ERRATA SHEET

INSTRUCTIONS:  After reading the transcript of your deposition, please note any change or correction and the reason therefore on this sheet.  **Do not make any marks or notations on the transcript itself.**  Rule 30(e) governing this procedure is enclosed.  Please sign and date this errata sheet and return it to our office at the address below.  Thank you.\

| Page | Line | Edits-Deletions represented by strikethroughs. Insertion represented by CAPS. Other remarks in *italics*. |
|------|------|---|
| 5 | 9 | One master's degree in HR MANAGEMENT FROM |
| | 10 | College ~~IN HR MANAGEMENT~~. And a doctorATE ~~of~~ IN |
| | 21 | ~~it was called at that time~~. That was my title at that time. |
| 6 | 8 | You'LL |
| 7 | 8 | Manager, both he – Urahn Roberts WHO |
| | 10 | Secretary, THEY ALL REPOTED TO ME. |
| | 20 | to ME, I believe, BY you. |
| 8 | 12 | I don't recall THOSE WORDS. |
| 10 | 12 | PDFs, SIGNED BY KEN COLE, |
| 11 | 3 | Opportunity to apply for ~~a~~ positions |
| 13 | 7 & 8 | *I am not sure what this sentence means.  What was meant is our goal was to group personnel from the same program into the same area.* |
| | 19 | Everything that we ~~do~~ DID |
| | 20 | recall THAT. |
| | 23 | I don't believe so, because OF |
| 16 | 1 | ~~There were problems?~~ Were there problems? |
| 17 | 18 | areas to try to promote A |
| 18 | 1 | ~~accountability.~~ ACCOUNTABLE. |
| | 2 | Accountability.  SHE expected--SHE had high expectations.  SHE |
| | 8 | Operated a lot more flexible ~~that~~ |
| | 10 | Followed that were not always acceptable as far AS, |
| | 13 | Resurfacing ~~are~~ WERE |
| | 14 | Calls from the schools |
| | 18 | ~~we~~ TONIA had planned to do and what ~~we~~ SHE |
| | 21 | Prepared the calendars that I would be at that school BUT THINGS CHANGED. |
| | 22 | And ~~that~~ to give you ~~an~~ ANOTHER example |
| 19 | 1 | that you were going to work off OF for the week, BUT THAT WAS not SO WITH TONIA ~~an at~~ |
| | 2 | ~~the time I prepared it~~ TONIA'S EXPECTATION WAS MORE LIKE ~~I~~ she thought she was going to there (SCHOOL VISIT), |
| | 3 | not necessarily that ~~I~~ SHE was really going to go there (SCHOOL VISIT). |

| 21 | 20 | Would I disagree with that? I don't recall A RECOMMENDATION. |
|----|----|---|
| 23 | 2 | people THAT WERE NOT ALREADY CLUSTERED TOGETHER. |
| 24 | 13 | And the ~~secretaries~~ SECRETARY. |
| 25 | 10 | of each of the programs together to promote ~~the~~ A teamwork |
| 27 | 19 | know she ~~had~~ SUPPORTED ~~multiple responsibilities~~ AREAS. |
| 35 | 17 | totally. They were not ~~like~~ FULLY enclosed offices like this. |
| 39 | 1 | ~~Layout individual offices — or individual space~~ PARTITIONS CREATED CUBICLES OR INDIVIDUAL SPACE |
|    | 2 | ~~separated by cubicles.~~ I don't recall how many, but... |
|    | 11-13 | *There was/is not "individual setups" along with "cubicles" for the student enrichment coordinators. It is partitions that create "cubicles" and "cubicles" that create "individual space".* |
|    | 14 | My answer is correct when aligned with my interpretation of partitions and cubicles. |
|    | 18 | They were set up without ~~cubicles~~ PARTITIONS. |
| 41 | 3 | *Talent Search and Upward Bound Classic did not have "cubicles" and "partitions." Partitions are what created the cubicles.* |
|    | 4 | My answer is correct when aligned with my interpretation of partitions and cubicles. |
| 55 | 9 | ~~recollection~~ RECOMMENDATION |
|    | 17 | and the ~~Ann~~ Susan |
| 59 | 3 | I'm looking right here AT YOUR CHART. |
| 64 | 23 | Process where — once a year ~~where~~ WHEN there is a change of |
|    | 24 | duties, ~~and~~ THE employees can submit paperwork FOR A POSITION REVIEW. |
| 65 | 6 | I may have. I would hope I ~~have~~ HAD because I could HAVE |
|    | 7 | ~~explain~~ EXPLAINED the change of duties. |
| 66 | 7 | would take place or at the ~~director~~ DIRECTOR'S LEVEL |
| 71 | 3-5 | *The sentence that begins with--A travel request I see come in two forms...makes no sense. I am not really sure what I said here.* |
|    | 7 | Date I'm going, and typically is ~~involved~~ INVOLVES |
| 76 | 25 | ~~when~~ WHERE and when, and what time. |
|    | 17 | ~~Exact~~ EXACTLY |
| 77 | 2 | and since Rose couldn't adequately respond to questions about her staff members schedules. |
|    | 19 | *My "No" response was related to not being there when Brigitte allegedly asked to change her work hours.* |
| 80 | 10 | I don't exactly know how filling my vacancy OCCURRED, I |

I have read the foregoing transcript of my deposition, and expect for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: 3/17/06 _____ *Ann L. Allegro*
(Signature of Deponent)

RETURN TO: WILCOX AND FETZER, LTD.
1330 King Street
Wilmington DE 19801

84

1  State of Delaware )

2                     )

3  New Castle County )

4

5              CERTIFICATE OF REPORTER

6

7              I, Kathleen White Palmer, Registered Merit
   Reporter and Notary Public, do hereby certify that there
8  came before me on the 30th day of January, 2006, the
   deponent herein, DR. ANN DEL NEGRO, who was duly sworn by
9  me and thereafter examined by counsel for the respective
   parties; that the questions asked of said deponent and
10 the answers given were taken down by me in Stenotype
   notes and thereafter transcribed into typewriting under
11 my direction.

12             I further certify that the foregoing is a
   true and correct transcript of the testimony given at
13 said examination of said witness.

14             I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
15 interested in the event of this suit.

16

17

18                        

19                     Kathleen White Palmer, RPR, RMR
                       Certification No. 149-RPR
20                     (Expires January 31, 2008)

21

   DATED:   February 3, 2006
22

23

24

                        **W&F**
                 **WILCOX & FETZER LTD.**
                 Registered Professional Reporters