IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KENNETH COLE and                    )  CONFIDENTIAL
BRIGITTE L. BROWN,                  )
                                    )
            Plaintiffs,             )
                                    )  C.A. No. 05-270 (KAJ)
      v.                            )     (Consolidated)
                                    )
DELAWARE TECHNICAL AND              )
COMMUNITY COLLEGE,                  )
                                    )
            Defendant.              )

            Deposition of PAUL THOMAS MORRIS, JR.,
taken pursuant to notice at the offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 10:00 a.m. on Friday, January 27, 2006,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.

APPEARANCES:

            LORI A. BREWINGTON, Esquire
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware  19806
              on behalf of the Plaintiffs,

            JAMES H. McMACKIN, III, Esquire
            MORRIS JAMES HITCHENS & WILLIAMS, LLP
              222 Delaware Avenue
              P.O. Box 2306
              Wilmington, Delaware  19899-2306
              on behalf of the Defendant.

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477



WILCOX & FETZER LTD.
Registered Professional Reporters
COPY



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    ALSO PRESENT:

2              KATHERINE GEPPERT, Paralegal

3              KENNETH COLE

4              BRIGITTE BROWN (By telephone)

5                   - - - - -

6              PAUL THOMAS MORRIS, JR.,,

7         the witness herein, having first been

8         duly sworn on oath, was examined and

9         testified as follows:

10                   EXAMINATION

11   BY MS. BREWINGTON:

12    Q.    Good morning.

13    A.    Good morning.

14    Q.    I'm taking your deposition today.  My name is

15   Lori Brewington, and I am representing Ken Cole and

16   Brigitte Brown in this discrimination and retaliation

17   matter.

18              We do have a court reporter here.  So I'll

19   ask that any statements that you give are audible,

20   like yes, no.  No mm-hmms or uh-huhs because she's

21   unable to properly record that.

22              Have you ever had your deposition taken

23   before?

24    A.    No.



1    Q.    I'm going to ask you a series of questions.

2    I'll make every effort to ask them one at a time.    If

3    at any time you don't understand a question, just let

4    me know and I'll try to explain it.    If you do go

5    ahead and answer the question, I'll assume that you

6    understand what I've asked.    If you need to take a

7    break at any time, just let us know.    There's rest

8    rooms.    All I ask is that you don't discuss the

9    deposition with Del Tech's attorney --

10   A.    Okay.

11   Q.    -- while the deposition is going on on breaks.

12          MR. McMACKIN:    I just want to state for

13   the record that we can discuss it, but the privilege

14   is waived if we do.

15          MS. BREWINGTON:    Okay.

16   BY MS. BREWINGTON:

17   Q.    Could you please begin by stating your name and

18   professional title?

19   A.    Paul Thomas Morris, Junior, Department Chair

20   For Community School Projects, Delaware Tech's

21   Wilmington campus.

22   Q.    How long have you been department chair?

23   A.    Department chair since April 2004.    I was

24   acting department chair from late August, beginning of

Paul Thomas Morris, Jr. - Brewington                    4

1    September 2003.

2        Q.    What was your possession prior to that?

3        A.    Prior to --

4        Q.    Prior to acting.

5        A.    I was program manager for Educational Talent

6    Search.

7        Q.    How long were you program manager for

8    Educational Talent Search?

9        A.    From May 2000 until I took the acting position

10   in August, late August, beginning of September 2003.

11       Q.    And prior to that?

12       A.    I was a student enrichment coordinator for

13   Educational Talent Search from June 1998 till May

14   2000.

15       Q.    At this time tell me about Educational Talent

16   Search.

17       A.    Educational Talent Search is a TRIO program.

18       Q.    And what did you do as program manager for the

19   TRIO program?

20            MR. McMACKIN:   Objection to form.

21            MS. BREWINGTON:   You can go ahead and

22   answer.

23            MR. McMACKIN:   You can answer.

24       A.    What I -- as program manager for Educational



1   Talent Search?

2   BY MS. BREWINGTON:

3       Q.   What were some of your responsibilities?

4       A.   I oversaw the operations of the Educational

5   Talent Search program.

6       Q.   You oversaw the responsibilities of the what?

7       A.   The operations of the program.

8       Q.   If you could explain to me what exactly the

9   Educational Talent Search program is.

10      A.   It is a federally-funded program by the U.S.

11  Department of Education to serve 700 low income, first

12  generation youth in the New Castle County area.

13      Q.   You mentioned the TRIO program.  Along with the

14  Educational Talent Search program, there are other

15  programs that are part of that TRIO program, am I

16  right?

17      A.   At the college?

18      Q.   At the college.

19      A.   Yes, ma'am.

20      Q.   What are those?

21      A.   Upward Bound Classic, Upward Bound Math and

22  Science, and we have a newer program called TRIO

23  Dissemination that was funded 2003.

24      Q.   Okay.

**W&F**

Paul Thomas Morris, Jr. - Brewington                    6

1      A.    There are seven TRIO programs nationally.  We

2  have four at the Wilmington campus.

3      Q.    Paul, can you tell us a little bit about your

4  educational background?  Where did you go to school?

5      A.    High school?

6      Q.    College.

7      A.    I went to Delaware Tech.  I have an associate's

8  degree in criminal justice.  And then I have a

9  bachelor's degree in behavioral science from

10  Wilmington College.  I have a master's degree in

11  educational counseling from Wilmington College.  And

12  I'm currently enrolled in an MBA program at the

13  University of Delaware.

14      Q.    When did you receive your bachelor's degree?

15      A.    In 1996.

16      Q.    And your master's?

17      A.    1998.

18      Q.    I'd like to begin by asking you about the move

19  of the Upward Bound Math and Science program.  I'm

20  going to call it UBMS.  Okay?

21            MS. BREWINGTON:  First exhibit I have

22  here, Paul Morris Exhibit 1.

23            (Paul Morris Deposition Exhibit 1 was

24  marked for identification.)

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    BY MS. BREWINGTON:

2        Q.    The document you have in front of you is an

3    e-mail.  It's dated August 7th, 2002, to you, Paul

4    Morris, from Ken Cole, ccing REDACTED          .

5                Who is REDACTED          , for the record?

6        A.    REDACTED        was program manager for Upward

7    Bound Math and Science.

8        Q.    And that was Ken Cole's manager?

9        A.    That's correct.

10                MR. McMACKIN:  Objection to form.

11        Q.    If you could review the e-mail for me, do you

12    recall receiving this e-mail from Ken Cole?

13        A.    Yes.

14        Q.    And did you meet with him following this

15    e-mail?

16        A.    Yes.

17                MR. McMACKIN:  Objection.

18        Q.    And when did that occur?  When did that meeting

19    occur?

20        A.    I'm unclear of the exact date.

21        Q.    In proximity.

22        A.    A few days following this.

23        Q.    And tell me about that meeting or tell me about

24    what happened.  It may not have been a meeting.  I

Paul Thomas Morris, Jr. - Brewington                    8

1    don't know.  You tell me.

2        A.    I received the e-mail, and I am not sure if I

3    e-mailed back, but somehow we set a meeting up.  And I

4    actually went to Mr. Cole's office and spoke with him

5    because, as you can see in the e-mail, it just says

6    "concerns."  I had no idea why he wanted to talk to

7    me.

8        Q.    Okay.

9        A.    So I went and met him in his office.  I don't

10   believe -- I don't remember how long, maybe 15, 20

11   minutes.

12       Q.    What did you say during that meeting or what

13   did he say during that meeting?

14       A.    If I recall, most of the conversation was about

15   the summer program.  Their summer program ended a few

16   weeks prior to that meeting, and there was some

17   instances -- incidents that happened during the summer

18   program, I guess, that he made some decisions on that.

19   He wanted to clarify to me why he made those

20   decisions.  So we talked about those issues.

21              And at the end -- basically at the end of

22   the conversation is when he mentioned about the

23   pending move and he had some concerns about a pending

24   move.

**W&F**

1    Q.   Is that all he said, that he had some pending

2    concerns?

3    A.   Yes.  He was trying to actually talk about a

4    pending move.  However, we did not -- we, meaning the

5    management team, did not release information about a

6    move because we were still working out the logistics

7    of the move, of a pending move.  So -- and other staff

8    weren't informed.  So I did not -- I did not disclose

9    anything about the pending move.

10   Q.   What did you tell him when he said he wanted to

11   talk to you about the pending move?

12   A.   I don't recall exactly.  Something to the

13   stance that, like I just said, we -- you know, I am

14   not going to discuss this at this time.  You'll be

15   informed by your program manager with information

16   about any possible move.

17   Q.   What was Ken's response to that?

18   A.   I don't recall.

19   Q.   Mr. Morris, whose decision was it to move the

20   UBMS program?

21   A.   There was a recommendation made by myself to

22   Ann Del Negro who was the Assistant Director for

23   Corporate Community Programs, and then Ann Del Negro,

24   in turn, made a recommendation to Dr. Zawislak, who,

1  in turn, made a recommendation to Mr. Miller, who is

2  our campus director.

3     Q.   And you said you made a recommendation.  What

4  were the reasons for your recommendation?

5     A.   That the TRIO programs, as you mentioned

6  earlier, are for -- at the time there was three

7  programs, and those programs, from 1998 when I came to

8  the college and the time of this e-mail -- we'll use

9  that as a reference point -- were all over the place,

10 meaning in the building.  There were staff members

11 scattered around the building.

12    Q.   Can I stop you?  When you say TRIO programs

13 were all over the place, are we talking about the

14 Talent Search, Upward Bound Classic, and Upward

15 Bound --

16    A.   Math and Science.

17    Q.   Those three programs were all over?

18    A.   From 1998 to this date, there were offices

19 located throughout all the buildings of the college at

20 the Wilmington campus.

21    Q.   Okay.

22    A.   From 1998 until this date, the programs -- and

23 this is actually -- this was an operation plan that

24 was set forth by our division director to actually

1    have like programs in the same area.

2        Q.    Who is this?

3        A.    Dr. Zawislak.

4              So over the previous three years, actually

5    previous four years, the programs migrated to the

6    fourth floor of the east building of the Wilmington

7    campus, but they were still not together.  One of the

8    thoughts that I had, because I was involved as a

9    student enrichment coordinator and also was program

10   manager, had been in the programs for four years, was

11   that collaboration of the programs seemed to be

12   getting better.  They are very similar programs, serve

13   the same population.

14       Q.    Are there differences between the programs,

15   though?

