1    Science stayed under the direction of the acting -- I

2    mean, the assistant director of corporate and

3    community programs.

4        Q.    And who was the assistant director of corporate

5    and community programs at the time that you became

6    department chair?

7        A.    The exact same time, the former department

8    chair became the acting assistant director.

9        Q.    Give me names, please.

10       A.    Jacquita Wright Henderson.

11       Q.    So Jacquita Wright Henderson became assistant

12   director of CCP, is that correct?

13       A.    Acting assistant director of CCP.

14       Q.    And so is it fair to say that all of the TRIO

15   programs were under you except for UBMS who was under

16   Jacquita Wright?

17       A.    That is correct.

18       Q.    Acting director of CCP?

19            MR. McMACKIN:    Objection just to the time

20   frame.

21            (Pages 91, *et seq.*, are under seal without

22   the seal request ending.)

23

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Paul Thomas Morris, Jr. - Brewington          91

1    BY MS. BREWINGTON:

2        Q.    You mentioned earlier -- and correct me if I'm

3    wrong -- that the reason for this was because of -- I

4    don't know whether you want to -- because of REDACTED --

5              MR. McMACKIN:  Let's go under seal again.

6        Q.    -- because of  REDACTED        and personnel

7    issues she was having, is that fair to stay?

8        A.    To my knowledge, yes.

9        Q.    Are there any other reasons why UBMS was not

10   under your umbrella?

11       A.    Not to my knowledge.

12       Q.    Do you recall who specifically told you that

13   the UBMS program would not be under your command or

14   your control?

15       A.    Dr. Zawislak.

16       Q.    What exactly did she say to you?

17       A.    The day that we were all put into acting

18   positions, we talked about the make-up of the

19   department, and that's when she told me who was going

20   to be in the department.  And she told me Upward Bound

21   Math and Science would not be in my department.  The

22   reason that was given was because of the personnel

23   matter involved with REDACTED

24       Q.    It's fair to say that you are aware that Ken

1    Cole filed a claim of discrimination against Delaware

2    Tech?

3       A.    Yes.

4               MR. McMACKIN:    Objection to form.

5       Q.    When --

6               MR. McMACKIN:    I retract that.

7       Q.    When did you become aware that he filed a

8    discrimination charge?

9       A.    I'm guessing, but it was probably late spring

10   of 2003.

11      Q.    Is it also fair to say that you're aware that

12   Brigitte Brown also filed a claim of discrimination,

13   correct?

14      A.    Yes.

15      Q.    When did you become aware of that?

16      A.    Around the same time.

17      Q.    So late spring of 2003, is that correct?

18      A.    Yes.

19      Q.    How did you become aware that she filed a claim

20   of discrimination?

21      A.    I don't recall.

22      Q.    So you don't recall who told you that they

23   filed a claim?

24      A.    No.  No.  I'd be speculating if I tried to

1  answer the question.  I don't recall specifically.

2      Q.    At some point we might want to go under --

3              MR. McMACKIN:  Under seal again.

4              (Pages 94, *et seq.*, are under seal without

5  the seal request ending.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    BY MS. BREWINGTON:

2      Q.    At some point -- and you said this earlier,

3    that  REDACTED        left Delaware Tech?

4      A.    She was terminated.

5      Q.    She was terminated, is that correct?

6      A.    That's correct.

7      Q.    When was she terminated?

8      A.    I believe 2004.

9      Q.    Is it fair to say it was around March of 2004?

10     A.    That's fair to say.

11     Q.    There was a posting for the Upward Bound Math

12   and Science program manager position, was there not?

13     A.    That's correct.

14     Q.    And this position was posted both internally

15   and externally, is that correct?

16     A.    I'm not sure.  I don't recall.

17     Q.    Is it fair to say that Del Tech's standard

18   practice is to post positions internally first and

19   then externally?

20     A.    No.

21     Q.    Do you know what their standard practice is?

22     A.    There was a policy on postings, but there was

23   no standard practice that I'm aware of.

24     Q.    What is your recollection of the policy on

1   postings?

2      A.    That you have -- that a department or a

3   division or whoever is posting the position has the

4   right to post internally or externally.

5      Q.    Were you involved in the interviewing process

6   for this position?

7      A.    .

8              MR. McMACKIN:  Objection.  Vague.

9      A.    There were different postings.  From that point

10  forward, there were folks that were offered the job

11  and then didn't take the job for one reason or

12  another.  So I was involved.  I believe I was involved

13  in all of them, but I'm not 100 percent sure.

14     Q.    We'll start with the posting of the UBMS

15  program manager.  You said that you may have been

16  involved or --

17     A.    I was involved.  I just don't know if I was

18  involved in all of them.  That's what I'm not clear

19  on.

20     Q.    Could you tell me about the interviewing

21  process for that position as far as -- do you

22  understand that question?

23     A.    Too vague.

24     Q.    As far as how it was done, who is involved, as

**W&F**

Paul Thomas Morris, Jr. - Brewington                96

1   far as like the position is posted, and then what

2   happens?

3       A.   I can answer your question generally, but you

4   said for that position.  I mean, I could answer your

5   question on what happens when a position is posted to

6   my knowledge.  Is that your question?

7       Q.   Can you answer as far as, do you know what

8   happened with the Upward Bound Math and Science

9   program that first posting?

10      A.   I don't recall specifics.  I can give you a

11  general answer, if that's what you're looking for.

12      Q.   Okay.

13      A.   When a position is posted, it's posted for a

14  certain length of time, window of time.

15      Q.   Internally, externally?

16      A.   Whatever decision was made.  You know, the

17  division director makes the ultimate decision to post

18  it, to my knowledge, to post something internally or

19  externally.  To recommend that it be posted internally

20  or externally.  That's approved by, I believe, the

21  campus director.

22           MR. McMACKIN:  I object.  Mr. Morris is

23  not probably the most qualified of our three noticed

24  deponents to answer that question because they deal

1    more with policy than other things.

2        A.   So, once the position is posted, in the window

3    of time it's open, applicants apply.  It closes.

4    There's a committee that's approved by the campus

5    director, put together a screening search committee, I

6    guess for lack of better words.

7        Q.   Okay.  Go ahead.

8        A.   That search committee reviews the applications,

9    and I'm not an HR representative, but HR reviews them

10   first and I guess they make decisions based on who's

11   qualified, who meets minimum qualifications and who

12   doesn't.

13            Committee reviews scores.  Every single

14   person scores independently.  The scores are noted.

15   The top -- there's an HR representative on this panel.

16   So the HR representative tallies all the scores up.

17   The top whatever -- depending on how many applicants

18   there was, the top percentage are asked to come back

19   for an interview.

20            They come back for an interview.  That

21   same panel interviews the potential candidates and

22   scores them independently.  All those scores are

23   tallied up at the end, and the top one or two

24   candidates are recommended onto the next stage or

1    level, which is the dean or director of that division

2    or department, that person interviews them.

3              They make recommendations to the assistant

4    campus director, campus director, and they each

5    interview and then the only person at Delaware Tech at

6    the Wilmington campus that ask actually offer a job,

7    offer employment is Mr. Miller, the campus director.

8        Q.    Mr. Miller, the campus director?

9        A.    Yes.

10       Q.    And were you on the interviewing committee for

11   that first posting of Upward Bound program manager?

12       A.    I was, yes.

13       Q.    And that posting was around March of 2004,

14   correct?

15       A.    I don't know.  I don't recall.

16       Q.    Well, I'll submit to you that that posting was

17   around March of 2004, and you became aware of Brigitte

18   Brown's filing of a discrimination charge against Del

19   Tech around late spring of 2003, is that correct?

20       A.    Yes.    That's correct.

21       Q.    So is it fair to say that, when you were

22   serving on the interviewing committee for the Upward

23   Bound Math and Science program, manager position, you

24   were aware that Brigitte Brown filed a discrimination

1  suit against Delaware Tech for race?

2    A.    I was aware of the EEOC complaint.  I'm not --

3  I'm not sure I was aware of this particular case at

4  that point.

5    Q.    When you say EEOC complaint, what exactly were

6  you aware of?

7    A.    That there was an EEOC claim filed through the

8  Department of Labor.  This is what I was made aware of

9  in late 2003 -- late spring 2003.  That there was a --

10  that there was an EEOC complaint filed through the

11  Department of Labor, and that there was -- I believe

12  the term used is right to sue issue, but that's all I

13  remember.

14    Q.    Who approved the interviewing committee and the

15  individuals on the interviewing committee?

16    A.    Mr. Miller is the one that actually appoints

17  the committee, or campus director.  We are given an

18  e-mail saying, you've been recommended and approved by

19  Mr. Miller to be on this committee, and you serve on

20  the committee if you can.

21    Q.    So did someone recommend that you serve on the

22  committee?

23    A.    I'm not sure.

24    Q.    Is it fair to say the only thing you know is

Paul Thomas Morris, Jr. - Brewington                100

1  that you were approved by Mr. Miller to serve on the

2  committee?

3      A.    Yes.  Through e-mail.  I've served on probably

4  65 -- in my eight years, 65 hiring committees.

5      Q.    Is it correct that Brigitte Brown was denied an

6  interview when she initially posted for the program

7  manager position?

8              MR. McMACKIN:  Objection.  Vague.

9      A.    I would refer to HR and their representation.

10  I know at some point she was interviewed.  So I don't

11  remember when she was or wasn't interviewed.

12      Q.    So you don't recall whether or not she was

13  denied an interview?

14      A.    At that time for the first one I'm not -- no, I

15  can't recall that.  For the first one.

16              MR. McMACKIN:  Your question was --

17      Q.    So you can't recall whether she interviewed for

18  the first one or not?

19      A.    That's correct.

20      Q.    Let me ask you this.  An individual is

21  interviewed by the committee, correct?

22      A.    Yes.

23      Q.    After the interview, is it fair to say you guys

24  do the numbers thing that you indicated, right?

1  A.  Yes.  As my previous statement was, after

2  everyone interviews, we all score individually.  Those

3  scores are tallied by the HR representative that's on

4  part of the panel, and then that person will give you

5  the scores in rank order.  And then those top one or

6  two will be then recommended for an interview with the

7  department head -- I mean the dean or director.

8  Q.  Let's talk about those that don't go any

9  further than that first interview.  Okay?  What

10  happens after they are not selected to go any further

11  than that first interview?

12  A.  I'm not qualified to answer that.  It's an HR

13  question.

14  Q.  Let me ask you this, after that initial

15  interview, how long will it take or how long does it

16  take for an applicant to receive notice that they are

17  not qualified for the position?

18  A.  Same answer as before.  I'm not qualified to

19  answer that question.  I don't -- it was not done by

20  me.  It's done by HR.  So that's their process.

21  Q.  So am I correct in stating that you do the

22  numbers and everything, but beyond that, you're not

23  familiar with the process?

24  A.  You're correct to say that I score

1    individually.

2      Q.   Okay.

3      A.   I don't do the numbers.  Just so we are clear,

4    I score my own -- the scores that I give each

5    candidate.  At the very end of the interview process,

6    everyone on that panel -- there's three to five

7    members on the panel depending what the panel's

8    make-up is.  All those scores are tallied together.

9    So I have my own scores.

10     Q.   And then what happens to your scores, then HR

11   compiles them together with the others?

12     A.   In a panel.  We are all sitting together.

13     Q.   So you're right there.  So this happens right

14   there?

15     A.   Yes.

16     Q.   Does it happen right after the applicant leaves

17   the room?

18     A.   When all -- we all score individually when all

19   the interviews are done.

20     Q.   So when all the interviews are done, you score

21   individually?

22     A.   No.  That's not what I said.

23     Q.   Okay.  Break it down.

24     A.   When the applicant is interviewed, I score that



1    applicant once they're done.

2        Q.    Once they get up and walk out of the room --

3        A.    Yes.   That's correct.

4        Q.    -- you score your score sheet?

5        A.    That's correct.

6        Q.    Everybody else scores their score sheet right

7    there?

8        A.    That's correct to my knowledge.   When it's all

9    said and done, I have scores for every single

10   applicant that came into the room for an interview.

11       Q.    Go back.   I'm just talking about that one

12   applicant that comes in and goes for an interview and

13   you score --

14       A.    That's correct.

15       Q.    -- your sheet and everybody else scores theirs.

16       A.    To my knowledge.   I wasn't looking around.

17   That's instructions we're given.

18       Q.    Okay.   That's fair.

19             What happens after that with that one

20   applicant?

21       A.    They get up from the table and leave.

22       Q.    Okay.   That's fine.   They get up from the table

23   and leave.   Then what do you guys do?

24       A.    We score that applicant, and two minutes later

1    another applicant walks.

2       Q.    Where do these forms go?

3       A.    The HR representative.  We sign at the bottom.

4    We give them to the HR representative that's on the

5    panel.  At the end of the day when we actually -- once

6    they are all tallied up, the HR representative takes

7    all the paperwork, and that's the last I see of it.

