1

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

KENNETH COLE and            )  CONFIDENTIAL
BRIGITTE L. BROWN,          )
                            )
        Plaintiffs,         )
                            )  C.A. No. 05-270 (KAJ)
v.                          )    (Consolidated)
                            )
DELAWARE TECHNICAL AND      )
COMMUNITY COLLEGE,          )
                            )
        Defendant.          )


        Deposition of SUSAN ELIZABETH ZAWISLAK,
taken pursuant to notice at the offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 3:00 p.m. on Friday, January 27, 2006,
before Ann M. Calligan, Registered Merit Reporter and
Notary Public.


APPEARANCES:

        LORI A. BREWINGTON, Esquire
        MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware  19806
            on behalf of the Plaintiffs,

        JAMES H. McMACKIN, III, Esquire
        Morris JAMES HITCHENS & WILLIAMS, LLP
            222 Delaware Avenue
            P.O. Box 2306
            Wilmington, Delaware  19899-2306
            on behalf of the Defendant.


            WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801.
            (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

COPY



**WILCOX & FETZER LTD.**
Registered Professional Reporters

2

```
 1    ALSO PRESENT:

 2              KATHERINE GEPPERT, Paralegal

 3              KENNETH COLE

 4              BRIGITTE Brown (By telephone)

 5                    - - - - -

 6              MR. McMACKIN:  Just wanted to say that, as

 7    counsel for Delaware Technical and Community College,

 8    our deponent is going to want to read and sign the

 9    transcript as well at the conclusion of this

10    deposition, and also that, at no point during this or

11    any other depositions, does the college or any of its

12    representatives intend in any way to waive the right

13    to include any of the testimony or questions as

14    content that's representative of the material that's

15    covered by the confidentiality stipulation entered

16    into by the parties on or about January 16, 2006.

17              Thank you.

18              SUSAN ELIZABETH ZAWISLAK,

19         the witness herein, having first been

20         duly sworn on oath, was examined and

21         testified as follows:

22                   EXAMINATION

23    BY MS. BREWINGTON:

24    Q.    Good afternoon, Doctor.  I have the privilege
```



1    of taking your deposition today.  I'm going to ask you

2    a series of questions, hopefully one at a time.  If,

3    for some reason, you do not understand the question,

4    just let me know and I'll go ahead and repeat it or

5    try to explain it for you.  If you do answer the

6    question, I'll assume that you understand.

7            We do have a court reporter here, and she

8    will be recording our statements today.  Please make

9    sure that your statements are audible.  For example,

10   yes and no, and not mm-hmms and uh-huhs because that

11   doesn't show up too well on the record.

12           If at any time you need to take a break,

13   just let me know and we'll go ahead and take a break.

14   The only thing that I ask is that you don't discuss

15   your testimony with your counsel.

16           MR. McMACKIN:  Just to state on the record

17   that if she does discuss it, the content of that

18   discussion would not be privileged, but we can discuss

19   it.

20   BY MS. BREWINGTON:

21      Q.   Please begin by stating your name and your

22   title.

23      A.   Susan Elizabeth Zawislak, Director of Corporate

24   and Community Programs at Delaware Technical and

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Community College, Stanton/Wilmington campus.

2        Q.    When you say Stanton and Wilmington campus,

3    does that mean that you are director of both of those

4    campuses?

5        A.    They are two campus locations.

6        Q.    Is there a director of the Owens campus

7    location?  Is Owens like a separate location?

8        A.    Yes, it is a separate location.

9        Q.    Is there a director of corporate and community

10   programs at that location?

11       A.    Yes, there is.

12       Q.    How long have you been director?

13       A.    Since July of 1998.

14       Q.    And what is your educational background

15   beginning with college?

16       A.    My undergraduate degree is from West Chester

17   State University.  My master's degree is from West

18   Chester University, and my doctorate in educational

19   leadership is from the University of Delaware.

20       Q.    And as director of corporate and community

21   programs, what are some of your general

22   responsibilities?

23       A.    I have oversight for the non-credit offerings

24   at the Stanton and Wilmington campus as well as



Susan Elizabeth Zawislak - Brewington                    5

1    contract training opportunities that occur off campus.

2    It encompasses areas as diverse as industrial

3    training, work force training, technology

4    applications, community and school projects,

5    continuing education, GED and basic education

6    programs.  It's a broad scope.

7        Q.    And does the TRIO program fall under that broad

8    scope?

9        A.    It falls under the community and school

10   projects.

11       Q.    And you're the director of corporate and

12   community programs, correct?

13       A.    Yes.

14               (Discussion off the record.)

15       Q.    Who reports directly to you?

16       A.    I have an assistant director of corporate and

17   community programs.

18       Q.    And what's her name?

19       A.    Jacquita Wright Henderson.

20       Q.    I'd like to begin today by asking you about an

21   exhibit.  I have exhibit 1.

22               MS. BREWINGTON:  I'd like to mark this as

23   Zawislak 1.

24               (Zawislak Deposition Exhibit 1 was marked



1    for identification.)

2    BY MS. BREWINGTON:

3      Q.    In your position as director of CCP, do you

4    regularly send out a newsletter?

5      A.    A newsletter had been sent during that time

6    frame.

7      Q.    My question, though, was, do you regularly send

8    out a newsletter as director of CCP?

9      A.    Not at the present time.

10     Q.    At this time, which when I say this time, I'm

11   indicating August 2002 at the top of this, was there a

12   newsletter that was generated on a regular basis?

13     A.    Yes.

14     Q.    How often was that newsletter generated?

15     A.    I don't recall.

16     Q.    So can you give me an approximation of how

17   often monthly, weekly, quarterly?

18     A.    No, I can't.

19     Q.    This document here, this is an update, is it

20   not?

21     A.    The document is called an update.

22     Q.    The document is called an update.  Okay.

23           Are you responsible for sending out this

24   exact update?  Did you send out this update?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.    It was forwarded from my e-mail address.

2      Q.    Did you draft it?

3      A.    I had -- different folks would send information

4    to me, and yes, I'm responsible for the draft and

5    review.

6      Q.    So you're responsible but you didn't

7    necessarily draft it?

8      A.    Input was provided from individuals related to

9    the different areas.

10      Q.    Now, I'm specifically looking at the second

11    paragraph.

12      A.    I wrote that.

13      Q.    Under people, you wrote that.

14            For the record, it says, "Paul Morris has

15    been promoted to special programs director."

16            You indicated that certain people provide

17    information to you for this newsletter, is that

18    correct?

19      A.    That is correct.

20      Q.    Did someone provide the information that Paul

21    Morris had been promoted to special programs director

22    to you?

23      A.    No.

24      Q.    Can you tell me why you sent out a newsletter



1    indicating that Paul Morris had been promoted to

2    special programs director?

3       A.    The word "promoted" was used incorrectly.

4       Q.    So my question was, why did you send 12 out,

5    and your response was --

6       A.    This is an update.

7       Q.    Right.  But your response was that the word

8    "promoted" was used incorrectly, is that correct?

9       A.    I don't understand your question.

10      Q.    I was just trying to understand.  I asked you a

11   question, and what I asked you was, why did you send

12   out a document indicating that Paul Morris had been

13   promoted to special programs director, and your

14   response was the word "promoted" was used incorrectly,

15   is that correct?

16      A.    That -- I did not think that was the question

17   you had asked.

18      Q.    Well, my question is, why did you send out an

19   update indicating that Paul Morris has been promoted

20   to special programs director?

21      A.    I sent out an update to inform my staff of many

22   things at -- there is an August update.  The academic

23   calendar year starts in September.  The in-service

24   programs are held in August.  This is an update that



Susan Elizabeth Zawislak - Brewington          9

1    contains many pieces of information on it.  It follows

2    a theme where we talk about people and programs,

3    proposals, policies, and procedures.

4        Q.    Well, is it fair to say that, because you

5    indicated in your August 2000 update that Paul Morris

6    had been promoted to special programs director, that

7    he, in fact, was promoted to the special programs

8    director?

9        A.    The word that I used in sending out this update

10   was the incorrect word.  The documents that all relate

11   to his reclassification was not consulted as I drafted

12   this update.  The word "promotion" was used

13   incorrectly.

14       Q.    So is it fair to say that you did not consult

15   the reclassification paperwork before you drafted this

16   August 2002 update.

17                   MR. McMACKIN:  Objection.  Foundation.

18                   MS. BREWINGTON:  You can go ahead and

19   answer.  Sorry.

20                   MR. McMACKIN:  If you know the answer, you

21   can answer.

22       A.    I did not have the reclassification report next

23   to me when this was drafted.

24       Q.    Did you have any involvement in Paul Morris's

1    reclassification?

2            MR. McMACKIN:   Objection.   Foundation

3    again.

4    Q.    You can go ahead and answer.

5    A.    I was a sign-off signature in the process of

6    the reclassification process.

7    Q.    So you were a sign-off signature in the

8    reclassification process, that's correct, right?

9    A.    That is correct.

10   Q.    So you, in fact, reviewed Paul Morris's

11   reclassification forms and approved them, is that

12   correct?

13           MR. McMACKIN:   Objection.   Foundation.

14   Q.    You can answer.

15   A.    I reviewed the documents that were provided.

16   Q.    And authorized it, signed off on it, is my

17   question.

18   A.    In my step of the process, I signed off on it.

19   Q.    So did this sign-off, this review and

20   authorization occur before or after you sent out this

21   August 2002 update indicating that Paul Morris has

22   been promoted to the special programs director?

23   A.    Could you repeat the question again?

24   Q.    Yes.   My question is -- let me take it step by



Susan Elizabeth Zawislak - Brewington          11

1    step.

2                You indicated, did you not, that you

3    reviewed and authorized his reclassification forms, is

4    that correct?

5    A.    My step of the process, it is correct.

6    Q.    My question to you, then, is, did you review

7    and authorize the reclassification forms before you

8    sent out the August 2002 update?

9    A.    Yes.

10   Q.    Then why did you indicate that Paul Morris had

11   been promoted?

12   A.    I used the word incorrectly.

13   Q.    Was the position of special programs director

14   posted?

15               MR. McMACKIN:   Objection.   Vague.

16   Q.    I'm sorry.   Was the position of special

17   programs director posted before Paul Morris received

18   the position?

19               MR. McMACKIN:   I'm going to object because

20   the question assumes that he received the position.

21   Q.    Paul Morris, in your opinion, was reclassified

22   to special programs director, is that correct?

23   A.    As result of the process of Delaware Tech, Paul

24   Morris was reclassified as special programs director.

1    Q.    So when he was reclassified as special programs

2    director, he, in fact, became special programs

3    director, is that correct?

4    A.    At the completion of the entire sign-off

5    process, Paul Morris was notified that his

6    reclassification was approved.

7    Q.    And when was that?

8    A.    I don't have the exact date.

9    Q.    Not exact.  Give me an approximate.

10   A.    July.

11   Q.    So July 2002?

12   A.    Mm-hmm.

13   Q.    Could you tell me about the reclassification

14   process?

