1    component?

2        Q.    No.    What I'm talking about is that you

3    indicated that there are other areas?

4        A.    Oh, okay.    Okay.    Go ahead.    I'll let you

5    finish the question.

6        Q.    Are there other areas that provide for

7    confidential communication.    You mentioned the

8    tutoring room.    I asked you if there were computers in

9    that room, and you said yes.    I then asked you who

10   uses those computers.    And you said all of the

11   students in the program, did you not?

12       A.    And students in the program --

13             MR. McMACKIN:    Objection.

14   Mischaracterizes the witnesses's testimony.

15       A.    The students in the program don't come to the

16   campus until after their school day during the

17   academic year.    In the summertime they are not getting

18   tutoring.    They are getting instruction in the

19   classrooms.

20       Q.    I'm not necessarily talking about the

21   summertime.    I'm talking about at any time.

22       A.    Students are in school during the regular

23   school day.    Therefore, they are not in the tutoring

24   room.    They're only there for a couple hours, three

1   o'clock, four o'clock, five o'clock in the tutoring

2   room.

3      Q.   So are you saying that the students don't use

4   the computers until three o'clock during the day?  Is

5   that what you're saying?

6      A.   When they are in school, they are in school and

7   they come for tutoring in that tutoring room that has

8   computers in it.

9      Q.   So it's your position that the conference room

10  or tutoring room allows for confidential

11  communications until three o'clock, is that correct?

12            MR. McMACKIN:   Objection.  It

13  mischaracterizes the witness's testimony.

14     A.   It's -- during the school year there are --

15  students are in school.  They are not in the tutoring

16  room.

17     Q.   Well, isn't this tutoring room also a copy

18  room?

19     A.   Not that I'm aware of.

20     Q.   So you don't know whether there is actually a

21  copier in that room?

22     A.   In the tutoring room?

23     Q.   In the tutoring room?

24     A.   I cannot say.



Susan Elizabeth Zawislak - Brewington          97

1     Q.    You can't say.

2              Is it fair to say that, if a copier was in

3     that room, that it would not provide for confidential

4     communication?

5              MR. McMACKIN:  Objection.  Calls for

6     speculation.

7     A.    Yeah.  Copier.  The --

8     Q.    Do you understand the question?

9     A.    Yes.  There are numerous copiers that could be

10    utilized if a space was being used for private

11    conversation.

12    Q.    Okay.  That's fair.

13    A.    And I don't even know if there's a copier in

14    that room, so that is speculation.

15    Q.    Well, say, if the copier was in use because

16    there is a copier in there --

17              MR. McMACKIN:  Are you making that

18    representation?

19              MS. BREWINGTON:  I'm making that

20    representation.

21    BY MS. BREWINGTON:

22    Q.    That office of the tutoring room with the

23    computers and copier would not allow for confidential

24    communications, is that correct?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan Elizabeth Zawislak - Brewington          98

1              MR. McMACKIN:  Objection.  Argumentative.

2      A.    If you have a large copy load, you could go to

3   a copy center.  There's a copy center on the floor.

4   There are other copiers on the floor.  If you're

5   making one copy and somebody's coming in, whether

6   the -- coming in -- hey, I'm out of here.  You need to

7   talk to a student.  There's copiers in other places,

8   and I don't even know that there was a copier in the

9   place where you're saying that there might be.

10     Q.    Now I'm talking about after the move.

11     A.    Okay.

12     Q.    Do other TRIO programs have some form of

13  partitions for privacy?

14     A.    Yes.

15     Q.    Tell me about their partitions.  Is that what

16  they are?  Is it fair to say that there are

17  partitions?

18     A.    Yes.

19     Q.    And it's fair to say that each student

20  enrichment coordinator has an area that was

21  partitioned off from others?

22     A.    Yes.

23     Q.    Now, going to the Upward Bound Math and Science

24  program and where they moved, 408, they do not have



WILCOX & FETZER LTD.
Registered Professional Reporters

1   partitions in their office, is that correct?

2      A.    That is correct.

3      Q.    And their office does not provide for

4   confidential communication, is that correct?

5      A.    Their offices do not have partitions because

6   the program manager didn't order partitions.  The

7   other room where the Educational Talent Search people

8   are was the same type of set up, and the program

9   manager worked and got partitions in there in that

10  room.  Partitions are something that is a request, and

11  that some of our faculty work in offices that are

12  shared offices.  Other faculty work in places where

13  there are three or four desks in one room.  It depends

14  on what they are comfortable with and what their

15  supervisor would support.

16     Q.    So I'm asking, is the only way for a program to

17  get partitions is through the program manager?

18     A.    The only way.  That is the legitimate way to

19  get them is your supervisor.

20     Q.    Are there other ways that -- student enrichment

21  coordinators?

22     A.    No.

23     Q.    No.  Okay.

24            MR. McMACKIN:  I want to go on the record.



1     It is 20 of 6. It's after business hours.

2     Dr. Zawislak has commitments this evening. Do you

3     know how much longer you are going to be?

4            MS. BREWINGTON:  I don't know. It

5     depends. What would you like to do?

6            MR. McMACKIN:  Do you have a preference?

7            THE WITNESS:  I don't know how much

8     longer -- I mean, you know.

9            MS. BREWINGTON:  There is still a while.

10     I mean, we haven't gotten to, I'd say, half.

11            MR. McMACKIN:  I am going to put an

12     objection on the record that this department was

13     noticed for three o'clock in the afternoon, and it's

14     uncustomary to start a deposition at that time when

15     it's anticipated to go for a few hours.

16            We are not waiving our right to object to

17     continuing this, and at a certain point we are going

18     to have to stop tonight. And whether or not

19     Dr. Zawislak would be available, I can't say. And

20     whether we are going to be able to present her as a

21     witness again I can't concede. So this may be her

22     only shot, and we can't keep her very late.

23            MS. BREWINGTON:  For the record, we agreed

24     to change her time today at your request. Paul Morris

1    requested that he be moved to the earlier time and not

2    the later time.  And we accounted for three hours to

3    take Dr. Zawislak's deposition today.

4            MR. McMACKIN:  Okay.  If you accounted for

5    three hours, you guys got 20 minutes.  It's 20 of 6

6    now.

7            MS. BREWINGTON:  But that's not the only

8    reason why this deposition is taking so long.  If we

9    review the transcript, it's difficult for me to get an

10   answer out of the witness.

11           MR. McMACKIN:  I would disagree and just

12   say that a lot of that has to do with the way the

13   questions are being asked, but we can continue.

14   BY MS. BREWINGTON:

15     Q.   Are you aware that Liz Wilson asked Paul Morris

16   for partitions?

17     A.   No, I'm not.

18     Q.   I'd like to go to another exhibit here.

19            (Zawislak Deposition Exhibit 8 was marked

20   for identification.)

21   BY MS. BREWINGTON:

22     Q.   Please take an opportunity to review this

23   document 8.

24           MS. BREWINGTON:  Off the record.

1          (Discussion off the record.)

2     BY MS. BREWINGTON:

3       Q.    This document is to Ken Cole from  REDACTED

4     REDACTED   .  She is the program manager.  It's dated

5     December 19, 2002.  Have you had an opportunity to

6     review it?

7       A.    I read it.

8       Q.    Did you inform  REDACTED       that Ken Cole's

9     hours were from 8:30 to 2:30, not 8:00 to 2:00?

10      A.    I informed her that working hours of the

11    college are 8:30 to 4:30.

12      Q.    That was in reference to Ken Cole?

13      A.    In reference to individuals in general.

14      Q.    So you didn't specifically indicate to  REDACTED

15    REDACTED    that Ken Cole's work hours should be 8:00 to

16    2:00?

17      A.    No, I did not.

18      Q.    Should be 8:30 to 2:00?

19      A.    No, I did not.

20      Q.    Were you aware that Ken was working 8:00 to

21    2:00?

22      A.    What time frame?

23      Q.    Around the time of this letter, prior to which

24    would have been, I guess, in the fall of 2002?

Susan Elizabeth Zawislak - Brewington    103

1    A.    No.

2    Q.    Were you aware at any time that he was working

3    8:00 to 2:00?

4    A.    No.

5    Q.    When did you become aware he was working 8:00

6    to 2:00?

7    A.    When   REDACTED      informed me that his work

8    hours were going to be until 12:00 o'clock.

9    Q.    And when did   REDACTED      inform you of that?

10    A.    At least a week before that when we met with

11    her.

12    Q.    So a week before September 19, 2002?

13    A.    Yeah.

14    Q.    And what was said during that meeting?

15    A.    What are Ken's hours?  Well, they were -- he's

16    working 8:00 to 12:00.  He used to work 8:00 to 2:00.

17    Working -- I say working hours are 8:30 to 4:30.  You

18    could work in that time frame.

19    Q.    Did you instruct   REDACTED      to advise Ken

20    of the work hours?

21    A.    Yes.

22    Q.    Okay.

23    A.    Of the college.  The work hours of the college.

24    Q.    Were you aware that Ken Cole, prior to this

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

1   memo being sent, had worked from 8:00 to 2:00 since

2   1999 when he was hired?

3     A.    No, I was not.

4     Q.    Did   REDACTED      come to you with concerns

5   that Ken Cole should be working 8:30 to 2:30?

6     A.    There was -- there was -- no.

7     Q.    When did you become aware that Ken Cole filed a

8   charge of discrimination against Delaware Tech?

9     A.    The EEOC thing after the moves.

10    Q.    After the moves, but before this e-mail or

11  after this e-mail?

12    A.    After the e-mail.

13    Q.    After this e-mail.  Okay.

14              (Discussion off the record.)

15  BY MS. BREWINGTON:

16    Q.    A week before this e-mail is when you had the

17  meeting with  REDACTED    , correct?

18    A.    I don't have the dates.

19    Q.    Okay.

20    A.    In September I met with her.

21    Q.    Is it fair to say that at this time you were

22  aware that Ken had filed a grievance about the job

23  posting of the special programs manager position?

