KENNETH COLE

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE

2

3    KENNETH COLE,                    : C.A. No.:

4    BRIGITTE L. BROWN,               : 05-270 KAJ

5          Plaintiffs,                :

6    v.                               :

7    DELAWARE TECHNICAL AND           :

8    COMMUNITY COLLEGE,               :

9          Defendant.                 :

10         Deposition of KENNETH COLE, taken pursuant

11   to notice before Tanya M. Congo, a Notary Public and

12   Certified Shorthand Reporter, at the offices of

13   Morris, James, Hitchens & Williams, LLP, 222 Delaware

14   Avenue, 10th Floor, Wilmington, Delaware, on Tuesday,

15   February 7, 2006, beginning at approximately 1:05

16   p.m., there being present:

17   APPEARANCES:

18         MARGOLIS, EDELSTEIN
           1509 Gilpin Avenue
19         Wilmington, Delaware 19806
           BY:  LORI A. BREWINGTON, ESQUIRE
20         Attorney for Plaintiffs

21         MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
           222 Delaware Avenue, 10th Floor
22         Wilmington, Delaware 19899
           BY:  DAVID H. WILLIAMS, ESQUIRE
23         Attorney for Defendant

24         Also present:  Brigitte L. Brown
                          Paul Morris

KENNETH COLE

1    KENNETH COLE, having first been duly

2  sworn according to law, was examined and testified as

3  follows:

4                    DIRECT EXAMINATION

5  BY MR. WILLIAMS:

6      Q.   Mr. Cole, have you ever been deposed

7  before?

8      A.   No.

9      Q.   Have you testified in any kind of a Court

10  proceeding?

11      A.   Yes.

12      Q.   And when was that?

13      A.   When, 2004 or 2004.  I'm not sure.

14      Q.   What Court was it?

15      A.   I'm temporary, part time, so I have a

16  business.  So the business is into employment

17  screening and providing landlord/tenant screening.

18  So it was probably a landlord/tenant issue, and we

19  was representing -- we also do property management.

20  So we was probably representing the landlord.

21      Q.   As you know, I represent the Defendant in

22  this case?

23      A.   Uh-huh.

24      Q.   I'm going to ask you a series of

KENNETH COLE

1    questions.  You were here yesterday for the

2    deposition of Brigitte Brown.  So I think you

3    probably have an understanding of the process; is

4    that fair to say?

5         A.    Yes.

6         Q.    As I said yesterday, if I ask a question

7    and you don't understand the question, please tell me

8    that you don't understand and I'll try to rephrase

9    the question for you.

10              If you answer the question, I'm going

11   to assume you did understand the question and your

12   answer is responsive.

13              If you want to take a break at any

14   time for any reason, let me know and we'll take a

15   break.

16              When I ask a question during the

17   course of the day, your response has to be audible so

18   that the Court Reporter can hear your response.

19              What is the highest level of education

20   that you've completed?

21        A.    I have a four-year degree, four-year

22   engineering degree from Widener University.

23        Q.    When did you secure that degree?

24        A.    1992, maybe '93.  It was night school, so

KENNETH COLE

1    I can't recall, but I do have a four-year engineering

2    degree.

3        Q.    Do you have any post-secondary education

4    other than what you've received at Widener?

5        A.    No.

6        Q.    So I take it then that you have not been

7    back to school since 1992?

8        A.    No, I've taken some business-related

9    seminars and courses.  I've taken an executive

10   management course sponsored by the SBA, the Small

11   Business Association.

12       Q.    Was that a one-day seminar?

13       A.    No, it was a four-day.  I think it was

14   four or five days.

15       Q.    And when was that?

16       A.    I don't recall.  If I had to take a guess,

17   maybe 2001, summer, summer of 2001.

18       Q.    I'm going to trace your employment

19   history, and as I'm asking this I understand that you

20   have a business apart from -- we'll get to that, but

21   apart from the business that you currently have, and

22   as I understand, have had for a number of years now,

23   what was your first job after graduating from high

24   school?

KENNETH COLE

1        A.    My first job was in a factory in

2    Philadelphia.

3        Q.    How long did you have that job?

4        A.    When?

5        Q.    When and for how long?

6        A.    '73, maybe, for about three or four years,

7    maybe.

8        Q.    What did you do after that?

9        A.    Went in the military.

10        Q.    How long were you in the military?

11        A.    In the military from '74 to -- regular

12    Army, '74 to '77.  And I came out and I was in the

13    Reserves.  And from '77 to about '83 -- '83, 1983.

14        Q.    You were back in the regular Army or you

15    were still in Reserves from '77 to '82 or '83?

16        A.    No, from '73 to '77, or '74 to '77, it was

17    regular Army.  From '77 to about '82 or '83 it was

18    the Army Reserves, in conjunction with some part-time

19    work and also going to school at Community College of

20    Philadelphia.

21        Q.    And how far did you go in Community

22    College during that time frame?

23             How many courses did you take?  What

24    degree, if any, did you --

KENNETH COLE

1          A.    '78 to '80 I have -- I graduated with an

2     associate's degree in electronic engineering

3     technology.

