KENNETH COLE

1    Bound Math and Science Program to Room 408, reading

2    what you wrote at that time, am I understanding

3    correctly that you believe that that move was related

4    to or precipitated by Kate Sullivan, a situation

5    involving Kate Sullivan?

6        A.    Yes.

7        Q.    Did you talk to Kate Sullivan about that

8    matter?

9        A.    No.

10       Q.    I'm handing you a document that's

11   identified as Brown-Cole 22.  It is a first page of a

12   document, and this is the form in which I got it in

13   the documents that you produced.  It has written on

14   the top Exhibit A.  Is that your handwriting?

15       A.    Yes.

16       Q.    This was attached as an exhibit to a

17   grievance that you filed in early September?

18       A.    Yes.

19       Q.    When did you first see this newsletter?

20       A.    August, 2002.

21       Q.    Do you know what date in August of 2002?

22       A.    I'm not sure, but I could take a guess,

23   mid.

24       Q.    Mid August?

KENNETH COLE

1          A.    If I have to take a guess, yes.

2          Q.    Now, on August 12th, Paul Morris met with

3     the Upward Bound Math Science Coordinators including

4     you; is that correct?

5          A.    I don't recall the date, but I know we did

6     meet somewhere around that time.  We did meet, yes.

7                MR. WILLIAMS:  Can you mark that as

8     Cole Number 1, and this one is Cole Number 2.

9                (Whereupon, the documents were marked

10    as Exhibits Cole Nos. 1 and 2 for identification.)

11    BY MR. WILLIAMS:

12         Q.    I'm placing before you a document that's

13    marked as Cole Number 1, and represent to you that

14    it's a copy of the Complaint that was filed on your

15    behalf in this lawsuit.

16                Would you turn to paragraph 14.

17    There's reference to a meeting that occurred on

18    August 12th, 2002, a meeting with Paul Morris.

19         A.    Okay.

20         Q.    I assume that you reviewed this Complaint

21    before it was filed?

22         A.    Yes.

23         Q.    And that it's accurate to the best of your

24    knowledge and recollection?

KENNETH COLE

1    A.    Yes.

2    Q.    Does that refresh your recollection as to

3  the date of what I referred to as the Paul Morris

4  meeting?

5    A.    Yes.

6    Q.    And it was on that date that Paul Morris

7  told you about the decision to move the Upward Bound

8  Math Science group to Room 408?

9    A.    Yes, that wasn't the exact language, but

10  --

11    Q.    The Complaint says, on or about August 12,

12  2002, Paul Morris met with Plaintiff and other

13  members of his department and informed them that he

14  had unilaterally made a decision to relocate Upward

15  Bound Math Science Program from their current

16  multiple offices to a single office that had been

17  occupied by the SOAR Program.

18        Is that an accurate statement?

19    A.    Pretty much, yes.

20    Q.    Well, in what respect is it inaccurate?

21    A.    Well, unilaterally means that the words he

22  used were personal.  It was his personal decision

23  that the Upward Bound Math Science group had their

24  own assigned space.

KENNETH COLE

1      Q.   And he also told you that that decision

2   had been approved by -- at a higher level in the

3   college?

4      A.   Yes.

5      Q.   Were you happy about that decision?

6      A.   No.

7      Q.   As a matter of fact you were very unhappy

8   about it?

9      A.   I wasn't satisfied, if that means

10  unhappiness.

11     Q.   I'm handing you a document marked Brown-

12  Cole 19 through 21.

13          Is this a copy of the grievance you

14  filed on September 5th, 2002?

15     A.   Yes.

16     Q.   And the grievance involved what you refer

17  to here, and what was referred in Brown-Cole 22, the

18  newsletter we talked about a few minutes ago as the

19  promotion of Paul Morris?

20     A.   Yes.

21     Q.   What happened first, did you see the

22  newsletter, or did you have the August 12th meeting

23  with Paul Morris?

24     A.   What happened first, did I see the

KENNETH COLE

1    newsletter.  I don't recall what happened first.

2        Q.    Based upon your testimony a few minutes

3    ago, would it be fair to say that although you don't

4    remember whether you saw the newsletter first or had

5    the meeting, that the two events happened within days

6    of each other?

7        A.    They were two different issues.  One was

8    the move, and one was a promotion issue.

9        Q.    My question isn't were they two different

10   issues.  My question is did you see the newsletter

11   within --

12       A.    I said I didn't recall.

13       Q.    Wait a minute.  A few minutes ago you

14   said, when I asked you about the newsletter, you saw

15   it in mid August?

16       A.    Right.

17       Q.    Then we talked about an August 12th

18   meeting, correct?

19       A.    Right.

20       Q.    My question is, is it fair to say that you

21   saw this newsletter within a few days of the August

22   12th meeting?

23       A.    Yes.

24       Q.    The reason that you filed the grievance is

KENNETH COLE

1    because you felt aggrieved about the fact that you

2    didn't have an opportunity to apply for this

3    promotional opportunity?

