KENNETH COLE

1    saying, I can't convey my thoughts on paper.  And,

2    then I turned around and came to the meeting with

3    paper.  She questioned that.  And, then she was very

4    upset that I read it from the paper.

5              And, then she asked Ms. Brown how she

6    felt, and she reiterated the same thing.

7              And in that meeting it was said that

8    nothing -- you have said nothing to convince us about

9    this move.  So we're going to go forward.

10       Q.   So you didn't use the word race.  You

11   didn't say, I feel like I've been discriminated

12   against because of my race.  You used the words that

13   you've just described in your testimony?

14       A.   Yes, that there was some fear of

15   retaliation, and that's what happened.

16       Q.   When is the last time you talked to REDACTED

17   REDACTED    about this litigation?

18       A.   About a week ago.

19       Q.   Well, what did you discuss with her?

20              MS. BREWINGTON:  I'm going to object

21   on the grounds of relevance.

22   BY MR. WILLIAMS:

23       Q.   Do you anticipate that REDACTED        will

24   be a witness in this case?

KENNETH COLE

Page 82

```
 1        A.   Yes.  Absolutely.

 2        Q.   What did you discuss with  REDACTED        ?

 3        A.   We discussed her testimony.

 4        Q.   What did you talk about with regard to

 5   that testimony?

 6        A.   Is this -- do we want to go on

 7   confidential?

 8             Am I allowed to say what --

 9             MS. BREWINGTON:  Oh, it's up to you

10   guys.  We can go off the record for a little bit.

11             (Discussion off the record)

12             (Thereupon, the following testimony

13   was deemed to be confidential and placed under

14   separate cover:)

15

16

17

18

19

20

21

22

23

24
```

KENNETH COLE

```
 1                O P E N  S E S S I O N

 2                (Thereupon, the confidential section

 3     of the deposition was concluded, and the deposition

 4     proceeded as follows:)

 5     BY MR. WILLIAMS:

 6        Q.    Do you receive performance evaluations?

 7        A.    From where, Del Tech?

 8        Q.    Yes.

 9        A.    Yes.

10        Q.    How frequently?

11        A.    Annually.

12        Q.    How would you characterize your

13     evaluations?

14        A.    Excellent.

15        Q.    And has that been the case throughout your

16     employment?

17        A.    At Del Tech?

18        Q.    At Del Tech.

19        A.    Yes.

20        Q.    If we went over and reviewed each of the

21     written communications, as I did yesterday, that took

22     place concerning the move between the time you were

23     informed of the move on August 12th to the time that

24     you filed your charge, would you agree with me that
```

KENNETH COLE

1    we would not see statements in those written

2    communications that were prepared by you or prepared

3    by Brigitte Brown that talked about race, but rather

4    talked about employee morale, productivity, employee

5    relations, feeling being punished, the feeling of

6    being treated unfairly, as you've described earlier

7    in your testimony, but we wouldn't see anything about

8    race --

9        A.    No, that's not true.

10       Q.    -- prior to the time of the filing of the

11   charge?

12       A.    No, that's not true.

13       Q.    Would we see the word race?

14       A.    Yes, I showed you earlier.  If you look at

15   when I filed the grievance, it referenced to the

16   statement of affirmative action, and, then -- and if

17   you look at the policy, it talks about the Civil

18   Rights Act of 1964.

19              And if you look at the last page, it

20   talks about the -- in reference to the policy where

21   it says, non-discrimination, that talks about race.

22   I said that policy was violated.

23       Q.    Listen to my question.  Maybe you

24   disagree.  My question was, documents that related to

KENNETH COLE

1    the move, do you view your grievance as related to

2    the move?

3         A.    Okay.  No.

4         Q.    Documents between the time you learned of

5    the move on August 12th, until the time you filed

6    your charge of discrimination in mid October, all the

7    documents that you prepared or prepared by someone

8    else in UBMS, and were provided to upper management,

9    none of those talked about race.

10              They talked about employee morale and

11   productivity and unfair punishment, but not any

12   allegation of discrimination on the basis of race?

13        A.    I equate words like being treated

14   differently and unfairly to race.

15        Q.    You equate that to race --

16        A.    Yes.

17        Q.    -- but you wouldn't find in those

18   documents, nor were there oral communications where

19   there was a claim of race discrimination.  The claim

20   was unfair, treated differently, inequality, those

21   kinds of words?

22        A.    The word race, no.  You won't see that in

23   the documents, but that's my words that equate to

24   that.

KENNETH COLE

1      Q.    Did anyone in management at the college

2   ever tell you that decisions about moving employees

3   or programs were based upon seniority?

4      A.    I'm sorry.  Repeat that.

5      Q.    Did Paul Morris or Sue Zawislak or Ann Del

6   Negro, or anyone else in management at the college,

7   ever tell you that decisions about moving people were

8   made based upon their relative seniority?

9      A.    No.

10      Q.    As of September of 2002, do you know what

11   the racial composition was of the CCP employees at

12   the Wilmington campus of the college?

13      A.    CCP?

14      Q.    Yes.

15      A.    No.

16      Q.    Did I understand correctly your earlier --

17   do you have an associate degree from Widener?

18      A.    No, I have an associate degree from

19   Community College of Philadelphia.  And I have a

20   4-year engineering degree from Widener University.

21      Q.    Let's go back to the Complaint which has

22   been marked as Cole Exhibit 1.  I think it's in your

23   stack, hopefully.  If not, I'll give you another

24   copy.

