

DEFENDANT'S
EXHIBIT

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF DELAWARE

KENNETH COLE,    )
        )
  Plaintiff,    )  C.A. NO. _____
        )
    v.     )
        )  JURY TRIAL DEMANDED
DELAWARE TECHNICAL AND )
COMMUNITY COLLEGE,  )
        )
  Defendant.    )

## COMPLAINT

### INTRODUCTION

1.  This is a Complaint brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, codified as 42 U.S.C. § 2000(e) et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) and 42 U.S.C. § 1981.

### PARTIES

2.  Plaintiff, Kenneth Cole (hereinafter "Plaintiff"), is and was at all times relevant to this Complaint, a resident of the State of Delaware, residing at 3102 Wilmont Drive, Wilmington, Delaware 19810.

3.  Defendant, Delaware Technical & Community College (hereinafter "Defendant"), is a statewide institution of higher education, i.e., a local community college, providing academic, technical, continuing education, and industrial training, and at all times relevant to this Complaint, the employer of Plaintiff Kenneth Cole. Defendant is subject to service of process through Delaware Technical & Community College; c/o Larry Miller, Office of the Campus Director, 333 Shipley Street, Wilmington, Delaware 19801.

## JURISDICTION

4.      Jurisdiction is founded on the existence of a question arising under federal statutes. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., as amended by the Civil Rights Act of 1991, 42 U.S.C. § 704(a) of Title VII of the Civil Rights Act. The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights secured by federal and state law which prohibits discrimination against employees because of their race.

5.      The state law claim regarding the breach of the implied Covenant of Good Faith and Fair Dealing is brought pursuant to the pendant jurisdiction of this Court.

## FACTUAL BACKGROUND

6.      Plaintiff was hired by Defendant as a part-time Student Enrichment Coordinator for the Upward Bound Math and Science Program (hereinafter "UBMS") at the Wilmington, Delaware campus in or around November 1999. Plaintiff has been continuously employed by Defendant for approximately five (5) years.

7.      When Plaintiff began his employment, Defendant had three (3) federal-grant TRIO programs: the Educational Talent Search Program, managed by Mr. Paul Morris, a Caucasian; the Upward Bound Classic Program, managed by Ms. Kate Sullivan, a Caucasian female; and the Upward Bound Math and Science Program, managed by Ms. Rosetta Henderson, an African-American female.

8.      In or around February 2001, a proposal was introduced by Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs, to move the Upward Bound Classic Program staff into the offices that were occupied by Plaintiff and the other members of the Upward Bound Math and Science Program. In turn, Plaintiff's

department would be relocated from their offices to the cubicles that were occupied by the Upward Bound Classic Program personnel. Plaintiff was informed that the reason for the move was to bring the TRIO programs together.

9.      Disappointed, and somewhat surprised by the announcement that they would potentially be losing their offices, Plaintiff and the other members of his department requested a meeting with Ms. Ann Del Negro, Assistant Director of Corporate and Community Programs for Defendant.

10.      As a result of that meeting, the move was halted; instead, only Ms. Tonia Conley, Student Enrichment Coordinator with the Upward Bound Classic Program, was relocated next to her Program Manager, Ms. Kate Sullivan.

11.      In or around July 2002, Mr. Paul Morris, a Caucasian, Program Manager for Educational Talent Search, was promoted to Special Program Director, a position that oversees all of the TRIO Programs, including Plaintiff's.

12.      On or about August 7, 2002, Plaintiff sent an e-mail to Mr. Morris regarding some of his concerns and issues and asked if they could meet to discuss same.

13.      On or about August 8, 2002, Morris went to Plaintiff's office to speak with him about the impending move, and informed Plaintiff that the move was his [Morris'] decision and was going to go forward despite Plaintiff's opposition to same.

14.      On or about August 12, 2002, Paul Morris met with Plaintiff and the other members of his department and informed them that he had unilaterally made a decision to relocate the Upward Bound Math and Science Program from their current multiple offices to the single office that had been occupied by the SOAR Program.