16       A.    Yes.  Absolutely.  But they are a little --

17   there are a lot of similarities.

18       Q.    Tell me about the differences between Upward

19   Bound Math and Science and other programs.

20              MR. McMACKIN:  Objection.  Form.

21       A.    The three programs all have differences.  If

22   you want to compare one to the other, it would be

23   easier to do that.

24       Q.    Let me ask you to tell me whether Upward Bound



1    Math and Science has a residential program.

2        A.    That is correct.

3        Q.    Do the other programs have a residential

4    program?

5        A.    No, they don't.

6        Q.    And the residential program, if you could kind

7    of explain to me what that is because I'm uncertain

8    about it.

9        A.    It was a six-week program out of the 52-week

10   year.  The six-week program runs at the time --

11   they've been housed different places.  They have even

12   been housed at Goldey-Beacom College.  The students

13   are on the campus.  Upward Bound Math and Science and

14   Upward Bound Classic have a six-week program.  The

15   student are there at the college, at the Wilmington

16   campus taking classes.  The difference is for the

17   Upward Bound Math and Science, at the end of the day,

18   they take a bus to Goldey-Beacom College to be housed

19   for the night.  So with the Upward Bound Math and

20   Science, unlike the other programs, the students are

21   housed for six weeks overnight in dormitories at

22   Goldey-Beacom College.

23       Q.    And Ken Cole and Brigitte Brown, are they

24   somehow responsible for the students in the



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    residential program?

2       A.    The program manager is ultimately responsible

3    for the students.

4       Q.    I kind of want to get an understanding of who

5    reports to who.

6       A.    Okay.

7       Q.    So the students are in the residential programs

8    and they have, I assume, RAs or something?

9       A.    Youth care workers we call them.

10      Q.    And youth care workers, who do they report to?

11      A.    They report -- everyone reports to the program

12   manager.

13      Q.    So youth care workers report directly to the

14   program manager?

15      A.    That's correct.

16      Q.    What role do the student enrichment

17   coordinators have with the residential program?

18      A.    Whatever role was directed by the program

19   manager.  The way the programs operate, the program

20   manager -- we don't have different levels of

21   supervision.  So the program manager operates the

22   program.  Everyone underneath the program manager goes

23   to him.  If the program manager delegates

24   responsibilities of checking on the students or things

Paul Thomas Morris, Jr. - Brewington                    14

1    like that, that would be at the discretion of the

2    program manager.

3        Q.    Do you know what specifically went on with the

4    Upward Bound Math and Science as far as you as do you

5    know whether or not REDACTED        delegated those

6    responsibilities to her student enrichment

7    coordinators?

8            MR. McMACKIN:    Objection to form.

9        A.    I don't know.

10       Q.    You don't know?

11       A.    No.

12       Q.    We got kind of off track here.    We were talking

13   about the move.

14       A.    Okay.

15       Q.    And you indicated that it was your decision --

16       A.    I'm sorry.    I didn't indicate that.

17           MR. McMACKIN:    Objection.

18       A.    I indicated I made a recommendation.

19       Q.    That you made a recommendation?

20       A.    That's correct.

21       Q.    All of the programs were on the fourth floor of

22   the east building when you made this recommendation,

23   correct?

24       A.    That's correct.



WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    And you made this recommendation.  I'm just

2    trying to understand.  If I'm wrong, please correct

3    me.

4    A.    Sure.

5    Q.    You wanted to make this recommendation so that

6    who could be more together, so that --

7              MR. McMACKIN:  Objection.  Presumes.

8    A.    The one program that was actually together,

9    meaning in the same exact space -- I used the word

10   "best defined space."  A defined space was the

11   Educational Talent Search program.

12              Just for history sake, that program -- and

13   personally I was involved in that program.  I moved

14   four times before we got to that space.  That space

15   was allocated to us because the grants work on a four-

16   to five-year cycle of funding.  So the goal was to

17   actually get space that we could keep.  One of the

18   problems in a college atmosphere is -- and especially

19   with grant funds -- it's all funding.  You're not

20   always the number 1 priority to having an opportunity

21   to be in space that you can keep for a while.  Was

22   very key for the -- for us to be able to meet the

23   objectives of the program.  The Educational Talent

24   Search program moved to the fourth floor, which the

1    Upward Bound Classic program was already there and

2    they have somewhat defined space.  They were a little

3    bigger than what the space could provide them because

4    they actually grew.  They actually got a supplement

5    where they could serve more students.  So the

6    Educational Talent Search program had defined space.

7              The Upward Bound Math and Science program

8    was along a wall that the space was not even -- it

9    wasn't even our division space.  It was being loaned

10   to us, meaning that the parallel program of the

11   University of Delaware that was -- that was kind of

12   their office space.  So being able to move, being able

13   to put the program in a spot to where -- because they

14   have a four-year grant cycle -- to where we know they

15   are not going to be moved again was important.

16     Q.   Now, you mentioned the Educational Talent

17   Search and Upward Bound Math and Science.  How about

18   the Upward Bound Classic, were they in a defined space

19   at this time?

20     A.   I mentioned that as well.  That was already on

21   the fourth floor.  They are on the fourth floor.

22     Q.   How were they located?

23     A.   They were located --

24              MR. McMACKIN:  Objection to form.



1    A.    They were located in a defined space.  However,

2    they grew.  They got a supplement.  So, therefore,

3    there was -- they were -- there was one spot.  The

4    office would only hold a number of staff.  That was

5    one more staff that needed to actually to go in there,

6    which there wasn't enough space.

7        Q.    So one of their staff members was not with UBC?

8            MR. McMACKIN:  Objection to form.

9        A.    Not in that space.

10       Q.    Not in that space?  Not in the defined space?

11       A.    That's correct.

12            MR. McMACKIN:  Can I interject for a

13   second?  Can I instruct the witness to give me an

14   opportunity to object before he answers the question.

15            MS. BREWINGTON:  Okay.  Where was I?

16            MR. McMACKIN:  I didn't mean to throw you

17   off.

18            MS. BREWINGTON:  That's okay.

19            MR. McMACKIN:  I just wanted to make sure

20   I was able to put my objections in.

21   BY MS. BREWINGTON:

22       Q.    I just wanted to make sure I understand the

23   reasons for your recommendation.

24       A.    Sure.



Paul Thomas Morris, Jr. - Brewington                18

1    Q.    ETS was in their defined space, all of them?

2                MR. McMACKIN:   Objection to form.

3    A.    Yes.  To a point.

4    Q.    Okay.  Explain.

5    A.    There was a part-time student enrichment

6    coordinator added to the grant, added to the budget

7    for the grant in 2002.  The Educational Talent Search

8    program received a 15 percent increase.  And when we

9    received the 15 percent increase, we built in -- in

10   our budget we built in an additional student

11   enrichment coordinator because the program served 700

12   students.

13   Q.    You know what would be easier for us?  Let's go

14   to the exhibit.  It is number 3.  Actually, turn to

15   the second page here.  Have you ever seen this

16   document before?

17   A.    Yes.

18   Q.    What is this?

19   A.    It looks like a set-up on the fourth floor.

20   Q.    Now, this is the way this exhibit -- does this

21   accurately depict the way that the fourth floor was

22   set up prior to your recommendation?

23                MR. McMACKIN:   I just want to put in an

24   objection that this document is not Bates numbered.

**W&F**

1    Where did you get this document?

2              MS. BREWINGTON:  In our files.

3              MR. McMACKIN:  Okay.  It wasn't produced,

4    or do you have a Bates number stamped version?

5              MS. BREWINGTON:  I mean, this version may

6    not have been -- this actual one, but this was

7    produced.  Can we find the Bates stamped one just to

8    let him know?

9              MR. McMACKIN:  Is this from your

10   production?

11             MS. BREWINGTON:  Yes.

12   BY MS. BREWINGTON:

13   Q.   I'm not sure you answered the question.  Do you

14   remember the question?

15   A.   No.

16   Q.   The question was, does this accurately depict

17   the set-up on the fourth floor prior to your

18   recommendation?

19             MR. McMACKIN:  Objection.  Ambiguous.

20             MS. BREWINGTON:  You can answer.

21             MR. McMACKIN:  Yeah.  You can answer.

22   A.   The only thing this purple program, the SOAR

23   program, at about that time was changed over.  There

24   was a program called "To the Max."  So, because you're

1   asking questions about a recommendation, part of the

2   recommendation was based on the fact that this program

3   was a program of four staff.

4       Q.    The SOAR?

5       A.    To the Max program.

6       Q.    To the Max.  Okay.

7       A.    And then that program was defunded.  When the

8   program was defunded, we received funding for a

9   similar program, but only had a staff of two.  So

10  because of that, because this was all going on at

11  about the same time, that was other important piece of

12  making the recommendation to make this move.  So this

13  document says "SOAR."  I just wanted to make sure it

14  was clear that the decision -- the recommendation for

15  the decision was made because -- one of the reasons

16  was because of that program being defunded, and only

17  being replaced with two staff members.  So, therefore,

18  the staff that was in this office, 401, had a staff of

19  four in that office and now had a staff of two.

20      Q.    Okay.  So they had a staff of four when it was

21  To the Max?

22      A.    That is correct.

23      Q.    Who are the people that were in that new --

24  when we are talking about this office, for



Paul Thomas Morris, Jr. - Brewington                    21

1    clarification, are we talking about this entire

2    rectangle to the left --

3    A.    That is correct.

4    Q.    -- of the piece of paper?

5          When this was To the Max, how many people

6    were in there?  You said four?

7    A.    That's correct.

8    Q.    What four people?  What are their names?

9          MR. McMACKIN:  Objection.  The question

10   doesn't call for a time frame.

11         MS. BREWINGTON:  Let me clarify.

12         MR. McMACKIN:  You can still answer.

13         THE WITNESS:  No.  No.  Actually that

14   helps me because there were different people.

15   BY MS. BREWINGTON:

16   Q.    That's fine.  As I understand it, when you made

17   the recommendation this was the To the Max program?

18   A.    About the same time To the Max was being

19   defunded, so, yes.

20   Q.    Okay.

21   A.    It was the SOAR -- at the time the

22   recommendation was made, it was the SOAR program, if I

23   recall.  It was like May -- April, May is when the

24   program was defunded, and we got -- we received

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

1  funding July 1st for the SOAR program 2002.

2    Q.   So at the time you made the recommendation,

3  this program was SOAR?