8       Q.    Okay.  Thank you.

9       A.    You're welcome.

10      Q.    When the program manager position was posted a

11   second time in July of 2004, Ms. Brown received an

12   interview for that same position.  And my question to

13   you is, do you know why she would have received an

14   interview the second time but not the first time she

15   posted?

16      A.    No.

17      Q.    Why not?

18      A.    Each panel is different.  Each pool is

19   different.  And because scores are done individually,

20   I would never be able to compare two pools.  So that's

21   why.

22      Q.    Is it the interviewing committee that makes a

23   decision on who gets interviews and who doesn't?

24      A.    Yes.  Based on my previous answer in one of

1     your questions, during the process, when we sit down

2     and screen the applicant's first paper for their

3     applications.

4         Q.    Well, HR does it first?

5         A.    HR does a prescreen.  Based on minimum

6     qualifications.

7         Q.    Right?

8         A.    Then the committee is brought in to score just

9     the applicants.  We just have paper.  We sit around a

10    table like this, and we score the applications.  Then

11    based on those scores, a decision is based -- you

12    know, they are all tallied up.  They are scored

13    individually.  We all sit around the room, do our own

14    thing.  We go around, tell our scores.  The HR

15    representative has a calculator.  They calculate all

16    the scores.  The top percentage based on how many --

17    how big the pool was to begin with and based on how

18    many we are going to interview and based on scores

19    really, get an interview.

20              The HR rep then, to my knowledge, calls

21    them and schedules the interviews.  We come up with a

22    date where we're going to interview, and then the

23    panel comes back for those interviews.

24              So because every single person scores --

1    you have two different pools, two different

2    application pools and we have different scores.  You

3    can't compare what two say and why did you give an

4    interview one time and you didn't give an interview

5    the other time.

6       Q.   Out of those first two postings for the project

7    manager position, were there the same members of the

8    committee for both postings?

9       A.   I believe so, but I'm not 100 percent sure.

10      Q.   Were you aware that the Department of Labor

11   issued a reasonable cause finding of discrimination in

12   July 2004 at the same time she was granted an

13   interview?

14      A.   No.  I was aware at some point, but I didn't

15   know the date and I didn't know that -- are you

16   stating that was the reason why?

17      Q.   No.  I'm asking you, were you aware of that?

18   She received a reasonable cause finding from the

19   Department of Labor in July of 2004, and that was the

20   same time that she was granted an interview.  And I'm

21   asking you, are you aware of that?

22      A.   I'm not aware of that time, the timing is at

23   issue.

24            MR. McMACKIN:   Objection.



1    Q.   Subsequently Andrea Coleman was placed in the

2    position of program manager of UBMS, is that correct?

3    A.   No.

4    Q.   What position was she?

5    A.   She transferred.  She requested -- you said

6    placed.  I'm actually objecting to your language.

7    Q.   That's fine.

8    A.   She wasn't placed in the position.  She

9    requested a transfer.  Del Tech policy -- I'm

10   definitely not expert on Del Tech policy, but policy

11   allows you -- if a position becomes vacant and you're

12   in an similar position, you can actually request a

13   transfer.

14   Q.   So it was your understanding that she requested

15   a transfer?

16   A.   That is correct.

17   Q.   To the Upward Bound Math and Science program

18   manager position?

19   A.   Yes.

20   Q.   And that was granted?

21   A.   Yes.

22   Q.   Who granted her transfer, or if you don't know

23   exactly who granted it, what is the normal practice of

24   who would grant that?

Paul Thomas Morris, Jr. - Brewington                108

1     A.    I believe that the campus director is the one

2     that actually approves any and all transfers.

3     Q.    So it is fair to say that Andrea Coleman did

4     not apply for the position of Upward Bound Math and

5     Science program manager, is that correct?

6     A.    That's correct.  She requested a transfer.

7     Q.    Is it fair to say that Andrea Coleman also

8     served on the interviewing committee for the Upward

9     Bound Math and Science program manager?

10    A.    Yes, she did.

11          MR. McMACKIN:  Objection.  Vague.

12    Q.    Let me go back.  You indicated, did you not,

13    that the same people that were on the first

14    interviewing committee were on the second interviewing

15    committee?

16    A.    I said I didn't know.  I didn't indicate that.

17    I said I wasn't 100 percent sure but I thought so.

18    Q.    But you thought so?

19    A.    Yes.

20    Q.    And it's your opinion that Andrea Coleman was

21    on the interviewing committee?

22    A.    I believe -- I know at one point she was.

23    Q.    You don't know whether it was the first posting

24    for the position or the second?



1     A.    That's correct.

2     Q.    But you're aware that she was on the committee

3   and she did serve?

4     A.    Yes, I am.

5     Q.    Did Andrea Coleman have less seniority than

6   Ms. Brown?

7     A.    I'm not sure.

8     Q.    Is it fair to say that Andrea Coleman had less

9   or even no Upward Bound Math and Science experience?

10          MR. McMACKIN:   Ask that the response be

11   put under seal.

12     A.    To my recollection, she never worked with Math

13   and Science.  That would be a fair statement, yes.

14     Q.    Okay.

15     A.    She did, however, work in TRIO, Upward Bound

16   Classic, which is a very similar program.

17          MR. McMACKIN:   That was my mistake.  I

18   shouldn't have requested that response be under seal.

19   I will retract that request.  Sorry about that.

20          (Discussion off the record.)

21          (Pause.)

22          MS. BREWINGTON:   Back on the record, I

23   don't have anything further.

24          MR. McMACKIN:   I don't have any redirect,

**W&F**

Paul Thomas Morris, Jr. - Brewington                110

1    but I just want to put a couple of stipulations on the

2    record if you don't mind.  I just wanted to note the

3    appearance of one of the two plaintiffs.  She is not

4    present, but she is present by phone.

5              We want to reserve the right to read and

6    sign the deposition transcript.

7              And we never intended to, nor do we intend

8    to waive any opportunities to redact or place

9    information under seal pursuant to the confidentiality

10   stipulation between the parties entered into on or

11   about January 16, 2006.

12             (Deposition ended at approximately

13   12:40 p.m.)

14

15

16

17

18

19

20

21

22

23

24

111

INDEX TO TESTIMONY

PAUL THOMAS MORRIS, JR.                                        PAGE

    Examination by Ms. Brewington                        2

- - - - -

INDEX TO EXHIBITS

PAUL MORRIS DEPOSITION EXHIBIT NO.                            PAGE

1    E-mail dated August 7, 2002                              6

2    Four pages of colored diagrams                          49

3    Complaint, Kenneth Cole v. Delaware
     Technical and Community College                         49

4    Six-page document labelled Upward Bound
     Math and Science Center, Program Years
     November 1, 2004 - October 31, 2009                     58

5    Corporate & Community Programs Division
     Stanton/Wilmington, August 2002 Update                  78

6    Grievance form                                          81

7    Complaint, Brigitte L. Brown v. Delaware
     Technical and Community College                         84

PAGES UNDER SEAL:                                          69-70

PAGES UNDER SEAL WITHOUT REMOVAL OF SEAL:                    77
                                                             88
                                                             91
                                                             94



WILCOX & FETZER LTD.
Registered Professional Reporters

Corbett Ⓢ Wilcox

The Team to Trust in Court Reporting

1400 N. French St., Wilmington, DE 19801
phone 302.571.0510  fax 302.571.1321
15 North Street, Dover, DE 19901
phone 302.734.3534  fax 302.734.3552

e-mail: info@corbettreporting.com

Ellen Corbett Hannum – President
June E. Griffith – Business Manager

## Errata Sheet

Attach to the deposition of: _Kenneth Cole_

In the Matter of: _Cole & Brown v Del Tech_

Date of Deposition: _Feb. 7, 2006_ Reporters initials: _____

**Instructions**: After reading the transcript of your deposition, please note any changes or corrections and the reasons therefor on this errata sheet. Please _sign_ and _date_ the errata sheet and _return a copy to our offices. Attach the original errata to the original transcript._ Thank You.

| Page & Line | Change/Correction | | Reason |
|---|---|---|---|
| 122   21 | REDACTED | _Rosanna Brown Simmons_ | To correct the name. |
| Highly Confidential 3   12 | _AGRA / EDGAR_ | | To correct the name. |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

I have read the foregoing transcript of my deposition and, except for any corrections or change noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Date: _3-6-06_ Signature: _Kenneth Cole_

Sworn to and subscribed before me this 9TH day of MARCH 2006

Notary _____

TIMOTHY J. WILSON, ESQ.
NOTARY PUBLIC
DELAWARE ATTORNEY
ID # 4323
DELAWARE ATTORNEY AT LAW

112

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.



113

State of Delaware   )
                    )
New Castle County   )

## CERTIFICATE OF REPORTER

I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 27th day of January, 2006,
the deponent herein, PAUL THOMAS MORRIS, JR., who was
duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked
of said deponent and the answers given were taken down
by me in Stenotype notes and thereafter transcribed by
use of computer-aided transcription and computer
printer under my direction.

I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.



Ann M. Calligan, RMR
(Certification No. 186-RPR)
(Expires January 31, 2008)

# EXHIBIT 1

Meeting

**Subject:** Meeting
**From:** "ken cole" <kcole@college.dtcc.edu>
**Date:** Wed, 7 Aug 2002 12:59:36 -0400
**To:** "Paul Morris" <pmorris@hopi.dtcc.edu>
**CC:** ' REDACTED          <rhenders@hopi.dtcc.edu>

Hello Paul,

I would like to a schedule a meeting to talk to you at your earliest
convenience in reference to some issues/concerns.

A prompt response will be very appreciated.

Thanks,
Ken
UBMS



# EXHIBIT 2

PRESENT SET UP ON 4TH. OR

UBMS ☐

UBC ▓

TALENT SEARCH ▓

SOAR ▓

PM-Program Manager
SEC-Student Enrichment Coordinators

PM

SEC

PM

SEC

SEC

Computer room

Secretary

Administrative Offices

Chemistry Lab 435



DEPOSITION
EXHIBIT
Paul Morris
1-27-06
PENGAD 800-531-6989

UBMS   [ ]

UBC   ▨

TALENT SEARCH   ▨

SOAR   ▨

PM-Program Manager
SEC-Student Enrichment Coordinators

---

**Proposed Move-Cost vs. Allocation of Space**

TS will hire a part time person

Pro:
-UBMS in one area

Cons:
-UBMS Inadequate space
-UBMS Program Manager not with other PM
-Classic PM not with UBC Team
-Empty office Space (Storage/Secretary)
-7 employees must be moved
-Not Cost Effective

---

Computer room

Administrative Offices

Chemistry Lab 435

PM    PM   SEC



PM



UBMS

UBC

TALENT SEARCH

SOAR

PM-Program Manager
SEC-Student Enrichment Coordinators

PM

Secre

SEC

SEC

Administrative Offices

Computer Room

Chemistry Lab 435

Alternative 1
Switch only Tonia and Liz
SOAR's Pt. Secretary can use existing desk
TS part time could use existing desk.
PROS:
Most Cost Effective
Only 2 employees move
Most Youth Programs are together
CONS:
UBC PM not with team





**UBMS** ☐

**UBC** ▨

**TALENT SEARCH** ▨

**SOAR** ▨

PM-Program Manager
SEC-Student Enrichment Coordinators

Alternative 2
Pros:
UBMS SEC's & Secretary together
(with adequate space)
UBC SEC's & Secretary together
(with adequate space)
All PM are together
Cons:
Less Costly 6 employees moved

Administrative Offices

Computer room

Chemistry Lab 435



# EXHIBIT 3

DEPOSITION
EXHIBIT

Paul Morris 3
a 1-2-06

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KENNETH COLE,

    Plaintiff,

        v.

DELAWARE TECHNICAL AND
COMMUNITY COLLEGE,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)

C.A. NO.    0 5 - 2 7 0 -

JURY TRIAL DEMANDED

2005 MAY -5  PM 2:49

## COMPLAINT

### INTRODUCTION

1.    This is a Complaint brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, codified as 42 U.S.C. § 2000(e) et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) and 42 U.S.C. § 1981.

### PARTIES

2.    Plaintiff, Kenneth Cole (hereinafter "Plaintiff"), is and was at all times relevant to this Complaint, a resident of the State of Delaware, residing at 3102 Wilmont Drive, Wilmington, Delaware 19810.

3.    Defendant, Delaware Technical & Community College (hereinafter "Defendant"), is a statewide institution of higher education, i.e., a local community college, providing academic, technical, continuing education, and industrial training, and at all times relevant to this Complaint, the employer of Plaintiff Kenneth Cole. Defendant is subject to service of process through Delaware Technical & Community College; c/o Larry Miller, Office of the Campus Director, 333 Shipley Street, Wilmington, Delaware 19801.

## JURISDICTION

4.    Jurisdiction is founded on the existence of a question arising under federal statutes. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) of Title VII of the Civil Rights Act. The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights secured by federal and state law which prohibits discrimination against employees because of their race.