15   A.    My part in the reclassification process is to

16   review the information that is submitted by the person

17   who is seeking reclassification.  After my review,

18   there are other steps that are taken according to our

19   human resource process.

20   Q.    And who submitted the information that you

21   reviewed with respect to Paul Morris and his

22   reclassification to special programs director?

23   A.    The request for consideration for

24   reclassification was submitted by Paul Morris.



1   Q.   And with respect to reclassification, is there

2   a requirement that an employee must be able to

3   complete the additional job duties within their

4   regular working hours?

5          MR. McMACKIN:   I'm going to object to

6   form.

7   BY MS. BREWINGTON:

8   Q.   You can answer.

9   A.   Could you repeat the question again?

10  Q.   My question is, with respect to

11  reclassification and the policy on reclassification,

12  isn't there a requirement that, in order for an

13  individual or an employee to be reclassified into

14  another position, they must be able to work those

15  additional duties of that other position within their

16  regular working hours, is that correct?

17  A.   I was not aware of that.

18  Q.   You were not aware of that, but is that true?

19  A.   Based on the information that was communicated

20  by our campus director, it has -- it has been

21  determined it is true.

22  Q.   Now, could Paul Morris work the additional job

23  duties that a special programs director requires

24  during his normal work hours?

**W&F**

1      A.    He completed those tasks required, but in order

2    to fulfill additional responsibility of his

3    position --

4      Q.    His position meaning?

5      A.    The Educational Talent Search program

6    manager --

7      Q.    Okay.

8      A.    -- functions.

9      Q.    I'm not sure I understand.

10     A.    The educational program manager functions are

11   the functions of a person who oversees one program.

12   The special programs director has the responsibility

13   not only for one program but for additional programs

14   as well of which there are separate program managers

15   for those parts of the position.  It is, again, called

16   a special programs director.

17     Q.    I'm not sure you answered my question, though.

18   My question was, prior to being reclassified, did Paul

19   Morris -- or was he able to perform those additional

20   job duties of special programs director prior to being

21   classified as special programs director within those

22   work hours?

23              MR. McMACKIN:  Objection to form.

24              I don't understand the question either.

Susan Elizabeth Zawislak - Brewington        15

1    I'm sorry.

2    BY MS. BREWINGTON:

3    Q.    All right.  I'll try this again because I

4    really want to make sure you understand the question.

5    Prior to the reclassification -- okay?  That's what we

6    are talking about -- was Paul Morris able to perform

7    the additional job duties of special programs director

8    within his regular work hours?

9    A.    The duties of a special programs director

10   include coordinating responsibilities, best practices,

11   some of the responsibilities that he did perform

12   during the work hours.

13   Q.    Is it fair to say that he was not able to

14   perform all the duties of special programs director

15   within his regular work hours?

16   A.    That is not fair to say.

17   Q.    Why not?

18   A.    Because there is a position that he had been

19   reclassified to that is called special programs

20   director, which would be a position that would be a

21   37 1/2 hour, full-time position.  Am I missing

22   something?

23          MR. McMACKIN:  Off the record for a

24   second.



1              THE WITNESS:  I don't know what I'm

2      missing.

3              (Discussion off the record.)

4      BY MS. BREWINGTON:

5        Q.    Back on the record, did Mr. Morris put in a

6      request for extra time to complete his job duties?

7        A.    His job duties that were related to the

8      Educational Talent Search program, yes.

9        Q.    So he did not put in extra time for work

10     related to the special programs director position?

11       A.    That is correct.

12       Q.    Now, so is it fair to say that he was not able

13     to perform both the special programs director position

14     and his position as program manager within his regular

15     duties?

16       A.    In the process that we were involved in, he did

17     have overtime hours to complete that.  Once the

18     reclassification was approved, he did not receive

19     additional hours.

20       Q.    But we are talking about prior to the

21     classification.

22              So prior to the -- do you want me to ask

23     the question again?

24       A.    He performed duties that were required of a



1    special programs director during the regularly

2    scheduled workday.  In order to accomplish all the

3    oversight tasks he had related to his particular

4    functions in Educational Talent Search, he put in and

5    overtime was approved for these functions.

6       Q.    So your answer is yes to my question?  I'm

7    trying to make sure that it's clear.

8               MR. McMACKIN:  Objection.

9       Q.    My question to you -- and it's yes-or-no

10   question -- was he able to perform the additional

11   duties of special programs director as well as his

12   duties as program manager within his regular work

13   schedule?

14      A.    No.

15      Q.    Thank you.

16               Were you aware that Ken Cole filed a

17   grievance with respect to Paul Morris's change in

18   position from program manager to special programs

19   director?

20      A.    What time?  Like what time frame?

21      Q.    I can give you a time frame, but that wasn't

22   the question.  The grievance was actually filed around

23   September 5th, 2002.  On September 5th, 2002.  I

24   can --



1     A.    I was aware of that grievance.

2     Q.    You were aware.

3           How did you become aware of this

4     grievance?

5     A.    There was the front page of the grievance sheet

6     with no attachments that was put in my mailbox at

7     the -- my mail bin at the Wilmington campus location.

8     Q.    Once you received the grievance, what did you

9     do?

10    A.    I can't recall the exact steps, but I knew I

11    was surprised that there were no attachments with the

12    grievance that I had received.  And I know I consulted

13    HR at that point.

14    Q.    What type of attachments should have attached

15    to the grievance?

16    A.    I just got the one front page sheet.

17    Q.    Okay.  You consulted -- off the record.

18          (Discussion off the record.)

19    BY MS. BREWINGTON:

20    Q.    Back on the record, and I don't really remember

21    where we were.  Ken Cole's grievance, September 5,

22    2002.  I think my question was, how did you respond to

23    the grievance?  And you did say you consulted HR,

24    correct?



1      A.    HR, our assistant campus director, and to

2    determine the process that I was following, HR manual.

3      Q.    Okay.

4      A.    Review the information.  I had step 1 of the

5    grievance.  That's called step 1.

6      Q.    The assistant director was Ann Del Negro?

7      A.    Yes.

8      Q.    So you consulted Ann Del Negro, and you

9    consulted human resource?

10     A.    And our assistant campus director, Connie

11   Winner.

12     Q.    And how did you respond to this grievance?

13     A.    I obviously looked at the word "promotion,"

14   recognized that it was an error in my communication to

15   the staff, went back and looked at the information

16   related to the reclassification process, and

17   communicated that information related to the

18   reclassification process in the response of my

19   grievance that there was not a promotion.  It's not a

20   separate position.  It was erroneously stated in my

21   update the word "promotion."  And that I sent out

22   information to the staff in an update correcting the

23   mistake.

24     Q.    So would it be fair to say that you sent out a



Susan Elizabeth Zawislak - Brewington          20

1  revision of the August 2002 update indicating that

2  Paul Morris received a promotion?

3     A.   Yes.

4     Q.   And are you aware that you sent out this update

5  four days after Ken Cole filed a grievance?

6     A.   I'm aware that this was brought to my attention

7  that the word "promotion" was used, and I reviewed my

8  information and indicated that it was a

9  reclassification.  That's what the process was.  And I

10 had used the wrong word.

11    Q.   Didn't you send this memo out to the CCP staff

12 informing them of the revision because of Ken Cole's

13 grievance?

14    A.   I sent it out because it was brought to my

15 attention through documentation that the word

16 "promotion" was used in something I had sent out, and

17 that was, in my review, was not the correct word.

18    Q.   And isn't it fair to say that it was brought to

19 your attention because of Ken Cole's grievance?

20    A.   Yes.

21         MS. BREWINGTON:  I'd actually like to mark

22 this as an exhibit.  It is 3.  And it's --

23         MR. McMACKIN:  It's marked as exhibit 2,

24 though, right?



1           MS. BREWINGTON:  This will be exhibit 2.

2           (Zawislak Deposition Exhibit 2 was marked

3   for identification.)

4   BY MS. BREWINGTON:

5     Q.   Dr. Zawislak, is this the memo that you sent

6   out to the CCP staff?

7     A.   Yes.

8           MS. BREWINGTON:  The next exhibit I'd like

9   to mark this as 3.

10           (Zawislak Deposition Exhibit 3 was marked

11   for identification.)

12   BY MS. BREWINGTON:

13     Q.   The document that you have in front of you, it

14   is to Jackie Jenkins, director of human resources, and

15   it's from Lawrence Miller, vice-president and campus

16   director, and the subject is rescission of

17   reclassification of Paul Morris, and it's dated

18   October 29, 2002, is that correct?

19     A.   Yes, it is.

20     Q.   Effective December 1st, 2002, Paul Morris will

21   be returned to his position of program manager and

22   removed from the position of special projects

23   director.

24           My question is, why did Lawrence Miller



1    send out this rescission of reclassification?

2    A.    The second step in our grievance process is to

3    appeal it to the next level of responsibility in the

4    organization.

5    Q.    So it went through you, and what happened as a

6    result?

7    A.    The second level of our grievance process was

8    followed.

9    Q.    So does that mean that nothing changed as far

10   as the reclassification -- I mean, not the

11   reclassification.  His position as special programs

12   director remained in play or the way it was after

13   Ken's grievance was filed with you?

14              MR. McMACKIN:  I'm going to object to the

15   form.  You can answer if you can answer.

16   A.    It stayed -- did not revert at the end of

17   level 1.  Level 1 is the first step in our process.

18   Q.    And that's why it went to level 2, is that

19   correct?

20   A.    Ken filed level 2.

21   Q.    Ken filed level 2, and level 2 is with Lawrence

22   Miller?

23   A.    Yes.

24   Q.    I'm sorry.  I did interrupt you.  You were



1   explaining to me why Lawrence Miller rescinded this

2   reclassification.

3       A.    He has responsibility in the second level of a

4   grievance process to conduct a more exhaustive

5   investigation.

6       Q.    What's your understanding of why he rescinded

7   the reclassification?

8       A.    My understanding of that --

9       Q.    Mm-hmm.

10      A.    -- is that, on the reclassification request,

11  Paul submitted all the duties and responsibilities

12  that he had been performing.  Nowhere on the

13  reclassification request paperwork did it say, are you

14  doing this as part of your regular work load or in

15  overtime?  When the HR director reviewed and met with

16  Paul, it was communicated, as I communicated to you,

17  that he performed the duties of the special

18  programs -- projects director during the regular

19  workday, but he did have extra compensation for

20  completing other duties.  At that point it was

21  determined that the reclassification should be

22  rescinded.

23      Q.    As I understand it -- and please correct me if

24  I'm wrong -- in your opinion Lawrence Miller was able

1   to do a more extensive research on the issue of Ken

2   Cole's grievance, is that correct?

3       A.    There are levels in our process where further

4   investigation is done.

5       Q.    Okay.

6       A.    He is at the next level in the process.

7       Q.    So my question is, was he able to do a more

8   extensive review of this situation than you?

9       A.    Was he able?  He did.

10      Q.    He did.  Okay.

11            And who signed off on Paul Morris's

12   additional hours?