24              MR. McMACKIN:  Can you repeat that,

1    please?  I'm sorry.

2      Q.    Is it fair to say that you were aware that Ken

3    Cole had filed a grievance with respect to Paul

4    Morris's promotion?

5      A.    No.

6      Q.    So you weren't aware of --

7      A.    This is a follow-up memo that REDACTED gave to Ken.

8    It's not when we had our original discussion.

9      Q.    I know, but I asked you, a week earlier you had

10   met with  REDACTED        and had a conversation with

11   her?

12     A.    I met with her twice.  And they were -- I don't

13   recall what date she had informed me of this, but it

14   was prior to any of this information.

15     Q.    So you don't know whether you were aware of his

16   grievance at the time you had a meeting with her with

17   respect to hours, do you?

18     A.    Well, I was not aware.

19     Q.    And for the record Ken Cole's grievance was

20   filed on September 5th, 2002, and you indicated a

21   revision in the CCP August update revision September

22   9, 2002.

23            Were you aware that Ken Cole's doctor

24   ordered a reduced work schedule around November 25th,

1    2002, for medical reasons?

2      A.    In November?  I don't recall the dates, but I

3    am aware.

4      Q.    Are you aware that he presented a doctor's note

5    with respect to his medical needs?

6      A.    Yes.

7      Q.    Who did he provide this doctor's note to, if I

8    could go to exhibit 9?

9      A.    I just know not me.

10     Q.    So you don't know who, but you know is wasn't

11   you?

12     A.    Yes.

13     Q.    Have you ever seen this document?

14               MR. McMACKIN:  Is this to be marked?

15               MS. BREWINGTON:  Yes, please.

16               (Zawislak Deposition Exhibit 9 was marked

17   for identification.)

18     A.    Yeah.

19   BY MS. BREWINGTON:

20     Q.    And did Ken Cole provide this doctor's note

21   indicating he was not contagious to anyone, that his

22   doctor wanted him to titrate his return to full

23   activity, which may take several months more?

24               Does it not say that at the bottom here?



1            MR. McMACKIN:  Can you repeat the

2    question?  She can read it back.

3    A.    Oh, no, I see it.  Okay.

4            In November, mm-hmm.

5    Q.    Yes or no?

6    A.    Yes.

7    Q.    Okay.  Did Del Tech accept this note and allow

8    him to work a reduced schedule?

9    A.    I don't know if it was this note because there

10   was documentation that was requested.  This was beyond

11   my level.

12   Q.    Okay.

13   A.    I can't -- my campus director directed me to

14   find out about reduced work schedule, and there was a

15   series of e-mails, letters that involved HR and not

16   me.

17   Q.    So far as whether this was an adequate --

18   A.    I couldn't comment.

19   Q.    You can't say?

20   A.    No.

21   Q.    Did  REDACTED        authorize Ken Cole's start

22   time of 8:00 o'clock?

23   A.    Yes.

24   Q.    Do you know what Liz Wilson's work hours were?



1     A.    From the documents that I had received, yes I

2   was aware.

3     Q.    What were Liz Wilson's work hours?

4     A.    Her work hours were from 9:00 to 5:00.

5     Q.    Were those her original work hours?

6     A.    No, they were not.

7     Q.    What were her original work hours?

8     A.    8:30 to 4:30.

9     Q.    Did you allow her to switch to 9:00 to 5:00?

10    A.    Several years before when she was employed in a

11   different program.

12              Several years before when she was

13   employed --

14    Q.    You did?

15    A.    Yes, I did.

16    Q.    What was the reason for allowing her to switch

17   her hours?

18    A.    There was need for the program.  We had lost

19   two programs in another area.  Liz was not affected as

20   a fund line in those programs.  She was available to

21   assist with all the administrative support that went

22   along with that.  And she did indicate that her mother

23   was ill and at that time, you know, she needed to be

24   there to take care of her.  And I did say, yes, go

Susan Elizabeth Zawislak - Brewington    109

1    ahead.  I needed to have a person who knew what they

2    were doing in the program to help me with this.  When

3    she transferred to the program, she had no hours.  I

4    was unaware for how long she kept those hours because

5    it was to deal with her ill mother.

6        Q.    So is it fair to say that the reason why she

7    was allowed to work different hours was for personal

8    reasons as well as for program --

9        A.    Yes.

10       Q.    -- reasons?  Okay.

11             MR. McMACKIN:  Can I just to object to

12   that question on the fact it was compound.

13       Q.    Are you aware that Brigitte Brown at one point

14   requested a change in her hours?

15       A.    Yes, I am.

16       Q.    And did you allow her to change her hours?

17       A.    No, I did not.

18       Q.    And what were her regular working hours?

19       A.    8:30 to 4:30.

20       Q.    What did she want to change her hours to?

21       A.    She wanted to come in 9:00 to 5:00.

22       Q.    Did she give you a reason for wanting to change

23   her work hours?

24       A.    Her memo to me indicates yes.

Susan Elizabeth Zawislak - Brewington          110

1       Q.     Indicates yes?

2       A.     Yes, she did.

3       Q.     What was the reason?

4       A.     That she had small children, and she choiced

5    into a school, and because she choiced into a school,

6    she would need to be there to take care of

7    transportation needs because of the choice program.

8       Q.     Okay.  Did you deny her request at that time?

9       A.     I consulted with my assistant campus director

10   and campus director who informed me that work hours

11   are 8:30 to 4:30, and that he would not approve any

12   move from that.

13      Q.     He denied the request.  Are you talking about

14   Lawrence Miller?

15      A.     I had to recommend a request.

16      Q.     So did you recommend the request?

17      A.     I consulted with him related to this and

18   basically that was not a reason that would be

19   acceptable.  So, therefore, I did not recommend

20   something in writing after 1 had a discussion with my

21   supervisor related to this.

22      Q.     Is that because it was for, quote, personal

23   reasons?

24      A.     Yes.



1    Q.    But Liz Wilson had personal reasons, isn't that

2    correct?

3    A.    Yes.

4    Q.    And didn't Brigitte Brown also advise you at

5    some point that this change of hours from 9:00 to 5:00

6    would also benefit the students in her program?

7    A.    She did not communicate that at that time.

8    Q.    Did she communicate it to you at any time?

9    A.    Not to me.

10    Q.    Did she communicate it to anyone?

11    A.    I could not answer that.

12    Q.    Why can't you answer?

13    A.    Because I don't know if she talked to anyone

14    else.

15    Q.    Okay.  That's fine if you don't know.  I

16    just -- okay.

17         Back to Ken Cole's work hours and how he

18    requested or he had to change his hours from 8:00 to

19    2:00 to 8:30 to 2:00, or when it was the middle, it

20    was 8:00 to noon.  Either way, the start time was at

21    8:00, is that correct?

22         MR. McMACKIN:  Objection.  Vague.

23    Q.    Either time, the start time was at 8:30?  I'm

24    sorry.

1    A.    I'm confused.

2    Q.    Okay.  I understand.

3          Back to Ken Cole and his work hours.  You

4    instructed that the work hours were from 8:30 to 4:30,

5    correct?

6    A.    Mm-hmm.

7    Q.    And as I understand it -- correct me if I'm

8    wrong -- Ken Cole requested to work from 8:00 to noon,

9    is that correct?

10   A.    Requested?

11   Q.    Requested or wanted to work from 8:00 to noon?

12   A.    Wanted?

13   Q.    Because of medical reasons?

14   A.    That's what we were trying to determine.  We

15   could not determine that based on the fact that he

16   said -- he said that, I want to work this because of

17   medical reasons.

18   Q.    Didn't he provide a doctor's note?

19   A.    Not at that point.

20   Q.    What point are we talking about?  This doctor's

21   note is dated November 25th, 2002?

22   A.    Well, I know in October my campus director

23   asked me to look into the -- to determine why Ken's

24   hours need to be reduced.

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Susan Elizabeth Zawislak - Brewington          113

1     Q.    So then he presented a doctor's note in

2     November of 2002.  Was he allowed to work a reduced

3     schedule after?

4     A.    Yes, he was.

5     Q.    Are you sure about that?

6     A.    Yeah.

7     Q.    Okay.

8     A.    That's what we needed.

9     Q.    Isn't it true that he presented the doctor's

10    note and that wasn't sufficient?

11    A.    I can't answer that.

12    Q.    Wasn't Ken Cole threatened with termination if

13    he did not provide additional information about his

14    illness?

15    A.    No.

16    Q.    That's not true?

17    A.    He was not threatened.

18    Q.    He was not threatened with termination?

19    A.    No.

20    Q.    With respect to Ken Cole and his work hours, I

21    have a memo here that I'd like to mark as an exhibit.

22    This is a memo from  REDACTED         .  It's dated

23    11/13/02, cc Larry Miller, Paul Morris, and Ann

24    Del Negro, if I can have that marked.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Susan Elizabeth Zawislak - Brewington          114

1            (Zawislak Deposition Exhibit 10 was marked

2      for identification.)

3      BY MS. BREWINGTON:

4         Q.    Are you aware that, in this memo,

5      REDACTED     indicates that she supports Ken's request to

6      work reduced hours until he is feeling 100 percent?

7         A.    Yes.

8         Q.    Is it also true that   REDACTED        indicates

9      in her memo that Ken "has been and still is one of

10     most reliable, dedicated, and dependable employees

11     that I have had since becoming a supervisor of this

12     program"?

13        A.    That is what REDACTED said in the memo.

14        Q.    At what point did Paul Morris change his

15     position to acting department chair?