4              And I went to accounting, I think,

5     prior to that, a few years prior for accounting for

6     about a year at the Palmer School of Business for

7     about a year, like a trade -- a trade school.

8          Q.    During the time that you were in the

9     Reserves, were you also working and going to school?

10         A.    Yes.  I stated that, yes.

11         Q.    Take us forward to the next job that you

12    had?

13         A.    Could you repeat.

14         Q.    What was your next job after --

15         A.    After the military?

16         Q.    -- the military?

17         A.    I started with a company, PECO Energy.  It

18    was Philadelphia Electric at the time.  They changed

19    the name to PECO Energy, and now they changed the

20    name to Exelon Corporation.

21         Q.    What was your job at PECO?

22         A.    I had various jobs.  I started in a Power

23    Plant with an associate degree.  And I was what they

24    called a Technical Assistant.

KENNETH COLE

1             Then I became a Outage -- not a

2     manager, supervisor, managing data entry clerks that

3     would enter data into the mainframe computer at that

4     time.

5             And Outage Planning would basically --

6     I was managing the data entry clerks that would enter

7     data, and a part of that was they would have outage

8     -- what they called outages which was no more than

9     taking a unit offline and scheduling the work using a

10    planning software at that time.  And it was premised

11    -- it's a planning tool.

12        Q.   And you said you supervised some other

13    employees in that job?

14        A.   Two -- two data entry clerks.  I think it

15    was two data entry clerks.  Kind of go back in the

16    brain archives there.

17        Q.   What other positions did you hold at PECO?

18        A.   From there, because of upward mobility, I

19    was requested to do something different.  So I would

20    transfer from the Power Plant in Eddystone, and went

21    to 23rd and Market, and worked as a -- I worked on a

22    project team, that they -- the company was looking at

23    integrating their business systems, mainly in the

24    Material Management, Purchasing System and Accounts

KENNETH COLE

1    Payable.

2                  They were looking at -- it was sort of

3    integrated, and they wanted to have electronic -- I'm

4    sorry, it was segregated, and we wanted to -- they

5    wanted to integrate it to make it a process that was

6    pretty much electronic opposed to manually.

7                  From there I went over to Financial

8    Planning -- Financial Analysis Group, and I was a

9    Financial Analyst.

10                 From there I went to Marketing.  I

11   transferred from 23rd and Market to Valley Forge

12   area, and I was a Marketing Analyst.

13                 The company was faced with

14   deregulation, so they created Exelon and I was part

15   of the Exelon Corporation to do the Marketing Analyst

16   to get some business, bring in new businesses for the

17   corporation.

18        Q.    Was that the last position you held with

19   PECO?

20        A.    Yes.

21        Q.    When did you leave your employment at

22   PECO?

23        A.    1998.

24        Q.    Why did you leave?

KENNETH COLE

1          A.    I was -- the company went through a

2     downsizing in 1994 and 1998, and I was downsized out.

3          Q.    What did you do next by way of employment?

4          A.    By way of employment?

5          Q.    Yes.

6          A.    I always had a backup plan.  The backup

7     plan was investing in real estate.  So I had the

8     investment in real estate.  I always believe that you

9     -- in life you have to have a Plan A and a Plan B.

10    So my Plan B was always the real estate.

11             So I managed the real estate and did

12    some part-time stuff to supplemental the income.

13    Like I worked for -- did some volunteer stuff at the

14    Census Bureau.  Seen an ad for Student Enrichment

15    Coordinator at Delaware Technical and Community

16    College.  I applied for that.  I'm still there.  I'm

17    still here.

18         Q.    What was your start date with the college?

19         A.    November of '99, somewhere around there.

20         Q.    You briefly referred earlier to the

21    business that you operate in addition to your

22    employment by the college.  When did you start that

23    business?

24         A.    About '92, '93.  1992, '93.

KENNETH COLE

1    Q.    During your years of employment by the

2    college, you've continuously operated that business

3    in addition to working for the college?

4    A.    Yes.

5    Q.    How many employees do you have?

6    A.    Right now?

7    Q.    Yes.

8    A.    One, but we hire summer help when needed,

9    and a secretary when needed, and consultants because

10   sometimes we do quarterly inspections, so we'll hire

11   consultants to do the quarterly inspections.

12   Q.    Describe, at least generally, the nature

13   of the business?

14   A.    Like I said before, it's a -- we're a

15   credit reporting agency.  It started off with real

16   estate investment, and we are now a credit reporting

17   agency, and we provide background screening,

18   employment screening, credit checks, criminal

19   reports, criminal background checks, to the

20   government, to industry, local, federal government,

21   and corporations.