4         A.   Yes.

5         Q.   Is the position Special Programs Director

6    a position which exists within the college at your

7    campus today?

8         A.   I don't think so.  It's at Owens Campus,

9    Owens Campuses, I think.

10        Q.   And given the fact that you've never

11   applied for a promotional opportunity during your

12   years of employment at Delaware Tech, are you telling

13   me that this particular position is the only one that

14   would have been of interest to you over all those

15   years?

16        A.   No, I'm not telling you that.  There are

17   other positions that have not became available that

18   don't interest me, but that particular one interested

19   me.

20        Q.   Ultimately, it was determined that Mr.

21   Morris was not, in fact, promoted to that position,

22   and it was more accurately characterized as a

23   reclassification; is that your understanding?

24        A.   Yes, and that came after I filed the

KENNETH COLE

1    grievance.

2        Q.    And Mr. Morris didn't end up in the

3    position of Special Programs Director; is that your

4    understanding?

5        A.    My understanding is that he was the

6    Special Programs Director at that time.

7        Q.    And your understanding basically is

8    derived from the newsletter that we referred to?

9        A.    No, mine is based on the deposition a few

10    weeks -- last week, that he held the position of

11    Special Programs Director from around June to

12    November, and he went from a pay grade 16 to a pay

13    grade 17.

14        Q.    Did you, in filing this grievance, refer

15    to a policy or policies of the college; is that

16    correct?

17        A.    Yes.

18        Q.    Is it also correct that the grievance does

19    not allege race discrimination?

20        A.    No.

21        Q.    Where is the -- point to me where you say

22    that you were a victim of discrimination on the basis

23    of race?

24        A.    Page -- here, look at 4.01 on the second

KENNETH COLE

Page 48

 1    page.  It states, in filling vacancies qualified

 2    regular college employees receive equal consideration

 3    for promotion in accordance with the college's

 4    statement of affirmative action policy, regardless of

 5    race, color, creed, sex or national origin.

 6              And go to page 3, finally, it's my

 7    belief that promoting Paul Morris into the position

 8    of Special Programs Director violated Section 1

 9    policy to non-discrimination affirmative action.  And

10    that's the statement.

11        Q.   So you're telling me that if, in fact,

12    this position had been posted, you would have

13    applied?

14        A.   I'm telling you the fact -- I'm sorry.  I

15    sort of jumped the gun.  Repeat that for me.  I'm

16    sorry.

17        Q.   Are you telling me that if this position

18    had been posted, at that time you would have applied?

19        A.   I'm telling you that I would have

20    evaluated the situation -- it was an interesting

21    position -- and taken into consideration and factor

22    in the business, and factor in the wage increase, how

23    much the wage increase would have been at that time.

24              I would have weighed all the options

KENNETH COLE

1   given an opportunity to have the position posted,

2   yes.

3        Q.   So you don't know whether you would have

4   applied or not. You're just telling me you would

5   have weighed the options?

6        A.   Oh, absolutely. But I was interested in

7   that position.

8        Q.   But, again, you don't know whether you

9   would have applied. You can't tell me that you would

10  have applied?

11       A.   I would have weighed the options if the

12  position would have been posted. I was very

13  interested in that position.

14            THE WITNESS:  Are we coming up on a

15  break soon here?

16            MR. WILLIAMS:  We can break whenever

17  you want to.

18            THE WITNESS:  Maybe about 15 minutes.

19            MR. WILLIAMS:  If you want to break

20  now, we'll break now.

21            THE WITNESS:  No, that's good.

22            MR. WILLIAMS:  Let's break at 2:30.

23            THE WITNESS:  Okay.

24  BY MR. WILLIAMS:

KENNETH COLE

1         Q.    I'm handing you a document that's

2    identified as Brown-Cole 42.

3                   The word, retaliation, that's

4    handwritten on this document, is that your

5    handwriting?

6         A.    Yes.

7         Q.    Earlier you said that there were

8    situations when visits to a Philadelphia school would

9    necessitate a 7:30 start time to allow you to get

10   there by 8:30, 9 o'clock, whenever the appointment

11   was.  Is this an E-mail which approves such a

12   request?

13        A.    Yeah.  Based on from Ann Del Negro to REDACTED

14   REDACTED     , yes.

15        Q.    And the final paragraph says, please call

16   me on Wednesday regarding the 11/7 and 11/8 visits,

17   and underneath that apparently you wrote retaliation,

18   and drew an arrow to the word, visits?

19        A.    Yes.

20        Q.    You viewed that statement by Ann Del Negro

21   as retaliation?

22        A.    Well, what I viewed is this never happened

23   before, prior to 2002 -- August of 2002.

24                   And can I make another statement?  And

KENNETH COLE

1    the reason I put that there, and please call me with

2    regard to 11/7 and 11/18 -- why was -- it's appalling

3    to me.  Why would a level up above    REDACTED        be

4    concerned about the daily activities of SECs, and it

5    never happened before prior to 2002.  That doesn't

6    make sense to me.