KENNETH COLE

1          You have it.  In paragraph 21 of the

2     Complaint, but it's not paginated, so I don't know

3     what page it is, you talk about the fact that Room

4     408 had been Ann Del Negro -- was at one time Ann Del

5     Negro's single office; is that correct?

6          A.   This is not -- it looks like this was

7     merged, and it's not -- this is not my statement

8     there.  The document was merged.

9               What was your question again, I'm

10    sorry.

11         Q.   Paragraph 21 says that the office that

12    UBMS group was being forced to move into, had been

13    Ann Del Negro's former single office?

14         A.   Yes, I agree with that.

15         Q.   It was not Ann Del Negro's office

16    immediately prior to UBMS group moving into 408, was

17    it?

18         A.   No.

19         Q.   In fact, it had been occupied by a program

20    called To the Max, which ceased to exist because of

21    funding issues, and, then it became SOAR?

22         A.   I don't know about it ceased to exist.  I

23    know that it was To the Max and, then SOAR.

24         Q.   And when To the Max was in there, there

KENNETH COLE

```
 1   were about -- there were two full-time Coordinators

 2   occupying the space that you currently occupy -- you

 3   and others currently occupy?

 4        A.   Two full-time African American

 5   Coordinators, and one, sometime, secretary.

 6        Q.   Paragraph 22, I think, is talking about

 7   the meeting that you described with Ann Del Negro

 8   when you were reading from a piece of paper, and

 9   talking about employee relations, morale,

10   productivity --

11        A.   Yes.

12        Q.   -- treated unfairly, unequally, ulterior

13   motives; that's an accurate allegation?

14        A.   Yes.

15        Q.   And prior to your being moved to Room 408,

16   you occupied a small office on kind of the opposite

17   hallway from where Room 408 is located?

18        A.   Well, it's not sort of opposite.  It's

19   sort of across the hall.  But, yes, we did occupy --

20        Q.   The hall goes in a square?

21        A.   Right.

22        Q.   And you were at the southwest corner of

23   that square, your former office?

24        A.   Yes, at the end where 408 is is north
```

KENNETH COLE

1    central, I guess.

2        Q.    And you were in a small office just about

3    big enough for you and your furniture and equipment,

4    not much else?

5        A.    No.

6        Q.    Pardon me.

7        A.    No.

8        Q.    That's incorrect?

9        A.    Yes.

10        Q.    How large would you say that office was?

11        A.    Well, I can't say how large, but there

12    were times that I had students and parents come in

13    and sit down and we would close the door and have a

14    private conversation.  There may be some issues at

15    the dorms that we need to discuss.

16        Q.    Did you measure that office?

17        A.    Did I measure the office?

18        Q.    That you occupied before you moved to 408?

19        A.    I think we did collectively, me and my

20    coworker.

21        Q.    Did you keep those measurements?

22        A.    There was a diagram floating around with

23    those measurements, and I think they were in -- I

24    didn't include them, but I think my coworker may have

KENNETH COLE

1    included them with the Complaint.

2         Q.    In paragraph 77 of the Complaint, you

3    claim that you are suffering a loss of considerable

4    pay.  What is the loss of pay that you are suffering?

5         A.    Well, there's the promotion of Paul

6    Morris, and I'm not sure how long -- I hear it in

7    testimony.  I'm not sure how long he was promoted,

8    but he went on to get other promotions.

9              I think that I should have been

10   afforded the opportunity to -- Brigitte and myself

11   should have been afforded an opportunity when REDACTED

12   REDACTED  , which we thought at the time, resigned.

13   And when they brought in Jacquita Wright Henderson,

14   she came in as acting.  I felt that I should have

15   been afforded an opportunity to become acting, or Ms.

16   Brown become acting.

17        Q.    Well, we'll come back to that.  In

18   paragraph 80 you talk about, or you allege that the

19   college denied career advancement opportunities by

20   denying his request for promotion.  Which request for

21   promotion are you talking about?

22        A.    That's another, I think, mistake there.

23   That document was merged from another -- maybe Ms.

24   Brown's claim.

KENNETH COLE

1          Q.    Because you never requested a promotion?

2          A.    No.

3          Q.    This document talks about in paragraph 77,

4    and also it talks about humiliation, mental anguish

5    and emotional pain.  Is that another mistake, or --

6          A.    Oh, no.  That's two different issues.

7          Q.    Do you have a claim for mental distress,

8    humiliation?

9          A.    Oh, no, that's another piece that was

10   merged.  No, the mental anguish and emotional stress

11   is Ms. Brigitte.

12         Q.    So you're telling me you have no such

13   claim for damages?

14         A.    Well, I have a claim for damages, yes.

15         Q.    For --

16         A.    I'm looking at compensatory and punitive.

17         Q.    Do you have a claim for damages arising

18   out of humiliation, mental anguish and emotional

19   pain?

20         A.    Yes.

21         Q.    I may have given you a copy of this

22   earlier, but perhaps not.  This is a copy of your

23   response to Answers to Interrogatories filed in this

24   case.  It's been marked for identification as Cole-2.

KENNETH COLE

1          You reviewed these Answers before you

2    signed?

3          A.    To the best of my ability.

4          Q.    And you signed an affirmation on October

5    31, 2005, saying that the facts stated in this

6    document are true and correct to the best of your

7    knowledge and belief?

8          A.    Yes.

9          Q.    And you carefully reviewed the document in

10   order to get it right before you signed that?

11         A.    I think that I did.  There's so many

12   documents.

13         Q.    On page 5, going over to the top of page

14   6, you were asked to identify expert you've

15   consulted, and the answer is, no expert witnesses

16   have been identified at this time.  Is that still

17   true?