15.     That same day, Plaintiff and the other members of his department visually surveyed the office space they were being forced into, and determined that it was completely inadequate to house two (2) full time employees, one (1) part time employee, two (2) student co-ops, student participants, visitors, files and equipment and other resources.

16.     Specifically, Plaintiff's new office space was approximately thirty-six (36) square feet less than what his department had in its original office space, a decrease from a combined total of 211 square feet to 175 square feet. In fact, Plaintiff's office space was so much smaller that partitions could not even be set up in the room.

17.     On or about August 13, 2002, the UBMS team (Plaintiff, Ms. Brigitte Brown, and Ms. Liz Wilson) met together to discuss the proposed move and the fact that they believed there were being unfairly discriminated against and treated differently from the other TRIO programs when they were forced into a smaller, single office.

18.     After speaking with their Program Manager, Plaintiff and the remaining UBMS staff prepared an agenda to discuss with management; the agenda was submitted via e-mail to Ms. Sue Zawislak, a Caucasian, and Defendant's CCP Director, on or about August 14, 2002.

19.     In response to their concerns, the UBMS group was later told by Mr. Paul Morris to "put it in black and white" and to "explain where it stated in [their] job description that [they couldn't be moved]." Plaintiff and his colleagues were eventually granted a meeting with upper management (Paul Morris and Ann Del Negro) on or about August 29, 2002, just two (2) working days before the proposed move.

20.     On or about August 29, 2002, the UBMS staff met with Ms. Ann Del Negro and Paul Morris.  Plaintiff and his group tried to explain that the proposed move would affect employee relations, morale and productivity, not to mention, the small space would make it extremely difficult to protect students' privacy which was necessary.

21.     The office that the UBMS Group was being forced to move into had been Ann Del Negro's former single office;  it was an office with only two wall sockets as it designed for occupancy by only one individual.  Instead, Defendant was putting the three (3) African-American members of the UBMS Program into a small, inadequate office space, despite their previous objections and their complaints that this move was discriminatory in nature.

22.     Ann Del Negro got very upset and expressed her feelings to the UBMS Group of how disappointed she was that they felt their move would affect employee relations, morale and productivity.  Plaintiff and the rest of the UBMS staff went on to explain how they felt that they were being treated unfairly and unequally and that they believed that there were ulterior motives for the move.  Plaintiff explained that by putting all three people in such a small, confined space, they felt as if they were being punished.

23.     Plaintiff and the rest of his group informed Del Negro that they felt the move was partially motivated by a conflict that existed between Ms. Kate Sullivan, a Caucasian employee and Ms. Tonia Conley, an African-American employee, and that Plaintiff's UBMS Group, which was comprised of all African-American employees, was subjected to relocation as a result of this conflict, despite the fact that they had provided reasonable alternatives to avoid the move.

24.     By the end of the meeting, Del Negro decided that the move would still continue as scheduled, never having addressed the group's issues of being punished, being discriminated against, being treated unfairly and unequally, and the effect that this move would have on employee relations, morale and productivity.  Plaintiff left the meeting feeling that his concerns were unheard.

25.     On Tuesday, September 3, 2002, the day before the move, Plaintiff went to Human Resources and met with Cara J. Stanard, Human Resource Specialist, to discuss the "move" and asked her to schedule an urgent meeting with Dr. Connie Winner, Assistant Campus Director, in an effort to file an additional complaint and hopefully halt the move which was scheduled for the next day.

26.     On September 4, 2002, the move was to take place, but it did not, presumably as a result of Plaintiff's complaint to Dr. Winner.  Instead, maintenance men were sent around to measure Plaintiff's group's offices.  As the maintenance crew was measuring, Ann Del Negro, Assistant Director of CCP, arrived and took over the job of measuring the office spaces herself.

27.     On September 5, 2002, Plaintiff filed a grievance against Ms. Zawislak, Director of CCP, alleging, *inter alia*, personal discrimination, and regarding Paul Morris's promotion to Special Program Director, which Plaintiff believed to be in violation of Defendant's Personnel and Policy Manual.  Plaintiff further alleged in his grievance that he was never afforded the opportunity to apply for the position because Defendant failed to properly post the position.