4    A.   That's correct.

5    Q.   Okay.

6    A.   But part of the reason I made the

7  recommendation was because it went from the To the Max

8  program to the SOAR program.

9    Q.   At the time around April or May when it was To

10  the Max program --

11    A.   Yes.

12    Q.   -- there were four people?

13    A.   Yes.

14    Q.   Who were those four people?

15    A.   I believe the program manager was Peter Lonie.

16    Q.   And was Peter Lonie located in this smaller

17  rectangle here?

18    A.   That say PM, that's correct.  On your document

19  it says PM.

20    Q.   So where it says PM, that's where Peter Lonie

21  was?

22    A.   I believe so.

23       MR. McMACKIN:  Let the record reflect

24  opposing counsel is pointing at a pink space in top

Paul Thomas Morris, Jr. - Brewington    23

1    right part of the paper.  Because they both state PM,

2    the green and pink, I just wanted to clarify.

3    BY MS. BREWINGTON:

4    Q.    All right.  So Peter Lonie was here.  Who was

5    in this rectangle right here to the top of the PM pink

6    rectangle?

7    A.    I believe -- there was -- there was changes in

8    staff, but you said May, so I'm trying to think who

9    was there at the time.

10    Q.    Okay.

11    A.    The two student enrichment coordinators, and

12    the two student enrichment coordinators, if I

13    believe -- if I'm correct, was Crystal Heath was one

14    and Carolyn Cave, I believe, was the second.

15    Q.    Carolyn Cave?

16    A.    Cave.

17    Q.    These were two student enrichment coordinators?

18    A.    Yes.

19    Q.    So that's three.

20    A.    And there was a program secretary.  And at one

21    point, the program secretary was Diana Dyson, and then

22    Cathy Hagan was the program secretary at one point as

23    well.  I don't recall when that change-over took

24    place.

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

1    Q.    Now, was Diana Dyson or Cathy Hagan in this

2    smaller rectangle to the right of the whole square

3    where it says, "part-time secretary"?

4    A.    I'm not -- I don't recall.  That office is --

5    is open.  So I don't know exactly where the student

6    enrichment coordinators -- I don't recall where the

7    student enrichment coordinators were located.  It

8    would be like this conference room.  They were located

9    throughout the room.

10    Q.    So it's not like a separate office or anything?

11    A.    That's correct.

12    Q.    So the number of people in -- I'm trying to

13    figure out how to explain this to you so that it's

14    clear on the record.  The number of people in the box

15    that's not located PM is three as I understand it?

16          MR. McMACKIN:    Objection.  Vague.

17    A.    I don't understand the question.

18    Q.    There were four people total in this entire

19    rectangle, correct?

20    A.    That's correct.

21    Q.    Peter Lonie was in the program manager?

22    A.    To my recollection, yes.

23    Q.    So there were three in the other rectangle

24    here, this portion right here?



Paul Thomas Morris, Jr. - Brewington          25

1    MR. McMACKIN:  Objection.  Vague.

2    A.  Yes.

3    Q.  Okay.  And one of them, Cathy Hagan was part

4    time?

5    MR. McMACKIN:  Objection to form.

6    A.  I didn't say that.  Are you --

7    Q.  I'm asking, is it true that one of them, Cathy

8    Hagan, was part time?

9    A.  I'm not sure.  There was two -- there was two

10   full time.  There was a full-time secretary.  Diana

11   Dyson was a full-time secretary.  At some point she

12   left the college and Cathy Hagan became the program

13   secretary for To the Max.  I'm not sure what her

14   status was.

15   Q.  So you don't know whether she was part time or

16   full time?

17   A.  I would -- I will say that I believe she was

18   full time.

19   Q.  But you're not certain?

20   A.  That's correct.

21   Q.  And you mentioned that Carolyn Care was one of

22   the three people in the area not identified as PM?

23   A.  Carolyn Cave.

24   Q.  Carolyn Cave.  Excuse me.



Paul Thomas Morris, Jr. - Brewington                26

1              Was there a time when she left this

2    program?

3    A.    She no longer works for that program.  So, yes,

4    there was a time she left the program.

5    Q.    So when she left the program, were others still

6    in there?  I'm trying to figure out when she left and

7    who was left in that office space at the time, so --

8    A.    To the Max program had a staff of four.  The

9    SOAR program had a staff of two.  SOAR program started

10   July 1, I believe, if I recall correctly the To the

11   Max program ended in June.

12   Q.    So when the SOAR program started in July, how

13   many people were in not the project manager's area,

14   but this area right here?

15   A.    I don't recall.

16              MR. McMACKIN:  Objection.  Vague.

17   A.    There was only one student enrichment

18   coordinator for the SOAR program.  Starting July 1

19   there was one student enrichment coordinator.

20   Q.    So one student enrichment coordinator.  What

21   was her name?

22   A.    Crystal Heath.

23   Q.    So when SOAR began, we have one student

24   enrichment coordinator in -- let me start here.  We

Paul Thomas Morris, Jr. - Brewington                27

1    have Lonie Peterson in here.

2       A.    Peter Lonie.

3       Q.    Peter Lonie in the project manager's area, in

4    the pink area here, and then we have one student

5    enrichment coordinator above him in this area right

6    here?

7                MR. McMACKIN:  Let the record reflect that

8    opposing counsel is pointing to the same area

9    referenced before, the pink area with the PM and the

10   part-time secretary.

11      A.    I'm not 100 percent sure, but the program had

12   two.  So that would make sense.

13      Q.    Okay.  Had two people?

14      A.    Two people.

15      Q.    Okay.

16      A.    That's correct.

17      Q.    So two people total in the whole room 408?

18      A.    Yes.

19      Q.    Is it true that this part right here above the

20   PM, is that 408E, do you know?

21      A.    408E represents -- the E represents east

22   building.  So all the rooms in that building are --

23   have an E representation.  So 404E.  It has nothing to

24   do with inner office, outer office.

1    Q.  So this --

2    A.  That entire rectangle is 408E.

3    Q.  Okay.  All right.  That was tough.

4          MR. McMACKIN:  Can we go off the record

5  for a second?

6          MS. BREWINGTON:  Yes.

7          (Discussion off the record.)

8  BY MS. BREWINGTON:

9    Q.  Back on the record, the next page of exhibit 3,

10  is identified as alternative 1.  Do you see that?

11          Do I have the wrong page?

12          Oh, it says, "Proposed move.  Cost versus

13  allocation of space."  It's the one right after.

14    A.  Yes.

15    Q.  Have you ever seen this document?

16    A.  No.

17    Q.  Let me ask you something.  Could you just read

18  it for me since you haven't seen it before?

19    A.  Okay.

20    Q.  Have you had an opportunity to read it?

21    A.  Yes.

22    Q.  Mr. Morris, is it fair to say that this diagram

23  here accurately reflects your recommendations for the

24  move?

1          MR. McMACKIN:  Objection.  The deponent

2    testified that he had no recollection of seeing the

3    document before.

4          You can answer.

5    A.    Point of clarification, I guess this is 408?

6    I'm pointing now to the upper left-hand corner.  The

7    yellow is 408?

8    Q.    Yes.

9    A.    The rectangles -- you know, one rectangle

10   that's noted as PM, but the other rectangles, are they

11   representing individuals?

12   Q.    I don't believe so.  I think they are

13   representing office space.  Just space.

14          Well, what it is is representing where the

15   yellow is would be where UBMS is and their project

16   manager would be in this area and the rest of them

17   would be in that area.

18   A.    The rest of them being the staff?

19   Q.    Yes.

20   A.    So each -- there's three rectangles, so I

21   assume you mean there's three staff members that would

22   be located in that area.  This isn't my document, so

23   I'm just --

24   Q.    I understand.  Yes.

**W&F**

1              MR. McMACKIN:  Can I just lodge a

2     continuing objection to exhibit 3 to the extent that

3     they weren't produced?  That way I don't have to do it

4     every time you flip the page.

5              And also, I personally haven't seen a

6     colored copy of this so I can't -- I don't want to

7     testify as to authenticity, but the authenticity of

8     this document hasn't been testified to.

9              You can answer it.

10    A.    Repeat your question, please.

11    Q.    My question to you, my earlier question was,

12    after you've had a opportunity to review this

13    document, does it accurately depict your

14    recommendation for the move?

15             MR. McMACKIN:  Objection.  Same objection.

16    A.    No.

17    BY MS. BREWINGTON:

18    Q.    And tell me why not.

19    A.    You have noted on the right side of the

20    document that the -- first of all, I would like to

21    make one statement, that the document is not to scale

22    obviously.

23    Q.    Obviously.

24    A.    The offices are -- some offices are made bigger

Paul Thomas Morris, Jr. - Brewington    31

1    and some offices are made smaller. I don't know if

2    that was done for any type of purpose or not, but it's

3    nowhere near close to scale.

4         The blue, it's noted program manager is

5    blue. I guess we call it a square to the right side

6    of document. In the middle, there's five squares.

7    The one in the middle, it's noted program manager.

8         My recommendation was to have the program

9    manager of Upward Bound Classic move down to one below

10   that where it says SEC. It's purple.

11   Q.   And who was the program manager of UBC?

12   A.   At the time the program manager for UBC was

13   Kate Sullivan.

14   Q.   So it was your recommendation to move project

15   manager Kate Sullivan into SEC below the blue project

16   manager --

17        MR. McMACKIN:  Objection.  Foundation.

18   Q.   -- that are now pink?

19   A.   Yes.

20   Q.   Can you tell me who was in the SEC in pink

21   there below project manager in blue?

22   A.   Who was --

23   Q.   Who was located in that office?

24   A.   Brigitte Brown.  She was student enrichment

1    coordinator for Upward Bound Math and Science.

2        Q.    And why did you recommend to have Kate Sullivan

3    move into Brigitte Brown's office?

4        A.    Just for a matter of record, this is proposed

5    move.  So if the move happened, Brigitte Brown would

6    no longer be there.  Brigitte Brown would be in the

7    yellow upper left-hand corner.  So it wasn't moving to

8    Brigitte Brown's office.  It was moving to a vacant

9    office.

10       Q.    What was your reason for moving Kate Sullivan

11   into what was Brigitte Brown's office?

12                    MR. McMACKIN:  Objection.  Foundation.

13                    MS. BREWINGTON:  You have an objection, a

14   long-standing objection for foundation issues.

15                    MR. McMACKIN:  Here's the issue.  He

16   doesn't remember this document, and you're questioning

17   him on this document.