5.    The state law claim regarding the breach of the implied Covenant of Good Faith and Fair Dealing is brought pursuant to the pendant jurisdiction of this Court.

## FACTUAL BACKGROUND

6.    Plaintiff was hired by Defendant as a part-time Student Enrichment Coordinator for the Upward Bound Math and Science Program (hereinafter "UBMS") at the Wilmington, Delaware campus in or around November 1999. Plaintiff has been continuously employed by Defendant for approximately five (5) years.

7.    When Plaintiff began his employment, Defendant had three (3) federal-grant TRIO programs: the Educational Talent Search Program, managed by Mr. Paul Morris, a Caucasian; the Upward Bound Classic Program, managed by Ms. Kate Sullivan, a Caucasian female; and the Upward Bound Math and Science Program, managed by Ms. Rosetta Henderson, an African-American female.

8.    In or around February 2001, a proposal was introduced by Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs, to move the Upward Bound Classic Program staff into the offices that were occupied by Plaintiff and the other members of the Upward Bound Math and Science Program. In turn, Plaintiff's

department would be relocated from their offices to the cubicles that were occupied by the Upward Bound Classic Program personnel. Plaintiff was informed that the reason for the move was to bring the TRIO programs together.

9. Disappointed, and somewhat surprised by the announcement that they would potentially be losing their offices, Plaintiff and the other members of his department requested a meeting with Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs for Defendant.

10. As a result of that meeting, the move was halted; instead, only Ms. Tonia Conley, Student Enrichment Coordinator with the Upward Bound Classic Program, was relocated next to her Program Manager, Ms. Kate Sullivan.

11. In or around July 2002, Mr. Paul Morris, a Caucasian, Program Manager for Educational Talent Search, was promoted to Special Program Director, a position that oversees all of the TRIO Programs, including Plaintiff's.

12. On or about August 7, 2002, Plaintiff sent an e-mail to Mr. Morris regarding some of his concerns and issues and asked if they could meet to discuss same.

13. On or about August 8, 2002, Morris went to Plaintiff's office to speak with him about the impending move, and informed Plaintiff that the move was his [Morris'] decision and was going to go forward despite Plaintiff's opposition to same.

14. On or about August 12, 2002, Paul Morris met with Plaintiff and the other members of his department and informed them that he had unilaterally made a decision to relocate the Upward Bound Math and Science Program from their current multiple offices to the single office that had been occupied by the SOAR Program.

15.    That same day, Plaintiff and the other members of his department visual surveyed the office space they were being forced into, and determined that it was completely inadequate to house two (2) full time employees, one (1) part time employee two (2) student co-ops, student participants, visitors, files and equipment and other resources.

16.    Specifically, Plaintiff's new office space was approximately thirty-six (36) square feet less than what his department had in its original office space, a decrease from a combined total of 211 square feet to 175 square feet. In fact, Plaintiff's office space was so much smaller that partitions could not even be set up in the room.

17.    On or about August 13, 2002, the UBMS team (Plaintiff, Ms. Brigitte Brown, and Ms. Liz Wilson) met together to discuss the proposed move and the fact that they believed there were being unfairly discriminated against and treated differently from the other TRIO programs when they were forced into a smaller, single office.

18.    After speaking with their Program Manager, Plaintiff and the remaining UBMS staff prepared an agenda to discuss with management; the agenda was submitted via e-mail to Ms. Sue Zawislak, a Caucasian, and Defendant's CCP Director, on or about August 14, 2002.

19.    In response to their concerns, the UBMS group was later told by Mr. Paul Morris to "put it in black and white" and to "explain where it stated in [their] job description that [they couldn't be moved]." Plaintiff and his colleagues were eventually granted a meeting with upper management (Paul Morris and Ann Del Negro) on or about August 29, 2002, just two (2) working days before the proposed move.

20.     On or about August 29, 2002, the UBMS staff met with Ms. Ann Del Negro and Paul Morris. Plaintiff and his group tried to explain that the proposed move would affect employee relations, morale and productivity, not to mention, the small space would make it extremely difficult to protect students' privacy which was necessary.

21.     The office that the UBMS Group was being forced to move into had been Ann Del Negro's former single office; it was an office with only two wall sockets as it designed for occupancy by only one individual. Instead, Defendant was putting the three (3) African-American members of the UBMS Program into a small, inadequate office space, despite their previous objections and their complaints that this move was discriminatory in nature.

22.     Ann Del Negro got very upset and expressed her feelings to the UBMS Group of how disappointed she was that they felt their move would affect employee relations, morale and productivity. Plaintiff and the rest of the UBMS staff went on to explain how they felt that they were being treated unfairly and unequally and that they believed that there were ulterior motives for the move. Plaintiff explained that by putting all three people in such a small, confined space, they felt as if they were being punished.

23.     Plaintiff and the rest of his group informed Del Negro that they felt the move was partially motivated by a conflict that existed between Ms. Kate Sullivan, a Caucasian employee and Ms. Tonia Conley, an African-American employee, and that Plaintiff's UBMS Group, which was comprised of all African-American employees, was subjected to relocation as a result of this conflict, despite the fact that they had provided reasonable alternatives to avoid the move.

24.    By the end of the meeting, Del Negro decided that the move would still continue as scheduled, never having addressed the group's issues of being punished, being discriminated against, being treated unfairly and unequally, and the effect that this move would have on employee relations, morale and productivity. Plaintiff left the meeting feeling that his concerns were unheard.

25.    On Tuesday, September 3, 2002, the day before the move, Plaintiff went to Human Resources and met with Cara J. Stanard, Human Resource Specialist, to discuss the "move" and asked her to schedule an urgent meeting with Dr. Connie Winner, Assistant Campus Director, in an effort to file an additional complaint and hopefully halt the move which was scheduled for the next day.

26.    On September 4, 2002, the move was to take place, but it did not, presumably as a result of Plaintiff's complaint to Dr. Winner. Instead, maintenance men were sent around to measure Plaintiff's group's offices. As the maintenance crew was measuring, Ann Del Negro, Assistant Director of CCP, arrived and took over the job of measuring the office spaces herself.

27.    On September 5, 2002, Plaintiff filed a grievance against Ms. Zawislak, Director of CCP, alleging, *inter alia*, personal discrimination, and regarding Paul Morris's promotion to Special Program Director, which Plaintiff believed to be in violation of Defendant's Personnel and Policy Manual. Plaintiff further alleged in his grievance that he was never afforded the opportunity to apply for the position because Defendant failed to properly post the position.

28.    On September 5, 2002, Sue Zawislak and Ann Del Negro called for Plaintiff, Liz Wilson, secretary, and the other members of the UBMS group for separate,

individual meetings at different times to discuss the proposed "move". Zawislak and Del Negro refused to believe Plaintiff, or even investigate his allegation that there was a conflict between Kate Sullivan and Tonia Conley that may have been the driving force behind the loss of their office space. Plaintiff's meeting, however, was put off until the following day, September 6, 2002.

29.     During those meetings, Plaintiff, along with the other members of his team, introduced clear alternatives to their proposed move. He gave Zawislak and Del Negro the measurements of their office spaces compared with the measurements of the proposed new office space. Zawislak insisted in the meeting that the proposed move was due to downsizing and because of allocation of space, and insisted that the move made sense, which was once again in direct contradiction to what Paul Morris said; that the move was his "vision" to have the TRIO Programs together.

30.     The proposed move consisted of moving eight (8) people as opposed to the alternative proposed by Plaintiff and his department which involved moving only two (2) people, and simultaneously achieving the same goal of having the TRIO programs together as well as achieving more cost effectiveness overall. Despite his best efforts, Plaintiff could not convince Defendant to entertain his suggestions.

31.     In the end, the individual meetings came across as a "witch hunt;" Plaintiff felt intimidated, interrogated and that Defendant was on a search and destroy mission. Plaintiff also felt as if he was being talked down to and belittled because he was African-American, and that nothing he said made any difference. Most of Plaintiff's answers to Defendant's questions were turned around and restated.

32.    On or about September 9, 2002, subsequent to Plaintiff's grievance filed on September 5, 2002 alleging that Morris was improperly placed in his position, Zawislak issued a memorandum via e-mail on September 11, 2002, dated September 9, 2002, entitled "CCP August Update Revision" which stated that Morris was "reclassified" to Special Programs Director, "not promoted," as a pretext to hide Defendant's discriminatory motive.

33.    On or about September 12, 2002, in another attempt to prevent the loss of his office space, Plaintiff once again met with Zawislak and Del Negro to present alternatives to the move, which included graphical representations of cost analysis, resources, computer equipment, telecommunication equipment needs, and the anticipated loss of productivity, to no avail.

34.    On or about September 19, 2002, Plaintiff received an e-mail from his Program Manager, Ms. Rosetta Henderson, stating that Zawislak informed her [Henderson] that Plaintiff's work hours began at 8:30 a.m. and not 8:00 a.m., as they had been since his date of hire in 1999. Plaintiff's hours had consistently been 8:00 a.m. to 2:00 p.m., but for some unknown reason, Zawislak informed Henderson that Plaintiff's hours were to be from 8:30 a.m. to 2:30 p.m. Plaintiff believes that his hours were changed in retaliation for the grievance he filed against Zawislak.

35.    On or about October 2, 2002, a meeting took place between Sue Zawislak, Ann Del Negro, and Paul Morris, Plaintiff and the rest of the UBMS team. Zawislak announced that the UBMS team would still be relocated according to the plan because she had "not heard anything that would change [her] mind."

36.    On or about Monday, October 7, 2002, Plaintiff filed a supplement to his original grievance, alleging Defendant's retaliatory actions, including, but not limited to, the changing of Plaintiff's work hours.

37.    On or about Tuesday, October 8, 2002, Plaintiff, and the other members of the UBMS group reluctantly spent the entire day moving into their new one-room office, room 408 E; a small, open room with inadequate space. The move required the assistance of five (5) maintenance workers, one (1) telecommunication person and three (3) computer services people to complete.

38.    As a result of being placed into such a small and inadequate workspace, Plaintiff, along with his co-workers Brigitte Brown and Liz Wilson, are subjected to each other's conversations, phone calls and visitors. There is no privacy whatsoever, which is in direct violation of Defendant's federal grant that requires that each Student Enrichment Coordinator have privacy for confidential communications. The noise from the shredding machines and electric staplers echoes throughout the small room, which is extremely distracting and counterproductive. Plaintiff strongly believes that his group has been placed in the confined office space because they are all African-Americans.

39.    Due to the fact that there was not enough space for Plaintiff's department's files, they were instructed by Defendant to use the extra file drawers on the third floor in the CCP office.

40.    Plaintiff feels degraded each day he goes to work. The UBMS group is subjected to negative comments as Del Tech students walk by his small office. Often, other employees of Del Tech will come by just to look at Plaintiff's space and comment

on how small it is, causing Plaintiff to feel embarrassed, humiliated and experience stress related symptoms because of this situation.

41.     Also on or about Tuesday, October 8, 2002, Plaintiff, Ms. Brigitte Brown, and Liz Wilson, secretary, received separate letters from Mr. Lawrence Miller, vice president and campus director, stating that Plaintiff had filed a supplement to his grievance stating that upper management was retaliating against Plaintiff's department.

42.     Lawrence Miller asked Plaintiff and the others to respond to his questions concerning Plaintiff's allegations of retaliation by upper management, and to submit their responses by October 15, 2002.  Miller said in his letter that if there were no retaliatory actions directed to them, that he would consider the case closed.

43.     On or about October 15, 2002, Plaintiff and the others submitted their responses to Miller confirming retaliatory actions by upper management.  As of the date of the filing of this lawsuit, Plaintiff has yet to receive a response from Miller.

44.     On or about October 15, 2002, with no other administrative remedy available to him, Plaintiff filed a Charge of Discrimination against Defendant with the Delaware Department of Labor alleging race discrimination and retaliation.

45.     Eventually, upper-management began to scrutinize UBMS Program Manager Rosetta Henderson, reprimanding her for being "unable to control [her] staff."

46.     Plaintiff also began to experience further acts of retaliation from Zawislak. For example, when his doctor ordered reduced work hours, Plaintiff was asked to provide justification for same repeatedly, despite the fact that his previous doctor's notes contained the necessary information.  Plaintiff's hours were questioned, as were the validity and longevity of his necessity for reduced hours and the nature of his medical

condition. Plaintiff was also threatened with termination due to his need for reduced work hours and occasional absences due to illness, despite documentation from his doctor justifying same.

47.    In or around December 2002, Plaintiff and the rest of his department were also informed that they were not allowed to continue to use the Blanket Travel Requests, as did all the TRIO programs; instead, only Plaintiff's department was required to submit separate Travel Requests as needed.

48.    In or around August 2003, Kate Sullivan, Upward Bound Classic Program Manager, resigned and went to another job with the State of Delaware. Her position as Program Manager of Upward Bound Classic was posted internally not long after she left.

49.    Ann Del Negro became the Director of Corporate and Community Programs (CCP) at the Del Tech Owens Campus. Ms. Jacquita Wright was promoted to Del Negro's former position, Acting Assistant Director of CCP.