13      A.    At the time --

14            MR. McMACKIN:  Objection.  Vague.

15      Q.    Go ahead.

16      A.    When Ann Del Negro moved into another position

17   at the campus, there were several individuals who had

18   extra hours added to their responsibilities, and that

19   was overtime hours, and overtime hours are approved by

20   the division director.

21      Q.    So who was the division director that signed

22   off on Paul Morris's extra time?

23      A.    I was.

24      Q.    Okay.



Susan Elizabeth Zawislak - Brewington        25

1     A.    The assistant director --

2     Q.    Well, assistant director or --

3     A.    Signed the time sheets.

4     Q.    The assistant director signed the time sheets.

5     A.    Signed the time sheets, yes.

6     Q.    And the assistant director at that time was

7     who?

8     A.    Ann Del Negro.

9     Q.    Do these time sheets ever come to you after the

10    assistant reviews them or signs off on them?

11    A.    No.  No.

12    Q.    When Paul Morris changed positions from program

13    manager to special programs director, why wasn't the

14    position of special programs director posted?

15    A.    Special programs require funding streams.

16    Funding streams must be available to support the

17    entire position in its entirety.  Therefore, if you're

18    managing more than one program, you have funding

19    streams from several programs.

20    Q.    Okay.  I don't understand.  I mean, my question

21    was, why wasn't the position of special programs

22    director posted?  And as I understand it, your

23    response is because there's different funding streams.

24    A.    Exactly.  That in order for a special projects



1    director position to be posted, as a posted separate

2    position, there would need to be funds established in

3    many grants in order to support the funds required to

4    pay that salary.  Special funds positions, are

5    supported by identified funding streams.

6        Q.    So, as I understand it, the reason why the

7    special programs director position was not posted was

8    because of the funding streams, am I correct?

9        A.    No.

10       Q.    Explain it to me again.

11       A.    A separate position that would have to have an

12   accountability for programs that were already funded.

13   A special projects director position was in charge of

14   looking at things as they relate across many of the

15   different programs with the different grants totally

16   funding that position.

17       Q.    Is it fair to say that the reason why it wasn't

18   posted is because of funding?

19       A.    There was no funding allocated to a separate

20   position for special projects director.

21                (Pages 27, et seq., are under seal without

22   the seal request ending.)

23

24



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    BY MS. BREWINGTON:

2        Q.    When Paul Morris was reclassified, didn't he

3    move from grade 16 to grade 17?

4                MR. McMACKIN:   I'm going to ask that the

5    answer be kept under seal.

6        A.    Yes.

7        Q.    Doesn't a person or an employee in grade 17

8    receive more money or more of a salary --

9        A.    Yes.

10       Q.    -- than grade 16?

11       A.    Yes.

12               MR. McMACKIN:   Like the last deposition,

13    we'll just go through, just put it on the record.

14    We'll figure out what is confidential or stipulate.

15    We are just making mention of it so we don't lose the

16    place.

17               MS. BREWINGTON:   All right.   You want

18    to --

19               MR. McMACKIN:   So we don't have to tell

20    her when to stop.

21               MS. BREWINGTON:   Okay.   I see what you're

22    saying.

23               MR. McMACKIN:   As we did last time.

24



1    BY MS. BREWINGTON:

2       Q.    The fact that this position wasn't posted,

3    isn't that a violation of Del Tech's transfer and

4    promotion policy?

5                    MR. McMACKIN:    Objection.    Foundation.

6       A.    It was a reclassification, which is part of

7    Delaware Tech's policy.

8       Q.    Are there special programs directors at other

9    campuses?

10      A.    At that time, yes.

11      Q.    Do you know whether their positions were

12   posted?

13      A.    No, I do not.

14      Q.    Where exactly in the policy manual is the

15   reclassification policy?

16                   MR. McMACKIN:    Object on foundation again.

17      A.    I cannot say that information comes from the HR

18   department to the campus at the time the

19   reclassification process is on the schedule.    I

20   believe it is every April information comes out in a

21   document to employees, to supervisors to basically

22   give them that information of what the process is.

23      Q.    But this wasn't a reclassification because it

24   was rescinded, correct?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1            MR. McMACKIN:  Objection.  Argumentative.

2       A.   Again, you know, I said in a memo dated --

3    issued by Karen Stone, this is what a reclassification

4    review was.  And this is what came out from Karen

5    Stone, vice-president for human resources, that I

6    cited in my exhibit 2.

7       Q.   Dr. Zawislak, whose decision was it to move the

8    Upward Bound Math and Science program?

9            MR. McMACKIN:  Objection.  Vague.

10   BY MS. BREWINGTON:

11      Q.   Whose decision was it to move the Upward Bound

12   Math and Science program from where they were

13   originally located to room 408?

14      A.   Okay.  There is a campus college vision to

15   utilize space in the most conducive process that we

16   can group programs together.  It was communicated

17   every year since I've been there that each year we

18   reexamine our available space to determine how it can

19   be used most effectively for the division functions.

20   The individuals responsible for program oversight of a

21   particular area make recommendations and --

22      Q.   Can you repeat that last part?

23      A.   For example, if --

24      Q.   You mentioned a certain position.

Susan Elizabeth Zawislak - Brewington          30

1    A.    If the position -- like, for example, at the

2    Stanton campus, I have our industrial training

3    division.

4    Q.    Okay.

5    A.    Okay.   There is an administrative group of

6    folks that work with that area at the Wilmington

7    campus.   Ann Del Negro was my assistant director, and

8    she worked with Paul Morris as the special projects

9    director and with the program managers and had

10   knowledge of the space restrictions, requirements,

11   what have you at the Wilmington campus.   And when a

12   program was downsized, basically a recommendation was

13   made to me that this would be a good utilization of

14   space.

15   Q.    The recommendation was made to you that it

16   would be a good utilization of space?

17   A.    That we had four people -- or actually it was

18   three people in one room, and one person in that

19   office.   If it's A or B -- you know, you see different

20   things in the documents.   I'm sure you noted that.

21   That there -- and at that point, there were two people

22   who were downsized.

23   Q.    We'll get to that.   Who made the recommendation

24   to that?



1    A.    My assistant director.

2    Q.    So when Ann Del Negro made the recommendation

3    to you, what did she say to you?

4    A.    What move are we referring to?

5    Q.    I'm sorry.

6    A.    Time frame.

7    Q.    Moving Upward Bound Math and Science to room

8    408?

9    A.    To room 408?

10    Q.    In and around 2002.

11    A.    Okay.

12    Q.    You mentioned that Ann Del Negro made the

13    recommendation to you --

14    A.    To me.

15    Q.    -- for the move.  Was this in a meeting?

16    A.    We -- as my assistant director, I talked to her

17    every day.  It wasn't a formal meeting that other

18    folks were present.

19    Q.    What exactly did she say to you?

20    A.    You have a program.  There we have space.

21    Let's --

22         MR. McMACKIN:  Lori, can you clarify, this

23    line of questioning deals with the actual move to 408,

24    not any proposed moves?  Is that what you're referring

1    to in this line of questioning?

2             MS. BREWINGTON:  I don't know what the

3    difference is.  The proposed move, an actual move,

4    seems to me the same thing.

5    BY MS. BREWINGTON:

6      Q.   My question is, who made the recommendation to

7    move?

8      A.   Why don't you give a time frame then?

9      Q.   I did.

10            MR. McMACKIN:  My understanding is that

11    there was a proposed move in 2001.

12            MS. BREWINGTON:  Okay.  I mentioned 2002.

13            MR. McMACKIN:  And there was talk of the

14    move beginning in, I think, June of 2002 all the way

15    up until the actual move.

16            MS. BREWINGTON:  And that's what I'm

17    referring to.

18            MR. McMACKIN:  I just wanted to see --

19            MS. BREWINGTON:  When you say proposed

20    move, you mean 2001.

21            MR. McMACKIN:  No.  I don't know.  I don't

22    mean -- I'm just asking because there was a proposed

23    move, and from what I understand -- I don't want to

24    provide testimony here.  I just want to clarify it

1   because you're asking the deponent about

2   conversations, and if they occurred, you know, in 2001

3   or they occurred in early summer 2002 or early fall

4   2002.  You are dealing with three different things.

5   BY MS. BREWINGTON:

6      Q.   We were talking about the recommendation and

7   you indicated that it was Ann Del Negro's

8   recommendation to you, not necessarily in a meeting,

9   but at some point?

10     A.   Right.  Just in talking, yeah.

11     Q.   And you also mentioned that it was the campus

12  college vision to utilize the space in the most

13  conducive way, is that correct?

14     A.   The exact words I don't have in front of me.

15     Q.   But is that generally --

16     A.   That we reexamine the office space for the best

17  effective functioning of the division or however it is

18  said to be done.

19             MR. McMACKIN:  Object to the form.

20             MS. BREWINGTON:  We may need to take a

21  break.  Can we go off the record?

22             (Pause.)

23  BY MS. BREWINGTON:

24     Q.   Dr. Zawislak, you mentioned earlier -- correct



1    me if I'm wrong -- that funding was part of the reason

2    why this special programs director position was not

3    posted, is that correct?

4        A.   Yes.

5        Q.   I'm quite confused, and I hope you can explain

6    this to me that, if there are no moneys in the budget

7    for posting, why are there moneys in the budget for

8    reclassification?

9             MR. McMACKIN:  Objection.  Argumentative.

10       A.   The budget money has nothing to do with the

11   process of posting or reclassification.  The special

12   projects director, to be posted as an entirely

13   distinct position with a different number -- in order

14   for a position to be created, we need to complete

15   paperwork that indicates that there are grant sources

16   to fund an entire new posted position.

17       Q.   So, as a follow-up, where did the money come

18   from to pay Paul Morris's salary as special programs

19   director?

20       A.   The majority of the money would come from the

21   position functions of educational programs manager

22   that he previously had because the role of the special

23   projects director assumes that you have management

24   oversight for one program plus additional oversight



1    for other programs.

2        Q.    Okay.    So --

3        A.    The -- confidentially, I guess, the salary

4    difference is a couple thousand dollars a year as

5    opposed to a new separate distinct position with

6    salary and benefits probably be in over $65,000.

7        Q.    Okay.    Let me go back.    So the majority of the

8    money came from his position as program manager, is

9    that correct?

10       A.    The funding for the position, yes.

11       Q.    And that's from the grant, is that correct?

12       A.    That's how the grants are written, yes.

13       Q.    So the grant allowed for him to pay the

14   majority of his salary through the grant?

15       A.    All special funded positions --

16               MR. McMACKIN:    Objection.    Form.

17       A.    -- are paid by grants.

18       Q.    You mentioned that the majority was through the

19   grant, correct?

20       A.    Mm-hmm.

21       Q.    What was the rest through?

22       A.    Through other grants.

23       Q.    Other grants?

24       A.    Other grants that you oversee have different

Susan Elizabeth Zawislak - Brewington          36

1   fund lines.  So one program has one fund line.