16        A.    When Ann Del Negro moved to a position at the

17     Owens campus in August of 2003, I recommended to

18     Mr. Miller a series of moves.

19        Q.    What did you recommend to Mr. Miller?

20        A.    I recommended that Jacquita Wright Henderson,

21     who was formerly in a position, was moved to acting

22     assistant director of CCP to fill the void left by

23     Ann, and that Paul Morris moved into her position.

24        Q.    Which was?



1    A.    The director of -- or no.  Not the director.

2    The department chair.

3    Q.    Department chair?

4    A.    Of school and community projects.

5    Q.    Okay.

6    A.    And then I recommended that Rosanna Brown

7    Simmons move into his position.  These are all part of

8    a recommendation to our campus director.

9    Q.    Around what time was that?

10    A.    2003.  August of 2003.

11    Q.    So the position of program manager was not

12    posted, is that correct?

13    A.    Correct.

14    Q.    And as acting department chair of community and

15    school programs, did Paul have all the TRIO programs?

16    Was he a supervisor of all TRIO programs?

17    A.    No, he was not.

18    Q.    Which program was he not a supervisor?

19    A.    Of the TRIO programs, Math and Science.

20    Q.    And why not?

21    A.    Because Ann Del Negro was supervising all of

22    the TRIO programs.  She was working very closely with

23    REDACTED        on numerous supervisory issues, and

24    Jacquita Wright Henderson at the assistant director

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan Elizabeth Zawislak - Brewington        116

1    level, acting assistant director level, assumed those

2    responsibilities, which were Ann's responsibilities.

3        Q.    So is it your testimony that UBMS was under Ann

4    Del Negro's control and Jacquita Wright as supervisor

5    because of the issues that REDACTED        was having

6    in her position?

7        A.    That's a two-part question too.

8        Q.    Was Paul Morris not the supervisor of UBMS

9    because    REDACTED      was having performance issues?

10            MR. McMACKIN:  Objection to form.

11       A.    It was at the assistant director level that

12    REDACTED              performance was being addressed.

13    That's the same level that was being addressed.

14            MR. McMACKIN:  We are on overtime now.

15    It's after six.  How much longer do you have?  Well,

16    actually I guess I should you ask you first.  How much

17    more do you have?

18            MS. BREWINGTON:  I don't know.  I have

19    probably another hour.

20            MR. McMACKIN:  What are your thoughts?

21            (Recess taken.)

22            MS. BREWINGTON:  I'm going to need a

23    continuance of this case.  The time is 6:15, and I

24    don't believe that I can fully depose you with the

1    remainder of my questions within 45 minutes.  The

2    court reporter has indicated that she is possibly

3    losing accuracy and that is something I want to avoid.

4    I would like to continue this deposition at this time.

5         MR. McMACKIN:  I just want to state for

6    the record that we are going to object to any

7    continuance, and when the time comes to renotice the

8    decision we'll deal with it then.

9         MS. BREWINGTON:  Objection noted.

10         MR. McMACKIN:  Do you want to stop now?

11         MS. BREWINGTON:  Yes.  Thank you.

12         (Discussion off the record.)

13         MS. BREWINGTON:  Back on the record,

14    without waiving any request to continue this

15    deposition, we are going to go forward today and may

16    continue at a later time.

17         MR. McMACKIN:  We are not going to

18    stipulate to that.  Counsel for the plaintiffs had an

19    opportunity to either discontinue at about 6:15 and

20    renotice the deposition for a subsequent date.

21    Counsel for the defendant offered to stay until 7:00

22    o'clock.  Since we are continuing until 7:00 o'clock,

23    we will not stipulate to any continuance or renotice

24    of the deposition.

**W&F**

Susan Elizabeth Zawislak - Brewington        118

1              MS. BREWINGTON:  Can you let me know the

2    last thing we were discussing?

3                  (Record read.)

4    BY MS. BREWINGTON:

5      Q.   So we are there.  I'm not sure I understand

6    your answer to that question.  Could you explain it?

7      A.   That Ann Del Negro had responsibilities.  The

8    responsibilities that she had for the programs was to

9    work and coach and counsel with a person who was

10   having a difficult time.  That was time consuming.

11     Q.   Is that why Paul Morris was not responsible for

12   Upward Bound Math and Science?

13     A.   That's why that position of school and

14   community programs division, even Jacquita was in that

15   position, that's why that function was not with that

16   level position; it was with Ann.

17                (Pages 119, *et seq.*, are under seal

18   without the seal request ending.)

19

20

21

22

23

24



Susan Elizabeth Zawislak - Brewington      119

1  BY MS. BREWINGTON:

2      Q.   When did the problem with   REDACTED      begin,

3  performance issue?

4              MR. McMACKIN:   Confidential.

5      A.   Confidential.   2000.

6      Q.   So the performance issues began in 2000,

7  correct?

8      A.   Yes.

9      Q.   And in 2001 when Paul Morris became special

10  programs director, was he responsible for all the

11  programs?

12      A.   Yes.

13      Q.   If   REDACTED       was having problems in 2000,

14  along with 2001, why wasn't Ann Del Negro in charge of

15  REDACTED       and her group at that time?

16              MR. McMACKIN:   Objection.   Argumentative.

17      A.   Ann Del Negro was   REDACTED       supervisor

18  until Paul's reclassification request was -- I don't

19  know what the correct word is, but it was

20  acknowledged.   It was in July of that year.

21      Q.   And at that time in July of that year, 2002, is

22  that correct?

23      A.   Yes.

24      Q.   Special programs director Paul Morris became in

1    charge of Upward Bound Math and Science, is that

2    correct?

3      A.    Yes.

4      Q.    And you already indicated, did you not, that

5      REDACTED        began having problems, performance

6    issues in 2001?

7      A.    Yes.

8      Q.    Okay.

9      A.    2000.

10     Q.    2000 and 2001, correct?

11     A.    Correct.

12     Q.    So why was Paul Morris put in charge of Upward

13   Bound Math and Science in 2001 even though REDACTED

14   REDACTED    was having performance issues at that time?

15     A.    He was not put in charge of Upward Bound Math

16   and Science in 2001.

17     Q.    As special programs director, Paul Morris

18   wasn't put in charge of Upward Bound Math and Science?

19     A.    The time frame is incorrect.

20     Q.    When was he put in charge of Upward Bound Math

21   and Science?

22     A.    When he was special programs director in July

23   of 2002.

24     Q.    Was   REDACTED        having issues in July of

Susan Elizabeth Zawislak - Brewington        121

1   2002?

2      A.   We were continuing to work and coach with her

3   related to her fiscal issues for her grant, yes.

4      Q.   So why was Paul Morris put in charge of Upward

5   Bound Math and Science in 2002 even though REDACTED

6   REDACTED    was having performance issues at that time?

7      A.   The performance issues at that time were at a

8   level that could be handled at the department chair

9   level.  They continued to escalate.

10     Q.   Kate Sullivan was program manager of Upward

11  Bound Classic, correct?

12     A.   Correct.

13     Q.   At some point she left her position, is that

14  correct?

15     A.   Yes.  That's correct.

16     Q.   Was her position posted?

17     A.   Yes, it was.

18     Q.   Was it posted internally and externally at the

19  same time?

20     A.   I don't recall.

21     Q.   You don't recall?  Do you recall who received

22  her position?

23     A.   The person who moved into her position was

24  Angie McCloskey.

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    So Angie posted?

2    A.    Mm-hmm.

3    Q.    What was Angie's former position?

4    A.    She was a student enrichment coordinator.

5    Q.    For the Upward Bound Classic program?

6    A.    Yes.

7    Q.    And did Andrea Coleman post for the program

8    manager position of Upward Bound Classic?

9    A.    Yes, she did.

10    Q.    Did she receive the position?

11    A.    No, she did not.

12    Q.    Was Andrea Coleman a student enrichment

13    coordinator?

14    A.    Yes, she was.

15    Q.    What position did Andrea Coleman move into

16    after her position as student enrichment coordinator?

17    A.    Program manager.

18    Q.    Program manager of what group?

19    A.    Youth in general, like youth camps programs.

20    During the school year there were different types of

21    programs.

22    Q.    Around what time did she become program manager

23    of youth programs?

24    A.    I don't recall.



Susan Elizabeth Zawislak - Brewington          123

1      Q.    Do you recall approximately when?

2      A.    It was -- beginning part of 2004, maybe.

3      Q.    Okay.  The beginning part of 2004-- so when you

4  say beginning --

5      A.    January, February.

6      Q.    January, February of 2004 she became program

7  manager of youth community --

8      A.    Mm-hmm.

9            MS. BREWINGTON:  I don't know if you want

10  to do a confidential.  I'm going to ask about REDACTED

11  REDACTED

12           MR. McMACKIN:  Confidential, please.

13           (Pages 124, et seq., are under seal

14  without the seal request ending.)

15

16

17

18

19

20

21

22

23

24

1    BY MS. BREWINGTON:

2        Q.   At some point   REDACTED       left employment

3    with Del Tech, is that correct?

4        A.   She was terminated.

5        Q.   She was terminated?  When was she terminated?

6        A.   I believe the date was April of 2004.

7        Q.   April of 2004, is that what you said?

8        A.   Yeah.  Something like that.

9        Q.   Why wasn't Brigitte Brown or Ken Cole chosen to

10   become acting Upward Bound Math and Science program

11   manager when   REDACTED       was terminated?

12       A.   I'm going to be brief about this.  Jacquita

13   Wright Henderson had been working very closely with

14   REDACTED and had oversight for that program.  REDACTED

15   actually physically left Delaware Tech on the --

16   February -- in February, 60 days' notice.

17            So for all intents and purposes, she was

18   working for us at the time that was perceived she had

19   quit.

20       Q.   I'm not sure I understand.  My question was why

21   wasn't Brigitte Brown or Ken Cole chosen to become

22   acting Upward Bound Math and Science once  REDACTED

23   REDACTED    was terminated?

24       A.   We --



1    Q.    Why?

2    A.    One, you gave me two choices.  One or the

3    other.  One would mean the other wouldn't.  So, again,

4    your question is -- you're asking me --

5    Q.    Okay.  We'll take it apart.  Why wasn't

6    Brigitte Brown chosen to become acting Upward Bound

7    Math and Science program manager once  REDACTED

8    was terminated?