22   Q.    Is the business a corporate entity?

23   A.    Yes.

24   Q.    Is it wholly owned by you?

KENNETH COLE

1      A.    No.

2      Q.    Do you have partners, or other people that

3   have an equity interest?

4      A.    Yes.

5      Q.    Are they actively involved in the business

6   as well?

7      A.    Part time.

8      Q.    And you're engaged in that business part

9   time?

10     A.    Yes.

11     Q.    Over the years -- you're still employed by

12  the college today?

13     A.    Yes.

14     Q.    Over the years that you have been employed

15  by the college, have you devoted about the same

16  amount of time to this business on average over those

17  years, or has it varied from year to year and month

18  to month?

19     A.    It varies from year to year and month to

20  month.

21     Q.    Let's take 1995.  Can you approximate how

22  much time you devoted to your outside business during

23  1995?

24     A.    In the year of 1995?

KENNETH COLE

Page 12

1        Q.    Yes.

2        A.    An educational guess, I was on about 29

3    hours a week at Del Tech, come to the business about

4    2:00, 2:30.   Sometimes go from that time till 6

5    o'clock, 7 o'clock, 8 o'clock, or 9 o'clock, 10

6    o'clock.   Some days 5:30, some days 10:30.   It

7    varied.   It depends on the work, you know.   When I

8    walk into the office it depends on the workload and

9    what kind of issues and concerns we had to -- I had

10   to manage.

11       Q.    Would it be fair to say on average you

12   devote 3 1/2 to 5 or 6 hours a day to your business?

13       A.    It's hard to say.   I mean, I never thought

14   about averaging the time.   I would like to average a

15   couple hours a day because the business is fairly

16   simplified, meaning that our clients pretty much go

17   to our website and download credit reports or

18   criminal reports.   And if they have issues, I have to

19   address those issues, but they're not many.

20            But there's another part of the

21   business.   The real estate business may require some

22   time.   So, I mean, it's hard to say.   I mean, to give

23   you a number it wouldn't be fair to me because it may

24   not reflect the true hours that I put into the

KENNETH COLE

Page 13

1    business.

2         Q.    From the outset of your employment by the

3    college, you've been part time; isn't that correct?

4              You're a part-time employee at the

5    college?

6         A.    Yes.

7         Q.    Meaning no more than 29 hours a week with

8    -- I understand there have been some exceptions to

9    that, but generally speaking?

10        A.    Yes.

11        Q.    And is it not also correct that you have

12   never applied for a full-time position at the

13   college?

14        A.    Yes.

15        Q.    Would it also be fair to say that given

16   your outside business interest that you've described,

17   that you have not had a desire to be a full-time

18   employee of the college?

19        A.    It depends on what's available.  If, for

20   instance, the Special Programs Director position

21   interests me, and I would have to make a decision,

22   analyze where the business is and who can manage that

23   business, and what the income level of the position

24   like a Special Program Director would generate.  What

KENNETH COLE

```
 1    kind of income would it generate, and there would

 2    have to be an evaluation to determine what to do.

 3         Q.   So you would look at a posting and look at

 4    the position and make a determination of whether you

 5    had an interest or didn't have an interest in that

 6    position?

 7         A.   Oh, absolutely.

 8         Q.   And the fact is that, as you said a few

 9    minutes ago you have not applied for a full-time

10    position --

11         A.   Correct.

12         Q.   -- at the college?  All right.

13              I assume when you worked at PECO at

14    the various jobs that you described, you did not work

15    with youth-type programs.  You worked with adult

16    employees?

17         A.   Yes.

18         Q.   You said, at one point you had the

19    responsibility of managing a couple of clerks?

20         A.   Uh-huh.

21         Q.   In the other jobs that you described at

22    PECO, to what extent, if at all, did you have the

23    responsibility of supervising and managing employees?

24         A.   That was the -- at PECO?
```

KENNETH COLE

1      Q.    Yes.

2      A.    That was the only time at PECO.

3      Q.    And apart from PECO and apart from your

4  experience with the college, are there other

5  positions of employment that you've occupied which

6  involved the responsibility of supervising and

7  managing employees?

8      A.    Absolutely.

9      Q.    And what was that?

10     A.    I put nine years in the military, and from

11  -- I left the military as an E-7.  I was a Sergeant

12  First Class.  In basic training I was a squad leader

13  pushing 16-, 17-year-olds.  And, then made corporal

14  -- not corporal, it was an E-4.  It wasn't a

15  corporal, squad leader, another squad leader.  And,

16  then, E-5.  I received accelerated promotions in the

17  military.

18          And when I went in, I think I was 21,

19  and 18-year-olds coming in, I had to manage those

20  guys.  And, then I became a commo sergeant in the

21  Commo Shop.

22     Q.    During the time that you've been employed

23  by the college, have you taken any opportunity to

24  participate in professional development

KENNETH COLE

1    opportunities?