7         Q.    Well, there's an explanation.  We'll move

8    on.

9               The fact that Ann Del Negro would ask

10    REDACTED        to call her on Wednesday, somehow

11    adversely affected your life?

12              MS. BREWINGTON:  I'm going to object

13    to that.

14    BY MR. WILLIAMS:

15        Q.    What was the adverse impact upon you, on

16    the terms and conditions of your employment?

17        A.    It was compounded.  It wasn't just that

18    one E-mail.  It was multiple E-mails, over and over,

19    constant E-mails.

20              First it was the medical.  Then it

21    became the calendars.  Then it became the travel

22    request.  Then it became the daily activities of

23    what's Ken doing.

24              MR. WILLIAMS:  I want to break now

KENNETH COLE

Page 52

 1    because I'm about to enter into a line of questioning

 2    that's going to be longer than ten or fifteen

 3    minutes.

 4                    (Recess)

 5    BY MR. WILLIAMS:

 6        Q.    I'm handing you a document that's

 7    identified as Brown-Cole 46.

 8                    Did you see this document back around

 9    November 21, 2002?

10        A.    Yes.

11        Q.    Was it provided to you by    REDACTED      ?

12        A.    Yes.

13        Q.    Does it accurately summarize the

14    discussion that you had with   REDACTED       at that

15    time?

16        A.    Yes, but it may be missing a page, if I'm

17    not mistaken.  It may be another memo, but it ends

18    with the copy on this page, so it looks like it could

19    be the end of the document.  But, yes.

20        Q.    The situation was that you were absent

21    from work.  You had been ill and, then you returned

22    to work on a reduced schedule?

23                    Do I understand correctly?

24        A.    Yes.

KENNETH COLE

1          Q.    And the college was asking you for medical

2     documentation that you couldn't work your full

3     schedule, and how long was that going to last, and

4     what were the restrictions in terms of how many hours

5     you could work?

6          A.    You mean Sue, Sue Zawislak, I guess?

7          Q.    Yes.   That's what she was asking of you?

8          A.    There were a lot of E-mails in between

9     here.   What's the date of this?

10                Yeah, there's some E-mails in between

11    here, but basically, with this E-mail, yes.

12         Q.    This actually looks like it's a

13    memorandum, not an E-mail.

14         A.    Yeah, I'm sorry, memo.

15         Q.    And if I understand what this document

16    says about the position you took, first of all, it

17    was your position that as long as you worked anywhere

18    between 15 and 29 hours, that you had a right to do

19    that?

20         A.    Right to do what?

21         Q.    Work however many hours you chose to work

22    as long as it fell between 15 and 29 hours a week?

23         A.    Yes, per my contract.   I signed a

24    contract.

KENNETH COLE

1        Q.   So that if the college wanted you to work

2   29 hours a week but you wanted to work 16 hours a

3   week, that was up to you.  It wasn't up to the

4   college.  That was your view?

5        A.   No, no.  My view is that I was

6   accommodating the needs of the college.  That there

7   were times that I would work from 8:00 to 12:00.  I

8   wasn't always in there from 8:00 to 2:00 for the 29

9   hours per week.  But let's get that straight.  There

10  was times that -- especially during the summer

11  program that I worked over and above the 29 hours, or

12  if I attended a reunion on a Saturday I would work

13  above the 29 hours.

14                I was more concerned about serving the

15  students.  At the same time, trying to create a

16  relationship with my supervisor and trying to provide

17  those services that she requested.

18       Q.   But if the upper management of the college

19  said, we want you to work 28 hours a week, it was

20  your position that you had a right to say, no, I'm

21  not going to work 28 hours this week.  I'm going to

22  work 16.

23                MS. BREWINGTON:  Objection.

24                THE WITNESS:  Just according to my

KENNETH COLE

1    contract, yes.  I was only quoting the contract and

2    the policy manual.  But as far as Ken -- you're

3    making this a character issue now.  But Ken always

4    gave over and above the call of duty, per se, to

5    serve the students.

6               But this particular situation, because

7    I felt it was retaliation and discrimination, yes, I

8    responded that way.

9        Q.    You also took the position that you didn't

10   believe that medical excuses were necessary in your

11   case because you were part time?

12       A.    Yes, that was based on -- I had seen full-

13   time employees during that time and prior to 2002, go

14   out for extended two to three days and not provide

15   medical excuses.  And I'd seen -- and I had been out

16   myself before and didn't provide any reason.  I would

17   just let the supervisor know I was going on vacation,

18   and that's the program and it was okay.

19       Q.    I'm handing you Brown-Cole 51.  Did you

20   receive this memo?