18         A.    Yes.

19         Q.    Paragraph 5 at the bottom of page 6, the

20   question is, describe in detail the types and amounts

21   of all damages you are seeking, setting forth the

22   calculation of damages you are seeking in this case

23   in detail and the manner in which you calculated such

24   damages.

KENNETH COLE

1          Your answer is, Plaintiff is unable to

2    determine an exact amount of damages at this time.

3    When Plaintiff is in a better position to determine

4    or approximate total damages, the information will be

5    provided.

6          Are you able to answer that question

7    now, and tell us what damages you are seeking, and

8    how you arrived at that number?

9      A.   No, I just mentioned compensatory and

10   punitive, and that's where I may need an expert to

11   help sort of calculating those numbers and generating

12   what we think would be an appropriate amount.

13     Q.   Are you aware of the fact that the

14   deadline for identifying expert witnesses has come

15   and gone in this case?

16     A.   No.

17     Q.   So are you telling me that you don't know

18   what damages you suffered?

19          You're unable to tell me how much.

20   Forget about punitive damages.  As I mentioned to you

21   a few minutes ago, you're claiming lost salary.  What

22   is the amount of your lost salary claim?

23          MS. BREWINGTON:  Objection.

24   BY MR. WILLIAMS:

KENNETH COLE

Page 94

1      Q.    What is the amount of your lost salary

2   claim?

3      A.    Well, I can't at this time give you a

4   figure.

5      Q.    Do you have a plan on giving us a figure

6   sometime?

7      A.    Yes.

8      Q.    And when would that be?

9      A.    When would that be.  Whenever it's the

10   appropriate time.

11      Q.    How much income did you earn in 2005 from

12   your business that you operate that you described?

13      A.    From my business?

14      Q.    Yes.

15            THE WITNESS:  Is this confidential

16   here under seal, or, I mean do I --

17            MS. BREWINGTON:  If you'd like it

18   under seal, we can certainly do that.

19            (Thereupon, the following testimony

20   was deemed to be confidential and placed under

21   separate cover:)

22

23

24

KENNETH COLE

Page 95

1              O P E N   S E S S I O N

2              (Thereupon, the confidential section

3    of the deposition was concluded, and the deposition

4    proceeded as follows:)

5    BY MR. WILLIAMS:

6         Q.    How are you paid currently?

7                Hourly would be a part-time employee

8    and you're paid for each hour that you work?

9         A.    Correct.

10        Q.    You're not paid by salary?

11        A.    No.

12        Q.    And from October, 2002 until the present,

13   there was obviously a time in 2003 when you were

14   working less than 29 hours a week; isn't that right?

15        A.    Yes.

16        Q.    You were working how many hours, 20 hours

17   a week?

18        A.    Yes.

19        Q.    How long did that go on?

20        A.    September of 2002, I recall, till about

21   March or April of 2003.

22        Q.    You were only able to work 20 hours a week

23   for health reasons?

24        A.    Yes.

KENNETH COLE

1          Q.    You would not have, during that period of

2     time, been able to fulfill the requirement of working

3     in a full-time position at the college?

4          A.    I didn't know that in 2000 -- I didn't

5     know the illness was going to occur at that time.

6          Q.    When did you first become ill?

7          A.    It was end of August, I think it was.

8          Q.    End of August, 2002?

9          A.    Yes.

10         Q.    And were you hospitalized for awhile?

11         A.    Three days.

12         Q.    And after you came out of the hospital, is

13    when you were working a reduced schedule?

14         A.    Yes.

15         Q.    Of about 20 hours a week?

16         A.    Yes.

17         Q.    So my question again is, as of that time,

18    end of August, September, and right through whatever

19    date it is you identified in 2003, you would not have

20    been able to fulfill the requirement of working in a

21    full-time position at the college?

22         A.    On the doctor's orders, no.

23         Q.    So in other words, my statement is

24    correct?

KENNETH COLE

1          A.    To some extent.

2          Q.    Well, to what extent is it incorrect?

3          A.    Because you never know, looking at a

4     situation back then.  I wasn't brain dead.  I was

5     working -- the doctor's advised me to work reduced

6     hours.  But I wasn't brain dead.  So if I was offered

7     a position, or applied for a position, I would like

8     to think that I could work some things out with the

9     employer.  Limited duty to some extent.

10         Q.    So you would like to think you'd be able

11    to work something out, but the fact of the matter is

12    you wouldn't have been able to work full time?

13                MS. BREWINGTON:  Objection.

14                THE WITNESS:  That's not a fact.

15    BY MR. WILLIAMS:

16         Q.    Well, you represented to the college that

17    you were only able to work 20 hours a week?

18         A.    Part time.

19         Q.    You were a part timer?

20         A.    Right.

21         Q.    The college wanted you to work more like

22    29 hours a week.  You told the college you could only

23    work 20 hours a week, did you not?

24         A.    On the doctor's orders, yes.  But what I'm

KENNETH COLE

1    saying to you is that under the same circumstances,

2    offered a position, I don't know what the mind set

3    would have been at that time.

4        Q.    Whose mind set, yours or your physician's?

5        A.    Mine.  Mine.

6        Q.    So you represented to the college that you

7    could only work 20 hours a week under doctor's

8    orders, but you're suggesting that if you had a

9    different position, you would have been able to work

10   more hours?

11            MS. BREWINGTON:  Objection.  Calls for

12   speculation.

13            THE WITNESS:  Right.  That has nothing

14   -- to me, there's no correlation between the two.

15   BY MR. WILLIAMS:

16       Q.    Well, you weren't misrepresenting the

17   facts to the college back in 2002 about your need to

18   work a limited work schedule, were you?