28.     On September 5, 2002, Sue Zawislak and Ann Del Negro called for Plaintiff, Liz Wilson, secretary, and the other members of the UBMS group for separate,

individual meetings at different times to discuss the proposed "move". Zawislak and Del

Negro refused to believe Plaintiff, or even investigate his allegation that there was a

conflict between Kate Sullivan and Tonia Conley that may have been the driving force

behind the loss of their office space. Plaintiff's meeting, however, was put off until the

following day, September 6, 2002.

29.     During those meetings, Plaintiff, along with the other members of his

team, introduced clear alternatives to their proposed move. He gave Zawislak and Del

Negro the measurements of their office spaces compared with the measurements of the

proposed new office space. Zawislak insisted in the meeting that the proposed move was

due to downsizing and because of allocation of space, and insisted that the move made

sense, which was once again in direct contradiction to what Paul Morris said; that the

move was his "vision" to have the TRIO Programs together.

30.     The proposed move consisted of moving eight (8) people as opposed to

the alternative proposed by Plaintiff and his department which involved moving only two

(2) people, and simultaneously achieving the same goal of having the TRIO programs

together as well as achieving more cost effectiveness overall. Despite his best efforts,

Plaintiff could not convince Defendant to entertain his suggestions.

31.     In the end, the individual meetings came across as a "witch hunt;" Plaintiff

felt intimidated, interrogated and that Defendant was on a search and destroy mission.

Plaintiff also felt as if he was being talked down to and belittled because he was African-

American, and that nothing he said made any difference. Most of Plaintiff's answers to

Defendant's questions were turned around and restated.

32.    On or about September 9, 2002, subsequent to Plaintiff's grievance filed on September 5, 2002 alleging that Morris was improperly placed in his position, Zawislak issued a memorandum via e-mail on September 11, 2002, dated September 9, 2002, entitled "CCP August Update Revision" which stated that Morris was "reclassified" to Special Programs Director, "not promoted," as a pretext to hide Defendant's discriminatory motive.

33.    On or about September 12, 2002, in another attempt to prevent the loss of his office space, Plaintiff once again met with Zawislak and Del Negro to present alternatives to the move, which included graphical representations of cost analysis, resources, computer equipment, telecommunication equipment needs, and the anticipated loss of productivity, to no avail.

34.    On or about September 19, 2002, Plaintiff received an e-mail from his Program Manager, Ms. Rosetta Henderson, stating that Zawislak informed her [Henderson] that Plaintiff's work hours began at 8:30 a.m. and not 8:00 a.m., as they had been since his date of hire in 1999.  Plaintiff's hours had consistently been 8:00 a.m. to 2:00 p.m., but for some unknown reason, Zawislak informed Henderson that Plaintiff's hours were to be from 8:30 a.m. to 2:30 p.m.  Plaintiff believes that his hours were changed in retaliation for the grievance he filed against Zawislak.

35.    On or about October 2, 2002, a meeting took place between Sue Zawislak, Ann Del Negro, and Paul Morris, Plaintiff and the rest of the UBMS team.  Zawislak announced that the UBMS team would still be relocated according to the plan because she had "not heard anything that would change [her] mind."

36.     On or about Monday, October 7, 2002, Plaintiff filed a supplement to his original grievance, alleging Defendant's retaliatory actions, including, but not limited to, the changing of Plaintiff's work hours.

37.     On or about Tuesday, October 8, 2002, Plaintiff, and the other members of the UBMS group reluctantly spent the entire day moving into their new one-room office, room 408 E; a small, open room with inadequate space.  The move required the assistance of five (5) maintenance workers, one (1) telecommunication person and three (3) computer services people to complete.

38.     As a result of being placed into such a small and inadequate workspace, Plaintiff, along with his co-workers Brigitte Brown and Liz Wilson, are subjected to each other's conversations, phone calls and visitors.  There is no privacy whatsoever, which is in direct violation of Defendant's federal grant that requires that each Student Enrichment Coordinator have privacy for confidential communications.  The noise from the shredding machines and electric staplers echoes throughout the small room, which is extremely distracting and counterproductive.  Plaintiff strongly believes that his group has been placed in the confined office space because they are all African-Americans.