18                    MS. BREWINGTON:  I've asked him to review

19   it here today.  I mean, I'm asking him about a

20   document here today.

21                    MR. McMACKIN:  I know.  He's answering the

22   question.

23                    MS. BREWINGTON:  But he's had an

24   opportunity to review it today.  I asked him to review

Paul Thomas Morris, Jr. - Brewington          33

1    it.

2    BY MS. BREWINGTON:

3      Q.    My question to you is, you wanted Kate Sullivan

4    to move into what would have been an empty office

5    because your recommendation was to have Brigitte move,

6    is that correct?

7      A.    You -- I didn't want.  You know, based on the

8    proposal of all these moves, Kate Sullivan would move

9    to that office.

10     Q.    And what was your reason for Kate Sullivan

11   moving to that office?  And that office, I mean -- I

12   have to identify it -- Brigitte Brown's former office,

13   if you were to recommend her to move to another

14   office.

15     A.    That office -- that was -- Brigitte Brown's

16   former office was a larger office, and that's one.

17            The second reason is, as you can see on

18   your document, you have program manager in the first

19   square and the fourth square says SEC.  They are both

20   labelled -- I guess that's pink or purple.  They are

21   the same program.  So my thought was to get those two

22   individuals next to each other.

23     Q.    Those two individuals of -- and I'm just asking

24   the question -- of  REDACTED          and Brigitte Brown?

1    A.    No.

2    Q.    Okay.  You can say their names.

3    A.    Your document suggests that this is what would

4    happen if the move took place.

5    Q.    Okay.

6    A.    If the move took place, the program manager

7    where    REDACTED        was would now be Peter Lonie.

8    His SEC, which was Crystal Heath, you have located on

9    this document -- you have located where Brigitte

10   Brown's former office was.  My proposed move had that

11   individual next to -- right underneath Peter Lonie.

12   Q.    Okay.

13   A.    Which is white and blank in your document.

14   Q.    And your proposed move would have had Kate

15   Sullivan move into this empty office here?

16   A.    Move down.

17   Q.    Below?  Move down one?

18   A.    That's correct.

19   Q.    Now, in the center of the document are rooms

20   that are colored blue.  Do you see that?

21   A.    Yes.

22   Q.    Is that an accurate depiction of where the

23   other members of the Upward Bound Classic program were

24   located?

**W&F**

1          MR. McMACKIN:  Objection.  Vague.

2      A.   It's AN accurate depiction but, once again, not

3  to scale.

4      Q.   Not to scale, okay.  But as far as location?

5      A.   That's correct.

6      Q.   With respect to where everything else is.

7  Okay.

8           So as far as defined space for the Upward

9  Bound Classic program, is it fair to say that there

10  wasn't a defined space for the Upward Bound Classic

11  program?

12     A.   No.

13     Q.   No, it's not fair to say that?

14     A.   No, it's not.

15     Q.   Why not?

16     A.   The program had defined -- the program actually

17  had the first defined space.  That program was on that

18  floor first.  They had that space because in 2001 they

19  received a supplement.

20          A supplement is a one-year supplement to

21  their grant to serve more students and to hire staff

22  to serve those students.  The student enrichment

23  coordinator that was hired because of that supplement

24  went into that office space.  Therefore, the program

1    manager was not that in office space.  The thought --

2    and I wasn't the program manager at the time, nor was

3    I ever the program manager for Upward Bound Classic.

4    The thought, to my recollection, was to have the

5    staff -- it was more important to have the staff

6    together than it was to have the program manager right

7    there if you're adding staff.

8              Because that was a one-year -- there was

9    no guarantee we were going to get it beyond one

10   year -- it had defined space.  If we didn't get it the

11   following year, then that -- one of those -- one of

12   those rectangles would become available and the

13   program manager would be move back in.

14        Q.    Is it fair to say that you consider this in the

15   blue representing on this model the UBC in the blue,

16   proposed move cost, that this is defined space for

17   Upward Bound Classic?

18        A.    Without the supplement, yes.

19        Q.    This is defined space even though the project

20   manager is not located in the same are?

21        A.    Without the supplement, yes.

22              And for the record, the supplement was

23   defunded a year later.  So the program manager

24   currently, for the last two years, has been in that

1    blue area that you just described.

2      Q.   My earlier question was to you, is there

3    anything on here that does not accurately reflect your

4    recommendation for the move?

5      A.   Yes.

6      Q.   And you mentioned Kate Sullivan's office and

7    how you would have moved her down one to where

8    Brigitte Brown was no longer.

9      A.   That was my recommendation.

10     Q.   Are there any other things on this that are --

11   that you would have recommended or that are not

12   accurate?

13     A.   That I did recommend.

14     Q.   That you did recommend.

15     A.   SEC -- if Kate Sullivan was to be -- because on

16   your document you have Kate Sullivan, PM, in blue in

17   the middle square of five squares.  If that PM for

18   Upward Bound Classic was to be moved down, the SEC in

19   purple, which is SOAR, per your document, would have

20   to go somewhere.  My recommendation was to have that

21   SEC move in the white blank square, one below the

22   program manager in purple.

23     Q.   Okay.

24     A.   Also, in your document you have the last square

**W&F**

1    or the bottom square.  It's labelled SEC, lower case

2    PT.

3       Q.    Yes.

4       A.    And could you clarify what that means?

5       Q.    There is the part time student enrichment

6    coordinator for the talent search program in green.

7       A.    My recommendation was to have the part-time

8    student enrichment coordinator for Talent Search move

9    into that office along with another part-time tutoring

10   coordinator, which was a student enrichment

11   coordinator as well.  Her name was Nell O'Neil.  So

12   there was actually two individuals sharing that

13   office.

14      Q.    That was your recommendation?

15      A.    That's correct.

16      Q.    Is it fair to say that the talent search

17   program was not in its defined space?

18      A.    No.

19      Q.    It's not fair to say that.  Why not?

20      A.    The Talent Search program up until this point

21   had only two student enrichment coordinators.  Because

22   of the 15 percent increase, a part-time student

23   enrichment coordinator was added.  Therefore, having

24   that part-time student enrichment coordinator, that

1   part-time student enrichment coordinator had to have

2   office space. However, it's not in the grant. That

3   position wasn't in the grant. So, therefore, when

4   you -- when you look at the defined space, you're

5   looking at space that fits the needs of the grant

6   because of it's a four- or five-year grant.

7       Q.   Okay.

8       A.   And really the same discussion we had with

9   Upward Bound Classic because it's a supplement and it

10  wasn't guaranteed.

11      Q.   So, in your opinion, the Talent Search program

12  had defined space even though not all of their student

13  enrichment coordinators were in that same defined

14  space?

15               MR. McMACKIN:   Objection.   Foundation.

16      A.   My opinion is that a part-time student

17  enrichment coordinator that was not in the grant was

18  not in that defined space.

19      Q.   Next page of the document, it say, alternative

20  1.  It's labelled, alternative 1.  Have you ever seen

21  this document before?

22      A.   No.

23      Q.   Can you please take time to review it for me.

24      A.   Okay.



1    Q.    Have you had an opportunity to review

2    alternative 1?

3    A.    Yes.

4    Q.    This document, does it show that the SOAR

5    program would be in the left-hand area in the

6    rectangle area of this diagram up at the top?

7    A.    That's what the diagram shows, yes.

8    Q.    And it also indicates that the Upward Bound

9    Math and Science program would remain along the wall

10   to the right?

11              MR. McMACKIN:   Objection to form.

12   BY MS. BREWINGTON:

13   Q.    Does it not?

14   A.    Yes.   The document shows that, yes.

15   Q.    It also seems to indicate that the secretary of

16   the Upward Bound Math and Science program would move

17   along the wall with the rest of the Upward Bound Math

18   and Science program, does it not?

19   A.    Yes, it does.

20   Q.    Mr. Morris, does alternative 1 indicate a

21   defined space for the Upward Bound Math and Science

22   program?

23   A.    In what regards?

24   Q.    I mean, we've been talking about defined space,



1    and you said that your recommendation was to have

2    defined space for the programs.  Would this

3    alternative provide a defined space for Upward Bound

4    Math and Science?

5          MR. McMACKIN:  Objection.  Vague.

6    A.    No.

7    Q.    Why not?

8    A.    Well, no for two reasons.  Defined space was

9    important to have for longevity.  These offices, as I

10   mentioned earlier in my testimony, were not secure for

11   our department meaning that they were a loan from

12   another department.  So that's why I would say they

13   are not defined space because it was not space that we

14   know we are going to have for a long time.  That -- I

15   should say that we were guaranteed to have for a long

16   time.

17   Q.    You said there was another reason?

18   A.    Second reason, the program is split with

19   another program member from another -- another member

20   from another program in the middle of the five.

21   Q.    Well, if we go back to the proposed move

22   document, the one before that --

23   A.    Okay.

24   Q.    -- isn't it accurate that, in the proposed move

1    that Kate Sullivan, program manager, will be split

2    from her group, student enrichment coordinators?

3        A.    That's correct.

4        Q.    And it's also true that, in the proposed move,

5    the student enrichment coordinator part time of the

6    Talent Search would also be split from the program

7    manager and the rest of the Talent Search members, is

8    that true?

9        A.    That's true.

10       Q.    If you could turn to alternative 2?

11       A.    Just for record, these alternatives are things

12   that you're proposing, not that we are proposing.  I

13   never had alternative 1 or alternative 2.  I made a

14   recommendation, which was -- which was captured not

15   accurately on the first page.  But I guess I'm asking,

16   these are things that you're proposing?

17       Q.    These are not things that I'm proposing.  These

18   are things that were proposed to Delaware Tech.

19       A.    Okay.  Just so you know, I wasn't involved in

20   this.  I just wanted to make sure.

21       Q.    Alternative 2, have you ever seen this document

22   before?

23       A.    No.

24       Q.    Can you please take time to review it?



Paul Thomas Morris, Jr. - Brewington          43

1    A.    All right.

2    Q.    Have you had an opportunity?

3    A.    Yes.

4    Q.    Mr. Morris, is it true that this alternative 2

5  would have REDACTED        , the project manager, remain

6  in her area, which is this yellow box at the top of

7  the row of boxes, and have the remainder of her group

8  move to what we know is 408 but on this diagram it's

9  the top rectangle on the left-hand side?

10         My question -- did you understand the

11 question?

12   A.    No.  Please repeat it.

13   Q.    The question is -- I had to explain so much and

14 give you so much detail, it's like the question got

15 lost in there somewhere.