50.    Paul Morris became Acting Department Chair of Community and School Programs, Jacquita Wright's former position. In addition, Morris was formally made Supervisor over the other TRIO Programs, with the exception of UBMS, which was assigned to Jacquita Wright, an African-American. Morris was basically offered the same position that he previously held in the prior year until Plaintiff filed his grievance regarding Morris' position. Roseanna Brown-Simmons, Student Enrichment Coordinator of Educational Talent Search, became Acting Program Manager to replace Paul Morris.

51.    Plaintiff believed that Morris was not made supervisor of his group due to their complaint, which caused Defendant to separate the programs and put a different person (an African-American) over the UBMS Program who had no prior experience

with TRIO programs, while Paul Morris oversaw the Upward Bound Classic Program and Educational Talent Search. Plaintiff was once again being treated differently by Defendant, this time with the assignment of his supervisor.

52.    In or around September 2003, the Upward Bound Classic Program Manager position became available. The position was posted internally only. Angi McCloskie, Andrea Coleman and Crystal Heath, the Student Enrichment Coordinators for that program, all applied for the position. Angi McCloskie was subsequently chosen as Program Manager.

53.    Andrea Coleman, who was hired with a special grant for the Upward Bound Classic Program was put in the position of Program Manager for summer youth camps once her grant monies ran out.

54.    In or around November 2003, Plaintiff's Program Manager, Ms. Henderson, went out on sick leave for scheduled surgery. She did not return to work until after the holiday break in January 2004, working part-time for the first couple of weeks.

55.    On or about February 4, 2004, UBMS Program Manager Rosetta Henderson resigned from her position after almost 9 years with Defendant, informing Plaintiff that she just couldn't take it anymore, referring to how she was being treated by Defendant after her employees filed their complaint.

56.    Plaintiff was never asked to become Acting Program Manager, despite his qualifications. Plaintiff had several years of experience and had always received exemplary performance evaluations.

57.    In or around February 2004, Defendant promoted the new Acting Assistant Director of Corporate and Community Programs, Jacquita Wright-Henderson, to the position of Acting Program Manager for UBMS, despite having no TRIO or Upward Bound Math Science experience.

58.    Wright-Henderson's office was four (4) floors lower, so she would spend approximately only 5% of her time upstairs with the UBMS program, especially since she had so many other responsibilities as the Assistant Director of Corporate and Community Programs.

59.    In or around March 2004, the Program Manager's position became available and applications were being accepted for the position until March 29, 2004. Plaintiff had the qualifications outlined in the job description. Plaintiff had been a Student Enrichment Coordinator since November of 1999; he had always received very good evaluations; and he always maintained an excellent rapport with the students, parents and counselors.

60.    To Plaintiff, it seemed only natural for one of the Student Enrichment Coordinators in a TRIO program to apply for and receive the Program Manager position once that manager had left the program. This succession occurred when Kate Sullivan, Program Manager for Upward Bound Classic left, and Angi McCloskie, SEC, became the new Program Manager. It also occurred when Rosanna Brown-Simmons, the Student Enrichment Coordinator for ETS, became acting Program Manager, then applied for and received the position of Program Manager for Talent Search when Paul Morris was made Acting Department Chair of Community and School Programs.

61.     The Delaware Department of Labor investigated Plaintiff's Charge of

Discrimination alleging race discrimination and retaliation and found in favor of Plaintiff,

finding reasonable cause to believe that violations of Title VII and 19 Del. C. § 711 had

occurred. A copy of the Delaware Department of Labor Notice of Reasonable Cause

Finding dated July 30, 2004 is attached hereto as Exhibit "A".

62.     In or around late December 2004, before the holiday break, Plaintiff and

the rest of the UBMS group were told that a new Program Manager had been hired and

that she would start on January 3, 2005.

63.     In January 2005, when the UBMS staff returned from break, they were

informed that the new Program Manager decided not to take the position, leaving the

Program Manager position vacant once again.

64.     On or about January 26, 2005, Sue Zawislak and Jacquita Wright-

Henderson announced in a meeting that Andrea Coleman, an African-American, who had

been a former Student Enrichment Coordinator for the Upward Bound Classic Program

was transferred into the UBMS Program Manager's position.

65.     Coleman had been managing youth camps for CCP prior to being named

the new UBMS Program Manager. Coleman originally applied for Program Manager for

her Upward Bound Classic Program in or around October 2003, but was not chosen for

the position. Coleman was also hired after Plaintiff; therefore, she had less seniority.

Coleman also had no math/science background, and never applied for the position.

66.     Despite having more seniority and years of experience in the Upward

Bound Math/Science Federal Trio Program, Plaintiff was denied the opportunity for

advancement to the position of Program Manager, in what Plaintiff believes was retaliation for his grievances and his complaint with the Delaware Department of Labor.

67. The United States Equal Employment Opportunity Commission ("EEOC") issued a Notice of Right to Sue Letter on February 2, 2005, received by Plaintiff's counsel on February 4, 2005, attached hereto as Exhibit "B."

## COUNT I
### (Racial Discrimination)

68. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 67 by reference as if specifically set forth herein.

69. The practices of Defendant as complained of above, had the effect of depriving Plaintiff of equal employment opportunities and otherwise affected his employment because of his race. The practices employed by Defendant were intentional and were done with malice and/or reckless indifference to the federally-protected rights of Plaintiff.

70. The practices of Defendant as complained of above caused Plaintiff to experience conscious pain and suffering and other emotional harm.

71. The practices of Defendant as described above are imputable to Defendant in violation of 42 U.S.C. § 2000e-2(a) and 3(a).

72. As a direct and proximate result of said acts, Plaintiff has suffered, and continues to suffer, loss of employment opportunities, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment and damages to his reputation.

## COUNT II
### (Title VII – Retaliation)

73.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 72 by reference as if specifically set forth herein.

74.    This cause of action arises under Title VII, 42 U.S.C. § 2000e(2)(a).

75.    Defendant intentionally and maliciously discriminated against Plaintiff in retaliation for his complaints in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(2)(a) when it:

    (a)    denied Plaintiff promotions and transfers despite his qualifications;

    (b)    forced Plaintiff to work in a hostile work environment; and

    (c)    forced Plaintiff to relocate to a workspace that was inadequately designed and obviously too small to house Plaintiff and the other members of his department.

76.    Defendant acted with discriminatory motive and the reasons provided by Defendant for failing to promote and/or transfer Plaintiff are pretextual.

77.    As a result of Defendant's unlawful retaliation against Plaintiff, Plaintiff has suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

## COUNT III
### (Failure to Promote)

78.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 77 by reference as if specifically set forth herein.

79.    Defendant denied Plaintiff numerous opportunities for career advancement despite his qualifications.

80.    Defendant denied Plaintiff career advancement opportunities by denying his requests for promotion.

81.    As a result of Defendant's discrimination, Plaintiff suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

82.    Defendant's discrimination was willful, wanton and malicious.    As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

COUNT IV
(Breach of the Covenant of Good Faith and Fair Dealing)

83.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 82 by reference as if specifically set forth herein.

84.    The actions of Defendant constitute a violation of the *Covenant of Good Faith and Fair Dealing* implicit in every employment agreement.

85.    Defendant breached the *Covenant of Good Faith and Fair Dealing* to Plaintiff by discriminating against him on the basis of his race, and/or based upon retaliatory motives.

86.    Defendant's discrimination was willful, wanton, and malicious. As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

87.    The above-stated damages were not the result of any act or omission on the part of the Plaintiff.

WHEREFORE, Plaintiff, Kenneth Cole, respectfully requests that this Court enter judgment in his favor and against Defendant, Delaware Technical and Community College:

(a)    Declaring that the conduct engaged in by the Defendant to be in violation of Plaintiff's rights;

(b)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide appropriate back pay with pre- and post-judgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(c)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for non-pecuniary losses, including, but not limited to, pain, suffering, and humiliation, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(d)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for past and future pecuniary losses, in amounts to be determined at trial;

(e)    Issuing a judgment in Plaintiff's favor ordering Defendant to pay punitive damages for its malicious and/or reckless conduct in amounts to be determined at trial;

(f)     Issuing a judgment in Plaintiff's favor ordering the Defendant to pay

the costs of reasonable attorneys' fees and expenses and the costs of

this litigation; and

(g)     Granting such other further relief as this Court deems just and proper.


MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Keri L. Morris, Esquire (#4656)
1509 Gilpin Avenue
Wilmington, Delaware 19806
302-777-4680 phone
302-777-4682 facsimile
jmartin@margolisedelstein.com
Attorneys for Plaintiff Kenneth Cole

Dated: May 5, 2005



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-82
FAX (302) 761-66

## NOTICE OF REASONABLE CAUSE FINDING

__RE: Cole v. DE Technical & Community College__          __State Case No.: 0210686__

On October 15, 2002, Mr. Kenneth Cole filed a charge of discrimination against DE Technical & Community College. The Charge of Discrimination is hereby incorporated by reference.

### Reasonable Cause Finding:

On July 30, 2004 the Department of Labor concluded it investigation and now finds, based on the following facts, that there is reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.    Undisputed Facts:

    1.    Charging Party began his employment in 1999 as a Part-time Student Enrichment Coordinator in the Upward Bound Math/Science Program

    2.    Charging Party is currently employed in the same position.

II.    Disputed Facts:

    1.    Charging Party claims that he endured racial discrimination because of denial of promotional opportunities and allocation of inappropriate office space with his other black similarly situated co-workers.

    2.    Respondent states that Charging Party was not denied a promotional opportunity because the position of a white male, Paul Morris, was re-classified and not upgraded.

    3.    Respondent states that Charging Party and other black similarly situated employees were moved to one office because other employees under the "To The Maxx Program" were terminated when the grant ended, thus leaving a vacant office space. Respondent states that the office move was an effort to group persons employed under particular grants in the same geographical area.

III.    Resolution of Material Facts in Dispute:

    1.    Observation site visit on 4/12/04 revealed that the previous distribution of offices allowed Charging Party and his co-workers to perform effectively in the same geographical area.

    2.    Observation revealed that other white similarly situated workers have their own offices or share offices which allow confidentiality, adequate space and safety conditions unlike Charging Party's office that he shares with his group of black co-workers.

    3.    Observation revealed that one of Charging Party's co-workers was moved to the current space while her old office is currently vacant with boxes.

    4.    Observation revealed that Respondent also has made room for a co-op worker to work in the same office that is already overcrowded and has cramped working conditions (wires in walking areas, draws and file cabinets can open blocking exits).

    5.    Charging Party submitted evidence that the grant did not specifically state that all staff in the Program needed to be in the same office rather than a suite of offices or cubicle style offices to provide privacy for confidential conversations when servicing center participants.

    6.    Charging Party provided evidence that Paul Morris' position was called a promotion and was not posted according to company policy.

EXHIBIT

Cole v. DE Technical & Community College
May 12, 2004
Page 2

7.    Charging Party provided corroborated evidence that Mr. Morris' position was rescinded only after Charging Party and Ms. Brown complained that his position was not posted.

8.    Charging Party has provided substantiated evidence that after he complained about his work conditions, he was subjected to changes in his work schedule and his work was scrutinized despite his excellent work performance.

IV.    Resolution:

Charging Party submitted a preponderance of evidence that supported his claim of racial discrimination. Charging Party proved that he suffered adverse actions and his allegations were corroborated by investigative observations and substantial evidence.

The administrative process will now proceed to the conciliation phase pursuant to 19 Del. C. Section 712 (c).

_7/14/04_____
DATE

_7/30/04_____
DATE

_B Sands_____
Brenda Sands
Labor Law Enforcement Officer

_Julie K. Cutler_____
Julie Cutler
Labor Law Enforcement Supervisor

EEOC Form 161-B (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:Mr. Kenneth Cole
3102 Wilmont Drive
Wilmington, DE 19810

From: Equal Employment Opportunity Commission
Philadelphia District Office
The Bourse
21 S. Fifth Street, Suite 400
Philadelphia, PA   19106-2515

RECEIVED FEB 0 4 2005 BY

[    ]    *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17CA300043 | Legal Unit | 215-440-2828 |

*(See also the additional information attached to this for*

## NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued ur Title VII and/or the ADA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII or the A **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.**  Otherwise, your right to sue based on this cha will be lost.  (The time limit for filing suit based on a state claim may be different.)

[ x ]    More than 180 days have passed since the filing of this charge.

[   ]    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC be able to complete its administrative processing within 180 days from the filing of the charge.

[ x ]    The EEOC is terminating its processing of this charge.