2   Another program has another fund line.  We have one

3   program that you would look at, on paper it has four

4   fund lines.  It's the challenge of managing programs

5   that are not established positions funded through the

6   State of Delaware.  They are funded through special

7   grants.

8            MS. BREWINGTON:  I'd like to go to my next

9   exhibit.  I think we are on exhibit 4.

10           (Zawislak Deposition Exhibit 4 was marked

11   for identification.)

12           MR. McMACKIN:  I'm going to say for the

13   record, this isn't the entire grant; it's just a part

14   of it.

15           THE WITNESS:  This is the achievement

16   report.

17           MR. McMACKIN:  I'm sorry.  Achievement,

18   not grant.

19   BY MS. BREWINGTON:

20   Q.   Could you tell me what this document is?

21   A.    This is the achievement report that I had

22   compiled in FY99 that was based on my goals and

23   objectives as part of my operational plan in 1998.

24   So, in other words, every year we have an operational

Susan Elizabeth Zawislak - Brewington          37

1     plan, and then we evaluate what we had done in that

2     plan, and we report back to the college community

3     based on, you know, what goals and objectives we have

4     that this is an open, you know, achievement report of

5     the college.

6         Q.    And you mentioned --

7         A.    Page 42, 43.

8         Q.    And you mentioned, did you not, that you

9     regularly or annually review or reexamine existing

10    office space, is that correct?

11        A.    Yes.

12        Q.    Objective 2 states, "We examine existing office

13    space and reallocate where appropriate," is that

14    correct?

15        A.    That's the objective that was stated in the

16    achievement report of 1999.

17        Q.    So is it fair to say that you not only have to

18    reexamine the existing office spaces, but you have to

19    reallocate where it's appropriate --

20              MR. McMACKIN:    Objection.    Compound.

21        Q.    -- to reallocate?

22        A.    In this achievement report, this is the

23    objective that is listed.

24        Q.    And this objective was written by you?



1      A.    And the division.

2            MR. McMACKIN:   Objection to form.

3      A.    The division, and you know, it's submitted to

4      the campus director.  And this is in 1998.

5      Q.    Okay.   It's in 1998 or 1999?

6      A.    The report is issued in 1999 for what had

7      happened from the time I was in this position to that

8      report.  Every year our plans go into place to say,

9      you're starting a new fiscal year, July.  You're

10     starting a new academic year, August.  And we have to

11     report back to the college community in May or June of

12     the next year of the accountability.  What did you say

13     you were going to do?  And how was it done?  At this

14     point in time was 1998, 1999.

15     Q.    Is it fair to say that one of the visions of

16     the program is to continue to, even to this day,

17     reexamine existing office spaces?

18           MR. McMACKIN:   Vague.

19     A.    Every year in the operational plan, there is

20     wording that would -- may differ from document to

21     document, but that looks at the whole concept of

22     programs that are funded or non-funded, programs that

23     grow, programs that expand, programs that, because of

24     the needs of the community, need more space, and

1    programs that do not, that are downsized, programs

2    that hire supplemental people, positions that become

3    available on a temporary basis, you know.

4        Q.    Is it fair to say that, in accordance with the

5    achievement report of 1999, that you are to reallocate

6    where appropriate?

7        A.    In 1999 that is what I reported.  Some

8    background information.  Delaware Technical and

9    Community College, as you know -- I hope you know.

10   You're in Wilmington, right? -- is a dynamic, growing

11   institution.  And we were fortunate to be able to add

12   that new building, and that new building actually,

13   before that time -- before this became available that

14   we could even move people around, there were two and

15   three people in one small office from various

16   programs, on different levels, on different floors, in

17   different buildings.

18            MR. McMACKIN:  I'm going to caution the

19   witness to only answer the question that's asked.

20   BY MS. BREWINGTON:

21       Q.    In defendant's answers to interrogatories, you

22   cited this report as your vision to relocate -- to

23   reallocate.  I'm sorry.  I'll repeat question.

24            MR. McMACKIN:  Do you want to show the

1    interrogatories?

2            (Pause.)

3    BY MS. BREWINGTON:

4    Q.    I'll represent to you that on defendant's

5    answers to interrogatories you cited this report as

6    your vision to reallocate.  Was this the last fiscal

7    year it was your goal?

8            MR. McMACKIN:   Objection.  Foundation.

9    The question is vague.  And it may mischaracterize.

10   The document is not being presented, what the

11   interrogatory response was.  And further, it also

12   implies that it was Dr. Zawislak's decision.

13           But to the extent you can answer, you can

14   answer.

15   A.    When I was hired in the position in July of

16   1998, there were books all over in different offices

17   because the greatest challenge that we have is

18   programs are added, programs are taken away.  The goal

19   that was communicated to the campus community -- the

20   college community that was -- the campus in general --

21   you know, it's however we're going to best use the

22   space that we have.  Everybody to this day still looks

23   at adding -- you know, how do we add classrooms?  How

24   do we serve more students?  How do we really look at



Susan Elizabeth Zawislak - Brewington        41

1    being able to serve our community.

2        Q.   So this was the goal in 1999, correct?

3            MR. McMACKIN:  Objection.  Foundation.

4        A.   It was stated as an objective under goal, under

5    college effectiveness.

6        Q.   Was it a goal in 2000?

7            MR. McMACKIN:  Same objection.

8            MS. BREWINGTON.  Okay.  Your objections

9    are noted.  We can have a long-standing objection for

10   foundation.

11           MR. McMACKIN:  Well, no, I am not talking

12   about the interrogatories, the lack of

13   interrogatories.  This particular time you're

14   referring to the year 2002 report, or what are you

15   referring to?

16           MS. BREWINGTON:  No.  I'm not.  I'm asking

17   if it was the goal in 2000.

18   BY MS. BREWINGTON:

19       Q.   The same goal that was in 1999 that we just

20   talked about was a goal in 2000?

21       A.   I don't know if the exact words are.  That

22   information is part of documents that show our

23   achievement reports every year.

24       Q.   Did you produce other achievement reports to us

Susan Elizabeth Zawislak - Brewington          42

1    besides the 1999 achievement report?

2       A.    Yes.

3       Q.    What fiscal year reports did you present?

4       A.    I don't know, but there was a whole series to

5    show that.  This is not a one-time thing.

6       Q.    Okay.  That's fine.

7       A.    And it was information that was provided.

8       Q.    So is it fair to say, from 1999 to present,

9    there are fiscal year reports?

10      A.    There are achievement reports.

11      Q.    From 1999 to the present?

12      A.    I would assume.  I can't answer that I --

13   there's the achievement reports.  I don't know if

14   every single one is in there.  I mean, they were

15   produced.  I don't have it in front of me.

16      Q.    Do they exist?

17      A.    Oh, yeah.

18      Q.    Okay.

19      A.    Oh, yeah.  At the campus these are -- they are

20   a big thing, every year you say what are you going to

21   do and --

22      Q.    I see?

23      A.    -- and how did you achieve it?  This is a

24   campus plan.

1    Q.    If I can turn your attention to another

2    exhibit, I'm not sure it's dated. Maybe it is. It's

3    dated at the top August 14th, 2002. If you could take

4    the time to review this.

5              (Zawislak Deposition Exhibit 5 was marked

6    for identification.)

7    BY MS. BREWINGTON:

8    Q.    Have you had an opportunity to review it?

9    A.    Yes.

10   Q.    Are you familiar with this document?

11   A.    Yes.

12   Q.    It's a memo, is it not, from Brigitte Brown,

13   Kenneth Cole, and Elizabeth Wilson to Ann Del Negro

14   and yourself?

15   A.    It was an e-mail.

16   Q.    An e-mail. Excuse me.

17             It also ccs Paul Morris and  REDACTED

18   REDACTED , correct?

19   A.    Yes, it did.

20   Q.    Did you meet with the Upward Bound Math and

21   Science after this e-mail was sent?

22             MR. McMACKIN:  Objection.  Vague.

23   A.    Could I comment on this?

24   Q.    You can answer my question. Did you meet with

1    them?

2      A.    I met with individuals in the Upward Bound Math

3    and Science program.

4      Q.    Who did you meet with?

5              MR. McMACKIN:  Objection.  Vague.

6              We retract the objection.

7      A.    I met with program manager    REDACTED          ,

8    Paul Morris, and Ann Del Negro in a meeting.

9      Q.    After this e-mail was sent, you met with REDACTED

10    REDACTED  and Ann Del Negro?

11     A.    And Paul Morris.

12     Q.    And Paul Morris?

13     A.    At a meeting following another meeting.  So

14    when you say after, could you give me a time frame?

15     Q.    Okay.  I can.  Did you meet individually or

16    together -- or let me ask you this.  Did you meet with

17    Ken Cole, Brigitte Brown, and Liz Wilson?

18     A.    I met with them in individual meetings after a

19    series of other meetings had occurred.  Not right

20    after this e-mail was received.

21     Q.    Okay.  You said you had individual meetings

22    with the members of the Upward Bound Math and Science,

23    correct?

24     A.    Yes, I did.



1      Q.    Why were these meetings individually held as

2   opposed to held in a group?

3      A.    There already had been group meetings that had

4   been held prior to the meeting with me.

5                MR. McMACKIN:   Objection to form.

6      Q.    So your reason for not meeting with the group

7   is because they had met with the group -- you had met

8   with the group previously?  Had you met with the group

9   previously?  I'm sorry.

10     A.    No.

11               MR. McMACKIN:   Can you rephrase that

12  question?

13  BY MS. BREWINGTON:

14     Q.    My question, had you met with the group

15  previously?

16     A.    No, I had not met with the group previously.

17     Q.    As I understand it, your reason for not meeting

18  with the group previously is because other people have

19  met with the group?

20     A.    In following a process, there are numerous

21  steps one takes.  This e-mail, which would never have

22  gotten to me if this was the document because my name

23  is spelled incorrectly -- if you would have sent an

24  e-mail, which that is how I got the information, it

1    would have kicked back with the name spelled like

2    this.  Okay?  But I received this.  I was on vacation

3    on this date.

4        Q.   Okay.

5        A.   Annual leave vacation.  The next day when I

6    came in, the direct supervisor of these individuals

7    was on annual leave.  The next day was our in-service

8    program.  That's a mandatory campus program where we

9    are in meetings all day.

10            The next day the supervisor of these

11   individuals was on vacation.  I did not, in our

12   protocol, respond to an e-mail that was sent to me

13   without first speaking to my assistant director or

14   their director related to this topic.

15       Q.   Okay.  So is it fair to say that the protocol

16   is you speaking with Ann Del Negro and Paul Morris and

17   REDACTED          ?

18       A.   Or even with --

19       Q.   Are you saying that you did or did you not

20   receive this e-mail?  I don't understand.

21       A.   I received this e-mail.

22       Q.   But you didn't receive it through your e-mail,

23   is that correct?