9    A.    That recommendation was not made.

10    Q.    Okay.

11    A.    There are options that you have.

12    Q.    That recommendation was not made.  So that's

13    the reason, because a recommendation was not made?

14    A.    Correct.

15    Q.    Who would have made that recommendation?

16    A.    In consultation with program manager direct --

17    you know, Jacquita and myself, we would have to make a

18    recommendation of her approval to the campus director.

19    Only the campus director could --

20    Q.    Why didn't you make that recommendation that

21    Brigitte Brown be chosen to become acting Upward Bound

22    Math and Science program manager?

23    A.    The other part of your question was why Ken

24    Cole --



Susan Elizabeth Zawislak - Brewington          126

1      Q.    And I'll go back to that.

2      A.    Right.  And that's -- again, looking at where

3   we were and what we --REDACTEDwas not there.  Jacquita

4   was there.  I had -- there's choices available to you.

5   Do you post something?  Do you put somebody in acting?

6   Moving somebody in an acting position is when you need

7   somebody to step right in and right up and be right up

8   to the plate and who was ready to handle that

9   responsibility.  Jacquita had been handling that

10  responsibility since prior to whenREDACTEDeven went on

11  medical leave that previous fall.

12     Q.    So are you saying that the reason why Brigitte

13  Brown wasn't chosen to become acting Upward Bound Math

14  and Science is because Jacquita Wright Henderson was

15  in that role?

16     A.    No.  She had oversight for that role.  You're

17  not in a role or in a position.  Usually when staff

18  move on, either you have somebody who is in a higher

19  position who facilitates what is supposed to be

20  happening in that program until somebody comes on

21  board.  When somebody leaves the next day, there's no

22  one right there.  Jacquita had been doing that for the

23  program since beforeREDACTEDwent on her medical leave.

24  She had been providing that direct oversight, not in

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    that position, but the direct oversight.

2      Q.    So is it fair to say, then, that the reason why

3    Brigitte Brown wasn't chosen is because Jacquita

4    Wright was overseeing that position?

5      A.    There's nothing to be chosen; it is a

6    recommendation.

7      Q.    Well, she wasn't recommended?

8      A.    Because Jacquita was performing that role.

9      Q.    Is that the same reason why Ken Cole wasn't

10   chosen -- wasn't recommended?

11     A.    Yes.  Yes.

12     Q.    I'm sorry.  Wasn't recommended?

13     A.    Yes.  Yes.

14     Q.    Now, if Jacquita Wright Henderson had oversight

15   for that position, why, then, was the position posted?

16     A.    Because she had oversight for the position.

17   She wasn't the program manager.  She wasn't an acting

18   program manager.  She was the assistant director of

19   corporate and community programs.

20     Q.    So why not put an acting Upward Bound Math and

21   Science program manager in there?

22     A.    That was the option that was not pursued.

23     Q.    Why not?

24     A.    I thought I answered that question.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      Q.    You didn't.

2            MR. McMACKIN:    Asked and answered.

3      Q.    When   REDACTED        left employment, was the

4   position of Upward Bound Math and Science posted?

5      A.    Yes.

6      Q.    Program manager.  I'm sorry.

7            Internally and externally?

8      A.    Yes.

9      Q.    Why was it posted internally and externally at

10   the same time?

11      A.    That was an option that's available to the

12   college.

13      Q.    Who made that decision?

14      A.    A recommendation of the campus director

15   approves the recommendations.

16      Q.    Who made that recommendation?

17      A.    Jacquita Wright Henderson and myself as the

18   administrators for the division made the

19   recommendation.  Actually, it's called a external post

20   which means internal candidate.

21      Q.    So you and Jacquita made a recommendation to

22   post the position internally and externally?

23      A.    Yes.

24      Q.    Why is that?



1    A.    Because that was an option that was available

2    to us.  It's -- you know.

3    Q.    Why didn't you choose the other option?  Why

4    didn't you choose the option of posting it internally

5    only first?

6    A.    The internal posting would not allow for

7    individuals to apply, you know, across the per.  It's

8    a choice.  You say we are looking -- we just went

9    through with the program manager.  We know that we

10   have been operating with Jacquita in an acting role,

11   and we want to look at a pool of applicants.

12   Q.    Did you not have a pool of applicants that were

13   internal as part of Del Tech?

14   A.    I couldn't answer that.

15   Q.    Okay.  You can't answer that, but your opinion

16   is that you wanted a pool of external applicants?

17         MR. McMACKIN:  Objection.

18   Mischaracterizes testimony.

19   A.    I can't answer that.

20   Q.    Isn't it the normal practice to post things

21   internally first to promote a policy of hiring from

22   within?

23   A.    That is the policy for plan D employees of the

24   college, not for plan A or B or C.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Susan Elizabeth Zawislak - Brewington          130

1       Q.    Not for plan A, B, or C?

2       A.    There's different -- yes.  There are options.

3       Q.    So is it mandatory for plan D to post

4    internally first and then externally?

5       A.    I can't answer that.  I don't post for plan D

6    positions.  It's in the personnel manual.

7       Q.    Do you know who was on the interviewing

8    committee in March of 2004?

9       A.    Yes.  I recommend the committee.

10       Q.    But for program manager of Upward Bound Math

11    and Science?

12       A.    Yes.

13       Q.    Who was on the committee?

14       A.    Best of my recollection, Paul Morris, Sam

15    Pinella, Andrea Coleman, and Reuben Evans.

16       Q.    Did those same individuals serve on the

17    committee in July?

18       A.    Mm-hmm.

19       Q.    Of 2004?

20       A.    Yes.

21       Q.    And you said that you were responsible for

22    choosing the interview committee?

23       A.    No.

24       Q.    What did you say?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1      A.    I am responsible for recommending the

2    committee.

3      Q.    Recommending.  Okay.

4            Why didn't you recommend any member of

5    Upward Bound Math and Science to be on the committee?

6      A.    Why didn't I recommend?  We are hiring a

7    program manager, not a senior student enrichment

8    coordinator.

9      Q.    I didn't get the names of everybody.  Is Reuben

10   Evans a program manager?

11     A.    He had been a former -- he had oversight for

12   the TRIO programs back in the day.  I can't even tell

13   you when.  He's a counselor at the college.

14     Q.    He's a counselor.  But you're saying he was

15   previously a program manager?

16     A.    He had been involved with the TRIO programs

17   prior to when I was involved.  I don't know.

18     Q.    So you don't know whether or not he is program

19   manager?

20     A.    I don't know what his title was, but he was

21   beyond a student enrichment coordinator.  So whatever

22   the titles were at that point, he had managerial

23   responsibility and oversight for the program.

24     Q.    Is it Saul?



1    A.    Sam.

2    Q.    Sam?  What's his last name?

3    A.    Pinella.

4    Q.    Was he a program manager?

5    A.    No.  He's an instructor.

6    Q.    He's an instructor of what?

7    A.    Science-y kind of things.  Science courses.

8    Q.    So he's a teacher?  Is that what he is?

9    A.    I think his title may be department chair,

10   program coordinator.  He has administrative oversight

11   for allied health courses, science course at the

12   Stanton/Wilmington campus.

13   Q.    So in choosing or recommending a committee,

14   would you normally choose individuals at that level or

15   higher?

16   A.    Yeah.

17   Q.    That was the standard.  Okay.

18   A.    Yes.

19   Q.    Okay.  Were you aware that Brigitte Brown was

20   denied an interview for the project manager position

21   in March of 2004?

22   A.    No.

23   Q.    No?

24   A.    No.

1    Q.    And the reason why you weren't aware of that?

2    A.    It is not part of the process.  I just see

3    recommended candidates.

4    Q.    Who ultimately became the Upward Bound Math and

5    Science program manager once all these interviews were

6    completed?

7         MR. McMACKIN:  Objection.  Vague.

8    Q.    You can answer.

9    A.    What interview -- are you saying each round of

10   interviews that --

11   Q.    Who ultimately became Upward Bound Math and

12   Science program manager?

13   A.    Andrea Coleman.

14   Q.    Wasn't Andrea Coleman serving on the

15   interviewing committee?

16   A.    Yes.  She had been.

17   Q.    And wasn't Paul Morris also serving on the

18   interviewing committee?

19   A.    Yes, he was.

20   Q.    And didn't both Brigitte Brown and Ken Cole

21   file charges of discrimination against the college

22   prior to Paul being chosen or recommended to be on the

23   committee?

24   A.    Yes.



1      Q.   How did Andrea Coleman become the program

2    manager --

3                 MR. McMACKIN:   Objection.   Vague.

4      Q.   -- of Upward Bound Math and Science?

5      A.   She requested a transfer, which was recommended

6    and approved by the campus director.

7      Q.   Recommended by?

8      A.   Myself.   It goes to the campus director.

9      Q.   So you recommended --

10     A.   No.   Andrea requested directly to him.

11     Q.   So you had no role in this?

12     A.   When a request is made, then Mr. Miller said,

13   you know, are you in support of this move?   You know,

14   it's a team -- he has --

15     Q.   So is it fair to say that Andrea made the

16   transfer request to Mr. Miller?

17     A.   That's our process.

18     Q.   Then he asked you what you thought about it?

19     A.   Well, there -- I'm just thinking, but when we

20   get the paper -- I don't know the timing, you know.

21     Q.   But is that how it happened?

22     A.   I don't know the timing.

23     Q.   Okay.   I'm not asking about the timing.   I'm

24   asking you if --

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan Elizabeth Zawislak - Brewington        135

1      A.    I don't know if I had the discussion with him

2   as she was doing the memo, as she did the memo.    I

3   can't tell you the timing.

4      Q.    But is it fair to say that she went directly to

5   Mr. Miller to request a transfer?

6      A.    The process is that only the campus directors

7   have the authority to approve a transfer.