2        A.    No.

3        Q.    You have had opportunities, I assume?

4        A.    Well, you get these -- I'm a part-time

5    employee.  You've got to realize that the nature of a

6    part-time employee -- as I mentioned to you earlier,

7    I attended an executive management course in Atlanta,

8    Georgia.  I didn't mention the state or the city.

9    But I've taken opportunities, but not at PECO.

10       Q.    Well, then --

11       A.    I'm sorry.  Not at Del Tech.

12       Q.    Have you attended any TRIO-related

13   conferences?

14       A.    Yes.

15       Q.    What one's that?

16       A.    Well, early in the stage when I first

17   started, they had the annual TRIO conferences in

18   Dover.  I attended a few.

19              We participate in TRIO Day.  We stand

20   out in the entrance of the college and sort of

21   promote the different programs on the TRIO.  I always

22   participate in that.

23       Q.    Are there TRIO conferences that you have

24   had an opportunity to participate in but have passed

KENNETH COLE

1    on those opportunities?

2         A.   Well, if I passed it was due to my

3    schedule, restricted to 29 hours per week, in trying

4    to maintain the duties of Student Enrichment

5    Coordinator.

6         Q.   Are you saying that if attending a

7    conference involved devoting more than 29 hours a

8    week, that you didn't -- that's why you didn't attend

9    conferences?

10        A.   Repeat that.

11        Q.   If attending a TRIO conference would

12   involve devoting more than 29 hours a week to

13   college-related activities, you would not do so; is

14   that what you're saying?

15        A.   No, that's not what I'm saying.  I don't

16   think I've ever been invited to a TRIO conference.

17   The preference always went to the full-time employees

18   because of, what I recall, budgetary reasons.

19        Q.   Have you taken any college classes since

20   you've been employed by the college?

21        A.   At Del Tech?

22        Q.   Yes.

23        A.   No.

24        Q.   Have you taken any certificate programs?

KENNETH COLE

1     A.   At Del Tech?

2     Q.   Yes.

3     A.   No.

4     Q.   Mr. Cole, I'm going to hand you a document

5   that's identified as Brown-Cole 2 and 3, and ask if

6   you can identify that document?

7     A.   (Witness perusing document.)

8     Q.   Can you identify it?

9     A.   Oh, I'm sorry.  Yes.

10    Q.   Did you prepare it?

11    A.   Yes.

12    Q.   I assume you prepared it on or about April

13  2nd --

14    A.   Yes.

15    Q.   -- 2003?

16    A.   Yes.

17    Q.   And was this submitted to the Delaware

18  Department of Labor?

19    A.   I think so.  I'm quite sure it was, but --

20  yes, I'm quite -- pretty -- about 99 percent sure it

21  was submitted.

22    Q.   Now, in the second full paragraph, the

23  last sentence talks about --

24    A.   First page?

KENNETH COLE

1        Q.    First page.  -- your view and/or the view

2    of  REDACTED        , in that she was being harassed,

3    and you say that she also stated she feels that 90

4    percent of the harassment and retaliation is

5    precipitated by their desire to pro-actively seek and

6    harass Ken.

7              Do you see that?

8        A.    Yes.

9        Q.    This is what  REDACTED        reported to

10   you about her feeling?

11             Is that what this represents? It's

12   what she reported to you about her feelings?

13       A.    No, that's what she attests to when

14   presented to her.

15       Q.    Well, did you question  REDACTED

16   about that subject?

17       A.    No, we all felt that we were being

18   retaliated against.  And --

19       Q.    I understand what you may have felt, but

20   this sentence talks about what she stated she felt.

21   That this is what she reported to you as to her

22   feelings?

23       A.    At one time.  I don't know if this was the

24   particular time, but it was a compilation that was

KENNETH COLE

1    like compounded.  And when we got to this point here,

2    she just signed off on it.  She may not have said at

3    that particular time that she signed off on it, but,

4    yes, it was said at one time.

5        Q.    With respect to the way in which travel

6    requests were submitted, which is the last bullet

7    point on the first page --

8        A.    Uh-huh.

9        Q.    -- it talked about instead of blanket

10   requests, as you did in the past, she wants

11   individual requests, referring to Ann Del Negro.  Do

12   you see that?

13       A.    Last paragraph?

14       Q.    Yes.

15       A.    Yes.

16       Q.    Do you know whether Ann Del Negro was

17   simply asking you to comply with a policy of the

18   college?

19       A.    Do I know whether she was asking that?

20       Q.    Yes.

21       A.    That didn't come directly via Ann Del

22   Negro.  It came via  REDACTED            .

23       Q.    Well, I take it from this statement that

24   you prepared that  REDACTED          communicated to you

KENNETH COLE

1    Ann Del Negro's request; is that correct?

2        A.    Yes.

3        Q.    And my question is, do you know whether

4    Ann Del Negro is simply asking that the people in

5    your program comply with college policy with regard

6    to the issue --

7        A.    I can't answer that.  I can't answer what

8    Ann Del Negro -- what her intent is.  All I can

9    express is what I felt at that time.