21       A.    Yes.

22       Q.    On about November 27th, 2002?

23       A.    Uh-huh.

24       Q.    Jackie Jenkins was Director of Human

KENNETH COLE

1    Resources, or was at that time?

2         A.   Yes.

3         Q.   Still is?

4         A.   Yes.

5         Q.   Now, she is indicating that the medical

6    note that you provided from your physician did not

7    indicate the actual number of hours you were able to

8    work.  That is a correct statement, is it not?

9         A.   What is a correct statement?  I'm sorry.

10        Q.   Her statement that there's no indication

11   of the actual number of hours you're able to work; is

12   that correct?

13             MS. BREWINGTON:  Is it correct that

14   she stated it, or is it correct --

15   BY MR. WILLIAMS:

16        Q.   No, that is a correct statement of fact?

17        A.   I assume so.  I don't have the doctor's

18   excuse -- the doctor's note in front of me right now,

19   but I would have to say so.

20        Q.   And she's also correct, as a matter of

21   fact, in stating that the doctor's note did not

22   indicate whether full activity means working 29 hours

23   at Delaware Tech?

24        A.   Yes, I guess so.

KENNETH COLE

1          Q.    I'm handing you documents identified as

2    Brown-Cole 53 and 54.

3                Is this a copy of the memorandum dated

4    December 4, 2002 which you authored and was in

5    response to the document of Jackie Jenkins that we

6    just talked about?

7          A.    Okay.  This is from me to her.

8          Q.    Is this your response to her November 27th

9    --

10         A.    Yes.  Yes.

11         Q.    You are declining to do what it is that

12   she asked you to do in her November 27th memorandum;

13   is that fair to say?

14         A.    No, as stated, I felt I provided all the

15   information necessary and that I thought it was just

16   harassment because I'd taken off prior to 2002,

17   August of 2002, three, four days and it never became

18   an issue.  And Sue Zawislak made this an issue and

19   she got HR involved.

20         Q.    And you prolonged the issue by not doing

21   what they asked you to do in the first instance, did

22   you not?

23         A.    I felt I did what I was asked to do, and

24   my doctor provided --

KENNETH COLE

1      Q.   Let's go back to that then.  Let's look at

2  what she asked you to do.

3           On November 27th she asked you to

4  provide a statement from the physician which was

5  signed.  You did that; is that correct?

6      A.   As I recall, yes.

7      Q.   Well, isn't that what the first sentence

8  of your December 4 memo says?

9      A.   Okay.  Yes.

10     Q.   She said, there's no indication of the

11 actual number of hours you were able to work.  She

12 wanted your doctor -- she wanted something from your

13 physician indicating the actual number of hours you

14 were able to work.  You declined to do that?

15     A.   Okay.  Yes.  I'm sorry.

16     Q.   She asked whether returning to full

17 activity means working 29 hours at Del Tech.  You

18 didn't provide a response to that question?

19     A.   I think I responded by quoting the PP --

20 Personnel and Policy Manual on employees, temporary

21 employees.

22     Q.   You did not give her a doctor's note which

23 indicated whether full activity meant working 29

24 hours at Delaware Tech; is that correct?

KENNETH COLE

```
 1       A.    No.

 2       Q.    That's incorrect or that's correct?

 3       A.    That's correct, as I recall.

 4       Q.    You continued to take the position that as

 5  long as you were working somewhere between 15 and 29

 6  hours a week, you were fulfilling the terms and

 7  conditions of your contact, and the section of the

 8  college's policy that you refer to in the third

 9  paragraph of your December 4 memo?

10       A.    Yes.

11       Q.    And you took the position that if they

12  continued to ask you to do all of what you were being

13  asked to do, that you would consider that an act of

14  retaliation?

15       A.    I considered all of that an act of

16  retaliation, not just that.

17       Q.    I'm handing you Brown-Cole 52 which, I

18  believe, is a copy of an E-mail from Jackie Jenkins

19  to you dated December 4, 2002?

20       A.    Uh-huh.

21       Q.    And in the first sentence of the E-mail it

22  indicates that Jackie Jenkins received your December

23  4, 2002 memo, which is the document we just talked

24  about?
```

KENNETH COLE

1    A.    Uh-huh.

2    Q.    Is that your understanding?

3    A.    Yes.

4    Q.    And, then in the first paragraph Jackie

5    Jenkins again takes the position that the

6    documentation you've provided to that date did not

7    clearly communicate the actual number of hours you're

8    able to work.  Nor did it address the duration of the

9    reduced hours.

10         We just talked about that, and would

11   you agree that, in fact, that's a correct statement

12   of fact?

13   A.    Yes.

14   Q.    In the next paragraph, in the second

15   sentence, she pointed out that the hours of work and

16   work schedule are established by the department and

17   approved by the Campus Director, and that any

18   adjustment to an employee's work schedule must be

19   approved by the Campus Director.  Do you see that?

20   A.    Yes.

21   Q.    She once again asks you to provide the

22   information she was requesting by December 9, 2002.