19       A.    No.

20       Q.    What you were representing to the college

21   was accurate?

22       A.    At that time, yes.

23       Q.    You were restricted --

24       A.    But you're asking me to speculate about

KENNETH COLE

1    something in 2002.

2         Q.   No, I'm not asking you to do that at all.

3    With the benefit of hindsight, the fact of the matter

4    is --

5         A.   That's what hindsight is, speculation.

6         Q.   The fact of the matter is that you were

7    unable to work a full-time schedule from August

8    through the balance of 2002 right through what date

9    in 2003?

10         A.   Under those circumstances.

11         Q.   Right through what date in 2003?

12         A.   Oh, I said, I don't know.  I think it was

13    March or April of 2003.

14         Q.   And the circumstance was if you had a

15    different job what?

16              MS. BREWINGTON:  Objection.

17    BY MR. WILLIAMS:

18         Q.   What would have been the difference?

19         A.   That's a hypothetical.

20         Q.   Would you have been able to work full time

21    in the position of Director of Special Programs?

22              MS. BREWINGTON:  Objection.

23              THE WITNESS:  You know some people

24    don't follow doctor's orders.  I can't speculate to

KENNETH COLE

Page 100

1    say what I would have did back then.

2    BY MR. WILLIAMS:

3         Q.    You would have not followed doctor's

4    orders under some circumstances?

5              MS. BREWINGTON:  Objection.

6              THE WITNESS:  I don't know.

7    BY MR. WILLIAMS:

8         Q.    Your lost salary, which I understand to be

9    the difference between the salary you earned and the

10   salary you think you should have earned, what salary

11   do you think you should have earned and for what

12   period of time?

13             MS. BREWINGTON:  Objection.  He

14   already answered that he wasn't sure.

15   BY MR. WILLIAMS:

16        Q.    What salary do you think you should have

17   earned and for what period of time?

18        A.    It's like I said before, that there are

19   three or four -- number 1, is when I grieved the

20   promotion of Paul Morris.  I'm not sure when he was

21   promoted.  And I'm not sure if when they said he was

22   -- the promotion was just rescinded.  I'm not sure if

23   that was the date that it was rescinded.

24             So until we can legally find out --

KENNETH COLE

Page 101

1    find out what occurred and when it started and when

2    it terminated, then as far as making an evaluation

3    and the calculation of what that income should be.

4            If -- all I know is, it was supposed

5    to be rescinded, and he went on to other positions.

6            That's -- the situation I gave was we

7    were standing with UBMS, my coworker and myself, and

8    we weren't offered the acting position as the Program

9    Manager, Brigitte Brown or myself.  That's what I

10   felt was retaliation.  We were both qualified.

11       Q.   Your claim of emotional, mental and

12   psychological injuries --

13       A.   That's not me.  I'm claiming no

14   psychological.  That's --

15       Q.   Turn to page 9 of your Answers to

16   Interrogatories.

17            Question 8, top of the page, describe

18   in detail any and all emotional, mental and/or

19   psychological injuries you encountered due to conduct

20   of Defendant.

21            Answer:  Plaintiff has suffered mental

22   anguish, degradation and humiliation.

23       A.   I'm sorry.  What number is that?

24       Q.   Page 9, paragraph eight.

KENNETH COLE

1      A.    Okay.  I agree with that.

2      Q.    You have received no treatment from any

3  physician, psychologist, psychiatrist or other

4  healthcare provider for the mental anguish,

5  degradation and humiliation you claim to have

6  suffered; is that correct?

7      A.    Correct.  That is correct.

8      Q.    Describe to me the physical manifestations

9  of this mental anguish, degradation and humiliation

10  claim?

11            How has it physically manifested

12  itself?

13      A.    The physical -- humiliation is something

14  you experience or you go through.  Degradation is

15  something you feel degraded, not necessarily for

16  medical treatment.  You don't need -- I don't think

17  you need medical treatment.

18            I tend to be a strong individual.  I

19  tend to not need medical treatment, but I still feel

20  humiliated.

21      Q.    But, actually, that wasn't my question.

22  So let's go back to my question so we can get an

23  answer to my question instead of the response you

24  gave.

KENNETH COLE

Page 103

1          My question is, what physical

2    manifestations, if any, are there of this mental

3    anguish, degradation and humiliation?

4          A.    I can't think of any.

5          Q.    Have you been treated by any kind of a

6    physician, healthcare provider, or any physician

7    other than the illness that you --

8          A.    None.

9          Q.    -- described in August of 2002?

10         A.    None.

11         Q.    And I assume that that illness was

12   unrelated to anything that happened as alleged in

13   this lawsuit?

14         A.    Correct.  Yes.

15         Q.    If you turn to page 10, paragraph 11 at

16   the bottom --

17         A.    Uh-huh.

18         Q.    -- you talk about the fact that you filed

19   three grievances.  Those grievances all related to

20   what we've been referring to as Paul Morris'

21   promotion, did they not?

22         A.    Yes.

23         Q.    Page 11, paragraph 13, which asks you to

24   describe in detail every action taken by the

KENNETH COLE

Page 104

1   Defendant which you claim was motivated by an intent

2   to discriminate on the basis of race.

3              You talked about the promotion of Paul

4   Morris.  We've already talked about that.

5              You also talked about the acting

6   position of Jacquita Wright Henderson.  In what way,

7   first of all, was that an action that, in your view,

8   that was motivated by an attempt to discriminate on

9   the basis of race?

10       A.    Yes, and retaliation.

11       Q.    In what way did it discriminate against

12   you on the basis of race?