39.     Due to the fact that there was not enough space for Plaintiff's department's files, they were instructed by Defendant to use the extra file drawers on the third floor in the CCP office.

40.     Plaintiff feels degraded each day he goes to work.  The UBMS group is subjected to negative comments as Del Tech students walk by his small office.  Often, other employees of Del Tech will come by just to look at Plaintiff's space and comment

on how small it is, causing Plaintiff to feel embarrassed, humiliated and experience stress related symptoms because of this situation.

41.     Also on or about Tuesday, October 8, 2002, Plaintiff, Ms. Brigitte Brown, and Liz Wilson, secretary, received separate letters from Mr. Lawrence Miller, vice president and campus director, stating that Plaintiff had filed a supplement to his grievance stating that upper management was retaliating against Plaintiff's department.

42.     Lawrence Miller asked Plaintiff and the others to respond to his questions concerning Plaintiff's allegations of retaliation by upper management, and to submit their responses by October 15, 2002.  Miller said in his letter that if there were no retaliatory actions directed to them, that he would consider the case closed.

43.     On or about October 15, 2002, Plaintiff and the others submitted their responses to Miller confirming retaliatory actions by upper management.  As of the date of the filing of this lawsuit, Plaintiff has yet to receive a response from Miller.

44.     On or about October 15, 2002, with no other administrative remedy available to him, Plaintiff filed a Charge of Discrimination against Defendant with the Delaware Department of Labor alleging race discrimination and retaliation.

45.     Eventually, upper-management began to scrutinize UBMS Program Manager Rosetta Henderson, reprimanding her for being "unable to control [her] staff."

46.     Plaintiff also began to experience further acts of retaliation from Zawislak. For example, when his doctor ordered reduced work hours, Plaintiff was asked to provide justification for same repeatedly, despite the fact that his previous doctor's notes contained the necessary information.  Plaintiff's hours were questioned, as were the validity and longevity of his necessity for reduced hours and the nature of his medical

condition. Plaintiff was also threatened with termination due to his need for reduced

work hours and occasional absences due to illness, despite documentation from his doctor

justifying same.

      47.    In or around December 2002, Plaintiff and the rest of his department were

also informed that they were not allowed to continue to use the Blanket Travel Requests,

as did all the TRIO programs; instead, only Plaintiff's department was required to submit

separate Travel Requests as needed.

      48.    In or around August 2003, Kate Sullivan, Upward Bound Classic Program

Manager, resigned and went to another job with the State of Delaware. Her position as

Program Manager of Upward Bound Classic was posted internally not long after she left.

      49.    Ann Del Negro became the Director of Corporate and Community

Programs (CCP) at the Del Tech Owens Campus. Ms. Jacquita Wright was promoted to

Del Negro's former position, Acting Assistant Director of CCP.

      50.    Paul Morris became Acting Department Chair of Community and School

Programs, Jacquita Wright's former position. In addition, Morris was formally made

Supervisor over the other TRIO Programs, with the exception of UBMS, which was

assigned to Jacquita Wright, an African-American. Morris was basically offered the

same position that he previously held in the prior year until Plaintiff filed his grievance

regarding Morris' position. Roseanna Brown-Simmons, Student Enrichment Coordinator

of Educational Talent Search, became Acting Program Manager to replace Paul Morris.

      51.    Plaintiff believed that Morris was not made supervisor of his group due to

their complaint, which caused Defendant to separate the programs and put a different

person (an African-American) over the UBMS Program who had no prior experience

with TRIO programs, while Paul Morris oversaw the Upward Bound Classic Program and Educational Talent Search. Plaintiff was once again being treated differently by Defendant, this time with the assignment of his supervisor.

52.    In or around September 2003, the Upward Bound Classic Program Manager position became available. The position was posted internally only. Angi McCloskie, Andrea Coleman and Crystal Heath, the Student Enrichment Coordinators for that program, all applied for the position. Angi McCloskie was subsequently chosen as Program Manager.