16         MR. McMACKIN:  I don't have to object any

17 more.  Now you got the message.

18         MS. BREWINGTON:  I got it down with the

19 detail.  Okay.  Let me try this again.

20 BY MS. BREWINGTON:

21   Q.    Is it true that this diagram, this alternative

22 2 diagram, indicates that REDACTED      would remain

23 where she is, which is indicated in a yellow box

24 labelled PM on the very top of a row of boxes and --

1    let me just take it there.  Let me ask you that one

2    question.  Is that what this alternative 2 indicates

3    to you?

4              MR. McMACKIN:  Objection to form.

5       A.    Yes.

6       Q.    Does it also indicate that the remainder of

7    UBMS would move to the rectangle at the top of the box

8    that's also colored in yellow?

9       A.    If the document represents that those three

10   rectangles would be three staff members, yes.

11      Q.    This document also depicts, does it not, that

12   the blue rectangle in the center of the row of boxes

13   to the right where Kate Sullivan was located would

14   remain where she is?

15      A.    That's what this document represents, yes.

16      Q.    And the remainder of her group would be in the

17   center underneath where it says "computer room," these

18   blue boxes here?

19              MR. McMACKIN:  Objection to form.

20      A.    That's what the document states, yes.

21      Q.    My question, Mr. Morris, is, does this

22   alternative accomplish your goal of having the TRIO

23   program, the UBMS in a defined space?

24              MR. McMACKIN:  Objection.  Foundation.



1    A.    No.

2    Q.    Okay.

3    A.    Because that wasn't the -- that wasn't the goal

4    to have UBMS in the defined space.

5    Q.    The goal was not to have UBMS in its own

6    defined space, is that correct?

7    A.    That's correct.

8    Q.    Who did you want in their defined space?

9    A.    I was trying to get everyone in defined space.

10   That was the ultimate goal.

11   Q.    So everyone meaning all of the TRIOs in a TRIO

12   defined space, is that --

13   A.    TRIO programs, yes.

14   Q.    So you wanted all the TRIO programs together?

15   A.    That's correct.

16   Q.    Okay.

17   A.    And have each individual program together.

18   Q.    Okay.

19   A.    That was the ultimate goal.

20   Q.    Ultimate goal.  Right.

21         To have not only the TRIO program in its

22   defined space, am I right, but to also have each

23   individual program in their defined space?

24   A.    That's correct.

1          MR. McMACKIN:  Objection to form.

2      Q.    Does this picture accurately depict alternative

3    2, the Upward Bound Math and Science program being in

4    their defined space?

5      A.    No.

6      Q.    Why not?

7      A.    Because there's -- the program manager is not

8    with the program.

9      Q.    But if I take you back to alternative 1 --

10   actually let's go back to proposed move.  Is it true

11   that you indicated that the Upward Bound Classic

12   program was in their defined space even though the

13   project manager was outside of that area?

14     A.    Your question to me was Upward Bound Math and

15   Science would be that defined space.  And now you are

16   asking about Upward Bound Classic?

17     Q.    Yes.

18     A.    Okay.  So we're clear on two distinctions.  If

19   the program did not have the supplement -- I guess we

20   can go back.

21          My statement was, if the program didn't

22   have the supplement, then, yes, it would be defined

23   space.

24     Q.    If the program didn't have --



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    A.   Didn't have the supplement.  The reason the

2    program manager is outside of this defined space is

3    because they received a supplement.  They no longer

4    have a supplement; the program manager is now actually

5    in that space.  So, when making a recommendation, I

6    was looking down the road, and knowing that that was

7    not secured funding, that was why the program manager

8    was not in that space.  So it wasn't defined space for

9    the entire program, but I knew it could accommodate

10    the program for the future.

11    Q.   Mr. Morris, do you recall saying to REDACTED

12    REDACTED      , the program manager of UBMS, that her group

13    should put their concerns in writing and put it in

14    black and white?

15    A.   No.

16           MR. McMACKIN:  Compound.  Objection.

17    Q.   Do you recall saying to REDACTED        that

18    they should explain where it says in their job

19    description where it's stated that they could not

20    move?

21    A.   No.

22    Q.   Do you have any idea where this allegation may

23    have come from?

24    A.   I said to REDACTED        to put their concerns

1  in writing.  You asked two questions, so, therefore, I

2  couldn't answer your question.

3      Q.    So you did tell REDACTED          that they should

4  put their concerns in writing?

5      A.    No.

6      Q.    Tell me what you said to REDACTED

7      A.    I asked REDACTED        to have her staff put

8  their concerns in writing based on the recommendation

9  of the division director.

10     Q.    But did you not say, explain where it says in

11 their job description where it's stated that they

12 could not move?

13     A.    Not to my recollection.

14     Q.    Did you say anything like that, similar?

15     A.    Not to my recollection.

16     Q.    I'd like to take you to -- I'm not sure what

17 exhibit this is.  It's the actual complaint.  It's

18 paragraph number 4.

19         MS. BREWINGTON:  Wait.  Did we mark these

20 as an exhibit.  Can I go ahead and do that?

21         MR. MULLER:  Would it be easier, because

22 you have all this together, to just -- the first thing

23 you referred to that we marked as exhibit 1 was

24 exhibit 1 as you presented it to us.  You skipped over

1   2, and then we went to 3.  Would it be an easier --

2   I'm just making a suggestion if you wanted to just

3   mark things non-sequentially as they are presented.

4   Just throwing that out there because we skipped over

5   2.  I don't know if you're planning on coming back to

6   it.

7              MS. BREWINGTON:  Yeah.  All these I may

8   not use.

9              MR. McMACKIN:  I don't want to add

10  confusion.  I'm sorry.

11             (Discussion off the record.)

12             (Paul Morris Deposition Exhibits 2 and 3

13  were marked for identification.)

14  BY MS. BREWINGTON:

15     Q.   Mr. Morris, I'd like to refer you to paragraph

16  20 of Ken Cole's complaint, if you could read that for

17  me.

18     A.   On or about --

19             MR. McMACKIN:  You can read it to

20  yourself.

21     A.   This is like reading class.

22     Q.   Do you recall meeting with the UBMS staff in or

23  around August 29, 2002?

24     A.   Yes.

1       Q.    I'd like for you to tell me what occurred

2   during that meeting as much as you can recall.  We'll

3   start with, what did you say at that meeting?

4       A.    I can't recall.

5       Q.    Do you recall saying anything at that meeting?

6       A.    I'm sure I said something, but I can't recall

7   what that was.

8       Q.    You can't recall.  Do you recall the meeting?

9       A.    Yes.

10      Q.    Where were you?

11      A.    I believe the meeting took place in Ann

12  Del Negro's office.

13      Q.    Okay.

14      A.    I believe.  That was a long time ago, so...

15      Q.    Do you recall anything that Ann Del Negro may

16  have said during that meeting?

17      A.    Not specifically.  I mean, if you ask me

18  questions, I might be able to answer based on what you

19  ask me, but I don't recall.

20      Q.    You don't recall exactly what you may have said

21  and you don't recall what Ann Del Negro may have said,

22  is that fair?

23      A.    That's fair, yes.

24      Q.    Do you recall Ken Cole and/or Brigitte Brown

1    expressing concerns about the move of the Upward Bound

2    Math and Science program?

3        A.    I recall that the meeting was about that, yes.

4        Q.    You recall that the meeting was about that?

5        A.    Yes.

6        Q.    So my question was, do you recall -- I don't

7    even remember what my question was.

8              Do you recall them voicing their concerns

9    about the Upward Bound Math and Science move?

10       A.    Yes.

11       Q.    What was said by Ken Cole and Brigitte Brown?

12       A.    Specifically?

13       Q.    Whatever you can remember.

14       A.    What I can recall is that the meeting was asked

15   for and it was requested for and given to Ken Cole and

16   Brigitte Brown, and I don't -- I'm not sure who else

17   was there, if there was anyone else really from the

18   staff or not.  Met with Ann Del Negro and myself at

19   their request to discuss their issues with the move.

20   And they -- to the best of my recollection, they

21   discussed their issues, which the three things that I

22   remember are in -- I just read.  Employee relations,

23   morale, and productivity.

24       Q.    So Ken Cole and Brigitte Brown expressed to you

1    and Ann Del Negro their concerns about employee

2    relations, morale and productivity, is that correct?

3         A.    That is correct.

4         Q.    And they also discussed with you that the small

5    space would make it extremely difficult to protect

6    students' privacy?

7         A.    I don't recall that.

8         Q.    Don't recall that part?

9              MR. McMACKIN:   Objection to form.

10        Q.    Did either Ken Cole or Brigitte Brown tell you

11   that this move was treating them unfairly or

12   unequally?

13        A.    No.

14        Q.    When Ken Cole and Brigitte Brown expressed

15   their concerns about employee morale and employee

16   relations and productivity, what was your response?

17        A.    I didn't have a response.

18        Q.    So --

19        A.    This was brought to Ann Del Negro who was my

20   supervisor.

21        Q.    So what was Ann's response?

22        A.    I don't recall.

23        Q.    Did you respond at all to their concerns during

24   this meeting?



1    A.    Not that I recall.

2    Q.    Do you recall, what was the resolution of this

3    meeting?

4    A.    Well, the move went on, so I don't know if that

5    answers your question.

6    Q.    Do you know or do you recall whether Ann or

7    yourself told the Upward Bound Math and Science group

8    that the move would go on at that meeting?

9    A.    I don't recall.  Now, at some point that was

10    said, but I don't recall if it was that meeting or

11    not.

12    Q.    And you mentioned that the move eventually did

13    occur?

14    A.    That's correct.

15    Q.    Is that correct?

16    A.    That's correct.

17    Q.    In the Upward Bound Math and Science program we

18    have Brigitte Brown and Ken Cole who are the student

19    enrichment coordinators, correct?

20    A.    One's a full-time student enrichment

21    coordinator.  One's a part-time student enrichment

22    coordinator.

23    Q.    Then we have Liz Wilson who's the secretary, is

24    that correct?



1    A.    Liz Persons.

2    Q.    Did she get married?

3    A.    She changed her name.

4    Q.    But we are talking about the same --

5    A.    I just wanted to make sure we were talking --

6    Q.    That's fine.  Clarification is the best.

7          We also have REDACTED          who's the

8    program manager, is that correct?

9    A.    At this present time.

10   Q.    At that present time?

11   A.    That is correct.

12   Q.    That's what we are --

13   A.    Yes.

14   Q.    Are there any other members of the Upward Bound

15   Math and Science program besides these four people

16   that I just mentioned at this time?