[   ]    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

[ x ]    The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITH 90 DAYS of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be l

[   ]    The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of y charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brou in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due **any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Marie M. Tomasso, District Director

February 2, 2005
*(Date Mailed)*

Enclosure(s)

Information Sheet

Jeffrey Martin, Esq for Charging Party
Brian D. Shirey, Esq for Respondent

EXHIBIT B

# EXHIBIT 4

# DELAWARE TECHNICAL & COMMUNITY COLLEGE WILMINGTON CAMPUS WILMINGTON, DE 19801





DEPOSITION
EXHIBIT
Paul Morris 4
1-22-06

# UPWARD BOUND MATH AND SCIENCE CENTER

## PROGRAM YEARS
### November 1, 2004 - October 31, 2009

Submitted
November 22, 2002

Delaware Technical & Community College
Wilmington Campus

## PART TIME SALARIES

| | |
|---|---|
| TRIO Administrator<br>10% of base salary ($50,000) | $ 5,000 |
| Youth Care Workers (5)<br>$11.27 per hour x 37.5 hours per week x 6 weeks x 5 | $12,679 |
| Summer Instructors (6)<br>$28.00 per hour x 29 hours per week x 6 weeks x 6 | $29,232 |
| Summer Tutor I (2)<br>$9.92 per hour x 29 hours x 6 weeks x 2 | $ 3,452 |
| Summer Tutor II (1)<br>$14.90 per hour x 29 hours x 6 weeks | $ 2,593 |
| Academic Year Tutor I (1)<br>$9.92 x 10 hours x 40 weeks | $ 3,968 |

| | |
|---|---|
| TOTAL PART TIME SALARIES | $56,924 |
| TOTAL SALARIES | $204,738 |

## FRINGE BENEFITS (e and f)

| | |
|---|---|
| Full Time Flexi Benefits (g) | $ 39,718 |
| FICA (h) | $ 12,694 |
| Medicaid (h) | $  2,969 |
| Workman's Compensation (h) | $  2,784 |
| Unemployment Insurance (h) | $    246 |

(g)  College policy regarding fringe benefits compensation for full time employees at 26.87% includes pension plan benefits, medical benefits flexi benefits for the Delaware Technical & Community College Fringe Benefits package effective November 1, 1998.

(h)  FICA (6.2%), Medicaid (1.45%), Workman's Compensation (1.36%), and Unemployment Insurance (0.12%) includes benefits for both full and part-time employees.

| | |
|---|---|
| TOTAL FRINGE BENEFITS | $ 58,411 |
| TOTAL PERSONNEL | $263,149 |

TRAVEL

STAFF TRAVEL

Staff travel to schools (When State car is not available)

Delaware Technical & Community College
Wilmington Campus

### (d) *Applicant and Community Support*

1. **The applicant is committed to supplementing the project with resources that enhance the project.**

The college provides the UBMS Center with a suite of offices conveniently located in the East Wing of DTCC/ Wilmington (See Diagrams D-1 and D-2). The Center will be within easy reach of students. It is in the same building as the cafeteria, student services, library, career center and chemistry, biology and academic skills labs; with easy access to the West and South East Buildings with the library, fitness center, and conference facilities. The Center also has access to all other college facilities, and the use of college vehicles.

The East Wing is easily accessible and offers many educational advantages. In addition to the facilities mentioned above, the East Wing has a newly renovated tutoring room that includes computer terminals and resource materials for student use, and houses other federal TRIO programs, making collaboration among the youth programs practical and possible. The college provides office space for the secretary and coordinators that includes file cabinets and office equipment. The Project Director has a separate office that includes file cabinets, storage areas, and office equipment. The East wing provides privacy areas for confidential conversation with Center participants. In addition, space in the Basic Skills Center, library and a conference room, conveniently located next to the UBMS offices is available for staff and student meetings.

By placing the UBMS Center in the same building with other student support services, such as the financial aid and admissions offices, both the UBMS staff and the participants have ready access to information that is vital. College staff has already shown their support for the program by offering assistance in retrieving and clarifying information and by supporting students who are referred to them. In particular, the Financial Aid Office, Marketing and

## 408
### DTCC – Wilmington Campus Offices
### (Fourth Floor – East Building)



91"X170"

64"X125"

87.5" X 96"

87.5 X 96"

DRAWING NOT TO SCALE



Delaware Technical & Community College
Wilmington Campus

### (d) *Applicant and Community Support*

1. The applicant is committed to supplementing the project with resources that enhance the project.

The college provides the Upward Bound Math and Science Center with a suite of offices conveniently located in the East Wing of the Wilmington Campus (Please see floor plans on the following page). In the same building with the cafeteria, student services, library, career center and academic skills laboratories and with easy access to the West Building with the library and fitness center, the Upward Bound Math and Science Center will be within easy reach of students. The Center also has access to all other college facilities, and the use of college vehicles for transportation.

The East Wing is easily accessible and offers many educational advantages. The office suite provides space for the secretary's office together with file cabinets and office equipment. The counselor will use one of the cubical style offices. The Center Director occupies the large office; it has space for staff meetings, storage and tutoring. The suite of offices provides privacy for confidential conversation with center participants. In addition, space in the Basic Skills Center, library and campus classrooms is available for tutoring purposes and group meetings.

By placing the Upward Bound Math and Science Center in the same building with other student support services, such as the financial aid and admissions offices, both the Upward Bound Math and Science staff and the participants have ready access to information. Access to these offices is vital, and college staff have already shown their support for the program by offering assistance in retrieving and clarifying information and by supporting students who are referred to them. In particular, the Financial Aid Office, Marketing Office and Counseling staff have agreed to extend to the program materials and hours to provide all participants with better information.

Delaware Technical & Community College
Wilmington Campus

## Upward Bound – Rooms 426, 430, 431, 432, 433



Fourth Floor – East Building
Admin. Services – Room 436
Dean of Development – Room 404
Dean of Instruction – Room 400
Language & Culture – Room 409
Math Lab – Room 406

92A

# EXHIBIT 5



*Corporate & Community*
*Programs Division*
*Stanton / Wilmington*
*August 2002*
*update*



DEPOSITION
EXHIBIT
Paul Morris 5
01-27-06

## PEOPLE

Diana Ritchie and Mary Beth Vore are welcome additions to the CCP Wilmington office staff. Diana is working in the Upward Bound Classic program, and Mary Beth will be helping with WIA programs. Stop by and say hi!

Paul Morris has been promoted to Special Programs Director, and in addition to Educational Talent Search, has oversight responsibilities for the Federal Trio programs, headed by Upward Bound Math/Science (Rose Henderson, Program Manager) and Upward Bound Classic (Kate Sullivan, Program Manager).

Olive Robbins has undergone surgery, and has come through fine—please keep her in your thoughts as she continues to recuperate. She hopes to be back part-time on August 26th.

Let's welcome back Peggy Jones to the CCP office – she's been recuperating from surgery and returned to full duty on Wednesday July 31st. We're glad she's back!!!

Please extend your best wishes to Dionna Harris, who has accepted a new position with the Christina School District effective August 30th. She will be working as a counselor with at-risk and special needs children.

## PROGRAMS

During the summer, while the pace of our non-credit professional and personal development classes slows down, summer youth programs really take off. Some (and certainly not all!) of the highlights:

➢ SUMMER CAMPS

New Camps were added this year, which included Kids in the Kitchen, Wonders of Web Design, Girl Scout, Build It, Bank It (in partnership with JP Morgan Chase), Health Careers, and Computer Camp (one of which was provided for the Girl Scouts). All in all, JP Morgan Chase and the Girl Scouts provided scholarships for 37 students to attend camps, and campers who attended the JP Morgan Chase camp received a computer (free of charge!) donated through the Educational Foundation. Wow!

All programs incorporated field trips and an impressive list of guest speakers representing a diverse range of occupations. Most notably, trips were arranged to the Brandywine Zoo and the Grand Opera House. Great support was also received from Regal People's Plaza Movie



Theaters, Oakwood Valley pool, Christiana Skating Center, Pike Creek and Prices Corner Bowling Lanes. Did we say impressive guest speakers? How about Scott Neely for example? If you don't know Scott, maybe you'd recognize his work if you were a fan of Scooby Doo or the Cartoon Network.

Many camps, especially the Web Design camp, were filled early, with most camps being filled to capacity. The return rate for our camp staff was 60%, and we offered an incentive program for the first time this year. This program awards the camp staff for good attitude, sound judgment, or overall way they interact with the kids. In addition, we are fortunate to have 15 kids from the S.O.A.R. program who are Counselor's in Training. This beneficial partnership has allowed our camps to be more than adequately staffed, and the S.O.A.R. kids to be paid for a valuable learning experience.

➢ S.O.A.R. PROGRAM

Other S.O.A.R. activities included placing the students in a variety of positions in Campus offices, such as CCP, the Library, and Administrative Services. In addition to working, S.O.A.R. students have completed computer training in hardware and web design classes here at DTCC. The final project consists of each student to post a web page that they have designed using HTML to a public server. If you want the full run-down about all the activities, click here.

➢ UPWARD BOUND CLASSIC

The theme of the summer program is, "Explore Your Personal Best". Each day of the week has a different focus, or theme. The trips and presentations have been planned to highlight those themes. The programming themes are: Career and College Exploration; Academic Growth; Personal Development; Community Involvement and Fun Factor Fridays. Two special programs have also been implemented this summer in the UBC program. One is the offering of the PSAT Kaplan Prep Course, for all rising 11th graders in the summer program. The other is ballet and jazz dancing lessons at the Grand Opera House for 10th, 11th and 12th graders that expressed interest in dance. The MBNA Foundation underwrites the PSAT, and the Grand Opera House Foundation donates the dance classes. Upward Bound Classic also held a Multicultural Awareness Day supported by a $1,000 grant from the Delaware Humanities Foundation. More information about the program and the guest speakers is available here.

➢ EDUCATIONAL TALENT SEARCH

The Educational Talent Search Program began its Second Annual Junior Educational Talent Search Career Camp on Monday, July 8, 2002. The two-week program was designed to introduce different career fields to the participants. Each day of the camp represented one of eight different career clusters. The career clusters covered during the camp were The Arts,

Health Care, Communications, Engineering, Science, Law & Government, Education & Social Services, and Business. A sampling of the career speakers, as well as more program details...

➢ UPWARD BOUND MATH SCIENCE

Upward Bound Math Science was participating in an ongoing Youth Leadership Program, which is an arm of Toastmasters International. This is a public speaking program in which students learn to present presentations in front a group, and to think on their feet. This program culminated in a debate titled "Table Topics." Upward Bound Math Science students were also exposed to a myriad of professions through workshops and seminars. These students had the opportunity to speak with representatives from Dentistry, Forensic Science, Mortuary Science, Pharmacy, and Medicine. More details are available here.

That doesn't mean that our occupational training programs took a hiatus. The new training contract with Dealer Support Services for the John Deere Company, as well as training for the John Deere Company began in July. Forty-four students are enrolled at the Stanton and Owens Campuses. It is anticipated that this is the first of many training opportunities to come.

ETC courses were held for K-12 teachers and DTCC staff, and enrollment in the summer computer classes continues to grow.

All ITD, Technology Applications, and Workforce Training instructors are gearing up for a busy fall. The Brownfield Technician Training class that begins October 16th is already filled to capacity!

Just check out the Fall Course Schedule and you'll see everything we have to offer from automotive and facilities maintenance, to project management and network security and much, much more!!!

## *PROPOSALS*

We are happy to announce that new WIA voucher funding has been granted for the A+ Help Desk Technician, Basic and Advanced First Core Curriculum for Childcare Providers, Brownfield Technician Certificate, and Certified Nursing Assistant. Project Management Certificate is still pending for approval by the Department of Labor.

## *POLICIES*

*UPDATE!!!!* A new policy has been implemented, which eliminates the travel advance paperwork. Instead, staff are asked to use the Supercard. Department Chairs and Program Managers are receiving detailed information which will be shared with their respective staff.

## *PROCEDURES*

Remember, if you are accumulating or utilizing your "comp time", it must be approved in advance. Also leave forms must be submitted and approved in a timely manner. Please remember to wait until your leave request is approved before finalizing your vacation plans.

*PROFESSIONAL DEVELOPMENT*

Congratulations to Ann DeNegro, Jacquita Wright, Peter Lonie, and Paul Morris who were nominated for the Collegewide Leadership Development Program.

Banner processes have been in place for almost a year now! Everyone who uses Banner is learning a lot on a daily basis, and there's more to come. Ask your supervisor about Banner training if you feel that you need more support. Remember the Banner Information page is available from the Intranet site, or you can click here. It is a valuable tool for those quick how-to answers.

A Sexual Harassment workshop is being presented on Thursday, August 22nd from 1:30 – 3:30 p.m. in Wilmington Conference rooms A & B. While this training is mandatory, you must cover your office. Other dates for training will be announced shortly.

*PASS IT ON*

ARE YOU AWARE :

Inservice 2002 will be held at the Wilmington Campus on Friday, August 16th.  Continental breakfast at 8:15a.m., and Dr. George begins his address at 9:00a.m.

Middle States Open Forums will be held from 1 – 3:00 p.m. in the SE Conference Centers in Wilmington.

Staff Senate will be meeting on August 14th in Stanton room D118 at 2:30 p.m.  All B and C staff are invited to attend!