24       A.   No.  I received an e-mail.



Susan Elizabeth Zawislak - Brewington        47

1    Q.    Is this the e-mail that you received?

2    A.    It -- I cannot say that.  It doesn't say --

3    this isn't a copy of the e-mail.  You know, when it

4    says, to, e-mail from blah, blah, blah.  This is not a

5    copy of the e-mail.  I did not receive a memo.  I

6    received an e-mail.

7            MR. McMACKIN:  I just want to state on the

8    record that this document is not Bates stamped.

9    Q.    Do the contents of this memo accurately reflect

10   the contents of the e-mail that you received?

11   A.    Yes, it does.

12   Q.    And going back to my question to you -- and I

13   want to understand your answer -- why did you meet

14   with the individuals of Upward Bound Math and Science

15   separately as opposed to in a group?

16           MR. McMACKIN:  Asked and answered.  You

17   can answer it to the extent that you know the answer.

18   A.    There were numerous steps taken before any

19   meetings that involved me occurred with these staff

20   members.

21   Q.    And when you say numerous steps, do you mean

22   the fact that the Upward Bound Math and Science

23   program had met as a group with Paul Morris and Ann

24   Del Negro?



1     A.    That is one meeting.

2     Q.    So it was your decision to address the group

3     individually because they had already been in group

4     meeting.

5              MR. McMACKIN:   Object to form.

6     A.    The other meeting that isn't noted in this

7     sequence is the meeting with  REDACTED    , Paul,

8     Ann, and myself.

9     Q.    What was the benefit of having an individual

10    meeting with each Upward Bound member?

11    A.    I consulted with our assistant campus director

12    and determined that there was a group meeting.  All

13    the information was provided.  There were -- I had

14    received -- I don't know what you want to say -- a

15    handout that was provided at that meeting, which was

16    what the topic of that meeting was.  My assistant

17    director, who is an administrator at the college, made

18    the recommendation to me to go, you know, go on with

19    the move.  Basically we wanted to gather more

20    information.  Individual meeting would allow

21    individuals to communicate their perspective.

22    Q.    Wouldn't group meetings allow for individuals

23    to communicate their perspective?

24    A.    That had already occurred.



Susan Elizabeth Zawislak - Brewington          49

1              MR. McMACKIN:  Objection.

2      Q.    But my question is, wouldn't group meetings

3   allow for the Upward Bound management members to

4   address their individual concerns?

5              MR. McMACKIN:  Objection.  Argumentative.

6   Not objection.  Sorry.

7      A.    They met with my assistant director.

8              MS. BREWINGTON:  Can you instruct her to

9   answer the question, please?

10             MR. McMACKIN:  I'm not going to object.

11  Asked and answered.  Again, just so I can understand

12  it too.

13  BY MS. BREWINGTON:

14     Q.    I don't know what my question was.  Would group

15  meetings allow the members of the Upward Bound Math

16  and Science program to express their individual

17  opinions?

18             MR. McMACKIN:  Objection.  Calls for

19  speculation.

20     A.    Group and individual meetings would allow

21  individuals to provide that information, both options

22  would.

23     Q.    Okay.  Thank you.

24             Who did you meet with first?

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

1    A.    The program supervisor.

2    Q.    No.   Let me clarify.   Out of Brigitte Brown,

3    Liz Wilson, Ken Cole, who did you meet with first?

4    A.    It was either Brigitte or Liz.

5    Q.    I'll represent to you that you met with

6    Brigitte Brown on September 5th, 2002, which was the

7    first meeting.   My question is, what occurred during

8    that meeting?

9              MR. McMACKIN:   Objection.   Foundation.

10   A.    Just trying to get information about the

11   perspectives related to the move.

12   Q.    Who was involved in that meeting?

13   A.    Ann Del Negro and myself.

14   Q.    It was Ann Del Negro and you and Brigitte

15   Brown?

16   A.    Mm-hmm.

17   Q.    Where was the meeting held?

18   A.    In my office.

19   Q.    What did you say?

20   A.    I don't recall.

21   Q.    Do you recall anything that you said in that

22   meeting?

23   A.    We talked about the space and the fact that the

24   space belongs to the college, that the college is

1    dynamic and changing.  I remember Brigitte saying that

2    they didn't object to moving, just where they were

3    moving.

4      Q.   Did she say why she objected to where she was

5    moving?

6      A.   I don't recall.

7      Q.   You don't recall her indicating that she felt

8    like she was being treated unfairly?

9            MR. McMACKIN:  Objection to form.

10     A.   In terms of her then clarifying that, if she

11   would have said that -- I don't recall the answer, how

12   she was being treated unfairly.

13     Q.   I'm just trying to understand.

14     A.   Yeah.

15     Q.   You recall her saying that she was treated

16   unfairly?

17     A.   That not what I said.  That's what you said.

18     Q.   I'm asking.  So you don't recall her saying she

19   was untreated unfairly?

20     A.   I know that she was -- she expressed discontent

21   about the move.

22     Q.   Do you recall her saying that she felt like she

23   was being treated unequally?

24     A.   I don't know.  Her, herself?  No.  Not her

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

1   herself.

2       Q.   You don't recall her saying that?

3       A.   I don't recall her saying that she herself was

4   treated unequally.

5       Q.   Do you recall her saying that she felt that

6   there were other reasons for the move?

7       A.   I recall her saying that.

8       Q.   Did you follow up with her and ask her what

9   other reasons?

10      A.   She indicated other reasons.

11      Q.   And what were those other reasons?

12      A.   She indicated that it would be -- there were

13  things to do about other programs, and this would be,

14  I guess, kind of confidential, kind of --

15      Q.   You can answer.

16      A.   We are talking about other programs than the

17  programs that we're talking about.

18      Q.   So Brigitte Brown mentioned that she felt that

19  there were other reasons for the move, is that

20  correct?

21      A.   That is what she had said.

22      Q.   What other reasons did Brigitte Brown indicate?

23      A.   That it was due to another program and issues

24  dealing with another program.



Susan Elizabeth Zawislak - Brewington          53

1              (Pages 54, *et seq.*, are under seal without

2        the seal request ending.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    BY MS. BREWINGTON:

2       Q.    What other program and what other issue?

3             MR. McMACKIN:   Let's go confidential here,

4    please.

5       A.    And it is confidential because basically --

6       Q.    I completely understand.

7       A.    When we were talking with individuals and

8    saying that, oh, there is something else going on in

9    this area, that's the reason why they want us to move,

10   and we are working with staff and there are staff

11   that -- it was observed by those individuals that

12   there was tension between those staff, those staff

13   members.

14      Q.    Who are you talking about?  Please provide me

15   names.

16      A.    Kate Sullivan and Tonia.

17      Q.    And what color is Kate Sullivan?  What race?

18   Excuse me.

19      A.    She's Caucasian.

20      Q.    And what race is Tonia Conley?

21      A.    She's African American.

22      Q.    Did Tonia Conley ever file a grievance against

23   Kate Sullivan?

24      A.    To my knowledge, a formal grievance was not



1    submitted.

2       Q.   Was an informal grievance submitted?

3       A.   I am not aware of any details related to that

4    particular thing.  I know that there was definitely

5    tension.

6       Q.   Are you aware if there was any informal

7    grievance?

8       A.   There was talk of a grievance.  I can't say I

9    recall there was a grievance, you know.

10              MR. McMACKIN:  Object to that question as

11   vague because I don't know what "informal grievance"

12   is.

13              MS. BREWINGTON:  I'm using the term that

14   she used.

15      A.   I mean, there's no formal grievance.  There was

16   no formal grievance.

17      Q.   Okay.

18      A.   So that's the answer:  There's no formal

19   grievance.

20      Q.   And you are aware of issues, are you not?  You

21   are aware of issues between Tonia Conley and Kate

22   Sullivan, is that correct?

23      A.   Confidentially speaking, yes.

24      Q.   What issues were you aware of?

Susan Elizabeth Zawislak - Brewington          56

1    A.   Issues that were brought to my attention by my

2    assistant director, Ann Del Negro, who was their

3    direct supervisor, who was working with them on

4    performance-related issues.

5    Q.   What issues?  I'm not asking who brought them.

6    Just what are the issues?

7    A.   Accountability.

8    Q.   Accountability of who?

9    A.   Tonia.

10        Work style differences between Kate and

11   Tonia.  And -- okay.

12   Q.   Tonia Conley reported to Kate Sullivan?

13   A.   Yes.

14        MR. McMACKIN:  Objection to form.

15   Q.   Is that true?  Is that correct?

16   A.   Sure.

17   Q.   How did you address Brigitte Brown's concerns

18   that she felt that there were other issues with

19   respect to the move?

20   A.   We said that there's confidential issues, can't

21   be discussed.  We can't discuss other programs.

22   Q.   And that's how you handled that situation?

23   A.   With Brigitte, yes.

24   Q.   Did you look into whether the issues with Tonia



Susan Elizabeth Zawislak - Brewington          57

1   Conley and Kate Sullivan may have sparked the reason

2   for this move?

3      A.   Their issues occurred well before any

4   downsizing of any program and any move.

5           MR. McMACKIN:   Object to that question on

6   foundation.

7      Q.   Is it fair to say that the issues between Tonia

8   and Kate impacted the move in some respect?

9      A.   No.

10     Q.   And do you recall meeting individually with Ken

11  Cole?

12     A.   Yes, I do.   And Ann Del Negro and Cara Stanard.

13     Q.   Okay.   Thank you.

14           So in that individual meeting with Ken

15  Cole you also met with Ann Del Negro and Cara Stanard?

16     A.   Cara Stanard was there at Ken Cole's request.

17     Q.   Who is Cara Stanard?

18     A.   She's a HR representative.   I don't know her

19  title.

20     Q.   You met with Brigitte on September 5th, 2002,

21  correct?

22     A.   Mm-hmm.

23     Q.   When did you meet with Ken Cole?

24     A.   Do you have the date I met with Liz?

1     Q.   I don't.

2     A.   Okay.  Because we met with Brigitte.  We met

3     with Liz.

4     Q.   The next day you met with Liz?

5     A.   I believe it was the next day.

6     Q.   So shortly after the meeting with Brigitte

7     Brown that you met with Ken Cole, is that correct?

8     A.   There was probably a weekend in there, and I

9     believe that there was a request for a continuation of

10    a meeting with Ken Cole that occurred, I believe,

11    prior to the weekend and after the weekend.  So I met

12    with Ken Cole and Cara Stanard and Ann Del Negro.

13    Q.   On two occasions?

14    A.   On two occasions because Ken felt that he did

15    not get his concerns heard on the first meeting.

16    Q.   Well, within those two meetings, did Ken Cole

17    express to you his concerns about being treated

18    unequally because of the move?

19              MR. McMACKIN:  Objection.  Vague.

20    A.   He did not say that related to himself.

21    Q.   Did he say it related to anything or anyone?

22    A.   Maybe the program.

23    Q.   You recall, do you not -- I'm asking.  I don't

24    want to be argumentative.



Susan Elizabeth Zawislak - Brewington                59

1    A.    Okay.    Yeah.

2    Q.    Do you recall him indicating that he felt that

3    the program, Upward Bound Math and Science, was being

4    treated unfairly?