8      Q.    Okay.

9      A.    We were aware that the transfer was being made.

10     Q.    You were?

11     A.    Yes.

12     Q.    When you say we, who --

13     A.    Jacquita.

14     Q.    Jacquita and yourself were aware?

15     A.    Yes.

16     Q.    Did Andrea Coleman come to you?

17     A.    Not to me personally, no.

18     Q.    Did she come to Jacquita?

19     A.    I can't answer that.

20     Q.    You can't answer because you don't know?

21     A.    Right.

22           MR. McMACKIN:  Can I instruct the witness,

23   in order to help speed things up, if you don't know,

24   just say you don't know.

**W&F**

Susan Elizabeth Zawislak - Brewington        136

1               THE WITNESS:  Okay.  We'll go on.  I'll be

2    faster.  Okay.  Go ahead.  Okay.  Okay.

3    BY MS. BREWINGTON:

4        Q.   When did Andrea Coleman request a transfer?

5        A.   I don't know.

6        Q.   When approximately?

7        A.   January.

8        Q.   January of 2004?

9        A.   Yes.

10       Q.   And when was the transfer approved?

11       A.   January, February.  I don't -- I don't know,

12   you know, that time frame.

13       Q.   So I'm confused because I must be missing

14   something.  She requested a transfer in January 2004,

15   correct, and the approval --

16       A.   2000 -- 2005.

17       Q.   Okay.  So 2005.

18       A.   Right.  It's 2006 now.

19       Q.   Yeah.  Yeah.  Okay.

20              MR. McMACKIN:  It was when we started the

21   deposition.

22       A.   And I'll -- and I'll -- go ahead.

23       Q.   So it's January 2005 --

24       A.   Yes.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Susan Elizabeth Zawislak - Brewington    137

1    Q.    -- when she requested the transfer?

2    A.    Yes.  Yes.  Yes.

3    Q.    Okay.  I was like --

4    A.    No.  No.  There were -- there were -- 2005.

5    Q.    January 2005 she requested a transfer and

6    shortly after that --

7    A.    The transfer was granted and she moved to the

8    position.

9    Q.    Is it fair to say that Andrea Coleman has less

10   experience than Brigitte Brown with respect to Math

11   and Science, Upward Bound Math and Science?

12              MR. McMACKIN:  Objection.  Vague.

13              MS. BREWINGTON:  I'm sorry.  Can I

14   rephrase?

15   BY MS. BREWINGTON:

16   Q.    Is it fair to say that Andrea Coleman had less

17   experience in Upward Bound Math and Science when she

18   applied for the transfer?

19   A.    Less experience in Math and Science, yes.

20   Q.    Is it fair to say that she didn't have any

21   experience with Upward Bound Math and Science when she

22   requested the transfer?

23   A.    Yes.

24   Q.    Is it fair to say that Ken Cole had more



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    experience with Upward Bound Math and Science at the

2    time of the transfer?

3      A.    Yes.

4      Q.    Are you familiar with blanket travel requests?

5      A.    Yes.

6      Q.    What are they?

7      A.    Back in the day you could request travel and

8    say, from this time to this period of time, on no

9    days, no accountability attached, nothing, I want

10   permission to go wherever I want whenever I want

11   and -- stop.

12     Q.    Back in the day, when's back in the day?

13     A.    Before -- well, fleet service where we get our

14   vehicles, their prices and everything went up, and the

15   campus director made -- wanted to make sure that all

16   of the programs, not CCP, every single program, looked

17   at our fleet vehicle use and how much our cars were

18   being used and who was going where what days, and

19   that, if you had a blanket request, it was not

20   assigned to a particular day and different times

21   and --

22     Q.    So did you say when?

23     A.    2002, like that time frame.

24     Q.    Were you concerned with the blanket travel



1   request of the Upward Bound Math and Science student

2   enrichment coordinators --

3              MR. McMACKIN:  Objection.  Vague.

4   Q.    -- at any time?

5   A.    Yes.

6   Q.    Okay.  Was this around 2002 or --

7   A.    Yeah.

8   Q.    And were you concerned with the blanket travel

9   request of any of the other --

10  A.    Yes.

11  Q.    -- student enrichment?

12             And what did you do about these concerns?

13  A.    Talked to the program managers and said that we

14  need a plan in place so I know what people are in what

15  cars what days of the week.  And the Classic program

16  and the Educational Talent Search program are local

17  programs.  They go to the same schools every week.

18  They may see different students, but their travel

19  request is pretty much the same.  Every Monday I go to

20  Glasgow High School.  Every Tuesday I go to Newark

21  High School where they would be using the cars for

22  similar mileage, similar distances on designated days

23  that were very standard and regular.  That was not the

24  case with Math and Science.

1              They had a blanket approval for three

2      months at one point. And then, you know, you see at

3      one point, it's I travel in the month of March.  I

4      travel in the month of March and April.  I travel in

5      the month of -- we just wanted to know, you know, when

6      did you travel?  Your request will be approved.  We

7      just need to know when you're going in a car and what

8      time you're going.  And we deal with fleet services.

9      And we deal with paying for cars every time.  And you

10     have budgets.  And you have your program manager who

11     understands what effect this has on the budget.

12     And...

13     Q.    So around 2002 did you end the blanket travel

14     request for Upward Bound Math and Science?

15     A.    Yes.

16     Q.    Did you end the blanket travel request for the

17     other --

18     A.    Yes.  Every program needed to have their

19     documentation as to how they were using what was in

20     their blanket travel request.

21     Q.    So you treated every program the same?

22     A.    Yes.

23     Q.    So every program had to halt blanket travel

24     requests?



1    A.    And they had to provide documentation as to

2    where they were when.

3    Q.    How did you disseminate this information to the

4    student enrichment coordinators?

5    A.    That was the responsibility of the program

6    manager.

7    Q.    So you spoke with    REDACTED    ?

8    A.    Or Ann did.  Ann was her direct supervisor, you

9    know.

10    Q.    So Ann spoke with REDACTED ?

11    A.    Yeah.  The bottom line is, watch your travel

12    expenses and get with everybody and see where it is

13    and start moving things and...

14    Q.    What's a school visit calendar?

15    A.    It provides accountability as to where the

16    student enrichment coordinators are so they fulfill

17    the requirements of their grants by going to their

18    targeted schools and seeing the students that they

19    indicate that they are supposed to see and have

20    student contact forms for grant accountability.

21    Q.    Is the CCP director involved in reviewing

22    school visit calendars for student enrichment

23    coordinators?

24    A.    Not on a typical basis, but when things are



1    brought to my level, I mean, I have to recommend them

2    on to Mr. Miller.  If there is something that I have

3    to make a recommendation on and I have questions

4    about, he is the only one who could approve this, and

5    I'm going to ask questions.

6        Q.   Did you review Ken Cole and Brigitte Brown's

7    school visit calendars?

8        A.   The ones that were provided by REDACTED        ,

9    yes.

10       Q.   For what reason?

11           MR. McMACKIN:   Objection, vague to the

12   previous question.

13           You can answer.

14       A.   Yeah.  To see how it affected travel, how it

15   affected flex time, how it affected -- how it affected

16   their program.

17       Q.   Did you review school visit calendars of

18   student enrichment coordinators in the Upward Bound

19   Classic program?

20       A.   Yes.  They were provided as to when the request

21   was made.  They said, these are the schools that

22   people are in on these days, and it's a regular

23   program where people go into the program.  It's not

24   sporadic, out-of-state travel.



1    Q.   So is it your testimony all of the student

2  enrichment coordinators provided their school visit

3  calendars to you and you reviewed them?

4    A.   No.  They provided them to their program

5  managers who then forwarded on a recommendation to me

6  that I forwarded on to the campus director.

7            Not me directly in all this.  This goes

8  back to the program manager.

9    Q.   Were you directly involved in reviewing Ken

10  Cole and Brigitte Brown's school visit calendars --

11            MR. McMACKIN:  Objection.  Vague.

12    Q.   -- at any time?

13    A.   When  REDACTED      sent them to me, because

14  she was requesting approval to -- yes.

15    Q.   The other program managers would send you their

16  school visit calendars?

17            MR. McMACKIN:  Objection to form.  You can

18  answer.

19    A.   I was going to say, they went to the same

20  schools every week.  That was what their

21  responsibilities were.  Their jobs were to go to the

22  schools every week, and that was on their calendar,

23  you know.  So it's different when you have a calendar

24  when you go one day here and one day here.  You don't

Susan Elizabeth Zawislak - Brewington          144

1    have --

2        Q.    So Upward Bound is different than these other

3    schools, is that what you are saying?

4        A.    Upward Bound Math and Science, yes.

5        Q.    Okay.  And Upward Bound was different because

6    they didn't have a regular schedule, is that what you

7    are saying?

8        A.    Right.

9        Q.    Oh.  And is that why you wanted their school

10   visit calendars?

11       A.    In order to see about the travel and the

12   visiting schools and one thing -- yes.  Yes.

13               Okay.  Go ahead.  I'm ready.

14               MS. BREWINGTON:  If I could have one

15   minute to confer with my client.

16               (Recess taken.)

17               MS. BREWINGTON:  I have no further

18   questions.

19               (Deposition ended at approximately

20   7:00 p.m.)