10        Q.    Mr. Cole, I didn't ask about her intent.

11        A.    Okay.

12        Q.    Do you know what the college policy is on

13    travel request forms?

14        A.    No.

15        Q.    So you don't know one way or the other

16    whether Ann Del Negro was simply saying, this is the

17    policy, follow the policy?

18        A.    No.

19        Q.    And you apparently also were troubled by

20    the fact that Ann Del Negro was inquiring as to why

21    it is that you had to start at 7:30 a.m.?

22        A.    Yes.

23        Q.    And is it correct that you would park your

24    personal car at a college parking lot at the

KENNETH COLE

1    Wilmington campus, and, then walk over to 9th and

2    French Streets to pick up a state car?

3        A.    Yes.

4        Q.    Is that because no vehicle at the college

5    was available to you, or is that simply what you

6    preferred to do?

7        A.    From experience in the past, vehicles

8    weren't too clean and presentable at the Del Tech

9    site.

10        Q.    So then would it be fair to say that there

11    were vehicles at the Delaware Tech site, and you

12    didn't think they were sufficiently clean and

13    presentable?

14        A.    Yes.    And the Program Manager at the time

15    didn't have a problem with that, which was    REDACTED

16        Redacted.

17        Q.    Would it also be fair to say that it took

18    additional time to go through the process of driving

19    to the Wilmington campus and, then walking -- what is

20    it, how many blocks -- six or seven blocks to 9th and

21    French?

22        A.    Additional time?

23        Q.    Yes, as opposed to simply taking a vehicle

24    from the college campus?

KENNETH COLE

```
 1        A.    It's obvious.  They had people standing

 2   around and talking and conversating for 10, 15

 3   minutes, 20 minutes in the hallways.  That takes

 4   additional time.

 5        Q.    Answer my question.  About how long did it

 6   take you to walk up --

 7        A.    I said, yes.

 8        Q.    How long did it take you to walk up to 9th

 9   and French Street from --

10        A.    How long?

11        Q.    Yes.

12        A.    I have no idea.  Probably 5, 10 minutes.

13   I'm a fast walker.

14        Q.    How many blocks is it?

15        A.    Four from 8 is 4.  Four blocks.

16        Q.    Is the college on 10th Street?

17        A.    Shipley.

18        Q.    So it's a couple blocks over and five

19   blocks up?

20        A.    Yeah.  I don't count the blocks.  Based on

21   your figures, yes.

22        Q.    Well, tell me if I'm incorrect.

23        A.    Yeah.  I said, yes.  Again, my supervisor

24   didn't have a problem with that at that time and
```

KENNETH COLE

1     prior to that time.

2          Q.    I've placed before you a document that is

3     Bates stamped Brown-Cole 4 through 6.

4                    Did you prepare this document?

5          A.    Yes, I did.

6          Q.    I'm not trying to confuse you.   These

7     documents are out of chronological sequence, but it's

8     the order in which I received them in the production

9     from your counsel.   This is actually January 3rd of

10    2002.   I assume it was prepared at that time?

11         A.    This document was prepared earlier.   This

12    may be a copy that went over to the Department of

13    Labor for an update.

14         Q.    Well, who put that date on?

15         A.    I did.

16         Q.    You're saying it was prepared sometime

17    prior to January --

18         A.    Well, the same information, is what I'm

19    saying.   It's not so much -- this looks like a

20    document that went to Larry Miller in conjunction

21    with the grievance, and was updated to the Department

22    of Labor with the same information and maybe

23    additional information with a different date.

24         Q.    This document, among other things, talks

KENNETH COLE

Page 25

1    about the change in your working hours?

2         A.    Yes.

3         Q.    As I understand the Complaint in this

4    action, you claim that the change in your working

5    hours was in retaliation for engaging in protected

6    activity?

7         A.    I'm sorry.

8         Q.    For filing a charge?

9         A.    Yes.

10        Q.    And do you know what the college's policy

11   is with respect to the starting time for employees at

12   your campus?

13        A.    No, not at the time when I started.  I

14   made an agreement with   REDACTED      , and we talked

15   about me being a temporary/part-time employee.  And

16   we talked about somewhere in the neighborhood of 8:00

17   to 2:00.

18        Q.    And do you have an understanding as to

19   whether  REDACTED      had authority to enter into

20   such an agreement with you; that is to say, a

21   deviation from the starting time?

22        A.    I felt that she had the same authority to

23   hire me.  If she had the same authority to hire me, I

24   kind of felt she had the same authority to set my

KENNETH COLE

1    time.

2        Q.    Have you subsequently become familiar with

3    the college policy as to who has the authority to --

4        A.    It depends on -- I've seen documentation

5    at the website where it says, from 8:00, start time

6    is 8 o'clock a.m.  I mean, I don't have -- it may not

7    be in your documentation, but at one time I did see,

8    and probably could generate a copy that the starting

9    hours were from 8 o'clock.