23   A.    Uh-huh.

24   Q.    Did you do that?

KENNETH COLE

1      A.    No.

2      Q.    I'm handing you a document identified as

3   Brown-Cole 55, which appears to be an E-mail from you

4   to Jackie Jenkins dated December 6, 2002?

5      A.    Uh-huh.

6      Q.    You take the position in the second

7   sentence that, quote, I've given you all the

8   information that you have requested, unquote?

9      A.    Yes.

10     Q.    In the last sentence of the first

11  paragraph you indicate you're working 20 hours a

12  week; is that right?

13     A.    At that time, yeah.

14     Q.    And, then you once again take the position

15  that despite what Jackie Jenkins said in her December

16  4 E-mail, you were satisfying the terms and

17  conditions of your contract?

18     A.    Uh-huh.  Yes.

19     Q.    I'm handing you a letter identified as

20  Brown-Cole 57 through 62.  It's actually a letter

21  with some attachments, three-page letter with

22  attachments.

23     A.    Uh-huh.

24     Q.    Did you receive this letter?

KENNETH COLE

Page 62

```
1        A.   Yes.

2        Q.   On Brown-Cole, page 60, the first

3   attachment --

4        A.   Okay.

5        Q.   -- there is handwritten word, retaliation,

6   with arrows.  That's you, that's your writing?

7        A.   Yes.

8        Q.   In the first paragraph Jackie Jenkins, in

9   the second sentence, says that, on December 4 I

10  requested that you provide your physician's note in a

11  specified format by December 9.

12            The next sentence says, rather than

13  provide the requested information, you raised a

14  number of issues that, although I'm happy to address,

15  have no bearing on your obligation to provide

16  appropriate substantiation of your request for

17  reduction in hours due to medical reasons.

18            She's correct, is she not, that rather

19  than provide the information in the requested format,

20  you raised issues about whether you should be

21  required to do so?

22       A.   No, I disagree with that.

23       Q.   Did you provide the medical documentation

24  in the required format by December 9th?
```

KENNETH COLE

Page 63

```
 1        A.    No.

 2        Q.    In the second sentence -- paragraph rather

 3   -- and this is from the Director of Human Relations;

 4   is that correct?

 5        A.    Resources.

 6        Q.    Human Resources?

 7        A.    Right, but these two don't -- these two

 8   don't go together.  I don't know if you just stapled

 9   these together for some reason, but these don't go

10   with this.

11        Q.    Let's remove the attachments.  And in the

12   third paragraph, for the second time now, Jackie

13   Jenkins -- third paragraph, page Brown-Cole 57 of the

14   December 13th letter, Jackie Jenkins again points out

15   that it is not the employee's option to choose how

16   many part-time hours he or she will work, but rather

17   that's the prerogative of the Campus Director.

18                  Is that your understanding of what

19   she's telling you in this paragraph?

20        A.    Yes.

21        Q.    On the second page in the first full

22   paragraph about midway through, she explains that the

23   purpose of making the request for the medical

24   documentation is to enable the Campus Director to
```

KENNETH COLE

1    determine whether an employee's limitations -- in

2    light of the employee's limitations, the employee's

3    able to perform the essential functions of the

4    position.  Do you see that?

5         A.    Uh-huh.  Yes.

6         Q.    She tells you that if you don't provide

7    the required documentation, you're going to be

8    expected to --

9         A.    Threatened with termination.

10        Q.    You're going to be expected to work from

11   8:30 to 2:30?

12        A.    Yes.

13        Q.    Did you ever provide the documentation she

14   had been requesting in a format in which she

15   requested it?

16        A.    No.

17        Q.    Did you return to the schedule that she

18   specifies on the second -- I'm sorry -- on the third

19   page of this letter -- second page of the letter?

20        A.    No,  REDACTED         provided the

21   documentation.

22        Q.    And how did   REDACTED       get the

23   documentation?

24        A.    She called the doctor's office and the

KENNETH COLE

1    doctor's office sent it.

2        Q.    And did you refuse or decline to do that?

3        A.    Yes, I felt I provided all the information

4    necessary, and it was just an act of retaliation.

5        Q.    Did you consider the fact that it was also

6    an act of insubordination on your part?

7        A.    No, I was willing to deal with that.

8        Q.    You didn't view that as insubordination?

9        A.    No, I felt the retaliation and the

10   discrimination because of the events of 2002 -- I

11   felt that I had did all I had -- I had provided all

12   the information, and that it was a case of

13   harassment, a case of retaliation, and even the

14   document that was finally provided, it wasn't even

15   clear enough to see -- understand whether it says I

16   was going to work from 8:00 to 12:00, and what time I

17   was going to work to 8:00 to 12:00 anyway.

18              So, no, I didn't feel it was

19   insubordination.  Why would I feel that.  I felt I

20   was being harassed, you know.  For me to feel that,

21   you know, other than that it just wasn't logical to

22   me.