13       A.    I think that it's the same system of Ann

14   and Sue, placed a black person over the UBMS group

15   which are primarily black.

16       Q.    So placing a black person over that group

17   was an act of discrimination against you on the basis

18   of your race?

19       A.    No, that's not what I'm saying.  I'm

20   saying that there's -- I think that the

21   discrimination was covert.  The retaliation was

22   overt.  The discrimination came from Ann and Sue, the

23   system, using a black person to put in a position

24   over qualified applicants sitting in place.  We were

KENNETH COLE

Page 105

1   qualified.  She's qualified.  I'm qualified.

2              So what better way to strategically

3   put somebody over a group, then to do it that way.

4        Q.   So in that case the college should have

5   avoided discriminating against you by placing a white

6   person in that position?

7        A.   No, the college should have offered

8   Brigitte Brown or myself an opportunity to act in

9   that position.

10       Q.   Are you saying that you're more qualified

11  than Jacquita Wright Henderson now?

12       A.   I felt I'm more qualified, yes, at that

13  time.

14       Q.   So the only decision the college could

15  make which, in your view, was not discrimination

16  basically was to promote you or Brigitte Brown?

17       A.   I'm sorry.

18       Q.   The only decision the college could make

19  that was not, in your view of the world be based upon

20  discrimination basically would have been to promote

21  you or to promote Brigitte Brown?

22       A.   That's the choice they made.  I'm not

23  saying it's the only decision.  I'm just saying,

24  that's the choice that they made.

KENNETH COLE

Page 106

1        Q.   Other than that choice of placing you or

2   Brigitte Brown in the acting position, how could the

3   college, in your view, have avoided discrimination

4   against you on the basis of race in making the

5   decision of who was going to have the acting

6   position?

7        A.   I think that the college should have

8   offered, and if you look at other situations at the

9   college where a certain person that's existing and

10  when it creates a vacancy, this person moves up to

11  become acting in Educational Talent Search, for

12  instance.  Why wasn't it offered to, an acting

13  position, to Brigitte Brown or myself.

14       Q.   So anything but that decision

15  discriminated against you on the basis of race, no

16  matter who was placed in that position?

17                  MS. BREWINGTON:  Objection.

18  BY MR. WILLIAMS:

19       Q.   Is that your position?

20       A.   My position is Sue and Ann retaliated

21  against the UBMS group and placed -- strategically

22  placed Ann -- I mean, placed Jacquita Wright

23  Henderson over us as an acting.

24       Q.   Mr. Cole, the next Interrogatory asks

KENNETH COLE

Page 107

1    about retaliation.  That's not what this question

2    asked.

3         A.    Okay.

4         Q.    It asked about an intent to discriminate

5    on the basis of race, not on the basis of

6    retaliation.

7               I'm trying to understand how the

8    college could have avoided, in your view,

9    discrimination on the basis of race in making this

10   decision?

11        A.    I think the college should have offered

12   Brigitte Brown or myself the position of acting

13   Program Manager for Upward Bound Math Science.

14        Q.    And any other decision, including placing

15   a black employee in the acting position resulted in

16   discrimination on the basis of your race?

17              Any decision other than placing you or

18   Brigitte Brown equals discrimination on the basis of

19   race?

20        A.    I'm looking at the evidence at that time,

21   what occurred at that time.  If it was a different

22   circumstance where I felt that there weren't any

23   retaliation and other issues that were previous to

24   that, then placing anybody -- I mean, placing

KENNETH COLE

1    Jacquita or someone else, I just felt that we were

2    both qualified.  Why weren't we afforded the

3    opportunity to be acting.

4        Q.    And you think it was because of your race;

5    that's why you weren't afforded the opportunity?

6        A.    Absolutely.  I said, I felt it was covert.

7        Q.    Let me approach it this way:  The college

8    could have avoided discriminating against you on the

9    basis of your race, by placing you in the acting

10   position.  That's one way the college could have

11   avoided racial discrimination, correct?

12       A.    I'm qualified, yes.  She's qualified, yes.

13       Q.    And the other way the college could have

14   avoided discrimination against you on the basis of

15   race is by placing Brigitte Brown in the acting

16   position?

17       A.    Yes, minimize any charges.

18       Q.    Tell me what other way could the college

19   have avoided discriminating against you on the basis

20   of your race other than the two ways that I've given

21   you previously?

22       A.    I don't understand your specific question.

23   Help me out here, ask that again.

24       Q.    Anything other than placing you in the

KENNETH COLE

1  acting position or placing Brigitte Brown in the

2  acting position would discriminate against you on the

3  basis of your race?

4      A.   I'm looking at that particular point in

5  time.

6      Q.   Is the answer to my question yes?

7      A.   I'm looking at that particular point in

8  time.

9      Q.   Tell me how else the college could have

10 avoided discriminating against you on the basis of

11 race.

12     A.   Promoted Brigitte Brown -- I'm sorry, I'm

13 not familiar, strike.

14          Place Brigitte Brown in --

15     Q.   You don't get to say strike.  Just the

16 lawyers get to say that.

17     A.   Place Brigitte Brown in the acting

18 position or Ken Cole in the acting position.