53.    Andrea Coleman, who was hired with a special grant for the Upward Bound Classic Program was put in the position of Program Manager for summer youth camps once her grant monies ran out.

54.    In or around November 2003, Plaintiff's Program Manager, Ms. Henderson, went out on sick leave for scheduled surgery. She did not return to work until after the holiday break in January 2004, working part-time for the first couple of weeks.

55.    On or about February 4, 2004, UBMS Program Manager Rosetta Henderson resigned from her position after almost 9 years with Defendant, informing Plaintiff that she just couldn't take it anymore, referring to how she was being treated by Defendant after her employees filed their complaint.

56.    Plaintiff was never asked to become Acting Program Manager, despite his qualifications. Plaintiff had several years of experience and had always received exemplary performance evaluations.

57.    In or around February 2004, Defendant promoted the new Acting Assistant Director of Corporate and Community Programs, Jacquita Wright-Henderson, to the position of Acting Program Manager for UBMS, despite having no TRIO or Upward Bound Math Science experience.

58.    Wright-Henderson's office was four (4) floors lower, so she would spend approximately only 5% of her time upstairs with the UBMS program, especially since she had so many other responsibilities as the Assistant Director of Corporate and Community Programs.

59.    In or around March 2004, the Program Manager's position became available and applications were being accepted for the position until March 29, 2004. Plaintiff had the qualifications outlined in the job description. Plaintiff had been a Student Enrichment Coordinator since November of 1999; he had always received very good evaluations; and he always maintained an excellent rapport with the students, parents and counselors.

60.    To Plaintiff, it seemed only natural for one of the Student Enrichment Coordinators in a TRIO program to apply for and receive the Program Manager position once that manager had left the program. This succession occurred when Kate Sullivan, Program Manager for Upward Bound Classic left, and Angi McCloskie, SEC, became the new Program Manager. It also occurred when Rosanna Brown-Simmons, the Student Enrichment Coordinator for ETS, became acting Program Manager, then applied for and received the position of Program Manager for Talent Search when Paul Morris was made Acting Department Chair of Community and School Programs.

61.    The Delaware Department of Labor investigated Plaintiff's Charge of Discrimination alleging race discrimination and retaliation and found in favor of Plaintiff, finding reasonable cause to believe that violations of Title VII and 19 Del. C. § 711 had occurred. A copy of the Delaware Department of Labor Notice of Reasonable Cause Finding dated July 30, 2004 is attached hereto as Exhibit "A".

62.    In or around late December 2004, before the holiday break, Plaintiff and the rest of the UBMS group were told that a new Program Manager had been hired and that she would start on January 3, 2005.

63.    In January 2005, when the UBMS staff returned from break, they were informed that the new Program Manager decided not to take the position, leaving the Program Manager position vacant once again.

64.    On or about January 26, 2005, Sue Zawislak and Jacquita Wright-Henderson announced in a meeting that Andrea Coleman, an African-American, who had been a former Student Enrichment Coordinator for the Upward Bound Classic Program was transferred into the UBMS Program Manager's position.

65.    Coleman had been managing youth camps for CCP prior to being named the new UBMS Program Manager. Coleman originally applied for Program Manager for her Upward Bound Classic Program in or around October 2003, but was not chosen for the position. Coleman was also hired after Plaintiff; therefore, she had less seniority. Coleman also had no math/science background, and never applied for the position.

66.    Despite having more seniority and years of experience in the Upward Bound Math/Science Federal Trio Program, Plaintiff was denied the opportunity for

advancement to the position of Program Manager, in what Plaintiff believes was

retaliation for his grievances and his complaint with the Delaware Department of Labor.

67. The United States Equal Employment Opportunity Commission ("EEOC")

issued a Notice of Right to Sue Letter on February 2, 2005, received by Plaintiff's

counsel on February 4, 2005, attached hereto as Exhibit "B."

## COUNT I
### (Racial Discrimination)

68. Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1

through 67 by reference as if specifically set forth herein.