17   A.    They have summer staff.

18   Q.    How many summer staff do they have?

19   A.    I have no idea.  I mean, I could give you a

20   roundabout number.  Say ten.

21   Q.    Ten summer staff.  Do the ten summer staff

22   members work in the same office space as the Upward

23   Bound Math and Science program people that I just

24   mentioned?

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.    No.

2    Q.    Okay.  Is there anyone else besides the four

3    people that I just mentioned that work in the same

4    office space with them?

5    A.    Not that I recall.

6    Q.    Aren't there also student co-ops in those

7    offices as well?

8    A.    Only at the recommendation or the request of

9    the program manager.  That was something that's -- if

10   the program manager wants a student worker, then they

11   request one.

12   Q.    So when you recommended that the UBMS program

13   move, were you aware of how many student co-op workers

14   UBMS had?

15   A.    When I recommended that all -- when I made the

16   recommendation of all the moves, not just the UBMS

17   move --

18   Q.    Okay.

19   A.    -- I did not -- I did not inquire about student

20   workers.

21   Q.    So you didn't take into account other people

22   being in the office besides UBMS members?

23   A.    No.  Because we never had office space for

24   co-ops.  Co-ops would work -- and I don't think they

1    are called co-ops.  Work study is what they are

2    actually called.

3              Work studies are requested by the program

4    manager to do tasks for the program manager.  They

5    don't -- no work studies have office space.

6    Q.    So when they do their work that's asked of them

7    by the program manager, where do they do that at?

8    A.    Wherever the program manager can find a place

9    for them to do it.

10   Q.    Would that be, at some point, the office where

11   the UBMS people work?

12   A.    It could be.  It could be.  But it -- once

13   again, it's a decision made by the program manager.

14   It could be in the library.  It could be in the

15   cafeteria.  It could be in the computer room, research

16   room.  It could be in lots -- if someone is out that

17   day, it could be at their desk.  It could be at a lot

18   of places.

19   Q.    Mr. Morris, could you tell me who was involved

20   in the move besides the four people that I mentioned

21   earlier?  And I can go over them, Liz Wilson, Brigitte

22   Brown, Ken Cole, and REDACTED          ?

23   A.    Who was involved in the move?  Can you be more

24   specific, please?

Paul Thomas Morris, Jr. - Brewington          57

1     Q.    Who else either was moved in this move or

2     participated in this -- assisting with the move as far

3     as maintenance, approvals to move, things like that?

4     Just who were these people?

5     A.    I don't recall.

6     Q.    Okay.

7     A.    Everyone's --

8     Q.    Just do the best you can.

9     A.    I can tell the folks that moved. Upward Bound

10    Math and Science program, all four individuals moved.

11    The part-time student enrichment coordinator, who

12    didn't have -- for Talent Search who didn't have

13    office space moved. The tutoring coordinator who was

14    Ms. Nell O'Neil, she moved subsequently. I mean, you

15    know. Kate Sullivan move. Peter Lonie move. Crystal

16    Heath moved. Administrative services had staff to

17    assist us in the move. I don't remember how many or

18    the names.

19    Q.    Okay.

20    A.    There was at least one, I believe one, computer

21    services technician that helped set up the computers.

22    My direct supervisor, who was Ms. Ann Del Negro, she

23    was involved in the decision making. Dr. Zawislak was

24    involved in the decision making. Mr. Miller was

Paul Thomas Morris, Jr. - Brewington          58

1     involved in the decision making.

2        Q.   If we can turn to -- it's tabbed 5.  I'd like

3     to mark it as an exhibit.

4              (Paul Morris Deposition Exhibit 4 was

5     marked for identification.)

6     BY MS. BREWINGTON:

7        Q.   Mr. Morris, what is this document?

8        A.   It's labelled Del Tech Community College's

9     Upward Bound Math and Science Center.  It looks like

10    part of the grant.

11       Q.   It was part of the grant?

12       A.   Grant proposal, looks like.

13       Q.   Have you ever seen it before?

14       A.   Yes.

15       Q.   It's labelled program years November 1, 2004,

16    through October 31, 2009.  It was submitted November

17    22nd, 2002.  Is that correct?

18       A.   That's what it says, yes.

19       Q.   I'm turning to the second page.  Actually, it's

20    labelled at the bottom 92?

21       A.   Okay.

22       Q.   Page 92.

23              MR. McMACKIN:  Can I just put on the

24    record that this isn't the entire document.  It hasn't

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Paul Thomas Morris, Jr. - Brewington          59

1    been produced, and it's not Bates stamped.

2         I'm sorry.  This isn't the entire grant.

3    It is the entire document, but it's not the entire

4    grant.  I misspoke there.  I apologize.

5    BY MS. BREWINGTON:

6    Q.   Halfway down the page, Mr. Morris, do you see

7    where it indicates the suite of offices provides

8    privacy for confidential conversations with center

9    participants?

10   A.   Yes.

11   Q.   Is it fair to say that the grant proposal

12   indicates that there will be suite of offices where

13   there would also be privacy?

14        MR. McMACKIN:  Objection.  Compound.

15   A.   Clarify.

16   Q.   Is it fair to say that the grant proposal

17   indicates that there will be suites of offices?

18   A.   That's what it says,  I mean, define suite.

19   Q.   But it does say that?

20   A.   That's -- that's correct.

21   Q.   And that was my question.

22        Is it also fair to say that the grant

23   proposal indicates that the suite of offices would

24   provide privacy for confidential conversations?

Paul Thomas Morris, Jr. - Brewington                60

1       A.    That's what it says, yes.

2       Q.    Mr. Morris, did Upward Bound Math and Science's

3   former office space before the move provide for

4   privacy?

5       A.    No.

6       Q.    Why not?

7       A.    Those were modular offices.  The walls are

8   modulars.  So there are spaces -- privacy meaning for

9   voice, I guess is what I think you're asking me.  Is

10  that correct?

11      Q.    Yes.

12      A.    There's space open to the upper right-hand

13  corner.  So, therefore, you could hear.  It's not

14  private as far as private conversations.

15      Q.    Are they offices where they were before,

16  individual office space?

17      A.    Where they are at now is individual office

18  space.

19      Q.    No.  My question was, where they were prior to

20  the move --

21      A.    Yes.

22      Q.    -- were they individual offices?

23      A.    Yes.

24      Q.    And these individual offices, my question is,



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    did they provide privacy?

2        A.    Define privacy.

3        Q.    Where they could communicate with their

4    students in private.

5        A.    No.

6        Q.    And the reason for that is?

7        A.    These are modular offices.  The offices were

8    constructed with modular materials.  So, therefore, in

9    the construction there is a space where the windows

10   are that's open to the next office.  So a private

11   conversation could be heard into the next office.

12       Q.    So there's partitions in these offices?

13       A.    Well, they're modular.  I don't want to use the

14   word "partition" because they look like a wall, but

15   they weren't part of the original construction, if

16   that makes sense.  So there's a cut-out, which you can

17   actually hear conversations.

18       Q.    Let me ask you this.  If you had to compare

19   where they were previously, the Upward Bound Math and

20   Science program, to where they moved to, which office

21   space provided more privacy?

22            MR. McMACKIN:  Objection.  Calls for

23   speculation.  You can answer.

24       A.    The question you asked me about voice privacy,

1    I would say there's not much difference.

2        Q.    Well, did where they move to have partitions or

3    modules that you just talked about?

4        A.    It didn't, no.

5        Q.    Did it have anything at all to account for a

6    separation of office space between individuals?

7        A.    It could have.

8        Q.    But did it?

9        A.    When they first moved, no. At the decision of

10   the program -- the program manager made a decision not

11   to put in partitions.

12       Q.    Isn't it true that Liz Wilson requested

13   partitions for the new office space?

14       A.    Not to my recollection.

15       Q.    Not to your recollection.  Okay.

16            Well, isn't it also true that that --

17       A.    Can I make an objection?  You said also true.

18       Q.    Okay.  I'm sorry.

19            Isn't it true that you indicated to Liz

20   Wilson that they could not have partitions because of

21   the Edgar grant?

22       A.    No.

23            MR. McMACKIN:  Objection to form.

24       A.    No.  Not true.

Paul Thomas Morris, Jr. - Brewington          63

1      Q.    Do you have any idea where that came from?

2      A.    No.   That's the first time I've heard of it.

3      Q.    Does the Edgar grant allow for monies to be

4    used for construction?

5      A.    Partitions are not construction.

6      Q.    So partitions would not be considered

7    construction in terms of the Edgar grant?

8      A.    You're referring to the Edgar grant.   Where

9    is -- I don't know what that is.

10     Q.    You don't know what that is.   I'm sorry.   Let

11   me confer.

12               (Discussion off the record.)

13   BY MS. BREWINGTON:

14     Q.    Let me ask you, are you familiar with the Edgar

15   regulation?

16     A.    You said grant.

17     Q.    I did, and I apologize for that.   The Edgar

18   regulation, what is that?

19     A.    Edgar regulations are regulations that govern

20   educational programs in the department of education --

21   I'm sorry -- in the government.

22     Q.    In the government?

23     A.    Not just the department of education.

24     Q.    Now, Edgar regulations, do they stipulate --

Paul Thomas Morris, Jr. - Brewington                64

1    correct me if I'm wrong.  My question is, do they

2    stipulate that you cannot use grant money for

3    construction?

4    A.    For construction, yes.

5    Q.    And do you recall saying to Liz Wilson that

6    they could not have partitions because the Edgar

7    regulations wouldn't allow it?

8    A.    No.  Not only do I not recall it, I didn't say

9    it.

10    Q.    We've talked about the Upward Bound Math and

11    Science program, and in their former office they

12    had -- you didn't say partitions.  You said modules.

13    Is that right?

14    A.    That's correct.

15    Q.    Did the other programs have modules or

16    partitions?

17    A.    Partitions, yes.

18         MR. McMACKIN:  Objection.  Vague.

19    Q.    So the other programs had partitions.  Let me

20    clarify.  The other programs, meaning the Talent

21    Search and Upward Bound Classic, they had partitions?

22         MR. McMACKIN:  Objection to form.

23    A.    At the request of the program manager -- the

24    program manager purchased and put in the partitions,



1  yes.

2     Q.    But the Upward Bound Math and Science program

3  did not have partitions?

4     A.    The Upward Bound Math and Science program

5  manager did not purchase and put in partitions, that's

6  correct.