In-Person registration for credit courses will be held on August 20th and 21st for the Fall 2003-01 semester from 8:30 a.m. to 8:00 p.m. The Fall 2003-01 semester officially begins on August 26th.

**If you have information regarding *People*, *Programs* or *Professional development* activities that you'd like included in the September Update, please email me by August 23rd at zawislak@college.dtcc.edu.**



# EXHIBIT 6

GRIEVANCE FORM

~~neth Cole~~                                              POSITION _Student Enrichment_

DATE OF OCCURRENCE _Mid to late Aug._

(Circle One)   (FIRST)   SECOND   THIRD

~~OF GRIEVANCE~~ _I am exercising my rights from UI&CC Personn_
~~licy Manual~~ _Sect XIII titled Grievances, 13.01, 13.02 & 13.03_
_I am filing a policy interpretation grievance because I feel th_
_the terms and conditions of my employment by the college ha_
_been materially adversely affected by a violation in policy_
_(see attachments for detailed explanations) in the promot_

SPECIFIC REMEDY DESIRED _of Paul Morris into "Special Programs Direct_
_position._

INFORMAL DISCUSSION HAS FAILED TO SATISFACTORILY RESOLVE THE PROBLEM.  ALL INTERMEDIATE
SUPERVISORS (IF ANY) HAVE BEEN NOTIFIED IN WRITING THAT A FORMAL GRIEVANCE IS BEING
FILED.

EMPLOYEE'S SIGNATURE _Kenneth Cole_                    DATE _9-5-02_

DATE RECEIVED _____               RECEIVED BY _____

                                          POSITION _____

DECISION _____

DATE OF DECISION _____

                                          SIGNATURE _____

Rev. 2/1/83                               POSITION _____

RECEIVED
SEP 0 5 2002
BY: MBV

TOTAL P.__

DEPOSITION
EXHIBIT
Paul Morris
Q 1-27-06

73827                    DEL TECH WILM HR                    PAGE   02

PAGE 1

## GRIEVANCE FORM

It is my belief that promoting Paul Morris into the position of Special Programs Director violated section III, 3.01 titled **Position in Salary Plans A and B.**

Because the Special Programs Director Position existed and the Special Programs Director's position was not posted (it has been thoroughly investigated via Human Resources), there was a violation of Section III 3.01 **Positions in Salary Plans A and B** which states: Regular, full-time position vacancies shall be posted for a minimum of fifteen (15) calendar days.

The following exceptions (1.) do not apply because we were told by Ann Del Negro and Sue Zawislak in a mandatory meeting approximately a year ago that Paul Morris will be a liaison between the Program Managers and Ann Del Negro.

3. When a position is posted internally for regular, full time and regular, part-time DTCC employers, it shall be posted for a minimum of ten (10) days.

This did not happen.

It is also my belief that promoting Paul Morris into the position of Special Programs Director violated section IV titled **Promotions and Transfer Policy.**

4.01 Promotion Policy

States: In filling vacancies, qualified regular college employees will receive equal consideration for promotion, in accordance with the College's Statement of Affirmative Action Policy, regardless of race, color creed, sex national origin, etc.;

and

4.02 Transfer of Full-Time Employees

1. Transfer from One Position Classification to Another

If Paul Morris was reclassified, policy was violated because Paul Morris went from a Program Manager pay grade 16 to the Special Programs Director pay grade 17, and "quantum leaped" into a new position (that has been investigated as well, via Human Resources).



DEL TECH WLM HR                    PAGE  04

*Exhibit "A"*

Corporate & Community
Programs Division
Stanton / Wilmington
August 200X
update

## PEOPLE

Diana Ritchie and Mary Beth Vore are welcome additions to the CCP Wilmington office staff. Diana is working in the Upward Bound Classic program, and Mary Beth will be helping with WIA programs. Stop by and say hi!

Paul Morris has been promoted to Special Programs Director, and in addition to Educational Talent Search, has oversight responsibilities for the Federal Trio programs, headed by Upward Bound Math/Science (Rose Henderson, Program Manager) and Upward Bound Classic (Kate Sullivan, Program Manager).

Olive Robbins has undergone surgery, and has come through fine—please keep her in your thoughts as she continues to recuperate. She hopes to be back part-time on August 26th.

Let's welcome back Peggy Jones to the CCP office -- she's been recuperating from surgery and returned to full duty on Wednesday July 31st. We're glad she's back!!!

Please extend your best wishes to Dionna Harris, who has accepted a new position with the Christina School District effective August 30th. She will be working as a counselor with at-risk and special needs children.

## PROGRAMS

During the summer, while the pace of our non-credit professional and personal development classes slows down, summer youth programs really take off. Some (and certainly not all!) of the highlights:

➤ SUMMER CAMPS
New Camps were added this year, which included Kids in the Kitchen, Wonders of Web Design, Girl Scout, Build It, Bank It (in partnership with JP Morgan Chase), Health Careers, and Computer Camp (one of which was provided for the Girl Scouts). All in all, JP Morgan Chase and the Girl Scouts provided scholarships for 37 students to attend camps, and campers who attended the JP Morgan Chase camp received a computer (free of charge!) donated through the Educational Foundation. Wow!

PAGE  89

PAGE

## GRIEVANCE FORM (con't)

Finally, It is my belief that promoting Paul Morris into the position of Special Programs Director violated section I Policies to Nondiscrimination and Affirmative Action

1.01    Statement of Affirmative Action Policy

It is also my belief that promoting Paul Morris into the Special Programs Director's position and still allowing him to function as Educational Talent Search Program Manager is a conflict of interest and violates Policy by not affording me the opportunity to apply for that position.

See Exhibit "A", which is the only formal announcement of his position other than Paul Morris relaying the information to Upward Bound Math/Science (UBMS) Program Manager, who relayed the information to the UBMS group.

An attempt to resolve or even discuss the grievance has failed.  Telephone calls and e-mails have failed.  I have the necessary documentation of e-mails dates and telephone calls if needed.

A copy of the Grievance Form has been submitted to the appropriate managers/supervisors;

# EXHIBIT 7



DEPOSITION
EXHIBIT
Paul Morris
1-27-06

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

BRIGITTE L. BROWN,                )
                                  )
        Plaintiff,                )        C.A. NO. _____
                                  )
        v.                        )
                                  )        JURY TRIAL DEMANDED
DELAWARE TECHNICAL AND            )
COMMUNITY COLLEGE,                )
                                  )
        Defendant.                )

### COMPLAINT

### INTRODUCTION

1.      This is a Complaint brought pursuant to Title VII of the Civil Rights Act

of 1964, as amended, codified as 42 U.S.C. § 2000(e) et seq., as amended by the Civil

Rights Act of 1991, 42 U.S.C. § 704(a) and 42 U.S.C. § 1981.

### PARTIES

2.      Plaintiff, Brigitte L. Brown (hereinafter "Plaintiff"), is and was at all times

relevant to this Complaint, a resident of the State of Delaware, residing at 1321 West 8th

Street, Wilmington, Delaware 19806.

3.      Defendant, Delaware Technical & Community College (hereinafter

"Defendant"), is a statewide institution of higher education, i.e., a local community

college, providing academic, technical, continuing education, and industrial training, and

at all times relevant to this Complaint, the employer of Plaintiff Brigitte L. Brown.

Defendant is subject to service of process through Delaware Technical & Community

College; c/o Larry Miller, Office of the Campus Director, 333 Shipley Street,

Wilmington, Delaware 19801.

## JURISDICTION

4.      Jurisdiction is founded on the existence of a question arising under federal statutes. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(c) et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) of Title VII of the Civil Rights Act. The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights secured by federal and state law which prohibits discrimination against employees because of their race.

5.      The state law claim regarding the breach of the implied Covenant of Good Faith and Fair Dealing is brought pursuant to the pendant jurisdiction of this Court.

## FACTUAL BACKGROUND

6.      Plaintiff was hired by Defendant as a full-time Student Enrichment Coordinator for the Upward Bound Math and Science Program (hereinafter "UBMS") at the Wilmington, Delaware campus on or about January 8, 2001. Plaintiff has been continuously employed by Defendant for four (4) years.

7.      When Plaintiff began her employment, Defendant had three (3) federal-grant TRIO programs: the Educational Talent Search Program, managed by Mr. Paul Morris, a Caucasian; the Upward Bound Classic Program, managed by Ms. Kate Sullivan, a Caucasian female; and the Upward Bound Math and Science Program, managed by Ms. Rosetta Henderson, an African-American female.

8.      In or around February 2001, a proposal was introduced by Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs, to move the Upward Bound Classic Program staff into the offices that were occupied by Plaintiff and the other members of the Upward Bound Math and Science Program. In turn, Plaintiff's

department would be relocated from their offices to the cubicles that were occupied by the Upward Bound Classic Program personnel.

9.     Disappointed, and somewhat surprised by the announcement that they would potentially be losing their offices, Plaintiff and the other members of her department requested a meeting with Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs for Defendant.

10.     As a result of that meeting, the move was halted; instead, only Ms. Tonia Conley, Student Enrichment Coordinator with the Upward Bound Classic Program, was relocated next to her Program Manager, Ms. Kate Sullivan.

11.     In or around October 2001, Plaintiff successfully completed the Educational Technology Certificate Program with the hope that possession of such a certificate would result in career advancement.

12.     In or around November 2001, Plaintiff was nominated for, and the recipient of the 2001 Delaware State TRIO Organization's Achiever's Award.[1]

13.     In or around April 2002, Plaintiff received the Mid-Eastern Association of Educational Opportunity Program Personnel Award, a regional TRIO award.

14.     In or around July 2002, Mr. Paul Morris, a Caucasian, Program Manager for Educational Talent Search, was promoted to Special Program Director, a position that oversees all of the TRIO Programs, including Plaintiff's.

15.     On or about August 12, 2002, Paul Morris met with Plaintiff and the other members of her department and informed them that he had unilaterally made a decision

---

[1] The Delaware State Trio Organization is the organization that is responsible for all federal TRIO Programs throughout the State of Delaware.

to relocate the Upward Bound Math and Science Program from their current multiple offices to the single office that had been occupied by the SOAR Program.

16.    That same day, Plaintiff and the other members of her department visually surveyed the office space they were being forced into, and determined that it was completely inadequate to house two (2) full time employees, one (1) part time employee, two (2) student co-ops, student participants, visitors, files and equipment and other resources.

17.    Specifically, Plaintiff's new office space was approximately thirty-six (36) square feet less than what her department had in its original office space, a decrease from a combined total of 211 square feet to 175 square feet. In fact, Plaintiff's office space was so much smaller that partitions could not even be set up in the room to allow for the necessary privacy.

18.    On or about August 13, 2002, the UBMS team (Plaintiff, Mr. Ken Cole, and Ms. Liz Wilson) met together to discuss the proposed move and the fact that they believed there were being unfairly discriminated against and treated differently from the other TRIO programs when they were forced into a smaller, single office.

19.    After speaking with their Program Manager, Plaintiff and the remaining UBMS staff prepared an agenda to discuss with management; the agenda was submitted via e-mail to Ms. Sue Zawislak, Defendant's CCP Director, on or about August 14, 2002.

20.    In response to their concerns, the UBMS group was later told by Mr. Paul Morris to "put it in black and white" and to "explain where it stated in [their] job description that [they couldn't be moved]." Plaintiff and her colleagues were eventually

granted a meeting with upper management (Paul Morris and Ann Del Negro) on or about August 29, 2002, just two (2) working days before the proposed move.

21.    On or about August 29, 2002, the UBMS staff met with Ms. Ann Del Negro and Paul Morris. The group tried to explain that the proposed move would affect employee relations, morale and productivity, not to mention, the small space would make it extremely difficult to protect students' privacy.

22.    The office that the UBMS Group was being forced to move into had been Ann Del Negro's former single office; it was an office with only two wall sockets as it was designed for occupancy by only one individual. Instead, Defendant was putting the three (3) African-American members of the UBMS Program into a small, inadequate office space, despite their previous objections and their complaints that this move was discriminatory in nature.

23.    Ann Del Negro got very upset and expressed her feelings to the UBMS Group of how disappointed she was that they felt their move would affect employee relations, morale and productivity. Plaintiff and the rest of the UBMS staff went on to explain how they felt that they were being treated unfairly and unequally and that they believed that there were ulterior motives for the move. Plaintiff explained that by putting all three people in such a small, confined space, they felt as if they were being punished.

24.    Plaintiff and the rest of her group informed Del Negro that they felt the move was partially motivated by a conflict that existed between Kate Sullivan and Tonia Conley, and Plaintiff's UBMS Group, which was comprised of all African American employees, was subjected to relocation as a result of this conflict, despite the fact that in that meeting, they had provided reasonable alternatives to avoid the move.

25.    By the end of the meeting, Del Negro decided that the move would still continue as scheduled, never having addressed the group's issues of being punished, being discriminated against, being treated unfairly and unequally, and the effect that this move would have on employee relations, morale and productivity. Plaintiff left the meeting feeling that her concerns were unheard.