5    A.    Or differently.    I don't recall the exact word.

6    Q.    So it was --

7    A.    I think it was -- he wrote a document where he

8    put something in there.    So I don't know his exact

9    words.

10    Q.    You don't know what he expressed to you during

11    the meeting?

12    A.    I don't recall.

13    Q.    So is it fair to say that this may have been

14    unequally?

15         MR. McMACKIN:    Calls for speculation.

16    Objection.

17    A.    Differently.

18    Q.    Is it fair to say, it might have been that he

19    said he felt the program was being treated unfairly?

20         MR. McMACKIN:    Asked and answered.

21    A.    I can't recall the words he used in the

22    meeting.

23    Q.    Did he provide to you exhibits or photographs

24    or diagrams of alternatives to the move that was

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    proposed?

2      A.    As I recall, yes.

3      Q.    Did you review those alternatives?

4      A.    The information that was presented was

5    reviewed, Ann and I and Ken discussed those

6    alternatives during the meeting.

7      Q.    So you discussed those alternatives with Ken

8    Cole during the meeting along with Ann Del Negro, is

9    that correct?

10     A.    And Cara Stanard.

11     Q.    And Cara Stanard.

12            Is that correct?

13     A.    To the best of my knowledge, I know that we had

14   information related to the move.  I don't know what

15   day it occurred on or what have you.  I know that

16   there was a proposal that was provided, and I know

17   that there was a colored document, you know, pink,

18   green, yellow.

19     Q.    Did you discuss that document with Ken Cole at

20   that meeting?

21     A.    I believe we discussed the document.

22     Q.    What did you tell him with respect to those

23   alternatives?

24     A.    We looked at the alternatives.  There were



Susan Elizabeth Zawislak - Brewington          61

1    various alternatives presented.  At that point, we

2    looked at kind of stepping back.  The move didn't

3    occur then, and we needed more information, and we

4    needed to pursue things.

5        Q.    In part of the pursuing things, did you

6    consider Ken Cole's alternatives that he provided to

7    you?

8        A.    The information was reviewed.

9        Q.    It was reviewed at the meeting.  Was it

10   reviewed after the meeting?

11       A.    Reviewed, discussed.

12       Q.    Who reviewed it?

13       A.    Ann Del Negro and myself..

14       Q.    So you and Ann Del Negro reviewed the

15   alternatives after the meeting?

16       A.    Mm-hmm.  Yes.  And probably discussed it with

17   the assistant campus director and campus director

18   again.  You know, at this point, it was like, let's

19   halt the move, see what's going on, and you know,

20   we --

21       Q.    What was the reason why you didn't go with

22   either of those alternatives?

23       A.    I don't have them in front of me, so I can't --

24   I really can't.

1              MS. BREWINGTON:  Next exhibit, if you can

2      mark this.

3              MR. McMACKIN:  I am going to enter the

4      same objection that we had during the Paul Morris

5      deposition this morning as to this document.

6              MS. BREWINGTON:  As to this four-page

7      document?

8              (Zawislak Deposition Exhibit 6 was marked

9      for identification.)

10     BY MS. BREWINGTON:

11       Q.   Is this the document that you reviewed with Ann

12     Del Negro as well as the --

13       A.   Yes.

14       Q.   Now, you said that you had an opportunity to

15     review this document, correct?

16               Correct?

17       A.   Yes.

18       Q.   And that you reviewed this document after your

19     meeting with Ken Cole, correct?

20       A.   Right.

21       Q.   And that within this document shows alternative

22     1 and 2?

23       A.   Yes.  Alternatives -- alternatives were

24     presented.

1    Q.    My question to you was, why did you not go with

2    either one of those alternatives, and your response

3    was, I didn't have the documents in front of me.    Is

4    that correct?

5    A.    There are alternatives that meet the needs of

6    grouping the programs in a more contiguous space, that

7    utilized space in a way where a program was downsized,

8    had a -- you know, three people in the one office, one

9    person in the other office, and that function and

10   process had been working fine in that configuration.

11   Q.    Let me see if I can understand that.    If you

12   flip forward one, you have the proposed move.    Okay?

13   Not that first?

14   A.    Where?

15   Q.    It's not the first page of the document.    It's

16   the second page.    At the top it says, "proposed move."

17   You don't have that?    Doesn't it say, "proposed move"?

18   A.    Yeah.

19   Q.    Okay.    That's the document.

20   A.    Okay.    I just want to make sure we're looking

21   at the right thing.    Okay.    Okay.

22   Q.    Doctor, does this accurately depict the

23   proposed move that eventually became the actual move?

24   A.    No.

**W&F**

1    Q.    Why not?

2    A.    The cons answer --

3    Q.    Okay?

4    A.    -- were opinionated answers as well as the pro

5    answers, so...

6    Q.    How about the diagram, does the diagram

7    accurately depict the proposed move and the actual

8    move?

9    A.    No.

10   Q.    Okay.  Why not?

11   A.    I don't see any measurements.  I don't see how

12   things are distributed.  I don't see -- no.

13   Q.    So aside from the measurements, if we look

14   specifically at the color coding, would that

15   accurately depict where individuals would be during

16   the proposed move and the actual move, specifically

17   with respect to the colors?

18   A.    The color locations of --

19   Q.    Mm-hmm.

20   A.    Yes.  The one group would be there.  Another

21   group would be here.  Yes.

22   Q.    Okay.

23   A.    Yes.  And this was not a computer room?

24   Q.    Okay.  That's fine.

1    A.    These were not administrative offices.   The

2    representation of the space is incorrect.   The

3    relationship of the space is incorrect.

4    Q.    Okay.

5    A.    There's no measurements, and -- yeah.

6    Q.    But as far as the colors, is that correct that

7    Upward Bound Math and Science is located --

8    A.    Would be placed together.

9    Q.    -- in the yellow at the top left, is that

10   correct?

11   A.    In a hallway like there.

12             So, again, the representation --

13   Q.    Okay.  But --

14   A.    The folks in Upward Bound Math and Science

15   would be in one area.   The depiction of this does not

16   show the distance.

17   Q.    Okay.  I understand.  Measurements and

18   distance, no.  I'm focussing on the colors?

19             MR. McMACKIN:  If I can, just to clarify,

20   I think what Lori -- please correct me if I'm wrong.

21   I think what she's asking is, are the colors

22   representative of where people would be after the

23   proposed movement?  Is that your question?

24             MS. BREWINGTON:  Yes.

1     A.    Just make sure all people were there at that

2     time frame.  They seem to.

3     Q.    And one of the reasons why -- let me ask that

4     question.

5              It was a benefit of the proposed move that

6     all the members of Upward Bound Math and Science would

7     be together?

8     A.    The benefit is, yes, that they will work in the

9     same space that had been allocated to a previous

10    program that had that same number, and they will all

11    be able to work together.  The secretary, the program

12    manager, working together along with the student

13    enrichment coordinators.

14    Q.    If we turn to alternative 1, wouldn't this

15    alternative allow for all of the Upward Bound Math and

16    Science to be together?

17    A.    No.

18    Q.    Why not?

19    A.    The color blue is in between the yellow colors.

20    Q.    But let's turn back to the proposed.  Is the

21    color blue not in between all the other different

22    colors on the proposal?

23    A.    It is in the middle.

24    Q.    It is in the middle.  It is, isn't it?



Susan Elizabeth Zawislak - Brewington          67

1              Now, PM over here in the blue with this

2      row of rectangles represents Kate Sullivan, does it

3      not?

4      A.    Yes, it does.

5      Q.    And Kate Sullivan was not with the rest of her

6      Upward Bound Math and Science group, was she not?

7              MR. McMACKIN:   Objection.  Kate Sullivan

8      was UBC according --

9      Q.    Was not with the rest of Upward Bound Classic?

10     A.    Correct.

11     Q.    And if we turn to --

12     A.    I thought there was another position -- oh,

13     well --

14     Q.    If we turn to alternative 2, wouldn't this

15     alternative allow for all the members of Upward Bound

16     Math and Science to be in the same location except for

17     their program manager?

18     A.    The distance on this is --

19     Q.    I'm asking you to answer the question.

20             MR. McMACKIN:   Will you repeat the

21     question, please.

22     Q.    Wouldn't this diagram allow for everyone in

23     Upward Bound Math and Science to be together except

24     for the program manager?



Susan Elizabeth Zawislak - Brewington          68

1          MR. McMACKIN:  Objection.  Argumentative.

2     A.    This would not reflect the use of space as it

3  previously had been with four folks, that one person

4  would be in a private office, two people would be

5  together, and the program manager would be over here.

6     Q.    So you're answer is, no?  I don't understand.

7          MR. McMACKIN:  Let me know if I'm

8  misstating your question.  I think she wants to, in

9  alternative 2, would the program manager be with the

10  other members of UBMS?  Is that your question?

11          MS. BREWINGTON:  That's part of it.

12     A.    She would be not be with them.

13     Q.    She would not be with them, but the other

14  members of the Upward Bound Math and Science would be

15  together, is that correct?

16     A.    Yes.  That is correct.

17     Q.    Actually, in the proposed move, if we go back

18  to that, the program manager of Upward Bound

19  Classic -- you're on the second page.

20          Second page.  Proposed move at the top.

21          The program manager of Upward Bound

22  Classic, Kate Sullivan, is not with the rest of her

23  Upward Bound Classic team, is that correct?

24     A.    That is correct.  There is no established space



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    in that area, blue area for a person to be in that

2    area.

3                (Pages 70, et seq., are under seal without

4    the seal request ending.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    BY MS. BREWINGTON:

2      Q.    So my question is, why wasn't alternative 2

3    used or why didn't the proposed move encompass the

4    design of alternative 2?

5      A.    Confidentially speaking?

6              MS. BREWINGTON:  You want to --

7              MR. McMACKIN:  Yeah.  I think she's got

8    it.

9      A.    The program manager for Upward Bound Math and

10   Science was needing to work very closely with the

11   program secretary in order to handle performance

12   issues that were occurring.

13              The space difference is so different.

14              MR. McMACKIN:  Can we go off the record?

15              (Discussion off the record.)

16              (Recess taken.)

17   BY MS. BREWINGTON:

18      Q.    I think before we took a break, the last

19   statement that you made was that the program manager

20   of Upward Bound Math and Science needed to work

21   closely with the secretary?

22      A.    Yes.

23      Q.    Is that true?

24      A.    Mm-hmm.  Yes.



Susan Elizabeth Zawislak - Brewington          71

1     Q.    And the program manager of Upward Bound Math

2   and Science was  REDACTED      , correct?

3     A.    Yes.

4     Q.    And the secretary was Liz Wilson, correct?

5     A.    Yes.

6             (Pages 72, et seq., are under seal without

7   the seal request ending.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



1   BY MS. BREWINGTON:

2       Q.    And why did the secretary have to work closely

3   with   REDACTED        ?