21

22

23

24

145

INDEX TO TESTIMONY

SUSAN ELIZABETH ZAWISLAK                    PAGE
      Examination by Ms. Brewington          2

              - - - - -


              INDEX TO EXHIBITS


ZAWISLAK DEPOSITION EXHIBIT NO.              PAGE
1   Corporate & Community Programs Division
    Stanton/Wilmington, August 2002 Update    5

2   Memorandum dated September 9, 2002       21

3   Memorandum dated October 29, 2002        21

4   FY99 Achievement Report                  36

5   Memo from Brigitte Brown, Kenneth Cole,
    Elizabeth Wilson to Ann Del Negro, Sue
    Zawislac (sic)                           43

6   Four pages of colored diagrams           62

7   Withdrawn                                84

7   Six-page document labelled Upward Bound
    Math and Science Center, Program Years
    November 1, 2004 - October 31, 2009      86

8   E-mail dated September 19, 2002         101

9   Document from John E. Hocutt, Jr., M.D. 106

10  Memo dated 11/13/02                     114
              - - - - -

PAGES UNDER SEAL WITHOUT REMOVAL OF SEAL:    27
                                             54
                                             70
                                             72
                                            119
                                            124

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters

03/27/06 MON 14:36 [TX/RX NO 9092]

ATTACH TO DEPOSITION OF: _Susan Elizabeth Zawislak_

DATE TAKEN: _January 27, 2006_

IN THE MATTER OF: _Cole v Delaware Technical and Community College_

### ERRATA SHEET

**INSTRUCTIONS:** After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet. **Do not make any marks or notations on the transcript itself.** Rule 30(e) governing this procedure is enclosed. Please sign and date this errata sheet and return it to our office at the address indicated below. Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 110 | 16 | "Took," is the incorrect word |
| 109 | 3 | change word "no" to "those" |
| 129 | 10 | I incorrectly used the word "acting" |
| | | I should have said the word "oversight" |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: _3/27/06_        _Susan E Zawislak_
                        (Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
              1330 King Street
              Wilmington, DE 19801

146

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.



147

State of Delaware  )
                   )
New Castle County  )

### CERTIFICATE OF REPORTER

    I, Ann M. Calligan, Registered Merit Reporter and Notary Public, do hereby certify that there came before me on the 27th day of January, 2006, the deponent herein, SUSAN ELIZABETH ZAWISLAK, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

    I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

    I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.



Ann M. Calligan, RMR
(Certification No. 186-RPR)
(Expires January 31, 2008)

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

# EXHIBIT 1



*Corporate & Community*
*Programs Division*
*Stanton/Wilmington*
*August 2002*
*Update*



DEPOSITION
EXHIBIT
Zawislak
a 1-2-05

### PEOPLE

Diana Ritchie and Mary Beth Vore are welcome additions to the CCP Wilmington office staff. Diana is working in the Upward Bound Classic program, and Mary Beth will be helping with WIA programs. Stop by and say hi!

Paul Morris has been promoted to Special Programs Director, and in addition to Educational Talent Search, has oversight responsibilities for the Federal Trio programs, headed by Upward Bound Math/Science (Rose Henderson, Program Manager) and Upward Bound Classic (Kate Sullivan, Program Manager).

Olive Robbins has undergone surgery, and has come through fine—please keep her in your thoughts as she continues to recuperate. She hopes to be back part-time on August 26th.

Let's welcome back Peggy Jones to the CCP office – she's been recuperating from surgery and returned to full duty on Wednesday July 31st. We're glad she's back!!!

Please extend your best wishes to Dionna Harris, who has accepted a new position with the Christina School District effective August 30th. She will be working as a counselor with at-risk and special needs children.

### PROGRAMS

During the summer, while the pace of our non-credit professional and personal development classes slows down, summer youth programs really take off. Some (and certainly not all!) of the highlights:

➢ SUMMER CAMPS
New Camps were added this year, which included Kids in the Kitchen, Wonders of Web Design, Girl Scout, Build It, Bank It (in partnership with JP Morgan Chase), Health Careers, and Computer Camp (one of which was provided for the Girl Scouts). All in all, JP Morgan Chase and the Girl Scouts provided scholarships for 37 students to attend camps, and campers who attended the JP Morgan Chase camp received a computer (free of charge!) donated through the Educational Foundation. Wow!

All programs incorporated field trips and an impressive list of guest speakers representing a diverse range of occupations. Most notably, trips were arranged to the Brandywine Zoo and the Grand Opera House. Great support was also received from Regal People's Plaza Movie Theaters, Oakwood Valley pool, Christiana Skating Center, Pike Creek and Prices Corner Bowling Lanes. Did we say impressive guest speakers? How about Scott Neely for example? If you don't know Scott, maybe you'd recognize his work if you were a fan of Scooby Doo or the Cartoon Network.

Many camps, especially the Web Design camp, were filled early, with most camps being filled to capacity. The return rate for our camp staff was 60%, and we offered an incentive program for the first time this year. This program awards the camp staff for good attitude, sound judgment, or overall way they interact with the kids. In addition, we are fortunate to have 15 kids from the S.O.A.R. program who are Counselor's in Training. This beneficial partnership has allowed our camps to be more than adequately staffed, and the S.O.A.R. kids to be paid for a valuable learning experience.

## ➢ S.O.A.R. PROGRAM

Other S.O.A.R. activities included placing the students in a variety of positions in Campus offices, such as CCP, the Library, and Administrative Services. In addition to working, S.O.A.R. students have completed computer training in hardware and web design classes here at DTCC. The final project consists of each student to post a web page that they have designed using HTML to a public server. If you want the full run-down about all the activities, click here.

## ➢ UPWARD BOUND CLASSIC

The theme of the summer program is, "Explore Your Personal Best". Each day of the week has a different focus, or theme. The trips and presentations have been planned to highlight those themes. The programming themes are: Career and College Exploration; Academic Growth; Personal Development; Community Involvement and Fun Factor Fridays. Two special programs have also been implemented this summer in the UBC program. One is the offering of the PSAT Kaplan Prep Course, for all rising 11th graders in the summer program. The other is ballet and jazz dancing lessons at the Grand Opera House for 10th, 11th and 12th graders that expressed interest in dance. The MBNA Foundation underwrites the PSAT, and the Grand Opera House Foundation donates the dance classes. Upward Bound Classic also held a Multicultural Awareness Day supported by a $1,000 grant from the Delaware Humanities Foundation. More information about the program and the guest speakers is available here.

## ➢ EDUCATIONAL TALENT SEARCH

The Educational Talent Search Program began its Second Annual Junior Educational Talent Search Career Camp on Monday, July 8, 2002. The two-week program was designed to introduce different career fields to the participants. Each day of the camp represented one of eight different career clusters. The career clusters covered during the camp were The Arts,

Health Care, Communications, Engineering, Science, Law & Government, Education & Social Services, and Business. A sampling of the career speakers, as well as more program details...

> ### UPWARD BOUND MATH SCIENCE



Upward Bound Math Science was participating in an ongoing Youth Leadership Program, which is an arm of Toastmasters International. This is a public speaking program in which students learn to present presentations in front a group, and to think on their feet. This program culminated in a debate titled "Table Topics." Upward Bound Math Science students were also exposed to a myriad of professions through workshops and seminars. These students had the opportunity to speak with representatives from Dentistry, Forensic Science, Mortuary Science, Pharmacy, and Medicine. More details are available here.

That doesn't mean that our occupational training programs took a hiatus. The new training contract with Dealer Support Services for the John Deere Company, as well as training for the John Deere Company began in July. Forty-four students are enrolled at the Stanton and Owens Campuses. It is anticipated that this is the first of many training opportunities to come.

ETC courses were held for K-12 teachers and DTCC staff, and enrollment in the summer computer classes continues to grow.

All ITD, Technology Applications, and Workforce Training instructors are gearing up for a busy fall. The Brownfield Technician Training class that begins October 16th is already filled to capacity!

Just check out the Fall Course Schedule and you'll see everything we have to offer from automotive and facilities maintenance, to project management and network security and much, much more!!!

### PROPOSALS

We are happy to announce that new WIA voucher funding has been granted for the A+ Help Desk Technician, Basic and Advanced First Core Curriculum for Childcare Providers, Brownfield Technician Certificate, and Certified Nursing Assistant. Project Management Certificate is still pending for approval by the Department of Labor.

### POLICIES

*UPDATE!!!!* A new policy has been implemented, which eliminates the travel advance paperwork. Instead, staff are asked to use the Supercard. Department Chairs and Program Managers are receiving detailed information which will be shared with their respective staff.

### PROCEDURES

Remember, if you are accumulating or utilizing your "comp time", it must be approved in advance. Also leave forms must be submitted and approved in a timely manner. Please remember to wait until your leave request is approved before finalizing your vacation plans.

## PROFESSIONAL DEVELOPMENT

Congratulations to Ann DelNegro, Jacquita Wright, Peter Lonie, and Paul Morris who were nominated for the Collegewide Leadership Development Program.

Banner processes have been in place for almost a year now! Everyone who uses Banner is learning a lot on a daily basis, and there's more to come. Ask your supervisor about Banner training if you feel that you need more support. Remember the Banner Information page is available from the Intranet site, or you can click here. It is a valuable tool for those quick how-to answers.

A Sexual Harassment workshop is being presented on Thursday, August 22nd from 1:30 – 3:30 p.m. in Wilmington Conference rooms A & B. While this training is mandatory, you must cover your office. Other dates for training will be announced shortly.

## PASS IT ON
### ARE YOU AWARE:

Inservice 2002 will be held at the Wilmington Campus on Friday, August 16th. Continental breakfast at 8:15a.m., and Dr. George begins his address at 9:00a.m.

Middle States Open Forums will be held from 1 – 3:00 p.m. in the SE Conference Centers in Wilmington.

Staff Senate will be meeting on August 14th in Stanton room D118 at 2:30 p.m. All B and C staff are invited to attend!

In-Person registration for credit courses will be held on August 20th and 21st for the Fall 2003-01 semester from 8:30 a.m. to 8:00 p.m. The Fall 2003-01 semester officially begins on August 26th.

If you have information regarding *People*, *Programs* or *Professional development* activities that you'd like included in the September Update, please email me by August 23rd at zawislak@college.dtcc.edu.