10       Q.    Mr. Cole, as of the time that your start

11   time was changed to 8:30, do you know whether the

12   Campus Director established 8:30 as a start time for

13   employees at your campus?

14       A.    No, I -- clarify that for me before I

15   answer that.

16       Q.    When was your starting time changed to

17   8:30?

18       A.    Around September of 2002.

19       Q.    As of September of 2002, do you know

20   whether the Campus Director established 8:30 as the

21   start time for the employees at that campus?

22       A.    That's not -- that's hard to answer.  I

23   know that my coworkers were coming in, one at 8:30,

24   one at 9 o'clock, and myself at 8 o'clock.

KENNETH COLE

1          So how am I supposed to assume the

2    Campus Director's starting hours?

3       Q.   Mr. Cole, I'm not actually asking you to

4    assume anything.  I'm asking you -- let me ask it to

5    you this way:  Is it your understanding that as of

6    September of 2002, the Campus Director had the

7    authority and responsibility to determine the

8    starting time for employees at your campus?

9          Or don't you know?

10      A.   Well, I'm not real sure what you're trying

11   -- the question you're asking.  If you're saying that

12   REDACTED        said that the Campus Director said the

13   office hours are 8:30, yes.  It came from management

14   that the office hours can -- you can't start at 8

15   o'clock anymore, you have to start at 8:30.

16          Is that the question you're asking?

17   Yes.

18      Q.   Mr. Cole, my question is do you know, as

19   of September of 2002, whether the Campus Director

20   established 8:30 as a start time?

21             MS. BREWINGTON:  Objection.

22             MR. WILLIAM:  On what grounds?

23             MS. BREWINGTON:  Asked and answered.

24   BY MR. WILLIAMS:

KENNETH COLE

1    Q.    You can answer the question.

2    A.    I don't know.

3    Q.    You don't know?

4    A.    I'm not real clear on your question.

5    Q.    So you can't tell me one way or the other

6    whether what was happening here was simply that the

7    college was enforcing a policy which had not been

8    enforced in the past?

9    A.    Yes.

10    Q.    You don't know?

11    A.    No, all I'm saying is that I received

12    notice that there was some change in my hours, and I

13    concurred.

14    Q.    I'm handing you a document that's

15    identified as Brown-Cole 7 through 14, and ask was

16    this document prepared by you?

17    A.    Yes.

18    Q.    Was it submitted to the Delaware

19    Department of Labor?

20    A.    Yes, I think so.

21    Q.    Did you provide it to anyone other than

22    the Delaware Department of Labor?

23    A.    No.

24    Q.    Is that also true --

KENNETH COLE

1       A.    I'm sorry.  The firm.  I think the firm

2  may have received it.

3       Q.    Your counsel in this case may have

4  received it; is that what you're saying?

5       A.    Right.  But see, I'm not -- so many

6  documents that I'm not sure.  I think so.

7       Q.    Would that also be true of the first two

8  documents I asked you about, namely that they were

9  supplied to the Delaware Department of Labor, and

10  other than providing them to your counsel, were they

11  supplied to anyone else?

12       A.    I'm sorry.  Would you repeat that.

13       Q.    These first two documents that we talked

14  about that you also prepared.

15       A.    Uh-huh.

16       Q.    You said that they were submitted to the

17  Delaware Department of Labor?

18       A.    I said, 99.9 percent I think it is.

19       Q.    And other than the Delaware Department of

20  Labor and your attorneys in this case, did you give

21  them to anybody else?

22       A.    No.

23       Q.    I'm handing you a document that's marked

24  Brown-Cole 15 through 18.

KENNETH COLE

Page 30

```
 1        A.   Okay.  So you're not going to reference to

 2   this one here?

 3               MS. BREWINGTON:  He may go back to

 4   that.

 5               THE WITNESS:  Okay.  You may go back

 6   to this one.  Okay.

 7   BY MR. WILLIAMS:

 8        Q.   Did you prepare this document?

 9        A.   Yes.

10        Q.   And is this also an update that you

11   prepared and you believe that you provided to the

12   Delaware Department of Labor?

13        A.   Yes.  October 15th, yes.

14        Q.   Did you provide it to anyone other than

15   the Delaware Department of Labor?

16        A.   I'm not sure.  I don't know all the

17   paperwork I gave the firm, and the firm, meaning

18   counsel.

19        Q.   I'm assuming that you gave it ultimately

20   to your counsel.

21        A.   Okay.  Right.  That's it, you know.

22        Q.   If you'd go back to the first document.

23        A.   Which one?

24        Q.   Identified as Number 2 and 3.  On the
```

KENNETH COLE

1    second page --

2         A.    Okay.  I'm sorry.

3         Q.    The second page --

4         A.    No, which one?

5         Q.    Brown-Cole 3 in the right-hand corner.

6         A.    Oh, okay.

7         Q.    The bullet point there, that paragraph --

8         A.    Uh-huh.

9         Q.    -- there's a statement there that, why do

10   I have to start at 7:30 a.m. to get there.  Other

11   programs under Ann Del Negro starts at 7:30.