23       Q.    So as long as you feel that you're being

24   harassed, if you don't think it's logical in your

KENNETH COLE

Page 66

```
 1    view, you're free to disregard --
 2                 MS. BREWINGTON:  Objection.
 3    Argumentative.
 4    BY MR. WILLIAMS:
 5        Q.   -- you're free to disregard a directive
 6    from the Director of Human Resources?
 7        A.   Here's my statement.  I felt I was
 8    harassed.  I felt I was retaliated against, in some
 9    cases discriminated against, and treated differently
10    than other program -- TRIO Program participants.  And
11    I just felt that it wasn't so much Jackie Jenkins.
12    It was Susan Zawislak and Ann Del Negro who uses
13    Jackie Jenkins, getting her involved at a point that
14    it was nothing she could do but respond the way that
15    she responded.
16        Q.   Did Jackie Jenkins tell you there was
17    nothing she could do but to respond in the way in
18    which she responded?
19        A.   No, I had no conversation with Jackie
20    Jenkins other than the E-mails.
21        Q.   The fact of the matter is you refused to
22    comply with what Jackie Jenkins asked you to do?
23        A.   No, I disagree.
24        Q.   Did you give her the medical documentation
```

KENNETH COLE

Page 67

1    in the format that she requested?

2        A.    Yes, I felt I did.    I felt that I gave her

3    the information that she requested.

4        Q.    Did the medical documentation that you

5    provided her identify the actual number of hours you

6    were able to work?

7        A.    At one point, no.

8        Q.    At what point did the medical --

9        A.    At one point in the E-mail.    I mean, I

10   can't go back and say where.    We just went over that.

11   At one point in the E-mails, she kept requesting more

12   and more information.    And I gave the information up

13   until the end of December, in this letter here where

14   I was threatened with termination.

15       Q.    Let's go back over those, Mr. Cole.    We

16   have a lot of time here.

17       A.    We have a lot of time?

18       Q.    Yes, as much time as it takes.

19       A.    I'm here.

20       Q.    Going back to the Brown-Cole 51, the

21   November 27th, 2002 memorandum from Jackie Jenkins,

22   she told you that in the medical documentation you

23   provided there was no indication the actual number of

24   hours you were able to work.

KENNETH COLE

1          When I asked you about that document

2    earlier, you agreed that that was an accurate

3    statement of fact?

4          A.   And I also said that I gave -- at

5    different stages in the E-mails based on her request,

6    I gave her all I felt that she was requesting.  There

7    was a point at the end of December or mid December

8    that she threatened me with termination in this

9    letter.  I felt that I had given her all that she had

10   requested.

11         And, then, you asked me, did I give

12   the final document.  I said, no,  REDACTED          gave

13   her the final document, the doctor's note.

14         Q.   Mr. Cole, as of November 27th, 2002 she --

15   Jackie Jenkins correctly pointed out that on the

16   medical documentation you provided there was no

17   indication of the actual number of hours you were

18   able to work; isn't that correct?

19         A.   I said that before.

20         Q.   And on December 13, 2002 she continues to

21   tell you that you're not providing medical

22   documentation of the actual number of hours you were

23   able to work?

24         A.   Yes.

KENNETH COLE

1          Q.    And what she asked you to do was to

2    provide that by December 29th.  You didn't do that?

3          A.    No.

4          Q.    And as of December 13, you still hadn't

5    done it?

6          A.    No.

7          Q.    And subsequent to December 13th, you

8    didn't do it.    REDACTED        did it?

9          A.    That's right.  It was done.  I felt

10   discrimination and retaliation at that point.

11         Q.    And, in fact, the December 13th letter is

12   the third time Jackie Jenkins asked you for the

13   medical documentation in the format that she was

14   looking for?

15         A.    Yeah.  I didn't count the times, but it's

16   quite a few E-mails.

17         Q.    Well, let's count them.  We have November

18   27th.

19         A.    Okay.  We've got three.

20         Q.    We have December 4th, with the deadline of

21   December 9th.

22         A.    Okay.

23         Q.    And, then, you have December 13th.  This

24   is the third time she's asking you.

KENNETH COLE

Page 70

1     A.   Yeah, but you're trying to convince me in

2  my mind that I didn't feel retaliation and harassment

3  at that time.  And you can't do it.

4     Q.   I'm not trying to convince you of

5  anything.  I'm trying to ask you questions and get

6  responses to my questions.

7     A.   I gave you the responses.

8     Q.   Are you telling me that it was your belief

9  that Jackie Jenkins was retaliating against you

10  because of your race?

11     A.   No.

12     Q.   I'm going to hand you a document that has

13  Bates stamps number on it Brown-Cole 74 through 92,

14  and ask you if you can identify that document?

15     A.   Yes.

16     Q.   What is it?

17     A.   Log sheet.

18     Q.   In your handwriting?

19     A.   Yes.

20     Q.   There are dates going down the left-hand

21  column.  Do those dates represent the dates when

22  various entries were made?