19     Q.   And the next thing you talked about in an

20 Answer to Interrogatory 13 is the promotion of Andrea

21 Collins.  Do you see that?

22          MS. BREWINGTON:  Andrea Coleman.

23          THE WITNESS:  No, she's --

24          MS. BREWINGTON:  Oh, so it is Collins?

KENNETH COLE

Page 110

```
 1              THE WITNESS:  It's Coleman and, then

 2    Collins.

 3    BY MR. WILLIAMS:

 4         Q.   At that time maybe her name was Coleman.

 5    Now, it's Collins.

 6              But you refer to the promotion of

 7    Andrea Coleman?

 8         A.   Absolutely.  I don't know.  I don't know

 9    whether it was a promotion, but, yes.

10         Q.   Did you apply for that position?

11         A.   I'm not even sure if it was posted.

12         Q.   Did you apply for that position?

13         A.   I'm not sure if it was posted.  How can I

14    apply for something if it's not posted?

15         Q.   Well, either you applied or you didn't

16    apply.  Did you apply for the position?

17         A.   What position are you talking about?  I'm

18    sorry, but --

19         Q.   You complained --

20         A.   She came over -- Andrea Coleman Collins

21    came over, a lateral move.  It wasn't posted that I

22    knew of.

23         Q.   Did you apply for the position?  My

24    question isn't, was it posted.  Did you apply for the
```

KENNETH COLE

1  position?

2      A.   Oh, at any time?

3      Q.   Yes.

4      A.   No.  I'm sorry.

5      Q.   The next page, page 12, paragraph 15, asks

6  you to describe in detail each of the promotions and

7  transfers referred to in paragraph 75 of the

8  Complaint.

9          The first question is the Paul Morris

10 situation.  The second one is Jacquita Wright

11 Henderson, which we've talked about.  Andrea Coleman,

12 which we've talked about and Roseanna Brown-Simmons

13 was transferred without offering the position to the

14 Plaintiff.

15         How was the college supposed to know

16 that you had an interest in a full-time position?

17     A.   They're not.  They're supposed to post it

18 or place a person in an acting position from six

19 months to a year, depending on their -- I mean, this

20 is based on the policies.

21     Q.   The fact is that during your employment by

22 the college, you never did anything which

23 communicated to management officials a desire to hold

24 a full-time position?

KENNETH COLE

Page 112

1        A.   I don't discuss my personal goals with --

2    go on up and discuss it with -- I don't know what you

3    mean by management, but --

4        Q.   Well, let's start here.  You never held a

5    full-time position.  You always held a part-time

6    position, correct?

7        A.   Yes.

8        Q.   And you made it known that you had a

9    business interest outside of your part-time position

10   with the college; that was known?

11       A.   In addition to interest in Special

12   Programs Director.

13       Q.   You never applied for a full-time position

14   in all your years at the college?

15       A.   No.

16       Q.   Who would testify to verify that you had

17   suffered this emotional pain and humiliation and

18   degradation?

19       A.   Brigitte Brown.

20       Q.   Who else?

21       A.   REDACTED                  .

22       Q.   Who else?

23       A.   I think that's about it that I can think

24   of.

KENNETH COLE

1          Q.    Incidentally, I'm correct, or am I correct

2    in my understanding that Jacquita Wright Henderson,

3    Andrea Coleman, now Collins, and Roseanna

4    Brown-Simmons are all African American?

5          A.    Yes.

6          Q.    After you moved to the Room 408, did you

7    call the Fire Marshal?

8          A.    No.

9          Q.    Were you aware of the fact that the Fire

10   Marshal inspected Room 408?

11         A.    Yes, but I'm not sure -- I know I heard it

12   again yesterday, but I'm not sure when I heard it

13   again prior to yesterday.

14         Q.    Has there been a determination by anyone

15   outside the college that there is a safety problem

16   with Room 408?

17         A.    Has it been determined by anyone?

18         Q.    Yes.

19         A.    Well, I heard it through testimony, and

20   I'm not sure where I heard it, but -- oh, yes, the

21   Department of Labor.  I think it was submitted to the

22   Department of Labor.

23         Q.    What was submitted to the Department of

24   Labor?

KENNETH COLE

1      A.   The -- whatever you asked me.  You asked

2  me -- I think you asked me if the results of the Fire

3  -- the Fire Inspector's results, were they -- did I

4  see the documentation of the findings.

5      Q.   Well, that was two or three questions ago.

6  The question that's pending now is, are you aware of

7  any agency outside the college which has determined

8  that there's a safety issue with Room 408?

9      A.   That there is a safety issue?

10      Q.   Yes.

11      A.   No.

12      Q.   In Room 408 you have furniture?  You have

13  a desk and a chair?

14      A.   Yes.

15      Q.   Computer?

16      A.   Yes.

17      Q.   What other equipment is in that room?  Fax

18  machine?

19      A.   No, there's no fax machine.

20      Q.   Is that in the side office, the small side

21  office?

22      A.   No, we don't utilize that.

23      Q.   Is there a fax machine there?

24      A.   I'm not so sure any more because it

KENNETH COLE

Page 115

1   doesn't have a dedicated fax line, so we have to go

2   to Room 430.

3          Q.   But you have your own computer?

4          A.   Yes.

5          Q.   Phone?

6          A.   Yes.

7          Q.   The equipment that you have is similar to

8   the equipment that other TRIO employees have?

9          A.   Yes, I think we may have a little bit

10  more.  I think we have a scanner that Ms. Brown was

11  using.

12         Q.   Is there sufficiently lighting in the

13  room?

14         A.   Yes.

15         Q.   It is, in fact, a room.  It's not --

16  you're not sitting out in the hallway?

17         A.   Say again.

18         Q.   It is, in fact, an enclosed room.  You're

19  not sitting out in the hallway?

20         A.   Right.

21         Q.   There are two doors in and out?

22         A.   Yes.

23         Q.   It's your belief, obviously, that Room 408

24  is an uncomfortable place to work?