69. The practices of Defendant as complained of above, had the effect of

depriving Plaintiff of equal employment opportunities and otherwise affected his

employment because of his race. The practices employed by Defendant were intentional

and were done with malice and/or reckless indifference to the federally-protected rights

of Plaintiff.

70. The practices of Defendant as complained of above caused Plaintiff to

experience conscious pain and suffering and other emotional harm.

71. The practices of Defendant as described above are imputable to Defendant

in violation of 42 U.S.C. § 2000e-2(a) and 3(a).

72. As a direct and proximate result of said acts, Plaintiff has suffered, and

continues to suffer, loss of employment opportunities, loss of income, loss of other

employment benefits, and has suffered, and continues to suffer, distress, humiliation,

great expense, embarrassment and damages to his reputation.

## COUNT II
### (Title VII – Retaliation)

73.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 72 by reference as if specifically set forth herein.

74.     This cause of action arises under Title VII, 42 U.S.C. § 2000e(2)(a).

75.     Defendant intentionally and maliciously discriminated against Plaintiff in retaliation for his complaints in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(2)(a) when it:

       (a)     denied Plaintiff promotions and transfers despite his qualifications;

       (b)     forced Plaintiff to work in a hostile work environment; and

       (c)     forced Plaintiff to relocate to a workspace that was inadequately designed and obviously too small to house Plaintiff and the other members of his department.

76.     Defendant acted with discriminatory motive and the reasons provided by Defendant for failing to promote and/or transfer Plaintiff are pretextual.

77.     As a result of Defendant's unlawful retaliation against Plaintiff, Plaintiff has suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

## COUNT III
### (Failure to Promote)

78.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 77 by reference as if specifically set forth herein.

79.    Defendant denied Plaintiff numerous opportunities for career advancement despite his qualifications.

80.    Defendant denied Plaintiff career advancement opportunities by denying his requests for promotion.

81.    As a result of Defendant's discrimination, Plaintiff suffered a loss of considerable pay: past, present, future and prospective and has suffered humiliation, mental anguish and emotional pain.

82.    Defendant's discrimination was willful, wanton and malicious.    As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

## COUNT IV
### (Breach of the Covenant of Good Faith and Fair Dealing)

83.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs 1 through 82 by reference as if specifically set forth herein.

84.    The actions of Defendant constitute a violation of the *Covenant of Good Faith and Fair Dealing* implicit in every employment agreement.

85.    Defendant breached the *Covenant of Good Faith and Fair Dealing* to Plaintiff by discriminating against him on the basis of his race, and/or based upon retaliatory motives.

86.    Defendant's discrimination was willful, wanton, and malicious.  As a result, Plaintiff is entitled to an award of compensatory and punitive damages.

87.    The above-stated damages were not the result of any act or omission on the part of the Plaintiff.

**WHEREFORE**, Plaintiff, Kenneth Cole, respectfully requests that this Court enter judgment in his favor and against Defendant, Delaware Technical and Community College:

(a)    Declaring that the conduct engaged in by the Defendant to be in violation of Plaintiff's rights;

(b)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide appropriate back pay with pre- and post-judgment interest, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(c)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for non-pecuniary losses, including, but not limited to, pain, suffering, and humiliation, in amounts to be determined at trial, and other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices;

(d)    Issuing a judgment in Plaintiff's favor ordering Defendant to provide compensation for past and future pecuniary losses, in amounts to be determined at trial;

(e)    Issuing a judgment in Plaintiff's favor ordering Defendant to pay punitive damages for its malicious and/or reckless conduct in amounts to be determined at trial;

(f)    Issuing a judgment in Plaintiff's favor ordering the Defendant to pay

the costs of reasonable attorneys' fees and expenses and the costs of

this litigation; and

(g)    Granting such other further relief as this Court deems just and proper.