7           Partitions are allowed under Edgar, just

8  to further clarify.

9     Q.    So partitions are allowed under Edgar?

10    A.    That's correct.

11    Q.    And do you know why Upward Bound Math and

12 Science did not have partitions in their room when

13 they moved?

14    A.    The program manager did not request them, to my

15 knowledge.

16    Q.    So --

17    A.    The program manager makes the purchases and did

18 not purchase partitions.

19    Q.    So, for clarification, my question is, so the

20 reason why they did not have partitions is because

21    REDACTED        did not order them?

22    A.    That's correct.

23    Q.    Mr. Morris, who is Tonia Conley?

24    A.    Tonia Conley was a student enrichment

Paul Thomas Morris, Jr. - Brewington                66

1    coordinator for Upward Bound Classic.

2        Q.    Does she still work at Delaware Tech?

3        A.    No.

4        Q.    And Kate Sullivan was the program manager for

5    Upward Bound Classic, is that correct?

6        A.    That's correct.

7                MR. McMACKIN:    Objection.    Form.

8                I sorry.    I retract that objection.

9    BY MS. BREWINGTON:

10       Q.    Is it fair to say that Tonia Conley reported to

11   Kate Sullivan, the program manager in Upward Bound

12   Classic?

13       A.    Yes.

14       Q.    And Kate Sullivan is white?

15       A.    Yes.

16       Q.    And Tonia Conley is black?

17       A.    Yes.

18       Q.    Do you know whether Tonia Conley filed a

19   grievance against Kate Sullivan?

20       A.    For?

21       Q.    I'm just asking any grievances.

22       A.    I know there was -- no.    I don't know about a

23   grievance, no.

24       Q.    You don't know about a grievance?

Paul Thomas Morris, Jr. - Brewington          67

1      A.    I don't recall a grievance filed, a formal

2   grievance filed.

3      Q.    Are you aware of the nature of their working

4   relationship?

5      A.    I'm aware -- I was aware of the nature of lots

6   of people's working relationship.

7      Q.    So you were you aware of the nature of Tonia --

8      A.    Yes.

9              MR. McMACKIN:   Objection.   Objection.

10  It's vague.

11     Q.    Did Tonia Conley and Kate Sullivan have a

12  personality conflict?

13     A.    I'm not a psychologist, so I don't know.

14     Q.    You don't know whether they did?

15     A.    No.

16     Q.    Do you know whether there were any issues

17  between Tonia Conley and Kate Sullivan?

18     A.    Yes.

19     Q.    Tell me about the issues between Tonia Conley

20  and Kate Sullivan?

21     A.    Some of these issues deal with personnel

22  issues.   And am I allowed to go into that?

23              MR. McMACKIN:   Yeah.   Just be ready,

24  please, we may, during the course of this particular

Paul Thomas Morris, Jr. - Brewington                    68

1  questioning, ask for certain testimony to be put under

2  seal.

3     A.    There was a period of time -- I don't know --

4  five, six months when I was Kate Sullivan's

5  supervisor --

6     Q.    When was this?

7     A.    It was -- I was reclassified as special

8  programs director from I believe it was June or July

9  to November.

10    Q.    Of 2000 --

11    A.    Of 2002.

12    Q.    Okay.

13    A.    When I was reclassified, I became Kate

14  Sullivan's supervisor.  So, in that capacity, the only

15  capacity that I was ever involved in their relations,

16  as you put it.

17    Q.    Okay.

18    A.    So that's why I said about employee

19  confidentiality.  There were issues, employee issues

20  with Tonia that the program manager was dealing with.

21            (Pages 69-70 are under seal.)

22

23

24

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

1              (Transcript continues unsealed.)

2    BY MS. BREWINGTON:

3       Q.   Was the office space that Liz Wilson, Brigitte

4    Brown, and Ken Cole moved to, was that at one time Ann

5    Del Negro's private office.

6              MR. McMACKIN:  I'm going stop you here.

7    We are going to pause our request for the information

8    to be put under seal, switching topics.

9              MS. BREWINGTON:  I should have told you.

10             MR. McMACKIN:  That's okay.

11      A.   Yes.

12      Q.   Yes to my question?

13      A.   Yes.

14      Q.   When was that?

15      A.   I don't recall.  It was -- I'll give you an

16   estimate.  I would say like 2000, 2001.

17      Q.   2000, 2001.

18             You mentioned that at one point you were

19   special programs director, is that correct?

20      A.   That's correct.

21      Q.   When were you special programs director?

22      A.   As previously stated, I believe around June,

23   July 2002 until November 2002.

24             MR. McMACKIN:  I'm going to bring an

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Paul Thomas Morris, Jr. - Brewington                72

1    objection.  The deponent testified that he was program

2    manager, not the special programs director.

3              MS. BREWINGTON:  I'm sorry.  I think --

4              THE WITNESS:  I was special programs

5    director for those six months.

6              MR. McMACKIN:  I apologize.

7              THE WITNESS:  I was program manager prior,

8    and then after November, I became -- I went back to

9    program manager.

10             MS. BREWINGTON:  Okay.  We'll get to that.

11   BY MS. BREWINGTON:

12   Q.   So you were program manager and then you said

13   you were reclassified to special programs director, is

14   that what you said?

15   A.   Yes.  That's correct.

16   Q.   When were you reclassified or when did you

17   change positions to special programs director?

18   A.   Just for the record, this is the third time

19   I've answered this question.

20   Q.   Okay.  I need a --

21   A.   June, July of 2002.

22   Q.   How did this change in position come about?

23   A.   The college has a reclassification process.

24   Q.   Tell me about the reclassification process.

1    A.    The office of the president puts out a

2    document, for lack of a better term, and if you feel

3    like your job duties have changed or are going to

4    change, you fill out the paperwork of what your job

5    duties have been, what they are, and they can

6    reclassify the position.

7              I have a colleague, through TRIO, down in

8    our Owens campus, who has a position of special

9    programs director, and what I was doing at the time

10   was very similar to what she did.  So I put in the

11   paperwork.  The paperwork was submitted, and the

12   office of the president reclassified my position.

13   Q.    Who was the individual at the Owens campus that

14   was special programs director?

15   A.    Bonnie Hall.  Still is.

16   Q.    Bonnie Hall?

17   A.    Hall.  She still is.

18   Q.    She still is.  Okay.  I thought you said

19   another name.

20              Now, in order to be reclassified, under

21   Del Tech's policy, is it true that you have to be able

22   to perform the additional job duties within your

23   normal work schedule?

24   A.    Yes.



1      Q.   Mr. Morris, did you perform the duties of

2   special programs director within your normal work

3   hours?

4                MR. McMACKIN:   Objection to time frame.

5      A.   I did for special programs director, yes.

6      Q.   For special programs director, yes?

7      A.   For additional duties I did, yes.  That was

8   your question, the additional duties?

9      Q.   I don't really understand your answer.  Every

10   time somebody objects it's like it breaks up the --

11   but my question is, were you able to perform the

12   duties of special programs director during your normal

13   work hours?

14                MR. McMACKIN:   Same objection.

15      A.   Yes and no.

16      Q.   Okay.  Explain that to me.

17      A.   Yes.  The additional duties, yes.  However,

18   because there was so many additional duties, a lot of

19   the program manager stuff I did for Talent Search I

20   did outside of my additional duties.  I

21   did previously.  See, that's where the question is

22   throwing me for a loop a little bit.  Based on the

23   classification, once I have reclassified, the answer

24   is, yes, I did all my duties within that time frame,



1   once I was reclassified.

2       Q.   Once you were reclassified, but when you

3   requested the classification, in order to even be

4   reclassified, isn't it true that you have to perform

5   those work duties within your regular work hours?

6       A.   And the policy says yes.  However, the forms

7   did not.  So there was nothing for me say -- nothing

8   for me to know that, to be honest with you.

9       Q.   But the policy does say --

10      A.   That's correct.

11      Q.   -- that you do have to --

12      A.   Yes.  Yes.  That's correct.

13      Q.   And you were not able to perform those

14  additional duties within your regular work hours?

15              MR. McMACKIN:  Objection to foundation.

16      A.   Not correct.

17      Q.   Let me ask you again.  Isn't it true that you

18  were not able to perform those additional work hours

19  for special programs director prior to being

20  reclassified?

21      A.   That's correct.

22      Q.   And isn't it also true that you were still

23  reclassified even though you weren't able to perform

24  those additional job duties?



1          MR. McMACKIN:   Objection.   The question is

2    ambiguous.

3       A.    Yes.   However, that was never -- that was never

4    known.   That was never put on any documentation.   That

5    was never requested in the reclassification process.

6    And I'm sure you know this.   Hence, the

7    reclassification was rescinded because of that.

8       Q.    We'll get to that.

9       A.    Because of the grievance filed.

10              (Pages 77, *et seq.*, are under seal without

11    the seal request ending.)

1    BY MS. BREWINGTON:

2        Q.    What salary plan were you in prior to your move

3    to special programs director?

4                    MR. McMACKIN:    This is under seal, please.

5        A.    B-16.

6        Q.    And when you moved to special programs

7    director, what salary plan were you in at that time?

8        A.    B-17.

9                    MR. McMACKIN:    Request is continuing that

10   the testimony be under seal.

11       Q.    So is it fair to say that you moved from a

12   grade 16 to a grade 17?

13       A.    That's fair to say, yes.

14       Q.    And isn't it fair to say that that would be

15   considered a promotion?

16       A.    No.   Reclassification.

17       Q.    Mr. Morris, was the position of special

18   programs director ever posted prior to you getting

19   this position?

20       A.    No, because reclassifications aren't posted.

21       Q.    You mentioned Bonnie Hall earlier, isn't that

22   true?

23       A.    Yes.

24       Q.    And you stated that she was the special



Paul Thomas Morris, Jr. - Brewington                78

1    programs director of the Owens campus, is that

2    correct?

3        A.    That's correct.

4        Q.    Do you know whether or not that position was

5    posted?

6        A.    No.

7        Q.    If you can turn to exhibit 7 in the complaint,

8    I'd like to have that marked.

9                (Paul Morris Deposition Exhibit 5 was

10   marked for identification.)

11   BY MS. BREWINGTON:

12       Q.    Mr. Morris, could you tell me what this

13   document is?

14       A.    I can tell you what it says.

15       Q.    You can't tell me what it is.  Do you know what

16   it is?