26.    On or about August 30, 2002, Plaintiff sent Ms. Sue Zawislak, Director of CCP, an e-mail asking for a meeting with the UBMS team. On the same day, Sue Zawislak called Plaintiff in response to her e-mail. Zawislak said the group had not followed proper protocol. However, Plaintiff specifically followed the protocol procedures directly from Defendant's Policy Manual

27.    Zawislak also stated during her conversation with Plaintiff that the "proposed move" was due to downsizing and the allocation of space, and informed her that because of those reasons, the move made sense; this explanation, however, was in direct contradiction to what Paul Morris had said about the move being his "vision" to have the Youth Programs together.

28.    On Tuesday, September 3, 2002, the day before the move, Plaintiff went to Human Resources and met with Cara J. Stanard, Human Resource Specialist, to discuss the "move" and asked her to schedule an urgent meeting with Dr. Connie Winner, Assistant Campus Director, in an effort to file an additional complaint and hopefully halt the move which was scheduled for the next day.

29.    On September 4, 2002, the move was to take place, but it did not, presumably as a result of Plaintiff's complaint to Dr. Winner. Instead, maintenance men were sent around to measure Plaintiff's group's offices. As the maintenance crew was

measuring, Ann Del Negro, Assistant Director of CCP, arrived and took over the job of measuring the office spaces herself.

30.     On September 5, 2002, Sue Zawislak and Ann Del Negro called for Plaintiff, Liz Wilson, secretary, and the other members of the UBMS group for separate, individual meetings at different times. Plaintiff went first to discuss the proposed "move". Zawislak and Del Negro refused to believe Plaintiff, or even investigate her allegation that there was a conflict between Kate Sullivan and Tonia Conley that may have been the driving force behind the loss of their office space.

31.     During that meeting, Plaintiff introduced clear alternatives to their proposed move. She gave Zawislak and Del Negro the measurements of their office spaces compared with the measurements of the proposed new office space. Zawislak insisted in the meeting that the proposed move was due to downsizing and because of allocation of space, and insisted that the move made sense, which was once again in direct contradiction to what Paul Morris said; that the move was his "vision" to have the Youth Programs together.

32.     The proposed move consisted of moving eight (8) people as opposed to the alternative proposed by Plaintiff and her department which involved moving only two (2) people, and simultaneously achieving the same goal of having the TRIO programs together as well as achieving more cost effectiveness overall. Despite her best efforts, Plaintiff could not convince Defendant to entertain her suggestion.

33.     On September 5, 2002, Mr. Kenneth Cole informed Plaintiff that he had filed a grievance alleging personal discrimination, and regarding Paul Morris's promotion to Special Program Director.

34.     In the end, the individual meetings came across as a "witch hunt;" Plaintiff felt intimidated, interrogated and that Defendant was on a "search and destroy" mission. Plaintiff also felt as if she was being talked down to and belittled because she was African-American, and that nothing she said made any difference. Most of Plaintiff's answers to Defendant's questions were turned around and restated.

35.     On or about October 2, 2002, a meeting took place between Sue Zawislak, Ann Del Negro, and Paul Morris, Plaintiff and the rest of the UBMS team. Zawislak announced that the UBMS team would still be relocated according to the plan because she had "not heard anything that would change [her] mind."

36.     In or around October 2002, just prior to the move, Plaintiff's Program Manager, Rosetta Henderson, told Plaintiff that Paul Morris had come to her [Henderson] and said, "[Plaintiff] will never go far at Del Tech doing the things that she is doing."

37.     Plaintiff went to the Human Resource Department and spoke with Ms. Cara Standard, Human Resources Specialist, to tell her what Henderson had told Plaintiff about the remark made by Paul Morris, and to see if documentation of this comment could be put into her file.

38.     On or about Monday, October 7, 2002, the day before the move, Plaintiff made one last appeal to Dr. Connie Winner. Winner responded promptly (the same day) to inform Plaintiff that she and Lawrence Miller had approved the move and it would go forward as scheduled. Winner submitted several questions to Plaintiff via e-mail and asked that Plaintiff respond to her questions so that she [Winner] could schedule a meeting the following week with Sue Zawislak and herself. On or about October 15,

2002, Plaintiff submitted responses to Dr. Winner. As of the filing of this lawsuit, Plaintiff still has not received a response from Winner.

39.     On or about Monday, October 7, 2002 Mr. Kenneth Cole informed Plaintiff that he had filed a supplement to his grievance alleging Defendant's retaliatory actions.

40.     On or about Tuesday, October 8, 2002, Plaintiff, and the other members of the UBMS group reluctantly spent the entire day moving into their new one-room office, room 408 E; a small, open room with inadequate space. The move required the assistance of five (5) maintenance workers, one (1) telecommunication person and three (3) computer services people to complete.

41.     At the completion of the move, a maintenance worker informed Plaintiff that there was a potential fire hazard in the new office space because there were only two (2) wall sockets, and approximately 22 electrical items that needed to be plugged in. Mr. Ed Cunningham, Superintendent of Buildings and Grounds, assured Plaintiff that the move was not based on his measurements.

42.     As a result of being placed into such a small and inadequate workspace, Plaintiff, along with her co-workers Kenneth Cole and Liz Wilson, are subjected to each other's conversations, phone calls and visitors. There is no privacy whatsoever, which is in direct violation of Defendant's federal grant that requires that each Student Enrichment Coordinator have privacy for confidential communications. The noise from the shredding machines and electric staplers echoes throughout the small room, which is extremely distracting and counterproductive. Plaintiff strongly believes that her group has been placed in the confined office space because they are all African-Americans.

43.     Due to the fact that there was not enough space for Plaintiff's department's files, they were instructed by Defendant to use the extra file drawers on the third floor in the CCP office.

44.     Plaintiff feels degraded each day she goes to work. The UBMS group is subjected to negative comments as Del Tech students walk by her small office. Often, other employees of Del Tech will come by just to look at Plaintiff's space and comment on how small it is, causing Plaintiff to feel embarrassed, humiliated and experience stress related symptoms because of this situation.

45.     Within her first two years working for Defendant, Plaintiff won two (2) TRIO Achievement Awards; one from the State of Delaware and the other was a Mid-Eastern Regional Achiever's Award. She was nominated and was accepted as the Secretary of the Delaware State TRIO Organization (DSTO), an Executive Board position, and she is also a member of COE Council on Education.

46.     On or about Tuesday, October 8, 2002, Plaintiff and Liz Wilson, secretary, received separate letters from Mr. Lawrence Miller, vice president and campus director, stating that Kenneth Cole had filed a supplement to his grievance stating that upper management was retaliating against Plaintiff's department.

47.     Lawrence Miller asked Plaintiff and Liz Wilson to respond to his questions concerning Cole's allegations of retaliation by upper management, and to submit their response by October 15, 2002. Miller said in his letter that if there were no retaliatory actions directed to them, that he would consider the case closed.

48.    On or about October 15, 2002, Plaintiff submitted a three-page response to Miller confirming retaliatory actions by upper management. As of the date of the filing of this lawsuit, Plaintiff has yet to receive a response from Miller.

49.    As a result of the added stress at work from Defendant's actions, Plaintiff began to experience sleep depravation, upset stomach, loss of hair and irritability, and went to see her physician. Plaintiff's physician referred her to a psychologist.

50.    On or about October 22, 2002, Plaintiff began seeing a psychologist for work-related stress; her treatment for same continues to date.

51.    Shortly after moving into the new office, Plaintiff began to keep the office door closed due to the humiliation of the room. Plaintiff overheard students who were walking past the office make comments about all the people in the small room looking like a bunch of monkeys. Plaintiff is/was also subjected to various remarks and stares as students walk by the office, feeling extreme humiliation.

52.    In or around November 2002, the maintenance department installed an additional electrical outlet, bringing the total of electrical outlets in the office to three.

53.    On or about November 8, 2002, with no other administrative remedy available to her, Plaintiff filed a Charge of Discrimination against Defendant with the Delaware Department of Labor alleging race discrimination and retaliation.

54.    Eventually, upper-management began to scrutinize UBMS Program Manager Rosetta Henderson, reprimanding her for being "unable to control [her] staff."

55.    In or around August 2003, Kate Sullivan, Upward Bound Classic Program Manager, resigned and went to another job with the State of Delaware. Her position as Program Manager of Upward Bound Classic was posted internally not long after she left.

56.    Ann Del Negro became the Director of Corporate and Community Programs (CCP) at the Del Tech Owens Campus. Ms. Jacquita Wright was promoted to Del Negro's former position, Acting Assistant Director of CCP.

57.    Paul Morris became Acting Department Chair of Community and School Programs, Jacquita Wright's former position. In addition, Morris was formally made Supervisor over the other TRIO Programs, with the exception of UBMS, which was assigned to Jacquita Wright, an African-American. Morris was basically offered the same position that he previously held in the prior year until Kenneth Cole filed his grievance regarding Morris' position. Roseanna Brown-Simmons, Student Enrichment Coordinator of Educational Talent Search, became Acting Program Manager to replace Paul Morris.

58.    Plaintiff believed that Morris was not made supervisor of her group due to their complaint, which caused Defendant to separate the programs and put a different person (an African-American) over the UBMS Program who had no prior experience with TRIO programs, while Paul Morris oversaw the Upward Bound Classic Program and Educational Talent Search. Plaintiff was once again being treated differently by Defendant, this time with the assignment of her supervisor.

59.    In or around September 2003, the Upward Bound Classic Program Manager position became available. The position was posted internally only. Angi McCloskie, Andrea Coleman and Crystal Heath, the Student Enrichment Coordinators for that program, all applied for the position. Angi McCloskie was subsequently chosen as Program Manager.

60.    Andrea Coleman, who was hired with a special grant for the Upward Bound Classic Program was put in the position of Program Manager for summer youth camps once her grant monies ran out.

61.    In or around November 2003, Plaintiff completed her second certificate program, entitled "Guiding our Youth: A Professional Approach" again with the hope that possession of such a certificate would result in career advancement.

62.    In or around November 2003, Ms. Henderson went out on sick leave for scheduled surgery. She did not return to work until after the holiday break in January 2004, working part-time for the first couple of weeks.

63.    On or about February 4, 2004, UBMS Program Manager Rosetta Henderson resigned from her position after almost 9 years with Defendant, informing Plaintiff that she just couldn't take it anymore, referring to how she was being treated by Defendant after her employees filed their complaint.

64.    Plaintiff was never asked to become Acting Program Manager, despite her qualifications. Plaintiff had several years of experience and had always received exemplary performance evaluations.

65.    In or around February 2004, Defendant promoted the new Acting Assistant Director of Corporate and Community Programs, Jacquita Wright-Henderson, to the position of Acting Program Manager for UBMS, despite having no TRIO or Upward Bound Math Science employment experience.

66.    Wright-Henderson's office was four (4) floors lower, so she would spend approximately only 5% of her time upstairs with the UBMS program, especially since she

had so many other responsibilities as the Assistant Director of Corporate and Community Programs.

67.    In or around March 2004, the Program Manager's position became available and applications were being accepted for the position until March 29, 2004. Plaintiff had the qualifications outlined in the job description. Plaintiff had been the full time Student Enrichment Coordinator since January 8, 2001; she had always received exemplary evaluations; and she always maintained an excellent rapport with the students, parents and counselors. Although the position should have only been initially posted internally, it was posted both internally and externally, unlike postings for the Classic and ETS Programs, which were posted internally only, and if a qualified candidate was not available, were then posted externally. Plaintiff believes Defendant posted the position internally and externally from its initial posting to prevent Plaintiff from obtaining the position.

68.    To Plaintiff, it seemed only natural for one of the Student Enrichment Coordinators in a TRIO program to apply for and receive the Program Manager position once that manager had left the program. This succession occurred when Kate Sullivan, Program Manager for Upward Bound Classic left, and Angi McCloskie, SEC, became the new Program Manager. It also occurred when Rosanna Brown-Simmons, the Student Enrichment Coordinator for ETS, became acting Program Manager, then applied for and received the position of Program Manager for Talent Search when Paul Morris was made Acting Department Chair of Community and School Programs.

69.    During a conference in West Virginia in or around mid-April 2004, Plaintiff heard a conversation between Paul Morris and other TRIO personnel from

lower-Delaware. Morris was explaining the TRIO programs at Defendant's Wilmington Campus, and told the individuals with whom he was speaking that he was in charge of UBC, ETS and the other youth programs, but not UBMS. When asked why, he said that he would also be in charge of UBMS within a couple of months.

70.     On or about April 29, 2004, only a month after Plaintiff handed in her application for the Program Manager position, she received a letter from Human Resources thanking her for applying for the position but informing her that they had chosen a more qualified candidate. Plaintiff was denied an opportunity to even interview for the Program Manager position. Plaintiff later discovered that Paul Morris was on the interviewing committee.

71.     Plaintiff contacted Jacquita Wright and Jackie Jenkins, head of Human Resources to discuss the hiring process for the Program Manager position. She never received an adequate response; Plaintiff merely received a standard form letter as a response.