4                   MR. McMACKIN:   Confidential, please.

5       A.    Yes.  Confidential.

6               REDACTED in her, you know, documented forms

7   had been experiencing a lot of problems with budgeting

8   and record keeping related to the budget.  We did

9   do -- she was on a corrective action plan in the year

10  2000.  And in 2001, her performance review indicated

11  that she was in need of assistance, actually before

12  that time.  I mean, she didn't even have a full-time

13  secretary.  So, with the full-time secretary, that was

14  one of the things that we had hoped would assist her

15  in developing working together, you know.

16      Q.    So is it fair to say that the problems with

17      REDACTED          performance began as early as 2000?

18      A.    Yes, it is.

19      Q.    And my earlier question was, why didn't you

20  consider alternative 2 as a reasonable reason for the

21  move?

22      A.    Is this alternative 2?

23      Q.    No.  Wait.  Yes.

24                  And your response was, so we can clarify



Susan Elizabeth Zawislak - Brewington          73

1    alternative 2?

2       A.    Alternative 2 -- okay.  This one.

3       Q.    And your response was because you to wanted to

4    keep --

5       A.    Four people.  Four people.  You know, this

6    group.  Four people in the area where four people

7    were.  Whether you call it one and three or four

8    people.

9       Q.    But your response, was it not, as I understood

10   it, was because you wanted to keep the program

11   manager,  REDACTED         , with her secretary?

12      A.    And the whole program together, yes.

13            The other point that I do want to mention

14   is that Upward Bound Classic in the rows here, they

15   had a position that was supplemental, that may or may

16   not continue for the length of the grant.

17      Q.    Did you discuss the case with anyone while you

18   were on break?

19      A.    No.  No.  We were talking about food and

20   parking places.

21            The dynamic nature of funding is, if you

22   know something is going to be in a place for three or

23   four or five years, and you could find a place for

24   three or four years for something to operate in that

1    space, that would be an effective, efficient use of

2    time.  Our programs are so dynamic.  We have some

3    programs that may be funded for one academic year.

4    You know, it's -- there are different types of

5    programs.  They do different functions.  And we need

6    space to put the workers?

7       Q.    If you can look at alternative 1 for me, you

8    indicated that you couldn't do alternative 2 because

9    the program manager was needed to work closely with

10   the secretary Liz Wilson, correct?

11      A.    That is correct.

12      Q.    Now, alternative 1, does this diagram indicate

13   that    REDACTED          will be allowed to work closely

14   with her secretary Liz Wilson?

15      A.    They would be in offices that would be next to

16   each other.

17      Q.    So why did you decide not to go with

18   alternative 1?

19           MR. McMACKIN:   Asked and answered.

20   Objection.  You can answer if you can answer.

21      A.    It replaced four people who were in one program

22   to go in another -- there was another alternative.

23   The other alternative would put people of like

24   programs all together rather than in the purple



1    alternative, you put purple and green.  You would have

2    four yellow blocks in the same block where there were

3    four yellow blocks.  And that was -- that was the

4    rationale.

5        Q.    So the rationale was to put four people where

6    four people had been, is that somewhat you're saying?

7        A.    That program we knew would be funded and the

8    programs that were downsized did not have four people

9    any more in that room.  And rooms that are separate,

10   if one -- if you are upsized, if you are downsized,

11   you know, you are going in and out of one room to the

12   next to the next.

13       Q.    What program was here, here meaning top left

14   corner of the diagram, room 408?  What program was in

15   here prior to the Upward Bound Math and Science being

16   in there?

17       A.    To the Max.

18       Q.    And who were the individuals in the To the Max

19   program?

20       A.    Peter Lonie was the program manager.  Carolyn

21   Cave, Crystal Heath, and Cathy Hagan.

22       Q.    And Cathy Hagan?

23       A.    Mm-hmm.

24       Q.    Okay.  Now, Peter Lonie was in the rectangular

1    box to the bottom of the entire huge box, in 408, is

2    that correct?

3       A.   Yes.

4       Q.   Were there three individuals in the rectangle

5    above Peter Lonie's?

6       A.   Yes.

7       Q.   And those three individuals were Carolyn Cave,

8    Crystal Heath, and Cathy Hagan, is that correct?

9       A.   Yes, it is.

10      Q.   Now, REDACTED -- REDACTED        was where Peter

11   Lonie was, is that correct?

12      A.   Peter Lonie, yes.

13      Q.   And Brigitte Brown, Ken Cole, and Liz Wilson

14   were in the rectangle above, is that correct?

15      A.   Yes, it is.

16      Q.   Now, with the To the Max program, Cathy Hagan

17   was only there part time, is that correct?

18      A.   No.   She was a full-time employee.

19      Q.   And Carolyn Cave had left that area, isn't that

20   correct?

21      A.   When the program was downsized.   So they were

22   no longer in that space on June 30th when the program

23   was downsized.

24      Q.   Okay.



Susan Elizabeth Zawislak - Brewington       77

1     A.    So in that small room, or the lower rectangle,

2     the small room, you know, where Peter is, it would

3     have been Peter, and in the whole big room there would

4     have been one person.

5     Q.    Okay.  And did Cathy Hagan have another office

6     in the building?

7     A.    She had worked from different locations

8     depending on functions that were needed.

9     Q.    So she wasn't always working from this

10    location, this meaning room 408, top left?

11    A.    I can't respond to that.

12    Q.    Why not?

13    A.    Because I don't know.

14    Q.    So you can't say for sure that four people were

15    working in that area all the time, correct?

16    A.    All the time meaning were four people assigned

17    to that space, yes.  Were there duties that were --

18    that they would be in the office for every single hour

19    of those days, the answer is no.  In neither case

20    would people be in duties in either of those offices

21    every day of the week because of the functions of

22    their responsibilities.

23    Q.    Do you know whether Peter Lonie had an office

24    somewhere else in the building?



1    A.    No, he did not.

2    Q.    Is it fair to say that Carolyn Cave did not

3    have another office in the building?

4    A.    In the building?

5    Q.    Yes.

6    A.    Yes, she did not have another office in the

7    building.

8    Q.    And Crystal Heath, did she have another office

9    in the building?

10   A.    No, she did not have another office in the

11   building.

12   Q.    And now Cathy Hagan, you don't know whether she

13   had another office in the building, is that correct?

14   A.    She may have worked from different work

15   stations as we were going through transitions.

16   Q.    So she may not have been there working with

17   Peter Lonie, Carolyn Cave, and Crystal Heath during

18   their work hours?

19   A.    She was assigned to that program.  It would

20   be -- well, you know, I mean, she was -- she was

21   assigned to that program.

22   Q.    Meaning?

23   A.    That she performed the functions of the

24   program, secretary for that program.  And if we need



1     somebody to help with this or that.

2        Q.    Did Ann Del Negro have Cathy Hagan on the third

3     floor to support her?

4        A.    On the third floor?

5              MR. McMACKIN:    Objection.    Vague.

6        A.    Third floor?    No.

7        Q.    I'm sorry.  On the fourth floor.

8              MR. McMACKIN:    Same objection.

9        Q.    Did you answer the question?

10       A.    What time frame?

11       Q.    At any time frame?

12       A.    Prior to the move of To the Max into that area,

13    Cathy Hagan and Ann were in that area.    Ann was in

14    another position at the time.

15       Q.    So to answer my question, Ann Del Negro did

16    work with Cathy at a different location than this, is

17    that correct?

18             MR. McMACKIN:    Can you repeat that

19    question?

20       Q.    I'm sorry.  Ann Del Negro and Cathy Hagan --

21    well, let's strike that.

22             Cathy Hagan not only worked in this area

23    right here, this 408, she also worked with Ann

24    Del Negro on the fourth floor, isn't that correct?

Susan Elizabeth Zawislak - Brewington          80

1   A.   No.

2   Q.   Did Cathy Hagan work with Ann Del Negro?

3   A.   What time frame are you referring to?

4   Q.   Did she ever work with Ann Del Negro?

5   A.   Yes, she did.

6   Q.   At what time?

7   A.   From September of 2000 to February of 2001.

8   Q.   So between September of 2000 and February of

9   2001, did Cathy Hagan occupy this office here, room

10  408, as well as use another office?

11  A.   No.

12  Q.   Did Cathy Hagan work not only in this office

13  but in another office?

14  A.   No.

15  Q.   Did Cathy Hagan work with Ann Del Negro in a

16  different area of the building?

17          MR. McMACKIN:  Objection.  Asked and

18  answered.

19  A.   The -- talking about time frame, you know.

20  Q.   Between September 2001 and February 2001?

21  A.   No.  That's where they worked.  Ann --

22  Q.   That's where Cathy Hagan worked here, in

23  room 408?

24  A.   Yes.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan Elizabeth Zawislak - Brewington        81

1     Q.   Okay.  So your testimony is that --

2             MR. McMACKIN:  I'm going to object to this

3     as vague.  You just said from September 2001 to

4     February 2001 Cathy Hagan worked here.  The question

5     doesn't make sense.  It's backwards.

6             Can you read back the last couple of

7     questions?

8             MS. BREWINGTON:  Oh, I said 2001 twice.

9             MR. McMACKIN:  Why don't you start that

10    line over again.

11            THE WITNESS:  Yeah.

12            MR. McMACKIN:  Let her reask the question.

13            MS. BREWINGTON:  Let me start all over.

14    BY MS. BREWINGTON:

15    Q.   From September 2001 to February of 2001, Cathy

16    Hagan --

17            MR. McMACKIN:  That's the same objection.

18    You can't from work September to February.

19            MS. BREWINGTON:  September 2000.  I'm

20    looking right at it and saying the wrong thing.

21    Q.   From September 2000 to February 2001, did Cathy

22    Hagan work with Ann Del Negro?

23    A.   Yes, she did.

24    Q.   In what capacity?

1      A.    She was her administrative assistant, and Ann

2    was the director of youth -- or department chair of

3    youth programs.

4      Q.    And where was Ann's office when she was

5    director of whatever you just said from September 2000

6    to February 2001?

7      A.    For that period of time, she was located in the

8    area where three people are located.

9      Q.    She was located --

10     A.    And To the Max replaced that when we allocated

11   space, when you look at the plan, to be in the best

12   efficient use and --

13     Q.    Okay.  So Ann Del Negro was in the office where

14   three people are located in room 408, correct?

15     A.    Yes, she was.

16     Q.    Where was Cathy Hagan located?

17     A.    During that time frame, Cathy Hagan was located

18   in that office labelled PM on the purple diagram.

19     Q.    Okay.  PM on the purple diagram alternatively.

20           Now, when did Cathy Hagan move to the

21   upper rectangle?

22     A.    When Peter and Carolyn and Crystal were -- it

23   may have been their predecessors.

24     Q.    Yes.



Susan Elizabeth Zawislak - Brewington        83

1    A.    When those individuals moved up into this room.

2    Q.    That was To the Max program, is that correct?

3    A.    Yes.  It was To the Max program.

4    Q.    And so that I'm clear, Cathy Hagan occupied

5    that office, and that was her only office, is that

6    correct?