# EXHIBIT 2

MEMORANDUM

TO:        CCP Staff

FROM:      Susan E. Zawislak
           Director

DATE:      September 9, 2002

SUBJ:      CCP August Update Revision

In a memo dated May 15, 2002, issued by Karen Stone, Associate Vice President for Human Relations, to Salary Plan B Merit Comparable Employees and Salary Plan C Regular, Part-Time Merit Comparable Employees, the open period for reclassification review was announced to be held May 16-May 31, 2002.

According to Karen's memo - *In order to be eligible for a classification review, there must have been a SIGNIFICANT change in the duties and responsibilities of the position since last evaluated and classified/reclassified. Reclassification requests may be initiated by either the employee or the supervisor. In either case, a "DTCC Position Classification Review Statement of Significant Change" form must be completed. This form is available in each campus Human Resources Office.*

As a result of this process, as of July 1, 2002, Paul Morris was reclassified to Special Programs Director, not promoted, as noted in the CCP August update.

SZ:lg



August Update Revision

| | Name: memo re CCP August Update Revision.doc |
|---|---|
| memo re CCP August Update Revision.doc | Type: WINWORD File (application/msword) |
| | Encoding: base64 |
| | Download Status: Not downloaded with message |

Attachment I

DEF 000331

# EXHIBIT 3

# MEMORANDUM

TO:      Jackie Jenkins
         Director of Human Resources

FROM:    Lawrence H. Miller
         Vice President and Campus Director

SUBJECT: Rescission of the Reclassification of Paul Morris

DATE:    October 29, 2002

Effective December 1, 2002, Mr. Paul Morris will be returned to his position of Program Manager and removed from the position of Special Projects Director. Please make the appropriate adjustments to his salary to accommodate this change.

Thank you for your prompt attention to this matter.

ms

cc: P. Morris

CONFIDENTIAL

DEPOSITION
EXHIBIT
Lewislah. 2
A 12706

# EXHIBIT 4

ATTACHMENT #1

# FY99

# ACHIEVEMENT REPORT



## DELAWARE TECHNICAL
## & COMMUNITY COLLEGE

### STANTON/WILMINGTON CAMPUS



DEPOSITION
EXHIBIT 4
Lewislak
1   27 06

DEF 000998

## CORPORATE AND COMMUNITY PROGRAMS DIVISION
## STANTON/WILMINGTON CAMPUS

### COLLEGE EFFECTIVENESS

**Goal 1**    Complete the reorganization of the Corporate & Community Programs Division to provide more effective and efficient delivery of services.   **Campus Plan Goal**

    **Objective 1**    Review current organizational structure and staffing needs.

- *The new Educational Training Specialist position category and coordinator/department chair structure was approved in July 1998. Assignments were allocated by program unit/departments within the CCP division. This provided for more accountability in budgets and staffing. As a result, some staff was reassigned based on workload and funding streams; other positions will be posted as part-time. Greater coordination and grouping of similar programs occurred in some areas while other areas of program overlap are under review. Our greatest challenge is to continue to modify the structure as new programs/funding streams are added or eliminated.*

    **Objective 2**    Reexamine existing office space and reallocate where appropriate.

- *The CCP offices at both the Stanton and Wilmington campuses have become more efficient as a result of the reallocation of space to create neighboring programmatic working groups. Specifically: The Program Developers work adjacent to the office support staff (that handles inquiries and processes registrations) at Stanton. The Bell Atlantic Project team has moved into the A-wing at Stanton adjacent to the office support staff. The Camp on Campus staff now works adjacent to the office support staff. A three-room office suite in the A-wing was added to allow the cluster of ABC Programs and*

DEF 000999

*potential Vista employees at Stanton. The entire TRIO staff is now housed in the East-wing at Wilmington and while they are located on different floors, the individual programs are now in closer working groups. The Community Programming staff has moved into the Southeast-wing at Wilmington, and is now adjacent to CCP classrooms and facilities.*

**Objective 3**     Evaluate current operational procedures and develop more uniformity throughout the division.

- *The Community Program component of CCP had completed a draft "process map" that explains the responsibilities and actions of core functions. This document helped to identify several key areas such as cash handling procedures, processing of registrations, and database management that lacked uniformity. We have since conducted meetings, drafted policies, and implemented procedures with the full intent of uniformity, yet have allowed a small degree of autonomy for programs that must follow different rules for different program/funding reasons. Standardization has also been discussed related to incoming software and internal systems.*

**Objective 4**     Analyze computer hardware and software needs and develop a division plan for future purchases.

- *A survey was drafted and conducted in the Fall that queried all CCP employees of the capabilities of their existing hardware and software. A report was compiled that identified our Division-wide needs for new and additional hardware and software. As a result of this plan eight new computers were purchased in April, which enabled us to give staff members significantly improved equipment. The use of compatible software versions will make the transfer of files more efficient and more frequent. While this reflects some progress, additional work is needed.*

DEF 001000

# EXHIBIT 5

8-14-02

From: Brigitte Brown
Kenneth Cole
Elizabeth Wilson

To:     Ann Del Negro
Sue Zawislac

Cc:     Paul Morris
Rosetta Henderson

We are requesting a meeting to discuss some issues that we attempted to resolve with
Paul Morris. Our issues are legitimate and valid. They impact employee relations,
employee morale, and employee productivity. These issues cannot be conveyed on paper
and just submitted, because we feel that they are important and warrant a meeting. We
feel that we are being denied due process by not being giving the opportunity to meet
with you to express our concerns.

The mission of the Corporate & Community Programs Division, Stanton/Wilmington
Campus, is to provide lifelong learning opportunities to a diverse population through
quality education and training programs. We are proud to apart of such a diverse and
innovative program division by working in the TRIO program. We support your vision
and mission to the fullest by putting in 150% of ourselves daily. All we are asking is for
fairness and consideration.

Brigitte Brown
Ken Cole
Elizabeth Wilson



DEPOSITION
EXHIBIT
5

# EXHIBIT 6

PRESENT SET UP ON 4TH FLOOR

UBMS ☐

UBC ▓

TALENT SEARCH ▓

SOAR ▓

PM-Program Manager
SEC-Student Enrichment Coordinators

PM

MP

SC

SEC

SEC

Computer room

Secretary

Administrative Offices

Chemistry Lab 435



DEPOSITION
EXHIBIT
Zubishk 6
6-12-06
PENGAD 800-631-6989

UBMS ☐

UBC ▨

TALENT SEARCH ▨

SOAR ▨

PM-Program Manager
SEC-Student Enrichment Coordinators

Proposed Move-Cost vs. Allocation of Space
TS will hire a part time person
Pro:
-UBMS in one area
Cons:
-UBMS Inadequate space
-UBMS Program Manager not with other PM
-Classic PM not with UBC Team
-Empty office Space (Storage/Secretary)
-7 employees must be moved
-Not Cost Effective

Administrative Offices

Computer room

Chemistry Lab 435



PM

**Alternative 1**
Switch only Tonia and Liz
SOAR's Pt. Secretary can use existing desk
TS part time could use existing desk.
PROS:
Most Cost Effective
Only 2 employees move
Most Youth Programs are together
CONS:
UBC PM not with team

UBMS ☐

UBC ▨

TALENT SEARCH ▨

SOAR ▨

PM-Program Manager
SEC-Student Enrichment Coordinators



Computer Room

Administrative Offices

Chemistry Lab 435





UBMS ☐
UBC ▨
TALENT SEARCH ▨
SOAR ▨

PM-Program Manager
SEC-Student Enrichment Coordinators

Alternative 2
Pros:
UBMS SEC's & Secretary together
(with adequate space)
UBC SEC's & Secretary together
(with adequate space)
All PM are together
Cons:
Less Costly 6 employees moved

PM

Computer room

Administrative Offices

Chemistry Lab 435

# EXHIBIT 7

*Violation of Federal Grant.*

# DELAWARE TECHNICAL
# & COMMUNITY COLLEGE
# WILMINGTON CAMPUS
# WILMINGTON, DE 19801



# UPWARD BOUND
# MATH AND SCIENCE
# CENTER

## PROGRAM YEARS
### November 1, 2004 - October 31, 2009

Submitted
November 22, 2002



DEPOSITION
EXHIBIT
Zawislak 7
a 1-27-06

Brown/Cole 068

Exhibit 5

Delaware Technical & Community College
Wilmington Campus

2004 - 2009

PART TIME SALARIES

TRIO Administrator
10% of base salary ($50,000)                                    $ 5,000

Youth Care Workers (5)
$11.27 per hour x 37.5 hours per week x 6 weeks x 5            $12,679

Summer Instructors (6)
$28.00 per hour x 29 hours per week x 6 weeks x 6             $29,232

Summer Tutor I (2)
$9.92 per hour x 29 hours x 6 weeks x 2                        $ 3,452

Summer Tutor II (1)
$14.90 per hour x 29 hours x 6 weeks                           $ 2,593

Academic Year Tutor I (1)
$9.92 x 10 hours x 40 weeks                                    $ 3,968

|  |  |
|---|---|
| TOTAL PART TIME SALARIES | $56,924 |
| TOTAL SALARIES | $204,738 |

**FRINGE BENEFITS (e and f)**

| | |
|---|---|
| Full Time Flexi Benefits (g) | $ 39,718 |
| FICA (h) | $ 12,694 |
| Medicaid (h) | $  2,969 |
| Workman's Compensation (h) | $  2,784 |
| Unemployment Insurance (h) | $    246 |

(g) College policy regarding fringe benefits compensation for full time employees at 26.87% includes pension plan benefits, medical benefits flexi benefits for the Delaware Technical & Community College Fringe Benefits package effective November 1, 1998.