12              Which other programs are you referring

13   to?

14        A.    Just let me read the statement here.

15   Okay.  Upward Bound Classic, Educational Talent

16   Search.

17        Q.    Which employees and which programs are

18   starting at 7:30?

19        A.    I'm not saying -- I'm not implying they're

20   starting.  Here's my implication here, is that as far

21   as I knew at that time, all the programs were allowed

22   to start at 7:30 to accomplish their mission or their

23   goals in terms of school business.

24              What I'm implying here is that when I

KENNETH COLE

1    asked -- or when our program asked to start at a

2    different time, like 7:30 or whatever, we were always

3    -- I was interrogated after 2002.

4        Q.    Well, that wasn't the question.  My

5    question was a simple one.  I said, what other

6    programs under Ann Del Negro started at 7:30?

7            You told me the Upward Bound Classic

8    and Educational Talent Search?

9        A.    Yes.

10       Q.    I asked what employees in those programs

11   started at 7:30.  That was my question.

12       A.    The school visits at that time.  I don't

13   know the names of the employees at that time.  Let me

14   think.  I can't recall all their names.

15            Okay.  I can give you Tonia Conley,

16   Daniel Davies,  REDACTED            at that time.

17   Those are the names that were in that -- those groups

18   at that time.  I don't know what goes on today.

19       Q.    How frequently did you travel from the

20   college to visit students who were involved in your

21   program?

22       A.    I'm sorry.  Can you speak up a little bit.

23       Q.    How frequently were you on the road

24   traveling for the purpose of visiting students in

KENNETH COLE

1    your program?

2        A.    How frequently.  At that time, twice a

3    year.

4        Q.    Two days a year?

5        A.    No, two periods.

6        Q.    And what periods and time frames?

7        A.    Okay.  October.  In the Fall, October.

8    I'd say Fall, early Winter, October to December.

9    Spring.  Winter, early Spring, late February, March

10   to about end of April.

11       Q.    And during those time frames that you just

12   identified, how frequently -- how many days a week

13   were you on the road visiting students?

14       A.    Three to four days per week.

15       Q.    During those three to four days a week,

16   would you be out of the office most of the day, half

17   the day?

18            What was the typical situation?

19       A.    Sixty percent.

20       Q.    Sixty percent of a work day?

21       A.    For me.  I'm part time.  It varies, I

22   guess for others.

23       Q.    Did you have personal reasons why you

24   wanted to start at 7:30 or 8 o'clock as opposed to

KENNETH COLE

1    8:30?

2        A.    No, sometimes -- it had nothing to do with

3    personal reasons.  It had something to do with the

4    business of the college.  Sometimes trying to

5    schedule an appointment to see a student, the

6    counselor'll say, well, this may be the best time to

7    set up an appointment.

8                So if I have to see a student in

9    Philadelphia at 8:30, I'll have to start around 7:30

10   or earlier to get there, to make that appointment.

11   So we pretty much try to satisfy the customer,

12   meaning the counselors and the students.  She would

13   look at the schedule, the class schedule, and

14   determine what the best time to see students.

15       Q.    So you're saying that sometimes 8:30 would

16   be the best time?

17       A.    Yes, sometimes.

18       Q.    Sometimes later?

19       A.    Yes.  And sometimes when the plan is for a

20   7:30 start to go to a Philadelphia school, is not

21   unreasonable.

22       Q.    Were you visiting schools in areas other

23   than Philadelphia?

24       A.    Yes.

KENNETH COLE

Page 35

```
 1        Q.   What geographic area would you have

 2   students located in?

 3        A.   For me, because I'm from Philly and knew

 4   Philly, Philadelphia.  I've been to Pottstown,

 5   certain parts of New Jersey.  And we try to divide

 6   the schools up between the two coordinators.  And

 7   Maryland -- not back then I don't remember Maryland,

 8   but now I know to Maryland.

 9        Q.   Did you have a desire to be able to get to

10   your other business by 2:00 -- 2 o'clock in the

11   afternoon or 2:30?

12        A.   Did I have a desire?

13        Q.   Yes.

14        A.   I had a desire, but sometimes that didn't

15   happen.

16        Q.   But that was your preference, to be able

17   to get to your business by 2:00 or 2:30?

18        A.   I had a desire, yes.  But sometimes that

19   didn't happen.

20        Q.   Was there an issue about asking -- there

21   was a request from upper management that was filtered

22   down through  REDACTED       concerning a schedule of

23   schools to be visited, was that an issue for you?

24        A.   Yes.
```

KENNETH COLE

1        Q.    And the issue was they wanted like a

2   90-day schedule versus a 30-day schedule; is that

3   correct?