23     A.   Yes.

24     Q.   Is this something you did while you were

KENNETH COLE

1    at work?

2        A.   I would maintain a log everywhere I am at

3    work.  Whether it's business, whether it's PECO,

4    whether it's the military, I maintain a log.

5        Q.   This log, do you log entries every day?

6        A.   Yes.

7        Q.   You provided this particular log to your

8    attorney; I take it?

9        A.   Yes.

10        Q.   Are there logs covering other time periods

11    which you did not provide to your attorney?

12        A.   Yes.

13        Q.   Why did you provide this particular log to

14    your attorney?

15        A.   Because that's the log period of

16    relevance.

17        Q.   Would I be correct in understanding that

18    nothing of relevance happened after April 23rd of

19    2003?

20        A.   What date?

21        Q.   April 23rd, 2003?

22        A.   To some extent some things are still going

23    on.  But I felt that that was the relevant period of

24    time.  I didn't think that -- I mean, I have it, if

KENNETH COLE

1    that's your question, to be presented, I have it.

2    But I just felt that that was just the relevant

3    period of time.

4         Q.    I accept the fact that you think this is

5    the relevant period of time.  Do you think that

6    because there wasn't any retaliation after --

7         A.    No.

8         Q.    -- April 23rd --

9         A.    No, there was some other --

10        Q.    Let me finish my question and, then, you

11   can have as much time as you want to answer.

12        A.    Okay.  I'm sorry.

13        Q.    Is that because you don't believe that

14   there were any acts of retaliation subsequent to

15   April 23rd, 2003?

16        A.    No, I think there's more acts of

17   retaliation.

18        Q.    And what are they?

19        A.    April of 2003.  I think there's acts of

20   retaliation in -- April, 2003 -- up until   REDACTED

21   REDACTED    left.  She left in February of 2004.  Such

22   as retaliation, discrimination.  I felt --

23        Q.    The fact that she left?

24        A.    No.  No.  I'm not saying that.  Up until

KENNETH COLE

1    now really.

2         Q.    And I'm going to ask you, subsequent to

3    April 23rd, 2003 --

4         A.    I think the other incidents of retaliation

5    concerning scrutinizing work schedules, what time do

6    you start, log in that time.  When you get to the

7    school, logging in that; that continued up until Ann

8    Del Negro decided to take another position elsewhere,

9    in conjunction with some other things, the promotion

10   of -- not promotion, but the lateral transfer of

11   Andrea -- let me go back.  I'm trying to get these

12   chronological dates together.

13             The point where Jacquita Wright

14   Henderson was made acting over UBMS, Upward Bound

15   Math Science.  That was another incident I felt was a

16   retaliatory and discrimination.

17             The point where Andrea Coleman came in

18   over the UBMS group was retaliation.

19             The point where  REDACTED            --

20   I mean, Roseanna Brown-Simmons coming over the group,

21   UBMS, is retaliation.

22        Q.    You filed your charge of discrimination --

23   I'll hand you a document that's identified as DEF

24   366.  Is this your packet of the charge of

KENNETH COLE

Page 74

1    discrimination?

2        A.    Yes.

3        Q.    And you signed it and dated it on October

4    15th, 2002?

5        A.    Yes.

6        Q.    You talk in here about your understanding

7    that Paul Morris was promoted.  Do you know when that

8    took effect?

9        A.    His promotion?

10       Q.    Yes.

11       A.    No, I only went by the newsletter at that

12   time because there was no -- other than a newsletter,

13   that was the only announcement that Paul Morris was

14   promoted.

15       Q.    It was prior to the time when Paul Morris

16   met with you on August 12th; isn't that correct?

17       A.    That newsletter?

18       Q.    No, what you characterized as a promotion,

19   and what was described as a promotion in the

20   newsletter?

21       A.    What's your question?

22       Q.    Let's call it a promotion for the sake of

23   simplicity which is what it's referred to in the

24   newsletter.

KENNETH COLE

1        A.    Okay.

2        Q.    The promotion occurred before Paul Morris

3    met with you on August 12th to tell you about the

4    move?

5        A.    Well, see, I'm not -- here's where I'm not

6    real clear in terms of recalling.  I do know that the

7    newsletter came out showing him promoted.

8              But I also realize that I thought he

9    was acting out of his authority by making a personal

10   decision to move the UBMS group.  That's when I

11   started asking questions about his authority.  What

12   authority does he have to direct us or direct the

13   UBMS group to move.

14             And that's when the investigation

15   started with HR to see if the job was posted.

16       Q.    As of the time that you sat down with Paul

17   Morris on August 12th --

18       A.    Okay.

19       Q.    -- and he informed you of the decision to

20   move the Upward Bound Math Science group, did you

21   have an understanding as to whether he had been

22   promoted?