KENNETH COLE

1      A.    I'm sorry.  Repeat that, please.

2      Q.    Is it your belief that Room 408 is an

3  uncomfortable place to work?

4      A.    Yes, absolutely.  It's just -- that's just

5  a light term.  Yes, no doubt about it.  I think it's

6  a little bit stronger than uncomfortable, but.

7      Q.    Have you ever been disciplined by the

8  college?

9      A.    No.

10      Q.    Have you been threatened with termination?

11      A.    Yes.

12      Q.    That was in connection with the medical

13  documentation?

14      A.    Yes.

15      Q.    The numbers of hours you were working per

16  week, did that change as a result of your move to

17  408?

18      A.    Direct result, it has changed.  My hours

19  have changed.

20      Q.    The start time?

21      A.    The start time.  I don't understand your

22  question.

23      Q.    The starting time of your hours is that

24  what has changed?

KENNETH COLE

Page 117

```
 1        A.   Yes.

 2        Q.   The move to Room 408 did not result in the

 3   loss of salary or pay?

 4        A.   No.

 5        Q.   As a part-time employee, do you receive

 6   benefits?

 7        A.   No.

 8        Q.   Did you receive benefits before you were

 9   moved to Room 408?

10        A.   No.

11        Q.   Did your title change as a result of the

12   move?

13        A.   No.

14        Q.   Did your responsibilities change?

15        A.   No.

16             MR. WILLIAMS:  Give me a few minutes

17   and I'll check through and make sure I don't have any

18   other questions.

19             MS. BREWINGTON:  That's fine.

20             (Recess)

21   BY MR. WILLIAMS:

22        Q.   Mr. Cole, are you able to point to or

23   refer me to any document which indicates that

24   Jacquita Wright Henderson was acting Program Manager?
```

KENNETH COLE

Page 118

1          You said that in your Complaint and

2    Answers to Interrogatories.

3          A.    Not in your -- I don't know if it's in

4    your possession, but I have -- there are monthly

5    reports that we are to fill out.  And she did it --

6    the PM is supposed to do it just like the SEC, the

7    Student Enrichment Coordinator's office.

8               So there are monthly reports that

9    would show that she was in that acting position.

10         Q.    Monthly reports that you filled out, or

11   that she filled out?

12         A.    No, that she -- she did.

13         Q.    Do you have those in your possession?

14         A.    They would be at the office at Del Tech in

15   the Monthly Report Book.

16         Q.    Do you have those in your possession?  I

17   just need a yes or no.

18         A.    Yeah, I guess I have them.  I'll make

19   copies.

20         Q.    Can you provide that, at least samples of

21   those reports to your counsel?

22         A.    Yes.

23         Q.    Isn't it a fact that the acting position

24   which she held was the position of Acting Assistant

KENNETH COLE

Page 119

```
 1   Director of CCP?

 2               And by her I mean Jacquita Wright

 3   Henderson.

 4      A.   We were told, and I'm quite sure that she

 5   mentioned a couple times, and the instructors and the

 6   summer staff and UBMS, Brigitte, Liz Wilson and

 7   myself, she was kind of -- it was announced or she

 8   identified herself as the Acting Program Manager for

 9   UBMS.

10      Q.   You're saying that Jacquita Wright

11   Henderson announced -- or described herself that way?

12      A.   Yes, she came into the office and she

13   announced that she was the acting UBMS Program

14   Manager.

15      Q.   Who replaced Ann Del Negro when she left

16   to go to Georgetown?

17      A.   Who replaced Ann Del Negro.  To my

18   recollection there was a cascade effect.  When Ann

19   left, Jacquita Wright Henderson was made Acting

20   Director to CCP.  That created a vacancy and, then I

21   think Paul was made Acting Department Chair of TRIO,

22   whatever position he had, and that created a vacancy

23   and, then Roseanna Brown Simmons was made acting in

24   Educational Talent Search.
```

KENNETH COLE

Page 120

```
1        Q.   Wasn't Jacquita Wright Henderson Acting

2   Assistant Director of CCP during the last year or so

3   when   REDACTED        was the Program Manager?

4        A.   I'm sorry.  Would you repeat that.

5        Q.   Wasn't Jacquita Wright Henderson the

6   Acting Assistant Director of CCP during the last year

7   or so when   REDACTED       was Program Manager of

8   UBMS?

9        A.   Well, I don't know the dates, but I do

10  know that it was announced to us that she was the

11  Acting Program Manager for Upward Bound Math Science

12  right around February of '04, because  REDACTED        ,

13  which we were was under the impression that she

14  resigned February 5th, 2004.

15               And sometime thereafter -- because she

16  would go with us to the -- a few times to schools,

17  ride with us in the car, the State car, to go to the

18  school.

19               And whatever title she had, all I know

20  is that it was announced to us that she was the

21  Acting Program Manager, and the monthly reports show

22  the time that's dedicated to the UBMS Program.

23       Q.   Isn't it also a fact that a few months

24  after   REDACTED        left in 2004, the UBMS Program
```

KENNETH COLE

Page 121

1    Manager position was posted?

2         A.    Yes.

3         Q.    And you didn't apply?

4         A.    No.

5         Q.    Did you ever submit a request to be

6    transferred?

7         A.    No.

8         Q.    Was it your understanding that the college

9    transferred employees who expressed an interest in

10    being transferred?

11         A.    I'm sorry.  Repeat that.

12         Q.    Well, is it your understanding that the

13    college transferred people who volunteered to be

14    transferred as opposed to involuntarily transferred

15    people?