MARGOLIS EDELSTEIN

Jeffrey K. Martin, Esquire (#2407)
Keri L. Morris, Esquire (#4656)
1509 Gilpin Avenue
Wilmington, Delaware 19806
302-777-4680 phone
302-777-4682 facsimile
jmartin@margolisedelstein.com
Attorneys for Plaintiff Kenneth Cole

Dated: May 5, 2005



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

## NOTICE OF REASONABLE CAUSE FINDING

**RE: Cole v. DE Technical & Community College**          **State Case No.: 0210686**

On October 15, 2002, Mr. Kenneth Cole filed a charge of discrimination against DE Technical & Community College. The Charge of Discrimination is hereby incorporated by reference.

**Reasonable Cause Finding:**
On July 30, 2004 the Department of Labor concluded it investigation and now finds, based on the following facts, that there is reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.    Undisputed Facts:
   1.    Charging Party began his employment in 1999 as a Part-time Student Enrichment Coordinator in the Upward Bound Math/Science Program
   2.    Charging Party is currently employed in the same position.

II.   Disputed Facts:
   1.    Charging Party claims that he endured racial discrimination because of denial of promotional opportunities and allocation of inappropriate office space with his other black similarly situated co-workers.
   2.    Respondent states that Charging Party was not denied a promotional opportunity because the position of a white male, Paul Morris, was re-classified and not upgraded.
   3.    Respondent states that Charging Party and other black similarly situated employees were moved to one office because other employees under the "To The Maxx Program" were terminated when the grant ended, thus leaving a vacant office space. Respondent states that the office move was an effort to group persons employed under particular grants in the same geographical area.

III.  Resolution of Material Facts in Dispute:
   1.    Observation site visit on 4/12/04 revealed that the previous distribution of offices allowed Charging Party and his co-workers to perform effectively in the same geographical area.
   2.    Observation revealed that other white similarly situated workers have their own offices or share offices which allow confidentiality, adequate space and safety conditions unlike Charging Party's office that he shares with his group of black co-workers.
   3.    Observation revealed that one of Charging Party's co-workers was moved to the current space while her old office is currently vacant with boxes.
   4.    Observation revealed that Respondent also has made room for a co-op worker to work in the same office that is already overcrowded and has cramped working conditions (wires in walking areas, draws and file cabinets can open blocking exits).
   5.    Charging Party submitted evidence that the grant did not specifically state that all staff in the Program needed to be in the same office rather than a suite of offices or cubicle style offices to provide privacy for confidential conversations when servicing center participants.
   6.    Charging Party provided evidence that Paul Morris' position was called a promotion and was not posted according to company policy.

EXHIBIT
A

Cole v. DE Technical & Community College
May 12, 2004
Page 2

7.    Charging Party provided corroborated evidence that Mr. Morris' position was rescinded only after Charging Party and Ms. Brown complained that his position was not posted.

8.    Charging Party has provided substantiated evidence that after he complained about his work conditions, he was subjected to changes in his work schedule and his work was scrutinized despite his excellent work performance.

IV.    Resolution:

Charging Party submitted a preponderance of evidence that supported his claim of racial discrimination. Charging Party proved that he suffered adverse actions and his allegations were corroborated by investigative observations and substantial evidence.

The administrative process will now proceed to the conciliation phase pursuant to 19 Del. C. Section 712 (c).

7/14/04
DATE

Brenda Sands
Labor Law Enforcement Officer

7/30/04
DATE

Julie Cutler
Labor Law Enforcement Supervisor

EEOC Form 161-B (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Mr. Kenneth Cole
3102 Wilmont Drive
Wilmington, DE 19810

From: Equal Employment Opportunity Commission
Philadelphia District Office
The Bourse
21 S. Fifth Street, Suite 400
Philadelphia, PA 19106-2515

RECEIVED
FEB 0 4 2005
BY:

[    ]    *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17CA300043 | Legal Unit | 215-440-2828 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ x ]    More than 180 days have passed since the filing of this charge.

[   ]    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[ x ]    The EEOC is terminating its processing of this charge.

[   ]    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ x ]    The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[   ]    The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Marie M. Tomasso, District Director

February 2, 2005
*(Date Mailed)*

Enclosure(s)
Information Sheet

cc:    Jeffrey Martin, Esq for Charging Party
Brian D. Shirey, Esq for Respondent

EXHIBIT
B