17       A.    It's a campus -- CCP update.

18       Q.    Who sends out the CCP update, meaning where is

19   this originated from?  Like who's involved in putting

20   this CC update together?

21                MR. McMACKIN:   Objection.  Compound.

22       Q.    My question is, who was involved in putting the

23   CC update together?

24       A.    I'm not sure.  I know -- I can answer this.



 1     Probably cut to the chase.  The division director is

 2     the one that authors the update.

 3       Q.   Okay.

 4       A.   But there's -- she had staff, I'm sure, that

 5     assisted her in putting it together and sending it

 6     out.   That's why it's hard to answer your question.

 7       Q.   Who was that?

 8       A.   I don't know.  Whoever her staff was at the

 9     time.

10       Q.   No.  I mean, you're saying "her."

11       A.   The division director.

12       Q.   Division director, and her name is --

13       A.   Dr. Susan Zawislak.

14       Q.   So is it fair to say that Susan Zawislak

15     authored this form right here?

16            MR. McMACKIN:  Objection.  Calls for

17     speculation.  You can answer.

18       A.   To my knowledge, yes.  I'm sure she has help

19     doing that, but yes, it's her update.  She's division

20     director.

21       Q.   And is it fair to say that the second paragraph

22     of this form indicates that "Paul Morris has

23     been promoted to special programs director"?

24       A.   That's what it says, yes.



Paul Thomas Morris, Jr. - Brewington                    80

1    Q.    She's your manager, correct?

2    A.    She wasn't my supervisor, no.

3    Q.    She wasn't your supervisor, no?  But she was

4    director of the entire program?

5    A.    She was director of the entire division.

6    Q.    Entire division.  Okay.

7          So Ms. Zawislak sent out a newsletter

8    indicating that you received a promotion to special

9    programs director, is that correct?

10   A.    Yes.  That's correct.  She later sent out a --

11   rescinded that and restated what the fact was, that I

12   was reclassified.

13   Q.    Do you know why she would send out something

14   indicating that you received a promotion?

15   A.    No.

16   Q.    Were you aware that Ken Cole filed a grievance

17   with respect to your change in position from program

18   manager to special programs director?

19   A.    I was made aware later.

20   Q.    Let me point you to Exhibit 8.

21         (Discussion off the record.)

22         (Recess taken.)

23         MS. BREWINGTON:  We are back on the

24   record.  Would you read back and tell me what my last

1    question was?

2                    (Record read.)

3                    MS. BREWINGTON:   Next exhibit is tab 8.

4                    (Paul Morris Deposition Exhibit 6 was

5    marked for identification.)

6    BY MS. BREWINGTON:

7       Q.   Mr. Morris, based on review of this, Ken Cole's

8    grievance was filed on September 5th, 2002, is that

9    correct?

10      A.   Based on this document, yes.

11      Q.   Did you say that you became aware of this

12   sometime after he filed the grievance?

13      A.   Yes.

14      Q.   Do you know approximately when you became aware

15   of the grievance?

16      A.   I was interviewed by Jackie Jenkins who was

17   director of human resources at Delaware Tech,

18   Wilmington campus, I would say late October.  I'm

19   guessing.  I know it was -- the reclassification was

20   rescinded in November, and it was probably a week or

21   two before that.  And that was when I was made aware

22   that -- to that point I didn't know that there was a

23   grievance filed.

24      Q.   So Ken Cole filed a grievance on September 5th



Paul Thomas Morris, Jr. - Brewington                82

1    2004.

2      A.   Not correct.

3      Q.   September 5th, 2002.  I'm sorry.

4           Were you aware that Sue Zawislak sent out

5    a memo on September 9, 2002, four days later,

6    indicating that you were not promoted but

7    reclassified?

8      A.   Yes.

9      Q.   Do you know why she would do that?

10     A.   To be --

11          MR. McMACKIN:   Objection.  Calls for

12   speculation.

13     A.   I thought it was to fix the language because I

14   wasn't promoted.

15     Q.   You mentioned earlier that your

16   reclassification was rescinded, is that correct?

17     A.   Yes.

18     Q.   Could you tell me why it was rescinded?

19     A.   I was told that it was rescinded because of,

20   prior to me being reclassified, I wasn't working all

21   the -- I wasn't performing all duties within a 37 1/2

22   hour workweek.

23     Q.   Who were you told this by?

24     A.   By Mr. Miller when it happened -- when it was



1    rescinded on -- I think it was November 11.  I'm

2    guessing on the date.  It was November sometime.

3    Mr. Miller called me in his office, and I was notified

4    that I was being classified back to program manager

5    and reason was that.  And I also received a -- a memo,

6    a letter stating that it was rescinded.

7        Q.    When was your position rescinded?

8        A.    I believe it was in November.

9        Q.    And after your position was rescinded, what

10   title did you have?

11       A.    Program manager.

12       Q.    So you returned to program manager, is that

13   correct?

14       A.    Of Educational Talent Search, yes, that is

15   correct.

16       Q.    Is it fair to say that your position as special

17   programs director was rescinded because of Ken Cole's

18   grievance?

19       A.    No.

20       Q.    Why not?

21       A.    My position was rescinded because of policy.

22       Q.    Because of policy?

23       A.    The policy stating that I cannot work -- you

24   cannot perform the duty -- you have to perform the



1    duties within a 37 1/2 hour workweek.  Prior to the

2    interview by Jackie Jenkins, she asked me questions --

3    she asked me questions and one of the questions she

4    asked was how did I perform the duties before the

5    reclassification?  And I explained to her that I

6    actually came in early and stayed late.  Based on

7    learning that and based on her knowledge of the

8    policy, she made a recommendation to Mr. Miller

9    that -- for it to be rescinded to my knowledge.

10       Q.    Is it fair to say that it was Ken Cole's

11   grievance that brought it to the attention of

12   Mr. Miller?

13       A.    I wouldn't be able to answer that.

14       Q.    Paragraph 36 of Brigitte Brown's complaint --

15              MR. McMACKIN:  What exhibit is that.

16              MS. BREWINGTON:  Exhibit E.

17              (Paul Morris Deposition Exhibit 7 was

18   marked for identification.)

19   BY MS. BREWINGTON:

20       Q.    Have you had an opportunity to review paragraph

21   36 in the complaint?

22       A.    Yes.

23       Q.    Did you tell  REDACTED          that Brigitte Brown

24   would not go far as a Del Tech employee doing the



Paul Thomas Morris, Jr. - Brewington                85

1    things that she is doing?

2    A.    No.

3    Q.    Do you recall saying anything like that?

4    A.    No.

5    Q.    Do you have any idea where this allegation may

6    have come from?

7    A.    No.

8    Q.    Did you have any discussion with REDACTED

9    concerning Brigitte Brown's status at Del Tech and her

10   promotion ability.

11   A.    No.

12           MR. McMACKIN:   Objection.   Compound.

13   Q.    From in the beginning of the depo, we talked

14   about your promotions at Delaware Tech.   You mentioned

15   that you became acting department chair of community

16   and school programs at some point?

17   A.    Community school projects, yes.

18   Q.    When was that?

19   A.    I stated earlier it was August, late August,

20   beginning September 2003.

21   Q.    And were all the TRIO programs under your

22   management?

23   A.    In my acting capacity?

24   Q.    Yes.



Paul Thomas Morris, Jr. - Brewington                86

1    A.    No.

2    Q.    Were any of the TRIO programs under your

3    management in your acting capacity?

4    A.    Under my oversight, yes.  Not management.  I

5    didn't directly manage the programs.

6    Q.    Okay.

7    A.    They were in my department.

8    Q.    In your department?

9    A.    Yes.

10    Q.    So what TRIO programs were in your department?

11    A.    Talent Search, Educational Talent Search,

12    Upward Bound Classic, and we had a new program that

13    started October 1st of 2003, which was TRIO

14    Dissemination.

15    Q.    I'm sorry.

16    A.    TRIO Dissemination

17          I also had other youth programs outside

18    the TRIO programs in my department.

19    Q.    So it's fair to say that Upward Bound Math and

20    Science was not under your umbrella?

21    A.    That's correct.

22    Q.    Why is that?

23    A.    I think we have to go back into -- I want to

24    say something that's confidential based on --

Paul Thomas Morris, Jr. - Brewington          87

1          MR. McMACKIN:  At this time I'd like to

2    designate the testimony under seal.

3          (Pages 88, *et seq.*, are under seal without

4    the seal request ending.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.    At the time the program manager, REDACTED

2   REDACTED    , was under -- I don't know proper words to

3   use, but an improvement plan.

4   BY MS. BREWINGTON:

5      Q.    I'm sorry.  She was in an improvement plan?

6      A.    Improvement plan.  Based on the running of a

7   program for the previous few years, I think -- I'm

8   giving approximates because I don't know the exact

9   time.  I only supervised her for a few months, so

10  dated back to -- I think it was in 2000 on, she

11  received reprimands and further disciplinary action

12  for mismanagement of program funds, mismanagement of

13  the program.  So when I became department chair,

14  because it was a personnel matter, because at that

15  point it was already -- she was at the point -- I

16  guess I'm allowed to say all these things?

17          MR. McMACKIN:  There is a confidentiality

18  stipulation in place.  So this is on the record, but

19  we will make sure it's redacted from the transcript.

20     A.    She was -- further down the road, she was

21  terminated.  So leading up to her termination and the

22  process up to her termination, it was already --

23  before I came into play, it was already happening.  So

24  the decision was made to have Math and Science not in

1    my department until that was all resolved.

2        Q.    And decision was made by who not to have Math

3    and Science in your department?

4        A.    Above me.   That's all I can say.   I don't know

5    who -- I would say it was probably ultimately the

6    campus director, but I don't know who recommended the

7    decision.   It wasn't something that I had any

8    involvement in whatsoever.   I was just told that Math

9    and Science was not going to be in my department.

10            MR. McMACKIN:   I'm going to caution the

11    witness not to speculate, but I'm not stating an

12    objection.

13    BY MS. BREWINGTON:

14       Q.    UBMS was not under your umbrella but it was

15    under someone else's.   Is that fair to say?

16       A.    It's fair to say it wasn't under my umbrella,

17    yes.

18       Q.    Who was responsible for the UBMS program?

19       A.    Prior to me becoming acting department chair,

20    the TRIO programs reported to the assistant director

21    of corporate and community programs.   When I became

22    department chair -- acting department chair, all the

23    TRIO programs except Upward Bound Math and Science

24    came under my department.   Upward Bound Math and