72.     Plaintiff also learned that several interviews were conducted, and that the candidate who was selected, declined the position.

73.     The Delaware Department of Labor investigated Plaintiff's Charge of Discrimination alleging race discrimination and retaliation and found in favor of Plaintiff, finding reasonable cause to believe that violations of Title VII and 19 Del. C. § 711 had occurred. A copy of the Delaware Department of Labor Notice of Reasonable Cause Finding dated July 30, 2004 is attached hereto as Exhibit "A".

74.     Also in or around July 2004, the UBMS Program Manager position became available for a second time. Plaintiff's immediate supervisor, the Assistant

Director of CCP, Jacquita Wright-Henderson, suggested to Plaintiff that she re-apply for the position, citing that Plaintiff had a good personality and dealt with the students and the parents well.

75.    Plaintiff re-applied for the position and was granted an interview on or about July 23, 2004. Once again, however, Paul Morris was one of the interviewers. Within two days after her interview, Plaintiff received a letter from Defendant stating that there were more qualified applicants for the position. However, the position was still not filled and the job was posted a third time in or around October 2004. Plaintiff believes she was denied the position in retaliation for her complaint and subsequent Notice of Reasonable Cause Finding from the Delaware Department of Labor.

76.    In or around late December 2004, before the holiday break, Plaintiff and the rest of the UBMS group were told that a new Program Manager had been hired and that she would start on January 3, 2005.

77.    In January 2005, when the UBMS staff returned from break, they were informed that the new Program Manager decided not to take the position, leaving the Program Manager position vacant once again.

78.    On or about January 26, 2005, Sue Zawislak and Jacquita Wright-Henderson announced in a meeting that Andrea Coleman, an African-American, who had been a former Student Enrichment Coordinator for the Upward Bound Classic Program was transferred into the UBMS Program Manager's position.

79.    Coleman had been managing youth camps for CCP prior to being named the new UBMS Program Manager. Coleman originally applied for Program Manager for her Upward Bound Classic Program in or around October 2003, but was not chosen for

the position. Coleman was also hired after Plaintiff; therefore, she had less seniority. Coleman also had no math/science background, and never applied for the position.

80.    Plaintiff filed a grievance in response to Coleman's transfer to UBMS, especially due to the fact that Coleman was also on the interviewing committee. Sue Zawislak, Director of Corporate and Community Programs, denied Plaintiff's grievance.

81.    Despite having more seniority and years of experience in the Upward Bound Math/Science Federal Trio Program, Plaintiff was denied the opportunity for advancement to the position of Program Manager, in what Plaintiff believes was retaliation for her complaint with the Delaware Department of Labor.

82. The United States Equal Employment Opportunity Commission ("EEOC") issued a Notice of Right to Sue Letter on February 2, 2005, received by Plaintiff's counsel on February 4, 2005, attached hereto as Exhibit "B."

COUNT I
(Racial Discrimination)

83.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 82 by reference as if specifically set forth herein.

84.    The practices of Defendant as complained of above, had the effect of depriving Plaintiff of equal employment opportunities and otherwise affected her employment because of her race. The practices employed by Defendant were intentional and were done with malice and/or reckless indifference to the federally-protected rights of Plaintiff.

85.    The practices of Defendant as complained of above caused Plaintiff to experience conscious pain and suffering and other emotional harm.

86.    The practices of Defendant as described above are imputable to Defendant in violation of 42 U.S.C. § 2000e-2(a) and 3(a).

87.    As a direct and proximate result of said acts, Plaintiff has suffered, and continues to suffer, loss of employment opportunities, loss of income, loss of other employment benefits, and has suffered, and continues to suffer, distress, humiliation, great expense, embarrassment and damages to her reputation.

### COUNT II
### (Title VII – Retaliation)

88.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 87 by reference as if specifically set forth herein.

89.    This cause of action arises under Title VII, 42 U.S.C. § 2000e(2)(a).

90.    Defendant intentionally and maliciously discriminated against Plaintiff in retaliation for her complaints in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(2)(a) when it:

(a)    denied Plaintiff promotions and transfer requests despite her qualifications;

(b)    forced Plaintiff to work in a hostile work environment; and

(c)    forced Plaintiff to relocate to a workspace that was inadequately designed and obviously too small to house Plaintiff and the other members of her department.

91.    Defendant acted with discriminatory motive and the reasons provided by Defendant for failing to promote and/or transfer Plaintiff are pretextual.

92.     As a result of Defendant's unlawful retaliation against Plaintiff, Plaintiff has suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

## COUNT III
### (Racial Discrimination – Failure to Promote)

93.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 92 by reference as if specifically set forth herein.

94.     Defendant denied Plaintiff numerous opportunities for career advancement despite her qualifications.

95.     Defendant denied Plaintiff career advancement opportunities by denying her requests and applications for promotion, and by failing to even grant Plaintiff an interview for said positions.

96.     As a result of Defendant's discrimination, Plaintiff suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

97.     Defendant's discrimination was willful, wanton and malicious.    As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

## COUNT IV
### (Breach of the Covenant of Good Faith and Fair Dealing)

98.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 97 by reference as if specifically set forth herein.

99.     The actions of Defendant constitute a violation of the *Covenant of Good Faith and Fair Dealing* implicit in every employment agreement.

100.    Defendant breached the *Covenant of Good Faith and Fair Dealing* to Plaintiff by discriminating against her on the basis of her race, and/or based upon retaliatory motives.

101.    Defendant's discrimination was willful, wanton, and malicious. As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

102.    The above-stated damages were not the result of any act or omission on the part of the Plaintiff.

WHEREFORE, Plaintiff, Brigitte L. Brown, respectfully requests that this Court enter judgment in her favor and against Defendant, Delaware Technical and Community College:

     (a)     Declaring that the conduct engaged in by the Defendant to be in violation of Plaintiff's rights;

     (b)     Issuing a judgment in Plaintiff's favor ordering Defendant to provide appropriate back pay with pre- and post-judgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

     (c)     Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for non-pecuniary losses, including, but not limited to, pain, suffering, and humiliation, in amounts to be determined at trial,

and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(d)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for past and future pecuniary losses, in amounts to be determined at trial;

(e)    Issuing a judgment in Plaintiff's favor ordering Defendant to pay punitive damages for its malicious and/or reckless conduct in amounts to be determined at trial;

(f)    Issuing a judgment in Plaintiff's favor ordering the Defendant to pay the costs of reasonable attorneys' fees and expenses and the costs of this litigation; and

(g)    Granting such other further relief as this Court deems just and proper.

MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Keri L. Morris, Esquire (#4656)
1509 Gilpin Avenue
Wilmington, Delaware 19806
302-777-4680 phone
302-777-4682 facsimile
jmartin@margolisedelstein.com
Attorneys for Plaintiff Brigitte Brown

Dated:  May 5, 2005



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-660

*Winner, Delaware Quality Award of Merit*

## NOTICE OF REASONABLE CAUSE FINDING

**RE: Brown v. DE Technical & Community College**          **State Case No.: 0211731**

On November 1, 2002, Ms. Brigitte L. Brown filed a charge of discrimination against DE Technical & Community College. The Charge of Discrimination is hereby incorporated by reference.

**Reasonable Cause Finding:**

On July 30, 2004, the Department of Labor concluded it investigation and now finds, based on the following facts, that there is reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.     Undisputed Facts:

1.   Charging Party began her employment in 2000 as a Student Enrichment Coordinator for Respondent's federal Upward Bound Program.

2.   Charging Party is currently employed in the same position.

II.     Disputed Facts:

1.   Charging Party claims that she endured racial discrimination because she was moved to inadequate office space while being replaced by less tenured white co-workers in individual offices or offices with adequate space. Also, after complaining about her conditions, Respondent scrutinized her work and denied her promotions and scheduling opportunities.

2.   Respondent states that Charging Party and other black similarly situated employees were moved to one office because other employees under the "To The Maxx Program" were terminated when the grant ended, thus leaving a vacant office space. Respondent states that the office move was in effort to group persons employed under particular grants in the same geographical area. Respondent states that before the move, Charging Party and her co-workers were scattered among non-contiguous offices.

III.     Resolution of Material Facts in Dispute:

1.   Observation site visit on 5/12/04 revealed that the previous distribution of offices allowed Charging Party and her co-workers to perform effectively in the same geographical area.

2.   Observation revealed that other white similarly situated workers have their own offices or share offices which allow confidentiality, adequate space and cubicle style work conditions unlike Charging Party's office that she shares with her group of black co-workers.

3.   Observation revealed that one of Charging Party's co-workers was moved to the current space while her old office is currently vacant with boxes.

4.   Observation revealed that Respondent also has made room for a co-op worker to work in the same office that is already overcrowded and appears to have cramped working conditions (wires in walking areas, draws and file cabinets can open blocking exits).

5.   Charging Party submitted evidence that the grant did not specifically state that all staff in the Program needed to be in the same office rather than a suite of offices or cubicle style offices to provide privacy for confidential conversations when servicing center participants.

EXHIBIT

Brown v. DE Technical & Community College
May 12, 2004
Page 2

6.    Charging Party provided evidence that adequate office space is required to conduct
      interviews and perform necessary business functions. In addition, Charging Party provided
      evidence that her position requires more than two hours per day inside the office and
      periodic visits to onsites.

7.    Charging Party has provided evidence that Respondent has previously allocated this office
      space to other black employees along with one white worker who was a floater and not
      permanently placed in that office.

8.    Site observation has confirmed that although other clusters are grouped together, there is
      adequate space and cubicles to work efficiently. Charging Party provided evidence that
      previous clusters placed in the same office (permanently) were also black.

9.    Respondent provided no evidence regarding the denial of promotional or scheduling
      opportunities.

IV.   Resolution:
      Charging Party submitted a preponderance of evidence that supported her claim of racial
      discrimination. Respondent did not prove that the office move, denial of promotional
      opportunities and scheduling changes were based solely on business reasons. Charging
      Party proved that she suffered adverse actions and her allegations were corroborated by
      investigative observations and substantial evidence.

      The administrative process will now proceed to the conciliation phase pursuant to 19 Del. C. Section
      712 (c).

_7/14/04_
DATE

_7/30/04_
DATE

_5) Sands_
Brenda Sands
Labor Law Enforcement Officer

_Julie K. Cutler_
Julie Cutler
Labor Law Enforcement Supervisor

EEOC Form 161-B (10/96)                    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: Ms. Brigitte L. Brown<br>1321 West 8th Street<br>Wilmington, DE 19806 | From: Equal Employment Opportunity Commission<br>Philadelphia District Office<br>21 South Fifth Street<br>Philadelphia, PA 19106-2515 |
|---|---|

[    ]    *On behalf of person(s) aggrieved whose identity is*
         *CONFIDENTIAL (29 CFR § 1601.7(a))*

FEB 0 4 2005
BY:

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17C-2003-00086 | Legal Unit | (215) 440-2828 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ X ]    More than 180 days have passed since the filing of this charge.

[    ]    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[ X ]    The EEOC is terminating its processing of this charge.

[    ]    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[    ]    The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[    ]    The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Marie M. Tomasso, District Director                    February 2, 2005
                                                        *(Date Mailed)*

Enclosure(s)

Delaware Technical & Comm College
Jeffrey K. Martin, Esquire (For Charging Party)

EXHIBIT
B

Paul Thomas Morris, Jr. - Brewington            69

1   BY MS. BREWINGTON:

2      Q.   And what issues was Kate Sullivan dealing with

3   as program manager?

4               MR. McMACKIN:  We are going to ask for

5   this response to be put under seal.

6      A.   Yes.  To my recollection there was work-related

7   issues.  There was several instances with not going to

8   schools at the time she should have been at schools,

9   using state cars for unofficial business, things like

10  that.  To that nature.

11     Q.   And how were these issues addressed?

12              MR. McMACKIN:  Same request.

13     A.   The program manager addressed those issues.

14     Q.   And how were they addressed?

15     A.   By fact-finding, finding out what the issues

16  were.  There was reprimands, those type of things.

17     Q.   Did you play a role in --

18              MR. McMACKIN:  I don't want to be

19  interrupting every time, so I'm going to have a

20  continuing request that these be put under seal.  Just

21  so I don't keep interrupting you.

22              MS. BREWINGTON:  That's fine.

23  BY MS. BREWINGTON:

24     Q.   Did you have a role in assisting Kate Sullivan

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

Paul Thomas Morris, Jr. - Brewington                70

1    in addressing these issues?

2        A.    I was her supervisor.

3        Q.    And what role did you play?

4        A.    She would bring things to my attention for

5    guidance, and I'd actually go to HR or she'd go to HR

6    for guidance.  Same thing, our assistant director,

7    division director, I would go -- if something was

8    brought to my attention, I would go for guidance.

9        Q.    Okay.

10       A.    For that period of six months.  I just want to

11   make sure that's clear.

12

13

14

15

16

17

18

19

20

21

22

23

24