7    A.    During that time, yes.

8    Q.    Let me strike that.  Okay.  I was going to say

9    that was her only work space?

10            MR. McMACKIN:  Objection to the form.

11   A.    I would say -- could you repeat the question as

12   it relates to the time frame?

13   Q.    September 2000 to February 2001 she started as

14   administrative assistant for Ann Del Negro, correct?

15   A.    Correct.

16   Q.    After February 2001, To the Max program

17   occupied that space above the PM position?

18   A.    And the PM position too.

19   Q.    And the PM position, correct?

20   A.    Mm-hmm.  Correct.

21   Q.    My question to you is, was this Cathy Hagan's

22   only office space during the time that she occupied

23   this space?

24   A.    Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan Elizabeth Zawislak - Brewington          84

1      Q.    Okay.  Do you know whether Paul Morris ever saw

2    the alternatives 1 and 2?

3      A.    I can't recall.

4      Q.    Okay.  So do you know whether Ann discussed

5    these alternatives with Paul Morris?

6      A.    I can't recall.

7      Q.    And you never discussed these alternatives with

8    Paul Morris, did you?

9      A.    Not that I recall.

10            MS. BREWINGTON:  Next exhibit.

11            (Zawislak Deposition Exhibit 7 was marked

12    for identification.)

13            MR. McMACKIN:  Let me submit for the

14    record that this document is complete, but it doesn't

15    look like it's the entire document.  There are pages

16    missing.

17    BY MS. BREWINGTON:

18      Q.    Are you familiar with this document?

19      A.    The pages of this document, yeah.

20      Q.    What is it?

21      A.    It's an Upward Bound Math and Science Center

22    proposal.

23      Q.    Is this in reference to the grant?

24      A.    Yes.



Susan Elizabeth Zawislak - Brewington          85

1     Q.    And it was submitted on November 22nd, 2002, is

2     that correct?

3     A.    Yes.

4     Q.    Are you aware that the grant provides that the

5     suite -- it indicates a suite of offices provides

6     privacy for confidential conversation with center

7     participants.  Do you see where it says that on

8     page 92?

9     A.    This page 92?

10    Q.    No.  I'm speaking of this page 92, that one

11    right there?

12    A.    This one right here?

13          MR. McMACKIN:  It looks like there's a

14    copying error because.  It is D1 at the top on page 92

15    and the previous page is D1 as well, and they are

16    different pages.

17          THE WITNESS:  It's a different grant.

18    BY MS. BREWINGTON:

19    Q.    It's a different grant?  The two pages are

20    different?

21    A.    Yes.

22    Q.    I don't have the same thing as her.  I have

23    this next.

24          MR. McMACKIN:  Do you guys have a Bates



1    stamped version of this?

2                MS. BREWINGTON:   This is off the record.

3                (Discussion off the record.)

4                (Pause.)

5                (Zawislak Deposition Exhibit 7 was

6    remarked for identification with a substitute

7    document.)

8    BY MS. BREWINGTON:

9       Q.   I'm looking at the third page of this document.

10   It doesn't have a page number on it actually.

11               MR. McMACKIN:   Let the record reflect that

12   we are looking at the document that is marked as

13   exhibit 7.

14      Q.   Would you review this page for me briefly?

15               Are you aware that the grant for the

16   Upward Bound Math and Science program indicates that

17   the east wing provides privacy areas for confidential

18   conversation with center participants?

19      A.   Yes.

20      Q.   I'm now turning to page 92 of the document.

21   It's actually skipping one page, the diagram, and then

22   the next page.

23               Are you also aware that the Upward Bound

24   Math and Science grant indicates that the suite of

Susan Elizabeth Zawislak - Brewington          87

1    offices provides privacy for confidential conversation
2    with center participants?
3         A.    That page doesn't go with this grant.
4         Q.    What grant does that go with?
5         A.    A previous grant.
6         Q.    Is it a grant dealing with Upward Bound Math
7    and Science program?
8         A.    Yes, it is.
9         Q.    Do you know what year this is applicable in,
10   meaning the suite of offices provides privacy for
11   confidential conversation with center participants?
12        A.    No.
13        Q.    Do you know whether it's after the November
14   22nd, 2002, grant or before?
15        A.    Before.
16        Q.    So in both the November 22nd, 2002, grant and
17   an additional grant, it indicates that the suite of
18   offices provides privacy for confidential
19   conversation?
20        A.    It does not say the same thing.
21        Q.    What is the difference between them?
22             MR. McMACKIN:   Objection.   The document
23   speaks for itself.
24        A.    Yes.



1           MR. McMACKIN: You can answer, though, to

2     the extent you can answer.

3     A.    That it says, "The college provides office

4     space for the secretary and coordinator.  That

5     includes file cabinets and office equipment.  The

6     project director has a separate office that includes

7     file cabinets, storage areas, and office equipment.

8     The east wing provides privacy areas for confidential

9     conversations."

10    Q.    Is that the existing grant that you're reading

11    from?

12    A.    Yes, it is.

13    Q.    So the existing grant provides privacy on the

14    east wing, is that correct?

15    A.    Yes.  Yes, it does.

16    Q.    Where on the east wing is there offices that

17    provide for privacy for students in the Upward Bound

18    Math and Science program?

19          MR. McMACKIN:  I'm going to object.  It

20    doesn't say offices provide privacy on the east wing.

21          It says the east wing provides privacy.

22          MS. BREWINGTON:  We're looking at the

23    existing grant which is page 92, and it indicates,

24    "The suite of offices provides privacy for



1    confidential conversation with center participants."

2                    THE WITNESS:  Which one are you looking

3    at?

4        Q.    92, page 92 at the bottom.  The existing grant.

5    And it says -- do you see that?

6        A.    This isn't the existing grant.

7        Q.    Is this the grant from 2002, effective 2002?

8        A.    This is a previous grant.  I don't have that

9    information.

10       Q.    Is there a place that provides confidential or

11   private communication for the Upward Bound Math and

12   Science program after this move?

13       A.    Yes.

14                   MR. McMACKIN:  Objection.  Vague.

15       Q.    Yes.  Where?

16       A.    Several locations.

17       Q.    Tell me about them.

18       A.    There is the conference center right next to

19   our conference room right next door.  There is a

20   tutoring room.  There is the program manager's office.

21   The east wing is very large, has other types of

22   areas --

23       Q.    What types of areas?

24       A.    -- that can be used.  Small conference, small

Susan Elizabeth Zawislak - Brewington        90

1   conferencing room as opposed to -- you know, small

2   conference rooms, individual offices.

3       Q.   Now, the conference center, where is that

4   located?

5       A.   Right next to 408.

6       Q.   Is it on the diagram that we looked at earlier?

7       A.   No.

8       Q.   No?  So there was a conference room --

9       A.   Adjoining.

10      Q.   -- adjoining.  Is the conference room opened?

11           MR. McMACKIN:   Objection.  Vague.

12      Q.   Let me rephrase then.  Is it fair to say that

13  the Upward Bound Math and Science program can't use

14  that conference room because it's locked?

15      A.   I can't answer that.

16      Q.   Why not?

17      A.   I don't know if it's locked.  And there's

18  nothing that says that they couldn't use it.

19      Q.   Did you give them permission to use that room?

20      A.   Did I give them permission?

21      Q.   Did anyone give them permission to use that

22  room?

23      A.   That room has been used, yes.

24      Q.   By Upward Bound Math and Science?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1     A.    By all of our programs at the college.

2     Q.    Is it true that you must schedule ahead of time

3     to use that room?

4     A.    Ahead of time -- if that room is occupied, yes,

5     a schedule is preferred.  You can use the room if it

6     is not in use at the time you would want to use it.

7     Q.    Do you have to schedule time to use the room?

8     A.    You can schedule time to use the room.

9     Q.    Do you have to schedule time to use the room?

10          MR. McMACKIN:  Objection.  Asked and

11    answered.

12    BY MS. BREWINGTON:

13    Q.    She's saying you can.  I want to know if you

14    have to.

15    A.    I don't know.

16    Q.    Okay.  That's fine.  If you don't know, that's

17    fine.

18          Who holds the key?  Do you know who holds

19    the key?

20    A.    No, I don't.

21    Q.    Do you know if Upward Bound Math and Science

22    has a key to that conference room?

23    A.    I do not know.

24    Q.    With the Upward Bound Math and Science program



1    is it correct that it's a residential program?

2       A.    There's a summer residential component to the

3    program.

4       Q.    Do any of the other TRIO programs have a

5    residential component?

6       A.    No, they do not.

7       Q.    Is it fair to say that because the Upward Bound

8    Math and Science is a residential program that they

9    may have different issues or additional issues because

10   they are a residential program?

11      A.    Yes.

12      Q.    Okay.  Now, Upward Bound Math and Science is a

13   residential program.  Is it fair to say that issues

14   may arise where the program managers may need to speak

15   with students and not have a schedule, not know ahead

16   of time?

17            MR. McMACKIN:   Objection.  Calls for

18   speculation.

19      Q.    After hours?

20      A.    After hours?

21      Q.    Not necessarily after hours but at any -- let

22   me correct that.

23            The Upward Bound Math and Science program

24   is a residential program, and you agreed with me, did



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan Elizabeth Zawislak - Brewington          93

1    you not, that there may be additional or different

2    issues?

3         A.    It was a summer residential program.

4         Q.    With the fact that it's a summer residential

5    program, is it fair to say that the student enrichment

6    coordinators may not always know when students are

7    coming in to meet with them so they can't preschedule

8    this time?

9         A.    The students of the Upward Bound summer

10   residential program are here or are on the campus less

11   than 30 days, six weeks, five days a week.  They are

12   living off campus at Goldey-Beacom College.  They are

13   attending sessions or classes all day while they are

14   here at the campus in different classrooms.  During

15   the summer, the conference room would very rarely be

16   used since full-time faculty or people who would be

17   here most times would not be here.

18        Q.    You also mentioned the tutoring program, did

19   you not?

20        A.    Yes, I did.

21        Q.    Is the tutoring room also a computer room?

22        A.    I believe the tutoring room has computers in

23   it.

24        Q.    Can anyone use those computers that work at Del

1      Tech or students or the employees -- who uses those

2      computers?

3          A.    The individuals that the student enrichment

4      coordinators and program managers --

5          Q.    Individuals, student program manager --

6          A.    No.    No.    They are the individual students that

7      the program manager and student enrichment people say,

8      sign in, you know, you...

9          Q.    So the tutoring room --

10         A.    For all the youth programs.

11         Q.    For all the youth programs, this is the

12     computer room that they use, correct?

13         A.    No.    This is the tutoring room that has

14     computers in it.    There are computer rooms at the

15     college.

16         Q.    But students in the programs use this tutoring

17     room, use the computers in this tutoring room, do they

18     not?

19         A.    I hope so, yes.

20         Q.    Tell me how this allows for privacy if the

21     computers are used by other students during the day?

22         A.    The timing of your question confuses me.

23         Q.    How so?

24         A.    Are you talking about the summer residential