(h) FICA (6.2%), Medicaid (1.45%), Workman's Compensation (1.36%), and Unemployment Insurance (0.12%) includes benefits for both full and part-time employees.

|  |  |
|---|---|
| TOTAL FRINGE BENEFITS | $ 58,411 |

| | |
|---|---|
| TOTAL PERSONNEL | $263,149 |

TRAVEL

STAFF TRAVEL

Staff travel to schools (When State car is not available)

Brown/Cole 069

Exhibit 6                    New

Delaware Technical & Community College 2004 - 2009
Wilmington Campus

### (d) *Applicant and Community Support*

1. The applicant is committed to supplementing the project with resources that enhance
the project.

The college provides the UBMS Center with a suite of offices conveniently located in the

East Wing of DTCC/ Wilmington (See Diagrams D-1 and D-2). The Center will be within easy

reach of students. It is in the same building as the cafeteria, student services, library, career

center and chemistry, biology and academic skills labs; with easy access to the West and South

East Buildings with the library, fitness center, and conference facilities. The Center also has

access to all other college facilities, and the use of college vehicles.

The East Wing is easily accessible and offers many educational advantages. In addition

to the facilities mentioned above, the East Wing has a newly renovated tutoring room that

includes computer terminals and resource materials for student use, and houses other federal

TRIO programs, making collaboration among the youth programs practical and possible. The

college provides office space for the secretary and coordinators that includes file cabinets and

office equipment. The Project Director has a separate office that includes file cabinets, storage

areas, and office equipment. The East wing provides privacy areas for confidential conversation

with Center participants. In addition, space in the Basic Skills Center, library and a conference

room, conveniently located next to the UBMS offices is available for staff and student meetings.

By placing the UBMS Center in the same building with other student support services,

such as the financial aid and admissions offices, both the UBMS staff and the participants have

ready access to information that is vital. College staff has already shown their support for the

program by offering assistance in retrieving and clarifying information and by supporting

students who are referred to them. In particular, the Financial Aid Office, Marketing and

Brown/Cole 070

Diagram 2004-2009

**408**

DTCC – Wilmington Campus Offices
(Fourth Floor – East Building)



91"X170"

64"X125"

87.5" X 96"

87.5 X 96"

DRAWING NOT TO SCALE

Brown/Cole 071



*Exhibit 7*

**Delaware Technical & Community College**
**Wilmington Campus**          *Existing Grant*

### (d) *Applicant and Community Support*

**1. The applicant is committed to supplementing the project with resources that enhance the project.**

The college provides the Upward Bound Math and Science Center with a suite of offices conveniently located in the East Wing of the Wilmington Campus (Please see floor plans on the following page). In the same building with the cafeteria, student services, library, career center and academic skills laboratories and with easy access to the West Building with the library and fitness center, the Upward Bound Math and Science Center will be within easy reach of students. The Center also has access to all other college facilities, and the use of college vehicles for transportation.

The East Wing is easily accessible and offers many educational advantages. The office suite provides space for the secretary's office together with file cabinets and office equipment. The counselor will use one of the cubical style offices. The Center Director occupies the large office; it has space for staff meetings, storage and tutoring. The suite of offices provides privacy for confidential conversation with center participants. In addition, space in the Basic Skills Center, library and campus classrooms is available for tutoring purposes and group meetings.

By placing the Upward Bound Math and Science Center in the same building with other student support services, such as the financial aid and admissions offices, both the Upward Bound Math and Science staff and the participants have ready access to information. Access to these offices is vital, and college staff have already shown their support for the program by offering assistance in retrieving and clarifying information and by supporting students who are referred to them. In particular, the Financial Aid Office, Marketing Office and Counseling staff have agreed to extend to the program materials and hours to provide all participants with better information.

Brown/Cole 072

Delaware Technical & Community College
Wilmington Campus

*Existing Grant*

*Diagram 92A*

Upward Bound – Rooms 426, 430, 431, 432, 433



Fourth Floor – East Building
Admin. Services – Room 436
Dean of Development – Room 404
Dean of Instruction – Room 400
Language & Culture – Room 409
Math Lab – Room 406

92A

Brown/Cole 073

# EXHIBIT 8

ken cole

From:       "Rose Henderson" <rhenders@college.dtcc.edu>
To:         <Kcole@college.dtcc.edu>; <rhenders@college.dtcc.edu>
Sent:       Thursday, September 19, 2002 11:17 AM
Subject:    Re: working hours

This is to formally document our discussion regarding working hours. Dr Zawislak
has informed me that working hours are from 8:30 am-4:30 pm and that I
do not have the authority to permit you to start at 8:00 am. You
informed me that when you started working for UBM/S ~ 3 years ago we had
an informal agreement that you could begin work at 8:00 am and that you
are asking me to get an official ruling from Human Resources, based on
the fact that you are TPT and that you are under contract and that are
limited to 15 to 29 hrs/week.

Rosetta M. Henderson
Program Manager
Upward Bound Math Science
Del Tech & Community College
302-657-5110
fax 657-5187



DEPOSITION EXHIBIT
Zawislak 8
on 1.27.06

DEF 000346

# EXHIBIT 9

DEC 02 2002 4:09PM    HP LASERJET 3200

p.1



John E. Hocutt, Jr., M.D.
3521 Silverside Road
Wilmington, DE 19810

Report Data
Patient: Kenneth Cole
Visit: 33537
Date: 11/25/02
Examiner: John Hocutt, Jr., M.D.

Subjective
======

Subjective: The patient is here for an office visit. Generally, he is doing
better.Would like to have a note/form stating that his condition is not
contageous to his working invironment.

Allergies:
======
NKDA

Vitals
======
BP: 108/80 Left Arm, Sitting Wt: 154 lb

Objective
======
Objective: Fundi clearNeuro no focal lesionNo nystagmusNo nodesAfebrileAlert,
oriented x 3

Impressions:                    Start    Stop
======================================
Viral meningitis, NOS          08-26-02 C
Allergic Rhinitis, cause unsp  05-09-02 C

Patient Discussion
======
Patient Discussion: The findings of today's visit were discussed with the
patient.Advised re pace, should titrate return to full activity which may take
several more monthsBextra prnRecheck prn

He is not contageous and he is of no risk to anyone else.

Encounter Charges
Charge      Diagnosis
99213       Viral meningitis, NOS(047.9)

DEPOSITION
EXHIBIT
Lewislak 9
C~ 1 27 06

RECEIVED
HUMAN RESOURCES
2002 DEC 16 PM 4: 23
D.T.& C.C.
WILMINGTON CAMPUS

DEAR _____

JOHN E. HOCUTT, JR., M.D., F.A.A.F.P.
LYNN MORGAN, M.S., A.P.N.
CHALOUR BUILDING WEST
3521 SILVERSIDE ROAD • SUITE 2-B
WILMINGTON, DE 19810
302-475-7800  Fax 302-475-0879

NAME Ken Cole                         DATE 12/16/02

ADDRESS _____

℞ (Please Print)

℞  (p) (day) limit @ work
should gradually increase
to full time over next
3 mo. per 4/28/02 →
3/1/03

REFILL _____

SUBSTITUTION PERMITTED

IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED, PRESCRIBER MUST HANDWRITE
"BRAND NECESSARY" OR "BRAND MEDICALLY NECESSARY" IN THE SPACE BELOW.

# EXHIBIT 10



# Memo

**To:** Sue Zawislak, Director of Corporate and Community Programs

**From:** Rosetta M. Henderson, Program Manager of Upward Bound Math/Science /RMH

**CC:** Larry Miller, Paul Morris and Ann Del Negro

**Date:** 11/13/02

**Re:** Kenneth Cole

---

In my discussion with Ken today in reference to your memo dated November 11, 2002, he informed me that his meeting & discussion with Mr. Miller was in regards to a Grievance he filed and a "Supplement to the Grievance" in which he alleged that he felt the group (UBM/S) and him was being retaliated against the Director of Corporate and Community Programs.

Ken also informed me that in the meeting, Mr. Miller inquired about his working hours and in addition to other acts of retaliation that he alleged.

Ken said he told Mr. Miller that on his start date, November 1999, he entered into a verbal agreement with me, prior to signing the contract that he would be able to work from 8:00 am to approximately 2:00 pm. Note: I have since learn that I did not have that authority, see attached e-mail dated September 19, 2002.

Ken indicated to me that he feels that since the filing of the Grievance and the "move," you retaliated against him by changing his mutually agreed upon time from 8:00 am to 8:30 am. See attached e-mail dated September 19, 2002

Prior to Ken's illness, in mid August 2002, he was working from 8:00 am to 2:00 pm. Upon his doctor's advice, Ken started working from 8:00 am to 12:00 pm.

After the "Grievance" was filed and the concerns about the "move", Ken stated that you changed his working hours from 8:00am - 12:00 pm to 8:30 am to 12:00 pm thus, reducing his working hours.

Additionally, in support of Ken's request to work reduced hours until he is feeling 100%, I support that request. Ken has been and still is, one of the most reliable,

1



DEPOSITION
EXHIBIT
Zawislak 10
1-27-06

DEE 001072

dedicated, and dependable employees that I have had since becoming supervisor of this program.

During the six-week, summer residential program, the students go home on Fridays and return on Sundays to 30th Street Station, in Philadelphia where an UBM/S representative meets them, checks attendance, and gets them on a school bus for their return to the dorm. In previous years this task was alternated among the summer employees. For the past three years, in order to bring some continuity to this task, Ken has volunteered to go to the 30th Street Train Station every Sunday afternoon during the six-week program, starting on Fathers Day and ending the last week of July.

Also, during the six-week residential program, problems have occurred in the dorm at night that needed the attention of a member of the regular UBM/S staff. Anytime of the night when I've called Ken to go to the dorm and assist the staff, it did not matter whether it was 9:00 pm or 12:00 am, he was always willing to go and assist the staff. There have been times at night when he has gone to the hospital with sick students and when needed stayed at the dorm as late as 2:00 am in the morning. Ken always kept me informed of the progress of any situation and always stayed until the problem was solved.

I am pleased with the quality and quantity of Ken's work. The student's in our program look up to Ken and sees him as a positive role model. I hope this letter addresses your concerns.

attachment

® Page 2

DEF 001073