4        A.    The issue was they wanted a 30-day --

5   well, let me clarify.  Can I clarify referencing the

6   way we used to do it and, then comparing it to the

7   way we do it?

8        Q.    Yes.

9        A.    Prior to 2002, August of 2002, we

10  submitted -- the secretary would submit a blanket

11  request, a travel request, and on that travel request

12  at the top it would say, to provide academic services

13  to schools, to students, in the States of

14  Pennsylvania, New Jersey, Maryland, or whatever.  And

15  that would be dated for 90 days, October, November,

16  December.  And, then we'd go off and do our jobs.

17            Somewhere -- sometime around 2002,

18  after August of 2002 that changed.  They wanted a

19  calendar.  The travel request was out.  Anytime you

20  travel you submit a travel request.

21            In addition to the travel request,

22  they wanted -- we heard from    REDACTED    , Ann De

23  Negro wanted a calendar of events.  Then she also

24  wanted the time we went to the school, the time we

KENNETH COLE

1   left Del Tech, the time we would get to the school,

2   that time, the time that we sit down with the

3   student, write that time down, the time that we would

4   leave the student, put that time down, the time that

5   we would leave the school, put that time down, and

6   the time that we would arrive at Del Tech, put that

7   time down.   That's how we were scrutinized.

8        Q.   The program that you worked in, was it

9   your understanding that it was funded by a Federal

10  grant?

11       A.   Absolutely.

12       Q.   And was it your understanding that there

13  was a regular audit conducted of the program?

14       A.   The times that I were there, from '99 up

15  until now, I don't recall a Federal audit.  I recall

16  a State audit, and the State audit was pretty much

17  based on what we had to go through.  We never went

18  through, that I knew of, paperwork concerning how

19  many times we went to the school, did you time in,

20  did you time out.  They was more concerned with the

21  eligibility status of students coming to the program,

22  and the monies, the budgetary monies spent.

23       Q.   Did you see the audit reports that were

24  generated?

KENNETH COLE

1    A.    I saw the -- which you call -- the

2    deficiency of the different programs.

3    Q.    If there were audits conducted other than

4    the audit process you just described, you're not

5    aware of them?

6    A.    I'm sorry.  Clarify.

7    Q.    Is it fair to say that if -- you said the

8    only audits you were aware of were some State audits?

9    A.    Yes.

10    Q.    If there were other audits conducted, is

11    it accurate to say that you weren't aware of those

12    other audits?

13    A.    Yes.

14    Q.    And if there were findings of violations

15    that had to be corrected, were you aware of all those

16    findings?

17    A.    Like I just said, we were issued the

18    deficiency reports.  The deficiencies, it was on

19    maybe a spreadsheet that showed the deficiencies for

20    the TRIO programs.

21            It would sort of list the infractions

22    that were committed, and they were based on

23    eligibility criteria.  Did we bring a student into

24    the program that didn't meet the criteria -- criteria

KENNETH COLE

Page 39

1    to be in this program.

2                    The Federal government is concerned

3    about money.

4        Q.    Well, I take it from what you described a

5    few minutes ago, you were being asked to -- you were

6    being held accountable for your time and how you were

7    spending your time, whether it was visiting a

8    student, traveling.  Whatever it is that you are

9    spending time on, you were being asked to keep

10   records of that and be accountable for the time that

11   you spent?

12                   MS. BREWINGTON:  Objection.  Compound

13   question.

14                   THE WITNESS:  I mean, you could say

15   accountability.  I call it retaliation and excessive

16   scrutinizing.

17   BY MR. WILLIAMS:

18       Q.    So if you were in charge that kind of

19   recordkeeping would not be appropriate or necessary

20   because you just don't think it is?

21                   MS. BREWINGTON:  Objection.  Calls for

22   speculation.

23                   THE WITNESS:  No, it depends.

24   Consistency.  If 1999 I required that type of

KENNETH COLE

Page 40

1    paperwork, and, then, 2002 I required the same

2    paperwork from every individual.  So it's

3    consistency.  Whether I think it's wrong or right,

4    it's consistency.

5            And all I'm saying to you is things

6    changed in 2002.

7    BY MR. WILLIAMS:

8        Q.    Do you know whether your Program Manager,

9    REDACTED        , was adhering to college policies in

10   every respect, and adhering to the requirements of

11   the grant, the federal grant that funded your

12   program?

13       A.    I read the grant.  The grant said twice a

14   year.

15       Q.    What's the answer to my question?  Do you

16   know whether REDACTED        was in every respect

17   following college policies in terms of managing you

18   and others in the program and adhering to the

19   requirements of the grant?

20       A.    That's not my job.  You're asking me

21   something that -- you know.

22       Q.    So the answer is, you don't know?

23       A.    I don't know.

24       Q.    With respect to the move of the Upward