23             MS. BREWINGTON:  I'm going to object.

24   Asked and answered.

KENNETH COLE

```
 1                  MR. WILLIAMS:  Well, I don't think it

 2    has been.

 3                  THE WITNESS:  I thought I just

 4    answered that.  I thought I just said, when I

 5    received the newsletter and didn't see any promotion

 6    -- I mean, any posting, I'm asking myself, who's

 7    giving him the authority, because at that time Paul

 8    was over Educational Talent Search as a Program

 9    Manager.  And I didn't know any of the change to that

10    other than the newsletter that he was promoted.

11                  So I'm starting to question his

12    authority, 'cause now you're telling us it's his

13    personal vision for Upward Bound Math Science to have

14    their own defined space.  The move will go forward.

15    It had been approved.  The move will go forward.

16                  So I'm starting to question that

17    authority.  What's the legitimacy of that authority,

18    if that authority hadn't been -- that position hadn't

19    been posted.

20    BY MR. WILLIAMS:

21        Q.    Mr. Cole, in this charge of discrimination

22    there's a check mark next to race; do you see that?

23        A.    Where?

24        Q.    In the -- there's a box which says race,
```

KENNETH COLE

1    color, sex, religion and national origin, age,

2    retaliation, disability, other.  It's right above the

3    text of your charge.  It's about the middle of the

4    page, above the --

5         A.    Oh, okay.

6         Q.    -- the text of your charge; do you see

7    that?

8         A.    Yes.

9         Q.    There's no check mark next to retaliation;

10   do you see that?

11        A.    That's because they made a mistake.

12        Q.    Did you ever correct that mistake?

13        A.    No, the Department of Labor, Brenda Sands,

14   realized that she made a mistake, and she amended --

15   as far as I know, I never did see the amendment.  She

16   was supposed to amend the charge of discrimination

17   and include the retaliation piece.

18        Q.    So as of October 15, 2002, you were

19   claiming retaliation.  What was the retaliation that

20   you were complaining about as of October 15th, 2002?

21        A.    Well, we just went through that.  I don't

22   understand what you're asking me.  It's sort of --

23        Q.    You --

24        A.    I mean, we just sat here for an

KENNETH COLE

Page 78

1    hour-and-a-half, or two hours or so, and went through

2    what I felt was retaliation, and the documents that

3    you provided, okay.

4              The medical excuse, the reduction in

5    hours, the scrutinizing our work schedules, the

6    change in the travel request, and I could go on and

7    on and on.

8         Q.   Well, let's analyze what you just said,

9    Mr. Cole.  The medical excuse, that happened in

10   November and December of 2002, did it not?

11        A.   No, the medical started in September of

12   2002.

13        Q.   Oh, so that went on -- that went back and

14   forth, and you refused to comply for three months?

15        A.   No, that's not true.  There's a series of

16   E-mails that went with -- between REDACTED        , the

17   Program Manager, and Ann and Sue, and, then HR got

18   involved around November, early November, if I'm not

19   mistaken.

20             But the medical started with Sue, not

21   with HR.

22        Q.   In this charge you say -- you talk about

23   being informed in August by Paul Morris.  And we've

24   established that that was August 12th, being informed

KENNETH COLE

1   of the move.  Are you claiming that that was

2   retaliation?

3       A.   No.

4       Q.   You're claiming that was race

5   discrimination?

6       A.   Yes, and I'm claiming that the move and

7   once I submitted the grievance and, then, things

8   started to change for UBMS in terms of retaliation.

9       Q.   This charge of discrimination is the first

10  time you contended in writing or orally -- well, let

11  me back up.

12          This charge of discrimination is the

13  first time you ever claimed in writing that the move

14  to 408, Room 408, was based upon race?

15      A.   That's not true.

16      Q.   What is the first time in writing that you

17  made the claim that the move to Room 408 was based

18  upon race?

19      A.   In writing?

20      Q.   Yes.

21      A.   When we were informed to move after the

22  meeting with Paul -- there was the meeting prior to

23  that meeting that Paul and I met together, but this

24  August 12th meeting that you're referencing to, we

KENNETH COLE

1   were told to -- by Paul, to put it in black and white

2   where your job description say that you can't move.

3               And we went to the Program Manager.

4   And we thought that was sort of unacceptable, and we

5   requested a meeting with Ann Del Negro -- yes, Ann

6   Del Negro.  And we met in that meeting, and Paul was

7   there, the UBMS staff was there.

8               And I had a document that we had --

9   that coworkers had put together, and I read from that

10  document.  And I used words -- I mean, in addition to

11  productivity, employee relations and morale, I used

12  words like treat -- we felt we was being treated

13  unfairly.  We felt that we was being treated

14  differently than if we were a different group.

15              I used words, and other words was used

16  like we felt that -- one person felt that they was

17  being punished, that word was used.

18              And, then we used ulterior motives.

19  That was -- we felt that there was ulterior motives

20  for the move.  And that created some response of Ann

21  Del Negro was very upset.

22              And she was upset that I read the

23  document because she said -- because when Paul said,

24  put it in black and white, I think I sent an E-mail