16         A.    To be honest with you, it's so

17    inconsistent, I don't know.  I know that that's

18    policy, but I see violations of it, of the policy,

19    when it comes to transfer versus acting versus

20    promotion.

21         Q.    Is it your understanding of the policy

22    that an employee submits a transfer request and, then

23    the college, if it chooses to do so, acts upon that

24    request?

KENNETH COLE

Page 122

1        A.   I don't know.

2        Q.   In any event, you never submitted such a

3   transfer request?

4        A.   No.

5        Q.   And if Andrea Coleman submitted a transfer

6   request, and was transferred as a result of that

7   request, you wouldn't be in a position to dispute

8   that one way or the other, would you?

9        A.   No, but I still felt that it was --

10  regardless of how it came about, it placed a person

11  over UBMS, and I felt that we were qualified and that

12  we should have been afforded the opportunity to act

13  in the position.

14       Q.   Even though you didn't submit a transfer

15  request?

16       A.   I didn't say, transfer.  I said, acting in

17  that position.

18       Q.   Well --

19       A.   Jacquita Wright Henderson was afforded the

20  opportunity to act in her position.

21                    REDACTED              was afforded the

22  opportunity to act in her position.

23            Paul Morris was afforded the

24  opportunity to act in his position.

KENNETH COLE

Page 123

```
 1              Why wasn't any Upward Bound members

 2    afforded the opportunity to act in their position?

 3         Q.    You complained about Andrea Collins'

 4    transfer?

 5         A.    Yes.

 6         Q.    She submitted a transfer request.  You did

 7    not?

 8              MS. BREWINGTON:  Objection.  Asked and

 9    answered.

10    BY MR. WILLIAMS:

11         Q.    Is that correct?

12         A.    I didn't.  I can only speak for Ken.  No,

13    I didn't submit one, and I answered that already.

14         Q.    Roseanna Brown Simmons, same thing.  If

15    she submitted a transfer request and it was granted,

16    you didn't submit a transfer request?

17         A.    You can submit any mechanism you want to,

18    but we weren't afforded the opportunity.

19         Q.    Well, in other words, you expected the

20    college to know that you wanted to be transferred

21    even though you didn't request to be transferred?

22              MS. BREWINGTON:  I'm going to object

23    to that as argumentative.

24              MR. WILLIAMS:  I have no further
```

KENNETH COLE

1    questions at this time.

2            I'm not sure what's -- I think we have

3    woefully incomplete Answers to Interrogatories and

4    discovery.  I don't know what's going to happen with

5    that, but I reserve the right to recall the witness

6    depending upon what the Court does with that issue,

7    as I did yesterday.

8            (Signature not waived)

9            (Whereupon, the deposition was

10   concluded at 4:40 p.m.)

11

12           I HAVE READ THE FOREGOING DEPOSITION,

13   AND IT IS TRUE AND CORRECT TO THE BEST OF MY

14   KNOWLEDGE.

15

16           _____

17           KENNETH COLE

18

19

20

21

22

23

24

**Corbett Ⓔ Wilcox**

The Team to Trust in Court Reporting

1400 N. French St., Wilmington, DE 19801
phone 302.571.0510  fax 302.571.1321
15 North Street,Dover. DE 19901
phone 302.734.3534  fax 302.734.3552

e-mail: info@corbettreporting.com

Ellen Corbett Hannum – President
June E. Griffith – Business Manager

### Errata Sheet

Attach to the deposition of: _Kenneth Cole_

In the Matter of: _Cole & Brown v. Del. Tech_

Date of Deposition: _Feb. 7, 2006_ _____ Reporters initials: _____

**Instructions:** After reading the transcript of your deposition, please note any changes or corrections and the reasons therefor on this errata sheet. Please _sign_ and _date_ the errata sheet and _return a copy to our offices. Attach the original errata to the original transcript._ Thank You.

| Page & Line | Change/Correction | Reason |
|---|---|---|
| 122   #1 | Roseanna Henderson/Rosanna Brown Simmons | To correct the name, |
| Highly Confidential 3    12 | AGRA / EDGAR | To correct the name, |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I have read the foregoing transcript of my deposition and, except for any corrections or change noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Date: _3-6-06_  Signature: _Kenneth Cole_

Sworn to and subscribed before me this _9th_ day of _MARCH_ 2006

Notary: _____

TIMOTHY J. WILSON, ESQ.
NOTARY PUBLIC
DELAWARE ATTORNEY
ID # 4323
DELAWARE ATTORNEY AT LAW

KENNETH COLE

Page 125

```
 1                      INDEX

 2          Deposition of KENNETH COLE

 3            Date:  February 7, 2006

 4   Examination of:               PAGE

 5   Kenneth Cole

 6   (By Mr. Williams)               2

 7                    EXHIBITS

 8   NAME           DESCRIPTION       PAGE

 9   No. 1          Copy of Complaint    42

10   No. 2          Response to Interrog.    42

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

KENNETH COLE

Page 126

1                  C E R T I F I C A T I O N

2              I, TANYA M. CONGO, Certified Shorthand

3    Reporter, certify that the foregoing is a true and

4    accurate transcript of the foregoing deposition, that

5    the witness was first sworn by me at the time, place

6    and on the date herein before set forth.

7              I further certify that I am neither

8    attorney nor counsel for, not related to nor employed

9    by any of the parties to the action in which this

10   deposition was taken; further, that I am not a

11   relative or employee of any attorney or counsel

12   employed in this case, or am I financially interested

13   in this action.

14   _Tanya Congo_____

15   Tanya M. Congo

16   Certified Shorthand Reporter and Notary Public of the

17   State of Delaware, #189-PS

18

19

20

21

22

23

24